## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

In re:

Pure Prairie Poultry, Inc.                                    Case No. 24-32426 KAC

　　　　　　Debtor.                                            Chapter 11 Case

## DECLARATION OF GEORGE PEICHEL
## IN SUPPORT OF CHAPTER 11 PETITION
## AND FIRST DAY MOTIONS

I, George Peichel, declare as follows:

1.　　　I am the Chief Financial Officer and a member of the Board of Directors of Pure Prairie Poultry, Inc. ("Debtor," "Pure Prairie" or the "Company"), formerly known as Pure Prairie Farms, Inc.

2.　　　I submit this Declaration (the "Declaration") to assist the Court and parties in interest in (a) understanding Debtor's operations and capital structure; (b) understanding the circumstances related to the commencement of this Chapter 11 case; and (c) in support of: (i) Debtor's petitions for relief under Chapter 11 of Title 11 of the United States Code filed on the date hereof (the "Petition Date"); and (ii) the relief requested by Debtor in various First Day Motions filed with the Court along with the petition for relief (the "First Day Motions").

3.　　　Based on my position and experience with Debtor, I am familiar with the day-to-day operations, business affairs, assets and liabilities, and books and records of Debtor.  Except as otherwise indicated herein, all facts set forth in this Declaration are based on: (a) my personal knowledge of Debtor's operations and finances; (b) my experience with Debtor; (c) information supplied to me by other members of Debtor's management or by Debtor's advisors; (d)

information obtained from my review of the relevant documents; and (e) information obtained from other sources relating to Debtor's operations and financial condition.

4.      On the date of this Declaration, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

5.      Debtor continues to operate its business and manage its property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner and no official committee of creditors has been appointed in this case.

**HISTORY, OPERATIONS
AND EVENTS LEADING TO THE FILINGS**

**II.      OVERVIEW OF THE BUSINESS**

6.      Debtor is a Minnesota corporation with a principal executive office of 68808 Fort Road, Fairfax, MN 55332-5533.  It was incorporated in the state of Minnesota on June 24, 2019.

7.      Debtor is a poultry producer and operates poultry production plant located at 901 North Main, Charles City, Iowa 50616 (the "Plant").  From its inception, its business model has been built upon a "know your food" philosophy – a philosophy whereby consumers value knowing that the food they consume is produced using healthy, sustainable and humane practices throughout all stages of production, or from "farm to table."  Accordingly, the Company contracts with hatcheries who supply chicks for ultimate processing into poultry products.  These chicks are delivered to local growers – farmers who raise chickens to maturity for processing.  From the time the chicks hatch until they are sold as poultry products, Debtor is the owner of the bird and ostensibly controls the flow of production.  As detailed more fully below, each grower with whom Debtor contracts has an equity interest in the Company.

8.      Though incorporated in June 2019, it was with the acquisition of the Plant that the vision for the Company began to take tangible form.   Simply Essentials, LLC ("Simply Essentials"), a Delaware limited liability corporation and previous owner of the Plant, completed extensive remodeling efforts in the 2016-2017 time period and subsequently operated it as a poultry production site for over two years before closing in August 2019.  The Plant's closing displaced a substantial number of employees, many of whom would subsequently become employees of Debtor.  In the course of exploring the acquisition of the Plant, Debtor learned that Simply Essentials' inability to make timely payment to the poultry growers upon whom it relied forced the Company into Chapter 7 bankruptcy in March of 2020.

9.      As a result, and despite the fact that it contained relatively new state-of-the art poultry-processing equipment, the Plant remained idle for over two years following its close in August 2019.  It was not until December 2021 that Debtor closed on its acquisition of the Plant. Due to the extended period of inactivity between August 2019 and December 2021, Debtor's activities over the course of the subsequent year focused in substantial part on refurbishing and re-outfitting the Plant so it could once again become operational.

10.      In November 2022, Debtor's revenue-generating operations at the Plant officially commenced, albeit in a limited capacity.  At that time, Debtor was equipped to engage in "primary processing" or "first processing" only.[1]  As a result, its product line was limited to a single product: whole chickens.

11.      Throughout the end of 2022 and through the first ten months of 2023, the Company expanded the Plant to become fully operational.   By November 2023, its capacity included

---

[1] In the poultry industry, "primary processing" or "first processing" refers to the process of receiving, staging, slaughtering, scolding and de-feathering, eviscerating and chilling whole birds for further packaging and sale.

"secondary processing" capabilities,[2] which enabled it to market a broader array of poultry products to customers including, but not limited to, retail grocery stores.  As of the Petition Date, its poultry products are sold in regional grocery stores and food markets in Minnesota, Iowa, North Dakota, South Dakota, Missouri and Nebraska.

12.    From its inception, the Company has been driven by the desire to become a key participant in the "Premium & Organic" tier of the poultry-production industry – the industry's top tier.  While the Company has yet to realize its vision, it has laid a foundation for future success by adopting and implementing practices and processes which are the hallmarks of market leaders.  For example, its products are 100% air chilled, which means that prior to packaging, each bird is chilled to safe temperatures by being transported through monitored, temperature-controlled, purified air chambers.  While the predominant practice in the poultry industry is to "water chill" poultry, it is widely-accepted in the industry that air-chilling produces a better-tasting product with less moisture retention during the process.

13.    In addition, the Company contracts with poultry "growers," who raise the chickens from hatchlings to maturity, feed the birds a 100%-vegetable diet and who, in keeping with premium segment norms and customer expectations, do not treat the birds with antibiotics.  Moreover, each of the Company's approximately 50 growers has an equity stake in the Company and is, therefore, heavily invested in the Company's overarching mission and long-term success.

14.    While the Company began selling its array of air-chilled chicken products into the branded and private-label retail market and foodservice industry in November 2023, the multi-year journey to reach that stage came at a substantial price.  Due in significant part to factors well beyond its control, Debtor has faced an uphill battle from the outset and now requires Chapter 11

---

[2] "Secondary processing" can include portioning, deboning, marinating, forming, cooking and packaging ready-to-eat poultry.

protection to fulfill its existing obligations, remain a going concern, and achieve its long term objectives.

## III.     EVENTS LEADING UP TO THE PETITION

15.     A variety of factors contributed to Debtor's financial difficulties and eventual bankruptcy filings.

16.     As an initial matter, the Covid-19 pandemic and contemporaneous supply-chain issues aggravated the challenges any new company could expect to face when in its earliest stages of development.

17.     In April 2022, four months after acquiring the Plant, the Company received notification from Greater Nevada Credit Union that it qualified for a loan of nearly $39 million under the federally-funded Food Supply Chain Guaranteed Loan Program.  The funds were to be used to continue rehabilitating and to provide much-needed working capital.  Unfortunately, however, the loan proceeds were not forthcoming and were subject to additional property appraisals.  Nevertheless, in July 2022, poultry prices were near an at an all-time high.  Despite lacking the financial wherewithal to achieve full capacity, Pure Prairie sought to capitalize market forces and planned to roll-out the sale of whole chickens in November.  The hope was this staged rollout would provide a source of short-term bridge revenue while the Company awaited the loan proceeds that would help it grow and refurbish the Plant to full capacity.

18.     Unfortunately, however, there was a substantial drop in poultry prices starting in the second week of October 2022.  Prices remained depressed for approximately one year.  This development did not stop Pure Prairie from beginning to sell whole chickens in November 2022.  However, revenues derived from such initial sales efforts were disappointing.

19.     Just weeks prior to the initial rollout, on October 21, 2022, the United States Department of Agriculture (the "USDA") issued a news release stating that it was "investing

$38,720,000 under the Food Supply Chain Guaranteed Loan Program [(the "FSC Loan")] to help Pure Prairie Farms Inc. expand capacity to process poultry and create job opportunities for people living in rural Iowa."[3]   In the same press release, the USDA stated that it was "investing a $6,963,725 grant in [Pure Prairie] from the Meat and Poultry Processing and Expansion Program. The funding is part of the Biden-Harris Administration's commitment to strengthen critical food supply chain infrastructure to create more thriving communities for the American people."[4]

20.     While the nearly $7 million grant from the Meat and Poultry Processing and Expansion Program (the "MPPEP Funds") helped provide gap financing for the Company at a time when it was generating little revenue (the Company began drawing on the MPPEP Funds in January 2023), delivery of the nearly $39 million in loan proceeds pursuant to FSC Loan was delayed substantially, thereby exacerbating the Company's economic stress.  In November 2022, the month after the USDA's press release, the Plant was appraised in connection with the underwriting process; at that time, the appraisal value of the property could not support the loan amount.  Approximately two months later, in January 2023 the Plant was appraised once again. Following the appraisal, the entire loan transaction had to be re-underwritten.

21.     Ultimately, however, Pure Prairie was not able to close on the loan until April 26, 2023, approximately one year after it was first informed that it qualified for the financing that was essential for its growth and survival.

22.     It was not until November 2023 that the Company completed refurbishing the Plant and had the capacity to engage in "second processing," the process by which poultry producers are able to bring a more diverse array of offerings to the market.  Pure Prairie was no longer limited

---

[3] *See* https://www.rd.usda.gov/newsroom/news-release/biden-harris-administration-invests-456-million-help-pure-prairie-farms-inc-expand-processing.
[4] *Id.*

to selling whole chickens to its customers.  Indeed, second processing enabled the Company to market an array of packaged products including, but not limited to, breast fillets and tenders, thighs, drumsticks and wings.  Completion of second processing improved the Company's outlook substantially, as the as the Company began selling higher-margin, premium air-chilled products into the branded and private-label retail market.

23.     Unfortunately, weathering the delays between the acquisition of the Plant in 2021 and completing construction of second processing in November 2023 came at a substantial cost. Indeed, the Company endured approximately $38 million in operating losses from November 2023 to the present.  Liquidity issues required shareholders to extend substantial loans to the Company. As a result of the company's extensive losses, in early 2024, Debtor's primary source of working capital, Bremer Bank, would not agree to increase Debtor's line of credit from $7.5 million to $12 million which was supported by the borrowing base.  This development left the Company unable to shoulder routine Plant maintenance duties and indirectly led to significant employee turnover. The 6-month delay in receiving loan funds and renovating the Plant caused a 9 month delay in broadly launching its brand, Pure Prairie Poultry because of seasonal launch windows at retailers.

24.     Debtor's efforts to secure an alternative banking relationship to Bremer Bank have thus far been unsuccessful.  Its liquidity problems persist as it is unable to satisfy ongoing operating expenses and payment obligations under the FSC Loan.

## CORPORATE STRUCTURE

25.     As detailed above, Debtor is a Minnesota corporation with a principal executive office of 68808 Fort Road, Fairfax, MN 55332-5533.  It is a board-managed corporation.  As of the Petition Date, it has issued 41,325,837 shares of common stock and 4,000,000 shares of preferred stock.

## PREPETITION SECURED DEBT

**Bremer Bank**

26.     Debtor is a borrower under a Business Loan Agreement with Bremer Bank, National Association ("Bremer Bank") dated as of May 4, 2023 ("5/4/23 Bremer Loan") in the principal amount of $4.0 million.  The maturity date of the 5/4/23 Bremer Loan is May 4, 2030. To secure repayment of the loan proceeds, Debtor executed a Commercial Security Agreement which granted to Bremer Bank a purchase money security interest in all equipment financed with the loan proceeds.

27.     In addition to the 5/4/23 Bremer Loan, Debtor is a borrower under a Business Loan Agreement (Asset Based) with Bremer Bank dated as of September 9, 2023 ("9/9/23 Bremer Loan") which provides a revolving line of credit in the principal amount of $7.5 million.  The 9/9/23 Bremer Loan requires Debtor to repay the outstanding principal amount, plus interest on each advance, on a monthly basis.  The 9/9/23 Bremer Loan's maturity date is September 29, 2024. To secure repayment of the 9/9/23 Bremer Loan, Debtor executed a Commercial Security Agreement which granted to Bremer Bank a first priority lien and security interest in a broad array of Debtor's assets.   Moreover, 9/9/23 Bremer Loan and the 5/4/23 Bremer Loan are cross-collateralized.

**Community Bank and Trust**

28.     Debtor obtained the FSC Loan (discussed above), which closed on April 26, 2023, through Community Bank and Trust.  The initial loan amount was $36,742,500.  As of June 29, 2024, the outstanding balance on the FSC Loan was $33,375,455.54.  The maturity date of the FSC Loan is April 26, 2050.  The interest rate is fixed at 9.75% for the life of the loan.  The repayment schedule for the includes interest-only payments until May 2025, then monthly

payments until maturity.  The FSC Loan is secured by the real estate that houses the Plant and supporting facilities, as well as the equipment therein.

**Automobile Financing (Ford Motor Credit Company LLC  and Union Bank & Trust)**

29.    Debtor maintains multiple automobile financing arrangements through Ford Motor Credit Company LLC ("Ford Credit") and Union Bank and Trust.  As of September 12, 2024, the outstanding balance on the automobile loans to Ford Credit was $145,792.59.  As of the same date, the outstanding balance to Union Bank & Trust was $95,744.40.  The Guarantor of the various automobile loans is the undersigned, George Peichel.

**Michael Helgeson**

30.    Michael Helgeson, the Chairman of Debtor's Board of Directors, has made multiple shareholder loans to Debtor secured by a mortgage on the Plant.  As of September 12, 2024, the amount of the lien on the Plant related to Mr. Helgeson's loans totaled $ 12,452,590.36.

**First Corporate Solutions**

31.    Debtor entered into a Factoring and Security Agreement ("Factoring Agreement") with Southstar Financial, LLC ("Southstar") on or about May 23, 2024.  Southstar subsequently assigned the Factoring Agreement to First Corporate Solutions ("First Corporate").  The Factoring Agreement provides that the total outstanding funds advanced to Debtor shall not exceed $10,000,000.   Pursuant to the Factoring Agreement, First Corporate may purchase Debtor's accounts in an amount not to exceed 85% of the face amount of each account sold.  As of the Petition Date, Debtor has $1,820,872 in outstanding invoices corresponding to $1,547,741 in funds advanced under the Factoring Agreement.

**The Waldinger Corporation**

32.     The Waldinger Corporation holds a mechanics lien on the Plant in the amount of $1,133,926 as of September 16, 2024 for contracting services performed in connection with Plant maintenance and renovations.

**Henkel Construction Company**

33.     Henkel Construction Company also holds a mechanics lien on the Plant due to Debtor's indebtedness in the amount of $1,357,478.76 as of September 18, 2024 for construction work completed or nearing completion at the Plant.   Henkel Construction Company agreed to release the lien and to subordinate any remaining interest in the property to the Debtor-in-Possession financing sought as part of Debtor's first day motions.

**First Cooperative Association (d/b/a AgState)**

34.     First Cooperative Association (d/b/a AgState), a feed mill that supplies Debtor with poultry feed, holds a supplier's input lien in connection with Debtor's outstanding balance of $356,214.64 as of September 16, 2024.

**Centra Sota Cooperative**

35.      Centra Sota Cooperative, another feed mill that supplies Debtor with poultry feed, holds a supplier's input lien in connection with Debtor's outstanding balance of $640,499.43 as of September 16, 2024.

**Gold Eagle Cooperative**

36.     Gold Eagle Cooperative is another feed mill that supplies Debtor with poultry feed. It holds a supplier's input lien in connection with Debtor's outstanding balance of $96,880.33 as of September 16, 2024.

**Premier Cooperative**

37.    Premier Cooperative, another feed mill that supplies Debtor with poultry feed, holds a supplier's input lien in connection with Debtor's outstanding balance of $1,595,899.67 as of September 16, 2024.

## DISPUTED PREPETITION SECURED CLAIMS

**Family Funding Group LLC**

38.    Debtor entered into a Standard Merchant Cash Advance Agreement ("Cash Advance Agreement") with Family Funding Group LLC ("FFG") on or about July 8, 2024, pursuant to which Debtor sold a portion of its future revenue stream to FFG.  The purchase price was $500,000; Debtor received $450,000 while $50,000 was allocated to underwriting and related expenses.  FFG is entitled to 25% of receivables (as defined in the Cash Advance Agreement) on a daily basis until the amount remitted to FFC reaches $749,500.  The Guarantor of the Revenue Purchase Agreement for Debtor is the undersigned, George Peichel.  Debtor's payment obligations under the Cash Advance Agreement are secured by Debtor's accounts, including but not limited to:  deposit accounts, accounts-receivable and other receivables, equipment, instruments and inventory.  However, FFG did not perfect its security interest.  Debtor, therefore, disputes any and all liens FFG may attempt to assert and/or enforce in this bankruptcy case.  As of the Petition Date, Debtor owed FFG approximately $249,500.

**Dynasty Capital 26, LLC**

39.    Debtor entered into a Sale of Future Receipts Agreement ("Future Receipts Agreement") with Dynasty Capital 26, LLC ("Dynasty") on or about July 18, 2024, pursuant to which Debtor sold a portion of its future revenue stream to Dynasty.  The purchase price was $2,200,000; Debtor received $250,000 while $50,000 was applied to an origination fee and

$1,900,000 was applied to an existing balance on a similar agreement between the parties. Dynasty is entitled to 35% of Debtor's revenue on a daily basis until the amount remitted to Dynasty Capital reaches $3,300,000. The Guarantor of the Revenue Purchase Agreement for Debtor is the undersigned, George Peichel. While the Future Receipts Agreement provides that Debtor's payment obligations are secured by Debtor's future receipts, Debtor will have no revenue following the Petition Date. Dynasty has not perfected its interest and its lien against Debtor. Debtor disputes that Dynast is entitled to a secured claim.

**ACE Funding Source LLC**

40.     Debtor entered into a Revenue Purchase Agreement and Security Agreement and Guaranty of Performance ("RPA No.1 ") with Ace Funding Source LLC ("Ace") on or about August 6, 2024, pursuant to which Debtor sold a portion of its future revenue stream to Ace. The purchase price was $200,000; Debtor received $100,058, $20,000 served as the origination fee and $79,942 went towards an existing balance on a similar agreement between the parties. Ace is entitled to 3.01% of Debtor's revenue on a daily basis until the amount remitted to Ace reaches $299,800. The Guarantor of the Revenue Purchase Agreement for Debtor is the undersigned, George Peichel. Debtor also entered into a Revenue Purchase Agreement and Security Agreement and Guaranty of Performance ("RPA No. 2") with Ace on or about August 7, 2024, pursuant to which Debtor sold a portion of its future revenue stream to Ace. The purchase price was $111,000; Debtor received $99,900 and $11,100 served as the origination fee. Ace is entitled to 1.67% of Debtor's revenue on a daily basis until the amount remitted to Ace reaches $166,389.00. RPA Nos. 1 and 2 provide that Debtor's payment obligations are secured by Debtor's accounts, including but not limited to: deposit accounts, accounts-receivable and other receivables, equipment, instruments and inventory. Debtor disputes any and all liens Ace attempts to assert or

enforce.  Ace filed a UCC-1 financing statement on September 9, 2024, less than two week prior

to the Petition Date.  Because no future receivables exist after the Petition Date, Debtor views Ace

as an unsecured creditor.

**Liquidity Access LLC**

41.     Debtor entered into a Future Receivables Sale and Purchase Agreement ("Future

Receivables Agreement") with Liquidity Access, LLC ("Liquidity Access") on or about August

16, 2024, pursuant to which Debtor sold a portion of its future revenue stream to Liquidity Access.

The purchase price was $500,000; Debtor received $282,757.50 while $50,000 was allocated to

underwriting and related expenses and $167,242.50 was allocated to an existing balance on a

similar agreement between the parties.  Liquidity Access is entitled to 32% of Debtor's revenue

on a daily basis until the amount remitted to Liquidity Access reaches $750,000.  The Guarantor

of the Revenue Purchase Agreement for Debtor is the undersigned, George Peichel.  Debtor's

payment obligations under the Cash Advance Agreement are secured by Debtor's accounts,

including but not limited to:  deposit accounts, accounts-receivable and other receivables,

equipment, instruments and inventory.  Liquidity Access did not perfect its security interest and

no future receivables exist after the Petition Date.  Debtor views Ace as an unsecured creditor.

## **REAL PROPERTY**

42.     Debtor owns a fee interest in the poultry production facility located at 901 N. Main

Street, Charles City, Iowa 50616 (*i.e.*, the Plant) and multiple surrounding parcels of land which

contain facilities that support Debtor's operations.

## **FIRST DAY MOTIONS**

43.     To enable Debtor to minimize adverse effects from the commencement of this case,

Debtor has requested various types of relief in certain "first day" applications and motions

(together the "First Day Motions") filed concurrently with this Declaration.

44.     I have reviewed the First Day Motions (including all related attachments and exhibits).  The facts stated therein and in this Declaration are true and correct to the best of my knowledge, information and belief, and I believe the relief sought in each of the First Day Motions is necessary to enable Debtor to: (a) continue operating its business and maintain going concern value; and (b) maximize the value of Debtor's assets for the benefit of Debtor's estates, creditors and other constituents.

45.     It is my further belief that, with respect to those First Day Motions requesting authority to pay certain, limited prepetition claims, the relief requested is essential to Debtor's efforts to preserve and maximize value in this case and to avoid immediate and irreparable harm to Debtor and its estate and creditors.

46.     I believe that any diminution in the limited relief requested in the First Day Motions could have an immediate and irreparably-harmful impact on the value of Debtor's assets to the detriment of all of Debtor's stakeholders.  Debtor believe that payment of those selected prepetition claims identified in the First Day Motions will protect Debtor from the onset of such harm and that Debtor will ultimately derive a benefit from the relief requested.

## IV.     HONOR OBLIGATIONS TO CRITICAL VENDORS

47.     Debtor also seeks authorization (but not the obligation) to pay valid prepetition amounts due to certain critical vendors who are listed on an exhibit to Debtor's critical vendor motion, each of whom provides essential goods and/or services to Debtor (collectively, the "Critical Vendors").

48.     The Critical Vendors consist primarily of approximately 50 live poultry farmers (or growers) who have contracted with Debtor to raise the chickens from hatchlings to maturity.  The operations of Debtor and its future viability depend in substantial part on the services provided by and its relationships with, the growers, each of whom (as noted above) also has an equity stake in

Debtor.  There are no alternative vendors who could supply these essential goods and/or services in the same quantities, with the same quality standards, and with the same efficiency and cost as the Critical Vendors.  Even if Debtor is able to find alternative vendors, changing the supply chain would result in a significant interruption in Debtor's supply of live poultry.  Debtor seeks authorization to pay prepetition amounts owed to critical vendors up to an approximate maximum of $1,700,535.77.

49.     It is my understanding that all of the prepetition amounts proposed to be paid pursuant to the critical vendors motion would be administrative expenses under Section 503(b)(9) of the Bankruptcy Code or are subject to liens under the Packers and Stockyards Act (commonly referred to as PASA).

50.     Because a disruption in poultry supply would devastate Debtor's business operations, cause exists to grant Debtor's critical vendor motion on an expedited basis.

## V.    MOTION TO MAINTAIN EXISTING BANK ACCOUNTS

51.     As part of the requested relief, Debtor is also asking the Court to authorize and direct banks and financial institutions, at Debtor's instruction, to receive, honor, process, and pay to the extent of funds on deposit, any and all checks or electronic funds transfers relating to the prepetition claims of the critical vendors.

52.     Debtor has filed a motion for authorization to continue the use of existing bank accounts and cash management systems (the "Bank Accounts Motion") on an expedited basis.

53.     A description of Debtor's bank accounts, and its cash management system, is set out in the Bank Accounts Motion.  I have reviewed those descriptions and they are accurate to the best of my knowledge, information and belief.

54.     I am advised that Chapter 11 debtors are generally required to: (a) close all existing bank accounts and open new debtor-in-possession accounts; (b) establish a single debtor-in-

possession account for all estate monies required for the payment of taxes, including payroll taxes; (c) maintain a separate debtor-in-possession account for cash collateral; and (d) obtain checks for all debtor-in-possession bank accounts bearing the designation "Debtor In Possession," the bankruptcy case number, and the type of account.

55.     As I understand it, these requirements are designed to provide a clear line of demarcation between prepetition and post-petition claims and payments, and to help to protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

56.     To avoid delays in payments to administrative creditors and critical vendors, to ensure a smooth transition into Chapter 11 with minimal disruption in Debtor's business operations, and to aid Debtor's efforts to complete a successful reorganization, it is important that Debtor be permitted to continue to maintain existing bank accounts, with the same account numbers, following commencement of this case, subject to a prohibition against honoring checks issued or dated before the Petition Date absent a prior order of the Court allowing such action.

57.     I believe that by preserving business continuity and avoiding the disruption and delay in Debtor's performance of its payment obligations that will result if Debtor is forced to close their existing bank accounts and open new debtor-in-possession accounts, all parties in interest, including employees, vendors, lenders and customers will be best served.

58.     I further believe that the relief sought under the Bank Accounts Motion must be granted immediately to avoid irreparable harm.  Without the relief sought, Debtor could be forced to discontinue operations and other activities being undertaken in an effort to maximize value for all concerned.  Any shutdown or interruption in Debtor's operations would damage Debtor's

relationships with customers and vendors, undermine employee confidence, and further impair Debtor's going concern value.

## VI.    PAYMENT OF PREPETITION WAGES AND BENEFITS

59.    Debtor seeks authority to (a) pay prepetition wages to employees that, absent the bankruptcy filings, would be paid to employees in the ordinary course of business; (b) maintain funding of employee benefit contributions, including contributions to insurance and related programs, in the ordinary course of business; and (c) have Debtor's payroll provider and applicable financial institutions receive, honor and pay any and all checks drawn to the extent those checks or transfers relate to any of the foregoing and provided that sufficient funds are immediately available and on deposit in the applicable accounts.

60.    Debtor further requests that Debtor's payroll provider and all other financial institutions be authorized and directed to rely on the representations of Debtor as to which checks, drafts or wire transfers are in payment of prepetition wages.

61.    As of the Petition Date, Debtor owes employees for unpaid gross wages, commissions, benefits, salaries, payroll taxes (including, but not limited to, employer matching), reimbursements, and 401(k) contributions (collectively, "Prepetition Wages").  Of this amount, Debtor will owe approximately $112,000 for payroll taxes.  Debtor's payroll is paid in arrears. The payroll periods are every two weeks and conclude on the Saturday immediately preceding the payday.  The payroll is made through direct deposit.  The last payroll was paid on September 6, 2024 in the amount of approximately $347,000 in gross wages, as described more fully in the exhibit attached to Debtor's motion requesting authorization to pay prepetition wages and benefits.

62.    Debtor will only pay Pre-Petition Wages to or on behalf of any individual employee up to the $15,150.00, which I understand is a limit set forth in the Bankruptcy Code.

63.     Accordingly, Debtor requests authorization to: (a) withhold amounts from employee paychecks necessary to satisfy third-party requirements, including taxes, Social Security and Medicare; employee contributions toward benefit plans and other benefits; and other deduction programs, including garnishment and child support or other similar orders; (b) honor obligations to employees to pay amounts necessary to provide employees with health benefits, including medical, dental, and vision insurance, and other insurance benefits, including disability and life insurance, as well as flexible spending and health savings account plans; (c) continue offering COBRA coverage for departed employees; (d) pay any unpaid prepetition amounts owed on account of employer matching and otherwise continue Debtor's 401(k) program in the ordinary course of business; (e) reimburse employees for expenses relating to travel and related items when employees are working away from their normal location; and (f) honor Debtor's obligations with respect to paid time off and vacation accrued prepetition ("PTO"), subject to Debtor's oversight and approval.

64.     Employee morale and retention will be critical to complete the restructuring process.  Both will likely falter if employees do not receive timely payments for their work. Moreover, it is my understanding that the employees at issue would qualify for a priority in payment in any event such that the only question raised by the motion is the timing of payment of employee claims.  Many of Debtor's employees have demonstrated a heartfelt commitment to Debtor's success, endured uncertainty following the closure of the Plant in August 2019 (when it was under the control of Simply Essentials) and bear no responsibility for Debtor's financial challenges.  The bankruptcy filing is in itself destabilizing to the work force; employees should not be forced to shoulder the additional burden of having to wait to be paid wages and benefits they have earned.

65.     Cause exists to grant the wages and benefits motion on an expedited basis.  If the motion is not granted expeditiously, Debtor's payroll processing will be disrupted, potentially preventing Debtor from timely meeting their wage and benefit obligations.  If that occurs, there is a risk that a large number of employees will stop working and seek employment elsewhere, with potentially devastating effects on Debtor's sale and restructuring efforts, to the detriment of Debtor, its estates and creditors.

## VII.    APPLICATION FOR AUTHORIZATION TO PAY INSURANCE PREMIUMS AND MAINTAIN INSURANCE POLICIES

66.     Debtor maintains multiple insurance policies with various insurance carriers, compiled and organized by Accel Group ("Accel"), a risk management agency based in the state of Iowa and focused on providing insurance solutions and strategic counsel.

67.     Debtor's insurance agreement with Accel (each an "Insurance Agreement" and, collectively, the "Insurance Agreements") covers its three parcels of real estate and the improvements located thereon (the "Real Property"), including its warehouse and the Plant, as well as 62 passenger vehicles and 28 cargo trucks and trailers owned and operated by Debtor (the "Vehicles").

68.     The Real Property and the Vehicles are instrumental to Debtor's day-to-day operations and are necessary to a successful reorganization.

69.     Debtor's additional insurance policies are described more thoroughly in Debtor's motion for an order authorizing Debtor to pay insurance premiums and maintain insurance policies.  I believe that the contents of the motion and factual information set forth therein is true and correct to the best of my information, knowledge and belief.  For the insurance coverage described in said motion, Debtor pays an annual premium of $1,155,326.62 (the "Insurance Premium").

70.     Debtor's Insurance Policies recently renewed on August 1, 2024, and remain in effect through August 1, 2025. Accordingly, Debtor must make a $750,000.00 payment towards the Insurance Premium in the month of September in order to maintain its coverage.

71.     Debtor is an additional party to an Insurance Premium Financing Agreement (the "Premium Financing Agreement") with IPFS Corporation.

72.     Pursuant to the Premium Financing Agreement, Debtor is required to make nine monthly payments of $15,882.16. The first such payment came due on September 1, 2024.

73.     Continuing to make payments under the Premium Financing Agreement is also necessary to maintain the Insurance Policies.

74.     Debtor maintains these Insurance Policies in amounts and form in accordance with state and local laws governing the multiple jurisdictions in which Debtor operates and as deemed necessary in Debtor's business judgment to adequately insure Debtor's assets and risk.

75.     Debtor and its creditors will suffer irreversible and irreparable harm if it is not authorized to pay Insurance Premiums in order to maintain Insurance Policies.

## VIII.  APPLICATION TO EMPLOY LAKESHORE FOOD ADVISORS, LLC AS INVESTMENT BANKERS AND FINANCIAL ADVISORS

76.     Debtor seeks the Court's approval to employ Lakeshore Food Advisors, LLC ("Lakeshore") (a) as financial advisors, to assist Debtor in the performance of its management, budgeting, accounting and financial reporting obligations under the Bankruptcy Code, and (b) as investment bankers to assist Debtor in designing and implementing a process for the sale or sales of all or substantially all of Debtor's assets.

77.     Lakeshore's services are necessary to assist Debtor in the Chapter 11 process. Such services will include, but will not be limited to: assisting and advising Debtor in developing a strategy for a possible sale of Debtor's business and related operations; preparing the 13-week cash

flow needed to determine capital needs; assisting in all aspect of securing and managing debtor-in-possession financing, and; assisting in the preparation of call schedules necessary for the Chapter 11 filing.

78.     Debtor also requires Lakeshore's assistance in carrying out an auction process and/or finding investors for recapitalization aimed at maximizing value for creditors while simultaneously creating a mechanism, if necessary, to transfer Debtor's poultry processing facilities and other assets in a manner that preserves large numbers of jobs in Iowa.

79.     Due to its prepetition engagements on behalf of Debtor, Lakeshore has a firm command of Debtor's business. I expect Lakeshore's familiarity with Debtor's finances will prove invaluable, particularly in the early stages of the post-petition process.

80.     I believe that Debtor's motion to employ Lakeshore should be addressed on an expedited basis as there is an immediate need for Lakeshore's assistance in devising a coherent strategy for implementing the essential tasks noted above to ensure that the restructuring process helps Debtor achieve its objectives.

## IX.     APPLICATION TO EMPLOY CORPORATE RESTRUCTURING OFFICER

81.     Debtor seeks the Court's authorization to employ Lighthouse Management Group, Inc. ("Lighthouse") as Corporate Restructuring Officer ("CRO") for the purpose of assisting Debtor in preparation of its Chapter 11 filing, managing the case and developing a plan of reorganization, assisting Debtor's Chief Financial Officer ("CFO") in evaluating financial forecasts, developing and evaluating a liquidation analysis, strategizing to maximize forward-looking profitability, assisting in general workout strategy, and providing any additional bankruptcy-related services as may be necessary.

82.     The services of Lighthouse are necessary to assist Debtor in the Chapter 11 process and ensure a successful reorganization. The full extent of Lighthouse's anticipated services for

Debtor's benefit is outlined in detail in the application seeking authorization to employ lighthouse as CRO and the Declaration of Timothy G. Becker submitted in support thereof.

83.     Debtor has selected Lighthouse as its CRO based upon, among other things, (i) Debtor's need to retain an experienced restructuring professional to provide advice and consultation with respect to Debtor's restructuring and possible sale transactions, and (ii) the extensive experience and excellent reputation of Lighthouse's professionals in providing corporate restructuring advice and facilitating effective communication and transactions between financially distressed businesses and interested creditors.

84.     Prior to the Petition Date, Lighthouse also provided Debtor assistance in gathering information used in connection with the various First Day Motions and has assisted in the development of a preliminary 13-week cash forecast, creditor and vendor analysis, debtor-in-possession funding, among other actions.

85.     Lighthouse has indicated a willingness to act on Debtor's behalf and to render necessary professional services as CRO for Debtor, effective immediately.

## X.     MOTION TO ESTABLISH PROCEDURES REGARDING ADEQUATE ASSURANCE OF FUTURE PERFORMANCE FOR UTILITIES

86.     In connection with the operation of its business, Debtor obtains utility services for electricity, natural gas, water, sanitation services, and telephone and cable television services (the "Utility Services") from the utility service providers listed on an exhibit to Debtor's motion for an order establishing procedures regarding adequate assurance of future performance for utilities; the exhibit to said motion also shows the current amounts owed to each of the utilities.  Debtor owes approximately $955,473.70 for Utility Services as of the Petition Date.  Pursuant to Debtor's 13-Week short term financing plan, Debtor intends to pay each Utility approximately 10% of the amount currently outstanding, for a total of $95,547.37.

87.     Uninterrupted Utility Services are essential to Debtor's ongoing operations.  Debtor cannot operate the Plant without uninterrupted access to the Utility Services.  Should any Utility Service be interrupted or discontinued, even for a brief period, Debtor's operations will be severely disrupted.  The impact of this disruption on Debtor's business operations and revenue would be extremely harmful and would jeopardize Debtor's efforts to reorganize and maximize value for all parties in interest.

88.     I believe that Debtor's motion relating to utility services must be addressed on an expedited basis in order to avoid potential cessation of services, which would cause immediate and irreparable harm to Debtor.

## XI.     POST-PETITION FINANCING/USE OF CASH COLLATERAL

89.     Debtor seeks interim approval to enter into a post-petition financing arrangement with Sandton Capital Solutions Master Fund VI, LP ("Sandton") in accordance with the terms of that Post-Petition Loan and Security Agreement (the "DIP Loan Agreement"), and also seeks authorization to use cash collateral.

90.     Debtor has an urgent and immediate need to use cash in order to, among other things operate its business, fund payroll, make lease payments, pay utilities, and pay other critical and ordinary course vendors.  Moreover, and as noted above, Debtor employs 138 full-time employees. Without access to cash in real time, Debtor will be unable to meet payroll obligations and will be forced to immediately cease operations and terminate its employees, thereby causing immediate and irreparable harm to the Chapter 11 estate.

91.     Debtor is unable to obtain financing on more favorable terms than those offered by Sandton.  Debtor has contacted several potential financing parties.  After review of proposed terms, Debtor determined that terms propose by Sandton presented the best financing package available to Debtor under the circumstances.

92.     Debtor believes that the entry into the DIP Loan Agreement represents a sound exercise of business judgment.  Access to the liquidity afforded under the DIP Loan Agreement will help to ensure that there are minimal disruptions to business operations and that sufficient funds will be available to backstop any sale process that would otherwise cover expenses.

## XII.    MOTION TO PAY PREPETITION REAL ESTATE TAXES

93.     As of the Petition Date, Debtor was delinquent on Prepetition Real Property Taxes relating to four parcels located in Floyd County, Iowa (the "Property").  The Property houses the Plant, which is instrumental to Debtor's business purpose and its ability to successfully reorganize. Loss of the Plant would be devastating to Debtor's reorganization efforts.

94.     By "Notice of Previous Tax Sale" received from the Floyd County Treasurer (the "Treasurer") on or around June 18, 2024 (the "Notice"), the Treasurer indicated that, because Debtor failed to timely make payment on these Prepetition Real Property Taxes, the Property was sold at a tax sale.  The Notice is attached as an exhibit to Debtor's motion seeking authorization to pay prepetition real property taxes and indicates that if Debtor fails to make a redemption payment of $110,788.00, the purchaser may take deed to the Property, which would pose substantial risk to Debtor's business operations.  Debtor continues to incur monthly penalties for each month that the property taxes remain delinquent.

95.     Because of the immediate risk of losing the Property, cause exists to hear this matter on an expedited basis to avoid further delay in payment.

## XIII.   CONTINUATION OF CUSTOMER LOYALTY PROGRAMS

96.     As part of the relief requested in the First Day Motions, Debtors also seek authorization to honor certain prepetition obligations to customers, to continue their prepetition customer programs and practices in the ordinary course of business, including Debtor's obligations related to certain advertising and product limited-time sale promotions ("Promotions"

and together with any other customer initiatives Debtor may undertake, the "Customer Programs"). I have reviewed the contents of the motion seeking authorization to honor the Promotions and Customer Programs and believe that the contents of the motion and factual information set forth therein is true and correct to the best of my information, knowledge and belief.

97.     Uninterrupted continuation of the Promotions and Customer Programs is vital to conserving Debtors' going concern value. Without the requested relief, Debtor's customer relations and good will stands to be negatively impacted. Any corresponding impact to Debtor's reputation will tarnish the value of the business.

98.     It is my belief that expedited relief is necessary to ensure that there is no disruption to Debtor's Promotions and Customer Program. The potential loss of existing customers and the difficulty in attracting new customers in the wake of such loss would likely depress revenues and the ability to generate earning on a going-forward basis. Granting this motion on an expedited basis is necessary to effectuate a smooth transition int Chapter 11 and to maintain customer loyalty and goodwill.

## XIV.   APPLICATION TO EXTEND DEADLINES TO FILE SCHEDULES

99.     The speed and complexity of events leading to the implementation a plan to file for Chapter 11 protection have accelerated dramatically in recent weeks. Completion of the schedules and statements required to support the Petition require an expenditure of time and resources by a core group of relatively few individuals, consisting primarily of management personnel. Given the numerous competing and compounding duties of this core group, preparing accurate and complete Schedules and Statements of Financial affairs by the current deadline will prove exceedingly difficult. I have reviewed the contents of the application to extend time to file schedules and statement of financial affairs believe that the contents of the motion and factual

information set forth therein is true and correct to the best of my information, knowledge and belief.  I believe that said information, as well as the additional facts detailed above, underscore that the extension of time sought is both necessary, appropriate and, moreover, is in the best interest of Debtor's estate and creditors.

For the reasons stated above, and all additional reasons set forth in Debtor's First Day Motions, Debtor respectfully requests that its First Day Motions be granted.

I swear that the foregoing is true and accurate to the best of my knowledge and belief.


Dated:  September 20, 2024                              _____
                                                                            George Peichel