## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

In re:

Pure Prairie Poultry, Inc.,                                   Case No. 24-32426 KAC

            Debtor.                                            Chapter 11 Case

---

### NOTICE OF HEARING AND MOTION FOR INTERIM AND FINAL ORDERS (I) GRANTING EXPEDITED HEARING, (II) APPROVING POSTPETITION FINANCING, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) AUTHORIZING USE OF CASH COLLATERAL, (V) GRANTING ADEQUATE PROTECTION, (VI) MODIFYING AUTOMATIC STAY, AND (VII) GRANTING RELATED RELIEF

---

TO:      THE PARTIES-IN-INTEREST AS SPECIFIED IN LOCAL RULE 9013-3.

1.      The above-named Debtor ("Debtor"), through its undersigned attorneys, moves the court for the relief requested below and gives notice of hearing.

2.      The court will hold a hearing on this motion for expedited hearing and on the portion of this Motion seeking interim orders at 3:00 p.m. on Wednesday, September 25, 2024 before the Honorable Katherine A. Constantine, Courtroom 8, U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415. A hearing on the portion of this Motion seeking final orders will be held at a date and time to be determined before the Honorable Katherine A. Constantine, Courtroom 8, U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415.

3.      Local Rule 9006-1(b) provides deadlines for responses to this Motion.  However, given the expedited nature of the relief sought with respect to the portion of the Motion seeking entry of interim orders, Debtor does not object to written responses being served and filed two hours prior to the hearing.  Any response to the Motion for entry of final orders must be filed and served no later than at least two (2) hours prior to the hearing, pursuant to the applicable Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules.  **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

4.      This court has jurisdiction over this motion under 28 U.S.C. §§ 157 and 1334, Bankruptcy Rule 5005 and Local Rule 1070-1. The petition commencing Debtor's chapter 11 case was filed on September 20, 2024 (the "Petition Date"). The case is now pending before this court.

5.      This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      This motion arises under 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507, and Fed. R. Bankr. P. 4001(b).  This Motion is filed under Fed. R. Bankr. P. 9014 and Local Rules 4001-2 and 9013.

7.      Debtor is authorized to operate its business and manage the property of the estate as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committee has been appointed.

8.      Information about the Debtor's  business and the events leading up to the Petition Date can be found in the Declaration of George Peichel in Support of Chapter 11 Petition and First Day Motions, filed on September 20, 2024 (the "Peichel Declaration"), which is incorporated herein by reference.

**REQUEST FOR RELIEF**

9.      By this Motion, Debtor seeks immediate access to postpetition financing in order to ensure its continued operations during this case as it implements a sale process.  To accomplish this task, Debtor requires the use of a postpetition credit facility consisting of a non-revolving

line of credit as more fully described below up to an aggregate principal amount of $15,000,000 (the "DIP Financing"), pursuant to the Post-Petition Loan and Security Agreement described below.  The DIP Financing will provide Debtor with the liquidity needed to fund its operations, bankruptcy costs including professional fees, working capital needs and general corporate purposes during this case.

10.     Without the DIP Financing, Debtor will lack sufficient liquidity to ensure uninterrupted operations.  Any cessation in operations will, in turn, likely result in immediate liquidation, the loss of more than 138 jobs and severe losses for vendors, customers and creditors. The Debtor's customers, its employees and all of Debtor's other constituents depend on Debtor's ability to access the DIP Financing so that Debtor can continue operating while a sale process takes place seeking to maximize recoveries for the estate and creditors.

11.     Debtor requests that the Court enter an interim order (the "Interim DIP Order") and a final order (the "Final DIP Order" and, collectively with the Interim DIP Order, the "DIP Orders").  The Interim DIP Order is attached hereto as Exhibit A and the Final DIP Order will be served and filed at least 10 days prior to the Final Hearing.  In summary, Debtor requests orders granting:

    a.     authority, pursuant to sections 105, 363, and 364(c) and 364(d) of the Bankruptcy Code, for Debtor to obtain senior secured postpetition financing in an aggregate principal amount of up to $15,000,000 (of which, (1) upon entry of this Interim Order and satisfaction or waiver of the borrowing conditions set forth in the DIP Loan Documents (as defined below), $7,500,000 (the "Initial Draw") shall be made available to Debtor within one business day, (2) (a) upon entry of the Final Order and (b) entry of the Bidding Procedures Order, Debtor may request an additional $2,500,000 (the "Second

Draw"), and (3) following the Second Draw, Debtor may request from the DIP Lender a final optional draw of $5,000,000 (the "Optional Draw"), which the DIP Lender shall have sole discretion to determine whether to fund.

      b.      authority for Debtor to enter into that certain senior secured, Post-Petition Loan and Security Agreement, among Debtor as Borrower and Sandton Capital Solutions Master Fund VI, LP and/or one or more of its designees, as Lender (the "DIP Lender") in substantially the same form as attached hereto as Exhibit A (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement" and, together with any ancillary, collateral or related documents and agreements, the "DIP Loan Documents");

      c.      authority for Debtor to grant to the DIP Lender valid, enforceable, non-avoidable, automatically and fully perfected security interests, liens and superpriority claims, including allowed superpriority administrative expense claims pursuant to sections 364(c)(1) and 503(b) of the Bankruptcy Code, subject only to the Permitted Encumbrances pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code in the Collateral (as defined below) (and all proceeds thereof), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, ("Cash Collateral"), to secure all DIP Obligations (as defined below), as more fully set forth in this Interim Order;

      d.      waiver by Debtor of all rights to surcharge against the Collateral of the DIP Lender pursuant to section 506(c) of the Bankruptcy Code;

e.      subject to and only effective upon entry of the Final Order, waiver of the equitable doctrine of marshaling or any other similar doctrine with respect to any collateral of the DIP Lender and the Prepetition Secured Parties;

f.      modification of the automatic stay to the extent hereinafter set forth and waiving the 14-day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h);

g.      the scheduling of a final hearing (the "<u>Final Hearing</u>") on the Motion for a date to be determined to consider entry of the Final DIP Order *inter alia,* authorizing borrowings under the DIP Facility on a final basis and approving notice procedures with respect thereto; and

h.      related relief.

12.     Debtor further requests that the Court enter an interim order (the "Interim Cash Collateral Order") and a final order (the "Final Cash Collateral Order" and, collectively with the Interim Cash Collateral Order, the "Cash Collateral Orders").  The Interim Cash Collateral Order is attached hereto as Exhibit B and the Final Cash Collateral Order will be served and filed at least 10 days prior to the Final Hearing.  In summary, Debtor requests orders granting authority for Debtor to grant to the Prepetition Secured Parties (as defined below) valid, enforceable, non-avoidable, automatically and fully perfected replacement liens and security interests in the Collateral to the same extent and having the character and dignity as existed prior to the filing of the Petition, and subject to any liens or priority claims that may arise pursuant to sections 361, 362, 363(c)(2) and 363(e) of the Bankruptcy Code, in order to secure diminution in value of the Prepetition Collateral, as more fully set forth in the Interim Cash Collateral Order, and all subject to the senior lien and super-priority liens and claims of the DIP Lender.

## RULE 4001 STATEMENT

13.     Pursuant to Local Rule 4001-2(a), attached hereto as Exhibit C is Debtor's 13-week cash flow projections (the "Proposed Budget").

14.     Pursuant to Fed. R. Bankr. P. 4001(b), the following summarizes the significant terms of the DIP Credit Agreement and the Interim DIP Order.  Debtor believes that the following provisions of the DIP Credit Agreement and the Interim DIP Order are justified and necessary in the context and circumstances of these cases.[1]

| **Lender:** | Sandton Capital Solutions Master Fund VI, LP and/or one or more of its designees (the "Lender"). |
|---|---|

---

[1] The following summary is provided for ease of reference only.  To the extent of any inconsistency as between the following summary and either the DIP Credit Agreement and/or the Interim DIP Order, the DIP Credit Agreement and/or Interim DIP Order (as applicable) shall control.  All capitalized terms used in this summary but not otherwise capitalized herein shall have the meanings given to them in the DIP Credit Agreement.

| | |
|---|---|
| **Borrower:** | Pure Prairie Poultry Inc. |
| **Line of Credit Commitment:** | Total aggregate principal amount not to exceed $15 million (<u>see</u> proviso in Funded Amount below), subject to entry of the Final DIP Order by the Court. |
| **Use of Proceeds:** | The proceeds from the Line of Credit will be available to the Borrower to fund Borrower's expenses in accordance with the Budget.  The Budget will be agreed to by the Borrower and the DIP Lender and will include, without limitation, budgeted professional fees. It is understood that all Packers and Stockyards Act liens will paid in full as described below. |
| **Funded Amount:** | <ul><li>**<u>Initial Draw: $7.5 million</u>**.  This amount will be immediately available for draw in accordance with the DIP Loan Documents upon the approval and entry of the Interim DIP Order by the Bankruptcy Court. All Packers and Stockyards Act obligations shall be fully repaid with the Initial Draw.</li><li>**<u>Second Draw upon Final DIP Order: $2.5 million</u>**. Upon (a) entry of a Final DIP Order, and (b) entry of the Bidding Procedures Order, the Borrower may draw an additional $2.5 million, subject to the Funding Dates below.</li><li>**<u>Optional Supplemental Draw: $5 million.</u>** Subsequent to the Second Draw, the Borrower may request to draw up to an additional $5 million.  Lender shall have no obligation to fund the Optional Draw and may elect to fund such Optional Draw in its sole discretion based upon its assessment of the likelihood that a Sale Transaction can be consummated that will allow for the payment in full of all Obligations owed to Lender under the DIP Loan Documents.</li></ul> |

7

| **Funding Dates:** | <ul><li>**<u>Initial Draw, $7.5 million</u>**, available on the entry of the Interim DIP Order and following the satisfaction of all other conditions as set forth in the DIP Credit Agreement.</li><li>**<u>Second Draw of up to an Additional $2.5 million</u>**. Upon (a) entry of a Final DIP Order, and (b) approval of the Bidding Procedures Order, and subject to the satisfaction of all other conditions as set forth in the DIP Credit Agreement, the Borrower may make an Additional Draw of up to $2.5 million</li><li>**<u>Optional Supplemental Draw: $5 million.</u>** Subsequent to the Second Draw, the Borrower may request to draw up to an additional $5 million. Lender shall have no obligation to fund the Optional Draw and may elect to fund such Optional Draw in its sole discretion based upon its assessment of the likelihood that a Sale Transaction can be consummated that will allow for the payment in full of all Obligations owed to Lender under the DIP Loan Documents.</li></ul> |

| | |
|---|---|
| **Maturity:** | Lender will be entitled to immediate repayment of all outstanding obligations under the DIP Credit Agreement on the earliest to occur of (the "<u>Line of Credit Termination Date</u>"):<br><br>(a) the closing of a sale approved by the Bankruptcy Court of all or a portion of the Borrower's assets;<br>(b) the effective date of any chapter 11 plan confirmed by the Bankruptcy Court;<br>(c) the occurrence of an Event of Default; and<br>(d) the date that is ninety (90) days following the date on which Lender disburses the Initial Draw.<br><br>Notwithstanding the foregoing, following entry of the Final DIP Order and the funding of the Second Draw (and the Optional Draw, if requested), Borrower may request an extension of up to an additional 90 days of the Line of Credit Termination Date to consummate a Sale Transaction that is in progress and/or to complete the wind down of the bankruptcy estate, upon payment of an extension fee equal to one percent (1%) of the total Obligations outstanding to Lender as of the date of the extension request (the "Maturity Extension"). Lender shall have no obligation to grant any request for a Maturity Extension but will evaluate any request for the same in good faith based upon its reasonable assessment of the likelihood that a Sale Transaction will be consummated that will allow for all Obligations owing under the DIP Loan Documents to be paid in full. |
| **Amortization:** | None. |
| **Prepayment:** | The Line of Credit will be prepayable in full or in part by the Borrower on one or more occasions. There will be a mandatory repayment of the Line of Credit upon the sale of any assets outside of the ordinary course of business or the Budget. |
| **Loan Interest Rates and Fees:** | The DIP Loan interest rates and fees will be as follows:<br>(i)  **<u>Issuance Fee:</u>** The Borrowers agree to an issuance fee of $375,000, which fee will be earned and payable upon the funding of the Initial Draw (and which will be capitalized and added to the outstanding principal balance of the Loan).<br>(ii)  **<u>Cash Interest:</u>** None.<br>(iii)  **<u>PIK Interest:</u>** The Borrower will pay the Lender paid-in-kind interest ("PIK interest") at 20.0% <u>per</u> <u>annum</u> on the outstanding principal amount of the Loan, |

|  | which shall be capitalized and added to the outstanding principal balance of the Loan on a monthly basis. PIK interest will not be counted against draw limits for any of the draws contemplated in the DIP Credit Agreement. |
|  | (iv) **Exit Fee:** The Borrower will pay the Lender an exit fee equivalent to the greater of: (a) 2.0% of the total amount funded by Lender to Borrower under or in connection with the DIP Credit Agreement, or (b) such amount as will ensure that Lender has recovered at least a 1.4x MOIC (or in the event that the Bankruptcy Court has not approved a Bidding Procedures Order including a Stalking Horse Bid within thirty (30) days of the funding of the Initial Draw, a 1.6x MOIC) inclusive of all accrued and paid-in-kind interest and fees. The Exit Fee shall be payable by Borrower to Lender upon the earlier of (a) the Line of Credit Termination Date and (b) the date on which the Obligations under the DIP Credit Agreement and/or the Line of Credit Note are paid in full; provided, however, that in the event of a partial prepayment by Borrower under the DIP Credit Agreement (either voluntary or mandatory), Borrower shall pay the corresponding *pro rata* portion of the Exit Fee contemporaneously with any such prepayment. |
|  | (v) **Default Interest Rate:** During the occurrence and continuance of an Event of Default, the PIK Interest rate will increase by 200 b.p. |
|  | (vi) **Unused Fee:** Borrower agrees to pay to Lender an unused fee equal to 1% per annum on the undrawn portion of the Line of Credit Commitment, which on a monthly basis shall be calculated as of the first day of each month and capitalized and added to the principal balance of the Line of Credit. |
| **Chapter 11 Case Milestones:** | Borrower shall achieve the following Milestones:<br><br>   (a) Throughout the Chapter 11 Case and until all Obligations owed to Lender are paid in full, Borrower shall remain within Ten Percent (10%) of its revenue projections as reflected on its rolling thirty (30) day Budget;<br><br>   (b) On or before the 28th calendar day after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order; |

| | |
|---|---|
| | (c) On or before the 45th calendar day following the date on which Lender funds the Initial Draw, the Bankruptcy Court shall have entered the Bidding Procedures Order; |
| | (d) On or before the 85th calendar day after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance satisfactory to Lender, approving the Borrower's entry into a Sale Transaction and authorizing Borrower to consummate such Sale Transaction; and |
| | (e) On or before the 100th calendar day after the Petition Date, Borrower shall have consummated the Sale Transaction. |
| **Collateral Security and Priority:** | The collateral for the Line of Credit (the "Collateral") will include pursuant, to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, (i) a fully perfected, first priority security interest in all of Borrower's assets not subject to Permitted Encumbrances, including but not limited to all such presently owned or hereafter acquired Accounts, Chattel Paper, Commercial Tort Claims, Avoidance Actions, Deposit Accounts, real property interests including the Owned Real Property, Documents, Equipment, Fixtures, General Intangibles, all Intellectual Property Collateral, Goods, Inventory, Instruments, Investment Property, Letter of Credit Rights, Payment Intangibles, Supporting Obligations, insurance policies, all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing, and all Products and Proceeds (including cash collateral, as defined in section 363 of the Bankruptcy Code and all accessions to, substitutions for, and all replacements, products, and cash and non-cash proceeds of the foregoing, including proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage or destruction of any Collateral), and (ii) a security interest in all assets of Borrower subject to Permitted Encumbrances, junior only to such Permitted Encumbrances |
| **Subordination:** | As a condition to Lender funding the Initial Draw, Borrower shall have delivered to Lender documentation or other evidence, satisfactory to Lender in its sole discretion, demonstrating that existing Lien holders have either: (i) agreed to fully subordinate their respective Liens and rights to payment to the Liens in favor of Lender and to Lender's rights to payment; or (ii) were duly and properly noticed with the Motion to approve the Interim DIP Order and Final DIP Order |

|  | and failed to object to the entry by the Bankruptcy Court of the Interim DIP Order.<br><br>As a condition to Lender funding the Second Draw, Borrower shall have delivered to Lender documentation or other evidence, satisfactory to Lender in its sole discretion, demonstrating that existing Lien holders have either: (i) agreed to fully subordinate their respective Liens and rights to payment to the Liens in favor of Lender and to Lender's rights to payment; or (ii) were duly and properly noticed with the motion to approve the Interim DIP Order and Final DIP Order and failed to object to the entry by the Bankruptcy Court of the Final DIP Order. |
|---|---|
| **Covenants:** | Affirmative, negative, and other financial and operational covenants customary for transactions of this type, including but not limited to:<br>• Minimum cash balance of at least $250,000 (which may be funded from borrowed funds)<br>• Limitations on capital expenditures<br>• No dividends or any other upstream payments<br>• No Change of Control, except as may be permitted under applicable provisions of the Bankruptcy Code, including, but not limited to Sections 363 or 1129 of the Bankruptcy Code<br>• Maintenance of appropriate insurances and having the Lender as a beneficiary of such insurance policies<br>• Limitations on additional debt, guarantees, and hedging arrangements, including the subordination of all intercompany indebtedness<br>• Limitations on liens and further negative pledges.<br>• Limitations on sales, transfers, and other dispositions of assets, except as may be permitted under applicable provisions of the Bankruptcy Code, including, but not limited to Sections 363 or 1129 of the Bankruptcy Code<br>• Limitations on loans and investments<br>• Limitations on creating new subsidiaries or becoming a general partner in any partnership |
| **Credit Bidding Rights:** | Lender will have the right to credit bid on any asset sales |
| **Representations and Warranties:** | Usual and customary representations and warranties, including organization in good standing, validity of agreements, tax status, compliance with law, and operational and financial disclosures. |
| **Events of Default:** | Events of Default will include, in addition to other such events customarily found in similar transactions: |

| | |
|---|---|
| | • Failure to meet Milestones<br>• Payment defaults<br>• Covenant defaults<br>• Representation or warranty breaches<br><br>Among other remedies, upon the occurrence of an Event of Default, the Lender may accelerate all of the Obligations owing to Lender under the Loan Documents. |
| **Expenses:** | The Borrower will be responsible for the Lender's out of pocket fees and expenses incurred by the Lender in connection with the preparation, negotiation, execution, management, administration, and/or enforcement of the Loan Documents including but not limited to Lender's attorneys' fees and fees of other retained professional advisors. |
| **Contingencies:** | As a condition to Lender funding the Initial Draw, Borrower shall have delivered to Lender documentation or other evidence, satisfactory to Lender in its sole discretion, demonstrating that multiple interested bidders are progressing toward submitting Stalking Horse Bids for all or substantially all of Borrower's assets in a Sale Transaction. |

## PREPETITION FINANCING FACILITIES

15.    As of the Petition Date, Debtor owes a total of approximately $62.8 million ("Prepetition Secured Obligations") in principal plus accrued interest to the Prepetition Secured Parties (defined below).

16.    Prior to the Petition Date, Bremer Bank, Community Bank and Trust, Ford Motor Credit Company LLC, Union Bank & Trust, Michael Helgeson, First Corporate Solutions, Waldinger Corporation, Henkel Construction Company, Steelcase Financial Services, Inc., First Cooperative Association, Centra Sota Cooperative, Gold Eagle Cooperative, and Premier Cooperative (collectively, "Prepetition Secured Parties") made loans, advances, provided agricultural supplies, provided improvements to Debtor's facilities, and provided other financial accommodations to Debtor.

17.     As it relates to Bremer Bank, Debtor is a borrower under a Business Loan Agreement, dated May 4, 2023, and a Business Loan Agreement (Asset Based), dated September 9, 2023. To secure repayment, on May 4, 2023, the Debtor executed a Commercial Security Agreement, which granted to Bremer Bank a purchase money security interest in all equipment financed with the loan proceeds. To secure repayment of the September 9, 2023 Agreement, Debtor executed a Commercial Security Agreement which granted to Bremer Bank a first priority lien and security interest in a broad array of the Debtor's assets. The May 4, 2023 and September 9, 2023 Bremer Agreements are cross-collateralized. As of the Petition Date, Debtor owes Bremer Bank at least $8,356,074.00 under the above-referenced agreements.

18.     As it relates to Community Bank and Trust ("CB&T"), Debtor is a borrower under a loan pursuant to the Food Supply Chain Guaranteed Loan Program ("FSC Loan"), guaranteed by the United States Department of Agriculture, dated April 26, 2023.  The FSC Loan is secured by a first priority  Construction Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated as of April 26, 2023 in the original principal amount of $36,742,500.00 (the "CB&T Construction Mortgage") and recorded in the Office of the Floyd County Recorder on May 4, 2023 as Instr. No. 2023 0754.  A true and correct copy of the CB&T Construction Mortgage is attached hereto as <u>Exhibit D</u>.  As of the date of the Petition, the Debtor owed CB&T principal of $35,269,286.29 and accrued and unpaid interest in the amount of $996, 625.30, for a total of $36,265,911.59 of debt secured by the CB&T Construction Mortgage.

19.     As it relates to Ford Motor Credit Company LLC ("Ford Credit") and Union Bank and Trust, Debtor is borrower under several purchase money equipment finance facilities used to purchase automobiles for use in the business. As of September 12, 2024, the outstanding balance on the automobile loans to Ford Credit was $145,792.59.  As of the same date, the

outstanding balance to Union Bank & Trust was $95,744.40. To secure repayment of the automobile debt to Ford Credit and Union Bank and Trust, Debtor granted Ford Credit and Union Bank and Trust a security interest in each vehicle financed by Ford Credit and Union Bank and Trust.

20. In June 2022, Michael Helgeson, the Chairman of Debtor's Board of Directors, provided purchase money financing necessary to fund the Debtor's purchase of the plant and was granted a first priority, purchase money mortgage in the real estate and improvements to the property where the poultry processing plant is located. To secure repayment of the purchase money loans, the Debtor executed and delivered to Mr. Helgeson a Purchase Money Mortgage, Security Interest, Assignment of Leases and Rents, and Fixture Financing Statement in the original principal amount of $9,954,000 on Debtor's plant (the "Original Helgeson Mortgage").

21. The Original Helgeson Mortgage was thereafter superseded by an Amended and Restated Purchase Money Mortgage dated as of April 26, 2023 (the "Amended Helgeson Mortgage") securing repayment of the original principal sum of $13,754,000.00. The Amended Helgeson Mortgage was thereafter duly recorded in the Office of the Floyd County Recorder as Document No. 2023 0755 on May 4, 2023. A true and correct copy of the Amended Helgeson Mortgage is attached hereto as Exhibit E. As of September 19, 2024, the amount the Debtor owes on the loans secured by the Amended Helgeson Mortgage against the Plant include principal in the amount of $13,754,000, together with accrued and unpaid interest in the amount of $3,350,236.04, for a total prepetition secured claim of $17,104,236.04

22. Pursuant to Subordination Agreements dated as of April 26, 2023, Michael Helgeson agreed to subordinate his rights to payment under the notes secured by the Amended Helgeson Mortgage to the CB&T Construction Mortgage.

15

23.    As it relates to First Corporate Solutions, on or about May 23, 2024, Debtor entered into a Factoring and Security Agreement ("Factoring Agreement") with Southstar Financial, LLC ("Southstar"), which was subsequently assigned to First Corporate Solutions ("First Corporate"). The Factoring Agreement provides that the total outstanding funds advanced to Debtor shall not exceed $10,000,000.    Pursuant to the Factoring Agreement, First Corporate may purchase Debtor's accounts in an amount not to exceed 85% of the face amount of each account sold.    As of the Petition Date, Debtor has $1,820,872 in outstanding invoices corresponding to $1,547,741 in funds advanced under the Factoring Agreement.  Debtor expects all funds advanced under the Factoring Agreement to be satisfied by its outstanding invoices.

24.    As it relates to Henkel Construction Company ("Henkel") and Waldinger Corporation ("Waldinger") (collectively, "Contractors"), Debtor hired these Contractors to make improvements to Debtor's plant. The Contractors hold, or may claim to hold, mechanics liens on Debtor's plant for improvements made to Debtor's plant. As of September 16, 2024, Waldinger holds a mechanics lien on Debtor's plant in the amount of $1,133,926 for improvements made to Debtor's plant. As of September 17, 2024 Henkel recently filed a mechanics lien against the Plant but has agreed to subordinate any liens or interests it may have in the Debtor's real property and improvements at the plant to the DIP Financing  in exchange for the Debtor's authorization to CB&T to release approximately $1.9 million to Henkel to secure discharge of an earlier filed lien.

25.    As it relates to Waldinger's asserted mechanics lien in the amount of $1,133,926, according to Waldinger's lien statement, Waldinger began work on Debtor's plant on February 27, 2024 and completed its work on June 10, 2024. CB&T, however, recorded the CB&T Construction Mortgage upon the Debtor's processing plant and associated real property on May

16

4, **2023**, nearly ten months before Waldinger commenced its work. Accordingly, because Iowa law does not accord priority to a mechanics lien claimant for claims that relate to work performed after the recording of the Construction Mortgage, the Waldinger lien is junior and inferior to the CB&T Construction Mortgage. Likewise, the Waldinger lien is junior and inferior to the Amended Helgeson Mortgage, which preexisted the Waldinger filing by nearly a year.

26.     According to a January 14, 2023 Appraisal Report ("Appraisal Report") of Debtor's plant, the "as is" condition of the property and improvements at the time was $18.7 million, while the Appraisal Report projected that the plant could be improved, with significant investments for improvements and equipment, to a value of $47.63 million. *See* Exhibit F. While Debtor has made substantial improvements to its plant, the Debtor was unable to complete all contemplated improvements or to purchase and have installed all equipment contemplated in the Appraisal Report. The Debtor estimates it would cost several million dollars to finish the work necessary to complete the improvements contemplated by the Appraisal Report. Given that Debtor owes $more than $53 million on the 2023 CB&T Construction Mortgage and the Amended Helgeson Mortgage, and the Debtor's plant is well short of the "As Complete" condition set forth in the Appraisal Report, Waldinger's mechanics lien on Debtor's plant is effectively unsecured and there is no collateral to which it can attach. Accordingly, Waldinger will be adequately protected if it is granted replacement liens – subordinate to the DIP Financing—having the same character, value, validity and dignity as existed prior to the Petition Date.

27.     Prior to the Petition, Centra Sota Cooperative, Gold Eagle Cooperative, Premier Cooperative, and First Cooperative Association (collectively, "Agricultural Suppliers") supplied the Debtor with feed on credit that was used to feed the Debtor's chickens. Pursuant to Iowa Code §570A.3, the Agricultural Suppliers possessed prepetition liens upon all livestock that

consumed the feed as well as the proceeds from such sales. As of September 16, 2024, the Agricultural Suppliers asserted input liens for the following amounts: (1) First Cooperative Association, $356,214.64; (2) Centra Sota Cooperative, $640,499.43; (3) Gold Eagle Cooperative, $96,880.33; and (4) Premier Cooperative, $1,595,899.67.

28.     All of the Debtor's cash, including the cash in its deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral and is Prepetition Collateral of the Prepetition Secured Parties including but not limited to Bremer Bank.

## OTHER POTENTIAL LIEN CLAIMANTS

29.     In addition to the Prepetition Secured Parties, as of the Petition Date, the Debtor owed approximately $3.5 million in principal plus accrued interest to the Disputed Prepetition Secured Claims (defined below).

30.     Prior to the Petition Date, Family Funding Group, LLC ("FFG"), Dynasty Capital 26, LLC ("Dynasty"), ACE Funding Source LLC ("Ace"), and Liquidity Access LLC ("Liquidity Access") (collectively, "the Disputed Prepetition Secured Claims") made loan, advances and provided other financial accommodations to Debtor.

31.     On or about July 8, 2024, the Debtor entered into a Standard Merchant Cash Advance Agreement ("Cash Advance Agreement") with Family Funding Group LLC ("FFG"), pursuant to which Debtor sold a portion of its future revenue stream to FFG. The purchase price was $500,000; Debtor received $450,000 while $50,000 was allocated to underwriting and related expenses. FFG is entitled to 25% of receivables (as defined in the Cash Advance Agreement) on a daily basis until the amount remitted to FFC reaches $749,500. The Debtor disputes any and all liens FFG may attempt to assert and/or enforce in this bankruptcy case. FFG

did not perfect its security interest, so the lien is avoidable under 11 U.S.C. § 544. In addition, because no future receivables of the pre-petition Debtor exist following the Petition Date, FFG is at best a general unsecured creditor. *See Matter of Cornerstone Tower Serv., Inc.*, A17-4050, 2019 WL 127359, at *3 (Bankr. D. Neb. Jan. 3, 2019). As of the Petition Date, Debtor owes FFG $249,500.

32.     The Debtor and Dynasty entered into a Sale of Future Receipts Agreement ("Future Receipts Agreement") with Dynasty on or about July 18, 2024, pursuant to which Debtor sold a portion of its future revenue streams to Dynasty.  The purchase price was $2,200,000; Debtor received $250,000 while $50,000 was applied to an origination fee and $1,900,000 was applied to an existing balance on a similar agreement between the parties.  Dynasty is entitled to 35% of Debtor's revenue on a daily basis until the amount remitted to Liquidity Access reaches $3,300,000.   The Debtor disputes that Dynasty is entitled to a secured claim.  Like FF&G, Dynasty did not perfect its security interest by filing a UCC-1 financing statement.  Any lien Dynasty may now claim is therefore avoidable under 11 U.S.C. § 544(a)(1).  In addition, because the pre-petition Debtor will have no revenue  following the Petition Date, Dynasty is an unsecured creditor. *See Matter of Cornerstone Tower Serv., Inc.*, A17-4050, 2019 WL 127359, at *3 (Bankr. D. Neb. Jan. 3, 2019). As of the Petition Date, Debtor owes Dynasty $2,272,500.

33.     Ace and the Debtor entered into a Revenue Purchase Agreement and Security Agreement and Guaranty of Performance ("RPA No.1 ") dated August 6, 2024, pursuant to which Debtor sold a portion of its future revenue stream to Ace.  The purchase price was $200,000; Debtor received $100,058, $20,000 served as the origination fee and $79,942 went towards an existing balance on a similar agreement between the parties.  Ace is entitled to 3.01% of Debtor's revenue on a daily basis until the amount remitted to Ace reaches $299,800.  In

addition, Debtor entered into a Revenue Purchase Agreement and Security Agreement and Guaranty of Performance ("RPA No. 2") with Ace on or about August 7, 2024, pursuant to which Debtor sold a portion of its future revenue stream to Ace. The purchase price was $111,000; Debtor received $99,900 and $11,100 served as the origination fee. Ace is entitled to 1.67% of Debtor's revenue on a daily basis until the amount remitted to Ace reaches $166,389.00. To secure repayment of the amounts advanced by Ace, the Debtor granted Ace a security interest in accounts and in various other items of collateral. Nevertheless, Debtor disputes any and all liens Ace attempts to assert and/or enforce. Ace filed its UCC-1 financing statement on September 9, 2024, less than two weeks prior to the date of the Petition. Ace's late perfection of its lien may be avoidable in accordance with 11 U.S.C. § 547. *See* 11 U.S.C. §547. In addition, because no future receivables exist following the Petition Date, Ace is an unsecured creditor. *See Matter of Cornerstone Tower Serv., Inc.*, A17-4050, 2019 WL 127359, at *3 (Bankr. D. Neb. Jan. 3, 2019). As of the Petition Date, Debtor owes Ace $372,943.

34.     Liquidity Access and the Debtor entered into a Future Receivables Sale and Purchase Agreement ("Future Receivables Agreement") with Liquidity Access on or about August 16, 2024, pursuant to which Debtor sold a portion of its future revenue stream to Liquidity Access. The purchase price was $500,000; Debtor received $282,757.50 while $50,000 was allocated to underwriting and related expenses and $167,242.50 was allocated to an existing balance on a similar agreement between the parties. Liquidity Access is entitled to 32% of Debtor's revenue on a daily basis until the amount remitted to Liquidity Access reaches $750,000. Liquidity Access may claim a lien or other security interest in and to the Debtor's assets. The Debtor, however, disputes any and all liens Liquidity Access may attempt to assert in these proceedings. Liquidity Access did not perfect its security interest. In addition, because

no future receivables exist following the Petition Date, Liquidity Access is an unsecured creditor.

*See Matter of Cornerstone Tower Serv., Inc.*, A17-4050, 2019 WL 127359, at *3 (Bankr. D. Neb. Jan. 3, 2019). As of the Petition Date, Debtor owes Liquidity Access $645,000.

### DEBTORS' NEED FOR ONGOING FINANCING
### AND USE OF CASH COLLATERAL

35.     The Debtor needs access to the cash collateral ("Cash Collateral") and debtor in possession financing ("DIP Financing") to, among other things, (a) purchase goods from and make payments to vendors on a current basis post-petition; (b) continue to pay employees; and (c) pay ordinary operating expenses to fund inventory acquisition, utilities, taxes and fees.  The Debtor's cash needs are set forth in the accompanying 13-week budget.

36.     The Debtor analyzed whether it could finance operations during this case using only the Cash Collateral. The Debtor concluded that DIP Financing is necessary for a number of reasons.  First, the Debtor considered such factors as the uncertainty inherent in estimating the timing of receipts and disbursements and the need for access to continued periodic incremental liquidity during this case in order to maintain the going concern value of its estate.  Second, the Debtor requires the support of its vendors and other suppliers in order to replenish inventory and maintain ordinary course operations during the case. The availability of DIP Financing sends a strong signal of support to vendors and suppliers that Debtor will have adequate funding available to pay post-petition obligations. It will also enable the Debtor to fund valid pre-petition statutory trust interests, which in turn will help to ensure that the Debtor will have access to growers to help raise the chickens the Debtor ultimately processes and sells.  Third, Debtor considered extraordinary or one-time costs that have been or will be incurred in this including costs incurred for professional fees for Debtor, the Unsecured Creditors Committee and secured creditors, insurance renewal costs, and to address the rights of third parties such as utility companies to

demand and receive deposits.  The Debtor concluded that risks associated with attempting to finance operations with cash collateral outweighed benefits and certainty provided by the use of DIP financing.  If approved, the DIP Financing will preserve and enhance the value of the Debtor's estate and, as such, entry into the DIP Financing is a sound exercise of the Debtor's business judgment.

37.     The Debtor was unable to obtain any alternative proposals for DIP Financing despite numerous inquiries.

38.     Under the DIP Financing, Debtor will pay a $375,000 Issuance Fee, 1% on the undrawn portion of the Line of Credit Commitment, 2.5% of the facility amount as a Funding Fee, 1.0% as a Commitment Fee, and the greater of (a) 2% of the total amount funded by the DIP Lender or (b)(i) 1.4x the amount of DIP Lender's invested capital or (ii) 1.6x of the amount of DIP Lender's invested capital in the event that the Bankruptcy Court has not approved the Bidding Procedures Order including a Stalking Horse Bid within thirty (30) days of the funding of the Initial Draw.  In addition, the Debtor will pay all reasonable and documented costs and expenses of DIP Lender in connection with the preparation, negotiation, execution, and/or administration of the Loan Documents. The Fees are in line with market rates and other DIP facilities approved in recent retail cases.

39.     Debtor, with the assistance of Lakeshore Food Advisors, LLC and its other advisors, determined that the proposal submitted by the DIP Lender is the only proposal available at this time.

40.     Debtors and the DIP Lender negotiated the DIP Credit Agreement in a good faith and arm's length manner, with the advice of sophisticated counsel and advisors.  The DIP

Credit Agreement represents the best and most favorable financing available to Debtor under the circumstances.

## PROPOSED DIP FINANCING

41.    Recognizing the Debtor's need for financing, and in consultation with its advisors, Debtor negotiated with the DIP Lender regarding the terms of potential DIP financing. As the result of good faith, arms-length negotiations, the DIP Lender has agreed to make available up to $15,000,000 of post-petition financing. The terms of the DIP Credit Agreement are summarized above.

42.    As a condition to entry into the DIP Credit Agreement, the extensions of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Lender requires, and Debtor agreed, that proceeds of the DIP Facility shall be used in a manner consistent with the terms and conditions of the DIP Loan Documents and the Interim Order, and in accordance with the Approved Budget, solely to pay expenses incurred by Debtor in the ordinary course of business and which are permitted to be paid by this Court and the Bankruptcy Code, in accordance with and up to the amounts provided for in the Budget.

43.    As a condition to entry into the DIP Loan Documents, the extension of credit under the DIP Facility, and the authorization to use Cash Collateral, Debtor and the DIP Lender have agreed that the proceeds of Collateral (as defined in Post-Petition Loan and Security Agreement (Exhibit A)) shall be applied in accordance with the Interim DIP Order.

## ADEQUATE PROTECTION

44.    As a result of the granting of the DIP Liens, the incurrence of the DIP Obligations (as defined in the DIP Credit Agreement (Exhibit D)), the subordination of the Prepetition Secured Parties and Disputed Prepetition Secured Claims, the use of Cash Collateral, and the imposition of

23

the automatic stay, the Prepetition Secured Parties and potentially the Disputed Prepetition Secured Claims are entitled to receive adequate protection pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code and as set forth in the Interim Cash Collateral Order.

45.    As adequate protection for the Prepetition Secured Parties, Debtor proposes that the Prepetition Secured Parties receive (i) adequate protection liens in the amount equal to the aggregate diminution in value of the interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, a valid replacement security interest in and lien on all prepetition and postpetition property and assets of Debtor and its estate, including the DIP Collateral and all proceed thereof, subordinate only to the DIP Liens (as defined in the Interim DIP Order), and (ii) payments as set forth in the Proposed Budget (to the extent applicable).

46.    As adequate protection for the Disputed Prepetition Secured Claims, Debtor proposes that the holders of Disputed Prepetition Secured Claims receive (i) adequate protection liens in Debtors' postpetition assets of the same character, value, validity and dignity as existed prior to the Petition Date.

## NOTICES

47.    Prior to the hearing on the Motion for a final order authorizing use of cash, and in settlement of any and all matters raised in this Motion, Debtor may enter into a stipulation or agreed order with parties claiming a security interest in cash collateral assets of Debtor concerning the use of cash collateral, adequate protection and other related matters. In the event that Debtor enters into any such stipulation, it will seek approval of the stipulation without further notice or hearing pursuant to Rule 4001(d)(4) of the Federal Rules of Bankruptcy Procedure, and DEBTOR HEREBY GIVES NOTICE OF THEIR INTENTION TO SEEK APPROVAL OF ANY SUCH STIPULATION.

48.     Pursuant to Local Rule 9013-2(a), this Motion is accompanied by a memorandum of law, proposed order, and proof of service.

49.     No prior request for the relief sought in this Motion has been made by Debtor to this or any other court.

50.     Pursuant to Local Rule 9013-2(c), Debtor gives notice that it may, if necessary, call George Peichel, Chief Financial Officer of Debtor to testify on behalf of Debtor about the factual matters raised in this Motion.

WHEREFORE, Debtor request that the Court (a) enter the Interim DIP Order authorizing the Debtor to obtain the DIP Financing substantially in the form attached hereto as Exhibit A, and a final order granting the relief requested herein, and (b) enter the Interim Cash Collateral Order in the form attached hereto as Exhibit B authorizing the debtor to use cash collateral and to provide adequate protection as set forth herein, and (c) that the Court grant such other and further relief as is just an proper.

Dated: September 20, 2024                    **TAFT STETTINIUS & HOLLISTER LLP**

                                             By: _/s/ James M. Jorissen_____
                                                 James M. Jorissen, #262833
                                                 Adam G. Chandler, #397408
                                                 Schaan P. Barth, #397898
                                                 2200 IDS Center
                                                 80 South Eighth Street
                                                 Minneapolis, MN 55402
                                                 Telephone: 612-977-8400
                                                 Facsimile: 612-977-8650
                                                 jorissen@taftlaw.com
                                                 achandler@taftlaw.com
                                                 sbarth@taftlaw.com

                                             **PROPOSED COUNSEL FOR THE
                                             DEBTOR**

## **VERIFICATION**

I, George Peichel, Chief Financial Officer of the Debtor named in the foregoing motion, declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.

Dated this <u>20th</u> day of September, 2024.

George Peichel

## E<small>XHIBIT</small> A

Interim DIP Order

(*See attached*)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA**

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| PURE PRAIRIE POULTRY INC., | : | Case No. 24-32426 (KAC) |
| | : | |
| | : | |
| | : | |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |
| | : | |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364, 503 AND 507 (I)
AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING, (II)
GRANTING LIENS AND SUPERPRIORITY CLAIMS TO POST-PETITION LENDER,
AND (III) SCHEDULING FINAL HEARING**

Upon the motion (the "Motion") [D.I. ___] of Pure Prairie Poultry Inc. (the "Debtor") in the

above-captioned case (the "Chapter 11 Case"), pursuant to sections 105, 362, 364, 503 and 507 of

title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the

1

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the [Minnesota Bankruptcy Local Rules] (the "**Local Bankruptcy Rules**"), seeking, among other things:

(a)      entry of this interim order (the "Interim DIP Order") and a final order (the "Final DIP Order") authorizing the Debtor to obtain post-petition financing (the "DIP Loans") consisting of a non-revolving line of credit in an aggregate principal amount not to exceed $15,000,000.00 (the "DIP Facility"), from Sandton Capital Solutions Master Fund VI, LP, and/or one or more of its designees (the "DIP Lender") pursuant to that certain Post-Petition Loan and Security Agreement, dated as of September [•], 2024, attached to the Motion as Exhibit 1 (as amended, modified, restated, or supplemented in accordance with the terms thereof or hereof, the "Loan Agreement"),[1] and all instruments, financing statements and documents as may be executed and delivered in connection with or relating to the DIP Facility, this Interim DIP Order and/or the Final DIP Order (subject to its entry) and any certificate or other document made or delivered pursuant hereto or thereto (collectively with the Loan Agreement, the "DIP Loan Documents"), and perform all such other and further acts as may be required in connection with the DIP Loan Documents;

(b)      scheduling a final hearing (the "Final Hearing") to consider entry of the Final DIP Order, and in connection therewith, approving the manner of notice of the Final Hearing; and

(c)      granting the Debtor such other and further relief as is just and proper;

And the Court having considered the Motion, the exhibits attached thereto, the Declaration of George Peichel in Support of the Debtor's First Day Motions (the "First Day Declaration"); and a hearing to consider entry of this Interim DIP Order having been held before the Court on September 25, 2024 (the "Interim Hearing"); and all objections, if any, to the interim relief

---

[1] All capitalized terms used but not defined herein shall have the meanings stated in the Loan Agreement.

requested in the Motion and the entry of this Interim DIP Order having been withdrawn, resolved, or overruled by the Court as reflected on the record of the Interim Hearing; and upon all of the pleadings filed with the Court, all evidence presented in support of the entry of this Interim DIP Order, the arguments of counsel stated on the record of the Interim Hearing, and all of the proceedings held before the Court; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any findings of fact herein constitute conclusions of law, they are adopted as such. To the extent any conclusions of law herein constitute findings of fact, they are adopted as such.

B.      The Court has jurisdiction over the Motion and the transactions contemplated by the DIP Loan Documents pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (M). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.      The statutory bases for the relief requested in the Motion are sections 105, 362, 364, 503 and 507 of the Bankruptcy Code.

D.      On September 20, 2024, the Debtor served copies of the Motion and notice of the Interim Hearing (collectively, the "Notice") in accordance with Bankruptcy Rule 4001 to all creditors and parties in interest entitled to such notice,  including: (i) the Office of the U.S. Trustee for this District; (ii) those parties listed as holding the twenty (20) largest unsecured claims against the Debtor's estate; (iii) the DIP Lender and its counsel; (iv) any other secured parties of record or

parties that, to the Debtor's knowledge, may assert a lien and/or security interest (each as defined in section 101 of the Bankruptcy Code) in property of the Debtor's estate; (v) the Internal Revenue Service; and (vi) any party that has requested notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002. Under the circumstances, such Notice of the Interim Hearing and the relief requested in the Motion is due, proper, and sufficient notice and complies with Bankruptcy Rules 2002, 4001, and 9014 and the Local Rules, and no other or further notice of the Interim Hearing or the interim relief granted in this Interim DIP Order is necessary or required, except as set forth herein with respect to the Final Hearing.

      E.      On September 20, 2024 (the "Petition Date"), the Debtor commenced this Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota (the "Court"). The Debtor is operating its business and managing its affairs as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no trustee, examiner, or official committee of creditors holding unsecured claims (a "Committee") has been appointed in the Chapter 11 Case.

      F.      The Debtor's use of its cash is insufficient, alone, to meet the Debtor's immediate post-petition liquidity needs. As a result, an immediate and critical need exists for the Debtor to obtain post-petition financing in order to maximize the value of the Debtor's estate, for the benefit of creditors and other parties in interest, via an expedited sale process for substantially all assets of the Debtor's estate.

      G.      Notwithstanding efforts of the Debtor and its retained professionals to do so, the Debtor is unable to obtain sufficient post-petition financing (i) in the forms of (1) unsecured debt incurred in the ordinary course of business allowable as an administrative expense under section

503(b)(1) of the Bankruptcy Code, (2) unsecured debt incurred outside the ordinary course of business allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, or (3) secured debt incurred outside the ordinary course of business secured by liens *pari passu* or junior to Existing Liens (defined below) (ii) on terms more favorable than those embodied in the Loan Agreement and the other DIP Loan Documents. The DIP Lender is prepared to enter into the DIP Loans solely on the terms set forth in the Loan Agreement and the other DIP Loan Documents.

H.    The terms of the DIP Loans are fair, just, and reasonable under the circumstances, reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and is supported by reasonably equivalent value and fair consideration.  The liquidity to be provided under the DIP Loan Documents and this Order will enable the Debtor to continue to operate its business in the ordinary course and preserve the value of the Debtor's business pending the sale of substantially all of its assets.

I.    The terms of the DIP Loans have been negotiated in good faith and at arm's length by and between the Debtor and the DIP Lender.

J.    Any credit extended or other indebtedness or liabilities arising under, in respect of, or in connection with the this Interim DIP Order, or any DIP Loan Document, shall be deemed to have been extended in "good faith" by the DIP Lender as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections afforded by section 364(e) of the Bankruptcy Code and this Order.

K.    The relief requested in the Motion and granted in this Interim DIP Order is necessary, essential, and appropriate for the management and preservation of the Debtor's assets and property and is in the best interests of the Debtor, its estate, its creditors and other parties in interest.

5

111894545_6

135081807v1

L.      Absent the relief granted herein, the Debtor's estate will be immediately and irreparably harmed.

M.      Good, adequate, and sufficient cause has been shown to justify the relief granted herein and the immediate entry and effectiveness of this Interim DIP Order.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is **GRANTED** on an interim basis as set forth herein. Any objections to the entry of this Interim DIP Order that have not been previously resolved or withdrawn are hereby overruled on their merits.

2.      The Loan Agreement and the other DIP Loan Documents are **APPROVED** in their entirety, and the Debtor is hereby authorized to execute and enter into, deliver, and perform all obligations thereunder.

3.      The Debtor is hereby authorized to borrow up to an aggregate principal amount of [Seven Million Five Hundred Thousand Dollars ($7,500,000)] under the DIP Facility on an interim basis, to be used solely as expressly provided in the Loan Agreement and the other DIP Loan Documents, and in accordance with the approved budget (the "Budget") attached hereto as **Exhibit A**, subject to the Permitted Variance, and as may be updated pursuant to Section 5.1 of the Loan Agreement.

4.      In furtherance of the foregoing and without further approval of this Court, the Debtor is hereby authorized to perform all acts, to make, execute and deliver all instruments and documents, and to pay all related fees, consistent with the terms of this Interim DIP Order, that may be reasonably required or necessary for the Debtor's performance of its obligations under the DIP Loans.

111894545_6

135081807v1

5.      All of the DIP Liens (defined below) shall be effective and perfected as of the date of entry of this Interim DIP Order without the necessity of the execution, recording, or filing of security agreements, pledge agreements, financing statements, or other agreements or instruments.

6.      The Loan Agreement and the "Obligations" (as defined in the Loan Agreement) constitute valid, binding, and non-avoidable obligations of the Debtor enforceable against the Debtor and its successors and assigns in accordance with the terms of this Interim DIP Order and the DIP Loan Documents, and shall survive the dismissal of this Chapter 11 Case or the conversion of this Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code and shall be binding upon any subsequently appointed chapter 7 trustee.

7.      No obligation, payment, transfer, or grant of security under this Interim DIP Order or the DIP Loan Documents shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under the Bankruptcy Code or any other applicable foreign or domestic law or regulation by any person or entity.

8.      The DIP Loans shall (a) be evidenced by the books and records of the DIP Lender and, upon the request of the DIP Lender, a note executed and delivered to the DIP Lender by the Debtor in accordance with the terms of the DIP Loan Documents, (b) bear interest at the rates set forth in the Loan Agreement, (c) be secured in the manner specified below and under the applicable DIP Loan Documents, (d) be payable in accordance with the applicable DIP Loan Documents, and (e) otherwise be governed by the terms set forth in this Interim DIP Order and the DIP Loan Documents.

111894545_6

135081807v1

9.      The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified and vacated without further notice, application, or order of the Court to the extent necessary to permit the DIP Lender to perform any act authorized or permitted under or by virtue of this Interim DIP Order or any of the other DIP Loan Documents, including, without limitation, (a) to implement the DIP Facility to the extent authorized by this Interim DIP Order and pursuant to the terms of the DIP Loan Documents, (b) to take any act to create, validate, evidence, attach, or perfect any lien, security interest, right, or claim in the "Collateral" (as defined in the Loan Agreement), and (c) to assess, charge, collect, advance, deduct, and receive payments with respect to the Obligations, including, without limitation, all principal, interest, fees, costs, and expenses permitted under the DIP Loan Documents, and to apply such payments to the Obligations pursuant to the DIP Loan Documents.

10.      The DIP Lender shall have no obligation to make any DIP Loans or any other financial accommodation under the respective DIP Loan Documents unless the conditions precedent to make such extensions of credit under the respective DIP Loan Documents have been satisfied in full or expressly waived in writing and in accordance with such DIP Loan Documents.

11.      Pursuant to section 364(c)(1) of the Bankruptcy Code, the Obligations constitute (without the need to file a proof of claim) superpriority claims (the "DIP Superpriority Claims") against the Debtor, with priority over any and all administrative expenses of the Debtor, whether now existing or hereafter arising or incurred, of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.

12.      As security for the full and timely payment of the Obligations, the DIP Lender is hereby granted: (i) pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, non-

111894545_6

135081807v1

avoidable, fully perfected, first-priority senior security interests in and liens upon all Collateral (as defined in the Loan Agreement) that was not subject to any valid, enforceable and non-avoidable lien in existence on the Petition Date, which lien was either properly perfected as of the Petition Date, or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code (an "Existing Lien"); and (ii) pursuant to section 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable, fully perfected, first-priority senior priming security interests in and liens upon all Collateral that was subject to an Existing Lien as of the Petition Date (the security interests and liens granted to DIP Lender in (i) and (ii) above, collectively, the "DIP Liens").  As required by section 364(d)(2), all holders of Existing Liens impacted by the DIP Liens (the "Primed Parties," and, such Existing Liens, the "Primed Liens") granted pursuant to section 364(d)(1) are adequately protected as and to the extent set forth in the [CASH COLLATERAL ORDER].  All Primed Liens are hereby primed by and made subject and subordinate to the perfected first-priority senior DIP Liens granted to DIP Lender hereunder, which senior priming DIP Liens in favor of DIP Lender shall also prime any liens granted following the commencement of the Chapter 11 Case to provide adequate protection in respect of any of the Primed Liens.

13.    The DIP Liens shall be effective immediately upon entry of this Interim DIP Order. This Interim DIP Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of executing, filing, or recording any mortgage, security agreement, pledge agreement, financing statement, or other instrument or document, or the taking of any other act that otherwise may be required under state or federal law, rule, or regulation of any jurisdiction to validate or perfect the DIP Liens or to entitle the DIP Lender to the priorities granted herein, provided, however, the Debtor may execute, and the DIP Lender is hereby authorized to execute, file, and/or record mortgages, security agreements, pledge

9

agreements, financing statements, and/or other instruments or documents to evidence the DIP Liens and the Debtor is hereby authorized, promptly upon a demand by the DIP Lender made in accordance with the terms of the DIP Loan Documents, to execute, file, and/or record any such mortgages, security agreements, pledge agreements, financing statements, or other instruments or documents as the DIP Lender may reasonably request; provided, however, that no such execution, filing, or recordation shall be necessary or required in order to create or perfect the DIP Liens. A copy of this Interim DIP Order may, in the discretion of the DIP Lender, be filed with or recorded in any filing or recording office in addition to or in lieu of such mortgages, security agreements, pledge agreements, financing statements, or other instruments or documents, and each and every federal, state, and local governmental agency, department, or office is hereby directed to accept a copy of this Interim DIP Order and any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by this Interim DIP Order and the other DIP Loan Documents, for filing and recording, and to deem this Interim DIP Order to be in proper form for filing and recording.  All cash of the Debtor, including the cash in its deposit accounts and other accounts, wherever located, shall be subject to the DIP Liens and no control agreement governing, or other possession or control over, such cash shall be necessary or required in order to perfect the DIP Liens in respect of such cash.

14.    The DIP Liens shall not be (a) subject to any lien that is avoided and preserved for the benefit of the Debtors' estate under section 551 of the Bankruptcy Code or (b) subordinated to or made *pari passu* with any other lien under section 364(d) of the Bankruptcy Code or otherwise.

15.    Absent indefeasible payment in full in cash of all Obligations of the Debtor and termination of the Loan Agreement, the Debtor shall not (a) grant or impose any liens on the Collateral, or (b) prime or seek to prime the DIP Liens.

111894545_6

135081807v1

16.     In no event shall any person or entity who pays (or through the extension of credit
to the Debtor, causes to be paid) any of the Obligations, be subrogated, in whole or in part, to any
rights, remedies, claims, privileges, liens or security interests granted in favor of, or conferred
upon the DIP Lender by the terms of this Interim DIP Order or any of the DIP Loan Documents,
until all of the Obligations are indefeasibly paid in full in cash (or by a credit bid in accordance
with Section 363(k) of the Bankruptcy Code) and the Loan Agreement is terminated.

17.     The DIP Liens and the DIP Superpriority Claims shall continue after conversion of
the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code and in any successor
bankruptcy case for the Debtor under any chapter of the Bankruptcy Code, and all liens, security
interests, and claims shall maintain their priority as provided in this Interim DIP Order until all of
the Obligations are indefeasibly paid in full in cash (or a credit bid in accordance with Section
363(k) of the Bankruptcy Code) and the Loan Agreement is terminated.

18.     Notwithstanding anything in this Interim DIP Order, any other DIP Loan
Documents, or any other order by this Court to the contrary, no proceeds of the DIP Loans or
Collateral may be used, directly or indirectly by the Debtor or any other person or entity, to fund
(a) any investigation of or challenge to, the (i) enforceability of any amounts due under the DIP
Loans or the DIP Loan Documents or on account of the DIP Superpriority Claims, or (ii) the
validity, perfection, priority or extent of the DIP Liens, (b) any investigation or prosecution of any
claims, defenses, or causes of action (including, without limitation, any claims or causes of action
under chapter 5 of the Bankruptcy Code) against the DIP Lender or its agents, affiliates,
representatives, attorneys, or advisors, (c) any effort to prevent, hinder or otherwise delay the DIP
Lender's assertion, enforcement, or realization against or upon the Collateral, in accordance with
this Interim DIP Order and the DIP Loan Documents, (d) any effort to seek to modify any of the

11

rights granted to the DIP Lender hereunder or under the DIP Loan Documents, or (e) any effort to take any other action prohibited by the Loan Agreement.

19.      The Debtor's authorization to use the DIP Facility shall immediately terminate on the Line of Credit Termination Date, as defined in the Loan Agreement.

20.      No costs or expenses of administration which have been or may be incurred in the Chapter 11 Case shall be recovered from the DIP Lender or be charged against the Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise. The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral and shall be entitled to a waiver of the exceptions provided in sections 552(b)(1) and (2) of the Bankruptcy Code. The DIP Liens shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code.

21.      Lender shall be entitled to reimbursement by Borrower of Lender's reasonable out-of-pocket expenses, including reasonable fees of its attorneys and other professionals, pursuant to and in accordance with the Loan Agreement for reimbursement of such amounts.

22.      In determining to extend credit under the DIP Facility, or in exercising any rights or remedies pursuant to this Interim DIP Order and the other DIP Loan Documents, the DIP Lender shall not be deemed to be in control of the Debtor's operations or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq.*, as amended, or any similar federal or state statute).

23.      The Debtor irrevocably waives any right they may have to seek authority to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) or 364(d) of the

12

Bankruptcy Code, other than from the DIP Lender, or as may be otherwise expressly permitted under the DIP Loan Documents, unless the Debtor uses the proceeds of such post-petition loans or other financial accommodations to indefeasibly pay in full in cash all Obligations.

24.     In any hearing regarding any exercise of rights or remedies by the DIP Lender following an alleged Event of Default, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing and/or whether any required notice has been provided, and the Debtor hereby waives its right to seek relief, including without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Lender, as set forth in this Interim DIP Order or the other DIP Loan Documents, other than to contest whether an Event of Default has occurred or is continuing and/or whether any required notice has been provided.

25.     In the absence of express prior written consent, no consent to a sale, transfer, lease, encumbrance, or other disposition of any portion of the Collateral shall be implied from any action, inaction, or acquiescence by the DIP Lender.

26.     Upon the occurrence of an Event of Default under the Loan Agreement and following five (5) days written notice thereof (the "Stay Termination Notice") to counsel to the Debtor, counsel to the Committee, if any, and the United States Trustee (collectively, the "Notice Parties"), and unless an Order extending the automatic stay (based upon a finding that an Event of Default has not occurred and is not continuing and/or that any required notice has not been provided) is entered prior to the date which is five (5) days after the date of service of the Stay Termination Notice as set forth below, the automatic stay of section 362 of the Bankruptcy Code shall be deemed automatically vacated and the DIP Lender shall be immediately permitted to, among other things, pursue any and all of its remedies against the Debtor and the Collateral;

provided, however, the automatic stay shall be deemed vacated immediately upon entry of this Interim DIP Order to the extent necessary to allow the DIP Lender to enforce its entitlement to payment in full of all Obligations from the proceeds of sale of any Collateral. Following the service of a Stay Termination Notice by the DIP Lender to the Notice Parties, the Notice Parties shall be entitled to an emergency hearing before this Court; provided, however, if the Court does not, prior to the date which is five (5) days after the date of service of the Stay Termination Notice, enter an Order extending the automatic stay (based upon a finding that an Event of Default has not occurred and is not continuing and/or that any required notice has not been provided), the automatic stay shall terminate as provided above notwithstanding the filing or pendency of any request for such emergency hearing.

27.    The provisions of this Interim DIP Order and any actions taken pursuant hereto shall survive the entry of any order: (a) confirming a chapter 11 plan in the Chapter 11 Case, (b) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (c) dismissing the Chapter 11 Case, and the Obligations and DIP Liens shall maintain their enforceability and priority as provided by this Interim DIP Order until all of the Obligations are indefeasibly paid in full in cash in accordance with the DIP Loan Documents.

28.    This Interim DIP Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lender may have to bring or be heard on any matter brought before this Court or, in the event of dismissal of the Chapter 11 Case before all Obligations are indefeasibly paid in full, in another court of competent jurisdiction.

29.    The terms, conditions, and provisions of this Interim DIP Order are in addition to and without prejudice to the rights of the DIP Lender to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Loan Documents, or any other applicable agreement or law,

14

111894545_6

135081807v1

including, without limitation, rights (a) to seek relief from the automatic stay, (b) to seek an injunction, (c) to oppose any request for use of cash collateral or for the granting of any interest in the Collateral, or of priority in favor of any other party, (d) to object to any sale of assets, or (e) to object to applications for allowance or payment of compensation of the Debtor's professionals or other parties seeking compensation or reimbursement from the Debtor's bankruptcy estate.

30.     Notwithstanding anything to the contrary contained in any prior or subsequent order of this Court, the DIP Lender shall not be required to file proofs of claim in order to maintain its claims with respect to the Obligations, all of which shall be due and payable in accordance with this Interim DIP Order and the DIP Loan Documents without the necessity of filing any such proof of claim.

31.     Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 7062 or any other Bankruptcy Rule, this Interim DIP Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim DIP Order.

32.     In the event of any inconsistency or conflict between any of the terms and provisions of this Interim DIP Order and the DIP Loan Documents, the terms and provisions of this Interim DIP Order shall govern.

33.     The Debtor's cash management system shall at all times be maintained in accordance with any order of this Court approving the maintenance of the Debtor's cash management system.  The Debtors shall not seek approval of any cash management system by the Court without prior written approval of the same by the DIP Lender.

34.     The DIP Lender shall have the unqualified right to credit bid up to the full amount of the applicable outstanding Obligations, including any accrued interest, in any sale of the Collateral (or any part thereof) without the need for further Court order authorizing the same, and

111894545_6

135081807v1

whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

35.    This Court shall retain jurisdiction to interpret, implement, and enforce the provisions of this Interim DIP Order and the other DIP Loan Documents.

36.    The DIP Lender is hereby granted all protections afforded by section 364(e) of the Bankruptcy Code.

37.    The failure to reference any provision of the DIP Loan Documents in this Interim DIP Order shall not affect the enforceability of such provision.

38.    This Order may not be amended, supplemented or otherwise modified without the express written consent of the DIP Lender.

39.    The Debtor shall promptly serve by United States mail, first class postage prepaid, copies of this Interim DIP Order and a notice of the Final Hearing (the "Final Hearing Notice") to be held on _____, 2024 at _____ to consider entry of the Final DIP Order on the following: (a) the Office of the United States Trustee; (b) the Internal Revenue Service; (c) the Office of the United States Attorney for the District of Minnesota; (e) those entities or individuals listed on the Debtor's list of twenty (20) largest unsecured creditors; (f) all other known parties asserting a lien against or interest in the Debtor's assets; and (g) counsel to any Committee, to the extent appointed. Copies of the Motion, this Interim DIP Order, and the Final Hearing Notice also shall be served upon all persons requesting service of papers pursuant to Bankruptcy Rule 2002 by United States mail, first class postage prepaid, promptly following the receipt of such request.

40.    The Final Hearing Notice shall state that any party in interest objecting to the entry of the Final DIP Order shall file written objections with the Court no later than _____, 2024 at _____CT, which objections shall be served so that the same are received on or before

16

111894545_6

135081807v1

such date and time by: (a) [PPP contact info]; (b) [counsel for PPP contact info]; (c) counsel for the DIP Lender, McGuireWoods LLP, Tower Two-Sixty, 260 Forbes Avenue, Suite 1800, Pittsburgh, PA 15222 (Attn: Mark E. Freedlander), mfreedlander@mcguirewoods.com; (d) counsel for the Committee, if any; and (e) [the Office of the United States Trustee].

17

# EXHIBIT 1

EXECUTION VERSION

**POST-PETITION LOAN AND SECURITY AGREEMENT**

DATED AS OF

SEPTEMBER [__], 2024

BY AND BETWEEN

PURE PRAIRIE POULTRY, INC.

AS BORROWER,

AND

SANDTON CAPITAL SOLUTIONS MASTER FUND VI, LP, AND/OR ONE OR MORE OF ITS DESIGNEES

AS LENDER

## TABLE OF CONTENTS

**Page**

**SECTION 1. DEFINITIONS** .......................................................................................... **1**

    1.1    General Provisions ................................................................................. 1
    1.2    Defined Terms ...................................................................................... 2

**SECTION 2. AMOUNT AND TERMS OF LOAN** ................................................ **10**

    2.1    Line of Credit ..................................................................................... 10
    2.2    Line of Credit Note ............................................................................ 11
    2.3    Loan Account ..................................................................................... 12
    2.4    Computation of Interest ...................................................................... 12
    2.5    Maximum Legal Rate ......................................................................... 12
    2.6    Issuance Fee ....................................................................................... 12
    2.7    Unused Fee. ........................................................................................ 12
    2.8    Exit Fee. ............................................................................................. 12
    2.9    Payments ............................................................................................ 13
    2.10    Application of Payments .................................................................... 13
    2.11    Voluntary and Mandatory Payments ................................................. 13
    2.12    Grant of Security Interest ................................................................... 13
    2.13    Perfection of Security Interests .......................................................... 13
    2.14    Administrative Status of Obligations ................................................ 14
    2.15    Adequate Protection; Cash Collateral Usage .................................... 14
    2.16    Right to Credit Bid ............................................................................. 14

**SECTION 3. BORROWER REPRESENTATIONS AND WARRANTIES** ...................... **14**

    3.1    Organization and Qualification .......................................................... 14
    3.2    Power and Authority .......................................................................... 14
    3.3    Enforceability..................................................................................... 14
    3.4    Conflict with Other Instruments ........................................................ 15
    3.5    Title to Collateral ............................................................................... 15
    3.6    Use of Proceeds ................................................................................. 15
    3.7    No Notices; No Violations.................................................................. 15
    3.8    Location of Collateral ........................................................................ 15
    3.9    Broker's Commissions ....................................................................... 16

**SECTION 4. CONDITIONS OF BORROWING** ............................................... **16**

    4.1    Initial Draw ........................................................................................ 16
    4.2    Second Draw ...................................................................................... 17
    4.3    Waiver of Conditions ........................................................................ 18

**SECTION 5. AFFIRMATIVE COVENANTS** ...................................................... **18**

    5.1    Financial Statements; Reports............................................................ 18
    5.2    Liabilities ........................................................................................... 18
    5.3    Notices ............................................................................................... 18
    5.4    Environmental Matters; Compliance with Laws ............................... 18

MW DRAFT 9.18.24

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 5.5 | Corporate Existence; Properties | 20 |
| 5.6 | Insurance | 20 |
| 5.7 | Books and Records | 20 |
| 5.8 | Location of Collateral | 21 |
| 5.9 | Chapter 11 Case Milestones | 21 |
| 5.10 | Minimum Cash Balance | 21 |
| 5.11 | Professional Retentions | 21 |

**SECTION 6. NEGATIVE COVENANTS ........... 22**

| | | |
|---|---|---|
| 6.1 | Debt | 22 |
| 6.2 | Liens | 22 |
| 6.3 | Investments, Loans and Advances | 22 |
| 6.4 | Capital Expenditures | 23 |
| 6.5 | Dividends; Distributions; Acquisition of Capital Stock | 23 |
| 6.6 | Disposition of Assets | 23 |
| 6.7 | New Subsidiaries or Partnerships | 23 |
| 6.8 | Continuance of Business | 23 |
| 6.9 | Removal and Protection of Property | 23 |
| 6.10 | Handling of Hazardous Substances | 23 |
| 6.11 | Packers and Stockyards Act Claims | 23 |

**SECTION 7. EVENTS OF DEFAULT, REMEDIES ........... 24**

| | | |
|---|---|---|
| 7.1 | Events of Default | 24 |
| 7.2 | Remedies | 25 |
| 7.3 | Right of Setoff | 26 |
| 7.4 | Remedies Cumulative | 26 |
| 7.5 | Site Assessments | 26 |

**SECTION 8. MISCELLANEOUS ........... 26**

| | | |
|---|---|---|
| 8.1 | No Waiver; Cumulative Remedies | 26 |
| 8.2 | Notices | 27 |
| 8.3 | Reimbursement of Lender | 27 |
| 8.4 | Payment of Expenses and Taxes | 28 |
| 8.5 | Survival of Representations and Warranties | 28 |
| 8.6 | Successors | 28 |
| 8.7 | Construction | 28 |
| 8.8 | Severability | 28 |
| 8.9 | Indemnity | 28 |
| 8.10 | Governing Law; Waiver of Trial by Jury; Jurisdiction | 29 |
| 8.11 | Actions Against Lender; Release | 29 |
| 8.12 | Performance by Lender | 30 |
| 8.13 | Counterparts | 30 |
| 8.14 | Further Actions | 30 |

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---:|
| 8.15 | Section 506(c) and 552(b) Waivers | 30 |
| 8.16 | Section 510, 544, 547, 548 and 549 Waiver, Etc. | 30 |
| 8.17 | No Marshaling | 31 |
| 8.18 | Entire Agreement | 31 |
| 8.19 | Bankruptcy Court Approval | 31 |

**<u>Table of Schedules</u>**

Schedule A          –     Copyrights, Licenses, Patents and Trademarks
Schedule 3.8        –     Location of Collateral
Schedule 4.1        –     Existing Lien Holders
Schedule 6.1        –     Certain Permitted Debt
Schedule 6.2        –     Certain Permitted Encumbrances

**<u>Table of Exhibits</u>**

Exhibit A          –     Initial Budget
Exhibit B          –     Interim DIP Order
Exhibit C          –     Final DIP Order

EXECUTION VERSION

## POST-PETITION LOAN AND SECURITY AGREEMENT

This POST-PETITION LOAN AND SECURITY AGREEMENT (this "*Agreement*") is made and entered into as of September [__], 2024, between PURE PRAIRIE POULTRY, INC., a Minnesota corporation ("*Borrower*"), and SANDTON CAPITAL SOLUTIONS MASTER FUND VI, LP, a Cayman limited partnership, and/or one or more of its designees ("*Lender*"). Lender and Borrower are each referred to herein as a "*Party*" and collectively as the "*Parties*."

### RECITALS

WHEREAS, Borrower is a debtor-in-possession under chapter 11 of the Bankruptcy Code in a case (the "*Chapter 11 Case*") pending in the United States Bankruptcy Court for the District of Minnesota (together with any other court having jurisdiction over the Chapter 11 Case or any proceedings therein from time to time, the "*Bankruptcy Court*"), as Case No. [_____]. Borrower has requested that Lender extend financing to Borrower in connection with the Chapter 11 Case in accordance with the provisions of this Agreement; and

WHEREAS, Lender is willing to make the Line of Credit (as defined herein) available to Borrower, subject to the terms and conditions of this Agreement and subject to the terms and conditions set forth in the orders of the Bankruptcy Court approving the financing described herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

SECTION 1.  DEFINITIONS.

1.1    General Provisions. Unless expressly provided otherwise in this Agreement or in the Loan Documents, or unless the context requires otherwise:

(a)    all accounting terms used in this Agreement and in the Loan Documents shall have the meanings given to them in accordance with GAAP;

(b)    all capitalized terms defined in this Agreement shall have the defined meanings when used in the Loan Documents and in any other documents made or delivered pursuant to this Agreement;

(c)    the singular shall include the plural, the plural shall include the singular, and the use of any gender shall include all genders;

(d)    all references to any particular party defined herein shall be deemed to refer to each and every person defined herein as such party individually, and to all of them, collectively, jointly and severally, as though each were named wherever the applicable defined term is used;

(e)      all references to "Sections" and "Subsections", unless the context to such reference clearly indicates otherwise, shall refer to provisions of this Agreement;

(f)      all references to time herein shall mean Central Standard Time or Central Daylight Time, as then in effect; and

(g)      all references to sections, subsections, paragraphs or other provisions of statutes or regulations shall be deemed to include successor, amended, renumbered and replacement provisions.

1.2      Defined Terms. As used herein, the following terms shall have the meanings indicated, unless the context otherwise requires:

"*Account*" has the meaning stated in the UCC, including all rights to payment for goods sold or leased, or for services rendered.

"*Affiliate*" means, with respect to a specified Person, any other Person which directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person; provided that such Person shall be deemed an Affiliate for only so long as such control exists. For purposes of this definition, the term "control" includes, without limitation, the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Agreement*" shall mean this Agreement and any future amendments, restatements, modifications or supplements hereof or hereto.

"*Authorized Officer*" means any officer of Borrower designated by Borrower as an Authorized Officer in writing to Lender.

"*Avoidance Action*" means any action under chapter 5 of the Bankruptcy Code.

"*Bankruptcy Code*" means the United States Bankruptcy Code, title 11 of the United States Code, as amended, or any successor law thereto, and any rules promulgated in connection therewith.

"*Bankruptcy Court*" has the meaning stated in the Recitals hereof.

"*Bidding Procedures Order*" means an order entered by the Bankruptcy Court, in form and substance acceptable to Lender, approving, among other things, (i) the bidding and auction (the "Auction") procedures with respect to the sale by the Borrower of all or substantially all of its assets pursuant to section 363 of the Bankruptcy Code, and (ii) a Stalking Horse Bid.

"*Borrower*" has the meaning stated in the preamble hereof.

EXECUTION VERSION

"**Budget**" means a thirteen (13) week cash-flow budget of Borrower, which shall include a list of expenses to be incurred by Borrower during the period as well as a liquidity forecast, in a form acceptable to Lender.  The initial Budget (which has been approved by Lender) is attached hereto as <u>Exhibit A</u>.

"**Business Day**" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York.

"**Chapter 11 Case**" has the meaning stated in the Recitals hereof.

"**Change of Control**" means any Person becoming the owner, directly or indirectly, beneficially or of record, of shares representing more than 50% of aggregate ordinary voting power represented by the issued and outstanding stock of the Borrower.

"**Chattel Paper**" has the meaning stated in the UCC.

"**Closing Date**" means the date the Interim DIP Order is entered.

"**Code**" means the Internal Revenue Code of 1986, as amended, or any successor law thereto, and any regulations promulgated thereunder.

"**Collateral**" has the meaning stated in <u>Section 2.12</u> hereof.

"**Commercial Tort Claim**" has the meaning stated in the UCC.

"**Committee**" has the meaning stated in <u>Section 7.2(b)</u> hereof.

"**Contamination**" means the presence of any Hazardous Substance which may require Remedial Actions under applicable law.

"**Contract Rate**" means the fixed annual rate of twenty percent (20%) per annum.

"**Copyrights**" means all of the following now owned or hereafter adopted or acquired by Borrower: (a) all copyrights (whether registered or unregistered, including, without limitation, each of the copyright registrations and copyright applications set forth on <u>Schedule "A"</u> hereto), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof; and (b) all reissues, extensions or renewals thereof.

"**Debt**" means, with respect to any Person at any applicable time (without duplication), (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (iii) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person to the extent of the value of such property (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business), (iv) all obligations, other than intercompany items, of such Person issued or assumed as the

EXECUTION VERSION

deferred purchase price of property or services purchased by such Person which would appear as liabilities on a balance sheet of such Person, (v) all Debt of others secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on, or payable out of the proceeds of production from, property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (vi) all guaranteed obligations of such Person, (vii) the principal portion of all capital lease obligations, (viii) all obligations of such Person in respect of interest rate protection agreements, foreign currency exchange agreements, or other interest or exchange rate or commodity price hedging agreements, (ix) the maximum amount of all performance and standby letters of credit issued or bankers' acceptances facilities created for the account of such Person and, without duplication, all drafts drawn thereunder (to the extent unreimbursed), (x) all preferred stock issued by such Person and required by the terms thereof to be redeemed, or for which mandatory sinking fund payments are due, by a fixed date, and (xi) any other item of indebtedness that would be reflected on the liabilities side of a balance sheet of such Person in accordance with GAAP. The Debt of any Person shall also include the Debt of any partnership or unincorporated joint venture in which such Person is legally obligated or has a reasonable expectation of being liable with respect thereto.

"**Default**" means any event that, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default specified in Section 7.1.

"**Default Rate**" means the Contract Rate plus two percent (2%) per annum.

"**Deposit Account**" has the meaning stated in the UCC.

"**Document**" has the meaning stated in the UCC.

"**Environmental Law**" and "**Environmental Laws**" means, individually and collectively, as appropriate, any current or future legal requirement of any Governmental Body pertaining to (i) the protection of health, safety, and the environment, (ii) the conservation, management or use of natural resources and wildlife, (iii) the protection or use of surface water and groundwater or (iv) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, release, threatened release, abatement, removal, remediation or handling of, or exposure to, any hazardous or toxic substance or material and includes, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 USC 9601 et seq., Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendment of 1984, 42 USC 6901 et seq., Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 USC 1251 et seq., Clean Air Act of 1966, as amended, 42 USC 7401 et seq., Toxic Substances Control Act of 1976, 15 USC 2601 et seq., Hazardous Materials Transportation Act, 49 USC App. 1801 et seq., Occupational Safety and Health Act of 1970, as amended, 29 USC 651 et seq., Oil Pollution Act of 1990, 33 USC 2701 et seq., Emergency Planning and Community Right—to—Know Act of 1986, 42 USC 11001 et seq., National Environmental Policy Act of 1969, 42 USC 4321 et seq., Safe Drinking Water Act of 1974, as amended, 42 USC 300(f) et seq., and any analogous implementing or successor law, and any amendment, rule, regulation, order or directive issued thereunder.

"*Equipment*" has the meaning stated in the UCC.

"*Event of Default*" means any event specified in <u>Section 7.1</u>, provided that any requirement for notice or lapse of time or any other condition has been satisfied.

"*Exit Fee*" has the meaning stated in <u>Section 2.8</u> hereof.

"*Extension Fee*" has the meaning stated in Section 2.1(e) hereof.

"*Feedstock Claims*" means any and all claims of third parties that, by common law, statute, regulation, or any other applicable federal, state or local law, could give rise to any liens or interests in feedstock in favor of such claim holders.

"*Final DIP Order*" means the order of the Bankruptcy Court entered in the Chapter 11 Case granting final approval of this Agreement and, among other things, granting the Liens and super-priority claims set forth in <u>Section 2.12</u> and <u>Section 2.13</u> hereof, substantially in the form of <u>Exhibit C</u> or otherwise in form and substance satisfactory to Lender.

"*Final Order*" means an order, judgment or other decree of any Governmental Body as to which (a) the operation or effect has not been reversed, stayed, modified or amended, (b) no appeals, motions for reconsideration, petitions seeking the grant of certiorari or, if certiorari has been granted, grants of certiorari are pending, and (c) any and all appeal periods and periods to seek the grant of certiorari have expired.

"*GAAP*" means, at any particular time, generally accepted accounting principles as in effect at such time, provided, however, that, if employment of more than one principle shall be permissible at such time in respect of a particular accounting matter, GAAP shall refer to the principle which is then employed by Borrower with the agreement of its independent certified public accountants.

"*General Intangibles*" has the meaning stated in the UCC.

"*Goods*" has the meaning stated in the UCC.

"*Governmental Body*" means any federal, state, local, municipal, foreign or other governmental or quasi-governmental entity or authority of any nature, including courts and administrative agencies (including the FDA and its equivalent authority or body in any foreign jurisdiction).

"*Hazardous Substances*" means all materials of any kind which are flammable, explosive, toxic, radioactive or otherwise hazardous to animal or plant life or the environment, including, without limitation, "hazardous wastes," "hazardous substances" and "contaminants," as such terms are defined by Environmental Laws. The term "Hazardous Substances" shall also include: (a) petroleum, crude oil, gasoline, natural gas, liquefied natural gas, synthetic fuel, and all other petroleum, oil, or gas based products; (b) nuclear, radioactive, or atomic substances, mixtures, wastes, compounds, materials, elements, products or matters; (c) asbestos, asbestos containing materials, polychlorinated biphenyls, and (d) any other substance,

EXECUTION VERSION

mixture, waste, compound, material, element, product or matter that presents an imminent and substantial danger to the public health or welfare or to the environment upon its Release.

"***Initial Draw***" has the meaning stated in Section 2.1(b) hereof.

"***Instrument***" has the meaning stated in the UCC.

"***Intellectual Property Collateral***" means, collectively, (i) Copyrights, (ii) Patents, (iii) Trademarks, (iv) Software, and (v) Licenses.

"***Interim DIP Order***" means that certain order of the Bankruptcy Court authorizing Borrower to enter into this Agreement subject to certain limitations applicable until entry of the Final DIP Order, substantially in the form of Exhibit B or otherwise in form and substance satisfactory to Lender.

"***Investment***" means (a) any direct or indirect purchase or other acquisition by Borrower of any equity interests, or other ownership interest in, any other Person, and (b) any direct or indirect loan, advance or capital contribution by Borrower to any other Person excluding Accounts and deposits arising in the ordinary course of business.

"***Issuance Fee***" has the meaning stated in Section 2.6 hereof.

"***Law(s)***" shall mean any federal, state, local and other law(s) (including common law), constitution, statute, treaty, regulation, rule, ordinance, opinion, issued guidance, release, ruling, order, executive order, injunction, writ, decree, bond judgment authorization or approval, lien or award of or any settlement arrangement, by agreement, consent or otherwise, with any Governmental Body, foreign or domestic.

"***Lender***" has the meaning stated in the preamble hereof.

"***Licenses***" means, collectively, all of Borrower's right, title and interest in and to all license agreements with any other Person in connection with any of the Patents, Copyrights, and/or Trademarks, whether Borrower is a licensor or a licensee under any such license agreement (including, without limitation, each license set forth on Schedule "A" hereto), and any right to prepare for sale, sell and advertise for sale all Inventory now or hereafter owned by Borrower and now or hereafter covered by such licenses, including, but not limited to, (i) the right to sue or otherwise recover for any and all past, present and future breaches and other violations thereof, (ii) all income, royalties, damages, settlements and other payments now and hereafter due and/or payable with respect thereto (including, without limitation, damages, settlements and payments for past or future breaches and infringements thereof) and (iii) all rights of Borrower corresponding thereto throughout the world and all other rights of Borrower of any kind whatsoever accruing thereunder or pertaining thereto.

"***Lien***" means, collectively, any mortgage, pledge, hypothecation, assignment, deposit arrangement, security interest, encumbrance, lien (statutory or otherwise), preference, priority or charge of any kind, including, without limitation, any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof.

EXECUTION VERSION

"*Line of Credit*" means the non-revolving line of credit facility described in Section 2.1 hereof.

"*Line of Credit Commitment*" means, as at any applicable time, Borrower's maximum credit availability under the Line of Credit, as established in Section 2.1(a), whether or not then fully extended.

"*Line of Credit Note*" means the promissory note described in Section 2.2 and any future amendments, restatements, modifications or supplements thereof or thereto.

"*Line of Credit Termination Date*" means the earliest to occur of (i) the closing of a sale approved by the Bankruptcy Court of all or a portion of the Borrower's assets, (ii) the effective date of any chapter 11 plan confirmed by the Bankruptcy Court, (iii) the occurrence of an Event of Default, and (iv) the date that is ninety (90) days following the date on which Lender disburses the Initial Draw.

"*Loan*" means the non-revolving line of credit facility made available to Borrower pursuant to this Agreement.

"*Loan Account*" means, collectively, the account or accounts of Borrower on the books of Lender in which are recorded the Loan and the payments of principal, interest and other charges made by Borrower to Lender thereon.

"*Loan Documents*" means this Agreement, the Line of Credit Note, the Interim DIP Order, the Final DIP Order, and all other documents, agreements and instruments executed and delivered to Lender by or on behalf of Borrower in connection herewith and any modifications, amendments, restatements, substitutions and replacements of or for any of the foregoing.

"*Maturity Extension*" has the meaning stated in Section 2.1(e) hereof.

"*Milestones*" has the meaning stated in Section 5.9 hereof.

"*MOIC*" means the multiple of the aggregate amount of all funds advanced by Lender pursuant to the Loan Documents, plus all accrued and unpaid expenses incurred by Sandton in connection with one or more Loan Documents.

"*Obligations*" means, collectively, all liabilities, duties and obligations of Borrower to Lender with respect to any covenants, representations or warranties herein or in the Loan Documents, with respect to the principal of and interest on the Loan and all other present and future fixed and/or contingent obligations of Borrower to Lender hereunder and under the Loan Documents.

"*Optional Draw*" has the meaning stated in Section 2.1(d) hereof.

"*Owned Real Property*" means the property located at 901 North Main Street, Charles City, Iowa 50616 including all buildings, structures, improvements and fixtures located thereon, and all easements and other rights and interests appurtenant thereto.

"*Packers and Stockyards Act*" means the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. §§ 181-229.

"*Patents*" means, collectively, all of Borrower's right, title and interest in and to all patents, patent applications and patentable inventions (including, without limitation, each patent and patent application set forth on Schedule "A" hereto), including, but not limited to, (i) all inventions and improvements described and claimed therein, (ii) the right to sue or otherwise recover for any infringements and other violations thereof, (iii) all income, royalties, damages, settlements and other payments now and hereafter due and/or payable with respect thereto (including, without limitation, payments under all licenses entered into in connection therewith, and damages, settlements and payments for past and future infringements thereof) and (iv) all rights corresponding thereto throughout the world and all reissues, divisions, continuations, continuations-in-part, provisional applications, substitutes, renewals and extensions thereof, all improvements thereon and all other rights of Borrower of any kind whatsoever accruing thereunder or pertaining thereto.

"*Payment Intangible*" has the meaning stated in the UCC.

"*Permitted Debt*" means any and all Debt permitted under Section 6.1.

"*Permitted Encumbrances*" has the meaning stated in Section 6.2(a)(i) hereof.

"*Permitted Expense*" has the meaning stated in Section 3.6 hereof.

"*Permitted Variance*" means, under the Budget, a variance of Borrower's actual disbursements against budgeted disbursements in an amount not in excess of 10% of the total aggregate budgeted disbursements for the cumulative period to date represented in the applicable Budget.

"*Person*" means an individual, a corporation, a partnership, a joint venture, a trust or unincorporated organization, a joint stock company or other similar organization, a government or any political subdivision thereof, or any other legal entity.

"*Petition Date*" means the date Borrower filed its voluntary petition for relief with the Bankruptcy Court commencing the Chapter 11 Case.

"*Post-Petition Obligation*" means an obligation of Borrower which is not a Pre-Petition Obligation.

"*Pre-Petition Obligation*" means any obligation of Borrower arising, or deemed to have arisen pursuant to the Bankruptcy Code, before the Petition Date.

"*Proceeds*" means, collectively, whatever is received when any of the Collateral is sold, exchanged, leased, collected, or otherwise disposed of, including cash, insurance proceeds, negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, other documents, and other noncash proceeds.

"***Release***" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, or dumping.

"***Remedial Actions***" means:

(a)     clean-up or removal of Hazardous Substances;

(b)     such actions as may be necessary to monitor, assess, or evaluate the Release or threatened Release of Hazardous Substances;

(c)     proper disposal or removal of Hazardous Substances;

(d)     the taking of such other actions as may be necessary to prevent, minimize, or mitigate the damages caused by a Release or threatened Release of Hazardous Substances to the public health or welfare or to the environment; and

(e)     the providing of emergency assistance after a Release.

Remedial Actions include, but are not limited to, such actions at the location of a Release as: storage; confinement; perimeter protection using dikes, trenches, or ditches; clay cover; neutralization; clean-up of Hazardous Substances or contaminated materials; recycling or reuse; diversion; destruction; segregation of reactive wastes; dredging or excavation; repair or replacement of leaking containers; collection of leachate and runoff; onsite treatment or incineration; providing alternative water supplies; and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.

"***Sale Transaction***" means a sale transaction, acceptable to Lender, to be undertaken pursuant to section 363 of the Bankruptcy Code for all or substantially all of the Debtor's assets.

"***Second Draw***" has the meaning stated in <u>Section 2.1(c)</u> hereof.

"***Security Documents***" means, individually and collectively, any instruments now or hereafter executed and delivered to Lender to secure, or to assure, payment or performance, of the Obligations, and any future amendments, restatements, modifications or supplements thereof or thereto.

"***Site Assessments***" has the meaning stated in <u>Section 7.5</u> hereof.

"***Site Reviewers***" has the meaning stated in <u>Section 7.5</u> hereof.

"***Software***" has the meaning stated in the UCC.

"***Stalking Horse Bid***" means a bid received by Borrower from a third-party acceptable to Lender to purchase all or substantially all of the Borrower's assets in a Sale Transaction for a purchase price sufficient to allow for the repayment at closing of all allowed administrative expenses incurred by Borrower in the Chapter 11 Case along with all Obligations

EXECUTION VERSION

owing to Lender under this Agreement, the Line of Credit Note, and the other Loan Documents, which bid is approved by the Bidding Procedures Order.

"***Trademarks***" means all of the following now owned or hereafter adopted or acquired by Borrower: (a) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, internet domain names, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature (whether registered or unregistered, including each registration and application set forth on <u>Schedule "A"</u> hereto)), all registrations and recordings thereof, and all applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof; (b) all reissues, extensions or renewals thereof; and (c) all goodwill associated with or symbolized by any of the foregoing.

"***UCC***" means the Uniform Commercial Code as in effect in the State of New York or, when the laws of any other jurisdiction govern the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

"***Unused Fee***" has the meaning stated in <u>Section 2.7</u> hereof.

SECTION 2.   <u>AMOUNT AND TERMS OF LOAN</u>.

2.1   <u>Line of Credit</u>.

(a)   Subject to and in accordance with the terms and conditions of this Agreement, Lender agrees to extend credit to Borrower by making loans to it, from time to time during the period commencing on the Closing Date and ending on the Line of Credit Termination Date, in an aggregate outstanding amount that shall not exceed, at any one time Fifteen Million Dollars ($15,000,000) in principal.

(b)   The initial borrowing under the Line of Credit shall be in the amount of Seven Million Five Hundred Thousand Dollars ($7,500,000), the proceeds of which shall be disbursed by Lender to Borrower within one (1) Business Day of entry of the Interim DIP Order, via wire transfer to a deposit account designated by Borrower (the "***Initial Draw***").

(c)   Upon (i) entry of the Final DIP Order, and (ii) entry of the Bidding Procedures Order, Borrower may request an additional draw (the "***Second Draw***") in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000), the proceeds of which shall be disbursed by Lender to Borrower within one (1) Business Day of the date of such request, via wire transfer to a deposit account designated by Borrower.

(d)   Following the funding of the Second Draw, Borrower may request one final, optional draw (the "***Optional Draw***") in an amount of up to Five Million Dollars ($5,000,000). Lender shall have the sole discretion to determine whether to fund an Optional Draw, which determination shall be based upon Lender's assessment about the likelihood of a successful Sale Transaction that will allow for all Obligations owing to Lender under the Loan Documents to be paid in full. Lender has no obligation to fund the Optional Draw, and may refuse

to fund the Optional Draw, or determine to fund a lesser amount of the Optional Draw than was requested.

(e)    Following entry of the Final DIP Order and the funding by Lender of the Second Draw (and the Optional Draw, if requested), Borrower may request an extension of the Line of Credit Termination Date of up to an additional ninety (90) days (the "***Maturity Extension***") in order to consummate a Sale Transaction that is in progress and/or to complete the wind down of Borrower's bankruptcy estate.  Lender shall have no obligation to grant any request for a Maturity Extension but will evaluate any request for a Maturity Extension in good faith based upon its reasonable assessment of the likelihood that a Sale Transaction will be consummated that will allow for all Obligations owing to Lender under the Loan Documents to be paid in full.  If Lender agrees to any request for a Maturity Extension, Borrower shall pay to Lender within five (5) Business Days an extension fee equal to One Percent (1%) of the total Obligations outstanding to Lender as of the date the request for a Maturity Extension is made (the "***Extension Fee***"), with the Maturity Extension effective upon Lender's receipt of the Extension Fee.  Any Extension Fee payable to Lender pursuant to this <u>Section 2.1(e)</u> shall not be included in any calculation of MOIC required for purposes of <u>Section 2.8(ii)</u> hereof.  Any and/or all further extensions of the Line of Credit Termination Date may only occur by written agreement between the Parties; <u>provided</u>, <u>however</u>, Lender shall have no duty or obligation, express or implied, to extend the Line of Credit Termination Date or consider any request for such an extension and further provided that an extension of the Line of Credit Termination Date after the occurrence of a Default or Event of Default shall not constitute a waiver of such Default or Event of Default.

(f)    Notwithstanding anything contained herein to the contrary, the Line of Credit shall be a non-revolving loan facility and, therefore, each advance under the Line of Credit shall permanently reduce, dollar for dollar, Borrower's credit availability under the Line of Credit and Borrower will not have the ability to re-borrow hereunder.

2.2    <u>Line of Credit Note</u>. On the Closing Date, Borrower shall execute and deliver to Lender the Line of Credit Note, which shall evidence Borrower's obligation to repay the principal of, interest on, and other amounts due in connection with the Line of Credit and the Obligations, and which shall:

(a)    be dated the Closing Date and be payable to Lender's order in the aggregate principal amount of Fifteen Million Dollars ($15,000,000);

(b)    require the payment of interest on the unpaid principal amount of any funds advanced and outstanding under the Line of Credit from the dates of such advances and, prior to the occurrence of an Event of Default, at an annual rate equal to the Contract Rate and, on and after (i) the Line of Credit Termination Date, or (ii) the date of occurrence of an Event of Default, at an annual rate equal to the Default Rate, in each case, whether prior to or after any judgment against Borrower; <u>provided</u>, <u>however</u>, that all interest payable under this Agreement and/or the Line of Credit Note shall be paid in-kind and capitalized and added to the principal balance of the Line of Credit on a monthly basis;

(c)    not require any cash payments prior to the Line of Credit Termination Date (except for any mandatory prepayments to the extent required under this

EXECUTION VERSION

Agreement) and be payable in full as to the entire unpaid principal balance, including all accrued and paid-in-kind interest and other sums due thereunder, on the Line of Credit Termination Date; and

(d)     be secured by the Security Documents and the Collateral.

2.3     Loan Account. Lender shall record in one or more Loan Accounts, the Loans, all advances to and all payments made by Borrower on account of the Loans, and all other appropriate debits and credits.

2.4     Computation of Interest. Interest shall be calculated on the basis of a 365-day year for actual days elapsed. Any change in the interest rate on the Line of Credit Note resulting from a change from the Contract Rate to the Default Rate shall become effective as of the opening of business on the day on which such change shall occur.

2.5     Maximum Legal Rate. Borrower shall not be obligated to pay and Lender shall not collect interest on any Obligation at a rate in excess of the maximum permitted by law or the maximum that will not subject Lender to any civil or criminal penalties. If, because of the acceleration of maturity, the payment of interest in advance or any other reason, Borrower is required, under the provisions of any Loan Document or otherwise, to pay interest at a rate in excess of such maximum rate, the rate of interest under such provisions shall immediately and automatically be reduced to such maximum rate, and any payment made in excess of such maximum rate, together with interest thereon at the rate provided herein from the date of such payment, shall be immediately and automatically applied to the reduction of the unpaid principal balance of the Obligations as of the date on which such excess payment was made. If the amount to be so applied to reduction of the unpaid principal balance exceeds the unpaid principal balance, the amount of such excess shall be refunded by Lender to Borrower.

2.6     Issuance Fee.  Borrower agrees to pay to Lender an issuance fee equal to $375,000 (the "*Issuance Fee*"), which fee shall be fully earned and payable to Lender upon Lender's funding of the Initial Draw.  Upon Lender's funding of the Initial Draw, the Issuance Fee shall be capitalized and added to the principal balance under the Line of Credit.

2.7     Unused Fee.  Borrower agrees to pay to Lender an unused fee equal to 1% per annum on the undrawn portion of the Line of Credit Commitment (the "*Unused Fee*"), which on a monthly basis shall be calculated as of the first day of each month and capitalized and added to the principal balance of the Line of Credit.

2.8     Exit Fee.  Borrower agrees to pay to Lender an exit fee equal to the greater of: (i) Two Percent (2.0%) of the total amount funded by Lender to Borrower under or in connection with this Agreement; and (ii) such amount as will ensure that Lender recovers an MOIC equal to 1.4x under or in connection with this Agreement (or, in the event that the Bankruptcy Court has not approved the Bidding Procedures Order including a Stalking Horse Bid within thirty (30) days of the funding of the Initial Draw, equal to 1.6x); in the case of both (i) and (ii), inclusive of all accrued and paid-in-kind interest and fees (the "*Exit Fee*").  The Exit Fee shall be payable by Borrower to Lender upon the earlier of (a) the Line of Credit Termination Date and (b) the date on which the Obligations under this Agreement and/or the Line of Credit Note are paid in full;

provided, however, that in the event of a partial prepayment by Borrower under this Agreement (either voluntary or mandatory), Borrower shall pay the corresponding *pro rata* portion of the Exit Fee contemporaneously with any such prepayment.

2.9    Payments. All payments by Borrower hereunder shall be made at Lender's address set forth in Section 8.2, or such other place or places as Lender may direct, prior to 5:00 P.M. on the date of payment, in lawful money of the United States of America, and in immediately available funds.

2.10    Application of Payments. All payments shall be applied first to the payment in full of any costs, fees, and/or expenses incurred by Lender and permitted to be charged to Borrower, including (without limitation) reasonable attorneys' fees, then to the reduction of the unpaid principal balance (including all accrued and paid-in-kind interest). Any payments made by Borrower shall permanently reduce the Line of Credit Commitment by the amount of such payment and may not be re-borrowed.

2.11    Voluntary and Mandatory Payments. The Obligations may be pre-paid, in whole or in part and without penalty, at any time prior to the Line of Credit Termination Date. In the event Borrower sells any assets outside of the ordinary course of business or otherwise out of accordance with the Budget, Borrower shall immediately pay to Lender for application to the Line of Credit Note an amount equal to the proceeds of such sale(s). All Obligations shall be due and payable in full on the Line of Credit Termination Date.

2.12    Grant of Security Interest. To secure the prompt payment and performance to Lender of the Obligations, Borrower hereby grants to Lender (i) a first priority lien and security interest in all of Borrower's assets not subject to Permitted Encumbrances, including but not limited to all such presently owned or hereafter acquired Accounts, Chattel Paper, Commercial Tort Claims, Avoidance Actions, Deposit Accounts, real property interests including the Owned Real Property, Documents, Equipment, Fixtures, General Intangibles, all Intellectual Property Collateral, Goods, Inventory, Instruments, Investment Property, Letter of Credit Rights, Payment Intangibles, Supporting Obligations, insurance policies, all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing, and all Products and Proceeds (including cash collateral, as defined in section 363 of the Bankruptcy Code and all accessions to, substitutions for, and all replacements, products, and cash and non-cash proceeds of the foregoing, including proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage or destruction of any Collateral), and (ii) a security interest in all assets of Borrower subject to Permitted Encumbrances, junior only to such Permitted Encumbrances (collectively, items (i) and (ii) above are referred to as the "*Collateral*"). Notwithstanding the foregoing, any accounts receivable of Borrower that arise prior to the Petition Date and which are subject to a factoring agreement with First Corporate Solutions, including the proceeds thereof, shall not be included as "Collateral" except in respect of any residual interest that Borrower has or may have in any such accounts receivable.   Borrower agrees that the aforesaid grant of security interests is intended as a contemporaneous exchange for value given to Borrower.

2.13    Perfection of Security Interests. The Interim DIP Order and the Final DIP Order shall, without the necessity of any further action or filings by Lender, Borrower or any other

Person, perfect Lender's liens and security interests in the Collateral. Notwithstanding the foregoing, Borrower shall, at its cost and expense, execute and deliver to Lender, concurrently with the execution of this Agreement, and at any time or times hereafter at the request of Lender, all deeds of trust, financing statements and all other agreements, instruments and documents that Lender may reasonably request, in form and substance satisfactory to Lender, and shall take any and all other steps reasonably requested by Lender, in order to perfect and maintain the security interests and liens granted herein by Borrower to Lender and in order to fully consummate all of the transactions contemplated herein and under any other Loan Documents.

2.14   <u>Administrative Status of Obligations</u>. In addition to being secured by the Collateral, the Obligations shall be allowed super-priority administrative expenses in the Chapter 11 Case, pursuant to section 503(b)(1) of the Bankruptcy Code, with priority over all other administrative expenses pursuant to section 364(c)(1) of the Bankruptcy Code.

2.15   <u>Adequate Protection; Cash Collateral Usage</u>.  Any order entered or to be entered by the Bankruptcy Court authorizing the Borrower to use cash collateral of, or providing any form of adequate protection to, any existing secured lender of Borrower shall be in form and substance acceptable to Lender.

2.16   <u>Right to Credit Bid</u>. In connection with any sale of Collateral, Lender shall have the right to credit bid the Obligations in accordance with applicable provisions of the Bankruptcy Code.

SECTION 3.   <u>BORROWER REPRESENTATIONS AND WARRANTIES</u>. To induce Lender to enter into this Agreement and to make the Loans, Borrower represents and warrants to Lender that:

3.1   <u>Organization and Qualification</u>. Borrower is a corporation duly incorporated or organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation and is duly qualified as a foreign corporation and in good standing under the laws of each jurisdiction in which the conduct of its business or the ownership of its assets requires such qualification.

3.2   <u>Power and Authority</u>. Subject to Bankruptcy Court approval of this Agreement, Borrower has the corporate power to execute, deliver and perform under, the Loan Documents, to borrow under this Agreement and to create the collateral security interests for which the Security Documents provide, and has taken all necessary corporate action to authorize the borrowings hereunder on the terms and conditions of this Agreement and the execution and delivery of, and performance under, the Loan Documents. Other than Bankruptcy Court approval of this Agreement, no consent of any other party (including members or shareholders of Borrower) and no consent, license, approval or authorization of, or registration or declaration with, any governmental authority, bureau or agency is required in connection with the execution, delivery, performance, validity or enforceability of the Loan Documents.

3.3   <u>Enforceability</u>. Subject to Bankruptcy Court approval of this Agreement, the Loan Documents, when executed and delivered to Lender pursuant to the provisions of this Agreement, will constitute valid obligations of Borrower legally binding upon it and enforceable

EXECUTION VERSION

in accordance with their respective terms, except as enforceability of the foregoing may be limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights.

3.4 <u>Conflict with Other Instruments</u>. Subject to Bankruptcy Court approval of this Agreement, the execution and delivery of, and performance under, the Loan Documents will not violate or contravene any provision of any existing law or regulation or decree of any court, governmental authority, bureau or agency having jurisdiction in the premises or of the articles or certificate of incorporation or formation, charter, or bylaws of Borrower, as applicable.

3.5 <u>Title to Collateral</u>. Borrower has good and marketable title in fee to the Collateral, free of any mortgages, deeds of trust, pledges, charges, liens, security interests or other encumbrances except (i) Liens in favor of Lender, (ii) Liens of other parties being primed by and subordinated to the Liens in favor of Lender by agreement of the Lien holder or otherwise by operation of the Interim DIP Order and/or the Final DIP Order, and (iii) Permitted Encumbrances.

3.6 <u>Use of Proceeds</u>. From and after the Closing Date, Borrower agrees that amounts borrowed under the Line of Credit may be used only to pay expenses incurred by Borrower in the ordinary course of business and which are permitted to be paid by the Bankruptcy Code and/or orders of the Bankruptcy Court, each in accordance with and up to the amounts provided for in the Budget (the "***Permitted Expenses***"), subject to the Permitted Variance. In addition and without limiting the foregoing, Borrower agrees that all pre-petition, valid, and timely asserted interests arising under the Packers and Stockyards Act shall be paid in full with proceeds of the Initial Draw. In no circumstance shall amounts drawn on the Line of Credit or any cash Collateral for the Obligations be used for expenses incurred to investigate or to contest in any adversary proceeding or any other action (a) the validity, extent, attachment, perfection or priority of the Liens created by this Agreement or the Loan Documents, (b) the validity, binding effect or enforceability of this Agreement or the Loan Documents or the Line of Credit Note, or (c) any other rights or interests of Lender under the Loan Documents. Nothing herein shall in any way prejudice or prevent Lender from objecting, for any reason, to any applications made for interim or final allowances of compensation for services rendered or reimbursement of expenses incurred under section 330 or 331 of the Bankruptcy Code.

3.7 <u>No Notices; No Violations</u>. Borrower has not received any notice from any Governmental Body or any insurance or inspection body to the effect that any of their properties, facilities, equipment or business procedures or practices fail to comply with any applicable Law, including any ordinance, regulation, building or zoning Law, judicial or administrative determination, or any other requirements of any such Governmental Body, which could reasonably be expected to have a material adverse effect upon the Collateral, and Borrower, and all such properties, facilities, equipment, procedures and practices, comply in all material respects with all such Laws, including any Environmental Laws.

3.8 <u>Location of Collateral</u>. The Collateral and all of Borrower's business records are situated at the locations set forth in <u>Schedule 3.8</u> attached hereto and made a part hereof, and Borrower's places of business are all listed thereon.

EXECUTION VERSION

        3.9    <u>Broker's Commissions</u>. No brokerage commission or similar compensation is due or will become due to any Person other than Lakeshore Food Advisors by reason of the making of the Loan.

    SECTION 4.    <u>CONDITIONS OF BORROWING</u>.

        4.1    <u>Initial Draw</u>. As a condition precedent to Lender's obligation to fund the Initial Draw under the Line of Credit, the following conditions shall all be satisfied:

        (a)    <u>Loan Documents</u>. Borrower shall have delivered or caused to be delivered to Lender duly executed copies of each of the Loan Documents.

        (b)    <u>Borrower's Authorizations</u>.  Borrower shall have delivered to Lender a copy, certified by Borrower, of the resolutions of the Board of Directors of Borrower authorizing and approving the execution and delivery of and performance under this Agreement and the other Loan Documents, the borrowings provided for hereunder and the creation of the collateral security interests for which the Security Documents provide.

        (c)    <u>Evidence of Subordination</u>.  Borrower shall have delivered to Lender documentation or other evidence, satisfactory to Lender in its sole discretion, demonstrating that the Lien holders identified on <u>Schedule 4.1</u> hereof have either: (i) agreed to fully subordinate their respective Liens and rights to payment to the Liens in favor of Lender and to Lender's rights to payment; or (ii) were duly and properly noticed with the motion to approve the Interim DIP Order and Final DIP Order and failed to object to the entry by the Bankruptcy Court of the Interim DIP Order.

        (d)    <u>Representations</u>. The representations and warranties contained in <u>Section 3</u> hereof shall be true and correct on and as of the date of the making of the Loans and the date of any advance under the Line of Credit with the same effect as if made on and as of such date, and no Event of Default or Default shall be in existence on the date of the making of Loans or such advance or shall occur as a result thereof.

        (e)    <u>Insurance</u>.  Lender shall have received certificates or policies evidencing the insurance required under <u>Section 5.6</u> hereof.

        (f)    <u>Interim DIP Order</u>. The Bankruptcy Court shall have entered the Interim DIP Order in form and substance satisfactory to Lender and its counsel, and such Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed. Without limiting the foregoing and for the avoidance of doubt, the Interim DIP Order shall contain, among other things, express findings by the Bankruptcy Court that any and all holders of validly asserted Feedstock Claims are adequately protected and that therefore such holders and claims may be primed by the liens and claims granted in favor of Lender as provided by section 364(d) of the Bankruptcy Code.

        (g)    <u>Closing Date Budget</u>. Borrowers shall have delivered to Lender a Budget setting forth: (a) projected weekly operating cash receipts for each week, (b) projected weekly disbursements (including, specifically, from advances under the Line of Credit) for each

week, and (c) a liquidity forecast of Borrower, for each week commencing with the week ending as of September 20, 2024 (collectively, the "***Projected Information***").

(h)     No Default. No Default or Event of Default shall exist as of the date of the Initial Draw or shall occur as a result of Lender funding the Initial Draw.

(i)     Progress Toward Sale Transaction.  Borrower shall have delivered to Lender documentation or other evidence, satisfactory to Lender in its sole discretion, demonstrating that multiple interested bidders are progressing toward submitting Stalking Horse Bids for all or substantially all of Borrower's assets in a Sale Transaction.

4.2     Second Draw. As a condition precedent to Lender's obligation to fund the Second Draws after the Initial Draw, the following conditions shall all be satisfied on the date of funding of the Second Draw:

(a)     No Default. No Default or Event of Default shall exist on the date of the Second Draw or shall occur as the result of making such Second Draw.

(b)     Representations.  Without limiting the generality of Section 4.2(a), the representations and warranties contained in Section 3 hereof shall be true and correct on and as of the date of the making of the Second Draw with the same effect as if made on and as of such date.

(c)     Final DIP Order.  The Bankruptcy Court shall have entered the Final DIP Order in form and substance satisfactory to Lender and its counsel, and such order shall be in full force and effect, and shall not have been vacated, reversed, modified, amended or stayed. Without limiting the foregoing and for the avoidance of doubt, the Final DIP Order shall contain, among other things, express findings by the Bankruptcy Court that any and all holders of validly asserted Feedstock Claims are adequately protected and that therefore such holders and claims may be primed by the liens and claims granted in favor of Lender as provided by section 364(d) of the Bankruptcy Code.

(d)     Bidding Procedures Order.  The Bankruptcy Court shall have entered the Bidding Procedures Order, and such order shall be in full force and effect, and shall not have been vacated, reversed, modified, amended, or stayed.

(e)     Passage of Time.  No less than thirty (30) days shall have passed from the date on which the Bankruptcy Court enters the Interim DIP Order.

(f)     Financing Statements/Deeds of Trust.  A financing statement and deeds of trust describing the Collateral shall have been filed in each such jurisdiction and in each such office as shall have been required by Lender.

(g)     Evidence of Subordination.  Borrower shall have delivered to Lender documentation or other evidence, satisfactory to Lender in its sole discretion, demonstrating that the Lien holders identified on Schedule 4.1 hereof have either: (i) agreed to fully subordinate their respective Liens and rights to payment to the Liens in favor of Lender and to Lender's rights to payment; or (ii) were duly and properly noticed with the motion to approve

the Interim DIP Order and Final DIP Order and failed to object to the entry by the Bankruptcy Court of the Final DIP Order.

      4.3     <u>Waiver of Conditions</u>. Lender may waive any condition in whole or in part.

    SECTION 5.    <u>AFFIRMATIVE COVENANTS</u>. Borrower covenants and agrees that from and after the Closing Date and so long as any of the Obligations remain outstanding and unpaid, in whole or in part, Borrower will observe the following covenants, unless Lender shall otherwise consent in writing:

      5.1     <u>Financial Statements; Reports</u>. Borrower will furnish to Lender:

      (a)     on or prior to Tuesday of each week following the Closing Date, a weekly cash flow scorecard measuring actual collections and disbursements for the current week, trailing 3-week, and period to date against the initial Budget; additionally, on or before the date that is four (4) weeks after the Petition Date, and on each four (4) week interval thereafter during the term of the Line of Credit, an updated Budget, combining period to date weekly actuals with revised projections for the remainder of the term of the Line of Credit, in form and substance satisfactory to Lender, will be submitted to the Lender for approval and will become the new Budget that cumulative actual results are scorecarded against; and

      (b)     from time to time, such financial and other information as Lender may reasonably request.

      5.2     <u>Liabilities</u>. Borrower will pay and discharge, at or before their maturity, all of its Post-Petition Obligations (including, without limitation, tax liabilities and all employee wages as provided in the Fair Labor Standards Act, 29 U.S.C. §§206-207 and any successor statute), except those which may be contested in good faith.

      5.3     <u>Notices</u>. Borrower will promptly give notice in writing to Lender of the occurrence of any of the following:

      (a)     any Event of Default or Default under this Agreement, or any event of default or similar occurrence under any instrument or other agreement of Borrower entitling any Person to accelerate the maturity of any obligation of Borrower or to exercise any other remedy against Borrower;

      (b)     the commencement of any material litigation, proceeding or dispute affecting Borrower or any material dispute between Borrower and any Person; or

      (c)     any material and adverse change in the Collateral or the financial position of Borrower.

      5.4     <u>Environmental Matters; Compliance with Laws</u>.

      (a)     Borrower shall comply, and cause all properties, assets, and operations owned or used by Borrower to comply, with (i) all Laws, including, without limitation, all Environmental Laws and all other applicable zoning, occupational safety, health, employment,

discrimination, labor and other Laws and regulations, (ii) the provisions and requirements of all franchises, licenses, permits and certificates of compliance and approvals issued by Governmental Bodies and with other like grants of authority held by Borrower in connection with its business, and (iii) all applicable material decrees, orders and judgments.

(b)    Borrower shall promptly notify Lender in reasonable detail once it is aware of any failure by Borrower to comply with or perform or any breach or violation by Borrower in respect of any of the matters compliance with which is required under <u>Section 5.4(a)</u> hereof.

(c)    Borrower shall:

(i)    immediately notify Lender (and any other person that Borrower is required to notify pursuant to any applicable laws) once they are aware of a Release or threatened Release of Hazardous Substances on, from, or near any of the properties owned or used by Borrower which might cause Contamination;

(ii)    immediately notify Lender once an environmental investigation or clean-up proceeding is instituted by any Person in connection with such properties;

(iii)    immediately notify Lender of any citation, notification, complaint, or violation which Borrower receives from any Person which relates to or pertains to the making, storing, handling, treating, disposing, generating, transporting or Release of any Hazardous Substances;

(iv)    promptly, upon the written request of Lender and upon reasonable notice to Borrower, permit Lender, its agents, contractors and other representatives, during regular business hours to enter into any property owned or used by Borrower in order to make such report or assessment, and at such other times as Lender may reasonably request, Borrower will make available at their offices to Lender or its representatives such historical and operational information (including the results of all samples sent for analysis), correspondence with official bodies, and environmental reviews conducted prior to and after the Closing Date regarding its properties as are within the possession, custody or control of Borrower or which are reasonably available to it, until such time as the Obligations have been indefeasibly repaid in full in cash;

(v)    make appropriate personnel employed by Borrower having knowledge of such matters available for meetings with Lender or its representatives; and

(vi)    comply, and cause all properties, assets, and operations owned or used by Borrower to comply, with all applicable federal, state, local and other environmental, zoning, occupational safety, health, employment, discrimination, labor and other laws and regulations.

(d)    If Borrower shall fail to fully execute and complete any requisite Remedial Action, Lender may, but is not obligated to, make advances or payments toward performance or satisfaction of such Remedial Actions.

(e)    If Lender acquires equitable or legal title to any of Borrower's property as a result of enforcement of remedies hereunder or under any other Loan Document, Lender does not accept and shall not bear (nor shall any assignee or transferee of Lender accept or bear) any responsibility for any Hazardous Substances in or about such property or for the actual or threatened Release thereof from such property. No provisions of the Loan Documents shall be interpreted to absolve or release Borrower from any liability or responsibility which they may have to any Person, under any local, state or federal statute or regulation, for Remedial Actions with respect to any such Hazardous Substances or for the actual or threatened Release of any such Hazardous Substances.

5.5    <u>Corporate Existence; Properties</u>. Borrower will not change its name and Borrower will maintain:

(a)    its corporate existence and its qualification to do business and good standing in each jurisdiction in which qualification is necessary for the proper conduct of its business;

(b)    all licenses, permits and other authorizations necessary for the ownership and operation of its properties and business; and

(c)    its assets and properties (including all of the Collateral) in substantially the state of repair, order and condition as on the date hereof, reasonable wear and tear or loss by casualty excepted.

5.6    <u>Insurance</u>.

(a)    Borrower shall carry at all times insurance covering risks, in amounts at least equal to and subject to terms no less favorable than the insurance maintained by Borrower as of the Petition Date, and pay all premiums on the policies for such insurance when and as they become due and do all other things necessary to maintain such policies in full force and effect. Borrower shall from time to time, upon request by Lender, promptly furnish or cause to be furnished to Lender evidence, in form and substance satisfactory to Lender, of the maintenance of all insurance required to be maintained by this <u>Section 5.6</u> including, but not limited to, such originals or copies, as Lender may request, of policies, certificates of insurance, riders and endorsements relating to such insurance and proof of premium payments.  Borrower shall name Lender as additional insured and/or lender loss payee on all liability, casualty, and property insurance policies of Borrower.

(b)    If Borrower shall fail at any time or times hereafter to obtain and maintain any of the policies of insurance required hereby, or fail to pay any premium in whole or in part relating to any such policies, then Lender may, but it shall have no obligation to do so, obtain and cause to be maintained any or all of such policies, and pay any part or all of the premiums due thereunder, without thereby waiving any default by Borrower, and any sums so disbursed by Lender shall become a part of the Obligations secured by the Collateral, payable on demand and, until paid, shall bear interest at the Default Rate.

5.7    <u>Books and Records</u>. Borrower will maintain accurate and complete records and books of account with respect to all its operations in accordance with GAAP, and will permit

officers or representatives of Lender to examine and make excerpts from such books and records and to visit and inspect its properties, both real and personal, at all reasonable times provided such examination will not interfere with Borrower's operations.

5.8    Location of Collateral. All Collateral and all of Borrower's business records will at all times be situated at the locations set forth in Schedule 3.8 hereof.

5.9    Chapter 11 Case Milestones. Borrower shall achieve the following milestones (as the same may be extended or modified from time to time with the advance written consent of Lender) (the "***Milestones***"):

(a)    Throughout the Chapter 11 Case and until all Obligations owed to Lender are paid in full, Borrower shall remain within Ten Percent (10%) of its revenue projections as reflected on its rolling thirty (30) day Budget;

(b)    On or before the 28th calendar day after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

(c)    On or before the 45th calendar day following the date on which Lender funds the Initial Draw, the Bankruptcy Court shall have entered the Bidding Procedures Order;

(d)    On or before the 85th calendar day after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance satisfactory to Lender, approving the Borrower's entry into a Sale Transaction and authorizing Borrower to consummate such Sale Transaction; and

(e)    On or before the 100th calendar day after the Petition Date, Borrower shall have consummated the Sale Transaction.

5.10    Minimum Cash Balance. Until all Obligations owed to Lender are paid in full: (i) Borrower shall maintain a minimum cash balance of at least Two Hundred and Fifty Thousand Dollars ($250,000), which minimum cash balance may be funded through amounts borrowed from Lender under this Agreement; and (ii) all cash of Borrower in excess of $100,000 must be maintained in one or more deposit accounts that are identified to Lender and that are not subject to any Liens (including, without limitation, any possessory Liens and/or Liens created through a deposit account control agreement or similar agreement) except for Liens in favor of Lender.

5.11    Professional Retentions. Until all Obligations owed to Lender are paid in full, Borrower shall continue its retention of Lakeshore Food Advisors as Borrower's investment banker and shall not modify the scope of its engagement without the advance written consent of Lender. In addition, Borrower shall retain and maintain the engagement of a Chief Restructuring Officer acceptable to Lender and on terms and conditions acceptable to Lender.

EXECUTION VERSION

SECTION 6.   NEGATIVE COVENANTS.

Borrower covenants and agrees that, from and after the Closing Date and so long as any of the Obligations remain outstanding and unpaid, in whole or in part, Borrower will observe the following covenants unless Lender shall otherwise consent in writing:

6.1   Debt. Borrower will not create, incur, assume or suffer or permit to exist any Debt, including indebtedness for borrowed money or any indebtedness constituting the deferred portion of the purchase price of any property, except (collectively, the "***Permitted Debt***"):

(a)   Debts identified on Schedule 6.1 hereof;

(b)   any Obligations, whether evidenced by the Line of Credit Note or any other instruments;

(c)   Debt related to Permitted Expenses;

(d)   Pre-Petition Obligations; and

(e)   any other Debt permitted under the Loan Documents.

6.2   Liens.

(a)   Borrower will not create, assume, or suffer to exist, any Lien of any kind upon the Collateral or any of their other assets (including, for the avoidance of doubt, any liens and/or interests created or arising under the Packers and Stockyards Act, or any other liens on feedstock arising under any other common law or statute), whether now owned or hereafter except the following:

(i)   Liens identified on Schedule 6.2 hereof (the "***Permitted Encumbrances***");

(ii)   Liens that are fully subordinated to the Liens granted to Lender herein by agreement of such Lien holders or otherwise by operation of the Interim DIP Order and/or Final DIP Order; and

(iii)   the Liens granted to Lender herein.

6.3   Investments, Loans and Advances. Borrower will not make or suffer to exist any Investment (by way of transfer of property, contribution to capital, purchase of stock, securities, partnership or other ownership interests or evidence of indebtedness, acquisition of the business or assets or otherwise) in, or make or suffer to exist any advances or loans to, any Person, except that:

(a)   Borrower may extend trade credit under usual and customary arms' length terms in the ordinary course of business; and

(b)      Borrower may invest money consistent with the provisions of section 345 of the Bankruptcy Code or as may be permitted by order of the Bankruptcy Court.

6.4      <u>Capital Expenditures</u>.  Borrower shall not make any capital expenditures without the prior written consent of Lender except as expressly set forth in the agreed Budget.

6.5      <u>Dividends; Distributions; Acquisition of Capital Stock</u>. Borrower will not declare or pay any dividends or make any other distribution (whether in cash or in property) on any shares of its stock or any other equity interests or securities (or rights, options or warrants to purchase such shares or interests), and Borrower will not purchase, redeem, retire or otherwise acquire for value any shares of its stock or any other equity interests or securities (or rights, options or warrants to purchase such shares or interests) of Borrower.

6.6      <u>Disposition of Assets</u>. Borrower will not convey, sell, lease, or otherwise transfer or dispose of all or any part of its properties, assets or business except in the ordinary course of business, unless Lender consents in advance and in writing.  For the avoidance of doubt, Borrower shall not factor or otherwise dispose of or encumber any of its accounts receivable arising on or after the Petition Date with, to, or in favor of First Corporate Solutions or any other third party.

6.7      <u>New Subsidiaries or Partnerships</u>.  Without the advance written consent of Lender, Borrower will not create any new subsidiaries or become a general partner of any partnership.

6.8      <u>Continuance of Business</u>. Borrower will not engage in any line of business other than those in which Borrower is actively engaged on the effective date of this Agreement.

6.9      <u>Removal and Protection of Property</u>. Borrower will not remove (other than in the ordinary course of business) any equipment, or general intangibles from the place of business where presently located, nor permit the value of any property to be impaired or any equipment to become a fixture or an accession to other goods.

6.10      <u>Handling of Hazardous Substances</u>. Borrower will not permit use in its business or operations, or produce as a result or as a by-product of its businesses or operations, or store or hold at any site or location at which it conducts its business or operations, or at any other property, Hazardous Substances unless Borrower strictly and fully complies with all requirements of any applicable law, regulation, decision or edict relating to the special handling, collection, storage, treatment, disposal, or transportation of such Hazardous Substance. Borrower will not permit the Release or threatened Release of any Hazardous Substance on, from, or near its properties which might cause Contamination.

6.11      <u>Packers and Stockyards Act Claims</u>.  Until all Obligations to Lender are paid in full, Borrower shall not incur or suffer to be incurred any post-petition, validly asserted claims arising under the Packers and Stockyards Act.  For clarity, all pre-petition, validly asserted claims arising under the Packers and Stockyards Act must be paid in full from proceeds of the Initial Draw as provided in <u>Section 3.6</u> hereof.

EXECUTION VERSION

SECTION 7.    EVENTS OF DEFAULT, REMEDIES.

7.1    Events of Default. The occurrence of any one or more of the following events shall constitute Events of Default:

(a)    Non-Payment. Failure by Borrower to pay when due any amounts owing to Lender under this Agreement and/or the Line of Credit Note, or any other Loan Document or instrument evidencing any Obligation;

(b)    Falsity of Representations and Warranties. Any representation or warranty made by Borrower in this Agreement or in any other Loan Document or in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement or any other Loan Document shall be false or misleading in any material respect as of the date made or deemed to have been made;

(c)    Failure to Perform Certain Covenants. Failure by Borrower to observe or perform any other covenants, conditions or provisions contained in this Agreement or in any other Loan Document which is not cured within five (5) days from the occurrence of such failure; *provided*, *however*, that the five (5) day grace period shall not apply to any Event of Default described in Sections 7.1(a), 7.1(b), or 7.1(i) hereof or any other covenant, condition or provision which is not curable;

(d)    Default Under Other Loan Documents. An Event of Default by Borrower shall have occurred and be continuing under any Loan Document;

(e)    Unenforceability. (i) Any material provision of any of the Loan Documents shall at any time for any reason cease to be a valid and binding obligation of Borrower, or shall be declared to be null and void or (ii) the validity or enforceability thereof shall be contested by Borrower or any other Person, or Borrower shall deny that they have any further liability or obligation under any Loan Document;

(f)    Lender's Liens. The Liens granted by Borrower to Lender shall at any time fail to be first priority perfected Liens, subject only to Permitted Encumbrances that have priority as a matter of applicable Law or with respect to which Lender has agreed in writing to subordinate its Lien, or Borrower shall so allege in any writing;

(g)    Judgments. One or more judgments are entered against Borrower which have a material adverse effect upon the Collateral;

(h)    Appointment of Trustee. The Bankruptcy Court shall enter an order appointing a trustee under section 1104(a) of the Bankruptcy Code in the Chapter 11 Case;

(i)    Failure to Achieve Milestones. Borrower shall fail to achieve any of the Milestones set forth in Section 5.9 hereof;

(j)    Appointment of Examiner. The Bankruptcy Court shall enter an order appointing an examiner for Borrower with powers beyond those stated in sections 1106(a)(3) and (4) of the Bankruptcy Code;

EXECUTION VERSION

(k)      Modification of Orders. The Interim DIP Order or the Final DIP Order, as applicable, shall be amended, supplemented, vacated, stayed or otherwise modified without the written consent of Lender;

(l)      Dismissal, Conversion, Priority Administrative Expenses. The Chapter 11 Case of Borrower shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or an application shall be filed by Borrower for the approval of, or there shall arise, any claim which is an administrative expense claim having priority over the administrative expense claim granted to Lender;

(m)      Relief from Automatic Stay. The Bankruptcy Court shall enter an order, without Lender's consent, granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder of any security interest in any material asset constituting Collateral;

(n)      Noncompliance with Interim DIP Order or Final DIP Order. Borrower shall fail to comply with the terms of the Interim DIP Order or, upon its entry, the Final DIP Order;

(o)      Payment of Pre-Petition Obligations. Borrower shall make any payment on account of a Pre-Petition Obligation other than as approved by the Bankruptcy Court, provided Lender shall not be deemed to have waived its rights to object to any motion to approve such payments.

(p)      Claims Against Lender.  Commencement by Borrower, or their estates or any other Person of any litigation, arbitration, or other proceeding relating to any claim or action against Lender arising or alleged to arise out of any conduct in connection with the Loan Documents other than with respect to enforcement of Lender's obligations under the Loan Documents or APA.

(q)      Change of Control.  Any Change of Control shall occur.

(r)      Abandonment or Failure of Sale Process.  Lender is informed by Borrower (including through its professionals) that the process for the Sale Transaction has failed or has been (or is intended to be) abandoned by the Borrower, that any Stalking Horse Bid has been withdrawn or otherwise becomes no longer viable, or that there are no viable potential purchasers willing to engage with the Borrower in a Sale Transaction.

7.2    Remedies.

(a)      Upon the occurrence of an Event of Default, Lender may, by written notice to Borrower, terminate immediately and irrevocably the Line of Credit, the Line of Credit Commitment, and any other obligation of Lender to make any advances to or for the account of Borrower, and declare the Line of Credit Termination Date to have occurred and the Line of Credit Note, and all other instruments evidencing the Obligations to be due and payable, whereupon the principal amount of the Line of Credit Note and all outstanding Obligations, together with the accrued interest thereon and all other amounts payable thereunder, shall become immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are

hereby expressly waived, anything contained herein or in the documents evidencing the same to the contrary notwithstanding;

(b)      Upon the occurrence of an Event of Default and following five (5) days' written notice to Borrower and counsel to the Unsecured Creditors Committee in the Chapter 11 Case, if one has been appointed (the "***Committee***"), the automatic stay of section 362 of the Bankruptcy Code shall be deemed automatically vacated and Lender shall be immediately permitted to, among other things, pursue any and all of its remedies against Borrower and the Collateral unless, prior to the expiration of such five (5) day period, the Bankruptcy Court, upon motion of Borrower or the Committee and a hearing with an opportunity for Lender to be heard, orders otherwise;

(c)      Upon the occurrence of an Event of Default, Lender shall have all rights and, subject to obtaining any necessary relief from the automatic stay, all remedies contained in this Agreement or in any other Loan Document, and all the rights and remedies of a secured party under the UCC. In addition to all such rights and remedies, subject to obtaining any necessary relief from the automatic stay, Lender may sell, lease or otherwise dispose of the Collateral, or any part thereof, at public or private sale, for cash, credit or any combination thereof. Lender shall have the right to credit bid and purchase at such sale or sales. The Proceeds of any sale or other disposition of all or any part of the Collateral upon which Lender has a security interest, shall be applied by Lender in accordance with applicable law. Borrower shall be liable to Lender for any deficiency.

7.3      <u>Right of Setoff</u>. Upon the occurrence of a Default or an Event of Default, Lender shall have the right, in addition to all other rights and remedies available to it, to set off against the unpaid balance of the Obligations, any debt owing to Borrower by Lender.

7.4      <u>Remedies Cumulative</u>. Lender may exercise any of its rights and remedies set forth in this Loan Agreement and the other Loan Documents. The remedies of Lender shall be cumulative and concurrent, and may be pursued singly, successively, or together, at its sole discretion, and may be exercised as often as the occasion therefor shall occur; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof.

7.5      <u>Site Assessments</u>.      In connection with Lender's consideration of enforcement or preservation of rights under any Loan Document, if an Event of Default shall occur, Borrower shall permit such persons ("***Site Reviewers***") as Lender may select to visit all properties owned or used by Borrower and perform such site investigations and assessments thereof ("***Site Assessments***").

SECTION 8.      <u>MISCELLANEOUS</u>.

8.1      <u>No Waiver; Cumulative Remedies</u>. No failure or delay on the part of Lender in exercising any right, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder or thereunder preclude or require any other or further exercise thereof or the exercise of any other right, power or privilege. Lender shall not be deemed, by any act of omission or commission, to have waived any of its rights or remedies hereunder unless such waiver is in writing

and signed by Lender, and then only to the extent specifically set forth in writing. A waiver with respect to one event shall not be construed as continuing or as a bar to or a waiver of any right or remedy with respect to a subsequent event. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.

8.2    Notices. All notices and other communications shall have been duly given and shall be effective (i) when delivered, (ii) when transmitted via telecopy (or other facsimile device) to the numbers set forth below, (iii) the Business Day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service, or (iv) the third Business Day following the day on which the same is sent by certified or registered mail, post prepaid, in each case to the respective parties at the address or telecopy number set forth below, or at such other address or telecopy number as such party may hereafter specify by written notice to the other party hereof:

| | |
|---|---|
| Borrower: | Pure Prairie Poultry, Inc. |
| | Attn: George Peichel |
| | Brian Roelofs |
| | 68808 Fort Road |
| | Fairfax, MN 55332 |
| | Email:  gpeichel@pureprairie.com |
| | broelofs@pureprairie.com |
| | |
| with a copy to: | Taft Stettinius & Hollister LLP |
| | Attn:  James Jorissen |
| | 2200 IDS Center |
| | 80 South Eighth Street |
| | Minneapolis, MN 55401 |
| | Email:  jjorissen@taftlaw.com |
| | |
| Lender: | Sandton Capital Solutions Master Fund VI, LP |
| | 16 W. 46th Street, 11th Floor |
| | New York, NY 10036 |
| | Attn:  Robert Orr |
| | Email:  rorr@sandtoncapital.com |
| | |
| with a copy to: | McGuireWoods LLP |
| | Attn: Mark E. Freedlander |
| | Tower Two-Sixty |
| | 260 Forbes Avenue, Suite 1800 |
| | Pittsburgh, PA 15222 |
| | email:  mfreedlander@mcguirewoods.com |

8.3    Reimbursement of Lender. In accordance with the Interim DIP Order and/or Final DIP Order, as applicable, Borrower agrees to pay all reasonable and documented costs and expenses of Lender in connection with the preparation, negotiation, execution, and/or administration of the Loan Documents, including the reasonable and documented fees and

expenses of counsel and/or any other professional advisor to Lender, in connection with the preparation and execution of the Loan Documents and in connection with the transactions contemplated hereby or thereby, and any amendment, waiver or consent related thereto, whether or not the transactions contemplated herein are consummated, together with any reasonable and documented fees and/or charges suffered or incurred by Lender in connection with any periodic environmental audits, fixed asset appraisals, title insurance policies, collateral filing fees and lien searches.   Borrower agrees, subject to the Interim DIP Order and/or Final DIP Order (as applicable), to pay to Lender all costs and expenses reasonably incurred or paid by Lender, including reasonable and documented attorneys' fees and/or professional advisors' fees and reasonable and documented disbursements and court costs, in connection with any Default or Event of Default hereunder or in connection with the enforcement of any of the Loan Documents.

8.4    Payment of Expenses and Taxes. In addition to payment of the expenses provided for in Section 8.3, Borrower agrees to pay, and to hold Lender harmless from any delay in paying, stamp and other similar taxes, if any, including, without limitation, all levies, impositions, duties, charges or withholdings, together with any penalties, fines or interest thereon or other additions thereto, which may be payable or determined to be payable in connection with the execution and delivery of this Agreement and the Loan Documents or any modification of any thereof or any waiver or consent under or in respect of any thereof.

8.5    Survival of Representations and Warranties. All representations, warranties, covenants and agreements made in this Agreement and all other Loan Documents shall survive the execution and delivery of the Loan Documents and the making of the Loans hereunder. All such representations and warranties shall be deemed to be made again at the date of each disbursement by Lender under the Line of Credit. The provisions of Sections 5.4, 8.3, 8.4, 8.9, 8.10 and 8.11 hereof shall survive payment of the Obligations.

8.6    Successors. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, except that Borrower may not assign or transfer its rights hereunder without the prior written consent of Lender.

8.7    Construction. This Agreement, all Loan Documents, and the rights and obligations of the parties hereunder and thereunder, shall be governed by and construed and interpreted in accordance with, the domestic internal laws of State of New York without regard to its rules pertaining to conflict of laws. The Section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

8.8    Severability. Any provision contained in this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.9    Indemnity. Borrower hereby agrees to pay, assume liability for, and indemnify, protect, defend, save and keep harmless Lender from and against, any and all liabilities, obligations, losses, damages, settlements, claims, actions, suits, penalties, costs and expenses

(including, but not limited to, legal and investigative fees and expenses) of whatsoever kind and nature, including, but not limited to claims based upon negligence, strict or absolute liability, liability in tort, latent and other defects (whether or not discoverable), and any claim for patent, trademark or copyright infringement which may from time to time be imposed on, incurred by or asserted against Lender (whether or not any such claim is also indemnified or insured against by any other person) relating to or resulting from this Agreement, any Loan Document, or any of the transactions contemplated herein or therein, except to the extent arising out of Lender's gross negligence or willful misconduct. The provisions of this <u>Section 8.9</u> shall survive the payoff, release, foreclosure or other disposition, as applicable, of this Agreement, the Obligations or the Collateral.

8.10    <u>Governing Law; Waiver of Trial by Jury; Jurisdiction</u>.

(a)    This Agreement and each Loan Document (unless and except to the extent expressly provided otherwise in any such Loan Document), and all matters relating hereto or thereto or arising herefrom or therefrom (whether arising under contract law, tort law or otherwise) shall, in accordance with Section 5-1401 of the General Obligations Law of the State of New York, be governed by and construed in accordance with the laws of the State of New York.

(b)    To the extent permitted by law, each party to this Agreement agrees that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by either party hereto or any successor or assign of any party on or with respect to this Agreement or any other Loan Document or which in any way relates, directly or indirectly, to the Loans or any event, transaction, or occurrence arising out of or in any way connection with the Loans, or the dealings of the parties with respect thereto, shall be tried only by a court and not by a jury. EACH PARTY HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION, OR PROCEEDING. BORROWER ACKNOWLEDGES AND AGREES THAT THIS <u>SECTION 8.10</u> IS A SPECIFIC AND MATERIAL ASPECT OF THIS AGREEMENT BETWEEN THE PARTIES AND THAT LENDER WOULD NOT EXTEND THE LOANS TO BORROWER IF THIS WAIVER OF JURY TRIAL SECTION WERE NOT A PART OF THIS AGREEMENT.

(c)    To the extent permitted by law, for the purpose of any suit, action or proceeding arising out of or relating to this Agreement, the Line of Credit Note or the Loan, Borrower hereby irrevocably consents and submits to the jurisdiction and venue of the state and federal courts located in Minnesota, and agree to accept and acknowledge all service of process in connection with any such matter by certified or registered mail or by any other legally permissible means. Borrower irrevocably waives any objection which it may now or hereinafter have to the laying of the venue of any suit, action or proceeding brought in such court and any claim that such suit, action or proceeding brought in such a court has been brought in an inconvenient forum and agree that service of process in accordance with the foregoing sentence shall be deemed in every respect effective and valid personal service of process upon Borrower. The provisions of this <u>Section 8.10(c)</u> shall not limit or otherwise affect the right of Lender to institute and conduct action in any other appropriate manner, jurisdiction or court.

8.11    <u>Actions Against Lender; Release</u>.

(a)      Any action brought by Borrower against Lender which is based, directly or indirectly, on this Agreement or any other Loan Document or any matter in or related to this Agreement or any other Loan Document, including but not limited to the making of the Loans or the administration or collection thereof, shall be brought only in the state or federal courts located in Minnesota.

(b)      Upon full payment and satisfaction of the Loans and the interest thereon, as provided in <u>Section 2</u> hereof, the parties shall thereupon automatically each be fully, finally, and forever released and discharged from any further claim, liability or obligation in connection with the Loans except as expressly set forth herein, except to the extent any payment received by Lender is determined to be a preference or similar voidable transfer, in which case the claims of Lender shall not be released.

8.12    <u>Performance by Lender</u>. If Borrower shall fail to observe or perform any of the terms, agreements or covenants contained in this Agreement, or in any other Loan Document, Lender may, in its discretion, but without any obligation or duty to do so, and without waiving any Default, or Event of Default, perform any of such terms, agreements or covenants, in part or in whole, and any money advanced or expended by Lender in or toward the fulfillment of such terms, agreements or covenants, shall be due on demand and become a part of and be added to the indebtedness due under the Line of Credit Note and secured as herein provided with interest thereon at the rate specified in such note from the date of the respective advance or expenditure. Lender's rights contained in this <u>Section 8.12</u> shall be in addition to any and all of Lender's rights under this Agreement, and Lender may, at its sole election, exercise any one or more, or all, of such rights alternatively or concurrently.

8.13    <u>Counterparts</u>. This Agreement may be executed by facsimile or electronic PDF signature and in any number of counterparts with then same effect as if the signatures thereto and hereto were upon the same instrument, but all of such counterparts taken together shall be deemed to constitute one and the same instrument.

8.14    <u>Further Actions</u>. Borrower shall execute and deliver such documents and instruments, and take such other actions, as Lender deems necessary to consummate the transactions described in this Agreement.

8.15    <u>Section 506(c) and 552(b) Waivers</u>. In consideration of the agreements of Lender stated in the Loan Documents, (i) Borrower hereby agrees not to assert and affirmatively waives any claim it otherwise might have under section 506(c) of the Bankruptcy Code and agrees that the Collateral securing the Obligations may not be charged with costs or expenses or administration including Permitted Expenses and other expenses which are permitted uses of the proceeds of the Line of Credit; and (ii) Borrower hereby agrees that Lender is entitled to a waiver of the exceptions provided in sections 552(b)(1) and (b)(2) of the Bankruptcy Code.

8.16    <u>Section 510, 544, 547, 548 and 549 Waiver, Etc</u>. In consideration of the agreements of Lender stated in the Loan Documents, Borrower hereby agrees not to assert and hereby affirmatively waive any claim they may have under sections 510, 544, 547, 548, or 549 of the Bankruptcy Code against Lender, in any form or manner whatsoever, and any right it may have

EXECUTION VERSION

to challenge the extent and validity of the Liens granted to Lender as security under the Loan Documents.

8.17    <u>No Marshaling</u>. The Interim DIP Order and Final DIP Order shall provide, among other things, that, effective as of the entry of the Final DIP Order, Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral and that, from and after entry of the Final Order, no party other than Lender shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of the Bankruptcy Court or otherwise) to marshal or otherwise control the disposition of the Collateral after an Event of Default under this Agreement or any other Loan Document.

8.18    <u>Entire Agreement</u>. This Agreement and the Loan Documents represent the entire agreement between Lender and Borrower with respect to the financing transactions to which they relate, and cannot be changed or amended except by an agreement in writing signed by the party against whom enforcement of the change or amendment is sought.

8.19    <u>Bankruptcy Court Approval</u>. Neither this Agreement nor the Loan Documents shall be binding upon any party prior to entry of the Interim DIP Order.

*[Signature Page Follows]*

EXECUTION VERSION

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

**BORROWER:**

PURE PRAIRIE POULTRY, INC.

By: _____

Name: George Reichel

Title: CFO

**LENDER:**

SANDTON CAPITAL SOLUTIONS MASTER FUND VI, LP

By: _____

Name:

Title:

# EXHIBIT B

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

---

In re:

Pure Prairie Poultry, Inc.,                                      Case No. 24-32426 KAC

        Debtor.                                      Chapter 11 Case

---

## ORDER FOR ADEQUATE PROTECTION AND USE OF CASH COLLATERAL
## PENDING FINAL HEARING

This case is before the court on Debtor's Motion For Interim And Final Orders (I) Granting Expedited Hearing, (II) Approving Postpetition Financing, (III) Granting Liens And Providing Superpriority Administrative Expense Status, (IV) Authorizing Use Of Cash Collateral, (V) Granting Adequate Protection, (VI) Modifying Automatic Stay, and (VII) Granting Related Relief (the "Motion"), as more fully described in the Motion and accompanying Memorandum of Law. This Court is contemporaneously issuing an Interim Order Authorizing Debtor to Obtain Post-Petition Financing, Granting Liens and Superprority Claims to Post-Petition Lender, and Scheduling a Final Hearing (the "Interim DIP Order"), which addresses all matters in the Motion except Debtor's request for an Order authorizing use of Cash Collateral and granting adequate protection. This Order addresses those issues.  All capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion unless otherwise specified.

Based on the Motion, and this court having determined that it is in the best interests of Debtor's estate to grant the Motion, and it appearing that due and proper notice of this Motion was given,

**IT IS HEREBY ORDERED:**

1.      Debtor's Motion is granted.

2.      Debtor's request for expedited relief is granted.

3.      Debtor needs to use Cash Collateral, in order to, among other things, preserve, maintain and maximize the value of its assets and business. The ability of Debtor to maintain liquidity through the use of Cash Collateral is vital to Debtor and its efforts to maximize the value of its assets. Accordingly, Debtor has demonstrated good and sufficient cause for the relief granted herein.

4.      Debtor is authorized to use Cash Collateral through and until _____, in an amount not to exceed the amounts set forth in the Proposed Budget, which is attached to the Motion as Exhibit B.

5.      For purposes of adequate protection, the Prepetition Secured Parties shall receive: (i) adequate protection liens in the amount equal to the aggregate diminution in value of the interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, a valid replacement security interest in and lien on all pre-petition and post-petition property and assets of Debtor and its estate, including the Collateral (as defined in the Interim DIP Order) and all proceeds thereof, subordinate only to the DIP Liens (as defined in the Interim DIP Order), (ii) payments as set forth in the Proposed Budget (to the extent applicable), and (iii) access to all information provided to DIP Lender.

6.      For purposes of adequate protection, the Prepetition Un-Perfected Secured Parties shall receive: (i) adequate protection liens in Debtor's post-petition assets of the same character, value, validity and dignity as existed prior to the Petition Date.

7.      The replacement liens of any Cash Collateral Secured Parties are deemed properly perfected without any further act or deed on the part of the Debtor or Secured Parties.

8.      Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

9.      This Court shall retain jurisdiction over any and all matters arising from or related to the implementation or interpretation of this Order.

10.     Entry of this order is without prejudice to the rights of any party-in-interest to dispute the validity, priority and effect of any security interest granted to any creditor claiming an interest in Cash Collateral.

Dated: _____               _____
                                      United States Bankruptcy Judge

135055747v1

# EXHIBIT C

**Pure Prairie Poultry Inc**
**13-Week Cash Flow Forecast**

9/20/2024

($ and volume in thousands)

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | 13-Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 21-Sep-24 | 28-Sep-24 | 5-Oct-24 | 12-Oct-24 | 19-Oct-24 | 26-Oct-24 | 2-Nov-24 | 9-Nov-24 | 16-Nov-24 | 23-Nov-24 | 30-Nov-24 | 7-Dec-24 | 14-Dec-24 | Period |
| Company Period | 9 | 9 | 10 | 10 | 10 | 10 | 10 | 11 | 11 | 11 | 11 | 12 | 12 | Total |
| Model Week | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Wk 12 | Wk 13 | |
| **VOLUME** | | | | | | | | | | | | | | |
| Birds to Process (thousands) | 322 | 276 | 291 | 319 | 318 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 4,085 |
| Dressed Pounds Sold (thousands) | 1,144 | 1,144 | 1,090 | 1,090 | 1,090 | 1,090 | 1,090 | 1,090 | 1,090 | 1,090 | 1,090 | 1,090 | 1,090 | 14,278 |
| **SALES** | | | | | | | | | | | | | | |
| Net Sales | 1,102 | 1,163 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,170 | 1,170 | 1,170 | 1,170 | 1,170 | 1,170 | 15,122 |
| - $ Per Pound Sold | 0.96 | 1.02 | 1.07 | 1.07 | 1.07 | 1.07 | 1.07 | 1.07 | 1.07 | 1.07 | 1.07 | 1.07 | 1.07 | 1.06 |
| **CASH FLOW SUMMARY** | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | |
| Customer Receipts | 882 | - | 110 | 692 | 1,165 | 1,167 | 1,167 | 1,167 | 1,167 | 1,169 | 1,170 | 1,170 | 1,170 | 12,197 |
| Other Customer Receipts | 212 | 130 | 175 | 202 | 159 | - | - | - | - | - | - | - | - | 879 |
| Discounts | (13) | - | - | - | - | - | - | - | - | - | - | - | - | (13) |
| Other Cash Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Freight | 26 | 26 | 21 | 21 | 21 | 21 | 21 | 26 | 26 | 26 | 26 | 26 | 26 | 309 |
| Finshed Goods (Chicken) | 57 | 57 | 57 | 57 | 57 | 57 | 57 | - | - | - | - | - | - | 400 |
| [] | | | | | | | | | | | | | | |
| Net Receipts | 1,164 | 213 | 363 | 972 | 1,402 | 1,245 | 1,245 | 1,193 | 1,194 | 1,196 | 1,196 | 1,196 | 1,196 | 13,772 |
| **General Disbursements** | | | | | | | | | | | | | | |
| Live Costs | 1,101 | 1,247 | 760 | 1,101 | 760 | 1,247 | 760 | 1,101 | 760 | 1,247 | 760 | 1,101 | 760 | 12,701 |
| Plant Costs | 852 | 255 | 690 | 255 | 690 | 255 | 690 | 255 | 690 | 255 | 690 | 255 | 690 | 6,522 |
| Freight | 26 | 26 | 21 | 21 | 21 | 21 | 21 | 26 | 26 | 26 | 26 | 26 | 26 | 309 |
| SG&A | 172 | 937 | 135 | 135 | 135 | 135 | 135 | 135 | 156 | 156 | 156 | 158 | 158 | 2,722 |
| Marketing | 9 | 9 | 7 | 7 | 7 | 7 | 7 | 9 | 9 | 9 | 9 | 9 | 9 | 102 |
| [] | | | | | | | | | | | | | | |
| Total General Disbursements | 2,160 | 2,473 | 1,612 | 1,518 | 1,612 | 1,664 | 1,612 | 1,546 | 1,639 | 1,692 | 1,639 | 1,548 | 1,641 | 22,357 |
| **Net Operating Cash Flow** | (996) | (2,260) | (1,249) | (546) | (210) | (419) | (367) | (353) | (446) | (498) | (444) | (352) | (446) | (8,585) |
| **Other Expenses** | | | | | | | | | | | | | | |
| Critical Vendors | 587 | 586 | 84 | 84 | 84 | 84 | 84 | 83 | 83 | 83 | 83 | 83 | 82 | 2,089 |
| Professional Fees | 166 | 99 | 99 | 79 | 77 | 72 | 62 | 61 | 61 | 61 | 61 | 51 | 51 | 994 |
| [] | | | | | | | | | | | | | | |
| Total Other Expenses | 752 | 685 | 183 | 163 | 160 | 155 | 145 | 144 | 144 | 143 | 143 | 133 | 133 | 3,082 |
| **Capital Spending** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Debt Payments** | - | - | 317 | - | - | - | - | 317 | - | - | - | 396 | - | 1,030 |
| **Total Disbursements** | 2,912 | 3,158 | 2,111 | 1,681 | 1,772 | 1,819 | 2,073 | 1,689 | 1,783 | 1,835 | 1,782 | 2,077 | 1,774 | 26,469 |
| **U.S. Trustee Expenses** | - | - | 59 | - | - | - | - | - | - | - | - | - | - | 59 |
| **Cash Flow** | (1,748) | (2,945) | (1,807) | (709) | (370) | (574) | (828) | (496) | (590) | (641) | (587) | (881) | (579) | (12,756) |
| Weekly Starting Cash | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Change in Cash | (1,748) | (2,945) | (1,807) | (709) | (370) | (574) | (828) | (496) | (590) | (641) | (587) | (881) | (579) | (12,756) |
| Net Cash | (1,748) | (2,945) | (1,807) | (709) | (370) | (574) | (828) | (496) | (590) | (641) | (587) | (881) | (579) | (12,756) |
| DIP Loan Funded/(Repaid) | 1,748 | 2,945 | 1,807 | 709 | 370 | 574 | 828 | 496 | 590 | 641 | 587 | 881 | 579 | 12,756 |
| Ending Cash | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Capitalized Interest/Fees | 375 | | | | | | 138 | | | 180 | | | | 694 |
| **DIP Loan Balance** | 2,123 | 5,068 | 6,876 | 7,584 | 7,955 | 8,667 | 9,496 | 9,992 | 10,582 | 11,403 | 11,990 | 12,871 | 13,450 | 13,450 |

# EXHIBIT D

Instr. Number: 2023 0754
BK: 2023 PG: 0754
Recorded: 5/4/2023 at 9:27:32.0 AM
Pages 24
County Recording Fee: $122.00
Iowa E-Filing Fee: $3.00
Combined Fee: $125.00
Revenue Tax:
Amy M. Assink RECORDER
Floyd County, Iowa

# CONSTRUCTION MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING

### Recorder's Cover Sheet

**Preparer Information:**

Patrick F. Brown, Esq., Maynard Nexsen, PC, 227 West Trade Street, Suite 1550, Charlotte, NC 28202
(704) 338-5314

**Taxpayer Information:**

Pure Prairie Poultry, Inc., 901 N. Main Street, Charles City, Iowa 50616

**Return Address:**

Patrick F. Brown, Esq., Maynard Nexsen, PC, 227 West Trade Street, Suite 1550, Charlotte, NC 28202

**Grantor:**

Pure Prairie Poultry, Inc., a company incorporated under the laws of the State of Minnesota, 901 N. Main Street, Charles City, Iowa 50616

**Grantee:**

Community Bank & Trust- West Georgia, a banking corporation formed under the laws of the State of Georgia, 201 Broad Street, LaGrange, Georgia 30241

**Legal Description:** See Exhibit A, which is attached to the Mortgage

**Document or instrument number if applicable:**

N/A

**NOTICE: This Mortgage secures credit in the amount of $36,742,500.00. Loans and advances up to this amount, together with interest, are senior to indebtedness to other creditors under subsequently recorded or filed mortgages and liens.**

NCS 015327A -MPLS (CF/KC)

1

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

Patrick F. Brown, Esq.
Maynard Nexsen, PC
227 West Trade Street, Suite 1550
Charlotte, NC 28202

_____

Space above this line for Recorder's Use

**CONSTRUCTION MORTGAGE, ASSIGNMENT OF RENTS,
SECURITY AGREEMENT AND FIXTURE FILING**

This Mortgage, effective as of April 26, 2023, is given by Pure Prairie Poultry, Inc. a company incorporated under the laws of the State of Minnesota, as mortgagor ("**Mortgagor**" or "**Obligor**"), to Community Bank & Trust- West Georgia, a banking corporation formed under the laws of the State of Georgia, including any successors or assigns, as mortgagee ("**Mortgagee**").

This Mortgage constitutes a Construction Mortgage as defined in the Iowa Code.

1. GRANT.

    1.1 The Property. For the purpose of securing payment and performance of the Secured Obligations defined in Section 2 below, Mortgagor hereby irrevocably and unconditionally grants, conveys, transfers and assigns to Mortgagee, upon the statutory mortgage condition for breach of which this Mortgage is subject to foreclosure as provided by law, with mortgage covenants and right of entry and possession, all estate, right, title and interest which Mortgagor now has or may later acquire in the following property (all or any part of such property, or any interest in all or any part of it, together with the Personalty (as hereinafter defined) being hereinafter collectively referred to as the "Property"):

        (a) The real property located in the County of Floyd, State of Iowa, as described in Exhibit A hereto (the "Land");

        (b) All buildings, structures, improvements, fixtures and appurtenances now or hereafter placed on the Land, and all apparatus and equipment now or hereafter attached in any manner to the Land or any building on the Land, including but not limited to all poultry processing plant equipment, engines, pipes, ditches and flumes, and also all gas, electric, cooking, heating, cooling, air conditioning, lighting, refrigeration and plumbing fixtures and equipment (collectively, the "Improvements");

        (c) All easements and rights of way appurtenant to the Land; all crops growing or to be grown on the Land (including all such crops following severance from the Land); all standing timber upon the Land (including all such timber following severance from the Land); all development rights or credits and air rights; all water and water rights (whether

2

riparian, appropriative, or otherwise, and whether or not appurtenant to the Land) and shares of stock pertaining to such water or water rights, ownership of which affect the Land; all minerals, oil, gas, and other hydrocarbon substances and rights thereto in, on, under, or upon the Land;

(d)  All existing and future leases, subleases, subtenancies, licenses, occupancy agreements and concessions relating to the use and enjoyment of all or any part of the Land or the Improvements, and any and all guaranties and other agreements relating to or made in connection with any of the foregoing;

(e)  All proceeds, including all claims to and demands for them, of the voluntary or involuntary conversion of any of the Land, Improvements, or the other property described above into cash or liquidated claims, including proceeds of all present and future fire, hazard or casualty insurance policies, whether or not such policies are required by Mortgagee, and all condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any breach of warranty, misrepresentation, damage or injury to, or defect in, the Land, Improvements, or the other property described above or any part of them; and

(f)  All proceeds of, additions and accretions to, substitutions and replacements for, and changes in any of the property described above.

1.2  <u>Fixture Filing</u>.  This Mortgage constitutes a financing statement filed as a fixture filing under Iowa Code Chapter 554 – Iowa Uniform Commercial Code, as amended or re-codified from time to time, covering any Property which now is or later may become a fixture attached to the Land or any building located thereon.

2.  <u>THE SECURED OBLIGATIONS.</u>

2.1  <u>Purpose of Securing</u>.  Mortgagor makes the grant, conveyance, transfer and assignment set forth in Section 1, makes the irrevocable and absolute assignment set forth in Section 3, and grants the security interest set forth in Section 4, all for the purpose of securing the following obligations (the "Secured Obligations") in any order of priority that Mortgagee may choose:

(a)  Payment of all obligations of Obligor to Mortgagee arising under the following instrument(s) or agreement(s) (collectively, the "Debt Instrument"):

(i)  A promissory note dated as of April 26, 2023, payable by Obligor as maker in the stated principal amount of $3,674,250.00 to the order of Mortgagee, having a final maturity date of April 26, 2050.

(ii)  A promissory note dated as of April 26, 2023, payable by Obligor as maker in the stated principal amount of $5,000,000.00 to the order of Mortgagee, having a final maturity date of April 26, 2050.

(iii)  A promissory note dated as of April 26, 2023, payable by Obligor as maker in the stated principal amount of $5,000,000.00 to the order of Mortgagee, having a final maturity date of April 26, 2050.

3

(iv)  A promissory note dated as of April 26, 2023, payable by Obligor as maker in the stated principal amount of $5,000,000.00 to the order of Mortgagee, having a final maturity date of April 26, 2050.

(v)  A promissory note dated as of April 26, 2023, payable by Obligor as maker in the stated principal amount of $5,000,000.00 to the order of Mortgagee, having a final maturity date of April 26, 2050.

(vi)  A promissory note dated as of April 26, 2023, payable by Obligor as maker in the stated principal amount of $5,000,000.00 to the order of Mortgagee, having a final maturity date of April 26, 2050.

(vii)  A promissory note dated as of April 26, 2023, payable by Obligor as maker in the stated principal amount of $5,000,000.00 to the order of Mortgagee, having a final maturity date of April 26, 2050.

(viii)  A promissory note dated as of April 26, 2023, payable by Obligor as maker in the stated principal amount of $3,068,250.00 to the order of Mortgagee, having a final maturity date of April 26, 2050.

(ix)  A certain Loan Agreement dated as of April 26, 2023, between Obligor and Mortgagee which provides for extensions of credit in the maximum principal amount of $36,742,500.00.

This Mortgage also secures payment of all obligations of Obligor under the Debt Instrument which arise after the Debt Instrument is extended, renewed, modified or amended pursuant to any written agreement between Obligor and Mortgagee, and all obligations of Obligor under any successor agreement or instrument which restates and supersedes the Debt Instrument in its entirety;

(b)  Payment and performance of all obligations of Mortgagor under this Mortgage;

(c)  Payment and performance of all obligations of Obligor under any Swap Contract with respect to which there is a writing evidencing the parties' agreement that said Swap Contract shall be secured by this Mortgage. "Swap Contract" means any document, instrument or agreement with Mortgagee, now existing or entered into in the future, relating to an interest rate swap transaction, forward rate transaction, interest rate cap, floor or collar transaction, any similar transaction, any option to enter into any of the foregoing, and any combination of the foregoing, which agreement may be oral or in writing, including, without limitation, any master agreement relating to or governing any or all of the foregoing and any related schedule or confirmation, each as amended from time to time; and

(d)  Payment and performance of all future advances and other obligations under the Debt Instrument.

This Mortgage does not secure any obligation which expressly states that it is unsecured, whether contained in the foregoing Debt Instrument or in any other document, agreement or instrument.  Unless specifically described in subparagraph (a) above, "Secured Obligations" shall not include any debts, obligations or liabilities which are or may hereafter be "consumer credit" subject to the disclosure requirements of the Federal Truth in Lending law or any regulation promulgated thereunder.

Notwithstanding any provision to the contrary, "Secured Obligations" secured hereby shall not include obligations arising under any Swap Contract to the extent that the grant of a lien hereunder to secure such Swap Contract would violate the Commodity Exchange Act by virtue of the Mortgagor's failure to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time such grant of such lien becomes effective with respect to such Swap Contract. "Commodity Exchange Act" means 7 U.S.C. Section 1 *et seq.,* as amended from time to time, any successor statute, and any rules, regulations and orders applicable thereto.

2.2 <u>Terms of Secured Obligations</u>. All persons who may have or acquire an interest in all or any part of the Property will be considered to have notice of, and will be bound by, the terms of the Debt Instrument described in Paragraph 2.1(a) and each other agreement or instrument made or entered into in connection with each of the Secured Obligations. These terms include any provisions in the Debt Instrument which permit borrowing, repayment and re-borrowing, or which provide that the interest rate on one or more of the Secured Obligations may vary from time to time.

**2.3  <u>NOTICE</u>:  This Mortgage secures credit in the amount of $39,000,000.00 plus interest thereon and all charges and expenses of collection incurred by Mortgagee, including court costs and reasonable attorneys' fees. Loans and advances up to this amount together with interest are senior to indebtedness to other creditors under subsequently recorded or filed mortgages and liens.**

3. <u>ASSIGNMENT OF RENTS</u>.

3.1 <u>Assignment</u>. Mortgagor hereby irrevocably, absolutely, presently and unconditionally assigns to Mortgagee all rents, royalties, issues, profits, revenue, income and proceeds of the Property, whether now due, past due or to become due, including all prepaid rents and security deposits (collectively, the "Rents"), and confers upon Mortgagee the right to collect such Rents with or without taking possession of the Property. In the event that anyone establishes and exercises any right to develop, bore for or mine for any water, gas, oil or mineral on or under the surface of the Property, any sums that may become due and payable to Mortgagor as bonus or royalty payments, and any damages or other compensation payable to Mortgagor in connection with the exercise of any such rights, shall also be considered Rents assigned under this Paragraph. <u>THIS IS AN ABSOLUTE ASSIGNMENT, NOT AN ASSIGNMENT FOR SECURITY ONLY.</u>

3.2 <u>Grant of License</u>. Notwithstanding the provisions of Paragraph 3.1, Mortgagee hereby confers upon Mortgagor a license ("License") to collect and retain the Rents as they become due and payable, so long as no Event of Default, as defined in Paragraph 6.2, shall exist and be continuing. If an Event of Default has occurred and is continuing, Mortgagee shall have the right, which it may choose to exercise in its sole discretion, to terminate this License without notice to or demand upon Mortgagor, and without regard to the adequacy of the security for the Secured Obligations.

4. <u>SECURITY INTEREST IN RELATED PERSONALTY</u>.

4.1 <u>Grant of Security Interest</u>. Mortgagor grants to Mortgagee a security interest in, and pledges and assigns to Mortgagee, all of Mortgagor's right, title and interest, whether presently existing or hereafter acquired in and to all of the following property (collectively, the "Personalty"):

(a)  All materials, supplies, goods, tools, furniture, fixtures, equipment, and machinery which in all cases is affixed or attached, or to be affixed or attached, in any manner on the Land or the Improvements;

(b) All inventory, including but not limited to all poultry, livestock, and crops, in each case raised or growing or to be raised or grown on or about the Land and Property (and, in addition, after severance from the Land or Property); all standing timber upon the Land (and after severance from the Land); all sewer, water and water rights (whether riparian, appropriative, or otherwise, and whether or not appurtenant to the Land) and all evidence of ownership rights pertaining to such water or water rights, ownership of which affect the Land; and all architectural and engineering plans, specifications and drawings which arise from or relate to the Land or the Improvements;

(c) All permits, licenses and claims to or demands for the voluntary or involuntary conversion of any of the Land, Improvements, or other Property into cash or liquidated claims, proceeds of all present and future fire, hazard or casualty insurance policies relating to the Land and the Improvements, whether or not such policies are required by Mortgagee, and all condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any breach of warranty, misrepresentation, damage or injury to, or defect in, the Land, Improvements, or other Property or any part of them;

(d) All substitutions, replacements, additions, and accessions to any of the above property, and all books, records and files relating to any of the above property, including, without limitation, all general intangibles related to any of the above property and all proceeds of the above property.

## 5. RIGHTS AND DUTIES OF THE PARTIES.

5.1 Representations and Warranties. Mortgagor represents and warrants that Mortgagor lawfully possesses and holds fee simple title to all of the Land and the Improvements, unless Mortgagor's present interest in the Land and the Improvements is described in Exhibit A as a leasehold interest, in which case Mortgagor lawfully possesses and holds a leasehold interest in the Land and the Improvements as stated in Exhibit A.

5.2 Taxes, Assessments, Liens and Encumbrances. Mortgagor shall pay prior to delinquency all taxes, levies, charges and assessments, including assessments on appurtenant water stock, imposed by any public or quasi-public authority or utility company which are (or if not paid, may become) a lien on all or part of the Property or any interest in it, or which may cause any decrease in the value of the Property or any part of it. Mortgagor shall immediately discharge any lien on the Property, which Mortgagee has not consented to in writing, and shall also pay when due each obligation secured by or reducible to a lien, charge or encumbrance which now or hereafter encumbers or appears to encumber all or part of the Property, whether the lien, charge or encumbrance is or would be senior or subordinate to this Mortgage.

5.3 Damages and Insurance and Condemnation Proceeds.

(a) Mortgagor hereby absolutely and irrevocably assigns to Mortgagee, and authorizes the payor to pay to Mortgagee, the following claims, causes of action, awards, payments and rights to payment (collectively, the "Claims"):

(i) all awards of damages and all other compensation payable directly or indirectly because of a condemnation, proposed condemnation or taking for public or private use which affects all or part of the Property or any interest in it;

(ii) all other awards, claims and causes of action, arising out of any breach of warranty or misrepresentation affecting all or any part of the Property, or for damage or injury to, or defect in, or decrease in value of all or part of the Property or any interest in it;

(iii) all proceeds of any insurance policies payable because of loss sustained to all or part of the Property, whether or not such insurance policies are required by Mortgagee; and

(iv) all interest which may accrue on any of the foregoing.

(b) Mortgagor shall immediately notify Mortgagee in writing if:

(i) any damage occurs or any injury or loss is sustained to all or part of the Property, or any action or proceeding relating to any such damage, injury or loss is commenced, the cost of which exceeds $150,000; or

(ii) any offer is made, or any action or proceeding is commenced, which relates to any actual or proposed condemnation or taking of all or part of the Property.

If an Event of Default has occurred, or if any condition or circumstance exists which would, in the Mortgagee's commercially reasonable judgment become an Event of Default after the giving of notice or  Mortgagee chooses to do so, it may in its own name appear in or prosecute any action or proceeding to enforce any cause of action based on breach of warranty or misrepresentation, or for damage or injury to, defect in, or decrease in value of all or part of the Property, and it may make any compromise or settlement of the action or proceeding. Mortgagee, if it so chooses, may participate in any action or proceeding relating to condemnation or taking of all or part of the Property and may join Mortgagor in adjusting any loss covered by insurance.

(c) If the cost of restoration of the Property is less than $150,000 and provided that there is no continuing Event of Default, the proceeds of any Claims shall be paid directly to the Mortgagor for the restoration and repair of the Property. If cost of restoration is greater than or equal to $150,000, the proceeds of any Claims shall be deposited with the Mortgagee and shall be used by the Mortgagor for the restoration and repair of the Property pursuant to the preceding paragraph.  In each instance, Mortgagee shall apply those proceeds first toward reimbursement of all of Mortgagee's costs and expenses of recovering the proceeds, including attorneys' fees.  Mortgagor further authorizes Mortgagee, at Mortgagee's option and in Mortgagee's sole discretion, and regardless of whether there is any impairment of the Property, (i) solely to the extent that an Event of Default has occurred and is continuing, to apply the balance of such proceeds, or any portion of them, to pay or prepay some or all of the Secured Obligations in such order or proportion as Mortgagee may determine, or (ii) to hold the balance of such proceeds, or any portion of them, in an interest-bearing account to be used by Mortgagor for the cost of reconstruction, repair or alteration of the Property, or (iii) to release the balance of such proceeds, or any portion of them, to Mortgagor.  If any proceeds are released to Mortgagor, Mortgagee shall not be obligated to see to, approve or supervise the proper application of such proceeds.  If the proceeds are held by Mortgagee to be used to reimburse Mortgagor for the costs of restoration and repair of the Property, the Property shall be restored to the reasonable equivalent of its original condition, or such other condition as Mortgagee may approve in

7

writing. Mortgagee may, at Mortgagee's option, condition disbursement of the proceeds on Mortgagee's approval of such plans and specifications prepared by an architect satisfactory to Mortgagee, contractor's cost estimates, architect's certificates, waivers of liens, sworn statements of mechanics and materialmen, and such other evidence of costs, percentage of completion of construction, application of payments, and satisfaction of liens as Mortgagee may reasonably require.

5.4 <u>Insurance</u>. Mortgagor shall provide and maintain in force at all times all risk property damage insurance (including without limitation windstorm coverage, and hurricane coverage as applicable) on the Property and such other type of insurance on the Property set forth in Section 4.1(d) of the Loan Agreement or as may be required by Mortgagee in its commercially reasonable judgment. At Mortgagee's request, Mortgagor shall provide Mortgagee with a counterpart original of any policy, together with a certificate of insurance setting forth the coverage, the limits of liability, the carrier, the policy number and the expiration date. Each such policy of insurance shall be in an amount, for a term, and in form and content satisfactory to Mortgagee, and shall be written only by companies approved by Mortgagee. In addition, each policy of hazard insurance shall include a Form 438BFU or equivalent loss payable endorsement in favor of Mortgagee. Unless Mortgagor provides evidence of the insurance coverage required by this Paragraph, Mortgagee may purchase insurance at Mortgagor's expense to protect Mortgagee's interest in the Property. This insurance may but need not, protect Mortgagor's interests. The coverage that Mortgagee purchases may not pay any claim that Mortgagor makes or any claim that is made against Mortgagor in connection with the Property. Mortgagor may later cancel any insurance purchased by Mortgagee, but only after providing evidence that Mortgagor has obtained insurance as required by this Paragraph. If Mortgagee purchases insurance for the Property, Mortgagor will be responsible for the costs of that insurance, including the insurance premium, interest and any other charges Mortgagee may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to outstanding principal balance of the Secured Obligations. The costs of the insurance may be more than the cost of insurance Mortgagor may be able to obtain on its own. Notwithstanding anything to the contrary herein, in the event of a conflict between this Section 5.4 and Section 4.1(d) of the Loan Agreement, Section 4.1(d) of the Loan Agreement shall control.

5.5 <u>Maintenance and Preservation of Property</u>.

(a) Mortgagor shall keep the Property in good condition and repair (ordinary wear and tear excepted) and shall not commit or allow waste of the Property. Good condition and repair shall include, but is not limited to, the Property being able to be used as a poultry processing plant. Mortgagor shall not remove or demolish the Property or any part of it, or alter, restore or add to the Property, or initiate or allow any change in any zoning or other land use classification which affects the Property or any part of it, except with Mortgagee's express prior written consent in each instance or as permitted in the Loan Agreement.

(b) If all or part of the Property becomes damaged or destroyed, Mortgagor shall promptly and completely repair and/or restore the Property in a good and workmanlike manner in accordance with sound building practices, regardless of whether or not Mortgagee agrees to disburse insurance proceeds or other sums to pay costs of the work of repair or reconstruction under Paragraph 5.3.

(c) Mortgagor shall not commit or allow any act upon or use of the Property which would violate any applicable law or order of any governmental authority, whether now existing or later to be enacted and whether foreseen or unforeseen, or any public or private covenant, condition, restriction or equitable servitude affecting the Property. Mortgagor shall not bring or keep any article on the Property or cause or allow any condition to exist

8

on it, if that could invalidate or would be prohibited by any insurance coverage required to be maintained by Mortgagor on the Property or any part of it under this Mortgage.

(d) If Mortgagor's interest in the Property is a leasehold interest, Mortgagor shall observe and perform all obligations of Mortgagor under any lease or leases and shall refrain from taking any actions prohibited by any lease or leases. Mortgagor shall preserve and protect the leasehold estate and its value.

(e) If the Property is agricultural, Mortgagor shall farm the Property in a good and husbandlike manner. Mortgagor shall keep all trees, vines and crops on the Property properly cultivated, irrigated, fertilized, sprayed and fumigated, and shall replace all dead or unproductive trees or vines with new ones. Mortgagor shall prepare for harvest, harvest, remove and sell any crops growing on the Property. Mortgagor shall keep all buildings, fences, ditches, canals, wells and other farming improvements on the Property in first class condition, order and repair.

(f) Mortgagor shall perform all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value.

5.6 <u>Releases, Extensions, Modifications and Additional Security</u>. Without affecting the personal liability of any person, including Mortgagor (or Obligor, if different from Mortgagor), for the payment of the Secured Obligations or the lien of this Mortgage on the remainder of the Property for the unpaid amount of the Secured Obligations, Mortgagee may from time to time and without notice:

(a) release any person liable for payment of any Secured Obligation;

(b) extend the time for payment, or otherwise alter the terms of payment, of any Secured Obligation;

(c) accept additional real or personal property of any kind as security for any Secured Obligation, whether evidenced by deeds of trust, mortgages, security agreements or any other instruments of security;

(d) alter, substitute or release any property securing the Secured Obligations;

(e) consent to the making of any plat or map of the Property or any part of it;

(f) join in granting any easement or creating any restriction affecting the Property;

(g) join in any subordination or other agreement affecting this Mortgage or the lien of it; or

(h) release the Property or any part of it from the lien of this Mortgage.

5.7 <u>Release</u>. When all of the Secured Obligations have been paid in full and no further commitment to extend credit continues, Mortgagee shall release the Property, or so much of it as is then held under this Mortgage, from the lien of this Mortgage.

5.8  Compensation and Reimbursement of Costs and Expenses.

(a) Mortgagor agrees to pay fees in the maximum amounts legally permitted, or reasonable fees as may be charged by Mortgagee when the law provides no maximum limit, for any services that Mortgagee may render in connection with this Mortgage, including Mortgagee's providing a statement of the Secured Obligations.  Mortgagor shall also pay or reimburse all of Mortgagee's actual costs and expenses which may be incurred in rendering any such services.

(b) Mortgagor further agrees to pay or reimburse Mortgagee for all actual costs, expenses and other advances which may be incurred or made by Mortgagee to protect or preserve the Property or to enforce any terms of this Mortgage, including the exercise of any rights or remedies afforded to Mortgagee under Paragraph 6.3, whether any lawsuit is filed or not, or in defending any action or proceeding arising under or relating to this Mortgage, including attorneys' fees and other legal costs, costs of any sale of the Property and any cost of evidence of title.

(c) Mortgagor shall pay all obligations arising under this Paragraph immediately upon demand by Mortgagee.  Each such obligation shall be added to, and considered to be part of, the principal of the Secured Obligations, and shall bear interest from the date the obligation arises at the rate provided in any instrument or agreement evidencing the Secured Obligations.  If more than one rate of interest is applicable to the Secured Obligations, the highest rate shall be used for purposes hereof.

5.9  Exculpation and Indemnification.

(a) Mortgagee shall not be directly or indirectly liable to Mortgagor or any other person as a consequence of any of the following:

(i)  Mortgagee's exercise of or failure to exercise any rights, remedies or powers granted to it in this Mortgage;

(ii)  Mortgagee's failure or refusal to perform or discharge any obligation or liability of Mortgagor under any agreement related to the Property or under this Mortgage;

(iii)  Mortgagee's failure to produce Rents from the Property or to perform any of the obligations of the lessor under any lease covering the Property;

(iv)  any waste committed by lessees of the Property or any other parties, or any dangerous or defective condition of the Property; or

(v)  any loss sustained by Mortgagor or any third party resulting from any act or omission of Mortgagee in operating or managing the Property upon exercise of the rights or remedies afforded Mortgagee under Paragraph 6.3, unless the loss is caused by the willful misconduct and bad faith of Mortgagee.

Mortgagor hereby expressly waives and releases all liability of the types described above, and agrees that no such liability shall be asserted against or imposed upon Mortgagee.

(b)    Mortgagor agrees to indemnify Mortgagee against and hold Mortgagee harmless from all losses, damages, liabilities, claims, causes of action, judgments, court costs, attorneys' fees and other legal expenses, cost of evidence of title, cost of evidence of value, and other costs and expenses which Mortgagee may suffer or incur in performing any act required or permitted by this Mortgage or by law or because of any failure of Mortgagor to perform any of its obligations.  This agreement by Mortgagor to indemnify Mortgagee shall survive the release and cancellation of any or all of the Secured Obligations and the full or partial release of this Mortgage.

5.10  Defense and Notice of Claims and Actions.  At Mortgagor's sole expense, Mortgagor shall protect, preserve and defend the Property and title to and right of possession of the Property, and the security of this Mortgage and the rights and powers of Mortgagee created under it, against all adverse claims.  Mortgagor shall give Mortgagee prompt notice in writing if any claim is asserted which does or could affect any of these matters, or if any action or proceeding is commenced which alleges or relates to any such claim.

5.11  [Reserved].

5.12  [Reserved].

5.13  Additional Provisions Relating to Condominiums.  If the Property is subject to a condominium declaration of conditions, covenants and restrictions recorded in the official records of the county in which the Property is located (the "Declaration"), the following provisions shall apply.

(a)    The provisions contained in this Mortgage are obligations of Mortgagor in addition to Mortgagor's obligations under the Declaration with respect to similar matters, and shall not restrict or limit Mortgagor's duties and obligations to keep and perform promptly all of its obligations as unit owner under the Declaration.

(b)    Mortgagor shall at all times fully perform and comply with all the agreements, covenants, terms and conditions imposed upon unit owners under the Declaration, and if Mortgagor fails to do so, Mortgagee may (but shall not be obligated to) take any action Mortgagee deems necessary or desirable to prevent or cure any default thereunder. Mortgagee may also take such action as it deems necessary or desirable to cure a default under the Declaration by Mortgagor or any other party occupying the unit(s) (a "Unit Occupant") encumbered by this Mortgage, upon receipt by Mortgagee from the condominium association under the Declaration (the "Association") of written notice of such default, even though the existence of such default or the nature thereof may be questioned or denied by Mortgagor or by any party on behalf of Mortgagor. Mortgagee may pay and expend such sums of money as Mortgagee in its sole discretion deems necessary to prevent or cure any default by Mortgagor or a Unit Occupant, and Mortgagor hereby agrees to pay to Mortgagee, immediately and without demand, all such sums so paid and expended by Mortgagee, together with interest thereon from the date of each such payment at the rate (the "Demand Rate") of two percent (2%) in excess of the then current rate of interest under the Debt Instrument.  All sums so paid and expended by Mortgagee, and the interest thereon, shall be added to and be secured by the lien of this Mortgage.  At Mortgagee's request, Mortgagor will submit satisfactory evidence of payment of all of its monetary obligations under the Declaration (including but not limited to rents, taxes, assessments, insurance premiums and operating expenses).

(c)    At Mortgagee's request, Mortgagor will submit satisfactory evidence of payment of all of its monetary obligations under the Declaration (including but not limited

to rents, taxes, assessments, insurance premiums and operating expenses).

(d)  Mortgagor shall advise Mortgagee in writing of the giving of any notice to Mortgagor by the Association under the Declaration of any default by Mortgagor as unit owner or by a Unit Occupant thereunder in the performance or observance of any of the terms, conditions and covenants to be performed or observed by Mortgagor or such Unit Occupant thereunder, and Mortgagor shall deliver to Mortgagee a true copy of each such notice.

(e)  If any action, proceeding, motion or notice shall be commenced or filed in respect of the Association in connection with any case (including a case commenced or filed under the Bankruptcy Code), Mortgagee shall have the option, to the exclusion of Mortgagor, exercisable upon notice from Mortgagee to Mortgagor, to conduct and control any such litigation with counsel of Mortgagee's choice.  Mortgagee may proceed in its own name or in the name of Mortgagor in connection with any such litigation, and Mortgagor agrees to execute any and all powers, authorizations, consents or other documents required by Mortgagee in connection therewith.  Mortgagor shall, upon demand, pay to Mortgagee all costs and expenses (including attorneys' fees) paid or incurred by Mortgagee in connection with the prosecution or conduct of any such proceedings.  Any such costs or expenses not paid by Mortgagor as aforesaid shall be secured by the lien of this Mortgage and shall be added to the principal amount of the indebtedness secured hereby.  Mortgagor shall not commence any action, suit, proceeding or case, or file any application or make any motion, in respect of the Declaration in any such case without the prior written consent of Mortgagee.

(f)  Mortgagor will use its best efforts to obtain and deliver to Mortgagee within twenty (20) days after written request by Mortgagee, an estoppel certificate from the Association setting forth (i) the name of the unit owner, (ii) that the Declaration has not been modified or, if it has been modified, the date of each modification (together with copies of each such modification), (iii) the amount of common expenses and other assessments payable by Mortgagor as unit owner under the Declaration, (iv) the date to which all common expenses and other assessments have been paid by Mortgagor as unit owner under the Declaration, (v) whether there are any alleged defaults by Mortgagor or a Unit Occupant under the Declaration and, if so, setting forth the nature thereof in reasonable detail, and (vi) as to such other matters as Mortgagee may reasonably request.

(g)  Mortgagor represents and warrants to Mortgagee that as of the date hereof, no default under the Declaration has occurred and is continuing.

(h)  Mortgagor shall take such actions as may be reasonable to insure that the Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Mortgagee.

(i)  Mortgagor shall not, except after notice to Mortgagee and with Mortgagee's prior written consent, either partition or subdivide the Property or consent to:

(i)     the abandonment or termination of the condominium(s) encumbered by this Mortgage, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain;

(ii)     any amendment to any provision of the Declaration, the Association's bylaws or articles or any rules and regulations promulgated by the Association;

(iii)    termination of professional management and assumption of self-management of the Association; or

(iv)     any action which would have the effect of rendering the public liability insurance coverage maintained by the Association unacceptable to Mortgagee.

## 6. ACCELERATING TRANSFERS, DEFAULT AND REMEDIES.

### 6.1 Accelerating Transfers

(a)     "Accelerating Transfer" means any sale, contract to sell, conveyance, encumbrance, or other transfer, whether voluntary, involuntary, by operation of law or otherwise, of all or any material part of the Property or any interest in it, including any transfer or exercise of any right to drill for or to extract any water (other than for Mortgagor's own use), oil, gas or other hydrocarbon substances or any mineral of any kind on or under the surface of the Property.. If Mortgagor is a corporation, "Accelerating Transfer" also means any transfer or transfers of shares possessing, in the aggregate, more than fifty percent (50%) of the voting power. If Mortgagor is a partnership, "Accelerating Transfer" also means withdrawal or removal of any general partner, dissolution of the partnership under applicable law, or any transfer or transfers of, in the aggregate, more than fifty percent (50%) of the partnership interests. If Mortgagor is a limited liability company, "Accelerating Transfer" also means withdrawal or removal of any managing member, termination of the limited liability company or any transfer or transfers of, in the aggregate, more than fifty percent (50%) of the voting power or in the aggregate more than fifty percent of the ownership of the economic interest in the Mortgagor.

(b)    Mortgagor agrees that Mortgagor shall not make any Accelerating Transfer, unless the transfer is preceded by Mortgagee's express written consent to the particular transaction and transferee. Mortgagee may withhold such consent in its sole discretion. If any Accelerating Transfer occurs, Mortgagee in its sole discretion may declare all of the Secured Obligations to be immediately due and payable, and Mortgagee may invoke any rights and remedies provided by Paragraph 6.3 of this Mortgage.

### 6.2 Events of Default. The occurrence of any one or more of the following events, at the option of Mortgagee, shall constitute an event of default ("Event of Default") under this Mortgage:

(a) Obligor fails to make any payment, when due, under the Debt Instrument (after giving effect to any applicable grace period), or any other default occurs under and as defined in the Debt Instrument or in any other instrument or agreement evidencing any of the Secured Obligations and such default continues beyond any applicable cure period;

(b) Mortgagor fails to make any payment or perform any obligation which arises under this Mortgage;

(c) Mortgagor makes or permits the occurrence of an Accelerating Transfer in violation of Paragraph 6.1;

(d) Any representation or warranty made in connection with this Mortgage or the Secured Obligations proves to have been false or misleading in any material respect when made;

(e) Any default occurs under any other mortgage on all or any part of the Property, or under any obligation secured by such mortgage, whether such mortgage is prior to or subordinate to this Mortgage; or

(f) An event occurs which gives Mortgagee the right or option to terminate any Swap Contract secured by this Mortgage.

6.3 <u>Remedies</u>. At any time after the occurrence of an Event of Default, Mortgagee shall be entitled to invoke any and all of the rights and remedies described below, as well as any other rights and remedies authorized by law. All of such rights and remedies shall be cumulative, and the exercise of any one or more of them shall not constitute an election of remedies.

(a) Mortgagee may declare any or all of the Secured Obligations to be due and payable immediately, and may terminate any Swap Contract secured by this Mortgage in accordance with its terms.

(b) Mortgagee may apply to any court of competent jurisdiction for, and obtain appointment of, a receiver for the Property.

(c) Mortgagee, in person, by agent or by court-appointed receiver, may enter, take possession of, manage and operate all or any part of the Property, and in its own name or in the name of Mortgagor sue for or otherwise collect any and all Rents, including those that are past due, and may also do any and all other things in connection with those actions that Mortgagee may in its sole discretion consider necessary and appropriate to protect the security of this Mortgage. Such other things may include: entering into, enforcing, modifying, or canceling leases on such terms and conditions as Mortgagee may consider proper; obtaining and evicting tenants; fixing or modifying Rents; completing any unfinished construction; contracting for and making repairs and alterations; performing such acts of cultivation or irrigation as necessary to conserve the value of the Property; and preparing for harvest, harvesting and selling any crops that may be growing on the property. Mortgagor hereby irrevocably constitutes and appoints Mortgagee as its attorney-in-fact to perform such acts and execute such documents as Mortgagee in its sole discretion may consider to be appropriate in connection with taking these measures, including endorsement of Mortgagor's name on any instruments. Mortgagor agrees to deliver to Mortgagee all books and records pertaining to the Property, including computer-readable memory and any computer hardware or software necessary to access or process such memory, as may reasonably be requested by Mortgagee in order to enable Mortgagee to exercise its rights under this Paragraph.

(d) Mortgagee may cure any breach or default of Mortgagor, and if it chooses to do so in connection with any such cure, Mortgagee may also enter the Property and/or do any and all other things which it may in its sole discretion consider necessary and appropriate to protect the security of this Mortgage. Such other things may include: appearing in and/or defending any action or proceeding which purports to affect the

security of, or the rights or powers of Mortgagee under, this Mortgage; paying, purchasing, contesting or compromising any encumbrance, charge, lien or claim of lien which in Mortgagee's sole judgment is or may be senior in priority to this Mortgage, such judgment of Mortgagee to be conclusive as among the parties to this Mortgage; obtaining insurance and/or paying any premiums or charges for insurance required to be carried under this Mortgage; otherwise caring for and protecting any and all of the Property; and/or employing counsel, accountants, contractors and other appropriate persons to assist Mortgagee. Mortgagee may take any of the actions permitted hereunder either with or without giving notice to any person.

(e) Mortgagee may bring an action in any court of competent jurisdiction to foreclose this instrument or to obtain specific enforcement of any of the covenants or agreements of this Mortgage.

It is agreed that if this Mortgage covers less than ten (10) acres of land, and in the event of the foreclosure of this Mortgage and sale of the property by sheriff's sale in such foreclosure proceedings, the time of one year for redemption from said sale provided by the statutes of the State of Iowa shall be reduced to six (6) months provided the Mortgagee, in such action files an election to waive any deficiency judgment against Mortgagors which may arise out of the foreclosure proceedings; all to be consistent with the provisions of Chapter 628 of the Iowa Code. If the redemption period is so reduced, for the first three (3) months after sale such right of redemption shall be exclusive to the Mortgagor, and the time periods in Sections 628.5, 628.15 and 628.16 of the Iowa Code shall be reduced to four (4) months.

It is further agreed that the period of redemption after a foreclosure of this Mortgage shall be reduced to sixty (60) days if all of the three following contingencies develop: (1) The real estate is less than ten (10) acres in size; (2) the Court finds affirmatively that the said real estate has been abandoned by the owners and those persons personally liable under this Mortgage at the time of such foreclosure; and (3) Mortgagee in such action files an election to waive any deficiency judgment against Mortgagors or their successors in interest in such action. If the redemption period is so reduced, Mortgagors or their successors in interest or the owner shall have the exclusive right to redeem for the first thirty (30) days after such sale, and the time provided for redemption by creditors as provided in Sections 628.5, 628.15 and 628.16 of the Iowa Code shall be reduced to forty (40) days. Entry of appearance by pleading or docket entry by or on behalf of Mortgagors shall be a presumption that the property is not abandoned. Any such redemption period shall be consistent with all of the provisions of Chapter 628 of the Iowa Code. This paragraph shall not be construed to limit or otherwise affect any other redemption provisions contained in Chapter 628 of the Iowa Code.

(f) Mortgagee may exercise the remedies contained in the Debt Instrument or in any other instrument or agreement evidencing any of the Secured Obligations.

(g) Mortgagee may proceed under the Uniform Commercial Code as to all or any part of the Personalty, and in conjunction therewith may exercise all of the rights, remedies and powers of a secured creditor under the Uniform Commercial Code. When all time periods then legally mandated have expired, and after such notice of sale as may then be legally required has been given, Mortgagee may sell the Personalty at a public sale to be held at the time and place specified in the notice of sale. It shall be deemed commercially reasonable for the Mortgagee to dispose of the Personalty without giving any warranties as to the Personalty and specifically disclaiming all disposition warranties. Alternatively, Mortgagee may choose to dispose of some or all of the Property, in any combination

15

consisting of both personal property and real property, in one sale to be held in accordance with the law and procedures applicable to real property, as permitted by Article 9 of the Uniform Commercial Code.  Mortgagor agrees that such a sale of personal property together with real property constitutes a commercially reasonable sale of the personal property.

6.4 <u>Application of Sale Proceeds and Rents</u>.

(a) Mortgagee shall apply the proceeds of any sale of the Property in the following manner: first, to pay the portion of the Secured Obligations attributable to the costs, fees and expenses of the sale, including costs of evidence of title in connection with the sale; and, second, to pay all other Secured Obligations in any order and proportions as Mortgagee in its sole discretion may choose.  The remainder, if any, shall be remitted to the person or persons entitled thereto.

(b) Mortgagee shall apply any and all Rents collected by it, and any and all sums other than proceeds of any sale of the Property which Mortgagee may receive or collect under Paragraph 6.3, in the following manner:  first, to pay the portion of the Secured Obligations attributable to the costs and expenses of operation and collection that may be incurred by Mortgagee or any receiver; and, second, to pay all other Secured Obligations in any order and proportions as Mortgagee in its sole discretion may choose.   The remainder, if any, shall be remitted to the person or persons entitled thereto.  Mortgagee shall have no liability for any funds which it does not actually receive.

7. <u>MISCELLANEOUS PROVISIONS</u>

7.1 <u>No Waiver or Cure</u>.

(a) Each waiver by Mortgagee must be in writing, and no waiver shall be construed as a continuing waiver.  No waiver shall be implied from any delay or failure by Mortgagee to take action on account of any default of Mortgagor.  Consent by Mortgagee to any act or omission by Mortgagor shall not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Mortgagee's consent to be obtained in any future or other instance.

(b) If any of the events described below occurs, that event alone shall not cure or waive any breach, Event of Default or notice of default under this Mortgage or invalidate any act performed pursuant to any such default or notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed); or impair the security of this Mortgage; or prejudice Mortgagee or any receiver in the exercise of any right or remedy afforded any of them under this Mortgage; or be construed as an affirmation by Mortgagee of any tenancy, lease or option, or a subordination of the lien of this Mortgage:

(i) Mortgagee, its agent or a receiver takes possession of all or any part of the Property;

(ii) Mortgagee collects and applies Rents, either with or without taking possession of all or any part of the Property;

16

(iii)  Mortgagee receives and applies to any Secured Obligation proceeds of any Property, including any proceeds of insurance policies, condemnation awards, or other claims, property or rights assigned to Mortgagee under this Mortgage;

(iv)  Mortgagee makes a site visit, observes the Property and/or conducts tests thereon;

(v)  Mortgagee receives any sums under this Mortgage or any proceeds of any collateral held for any of the Secured Obligations, and applies them to one or more Secured Obligations;

(vi)  Mortgagee or any receiver performs any act which it is empowered or authorized to perform under this Mortgage or invokes any right or remedy provided under this Mortgage.

7.2  <u>Powers of Mortgagee</u>.  Mortgagee may take any of the actions permitted under Paragraphs 6.3(b) and/or 6.3(c) regardless of the adequacy of the security for the Secured Obligations, or whether any or all of the Secured Obligations have been declared to be immediately due and payable, or whether notice of default and election to sell has been given under this Mortgage.

7.3  <u>Nonborrower Mortgagor</u>.

(a)  If any Mortgagor ("Nonborrower Mortgagor") is not the Obligor under the Debt Instrument described in Paragraph 2.1(a), such Nonborrower Mortgagor authorizes Mortgagee to perform any of the following acts at any time, all without notice to Nonborrower Mortgagor and without affecting Mortgagee's rights or Nonborrower Mortgagor's obligations under this Mortgage:

(i)  Mortgagee may alter any terms of the Debt Instrument or any part of it, including renewing, compromising, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the Debt Instrument or any part of it;

(ii)  Mortgagee may take and hold security for the Debt Instrument, accept additional or substituted security for the Debt Instrument, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect, sell or otherwise dispose of any such security;

(iii)  Mortgagee may apply any security now or later held for the Debt Instrument in any order that Mortgagee in its sole discretion may choose, and may direct the order and manner of any sale of all or any part of it and bid at any such sale;

(iv)  Mortgagee may release Obligor of its liability for the Debt Instrument or any part of it;

(v)  Mortgagee may substitute, add or release any one or more guarantors or endorsers of the Debt Instrument; and

(vi) Mortgagee may extend other credit to Obligor, and may take and hold security for the credit so extended, whether or not such security also secures the Debt Instrument.

(b) Nonborrower Mortgagor waives:

(i) Any right it may have to require Mortgagee to proceed against Obligor, proceed against or exhaust any security held from Obligor, or pursue any other remedy in Mortgagee's power to pursue;

(ii) Any defense based on any legal disability of Obligor, any discharge or limitation of the liability of Obligor to Mortgagee, whether consensual or arising by operation of law or any bankruptcy, reorganization, receivership, insolvency, or debtor-relief proceeding, or from any other cause, or any claim that Nonborrower Mortgagor's obligations exceed or are more burdensome than those of Obligor;

(iii) All presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance of this Mortgage and of the existence, creation, or incurring of new or additional indebtedness of Obligor, and demands and notices of every kind;

(iv) Any defense based on or arising out of any defense that Obligor may have to the payment or performance of the Debt Instrument or any part of it; and

(v) Until the Secured Obligations have been paid and performed in full, all rights of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under the Bankruptcy Code (Title 11 of the U.S. Code) or any successor statute, all rights to enforce any remedy that the Mortgagee may have against Obligor, and all rights to participate in any security now or later to be held by Mortgagee for the Debt Instrument.

(c) Nonborrower Mortgagor assumes full responsibility for keeping informed of Obligor's financial condition and business operations and all other circumstances affecting Obligor's ability to pay and perform its obligations to Mortgagee, and agrees that Mortgagee shall have no duty to disclose to Nonborrower Mortgagor any information which Mortgagee may receive about Obligor's financial condition, business operations, or any other circumstances bearing on its ability to perform.

(d) No provision or waiver in this Mortgage shall be construed as limiting the generality of any other provision or waiver contained in this Mortgage.

(e) For purposes of this Paragraph 7.3, all references to the Debt Instrument shall also include any instrument or agreement executed by Obligor subsequent to the date of this Mortgage which is secured by this Mortgage in accordance with the provisions of Paragraphs 2.1(c) and 2.1(d).

7.4 <u>Merger</u>. No merger shall occur as a result of Mortgagee's acquiring any other estate in or any other lien on the Property unless Mortgagee consents to a merger in writing.

7.5 <u>Joint and Several Liability</u>.  If Mortgagor consists of more than one person, each shall be jointly and severally liable for the faithful performance of all of Mortgagor's obligations under this Mortgage.

7.6 <u>Applicable Law</u>.  This Mortgage shall be governed by the laws of the State of Iowa.

7.7 <u>Successors in Interest</u>.  The terms, covenants and conditions of this Mortgage shall be binding upon and inure to the benefit of the heirs, successors and assigns of the parties.  However, this Paragraph does not waive the provisions of Paragraph 6.1.

**7.8 <u>Waiver of Jury Trial</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS MORTGAGE OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).    EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS MORTGAGE AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

7.9 <u>Waiver of Class Actions</u>.  The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Community Bank & Trust, a non-profit corporation organized under the laws of the State of Georgia, its subsidiaries and affiliates, on the one hand, and the other parties to this Mortgage, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties").  Whether in state court, federal court, or any other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action. Thus the Parties may only bring Claims against each other in an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action.  **THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.**

7.10 <u>Interpretation</u>.  Whenever the context requires, all words used in the singular will be construed to have been used in the plural, and vice versa, and each gender will include any other gender. The captions of the sections of this Mortgage are for convenience only and do not define or limit any terms or provisions.  The word "include(s)" means "include(s), without limitation," and the word "including" means "including, but not limited to."  The word "obligations" is used in its broadest and most comprehensive sense, and includes all primary, secondary, direct, indirect, fixed and contingent obligations. It further includes all principal, interest, prepayment charges, late charges, loan fees and any other fees and charges accruing or assessed at any time, as well as all obligations to perform acts or satisfy conditions. No listing of specific instances, items or matters in any way limits the scope or generality of any language of this Mortgage. The Exhibits to this Mortgage are hereby incorporated in this Mortgage.

7.11  <u>In-House Counsel Fees</u>.  Whenever Mortgagor is obligated to pay or reimburse Mortgagee for any attorneys' fees, those fees shall include the allocated costs for services of in-house counsel to the extent permitted by applicable law.

7.12  <u>Waiver of Marshaling</u>.  Mortgagor waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to direct the order in which any of the Property will be sold in the event of any sale under this Mortgage. Each successor and assign of Mortgagor, including any holder of a lien subordinate to this Mortgage, by acceptance of its interest or lien agrees that it shall be bound by the above waiver, as if it had given the waiver itself.

7.13  <u>Severability</u>.  If any provision of this Mortgage should be held unenforceable or void, that provision shall be deemed severable from the remaining provisions and in no way affect the validity of this Mortgage except that if such provision relates to the payment of any monetary sum, then Mortgagee may, at its option, declare all Secured Obligations immediately due and payable.

7.14  <u>Notices</u>.  Mortgagor hereby requests that a copy of notice of default and notice of sale be mailed to it at the address set forth below.  That address is also the mailing address of Mortgagor as debtor under the Uniform Commercial Code.  Mortgagee's address given below is the address for Mortgagee as secured party under the Uniform Commercial Code.

Addresses for Notices to Mortgagor:      901 N. Main Street
      Charles City, Iowa 50616

Address for Notices to Mortgagee:      c/o Greater Commercial Lending
      5190 Neil Road, Ste 205
      Reno, NV 89502
      Attention:  Commercial Services

[SIGNATURE AND NOTARY FOLLOW]

IN WITNESS WHEREOF, Mortgagor has executed this Mortgage as of the date first above written.

MORTGAGOR:

Pure Prairie Poultry, Inc.,
a Minnesota corporation

By: _____
George Peichel, CFO

## ACKNOWLEDGMENT

STATE OF ~~IOWA~~ MINNESOTA )
                                       ) ss.
COUNTY of _Renville_         )

This record was acknowledged before me on _April 21_, 2023, by George Peichel, the CFO of Pure Prairie Poultry, Inc.

_____
(Signature of notarial officer)

(Stamp)        _____NOTARY_____

                                Title of office

                                My commission expires: _1-31-26_

KAREN M. BASTIAN
Notary Public
Minnesota
My Commission Expires January 31, 2026

## EXHIBIT A TO MORTGAGE

Exhibit A to MORTGAGE effective as of April 26, 2023 given by Pure Prairie Poultry, Inc., as "Mortgagor", to Community Bank & Trust-West Georgia, a banking corporation formed under the laws of the State of Georgia , as "Mortgagee."

### Description of Property

Real Property in the city of Charles City, County of Floyd, state of Iowa, described as follows:

Parcel 1/Plant Parcel:

Parcel J in Blocks 148 and 149 of Lane's Addition, Charles City, Iowa and in Blocks 3 and 4 of Detwiler's Subdivision of Lots 3, 4 and 5 of Block 149, Lane's Addition, Charles City, Iowa in the NE 1/4 of the SE 1/4 of Section 1, Township 95 North, Range 16 West of the 5th P.M., City of Charles City, Floyd County, Iowa, as described and depicted on Plat of Survey filed March 25, 2022, as Instrument No. 2022-0633 in the office of the Floyd County Recorder.

Parcel 2/Parking Lot Parcel:

Parcel "A": Lots 1 and 2, Subdivision of Lot 11, Block 139, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa.

Parcel "B": A part of Blocks 138 and 139, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa, being more particularly described as follows: Beginning at the Northeast corner of Lot 4, of said Block 138, thence S00° 29' 23" E along the Westerly right of way of "E" Street to a point 36 foot distant from the centerline of the Illinois Central railroad track, 451.10 feet; thence S89° 26' 59" W along a line 36 foot distant and parallel to the said centerline of railroad track 330.49 feet to the Easterly right of way of "D" Street; thence N88° 48' 52" W, 66.03 feet to the Westerly right of way of said "ID" Street and 38 foot distant from said centerline of railroad track; thence N77° 15' 01" W, 456.98 feet to a point on the North line of Lot 13, of said Block 139 (also being the North line of Lot 7, Cheney's Sub division); thence S89° 27' 58" W along said North line of Lot 13 (also being along the North line of Lots 7, 8 and 9 of said Cheney's subdivision),
141.19 feet to the East line of the West half of original Lot 12 of said Block 139; thence N 0° 35' 54" W along said East line of the West half Lot 12 and along West line of vacated Lawler Street, 212.80 feet to the North right of way line of said Lawler Street; thence S89° 38' 46" W along said North right of way 14.17 feet; thence N00° 35' 54" W, 120.00 feet to the South right of way of the Chicago, Milwaukee & St. Paul railroad; thence N89° 38' 46" E along said railroad, 600.00 feet to the West right of way of vacated "D" Street; thence, continuing along said railroad, N78° 19' 09" E, 67.25 feet to the Northwest corner of Lot 41, of said Block 138; thence N89° 25' 24" E, continuing along said railroad also being along the North line of said Lots 41 and 4, 331.34 feet to the point of beginning.

Parcel 3/RR Parcel:

Parcel I: That part of Lots 1, 7 and 8, lying north of the Illinois Central Railroad, in Detwiler's Subdivision of Lots 6, 7 and 8 in Block 150 of Lane's Addition to the City of St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, together with all of Lots 10, 11 and 12 of Detwiler's Subdivision of Lots 6, 7 and 8 in Block 150 of Lane's Addition to the City of St.

Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, more particularly described as follows:
Beginning at the Northwesterly corner of said Lot 12; Thence along the Northerly line of said Lot 12 S56°37'29"E 123.23' to the Westerly right-of-way of N. Grand Street, also being the Northeasterly corner of said Lot 12; thence along the Westerly right-of-way of N. Grand Street S00°14'20"E 67.88' to the Northerly right-of-way of the Illinois Central Railroad; thence Northwesterly along a 842.41' radius curve concave Northeasterly 169.23', said curve having a long chord of N74°35'34"W 168.94' to the Easterly right-of-way of N. Main Street; thence along the Easterly right-of-way of N. Main Street N33°19'12"E 108.64' to the Point of Beginning.

Parcel 4:

All of Lot Nine (9) in Block One Hundred Fifty (150), Lane's Addition to St. Charles, now a part of the incorporated City of Charles City, Floyd County, Iowa EXCEPT that part of said lot described as follows:
Start at the intersection of the West line of Grand Avenue and the South line of Lawler Street produced; thence South along the West line of Grand Avenue 66 feet to a point; thence Northwesterly on a straight line Fifty-one and Five tenths (51.5) feet to a point in the East line of Main Street; thence Northeasterly along said East line of Main Street 31 feet to a point in the South line of said Lawler Street produced; thence East along said South line of Lawler Street produced Fifteen and Seventy-five one hundredths (15.75) feet to the place of beginning; containing Sixteen Hundred Thirty-eight and one half (1,638 ½) square feet more or less BUT RETAINING THEREFROM: A part of Lot 9, Block 150, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Iowa, described as follows: commencing at the intersection of the West line of Grand Avenue and the South line of Lawler Street produced, and thence South along the West line of Grand Avenue 44 feet to a point, thence Northwesterly on a straight line 43 feet to a point in the Southeasterly line of Main Street, thence Northeasterly along said line of Main Street 14 feet to a point in the South line of Lawler Street produced, thence East along said South line of Lawler Street produced 15.75 feet to the place of beginning.

Parcel 5:

That part of Lot Nine (9) in Block One Hundred Fifty (150), Lane's Addition to St. Charles, now a part of the incorporated City of Charles City, Floyd County, Iowa, described as follows:
Start at the intersection of the West line of Grand Avenue and the South line of Lawler Street produced; thence South along the West line of Grand Avenue 66 feet to a point; thence Northwesterly on a straight line Fifty-one and Five tenths (51.5) feet to a point in the East line of Main Street; thence Northeasterly along said East line of Main Street 31 feet to a point in the South line of said Lawler Street produced; thence East along said South line of Lawler Street produced Fifteen and Seventy-five one hundredths (15.75) feet to the place of beginning; EXCEPTING THEREFROM:
A part of Lot 9, Block 150, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Iowa, described as follows: commencing at the intersection of the West line of Grand Avenue and the South line of Lawler Street produced, and thence South along the West line of Grand Avenue 44 feet to a point, thence Northwesterly on a straight line 43 feet to a point in the Southeasterly line of Main Street, thence Northeasterly along said line of Main Street 14 feet to a point in the South line of Lawler Street produced, thence East along said South line of Lawler Street produced 15.75 feet to the place of beginning.

Parcel 6:

That portion of Main Street lying between Block 149 and Block 150 Lane's Addition to Charles City, Iowa, lying north of the northerly right-of-way of the Canadian National Railway (vacated pursuant to Ordinance No. 1161 as evidenced by Certificate recorded as Document No. 2023-0230).

<u>Street Address of Property</u>

901 N. Main Street, Charles City, Iowa 50616; Multiple Parcels

# EXHIBIT E

Instr. Number:  2023 0755
BK:  2023 PG:  0755
Recorded: 5/4/2023 at 9:27:33.0 AM
Pages 23
County Recording Fee: $117.00
Iowa E-Filing Fee: $3.00
Combined Fee: $120.00
Revenue Tax:
Amy M. Assink RECORDER
Floyd County, Iowa

## AMENDED AND RESTATED
## PURCHASE MONEY MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FINANCING STATEMENT

Preparer Information:
Justin Weinberg, Esq.
Taft Stettinius & Hollister LLP
80 S. 8th Street, Suite 2200
Minneapolis, Minnesota 55402
(612) 977-8400

Taxpayer Information:
Pure Prairie Poultry, Inc.
901 North Main Street
Charles City, IA 50616

Return Document To:
Jamie L. Erickson, Esq.
Taft Stettinius & Hollister LLP
80 S. 8th Street, Suite 2200
Minneapolis, Minnesota 55402
(612) 977-8400

NCS-*101532)A*-MPLS (*AIKC*)

Grantor:
Pure Prairie Poultry, Inc.
901 North Main Street
Charles City, IA 50616

Grantee:
Michael Helgeson
2298 Rodeo Road
Sartell MN 56377

Legal Description:
See attached Exhibit A

Document or instrument number if applicable:
Instrument No. 2021-3156

1

76987677v4

NOTICE: THIS MORTGAGE SECURES CREDIT IN THE AGGREGATE AMOUNT OF $13,754,000.00. LOANS AND ADVANCES UP TO THIS AMOUNT, TOGETHER WITH INTEREST, ARE SENIOR TO INDEBTEDNESS TO OTHER CREDITORS UNDER SUBSEQUENTLY RECORDED OR FILED MORTGAGES AND LIENS.

THIS MORTGAGE IS A PURCHASE MONEY MORTGAGE AS DEFINED IN THE IOWA CODE SEC. 654.12B.

### AMENDED AND RESTATED PURCHASE MONEY MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FINANCING STATEMENT

THIS AMENDED AND RESTATED PURCHASE MONEY MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FINANCING STATEMENT (this "Mortgage") is made as of April 26 , 2023 by PURE PRAIRIE POULTRY, INC., a Minnesota corporation, f/k/a Pure Prairie Farms, Inc. (the "Mortgagor"), having its principal offices at 901 North Main Street, Charles City, IA 50616, in favor of MICHAEL HELGESON, an individual resident of the State of Minnesota (the "Lender"), having a mailing address of 2298 Rodeo Road, Sartell, MN 56377.

### RECITALS:

A.      The Lender has lent, or agreed to lend, to the Mortgagor, the aggregate principal sum of $13,754,000.00 (the "Loan"), to be repaid with interest thereon, as evidenced by (i) that certain Amended and Restated Secured Promissory Note dated June 30, 2022 made by Mortgagor and payable to the order of Lender, in the original principal amount of $9,954,000.00 (as the same may be amended, restated, replaced, extended, supplemented or otherwise modified from time to time, "Note A"), (ii), that certain Secured Promissory Note dated April 19, 2023 made by Mortgagor and payable to the order of Lender, in the original principal amount of $690,801.00 (as the same may be amended, restated, replaced, extended, supplemented or otherwise modified from time to time, "Note B"), and (iii) that certain Secured Promissory Note dated April 19, 2023 made by Mortgagor and payable to the order of Lender, in the original principal amount of $3,109,199.00 (as the same may be amended, restated, replaced, extended, supplemented or otherwise modified from time to time, "Note C", and together with Note A and Note B, each a "Note" and collectively, the "Notes"). The Notes and all other documents, instruments and agreements delivered to Lender in connection therewith are hereby incorporated by reference, and, together with this Mortgage, as any of the same may be amended, modified, supplemented, extended, renewed, replaced or restated, are sometimes collectively referred to as the "Loan Documents".

B.      This is a Purchase Money Mortgage entitled to priority pursuant to Iowa Code § 654.12B and other applicable law. The obligations secured by this Mortgage (the "Obligations") are as follows:

(i)      the principal amount of $9,954,000.00 or so much thereof as may be advanced by the Lender under Note A; plus

(ii)      the principal amount of $690,801.00 or so much thereof as may be advanced by the Lender under Note B; plus

(iii)      the principal amount of $3,109,199.00 or so much thereof as may be advanced by the Lender under Note C; plus

(iv)      interest on the amount advanced and unpaid under the Notes, at the interest rate or rates provided in the Notes; plus

(v)      all other amounts payable by Mortgagor under the Loan Documents as the same now exist or may hereafter be amended, including without limitation, all expenses described more particularly in <u>Section 3.3</u> of this Mortgage; <u>plus</u>

(vi)      except as described below, the performance of all covenants and agreements contained in this Mortgage and the Loan Documents.

C.      The Obligations evidenced by Note A shall be due and payable on June 17, 2023, the Obligations evidenced by Note B shall be due and payable on April 19, 2024, and the Obligations evidenced by Note C shall be due and payable on April 19, 2024.

NOW, THEREFORE, the Mortgagor, in consideration of the Lender making the Loan, and to secure the Loan and payment and performance of the Obligations, hereby grants, bargains, sells, conveys and mortgages to the Lender, its successors and assigns, forever, along with the POWER OF SALE, the right of Lender to elect Nonjudicial Foreclosure pursuant to Iowa Code 655A, the immediate right of entry and possession, and grants to the Lender, its successors and assigns, a continuing security interest in Mortgagor's right, title and interest in and to the following, all of which is called the "<u>Mortgaged Property</u>":

<u>A. LAND AND IMPROVEMENTS</u>

The land described in <u>Exhibit A</u> attached hereto and all mineral rights, hereditaments, easements and appurtenances thereto (the "<u>Land</u>"), and all improvements and structures now or hereafter located thereon (the "<u>Improvements</u>"); and

<u>B. FIXTURES AND PERSONAL PROPERTY</u>

Whether now owned or hereafter arising or acquired, all Fixtures and Equipment which are now or hereafter located on the Land or are attached to the improvements which by the nature of their location thereon or attachment thereto are real property, all accessions to, substitutions for and replacements, products and Proceeds of the foregoing, including any materials intended for the construction, reconstruction, repair, replacement, alternation, addition, or improvement of or to such buildings, equipment, fixtures, structures, and improvements construction and building materials stored on and to be included in the Improvements (together with all other collateral described in Clauses A through F of the definition of Mortgaged Property in which a security interest may be created under the Iowa Uniform Commercial Code, collectively, the "<u>Personal Property</u>"); and

<u>C. LEASES AND RENTS</u>

All rights of the Mortgagor with respect to all tenants or occupants now or hereafter occupying all or any part of the Land or the Improvements, if any, including without limitation all leases, rental agreements, occupancy agreements and licenses and rights in connection therewith, whether oral or written, and all guaranties and other supporting obligations relating thereto (each a "<u>Lease</u>", collectively, the "<u>Leases</u>"), and all rents, profits, issues and income, both from services and occupation, royalties, revenues and payments, including prepayments and security deposits (collectively, the "<u>Rents</u>"), which are now or hereafter due or to be paid in connection with the Land, the Improvements, the Fixtures or the Personal Property; and

<u>D. GENERAL INTANGIBLES</u>

All general intangibles of the Mortgagor which relate to any of the Land, the Improvements, the Fixtures, the Personal Property, the Leases or the Rents, including proceeds of insurance and condemnation

3

or conveyance of the Land and the Improvements, accounts, trade names, contract rights, accounts and bank accounts; and

### E. OTHER PROPERTY

All feasibility studies, plans and specifications, soil tests, environmental reports, engineering reports, architect's, engineer's and construction contracts, licenses, permits, certificates and documents relating to the Land, the Improvements, the Fixtures and the Personal Property; and

### F. AFTER ACQUIRED PROPERTY AND PROCEEDS

All property similar to the property herein described and conveyed which may be subsequently acquired by the Mortgagor and used in connection with the Land, the Improvements, the Fixtures, the Personal Property and other property described herein; and all cash and non-cash proceeds and products of all of the foregoing property.

TO HAVE AND TO HOLD the same, and all estate therein, together with all the rights, privileges and appurtenances thereunto belonging, to the use and benefit of the Lender, its successors and assigns, forever.

PROVIDED NEVERTHELESS, should the Mortgagor pay and perform all the Obligations, then these presents will be of no further force and effect, and this Mortgage shall be satisfied by the Lender, at the expense of the Mortgagor.

THE MORTGAGOR FURTHER agrees as follows:

## ARTICLE I - AGREEMENTS

Section 1.1    Performance of Obligations; Incorporation by Reference. The Mortgagor shall pay and perform the Obligations in accordance with the terms of the Loan Documents. Time is of the essence hereof. All of the covenants, obligations, agreements, warranties and representations of the Mortgagor contained in the Notes and the other Loan Documents and all of the terms and provisions thereof, are hereby incorporated herein and made a part hereof by reference as if fully set forth herein.

Section 1.2    Terms defined in Uniform Commercial Code. For purposes of interpretation and enforcement of the above defined Mortgaged Property, Clause B, Fixtures and Personal Property, any related terms shall have the meanings set forth in the Iowa Uniform Commercial Code, as amended from time to time, and such meanings shall automatically change at the time that any amendment to the Iowa Uniform Commercial Code, which changes such meanings, shall become effective. For purposes of this Mortgage, such terms may be capitalized, even if not capitalized in the Iowa Uniform Commercial Code, provided, that if any additional goods, property or rights shall be included in such terms under Clause B hereof, such terms shall be construed to include such additional goods, property or rights.

Section 1.3    Further Assurances. If the Lender requests, the Mortgagor shall sign and deliver and cause to be recorded (if applicable) and hereby authorizes the Lender to record to the full extent permitted by applicable law, any further mortgages, pledge agreements, financing statements, security agreements, certificates and other documents as the Lender reasonably may consider necessary or desirable in order to perfect, continue and preserve the Obligations and the Lender's rights, title, estate, liens and interests under the Loan Documents. The Mortgagor further agrees to pay to the Lender, upon demand, all reasonable costs and expenses incurred by the Lender in connection with the preparation, execution,

4

recording, filing and refiling of any such documents, including reasonable attorneys' fees and title insurance costs.

Section 1.4     Sale, Transfer, Encumbrance. If the Mortgagor sells, conveys, transfers or otherwise disposes of, or encumbers, any part of its interest in the Mortgaged Property, legal or equitable, whether voluntarily, involuntarily or by operation of law, without the prior written consent of the Lender, which consent may be given or withheld by the Lender in its sole and absolute discretion, the Lender shall have the option to declare the Obligations immediately due and payable without notice to the Mortgagor (which notice the Mortgagor hereby expressly waives). Included within the foregoing actions requiring prior written consent of the Lender are: (a) sale by deed, land sale contract or contract for deed; and (b) mortgaging or granting a Lien (as hereinafter defined) on the Mortgaged Property. The Mortgagor shall give notice of any proposed action to the Lender at least 30 days prior to taking such action. The Mortgagor shall pay all costs and expenses incurred by the Lender in evaluating any such action, The Lender may condition such consent upon modification of the Loan Documents or payment of fees. The consent by the Lender to any action shall not constitute a waiver of the necessity of such consent to any subsequent action. No transfer, conveyance, lease, sale or other disposition shall relieve the Mortgagor from personal liability for the Obligations, whether or not the transferee assumes this Mortgage. The Lender may, without notice to the Mortgagor, deal with any successor owner of all or any portion of the Mortgaged Property in the same manner as with the Mortgagor, without in any way discharging the liability of the Mortgagor under the Obligations.

Section 1.5     Insurance. The Mortgagor shall obtain, maintain and keep in full force and effect and upon request of the Lender shall furnish to the Lender copies of or certificates evidencing policies of insurance with respect to the Mortgaged Property.

Section 1.6     Taxes. The Mortgagor shall, at least five days before any penalty attaches thereto, pay and discharge, or cause to be paid and discharged, all taxes, assessments and governmental charges and levies (collectively "Impositions") imposed upon or against the Mortgaged Property or the Rents, or upon or against the Obligations, or upon or against the interest of the Lender in the Mortgaged Property or the Obligations, except Impositions measured by the income of the Lender. The Mortgagor shall provide evidence of such payment at the Lender's request.

Section 1.7     Liens. The Mortgagor shall keep the Mortgaged Property free and clear of all liens, security interests, encumbrances, easements, covenants, conditions, restrictions and reservations (collectively "Liens") except those listed on Exhibit B attached hereto (the "Permitted Encumbrances").

Section 1.8     Utilities. The Mortgagor shall pay or cause to be paid when due all charges or fees for utilities and services supplied to the Mortgaged Property.

Section 1.9     Maintenance and Repair; Compliance with Laws. The Mortgagor (a) shall cause the Mortgaged Property to be operated, maintained and repaired in safe and good repair, working order and condition, reasonable wear and tear excepted; (b) shall not commit or permit waste thereof; (c) shall complete or cause to be completed forthwith any Improvements which are now or may hereafter be under construction upon the Land; (d) shall comply or cause compliance with all laws, statutes, ordinances and codes, and governmental rules, regulations and requirements, applicable to the Mortgaged Property or the manner of using or operating the same, and with any covenants, conditions, restrictions and reservations affecting the title to the Mortgaged Property, and with the terms of all insurance policies relating to the Mortgaged Property; and (e) shall obtain and maintain in full force and effect all consents, permits and licenses necessary for the use and operation of the Mortgaged Property.

Section 1.10    Assignment of Leases and Rents.

5

(a)      The Mortgagor hereby assigns and transfers to the Lender all of the Mortgagor's right, title and interest in and to all Leases and Rents from the Mortgaged Property and each and every part thereof, including all present and future Leases and rental agreements, for the purpose of securing the Obligations. The Mortgagor agrees not to default in performing its obligations under any Lease or rental agreement with respect to the Mortgaged Property or any part thereof. This assignment may be enforced by the Lender at any time during the existence of an Event of Default hereunder, without regard to the adequacy of the security hereof or the solvency of the Mortgagor, by any one or more of the following methods: (i) the appointment of a receiver; (ii) the Lender's taking possession of the Mortgaged Property; (iii) the collection by the Lender of any moneys payable under Leases, purchase agreements or rental agreements directly from the parties obligated to make such payment; (iv) the obtaining of an injunction and (v) any other method permitted by law. Prior to the occurrence of an Event of Default (as hereafter defined in Article IV), the Mortgagor shall have a conditional license and opportunity to collect (but not more than one month in advance) all such Rents, and to use the same for payment of all sums which the Mortgagor is required to pay by the terms hereof and the Obligations, before using the same for any other purpose.

(b)      Receipt by the Lender of Rents shall not constitute a waiver of any right that the Lender may enjoy under this Mortgage or under the laws of the State of Iowa, nor shall the receipt and application thereof cure any Event of Default hereunder nor affect any foreclosure proceeding or any sale authorized by this Mortgage and the laws of the State of Iowa. There shall be no merger of the leasehold estates, created by the Leases, with the fee estate of the Mortgaged Property without the prior written consent of the Lender.

(c)      This assignment shall extend to and cover any and all extensions and renewals of existing and future Leases and to any and all present and future rights against guarantors of any such obligations and to any and all Rents collected under Leases or other rentals. This assignment is given to facilitate payment and performance of the Obligations. The Lender shall not be obligated to perform or discharge any obligation, duty or liability under any Lease or under or by reason of this assignment, and the Mortgagor shall and does hereby agree to indemnify and to hold the Lender harmless from any liability, loss or damage that it might incur under any Lease or under or by reason of this assignment and from any claims and demands whatsoever that may be asserted against it by reason of any alleged obligations or undertakings on the Lender's part. Unless otherwise specified by the Lender in writing, all existing and future Leases for the use or occupancy of all or any part of the Mortgaged Property shall be subordinate to the lien of this Mortgage. In pursuance of this assignment, and not in lieu hereof, the Mortgagor shall on demand give the Lender separate specific assignments of Rents and Leases, covering some or all of the Leases, the terms of such assignments being incorporated herein by reference, The Lender is hereby authorized to notify all lessees and tenants of the Mortgaged Property of the existence of any and all such assignments. The Mortgagor hereby authorizes and directs the lessees and tenants of the Mortgaged Property that, upon written notice from the Lender, all payments required under said Leases and rental agreements or in any way respecting the same, shall be made directly to the Lender as they become due. The Mortgagor hereby relieves said purchasers, lessees and tenants from any liability to the Mortgagor by reason of said payments being made to the Lender. With or without exercising the rights set forth in Section 3.2 hereof, the Lender is authorized to give such written notice to tenants at any time during the existence of an Event of Default hereunder.

(d)      All Rents derived from the Mortgaged Property that are collected by the Lender, its agent or a receiver each month shall be applied to the payment of principal of and interest on the Notes and other amounts due under the Loan Documents. The rights and powers of the Lender under this Section and the application of Rents pursuant hereto shall continue until expiration of

the redemption period from any foreclosure sale, whether or not any deficiency remains after a foreclosure sale. The entering upon and taking possession of the Mortgaged Property, the collection of such Rents and the application thereof as aforesaid shall not cure or waive any Event of Default or waive, modify or affect any notice of default under any Note, under this Mortgage, or under any other Loan Document, or invalidate any act done pursuant to such Event of Default or notice of default. The Mortgagor shall in every way facilitate the payment of Rent to the Lender, when the Lender has the right to receive the same hereunder. The Lender shall be accountable only for Rents actually collected hereunder and not for the rental value of the Mortgaged Property. The Lender shall not be liable for any security deposit made by any tenant unless and until the Lender comes into actual, physical possession and control thereof. Failure of the Lender to collect, or discontinuance by the Lender from collecting, at any time, and from time to time, any Rent, shall not in any manner affect the rights of the Lender to thereafter collect the same.

(e)      The Lender shall have the right, under this assignment, to take possession of and use, without rental or charge, any fixtures, equipment, furniture, appliances, personal property, books of account and records of the Mortgagor or its agents located in or constituting a part of the Mortgaged Property in connection with the Lender's occupancy, management and operation of the Mortgaged Property. The Lender shall be deemed to be the creditor of any tenant in respect of any assignment for the benefit of creditors and any bankruptcy, arrangement, reorganization, insolvency, dissolution, receivership or other debtor-relief proceeding affecting such tenant; provided, however, so long as there exists no Event of Default, the Mortgagor shall have a right to appear and pursue claims against any such tenant in any such proceeding and provided further that Mortgagor shall have no right to require that the Lender file timely claims in such proceedings or to otherwise pursue any creditor's rights therein.

(f)      The Lender shall not be deemed to be a partner of, or a joint venturer with, the Mortgagor with respect to the Mortgaged Property or to be a participant of any kind in the management or operation of the Mortgaged Property.

(g)      Neither this assignment, nor the exercise by the Lender of its rights hereunder, shall be deemed to constitute the Lender a mortgagee in possession of the Mortgaged Property, unless the Lender elects in writing to be so constituted.

Section 1.11      Indemnity. The Mortgagor shall indemnify the Lender and its agents and employees (collectively the "Indemnified Parties") against, and hold the Indemnified Parties harmless from (i) all losses, damages, suits, claims, judgments, penalties, fines, liabilities, costs and expenses by reason of, or on account of, or in connection with the construction, reconstruction or alteration of the Mortgaged Property, or any accident, injury, death or damage to any person or property occurring in, on or about the Mortgaged Property or any street, drive, sidewalk, curb or passageway adjacent thereto and (ii) any liability, loss or damage that it might incur under any Lease or under or by reason of the assignment hereunder and from any claims and demands whatsoever that may be asserted against it by reason of any alleged obligations or undertakings on the Lender's part. The indemnity contained in this Section shall include costs of defense of any such claim asserted against an Indemnified Party, including attorneys' fees, other than damage caused solely by the recklessness or willful misconduct of the Lender or the Lender's agents. Any liability, loss or damage incurred by the Lender and which is covered by this Section shall be secured by this Mortgage, and the Mortgagor shall reimburse the Lender therefor immediately upon demand. The indemnity contained in this Section shall survive payment and performance of the Obligations and satisfaction and release of this Mortgage and any foreclosure thereof or acquisition of title by deed in lieu of foreclosure. The indemnity contained in this Section shall be in addition to, not in limitation of, any indemnity provided for under any of the other Loan Documents.

7

## ARTICLE II - REPRESENTATIONS AND WARRANTIES

The Mortgagor makes the following representations and warranties:

Section 2.1  <u>Ownership, Liens, Compliance with Laws.</u> The Mortgagor owns good and marketable fee title to the Mortgaged Property free from all Liens, except the Permitted Encumbrances. All applicable zoning, environmental, land use, subdivision, building, fire, safety and health laws, statutes, ordinances, codes, rules, regulations and requirements affecting the Mortgaged Property permit the current use and occupancy thereof, and the Mortgagor has obtained all consents, permits and licenses required for such use. The Mortgagor has examined and is familiar with all applicable covenants, conditions, restrictions and reservations, and with all applicable laws, statutes, ordinances, codes and governmental rules, regulations and requirements affecting the Mortgaged Property, and the Mortgaged Property complies with all of the foregoing.

Section 2.2  <u>Use.</u> The Mortgaged Property is to be used solely for business purposes.

Section 2.3  <u>Utilities; Services.</u> The Mortgaged Property is serviced by all necessary public utilities, and all such utilities are operational and have sufficient capacity.

## ARTICLE III -DEFAULTS AND REMEDIES

Section 3.1  <u>Events of Default.</u> Any of the following shall constitute an "<u>Event of Default</u>" hereunder:

(a)  The occurrence of any default or event of default under the terms of, and as defined in, any Loan Document.

(b)  Any breach by the Mortgagor of any covenant, agreement, conditions, term or provision of this Mortgage or any other Loan Document.

(c)  Any breach by the Mortgagor of any covenant, agreement, condition, term or provision of any other mortgage or lawful lien or encumbrance against the Mortgaged Property, or any portion thereof.

(d)  There is filed by Mortgagor any case, petition, proceeding or other action ("<u>Bankruptcy Case</u>") under any existing or future bankruptcy, insolvency, reorganization, liquidation or arrangement or readjustment of debt law or any similar existing or future law of any applicable jurisdiction, including the Bankruptcy Code ("<u>Insolvency Law</u>"), (ii) an involuntary Bankruptcy Case ("<u>Involuntary Proceeding</u>") is commenced against Mortgagor, under any Insolvency Law and the Involuntary Proceeding is not controverted within 10 days, or is not dismissed within 30 days, after the commencement of the Bankruptcy Case, or (iii) a custodian, receiver, trustee, sequestrator, or agent is appointed or authorized to take charge of any of the properties of Mortgagor.

Section 3.2  <u>Remedies.</u> Upon the occurrence of an Event of Default described in Section 3.1(d), all of the Obligations shall be accelerated and become immediately due and payable without notice or declaration to the Mortgagor. Upon the occurrence of one or more other Events of Default hereunder, all of the Obligations, at the option of the Lender, shall be accelerated and become immediately due and payable without presentment, demand or notice of any kind to the Mortgagor, all of which are hereby expressly waived. In either event, the Obligations shall be due and payable without presentment, demand or further notice of any kind. In addition to and without limiting the rights and remedies set forth in the

8

Loan Documents or under applicable law, but subject at all times to any mandatory legal requirements, the Lender shall have the right to proceed to protect and enforce its rights by one or more of the following remedies:

(a)    Lender shall, with respect to any part of the Mortgaged Property constituting property of the type in respect of which realization on a lien or security interest granted therein is governed by the Iowa Uniform Commercial Code, have all the rights, options and remedies of a secured party under the Iowa Uniform Commercial Code, including without limitation, the right to the possession of any such property, or any part thereof, and the right to enter without legal process any premises where any such property may be found. Any requirement of said Iowa Uniform Commercial Code for reasonable notification shall be met by mailing written notice to Mortgagor at its address above set forth at least ten (10) days prior to the sale or other event for which such notice is required. The costs and expenses of retaking, selling, and otherwise disposing of said property, including attorneys' fees and legal expenses incurred in connection therewith, shall constitute Obligations and shall be payable upon demand with interest at the default rate (as specified in the Notes).

(b)    Lender may proceed to protect and enforce the rights of Lender hereunder (i) by any action at law, suit in equity or other appropriate proceedings, whether for the specific performance of any agreement contained herein, or for an injunction against the violation of any of the terms hereof, or in aid of the exercise of any power granted hereby or by law, or (ii) by the foreclosure of this Mortgage.

(c)    Lender shall, as a matter of right, without notice and without giving bond to Mortgagor or anyone claiming by, under or through it, and without regard to the solvency or insolvency of Mortgagor or the then value of the Mortgaged Property, be entitled to have a receiver appointed for all or any part of the Mortgaged Property and the Rents, with such power as the court making such appointment shall confer, and Mortgagor hereby consents to the appointment of such receiver and shall not oppose any such appointment. Any such receiver may, to the extent permitted under applicable law, without notice, enter upon and take possession of the Mortgaged Property or any part thereof by force, summary proceedings, ejectment or otherwise, and may remove Mortgagor or other persons and any and all property therefrom, and may hold, operate and manage the same and receive all Rents and proceeds accruing with respect thereto or any part thereof, whether during the pendency of any foreclosure or until any right of redemption shall expire or otherwise.

(d)    Lender may enter and take possession of the Mortgaged Property or any part thereof and manage, operate, insure, repair and improve the same and take any action that, in Lender's judgment, is necessary or proper to conserve the value of the Mortgaged Property. Lender may also take possession of, and for these purposes use, any and all Personal Property contained in the Mortgaged Property and used in the operation, rental or leasing thereof or any part thereof. Lender shall be entitled to collect and receive all Rents of the Mortgaged Property or any part thereof (and for such purpose Mortgagor does hereby irrevocably constitute and appoint Lender its true and lawful attorney-in-fact for it and in its name, place and stead to receive, collect and receipt for all of the foregoing, Mortgagor irrevocably acknowledging that any payment made to Lender hereunder shall be a good receipt and acquittance against Mortgagor to the extent so made) and to apply same to the reduction of the Obligations. The right to enter and take possession of the Mortgaged Property and use any Personal Property therein, to manage, operate and conserve the same, and to collect the Rents shall be in addition to all other rights or remedies of Lender hereunder, under the Loan Documents, or afforded by law, and may be exercised concurrently therewith or independently thereof. The expenses (including any receiver's fees, attorneys' fees,

9

costs and agent's compensation) incurred pursuant to the powers herein contained shall be Obligations, which Mortgagor promises to pay upon demand together with interest at the default rate (as specified in the Notes), Lender shall not be liable to account to Mortgagor for any action taken pursuant hereto other than to account for any Rents actually received by Lender. Without taking possession of the Mortgaged Property, Lender may, in the event the Mortgaged Property becomes vacant or is abandoned, take such steps as it deems appropriate to protect and secure the Mortgaged Property (including hiring watchmen therefor) and all costs incurred in so doing shall constitute Obligations payable upon demand with interest thereon at the default rate (as specified in the Notes).

(e)    The Lender shall have the right to file proof of claim and other documents as may be necessary or advisable in order to have its claims allowed in any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceedings affecting the Mortgagor, its creditors or its property, for the entire amount due and payable by the Mortgagor in respect of the Obligations at the date of the institution of such proceedings, and for any additional amounts which may become due and payable by the Mortgagor after such date.

All rights and remedies provided for herein or which the Lender or any other holders of any Note may otherwise have, at law or in equity, shall be distinct, separate and cumulative and may be exercised concurrently, independently or successively in any order whatsoever, and as often as the occasion therefor arises, as may be deemed expedient by the Lender. The exercise or the beginning of the exercise of one right shall not be deemed a waiver of the right to exercise at the same time or thereafter any other right. No waiver by the Lender of any particular provision of this Mortgage shall be deemed effective unless in writing signed by the Lender. In addition to the foregoing, the Lender shall have all rights and remedies available under the law in effect now and/or at the time such rights and remedies are sought to be enforced, whether or not they are available under the law in effect on the date hereof.

Section 3.3    Expenses of Exercising Rights, Powers, and Remedies. The reasonable expenses (including any receivers' fees, attorneys' fees, appraisers' fees, environmental engineers' and/or consultants' fees, costs incurred for documentary and expert evidence, stenographers' charges, publication costs, costs (which may be estimated as to items to be expended after entry of the decree of foreclosure) of procuring all abstracts of title, continuations of abstracts of title, title searches and examinations, title insurance policies and commitments and extensions therefor, UCC and chattel lien searches, and similar data and assurances with respect to title as the Lender may deem reasonably necessary either to prosecute any foreclosure action or to evidence to bidders at any sale which may be had pursuant to any foreclosure decree the true condition of the title to or the value of the Mortgaged Property, and agent's compensation) incurred by the Lender after the occurrence of any Event of Default and/or in pursuing the rights, powers and remedies contained in this Mortgage shall be immediately due and payable by the Mortgagor, with interest thereon from the date incurred at the default rate (as specified in the Notes), and shall be added to the Obligations secured by this Mortgage.

Section 3.4    Restoration of Position. In case the Lender shall have proceeded to enforce any right under this Mortgage by foreclosure, sale, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely, then, and in every such case, the Mortgagor and the Lender shall be restored to their former positions and rights hereunder with respect to the Mortgaged Property subject to the lien hereof.

Section 3.5    Waiver of Right to Redeem From Sale - Waiver of Appraisement, Valuation. Mortgagor shall not and will not apply for or avail itself of any appraisement, valuation, stay, extension or exemption laws, or any so-called "Moratorium Laws", now existing or hereafter enacted in order to prevent or hinder the enforcement or foreclosure of this Mortgage, but hereby waives the benefit of such laws,

10

Mortgagor for itself and all who may claim through or under it waives any and all right to have the property and estates comprising the Mortgaged Property marshalled upon any foreclosure of the lien hereof and agrees that any court having jurisdiction to foreclose such lien may order the Mortgaged Property sold as an entirety. In the event of any sale made under or by virtue of this Mortgage, the whole of the Mortgaged Property may be sold in one parcel as an entirety or in separate lots or parcels at the same or different times, all as Lender may determine, Lender shall have the right to become the purchaser at any sale made under or by virtue of this Mortgage and Lender so purchasing at any such sale shall have the right to be credited upon the amount of the bid made therefor by Lender with the amount payable to Lender out of the net proceeds of such sale. In the event of any such sale, the Obligations, if not previously due, shall be and become immediately due and payable without demand or notice of any kind. Subject to Section 3.9, below, Mortgagor hereby waives any and all rights of redemption prior to or from sale under any order or decree of foreclosure pursuant to rights herein granted, on behalf of Mortgagor, and each and every person or entity acquiring any interest in, or title to the Mortgaged Property described herein subsequent to the date of this Mortgage, and on behalf of all other persons to the extent permitted by applicable law.

Section 3.6     Waivers. No waiver of any provision hereof shall be implied from the conduct of the parties. Any such waiver must be in writing and must be signed by the party against which such waiver is sought to be enforced. The waiver or release of any breach of the provisions set forth herein to be kept and performed shall not be a waiver or release of any preceding or subsequent breach of the same or any other provision. No receipt of partial payment after acceleration of any of the Obligations shall waive the acceleration. No payment by the Mortgagor or receipt by the Lender of a lesser amount than the full amount secured hereby shall be deemed to be other than on account of the sums due and payable hereunder, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and the Lender may accept any check or payment without prejudice to the Lender's right to recover the balance of such sums or to pursue any other remedy provided in this Mortgage. The consent by the Lender to any matter or event requiring such consent shall not constitute a waiver of the necessity for such consent to any subsequent matter or event.

Section 3.7     The Lender's Right to Cure Defaults. If the Mortgagor shall fail to comply with any of the terms of the Loan Documents with respect to the procuring of insurance, the payment of taxes, assessments and other charges, the keeping of the Mortgaged Property in repair, or any other term contained herein or in any of the other Loan Documents, the Lender may, after providing 10 days prior written notice to the Mortgagor, make advances to perform the same without releasing the Mortgagor from any of the Obligations, provided, however, it is expressly understood and agreed that the Lender may make such advance without prior written notice to the Mortgagor if, in the Lender's determination, such advance is required to be made before such 10-day period to protect and/or preserve the Mortgaged Property or the Lender's security interest and lien therein. The Mortgagor agrees to repay upon demand all sums so advanced and all sums expended by the Lender in connection with such performance under this Section 3.7, including without limitation attorneys' fees, with interest at the default rate (as specified in the Notes) from the dates such advances are made, and all sums so advanced and/or expenses incurred, with interest, shall be secured hereby, but no such advance and/or incurring of expense by the Lender, shall be deemed to relieve the Mortgagor from any default hereunder or under any of the other Loan Documents, or to release the Mortgagor from any of the Obligations.

Section 3.8     Suits and Proceedings; Power of Attorney.

(a)     The Lender shall have the power and authority, upon prior notice to the Mortgagor, to institute and maintain any suits and proceedings as the Lender may deem advisable to (i) prevent any impairment of the Mortgaged Property by any act which may be unlawful or by any violation of this Mortgage, (ii) preserve or protect its interest in the Mortgaged Property, or (iii) restrain the enforcement of or compliance with any legislation or other governmental enactment, rule or order

11

that may be unconstitutional or otherwise invalid, if, in the sole opinion of the Lender, the enforcement of or compliance with such enactment, rule or order might impair the security hereunder or be prejudicial to the Lender's interest.

(b)    Mortgagor does hereby make, constitute and appoint Lender (or any officer or agent of Lender) as Mortgagor's true and lawful attorney-in-fact, with full power of substitution, in the name of Mortgagor or in the name of Lender or otherwise, for the use and benefit of Lender, but at the cost and expense of Mortgagor, to do any and all things necessary or desirable (i) to perfect Lender's mortgage and security interest in, and Lien on, and other rights and interests in, the Mortgaged Property, (ii) to preserve and protect the Mortgaged Property, (iii) to enforce the Lender's rights and remedies under this Mortgage, the other Loan Documents and applicable law, and (iv) to otherwise carry out this Mortgage and the other Loan Documents. This power of attorney is coupled with an interest and shall be irrevocable.

Section 3.9    <u>Redemption Period.</u> Mortgagor hereby agrees to the provisions of Section 654.20 of the Iowa Code, as the same may be amended and renumbered from time to time, providing Lender a right to elect foreclosure without redemption as provided further therein.

## ARTICLE IV - MISCELLANEOUS

Section 4.1    <u>Binding Effect; Survival; Number; Gender.</u> This Mortgage shall be binding on and inure to the benefit of the parties hereto, and their respective heirs, legal representatives, successors and assigns. All agreements, representations and warranties contained herein or otherwise heretofore made by the Mortgagor to the Lender have been relied upon by Lender notwithstanding any independent investigation heretofore or hereafter made by Lender or on its behalf and shall survive the execution, delivery and foreclosure hereof until the Obligations have been fully paid and satisfied. The singular of all terms used herein shall include the plural, the plural shall include the singular, and the use of any gender herein shall include all other genders, where the context so requires or permits.

Section 4.2    <u>Severability.</u> The unenforceability or invalidity of any provision of this Mortgage as to any person, entity or circumstance shall not render that provision unenforceable or invalid as to any other person, entity or circumstance.

Section 4.3    <u>Notices.</u> Any notice or other communication to any party in connection with this Mortgage shall be given pursuant to the provisions of the Notes.

Section 4.4    <u>Applicable Law.</u>

(a)    The Loan Documents shall be governed by and interpreted in accordance with the internal laws of the State of Minnesota (regardless of conflict of laws principles, the location of the Mortgaged Property or the place of business, location or domicile of Mortgagor), except to the extent superseded by federal law. Mortgagor agrees that the laws or procedural rules of any jurisdiction except for Minnesota purporting to limit or affect Lender's ability to enforce its rights as set forth in this Mortgage and any other documents referred to herein (including, without limitation, any fair value, security-first, security-only, or one-action provisions) are not applicable to the enforcement of Lender's rights thereunder. Mortgagor intends and understands that Lender will rely upon the agreements in the foregoing sentences in providing the credit accommodations constituting the Obligations.

(b)    Notwithstanding subparagraph (a) above, the laws of Iowa shall (i) govern the creation, perfection and priority of security interests upon real property or personal property perfected by filing, possession or control in the State of Iowa, (ii) govern the procedures regarding Lender's enforcement of its foreclosure and other remedies with respect to such real property or personal property, and (iii) apply in

12

determining the legal requirements applicable to the care and preservation of the Mortgaged Property. However, the foregoing limited application of Iowa law and the fact that portions of this Mortgage or other documents relating to the Obligations may include provisions drafted to conform to Iowa law are not intended in any way to derogate from the provisions set forth elsewhere in such documents designating Minnesota law as the governing law. Mortgagor specifically acknowledges and agrees that Lender's right to collect a deficiency in connection with the sale of any collateral shall be governed solely by Minnesota law.

(c)     Whenever possible, each provision of this Mortgage, shall be interpreted in such manner as to be effective and valid under such applicable law, but, if any provision of this Mortgage or any other statement, instrument or transaction contemplated hereby or relating hereto shall be held to be prohibited or invalid under such applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Mortgage or any other statement, instrument or transaction contemplated hereby or relating hereto.

Section 4.5     **WAIVER OF JURY TRIAL. AS A SPECIFICALLY BARGAINED INDUCEMENT FOR THE LENDER TO EXTEND CREDIT TO THE MORTGAGOR, THE MORTGAGOR AND THE LENDER EACH WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (a) UNDER THIS MORTGAGE OR UNDER ANY AMENDMENT, INSTRUMENT, OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR (b) ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS MORTGAGE, AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.**

Section 4.6     Effect. This Mortgage is in addition to and not in substitution for any other guarantees, covenants, obligations or other rights now or hereafter held by the Lender from any other person or entity in connection with the Obligations.

Section 4.7     Assignability. The Lender shall have the right to assign this Mortgage, in whole or in part, or sell participation interests herein, to any person or entity obtaining an interest in the Obligations.

Section 4.8     Headings.     Headings of the Sections of this Mortgage are inserted for convenience only and shall not be deemed to constitute a part hereof.

Section 4.9     Uniform Commercial Code Security Agreement. This Mortgage also constitutes a security agreement within the meaning of the Uniform Commercial Code as in effect in the State of Iowa (the "UCC" or "Iowa Uniform Commercial Code"), with respect to all of the Personal Property, and is intended to afford the Lender, to the fullest extent allowed by law, the rights and remedies of a secured party under the UCC. For the purposes of the security agreement and related financing statements, the "debtor" is the Mortgagor, and the "secured party" is the Lender. The Mortgagor hereby authorizes the Lender (and the Lender's representatives and agents) to file (a) the Lender's financing statements (together with amendments thereto and continuation statements thereof) relating to the Mortgaged Property and (b) any termination statements relating to the filings of other secured parties that relate to the Mortgaged Property. The Mortgagor hereby irrevocably constitutes and appoints the Lender and any officer or agent of the Lender, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of the Mortgagor or in the Mortgagor's own name to execute in the Mortgagor's name any documents and otherwise to carry out the purposes of this Section, to the extent that the Mortgagor's authorization above is not sufficient. This power of attorney is coupled with an interest and shall be irrevocable. For purposes of such filings, the Mortgagor agrees to furnish any information requested by the Lender promptly upon request by the Lender. The form and substance of any financing

statement filed with respect to this Mortgage shall be as the Lender, in its sole discretion, may determine and the Lender is authorized to file a financing statement with a collateral description of "all assets" or any other similar description. The Mortgagor shall pay all costs of filing such financing statements and termination and any extensions, renewals, amendments and releases thereof, and shall pay all reasonable costs and expenses of any record searches for financing statements the Lender may reasonably require. Without the prior written consent of the Lender, the Mortgagor shall not create or suffer to be created pursuant to the UCC any other security interest in said items, including replacements and additions thereto. Upon the Mortgagor's breach of any covenant or agreement of the Mortgagor contained in this Mortgage, including the covenants to pay when due all sums secured by this Mortgage, the Lender shall have the remedies of a secured party under the UCC and, at the Lender's option, may also invoke the remedies provided in <u>Section 3.2</u> of this Mortgage as to such items. In exercising any of said remedies, the Lender may proceed against the items of real property and any items of personal property specified above as part of the Mortgaged Property separately or together and in any order whatsoever, without in any way affecting the availability of the Lender's remedies under the UCC, the remedies provided in <u>Section 3.2</u> of this Mortgage, or any other remedies under the Loan Documents.

The Mortgagor represents and warrants to the Lender: that the exact legal name of the Mortgagor is set forth in the first paragraph of this Mortgage; that the Mortgagor is organized or incorporated under the laws of the state set forth in the first paragraph of this Mortgage; that the Mortgagor is an organization of the type described in the first paragraph of this Mortgage; and that the Mortgagor's organizational number is correctly set forth in <u>Section 4.10</u> of this Mortgage. The Mortgagor covenants that the Mortgagor will not cause or permit any change to be made in its name, identity or corporate or partnership structure unless the Mortgagor shall have first notified the Lender in writing of such change at least 60 days prior to the effective date of such change, and shall have first taken all action required by the Lender for the purpose of perfecting or protecting the lien and security interest of the Lender. The Mortgagor's principal place of business and chief executive office, and the place where the Mortgagor keeps its books and records, including recorded data of any kind or nature, regardless of the medium or recording, including software, writings, plans, specifications and schematics, has been for the preceding four-months (or, if less, the entire period of the existence of the Mortgagor) and will continue to be the address of the Mortgagor set forth in <u>Section 4.10</u> of this Mortgage (unless the Mortgagor notifies the Lender in writing at least 60 days prior to the date of such change). The Mortgagor shall promptly notify the Lender of any change in its organizational identification number, If the Mortgagor does not now have an organizational identification number and later obtains one, the Mortgagor promptly shall notify the Lender of such organizational identification number.

Section 4.10    <u>Fixture Filing.</u> This instrument shall be deemed to be a Fixture Filing within the meaning of the Iowa Uniform Commercial Code, and for such purpose, the following information is given:

| | | |
|---|---|---|
| (a) | Name and address of Debtor: | Pure Prairie Poultry, Inc.<br>901 North Main Street<br>Charles City, IA 50616 |
| (b) | Name and address of Secured Party: | Michael Helgeson<br>2298 Rodeo Road<br>Sartell, MN 56377 |
| (c) | Description of the types (or items) of granting clauses property covered by this Fixture Filing: | See Mortgaged Property granting clauses contained above. |
| (d) | Description of real estate to which | See <u>Exhibit A</u> hereto. |

14

the collateral is attached or upon
which it is or will be located:

Some of the above-described collateral is or is to become fixtures upon the above described real estate, and this Fixture Filing is to be filed for record in the public real estate records.

Section 4.11    Advice of Counsel Obtained. Each of the parties acknowledges and represents that it has had the opportunity to consult with legal, financial, and other professional advisors as it deems appropriate in connection with its consideration and execution of this Mortgage. Each undersigned party further represents and declares that in executing this Mortgage, it has relied solely upon its own judgment, belief and knowledge, and the advice and recommendation of its own professional advisors, concerning the nature, extent and duration of its rights, obligations and claims; that it has reviewed its records, evaluated its position and conducted due diligence with regard to all rights, claims or causes of action whatsoever with respect to any and all other parties; and that it has not been influenced to any extent whatsoever in executing this Mortgage by any representations or statements made by the other party or its representatives, except those expressly contained herein.

Section 4.12    Mortgage Jointly Drafted. The parties agree that this Mortgage shall not be construed against any party to the Mortgage on the grounds that such party drafted this Mortgage, but shall be construed as if all parties jointly prepared this Mortgage, and any uncertainty or ambiguity shall not on such grounds be interpreted against any one party.

Section 4.13    Miscellaneous. This Mortgage may be executed in two or more counterparts, and (if there is more than one party) by each party on separate counterparts, each of which shall be deemed an original but which together shall constitute one and the same instrument. **Delivery of an executed counterpart of a signature page of this Mortgage, whether with or without the remainder hereof, by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart hereof.** To the maximum extent permitted by applicable law, Lender is hereby authorized by Mortgagor without notice to Mortgagor to fill in any blank spaces and dates herein or in any Loan Document to conform to the terms of the transaction and/or understanding evidenced hereby. This Mortgage may not be amended, waived or terminated without the prior written consent of Lender. **THIS MORTGAGE AND THE LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AS TO THE SUBJECT MATTER HEREOF AND THEREOF, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF TILE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

Section 4.14    **NO PUNITIVE DAMAGES. NO PARTY HERETO MAY SEEK OR RECOVER PUNITIVE DAMAGES IN ANY PROCEEDING BROUGHT UNDER OR IN CONNECTION WITH THIS MORTGAGE OR ANY LOAN DOCUMENT. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO EXTEND CREDIT.**

Section 4.15    Lender May Also Be Fiduciary. Mortgagor hereby irrevocably waives, releases and forever relinquishes any claim or right of any nature whatsoever based upon the fact that a trustee or other fiduciary of any Mortgagor or any guarantor of the Obligations is or may be Lender itself or a Lender affiliate, and irrevocably consents to any such circumstance. The rights and powers of Lender shall not in any way be restricted by reason of any such present or future circumstance.

Section 4.16    Arm's Length Transactions. Mortgagor acknowledges and agrees that:

(a)      The transactions contemplated by this Mortgage and the Loan Documents are arm's length commercial transactions among Mortgagor, Lender and any other parties thereto.

(b)      In connection with such transactions, Lender is acting solely as a principal and not as an agent or a fiduciary of Mortgagor or any guarantor of the Obligations.

(c)      With respect to any advances of Obligations or the process leading thereto (whether or not Lender or any affiliate of Lender has advised or is currently advising Mortgagor or any guarantor of the Obligations on other matters), Lender has not assumed a fiduciary responsibility in favor of Mortgagor or any guarantor of the Obligations, or any other obligation of Mortgagor or any guarantor of the Obligations.

Section 4.17    <u>Amendment and Restatement</u>. This Mortgage amends and restates that certain Mortgage, Assignment of Leases and Rents and Security Agreement dated December 17, 2021 given by the Mortgagor in favor of the Lender and recorded December 23, 2021 with the Office of the County Recorder for Floyd County, Iowa (the "<u>Recorder</u>") as Instrument No. 2021-3156, as amended by that certain First Amendment to Mortgage, Assignment of Leases and Rents, and Security Agreement dated June 30, 2022, and recorded July 21, 2022 with the Recorder as Instrument No. 2022-1639 (collectively, the "<u>Prior Mortgage</u>"), in its entirety with the intent and legal effect that the amended and restated terms hereof shall replace the terms of the Prior Mortgage as a renewal, but not as an extinguishment, novation, satisfaction or release of the Prior Mortgage or the lien and security interest granted thereunder, which lien and security interest shall continue in full force and effect in favor of the Lender, subject to the restatement or amendment of such document as provided herein.

*(Signature pages follow)*

16

76987677v4

IN WITNESS WHEREOF, the Mortgagor has executed this Mortgage as of the date first written above. To the extent applicable under any state law, the parties executed this Agreement intending to create an instrument executed under seal.

**MORTGAGOR:**

PURE PRAIRIE POULTRY, INC., a Minnesota corporation

By: _____
Name: George Peichel
Title: Chief Financial Officer

STATE OF ___MINNESOTA___ )
                          ) ss.
COUNTY OF ___RENVILLE___ )

On this _21_ day of ___April___ 2023, before me the undersigned, a Notary Public in and for said state, personally appeared George Peichel, personally known to me, or proved to me on the basis of satisfactory evidence, to be the person who executed the within instrument as the Chief Financial Officer of PURE PRAIRIE POULTRY, INC., a Minnesota corporation, and executed the within instrument on behalf of such corporation.

_____
Notary Public

KAREN M. BASTIAN
Notary Public
Minnesota
My Commission Expires January 31, 2026

Amended and Restated Purchase Money Mortgage, Security Agreement,
Assignment of Leases and Rents and Fixture Financing Statement

**LENDER:**

_Michael Helgeson_

MICHAEL HELGESON, an individual resident of
the State of Minnesota

STATE OF _Minnesota_ )
                                              ) ss.
COUNTY OF _St Louis_ )

On this _21st_ day of _April_ 2023, before me the undersigned, a Notary Public in
and for said state, personally appeared MICHAEL HELGESON, an individual resident of the State of
Minnesota, personally known to me, or proved to me on the basis of satisfactory evidence, to be such
individual.

DAWN F. HATHAWAY
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2025

_____
Notary Public

Amended and Restated Purchase Money Mortgage, Security Agreement,
Assignment of Leases and Rents and Fixture Financing Statement

76987677

**EXHIBIT A**

**Legal Description**

Real property in the City of Charles City, County of Floyd, State of Iowa, described as follows:

**Parcel 1/Plant Parcel:**

Parcel J in Blocks 148 and 149 of Lane's Addition, Charles City, Iowa and in Blocks 3 and 4 of Detwiler's Subdivision of Lots 3, 4 and 5 of Block 149, Lane's Addition, Charles City, Iowa in the NE 1/4 of the SE 1/4 of Section 1, Township 95 North, Range 16 West of the 5th P.M., City of Charles City, Floyd County, Iowa, as described and depicted on Plat of Survey filed March 25, 2022, as Instrument No. 2022-0633 in the office of the Floyd County Recorder.

**Parcel 2/Parking Lot Parcel:**

Parcel "A": Lots 1 and 2, Subdivision of Lot 11, Block 139, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa.

Parcel "B": A part of Blocks 138 and 139, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa, being more particularly described as follows: Beginning at the Northeast corner of Lot 4, of said Block 138, thence S00° 29' 23" E along the Westerly right of way of "E" Street to a point 36 foot distant from the centerline of the Illinois Central railroad track, 451.10 feet; thence S89° 26' 59" W along a line 36 foot distant and parallel to the said centerline of railroad track 330.49 feet to the Easterly right of way of "D" Street; thence N88° 48' 52" W, 66.03 feet to the Westerly right of way of said "ID" Street and 38 foot distant from said centerline of railroad track; thence N77° 15' 01" W, 456.98 feet to a point on the North line of Lot 13, of said Block 139 (also being the North line of Lot 7, Cheney's Sub division); thence S89° 27' 58" W along said North line of Lot 13 (also being along the North line of Lots 7, 8 and 9 of said Cheney's sub- division), 141.19 feet to the East line of the West half of original Lot 12 of said Block 139; thence N 0° 35' 54" W along said East line of the West half Lot 12 and along West line of vacated Lawler Street, 212.80 feet to the North right of way line of said Lawler Street; thence S89° 38' 46" W along said North right of way 14.17 feet; thence N00° 35' 54" W, 120.00 feet to the South right of way of the Chicago, Milwaukee & St. Paul railroad; thence N89° 38' 46" E along said railroad, 600.00 feet to the West right of way of vacated "D" Street; thence, continuing along said railroad, N78° 19' 09" E, 67.25 feet to the Northwest corner of Lot 41, of said Block 138; thence N89° 25' 24" E, continuing along said railroad also being along the North line of said Lots 41 and 4, 331.34 feet to the point of beginning.

**Parcel 3/RR Parcel:**

Parcel I: That part of Lots 1, 7 and 8, lying north of the Illinois Central Railroad, in Detwiler's Subdivision of Lots 6, 7 and 8 in Block 150 of Lane's Addition to the City of St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, together with all of Lots 10, 11 and 12 of Detwiler's Subdivision of Lots 6, 7 and 8 in Block 150 of Lane's Addition to the City of St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, more particularly described as follows:

Beginning at the Northwesterly corner of said Lot 12; Thence along the Northerly line of said Lot 12 S56°37'29"E 123.23' to the Westerly right-of-way of N. Grand Street, also being the Northeasterly corner of said Lot 12; thence along the Westerly right-of-way of N. Grand Street S00°14'20"E 67.88' to the Northerly right-of-way of the Illinois Central Railroad; thence Northwesterly along a 842.41' radius curve concave Northeasterly 169.23', said curve having a long chord of N74°35'34"W 168.94' to the Easterly right-of-way of N. Main Street; thence along the Easterly right-of-way of N. Main Street N33°19'12"E 108.64' to the Point of Beginning.

**Parcel 4:**

All of Lot Nine (9) in Block One Hundred Fifty (150), Lane's Addition to St. Charles, now a part of the incorporated City of Charles City, Floyd County, Iowa EXCEPT that part of said lot described as follows:

Start at the intersection of the West line of Grand Avenue and the South line of Lawler Street produced; thence South along the West line of Grand Avenue 66 feet to a point; thence Northwesterly on a straight line Fifty-one and Five tenths (51.5) feet to a point in the East line of Main Street; thence Northeasterly along said East line of Main Street 31 feet to a point in the South line of said Lawler Street produced; thence East along said South line of Lawler Street produced Fifteen and Seventy-five one hundredths (15.75) feet to the place of beginning; containing Sixteen Hundred Thirty-eight and one half (1,638 ½) square feet more or less BUT RETAINING THEREFROM: A part of Lot 9, Block 150, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Iowa, described as follows: commencing at the intersection of the West line of Grand Avenue and the South line of Lawler Street produced, and thence South along the West line of Grand Avenue 44 feet to a point, thence Northwesterly on a straight line 43 feet to a point in the Southeasterly line of Main Street, thence Northeasterly along said line of Main Street 14 feet to a point in the South line of Lawler Street produced, thence East along said South line of Lawler Street produced 15.75 feet to the place of beginning.

**Parcel 5:**

That part of Lot Nine (9) in Block One Hundred Fifty (150), Lane's Addition to St. Charles, now a part of the incorporated City of Charles City, Floyd County, Iowa, described as follows:

Start at the intersection of the West line of Grand Avenue and the South line of Lawler Street produced; thence South along the West line of Grand Avenue 66 feet to a point; thence Northwesterly on a straight line Fifty-one and Five tenths (51.5) feet to a point in the East line of Main Street; thence Northeasterly along said East line of Main Street 31 feet to a point in the South line of said Lawler Street produced; thence East along said South line of Lawler Street produced Fifteen and Seventy-five one hundredths (15.75) feet to the place of beginning; EXCEPTING THEREFROM: A part of Lot 9, Block 150, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Iowa, described as follows: commencing at the intersection of the West line of Grand Avenue and the South line of Lawler Street produced, and thence South along the West line of Grand Avenue 44 feet to a point, thence Northwesterly on a straight line 43 feet to a point in the Southeasterly line of Main Street, thence Northeasterly along said line of Main Street 14 feet to a point in the South line of Lawler Street produced, thence East along said South line of Lawler Street produced 15.75 feet to the place of beginning.

**Parcel 6:**

That portion of Main Street lying between Block 149 and Block 150 Lane's Addition to Charles City, Iowa, lying north of the northerly right-of-way of the Canadian National Railway (vacated pursuant to Ordinance No. 1161 as evidenced by Certificate recorded as Document No. 2023-0230).

# EXHIBIT B

## Permitted Encumbrances

1.    This item has been intentionally deleted.

2.    This item has been intentionally deleted.

3.    This item has been intentionally deleted.

4.    This item has been intentionally deleted.

5.    This item has been intentionally deleted.

6.    This item has been intentionally deleted.

7.    This item has been intentionally deleted.

8.    Real estate taxes and assessment installments, general and special, for fiscal year 2022-2023 payable in the year 2023-2024, a lien not yet due and payable, and subsequent years.

9.    This item has been intentionally deleted.

10.   Rights reserved by the Illinois Central Railroad Company, an Illinois corporation, in Quit Claim Deed dated May 23, 1972, recorded August 17, 1972, in Book 71, Page 142-4. (Parcel 1)

11.   This item has been intentionally deleted.

12.   Easement for utility purposes, together with the rights incidental thereto, in as reserved by the City of Charles City in Ordinance No. 1055, an Ordinance vacating a portion of Floyd Street, recorded June 7, 2011, as Instrument No. 2011-1274. (Parcel 1)

13.   Plat of Survey, filed October 10, 2006, as Instrument No. 2006-2579. (Parcel 1)

14.   Rights of the Public, State of Iowa, and County of Floyd, in and to that portion of the land taken or used for road purposes, whether by easement or fee title. (Parcel 1)

15.   Rights of way for railroads, switch tracks or spur tracks, if any, and right of the railroad company to the use, operation, maintenance and repair of same.

16.   Reservation of mineral rights and easements as contained in Deed dated August 10, 1972, recorded September 27, 1972, in Book 98 LD, Page 393. (Parcel 2-Parcels A and B)

17.   Terms and conditions of the Memorandum of Easement dated March 20, 2007, recorded April 18, 2007, as Document No. 2007-0879. (Parcel 2-Parcel B)

18.   Certificate of No Further Action regarding underground storage tank dated May 2, 2011, recorded May 13, 2011, as Document No. 2011-1075. (Parcel 2-Parcels A and B)

76987677v4

19.    Certificate of No Further Action regarding underground storage tank dated May 2, 2011, recorded May 2, 2011, as Document No. 2011-1076. (Parcel 2-Parcels A and B)

20.    Certificate of No Further Action regarding underground storage tank dated May 2, 2011, recorded May 13, 2011, as Document No. 2011-1077. (Parcel 2-Parcels A and B)

21.    Certificate of No Further Action regarding underground storage tank dated September 19, 2011, recorded September 22, 2011, as Document No. 2011-2066. (Parcel 2-Parcels A and B)

22.    Certificate of No Further Action regarding underground storage tank dated September 13, 2011, recorded September 22, 2011, as Document No. 2011-2032. (Parcel 2-Parcels A and B)

23.    Certificate of No Further Action regarding underground storage tank dated September 13, 2011, recorded September 22, 2011, as Document No. 2011-2033. (Parcel 2-Parcels A and B)

24.    Certificate of No Further Action regarding underground storage tank dated September 13, 2011, recorded September 22, 2011, as Document No. 2011-2034. (Parcel 2-Parcels A and B)

25.    Certificate of No Further Action regarding underground storage tank dated February 9, 2015, recorded February 18, 2015, as Document No. 2015-0370. (Parcel 2-Parcels A and B)

26.    Terms and conditions of Resolution No. 05-16 Granting Special Use dated January 18, 2018, recorded January 22, 2018, as Document No. 2018-0153. (Parcel 2-Parcel B)

27.    Plat of Survey, filed March 25, 2022, as Instrument No. 2022-0633. (Parcel 1)

28.    Easements in favor of the City of Charles City, Iowa, as contained in Easement dated June 16, 1949, recorded July 19, 1949, in Book M Misc., Page 223; as affected by the Affidavit recorded as Instrument No. 2023 0112. (Parcel 4)

29.    Easements in favor of the City of Charles City, Iowa, as contained in Easement dated June 16, 1949, recorded July 19, 1949, in Book M Misc., Page 224. (Parcel 5)

30.    Plat of Survey, filed November 30, 2022, as Instrument No. 2022-2612. (Parcel 3) As affected by Surveyor's Affidavit of Correction dated December 15, 2022, recorded December 19, 2022, as Instrument No. 2022-2712.

31.    Reservations and conditions as contained in Quit Claim Deed dated November 28, 2022, recorded November 30, 2022, as Instrument No. 2022-2613; and as contained in Corrective Quit Claim Deed dated December 16, 2022, recorded December 27, 2022, as Instrument No. 2022-2756.

32.    This item has been intentionally deleted.

33.    This item has been intentionally deleted.

34.    This item has been intentionally deleted.

35. Lease Agreement with Option to Purchase dated November 10, 2022, and the terms and conditions contained therein, by and between the City of Charles City, Iowa, landlord, and Pure Prairie Farms, Inc., tenant, as evidenced by the Certificate recorded February 8, 2023, as Document No. 2023-0230. (Parcel 6)

36. No insurance is afforded as to the engineering calculations in computing the exact amount of acreage or square footage contained in the insured property.

37. Interest of Iowa Terminal Railroad Co. as referenced in the Special Warranty Deed recorded in Book 93 LD, Page 6.(Parcel 5)

38. Survey prepared by Sayre Associates, dated January 1, 2023, last revised March 28, 2023, under Project #22932, shows the following:

   a. Encroachment of building into parcel of real estate northerly adjacent to Parcel 1;
   b. Encroachment over the parcel northerly adjacent to Parcel 1 for access purposes to North Main Street without benefit of an easement;
   c. Building on Parcel 1 encroaches into the easement recorded as instrument 2011-1274(Exception 12); and
   d. Encroachment of concrete pad into parcel of real estate northerly adjacent to Parcel 1.
   e. Encroachment of overhead wire over Parcel 2 without benefit of an easement.
   f. Encroachment of fence along the southerly boundary line of Parcel 2 without benefit of an easement.

   g. Underground Vault is located in the easterly portion of Parcel 1.
   h. Building and HVAC Equipment encroaches into the setback areas on Parcel 1.
   i. railroad tracks encroach into the southerly portion of Parcel B of Parcel 2.

39. Terms, conditions and easements as set forth in the Letter of Undertaking dated _____, by and between Pure Prairie Poultry, Inc., formerly known as Pure Prairie Farms, Inc., and the City of Charles City, Iowa (Parcels 4, 5 and 6).

40. Liens in favor of Community Bank & Trust - West Georgia, a banking corporation organized under the laws of the State of Georgia (together with its successors and/or assigns).

76987677v4

# EXHIBIT F

# APPRAISAL REPORT

### Pure Prairie Farms, Inc.
901 North Main Street
Charles City, IA 50616
Floyd County

<u>Prepared for</u>
Lori Adkins
Greater Commercial Lending
481 Eagle Station Lane
Carson City, NV 89701

<u>Prepared by</u>
Jodi M. Pries, MAI
AgVisory LLC
P.O. Box 177
Nassau, DE 19969



Effective Date | September 21, 2022          Report Date | January 14, 2023





**Jodi Pries, MAI**
AgVisory LLC
P.O. Box 177 ● Nassau, DE 19969
Phone:  302.270.5165
info@agvisory.com

January 14, 2023

Ms. Lori Adkins
Greater Commercial Lending
481 Eagle Station Lane
Carson City, NV 89701

RE:  Pure Prairie Farms – Poultry Processing Facility on 13.434 Acre Site

Dear Ms. Adkins:

As agreed, I have completed an appraisal report of the poultry processing facility located at 901 North Main Street in Charles City, Iowa in Floyd County, as outlined in the engagement letter and described in the Property Identification section of this report. The purpose of this appraisal is to estimate the current 'as is' market value and the prospective 'as proposed/as complete' market value. In addition, this assignment includes the current 'as is' fair market value – installed, the prospective 'as proposed' fair market value – installed of certain machinery and equipment, and the fair market value of certain rolling stock.

The intended use of the appraisal is to aid in a lending decision. The intended user of the appraisal is Greater Nevada Credit Union and the USDA.

The following report has been prepared in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP) as set forth by the Appraisal Foundation, FIRREA legislations, the Code of Ethics of the Appraisal Institute (AI), and the Code of Ethics and Standards of Practice of the American Society of Farm Managers and Rural Appraisers (ASFMRA). It complies with the reporting requirements set forth under Standards Rule 2-2(a) of USPAP for appraisal reports. Taking that into consideration, the report references summary discussions of the data and analyses that were utilized in order to formulate an opinion of value for the subject property. Supporting documentation of the data and analyses not included directly in the report can be found in the work file. The depth of discussion contained in this report is specific to the intended use of the report and the needs of the client.

This report, in part or in whole, shall not be used for any purpose or by anyone except the client and intended users without my prior written consent. I am not responsible for the unauthorized use of this report.

I certify that I have no present or contemplated future interest in the property beyond this estimate of value. Your attention is directed to the Limiting Conditions and Assumptions. Acceptance of this report constitutes an agreement with these terms.

It is also important for the readers of this report to understand that my opinion of value is subject to a series of definitions, assumptions, and/or limiting conditions stated within the attached document, which is incorporated by reference. The subject was inspected on September 21, 2022 which is also the effective date of the 'as is' values. The anticipated completion date for all additions and renovations is October 31, 2023 which is also the effective date of the 'as complete' values.

As a result of the investigation and analysis set forth in this report, it is my opinion, based on the assumptions and limiting conditions referenced herein, that the prospective 'as proposed/as complete' market values for the subject property, as of October 31, 2023, are:

| Pure Prairie Farms - As Proposed/As Complete | |
|---|---|
| Market Value Real Estate | $ 16,800,000 |
| FMV - Installed M&E | $ 26,640,000 |
| FMV - Rolling Stock | $ 4,190,000 |
| **Total Market Value** | **$ 47,630,000** |

As a result of the investigation and analysis set forth in this report, it is my opinion, based on the assumptions and limiting conditions referenced herein, that the current 'as is' market values for the subject property, as of September 21, 2022, are:

| Pure Prairie Farms - As Is | |
|---|---|
| Market Value Real Estate | $ 5,500,000 |
| FMV - Installed M&E | $ 11,130,000 |
| FMV - Rolling Stock | $ 2,070,000 |
| **Total Market Value** | **$ 18,700,000** |

The supporting data, analysis, and conclusions upon which this valuation is based are contained in the accompanying appraisal report and in the work file. **THIS LETTER MUST REMAIN ATTACHED TO THE REPORT IN ORDER FOR THE VALUE OPINION SET FORTH TO BE CONSIDERED VALID.** Thank you for using AgVisory LLC for your appraisal needs.

Respectfully Submitted,

*Jodi M Pries*

Jodi M Pries, MAI
Certified General Appraiser
IA Temporary License #22-094

## TABLE OF CONTENTS

| | |
|---|---|
| SUMMARY OF SALIENT FACTS | 5 |
| PROPERTY IDENTIFICATION | 6 |
| LEGAL DESCRIPTION | 6 |
| PRIOR SERVICES | 11 |
| CLIENT-INTENDED USER/USE-EFFECTIVE DATE-PURPOSE | 11 |
| PROPERTY RIGHTS APPRAISED | 12 |
| SCOPE OF WORK | 12 |
| ASSUMPTIONS AND LIMITING CONDITIONS | 13 |
| HYPOTHETICAL CONDITIONS | 15 |
| EXTRAORDINARY ASSUMPTIONS | 15 |
| OTHER DISCLOSURES | 16 |
| MARKET AREA DESCRIPTION | 21 |
| MEAT & POULTRY INDUSTRY ANALYSIS | 23 |
| OWNERSHIP AND PROPERTY HISTORY | 27 |
| ACCESS | 28 |
| SUBJECT MAPS | 30 |
| FLOOD HAZARD | 30 |
| PRESENT LAND USE | 31 |
| PHYSICAL PROPERTY DESCRIPTION | 31 |
| ZONING AND LAND USE | 33 |
| TAX AND ASSESSMENT INFORMATION | 34 |
| EXCEPTIONS, EASEMENTS, AND ENCUMBRANCES | 34 |
| SITE IMPROVEMENTS AND UTILITIES | 34 |
| IMPROVEMENTS DESCRIPTION | 35 |
| SUBJECT PHOTOGRAPHS | 43 |
| MARKETABILITY | 48 |
| RENTABILITY | 48 |
| EXPOSURE TIME AND MARKETING TIME | 48 |
| HIGHEST AND BEST USE | 48 |
| VALUATION METHODOLOGY | 52 |
| COST APPROACH – AS PROPOSED/AS COMPLETE | 55 |
| LAND VALUATION | 55 |
| SALES COMPARISON APPROACH – AS PROPOSED/AS COMPLETE | 70 |
| FINAL RECONCILIATION – AS PROPOSED/AS COMPLETE | 83 |
| MACHINERY & EQUIPMENT VALUATION – AS PROPOSED | 85 |
| INCOME APPROACH – AS PROPOSED/AS COMPLETE | 91 |
| TEST OF REASONABLENESS | 91 |
| COST APPROACH – AS IS | 99 |
| LAND VALUATION | 99 |
| SALES COMPARISON APPROACH – AS IS | 106 |
| FINAL RECONCILIATION – AS IS | 119 |
| MACHINERY & EQUIPMENT VALUATION – AS IS | 121 |
| APPRAISER CERTIFICATION | 126 |
| STATEMENT OF QUALIFICATIONS | III |

## SUMMARY OF SALIENT FACTS

| | |
|---|---|
| **Client:** | Greater Commercial Lending |
| **Intended Users:** | The intended user of the appraisal is Greater Nevada Credit Union and the USDA. |
| **Intended Use:** | The intended use of the appraisal is to aid in a lending decision. |
| **Interest Appraised:** | Fee simple – *Real Estate Only* |
| **Value Opinion:** | Current 'As Is' Market Value Prospective 'As Proposed/As Complete' Market Value |
| **Property Name:** | Pure Prairie Farms |
| **Property Location:** | 901 North Main Street Charles City, IA 50616 |
| **Owner of Record:** | Pure Prairie Farms, Inc. |
| **County Assessor's Parcel ID:** | 11-01-428-005-00, 12-06-301-007-00, p/o 11-01-429-002-00, & 11-01-429-001-00 |
| **Estimated Acreage:** | 13.434 acres |
| **Zoning:** | M-1 & M-2, Light & General Manufacturing |
| **Flood Zone Designation:** | Zone X – outside the 500-year plain |
| **Concluded Highest and Best Use:** | Poultry Processing Facility |
| **Effective Date 'As Is':** | September 21, 2022 |
| **Effective Date 'As Proposed':** | October 31, 2023 |
| **Date of Report:** | January 14, 2023 |

**Prospective 'As Proposed/As Complete' Market Value**

| | |
|---|---|
| **Cost Approach:** | $16,845,000 |
| **Sales Comparison Approach:** | $16,800,000 |
| **Income Approach:** | Test of Reasonableness |
| **Reconciled Market Value:** | $16,800,000 |
| **FMV – Installed M&E:** | $26,640,000 |
| **FMV Rolling Stock:** | $4,190,000 |

<u>Current 'As Is' Market Value</u>

|  |  |
|---|---|
| **Cost Approach:** | $5,800,000 |
| **Sales Comparison Approach:** | $5,320,000 |
| **Income Approach:** | Considered, but not developed |
| **Reconciled Market Value:** | $5,500,000 |
| **FMV – Installed M&E:** | $11,130,000 |
| **FMV Rolling Stock:** | $2,070,000 |

## PROPERTY IDENTIFICATION

Subject is located in Floyd County, IA. The address is 901 North Main Street, Charles City, IA 50616. It can be further identified as Floyd County tax parcels # 11-01-428-005-00, 12-06-301-007-00, part of 11-01-429-002-00, and 11-01-429-001-00. The global positioning coordinates (GPS) are 43.073620, -92.673245.

## LEGAL DESCRIPTION

**Parcel 11-01-428-005-00** survey was recorded on March 25, 2022, by Floyd County, Iowa's County Recorder as Book 2022 Page 0633. A copy of the survey is on the next page and the following is the written legal description:

**Parcel J** in the NE1/4 of the SE1/4 of Section 1, Township 95 North, Range 16 West of the 5th P.M., City of Charles City, Floyd County, Iowa, more particularly described as follows:

Beginning at the Northeasterly corner of the SI/2 of vacated Floyd Street and the Westerly right-of-way of Main Street;

Thence along the Westerly right-of-way of Main Street S33°19'12" 310.49' to the Northerly right-of-way of the Illinois Central Railroad; thence Northwesterly along a 794.02' radius curve concave Northeasterly 265.10', said curve having a long chord of North 54°24'32"W 263.87'; thence S33°02'52"W 62.86' to the Northerly right-of-way of Lane Street; thence along the Northerly right-of-way of Lane Street N56°41'33" 65.99'; thence N33°15'11"E 76.62' to the Northerly right-of-way of the Illinois Central Railroad; thence Northwesterly along a 794.02' radius curve concave Northeasterly 25.90', said curve having a long chord of North 39°01'52"W 25.090'; thence continuing along said Northerly railroad right-of-way N38°13'50"W 246.82' to the South right-of-way of the Iowa Chicago and Eastern Railroad; thence continuing along the South right-of-way of the Iowa Chicago and Eastern Railroad N89°45'41"E 357.45' to the centerline of vacated Floyd Street; thence along the centerline of vacated Floyd Street S56°37'29"E 290.39' to the Point of Beginning containing 139,242 SF + and 3.197 Acres ±, subject to any easements of record.



**Parcel 12-06-301-007-00** was surveyed on December 17, 2021, by James Cordell. The tax parcel is composed of two noncontiguous tracts named 'Parcel A' and 'Parcel B' on the survey. A copy of the survey is shown on the following page and below is the written legal description.

Real property in the City of Charles City, County of Floyd, State of Iowa, described as follows:

Parcel "A": Lots 1 and 2, Subdivision of Lot 11, Block 139, Lane's Addition to St. Charles,

now incorporated in and a part of Charles City, Floyd County, Iowa.

Parcel "B": A part of Blocks 138 and 139, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa, being more particularly described as follows: Beginning at the Northeast corner of Lot 4, of said Block 138, thence S00° 29' 23" E along the Westerly right of way of "E" Street to a point 36 foot distant from the centerline of the Illinois Central railroad track, 451.10 feet; thence S89° 26' 59" W along a line 36 foot distant and parallel to the said centerline of railroad track 330.49 feet to the Easterly right of -way of "D" Street; thence N88° 48' 52" W, 66.03 feet to the Westerly right of way of said "ID" Street and 38 foot distant from said centerline of railroad track; thence N77° 15' 01" W, 456.98 feet to a point on the North line of Lot 13, of said Block 139 (also being the North line of Lot 7, Cheney's Sub-division); thence S89° 27' 58" W along said North line of Lot 13 (also being along the North line of Lots 7, 8 and 9 of said Cheney's sub-division), 141.19 feet to the East line of the West half of original Lot 12 of said Block 139; thence N00 35' 54" W along said East line of the West half Lot 12 and along West line of vacated Lawler Street, 212.80 feet to the North right of way line of said Lawler Street; thence S89° 38' 46" W along said North right of way 14.17 feet; thence N00° 35' 54" W, 120.00 feet to the South right of way of the Chicago, Milwaukee & St. Paul railroad; thence N89° 38' 46" E along said railroad, 600.00 feet to the West right of way of vacated "D" Street; thence, continuing along said railroad, N78° 19' 09" E, 67.25 feet to the Northwest corner of Lot 41, of said Block 138; thence N89° 25' 24" E, continuing along said railroad also being along the North line of said Lots 41 and 4, 331.34 feet to the point of beginning.

The property described herein is the same property described in First American Title Insurance Company commitment number NCS-1015327-1-MPLS bearing an effective date of November 29, 2021 and all easements, covenants and restrictions referenced in said title commitment or apparent from a physical inspection of the site or otherwise known to me have been plotted hereon or otherwise noted as to their effect on the subject property.



**Parcel 11-01-429-002-00** was surveyed on November 28, 2022, by James H. Cordell. There are two noncontiguous parcels split by the railroad tracks. Only the northern

parcel labeled as 'Parcel I' is included in this appraisal. Below is the written legal description and the survey.

PARCEL I

That part of Lots 1, 7 and 8, lying north of the Illinois Central Railroad, in Block 150 of Lane's Addition to the City of St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, together with all of Lots 10, 11 and 12 in Block 150 of Lane's Addition to the City of St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, more particularly described as follows:

Beginning at the Northwesterly corner of said Lot 12; Thence along the Northerly line of said Lot 12 S56°37'29"E 123.23' to the Westerly right-of-way of N. Grand Street, also being the Northeasterly corner of said Lot 12; thence along the Westerly right-of-way of N. Grand Street S00°14'20"E 67.88' to the Northerly right-of-way of the Illinois Central Railroad; thence Northwesterly along a 842.41' radius curve concave Northeasterly 169.23', said curve having a long chord of N74°35'34"W 168.94' to the Easterly right-of-way of N. Main Street; thence along the Easterly right-of-way of N. Main Street N33°19'12"E 108.64' to the Point of Beginning containing 12,694 SF ± and 0.291 Acres ±, subject to any easements of record.



**Parcel 11-01-429-001-00** was surveyed on June 22, 2022, by James H. Cordell. Below is the written legal description and the survey.

All of Lot 9 in Block 150, Lane's Addition to St. Charles, now a part of incorporated City of Charles City, Floyd County, Iowa, more particularly described as follows:
Beginning at the Northeasterly corner of said Lot 9; Thence along the Westerly right-of-way of N. Grand Street S00°14'20"E 158.30' to the Southeasterly corner of said Lot 9; thence along the Southerly line of said Lot 9 N56°37'29"W 123.23' to the Easterly right-of-way of N. Main Street and the Southwesterly corner of said Lot 9; thence along the Easterly right-of-way of N. Main Street N33°19'12" 131.85' to the Northwesterly corner of said Lot 9; thence along the Northerly line of said Lot 9 S56°36'10"E 35.72' to the Point of Beginning containing 10,478 SF ± and 0.240 Acres ±, subject to any easements of record.



For the purpose of this report, the subject property is identified as detailed in the Property Identification section above, and as depicted on the Floyd County Tax Map incorporated in this report. The client is advised to contact an expert if concerns are identified. Copies of the deeds and surveys are appended to the addendum section of this report.

## PRIOR SERVICES

The appraiser has performed the following services regarding the subject within the three-year period immediately preceding acceptance of this assignment:

- The appraiser appraised the subject facility for another client with an effective date of November 17, 2020, and report date of December 28,2020.
- The appraiser appraised the subject facility for another client with an effective date of May 1, 2020, and report date of May 4, 2020.

## CLIENT-INTENDED USER/USE-EFFECTIVE DATE-PURPOSE

- **Client** – This appraisal was made at the request of Lori Adkins on behalf of the client, Greater Commercial Lending.

- **Intended users** – The intended user of the appraisal is Greater Nevada Credit Union and the USDA.

- **Intended use** – The intended use of the appraisal is to aid in a lending decision.

- **Effective date** – The effective date for the current 'as is' value in this report is September 21, 2022. The effective date for the prospective 'as proposed/as complete' value in this report is October 31, 2023.

- **Purpose** – The purpose of this appraisal is to estimate the current 'as is' market value and the prospective 'as proposed/as complete' market value. In addition, this assignment includes the current 'as is' fair market value – installed, the prospective 'as proposed' fair market value – installed of certain machinery and equipment, and the fair market value of certain rolling stock.

- **Market Value** – The most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

  - Buyer and seller are typically motivated;
  - Both parties are well informed or well advised, and acting in what they consider their best interests;
  - A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

(12 C.F.R. Part 34.42(g); 55 *Federal Register* 34696, August 24, 1990, as amended at 57 *Federal Register* 12202, April 9, 1992; 59 *Federal Register* 29499, June 7, 1994)

## PROPERTY RIGHTS APPRAISED

This appraisal considers the property to include all rights lawfully held under fee simple estate exclusive of any encumbrances, liens, or restrictions on ownership. For the purpose of this report fee simple estate is defined as follows:

**Fee Simple Estate** *is absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.*[1]

The assumption is made that mineral rights are included in the fee simple estate; however, they are beyond the scope of this assignment and not included in this report. ***The fee simple estate applies to the real estate only.***

## SCOPE OF WORK

I have considered this assignment and developed a scope of work necessary to produce credible opinions and conclusions based on the subject property and its defined market characteristics, outside influences, and needs of the client. I have concluded that this scope of work does conclude with credible results and is what would be expected by the intended user. In addition, the scope of work is considered similar to what other appraisers would complete for a similar assignment. If not identified elsewhere in the report, the following disclosure is provided to ensure that the intended user will understand the scope of work performed.

The subject property was physically inspected on September 21, 2022 by Jodi M. Pries. Brian Roelofs and Hunter Ortmayer were also present during the inspection.

The focus of this assignment is on the real estate, the trade fixtures, and machinery and equipment. No value was considered nor allocated to the business enterprise value and/or intangible assets, etc.

During the inspection, the following assessments were made:

- An interior and exterior inspection was completed.

---

[1] Appraisal Institute (2014) Appraisal of Real Estate, page 78

- Physical access to the subject property was verified.
- The plat map, topography map, and aerial photograph were reviewed in order to identify general property boundaries.

Research that was conducted and considered includes:

- Site analysis established by a combination of survey, aerial photograph analysis, and discussions with the owner.
- County and city demographic, economic, and market information.
- Land use regulations (zoning, etc.).
- Soil information obtained from National Resources Conservation Service (NRCS) soil surveys.
- Prior history of the subject property.
- Comparable sales information obtained through County Records, Multiple Listing Services, Realtors, and other appraisers.
- Discussions with market participants regarding the current economic conditions of the food processing market and agricultural markets including, but not limited to, property owners, managers, appraisers, real estate agents, and lenders familiar with the industry.
- Discussions with experts in the poultry industry. Research of transactions of similar properties.

Available resources were examined in order to identify current market trends, influences, and other significant factors pertinent to the subject property. Given this information, a highest and best use analysis was completed. All sales used were viewed and analyzed by the appraiser and/or appraiser assistant. A detailed review of the collected data was then completed, with the most relevant factors extracted and applied in comparison to the subject, resulting in a final market value conclusion.

This appraisal is made for the purpose of estimating the market value of the subject property. It has been prepared in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP) as set forth by the Appraisal Foundation, FIRREA legislations, the Code of Ethics of the Appraisal Institute (AI), and the Code of Ethics and Standards of Practice of the American Society of Farm Managers and Rural Appraisers (ASFMRA). The appraisal report format references a concise presentation of the data and analysis. The depth of discussion included in this report is specific to the intended users of the report and the needs of the client.

## ASSUMPTIONS AND LIMITING CONDITIONS

The certification of the appraiser appearing in this appraisal report is subject to the following assumptions and limiting conditions and to other specific and limiting conditions as set forth in the Hypothetical Conditions and Extraordinary Assumptions sections of this report.

1. The appraiser is not qualified to verify or detect the presence of hazardous substances or environmental hazards nor determine the effect, if any, of known or unknown substances present.

2. The valuation of mineral rights is beyond the scope of this appraisal and the experience of this appraiser, and therefore was not included in this report. Should a valuation of mineral rights be required, it is recommended that a person qualified in mineral rights valuation be contacted.

3. This appraisal complies with the reporting requirements set forth under the Uniform Standard of Professional Appraisal Practice. Disclosure of the contents of the appraisal report is governed by the Code of Professional Ethics of the Appraisal Institute and is subject to peer review. Disclosure of the contents of this report is governed by applicable law and/or by the Bylaws and Regulations of the professional appraisal organizations with which the appraiser is affiliated.

4. No part of the appraisal report (nor any copy of it) shall be used for any purpose by any party except the client without the previous written consent of the appraiser. No portion of the appraisal report may be reproduced or used for public relations without the consent and approval of the author.

5. The appraiser will not appear or give testimony in court in connection with this appraisal unless prior arrangements have been made.

6. Information, estimates, and opinions furnished to the appraiser, and contained in the report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility or warranty for accuracy of such items furnished to the appraiser can be assumed by the appraiser.

7. Any allocation of the total value opinion stated in this report between the site and improvements applies only under the stated program of use. The separate values allocated to the site and improvements may not be used in conjunction with any other appraisal and are invalid if so used. Any value opinions provided in the appraisal report apply to the entire property and any proration or division of the total into fractional interests will invalidate the value opinion unless such proration or division of interests has been stated in the report.

8. The appraiser has assumed that the property is under responsible ownership and management, unless otherwise stated.

9. No responsibility is assumed for the legal description or for matters pertaining to legal or title considerations. The appraiser assumes that the title is good and marketable and free and clear of any liens or encumbrances, unless otherwise stated.

10. The appraiser assumed the property complies with all applicable zoning requirements, use regulations, and other restrictions, unless a lack of conformity has been stated, defined, and considered in the appraisal report.

11. Any value opinion, when stated to be contingent upon completion of an improvement, is assumed by the appraiser to have been completed in a professional and competent manner in accordance with the submitted plans and specifications and all applicable laws, building codes and zoning regulations.

12. Illustrative material in the report may show approximate dimensions and/or boundaries and are included only to assist the reader in visualizing the Property. The appraiser has made no survey of the Property. Drawings and/or assessor parcel maps are not represented as engineer's work product, nor are they provided for legal reference.

13. The appraiser assumed the use of the site and improvements is confined within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

14. Water requirements and information provided have been relied on and, unless otherwise stated, it is assumed water and drainage system components, including distribution equipment, subsurface piping, or equipment essential for water distribution, recovery, or drainage are real estate fixtures, and secured with title to the real estate. The certification of the Appraiser appearing in the Appraisal Report is subject to the following assumptions and limiting conditions.

15. Acceptance of the report by the client constitutes acceptance of all assumptions and limiting conditions contained in the report.

## HYPOTHETICAL CONDITIONS

*A hypothetical condition is an assumption made contrary to fact, but which is assumed for purposes of discussion, analysis, or the formulation of opinions.*

There are no hypothetical conditions for this appraisal.

## EXTRAORDINARY ASSUMPTIONS

*An extraordinary assumption is an assumption, which if found to be false, could alter the resulting opinion or conclusion.*

It is also noted that the use of extraordinary assumptions may affect value. In connection with developing this appraisal report of the subject, the following Extraordinary Assumptions were made:

- It is assumed that this property has no known easement, mineral right, and/or water right issues that would affect the final conclusion of value rendered in this assignment.
- It is assumed that all of the buildings and structures are in the boundaries of the subject property.

- It is assumed that all approvals, permits, and licenses are in place or will be obtained and that all regulations and laws are in compliance for the proper operation of the subject property.
- It is assumed that all facilities will be structurally sound and in good working order for the proper operation of the subject property.
- It is assumed that no systems were damaged during decommissioning and can easily be placed back in service.
- It is assumed that the boundaries and estimated land size and tract size from information provided by the owners is correct. The surveys, owner's records, and assessment information were used to estimate the size of the site area. Should future surveys prove this information inaccurate, it is noted that this may affect the value conclusions reported in this assignment.
- It is assumed that the lease for a portion of North Main Street from the City of Charles City will remain in place. For details of the lease refer to the Ownership and Property History section of this report.
- It is assumed that there are no environmental hazards that will adversely impact the value of the subject.
- It is assumed that construction contracts, equipment lists, cost estimates and financial models provided by the client and property owner are accurate and reflective of proposed operations.

It is noted that the subject property is currently utilized as a food processing facility with wastewater treatment. During the normal course of operation, it is assumed a number of potentially hazardous substances, such as CIP chemicals, fuel, lubricants, etc. could be used on the property. No warranty as to the environmental condition of the property is made in this report. It is suggested that an environmental engineering firm be retained to conduct a detailed Environmental Audit Study, should further information be desired. This report is under the extraordinary assumption the property is free and clear of any adverse environmental conditions.

## OTHER DISCLOSURES

- The valuation of mineral rights is beyond the scope of this appraisal and the experience of this appraiser, and therefore was not included in this report. Should a valuation of mineral rights be required, it is recommended that a person qualified in mineral rights valuation be contacted.

- The appraiser is not an expert on detection of hazardous materials. There were several above ground tanks. No below ground tanks were reported or observed with the exception of septic tanks. The user is encouraged to contact a person specializing in the detection of hazardous materials if concerns are identified.

# AREA AND NEIGHBORHOOD ANALYSES



**AREA MAP**



**LOCATION MAP**



**AERIAL EXHIBIT**

## MARKET AREA DESCRIPTION

The subject tract is located in northern Iowa in the western portion of Floyd County in city limits of Charles City. Floyd County has a population of 15,627 according to the 2020 census. Population projections for 2015 show a 2.1 percent decrease from 2010 and population has been declining since 1960. The county seat is Charles City; it is also the largest city in the county with a population of 7,396.

Floyd County shares its borders with seven other counties: to the north is Mitchell County, northeast is Howard, east is Chickasaw, southeast is Bremer, south is Butler, southwest is Wright, and west is Hancock. There are four major roadways in Floyd County; they are U.S. Highway 18 running east to west, U.S. highway 218 running north to south, Iowa Highway 14 running north to south and intersecting both 18 and 281, and Iowa Highway 27 (Avenue of the Saints).

According to the 2020 U.S. Census Bureau data, the total land area for Iowa is 55,839.9 square miles with a population of 3,190,369. Between 2000 and 2010 the state's population grew 4.2%. Floyd County total land area is 500.63 square miles with a 2020 population of 15,627. The land area for Charles City is 6.22 square miles with the 2020 population at 7,396. According to Iowa Data Center there is projected population growth for the state and capital but a decrease in Floyd County and Charles City. This is demonstrated in the chart shown below.

| | 2000 | 2010 | 2020 | 2030 | 2040 |
|---|---|---|---|---|---|
| **State of Iowa** | 2,928,046 | 3,046,869 | 3,172,237 | 3,328,308 | 3,487,942 |
| **Polk** | **375,925** | **434,416** | **484,323** | **536,062** | **588,435** |
| * Des Moines Metro | 481,394 | 569,633 | 678,422 | 805,369 | 934,921 |
| **Cerro Gordo** | **46,351** | **44,405** | **45,532** | **47,200** | **48,917** |
| * Mason City Metro | 54,356 | 51,952 | 49,320 | 46,613 | 42,622 |
| **Floyd** | **16,854** | **16,132** | **15,948** | **15,829** | **15,724** |
| * Charles City | 7,812 | 7,652 | | | |

(Source: Iowa Data Center County population estimates)

The income levels in the county reflect a moderately healthy income base. The median household income in 2020 was $51,768 with a homeownership rate of 73%. The household income distribution is not very spread out with 44% of the population earning $30,000 to $75,000 per year. Approximately12.5% of the population in Floyd County is considered below the poverty line.

Retail sales within the county have increased each of the past 15 years since the rebound of the national and local economies. Retail sales in the county have risen to $215,041 in 2017. Total retail sales per capita in the same year reached $13,629.

Consistent with national trends, unemployment has decreased in Floyd County. The chart below was taken from the Fred Economic Research website, which shows that

from November 2015 to November 2016 unemployment rates in Floyd County dropped 0.1%.

| Unemployment Rates, Not Seasonally Adjusted | | | |
|---|---|---|---|
| Area | Nov. 2015 | Nov. 2016 | Net Change |
| United States | 5 | 4.6 | -0.4 |
| Floyd County, IA | 3.0 | 2.9 | -0.1 |

Fred Economic Research. Updated December 29, 2016.

Most of the Floyd County population is near Charles City. The county does not have any specific areas devoted to the tourism industry. Some of the top attractions and areas of tourism would be the Charles City Art Center, Floyd County Historical Society Museum, and Little Brown Church in the Vale. Floyd County offers 18 county parks, as well as 22 parks managed by local municipalities. The county has a wide array of hiking, boating, bicycling, and camping opportunities. Some of the more popular destinations are along the Cedar River, Shell Rock River, and Rudd Lake. The county is also home to two wildlife management areas and fossil and prairie parks.

There are 2 school districts that serve the county: the Charles City School District and the Rudd-Rockford-Marble Rock community school district. The subject property is located in the Charles City School District. There is one hospital in the county.

There are multiple industries in Floyd County with healthcare & social assistance, retail trade, and manufacturing being the major three. Floyd County is very heavily influenced by agriculture, as is most of Iowa. According to the 2017 Agriculture Census there are a total of 917 farms with a total of 310,757 acres within the county. The average size of a farm is 339 acres with an average value of $306,482 worth of products sold. The county is not a top producer in the state for any agricultural product.

Iowa has a humid continental climate with four seasons; generally hot humid summers and cold winters. Spring and summer bring in, on average, 50 thunderstorms per year. The average annual temperature is 50°F with the average July high at 84.3°F and the average January low at 10.2°F. The Far north of Iowa sees the coldest temperatures while the southeast sees the warmest. The average rainfall in the state is 35.2 inches and the average snowfall per year is 30.5 inches. The mean annual temperature for Floyd County is below 50 degrees with yearly temperatures ranging from the average 8.1°F at the January low to the average 82.4°F in July. The annual precipitation is 35.2 inches of rain and 36.5 inches of snow.

## MEAT & POULTRY INDUSTRY ANALYSIS

The Meat, Beef and Poultry Processing industry involves the slaughtering, processing and packaging of livestock and poultry. Over the five years to 2022, the industry has contended with volatile meat prices resulting from drought, disease and volatile feed prices, in addition to the COVID-19 (coronavirus) pandemic in 2020. Conversely, domestic demand exhibited strong growth during the current period, as per capita disposable income increased in line with the economy in the years leading up to 2022. Moreover, China agreed to import more meat products as part of the phase two trade deal between the U.S. and China in 2020. In 2021, the industry benefited from a broad-based economic recovery and an increase in exports and the same trends are anticipated in 2022. Despite volatility, industry revenue is expected to grow during the current period, increasing an annualized 2.3% to $274.7 billion in 2022, despite an anticipated decline of 1.5% in 2022. Similarly, profit is expected to grow slightly over the five years to 2022, to reach 4.9%.

Meat products represent a significant consumer staple, and demand for industry products is reliant on the overall economy and household income. Demand for meat was positively affected by the growing economy before 2020. In 2020, the coronavirus pandemic led to a reduction in industry capacity due to temporary plant shutdowns and social distancing measures at meat plants, lower demand from restaurants and low export demand. Nonetheless, industry revenue increased 2.3% in 2020. In 2021 the industry continued to grow amid reopening of the domestic market, which drove demand for industry products. Although this trend is anticipated to continue in 2022, industry revenue is anticipated to decline slightly, dropping 1.5% during the year.

Over the five years to 2027, industry revenue is projected to increase further as the global market for industry products grows. While demand from China will likely lessen as the country contains its African Swine Flu outbreak and recovers its pork production self-sufficiency, demand from other export destinations will likely rise as the global coronavirus pandemic subsides and foreign economies recover, contributing to a slight increase in industry revenue. Moreover, domestic meat consumption is expected to remain during the outlook period. Overall, IBISWorld expects industry revenue to increase an annualized 0.4% to $279.7 billion over the next five years.

Poultry processing represents the industry's second-largest product segment. This segment includes the processing of chickens, turkeys, ducks and Cornish game hens into consumable meats and meat byproducts. Young chickens, known as broilers, make up the majority of this segment and their products include bulk, chilled, frozen and whole chickens as well as parts. The poultry processing segment has increased marginally as a share of industry revenue over the past five years, accounting for an estimated 32.6% of industry revenue in 2022. U.S. per capita poultry consumption has seen a secular rise since the 1970s due to increasing awareness of the healthiness of poultry consumption relative to red meat. Over the five years to 2027, perceived

health benefits of white meat and lower relative prices will likely lead this product segment to increase as a share of industry revenue.

## DESCRIPTION OF VERTICALLY INTEGRATED POULTRY

The valuation of poultry processing complexes poses challenges for appraisers because of the special-purpose nature of the facilities. Large auto manufacturing plants, railroad siding properties, and research and development properties are other examples of limited-market properties that typically appeal to relatively few potential purchasers. Poultry processing facilities include structures with unique designs, special construction materials, and layouts that restrict their utility to the use for which they were originally built. Moreover, the complexes contain live production facilities that must be carefully managed to complement production schedules for processing. Live production must also be carefully monitored for biosecurity purposes. Consequently, these properties usually have little or no conversion potential without significant capital improvements, and if sold for an alternate use, may have little or no value in the open market.

A poultry-processing complex (or group of complexes) is most often sold in a single transaction in its continuing use. The transactions include both stock and asset transfers, but the operations are rarely shut down unless some type of obsolescence prevents the complex from operating profitably. This is primarily because the industries are organized under a structure of "vertical integration," where the company owns and controls most of the stages of production. The organization of operation is extremely complex because of the timing of estimating the number of birds for hatching, grow out, and processing to meet customer demand. Market conditions often change quickly during the live production stage, which can produce a mismatch between supply and demand.



In the industry, a processing "complex" is made up of:

- Feed Mill
- Hatchery
- Contract Grow-out (Farmer-owned)
- Processing Plant
- Further Processing

The feed mill is constructed for grain storage as well as feed processing, which is regulated by the FDA. While a feed mill may resemble a grain elevator, its function is very different and is not practical for conversion.

The chicks are hatched at company-owned hatcheries, vaccinated against poultry diseases, and delivered to the grower's farm, where they are raised in large, specialized structures called grow-out houses. The company also delivers feed which the farmer distributes to the flock through a mechanical system.

When the birds reach market age and weight in six or seven weeks, the farmer is paid on the basis of weight gained by the flock, which is influenced by the farmer's skill and good management. The chickens are then delivered in cages to the processing plant by truck. The chickens are slaughtered, dressed and processed for delivery to the consumer. Some companies also include cooked products (par-fry and fully cooked, breaded, and grilled).

# SUBJECT PROPERTY INFORMATION

## OWNERSHIP AND PROPERTY HISTORY

The subject is known as Pure Prairie Farms. The county tax parcel numbers are 11-01-428-005-00, 12-06-301-007-00, part of 11-01-429-002-00 identified as 'Parcel I' on the survey, and 11-01-429-001-00.

Parcels 11-01-428-005-00 and 12-06-301-007-00 and certain personal property were purchased for $9,500,000 on December 14, 2021. The real estate transferred via a court officer deed recorded with Floyd County Recorder of Deeds as Instrument # 2021 3155. The grantor was Simply Essentials, LLC, c/o Larry S. Eide, Chapter 7 Bankruptcy Trustee and the grantee was Pure Prairie Farms, Inc. The subject was sold as part of a bankruptcy proceeding. The allocation to the real estate was $2,500,000 and to the personal property was $7,000,000.

Parcel 11-01-429-002-00 went under contract of sale on May 3, 2022, for $50,000. The seller is Illinois Central Railroad Company. It was amended on June 14, 2022, extending the due diligence period until June 17, 2022. The second amendment was made on July 26, 2022, which extended the due diligence period until September 15, 2022. The transfer was recorded on November 28, 2022 with Floyd County Recorder as Book 2022 Page 2613

Parcel 11-01-429-001-00 is currently titled to City Improvement Association of Charles City. It is under contract of sale for $37,000 to Pure Prairie Farms, Inc. The contract is dated May 18, 2022, which is the acceptance signature of the seller. There is a copy of the contract appended to the addenda section of this report.

To the best of the appraiser's knowledge, the subject property has not been listed or offered for sale on the open market since its purchase in 2021.

### PRIOR TRANSFERS

The prior transaction occurred on March 16, 2016, from Cedar River Poultry, L.L.C. to Simply Essentials, LLC for consideration of $3,209,609 recorded as Deed # 2016 0663 (corrective deed) in Floyd County Land Records. It was listed by Cedar Valley Iowa Realty for $8,000,000 for approximately four months. After purchase, Simply Essentials, LLC completely renovated the facility and added a brand line of Stork-Marel poultry processing equipment. The cost of the renovations and new processing equipment was estimated to be over $40 million.

The subject was transferred on November 13, 2017, as part of an equity purchase agreement between Simply Essentials Holdings, LLC (Seller) and Pitman Farms (Buyer) for consideration of $1,000,000 plus an earnout amount of 80% times EBITDA for the first two fiscal years to be paid to Simply Essentials Holdings, LLC. This transaction includes the real property and personal property.

The subject facility was shuttered in the summer of 2019. CO2 systems were decommissioned, and the main tank removed. Some equipment and rolling stock were purchased by Pitman Farms and moved to California.

There were two competing bankruptcy proceedings in the works for Simply Essentials LLC. One is an involuntary Chapter 7 bankruptcy petition filed against Simply Essentials by claimed creditors in U.S. Bankruptcy Court for the Northern District of Iowa, entered March 6, 2020. The other is a voluntary Chapter 11 case filed by Simply Essentials in U.S. Bankruptcy Court for the Eastern District of California, filed August 10, 2020.

## LEASES

The owners are leasing a portion of North Main Street part of their expansion plans. The city has vacated the right-of-way of the portion of North Main Street between Block 149 and Block 150 Lane's Addition lying north of the northerly right-of-way of the Canadian Railway. It is approximately 17,424 square feet. This is a lease with an option to purchase real estate. The lease term commenced on November 7, 2022 and will terminate three years later on November 7, 2025. Rent is $22,000 per year to be paid in advance. The option to purchase is for $100,000. The rent is applied to the purchase price; therefore, if all rents are paid during the term of the lease then $34,000 will be due.

The leased property lies between Parcel 11-01-428-005-00 and Parcels 11-01-429-002-00 and 11-01-429-001-00. It is noted that the leased land is not included in this appraisal.

## ACCESS

Legal and physical access is provided by frontage along North Main Street and truck access is provided via the closed city street called Floyd Street and also from Lane Street. Interior paved and dirt drives and access points provide onsite access to the plant. The employee parking and live hold shed is accessed via Lawler Street. The overall access to the subject property is average. See map on the following page.



## SUBJECT MAPS



**AERIAL PHOTOGRAPH**

## FLOOD HAZARD

According to Flood Insurance Rate Map panel number 19067C0210E, dated June 19, 2020, the subject is located in Zone X. The majority of the subject appears to be outside the flood zone; however, there is a portion of the subject that is shaded orange. The orange shading represents a 0.2% Annual Chance Flood Hazard, Areas of 1% annual chance flood with average depth less than one foot or with drainage areas of less than one square mile Zone X. The appraiser is not an expert in this matter and is reporting data from FEMA maps. It is recommended that an elevation survey be completed.



**FLOOD HAZARD EXHIBIT**

## PRESENT LAND USE

The subject's 13.434 acres are devoted to site acreage. The acreage allocation is based upon physical inspection, aerial photograph analysis, discussions with the manager, and from site plans provided by owners.

## PHYSICAL PROPERTY DESCRIPTION

The following is a summary of the land's physical characteristics.

- **Shape** – The overall shape of the property is irregular.

- **Bordering Properties** – The subject property is bordered by agribusinesses, commercial properties, and residences. It has frontage on North Main Street, North Grand Avenue, Lane Street, and Lawler Street. It is also bordered by railroad to the north and south.

- **Topography** – Topography of the subject is basically level.

- **Elevations** – The elevation is approximately 1,020+/- feet above sea level.

- **Environmental Issues** – The appraisal was provided was Phase I
  Environmental Site Assessments for all parcels included in this assignment.
  There was also a Phase II for Parcel 11-01-429-001-00. The following
  summarizes the findings of the ESAs.

  o **Simply Essential Plant** – There was a Phase I that includes Parcel 11-
    01-428-005-00, part of 12-06-301-007-00 labeled 'Parcel A' in the
    survey, all of Parcel 11-01-429-002-00, and Parcel 11-01-429-001-00.

    The assessment found a filling station was located on the north end of
    the central portion of the subject property from at least the late-1940s
    to the late-1960s. A 1947 fire insurance map depicted two gas tanks
    associated with the filling station. Bulk petroleum storage tanks
    represent the material threat for a release to the environment.
    Therefore, WCEC considers the former filling station with gas tanks a
    Recognized Environmental Condition.

    Based on our findings, WCEC recommends the completion of a Phase
    II ESA to evaluate for potential soil or groundwater contamination on
    the subject property.

    A copy of the Phase I is retained in the appraiser's workfile.

  o **Dana Park** – There was a Phase II that includes Parcel 11-01-429-001-
    00 known as Dana Park.

    The purpose of the Phase II ESA is to determine the presence or
    absence of contaminant impacts associated with the historical
    underground storage tank system on the subject property.

    WCEC oversaw the completion of two test holes on the subject
    property and the collection of groundwater for field and laboratory
    analysis. Based on field observations and confirmation laboratory
    analysis, no petroleum constituents are present in the subgrade soils or
    groundwater. Therefore, no additional investigation appears warranted
    at this time.

  o **Live Shed Property** – There was a Phase I that includes part of 12-06-
    301-007-00 labeled 'Parcel B' in the survey.

    This assessment identified no Recognized Environmental Conditions
    or Controlled Recognized Environmental Condition in connection
    with the subject property, except for the following:

    Petroleum, heavy metals, and chlorinated solvents were identified on
    the subject property and eastern adjacent property in association with
    the former tractor manufacturing plant. Multiple USTs were also
    formerly located on the subject property and several Leaking
    Underground Storage Tanks were identified during the removal of the
    tanks. The LUSTs and Brownfield sites are identified as closed by the

Iowa Department of Natural Resources, requiring no further investigation or cleanup. However, it should be noted that contamination remains on the subject property. Future excavation and development may encounter impacted soil/groundwater, likely requiring special handling of the materials. Therefore, WCEC considers the LUSTs and Brownfield site a Controlled Recognized Environmental Condition.

## ZONING AND LAND USE

The subject property is entirely zoned M-1 & M-2, Light & General Manufacturing by Charles City.

The M-1, Light Manufacturing District, is intended and designed to provide flexibility in the location of certain manufacturing, industrial, and warehousing uses while maintaining protection for nearby non-industrial districts. The M-1 District is characterized by lots with landscaped grounds, provisions for off-street parking and loading spaces, structures generally one or two stories in height, and enclosed by fence or landscape buffer.

The M-2, General Manufacturing District, is intended and designed to provide areas suitable for activities and uses of a medium and heavy industrial nature. It is intended that no residential development be permitted in the M-2 District.



**ZONING MAP**

## TAX AND ASSESSMENT INFORMATION

Tax information for the subject property was obtained via county records and tax bills provided by the client. The information from Floyd County and Charles City for the 2021-2022 tax year is utilized in this report for informational purposes only. The following is a summary of the tax information.

| Real Estate Assessment and Taxes | | | | |
|---|---|---|---|---|
| Tax ID | Land | Improvements | Total Assessment | Taxes |
| 11-01-428-005-00 | $77,400 | $2,360,830 | $2,438,230 | $82,234 |
| 12-06-301-007-00 | $46,780 | $331,520 | $378,300 | $12,758 |
| 11-01-429-002-00 | $17,270 | $7,150 | $24,420 | $516 |
| 11-01-429-001-00 | $75,640 | $4,260 | $79,900 | $0 |
| Totals | $217,090 | $2,703,760 | $2,920,850 | $95,508 |

These are the actual real estate taxes. The appraiser makes note that the assessed values and taxes appear typical for the market area. Per the client and the county tax collector, the taxes are current. It is noted that after proposed addition is complete, the assessed value and resulting tax liability may increase.

## EXCEPTIONS, EASEMENTS, AND ENCUMBRANCES

There are no known adverse encumbrances or easements. Please reference Limiting Conditions and Assumptions. The title report is appended to the addenda section of this report.

## SITE IMPROVEMENTS AND UTILITIES

The site improvements for the subject include Charles City municipal water and sewer. Electric and natural gas are provided by MidAmerican Energy. Other site improvements include asphalt paved parking areas, curbing, sidewalks, minimal landscaping, drainage, signage, fencing, and yard lighting. The property is bordered on the south side by the Illinois Central Railroad tracks and on the northwest side by Iowa-Chicago and Eastern Railroad tracks; however, the subject does not have rail access. The parking area is minimal in front of the plant. The employees park in a lot across Main Street from the processing building.

## SITE PLAN



## IMPROVEMENTS DESCRIPTION

### 'AS IS' DESCRIPTION

The subject is a poultry processing plant that has the capacity to process 140 birds per minute. The plant building has 82,187 square feet GBA. Approximately two-thirds of the plant is masonry and steel construction, and the remaining one-third is all steel construction. The exterior is concrete block and metal panels. The roof is metal in the steel framed sections of the building and flat roof with steel decking, insulation, and membrane covering in the masonry sections of the building. Interior finishes include concrete floors with floor drains, epoxy covered concrete floors, metal insulated panels on walls, metal panel ceilings, and some exposed ceilings. The mezzanine area is heavy steel frame with steel decking. Office and employee area finishes include painted drywall and tile floors. Ceiling heights vary throughout the facility.

The plant space is broken down into multiple areas: offices, employee locker rooms, employee break rooms, live unload area, controlled atmosphere stunning area, hanging area, harvest area, scalding and picking area, evisceration room, cone line and cut-up room, air chill room, coolers, spiral freezer room, mezzanine area, packaging area, offal area, wastewater treatment area, boiler room, ammonia engine room, and MCC rooms. See the table on the following page for the 'as is' breakdown of the square footage of the plant and the current floor plan.

The building was originally built in 1973. It has been renovated and added-on-to in the mid-1990's and again in 2010 and updated in 2016. The actual age of the building varies from 12 to 50 years old.

| Improvement Summary | | | | | |
| Building | Level 1 | Level 2 | Total | Height (FT) | Perimeter |
|---|---|---|---|---|---|
| **Processing Plant** | | | **82,187** | **36'** | **1,360'** |
| Offices | 2,428 | | | | |
| Mezzanine Offices | | 2,428 | | | |
| Employee Welfare | 5,545 | | | | |
| Mezzanine Employee Welfare | | 1,935 | | | |
| Mezzanine Panel Room | | 753 | | | |
| Loading Dock | 2,747 | | | | |
| Freezer | 2,718 | | | | |
| Engine Room | 2,107 | | | | |
| Maintenance | 439 | | | | |
| Mezzanine Box Room | 3,798 | | | | |
| Packaging Room | 10,767 | | | | |
| Cut Up Room | 9,447 | | | | |
| Evisceration Room | 4,369 | | | | |
| Boiler Room | 1,585 | | | | |
| Water Treatment | 3,876 | | | | |
| Kill Welfare | 498 | | | | |
| Chemicals | 842 | | | | |
| Panel Room | 545 | | | | |
| Kill, Scald, & Pickers | 6,607 | | | | |
| Live Shed & CAS System | 9,717 | | | | |
| Feather Building | 1,457 | | | | |
| Chill Room & Anteroom | | 6,192 | | | |
| North End Chill | | 1,387 | | | |
| **Live Hold Shed** | **6,500** | **-** | **6,500** | **18'** | **330'** |
| **Totals** | **75,992** | **12,695** | **88,687** | | |



In 2016, the owners at the time removed the majority of the existing poultry processing equipment. The equipment that was original included: offal/wastewater treatment equipment, a spiral cooler/freezer, four cone lines, refrigeration equipment, mechanicals (boilers, air compressors), furniture, etc. The plant was then retrofitted to suit their needs and a new line of Stork-Marel equipment was installed including controlled atmosphere stunning, air-chill, cut-up equipment, and packaging equipment. The total cost of the new equipment and renovations to the building in 2016 was approximately $40 million including installation, electrical, plumbing, refrigeration, etc. The facility was sold in 2017. The new owners made some additional modifications to the equipment and swapped out certain items. No major renovations were made. The plant was shuttered in August 2019 and was sold during bankruptcy proceedings. The current owners, Pure Prairie Farms, have begun to clean up the facility and put it into working condition.

In the 'as is' condition, the building has a functional, but dated design and layout. Overall, it is average quality and in fair-to-average condition.

There is also a 6,500 square foot live hold shed that is located off Lawler Street. It is a steel frame building with metal exterior and five bays to hold trailers of live birds. It has a concrete floor and large concrete apron. The building has ventilation fans to circulate air for birds.



## 'AS PROPOSED' DESCRIPTION

The owners have proposed several renovations and additions to the subject processing facility. Pure Prairie Farms' intention was to begin processing birds in November 2022 and continue processing during the renovations with as little down time as possible. All renovations and additions are slated to be complete by October 31, 2023. The renovations and additions include the following:

- New distribution center – 28-degree freezer
- New employee breakroom
- Renovated space for locker rooms and plant entry to improve food security
- Added office space
- Maintenance shop
- Chemical storage room

Pure Prairie Farms is planning to invest approximately $34 million to increase value-added processing capabilities and expand warehousing and distribution space, alongside improving employee welfare space. The table below summarizes the square footage of the facility. In addition to building renovations and additions, the owners will be adding new equipment to optimize the capacity of the plant. The facility will have the capacity to run 140 birds per minute, or 67,200 bird per 8-hour shift. The owners are looking to process birds 5 days per week, or 336,000 birds per week.

| Description | Square Feet | % of Total |
|---|---|---|
| Live Shed and CAS System | 9,717 | 9.20% |
| Cut Up Room | 9,447 | 8.95% |
| Kill, Scald, and Pickers | 6,607 | 6.26% |
| Chill Room and Anteroom | 6,192 | 5.86% |
| Evisceration Room | 4,369 | 4.14% |
| Air Chill Room | 7,485 | 7.09% |
| Box Room | 3,798 | 3.60% |
| Freezer | 2,718 | 2.57% |
| Feather Building | 1,457 | 1.38% |
| North End-Chill Upstairs | 1,387 | 1.31% |
| Chemical Room | 842 | 0.80% |
| Panel Room | 753 | 0.71% |
| Panel Room-Picker Panels | 545 | 0.52% |
| Packout Room | 3266 | 3.09% |
| Welfare | 498 | 0.47% |
| **Production Area Total** | **59,081** | **55.95%** |
| New Distribution Center | 12,958 | 12.27% |
| Product Cooler | 1,975 | 1.87% |
| Dry Storage | 2,155 | 2.04% |
| **Warehousing Total** | **17,088** | **16.18%** |
| Water Treatment | 3,876 | 3.67% |
| Engine Room | 2,107 | 2.00% |
| Boiler Room | 1,585 | 1.50% |
| Maintenance | 1328 | 1.26% |
| **Building Services Total** | **8,896** | **8.42%** |
| Employee Welfare | 13,067 | 12.37% |
| Offices | 7,462 | 7.07% |
| **Welfare Total** | **20,529** | **19.44%** |
| **Plant Total** | **105,594** | **100.00%** |

The owners provided a budget for the renovations and addition to the processing facility. The total costs for the real estate portion of the project are $14,267,902. They are summarized in the table below.

| Pure Prairie Farms - Proposed Construction Budget | | | | | | |
|---|---|---|---|---|---|---|
| 05 | **Other Architectural & Engineering** | | | | $ | 8,500 |
| | 1000 | General Conditions | $ | 8,500 | | |
| 06 | **Inspections** | | | | $ | 35,000 |
| | 1000 | General Conditions | $ | 35,000 | | |
| 08 | **Demolition** | | | | $ | 131,279 |
| | 2000 | Sitework | $ | 131,279 | | |
| 09 | **Construction** | | | | $ | 10,445,812 |
| | 1000 | General Conditions | $ | 949,762 | | |
| | 2000 | Sitework | $ | 576,287 | | |
| | 3000 | Concrete | $ | 921,684 | | |
| | 4000 | Masonry | $ | 105,000 | | |
| | 5000 | Steel | $ | 1,102,317 | | |
| | 6000 | Wide & Plastics | $ | 244,004 | | |
| | 7000 | Thermal-Moisture | $ | 732,735 | | |
| | 8000 | Doors & Windows | $ | 486,797 | | |
| | 9000 | Finishes | $ | 613,363 | | |
| | 10000 | Special Conditions | $ | 34,500 | | |
| | | Other Building Repairs | $ | 486,581 | | |
| | | New Roof | $ | 500,000 | | |
| | 15000 | Mechanical | $ | 2,817,782 | | |
| | 16000 | Electrical | $ | 875,000 | | |
| 13 | **Contingencies** | | | | $ | 2,500,000 |
| | 1000 | General Conditions | | | | |
| | | Price Increases | $ | 515,055 | | |
| | | Contingency | $ | 1,984,945 | | |
| 11 | **Miscellaneous** | | | | $ | 1,147,311 |
| | | | $ | 462,496 | | |
| | Preconstruction Fee | $ | 10,000.00 | | | |
| | Construction Fee | $ | 452,496.00 | | | |
| | | | $ | 684,815 | | |
| | Design Fee | $ | 679,815.00 | | | |
| | Design Reimbursables | $ | 5,000.00 | | | |
| | | **Total Proposed Construction Costs** | | | $ | 14,267,902 |



**First Floor Plan**



**Second Floor Plan**



**Rendering of Proposed Addition**

## SUBJECT PHOTOGRAPHS



Front of Plant | Office Entrance



Front of Plant



South Side of the Plant



South Side of the Plant



Live Hold/CAS Area



Rear of Plant



Live Hold Shed



Interior of Live Hold Shed



Interior of Live Hold Shed



MCC of Live Hold Shed



Rear of Live Hold Shed



Driveway to Live Hold Shed



Current Office – 2ⁿᵈ Floor



2ⁿᵈ Floor Office Area



Cooler



Interior Plant Live Hold/CAS Area



Controlled Atmosphere Stun Area



Controlled Atmosphere Stun Area


Air Compressor


MCC Room


Harvest Area


Harvest Area


Stainless Steel Shackles


Rehang Area



Ammonia Compressors



Air Chill Room



2nd Process & Packaging Area



Existing Cafeteria | Break Room



Boilers



Existing Conference Room

** Other pictures retained in the appraiser's work file

## MARKETABILITY

The subject is located in northeast Iowa and is in close proximity to poultry and other livestock that are processed and/or stored. The facility will be of functional design and layout with adequate ceiling height, office and employee wellness areas, and average-to-good product flow. Due to the large expenditure required to purchase the property, the buyer(s) would have to be financially strong in order to handle the capital outlay required to purchase with cash or service the debt. The typical buyer(s) would be a vertically integrated poultry company looking to expand and/or diversify their product offerings. There has been sales activity in the food processing and poultry processing industry. Therefore, given all of the above attributes and consideration noted the marketability of the subject is considered to be average.

## RENTABILITY

Properties like the subject are typically owner operated. Poultry processing facilities are not typically purchased or developed with the purposes of leasing. Therefore, lease information in the market area is extremely limited. Given the subject's positive attributes, such as its functional design and layout and modern equipment, it would likely not be difficult to lease the subject facility; especially to another poultry integrator in the area, therefore, maximizing profit potential. Given these factors, the subject property is considered to have below average "rentability."

## EXPOSURE TIME AND MARKETING TIME

**Marketing Time (also marketing period)** *is an opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from* **exposure time**, *which is always presumed to precede the effective date of an appraisal.*[2]

Based on the characteristics of the subject property, an appropriate marketing time for the subject property is estimated at nine to eighteen months. Exposure time is also estimated at nine to eighteen months. This is based on the expectation of the property being priced at no more than 10% above the estimate of fee simple market value concluded within this report.

## HIGHEST AND BEST USE[3]

**Highest and best use may be defined as:** *The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value.*[3]

---

[2] The Appraisal of Real Estate, 14th Edition, Appraisal Institute, page 121
[3] The Appraisal of Real Estate, 14th Edition, Appraisal Institute, pages 331 - 358

In the analysis of pertinent data, four criteria are applied in the following order to develop adequate support for the appraiser's highest and best use determination:

1. Legally permissible
2. Physically possible
3. Financially feasible
4. Maximally productive

These criteria are generally considered sequentially; however, the tests of legal permissibility and physical possibility can be applied in either order, but they both must be applied before the tests of financial feasibility and maximum productivity. These four tests are applied to each property both as vacant and as improved.

## HIGHEST AND BEST USE AS THOUGH VACANT

The first step in the highest and best use analysis is to determine what the highest and best use of the subject property would be if the site was vacant land. The **highest and best use of land or a site as though vacant** is defined as follows:

*Among all reasonable, alternative uses, the use that yields the highest present land value, after payments are made for labor, capital, and coordination. The use of a property based on the assumption that the parcel of land is vacant or can be made vacant by demolishing any improvements.[4]*

The highest and best use of the land as though vacant must be considered in relation to its existing use and all potential uses. It builds on the area, neighborhood, and industry analyses and focuses on alternative uses, with the appraiser testing each reasonably probable use for legal permissibility, physical possibility, financial feasibility, and maximum productivity.

The highest and best use of the land as though vacant is concluded after the four criteria have been applied and various alternative uses have been eliminated. The remaining use that fulfills all four criteria is the highest and best use of the land as though vacant. A proper highest and best use conclusion indicates the use, the market participants for the use, and the timing of the use.

## LEGALLY PERMISSIBLE

The subject property is currently zoned M-1 & M-2, Light & General Manufacturing, which allows for an array of industrial uses. All of the uses permitted under zoning appear to be consistent with prevailing land use patterns in the area.

---

[4] The Dictionary of Real Estate Appraisal-5th Edition, 2010, Appraisal Institute, page 93

## PHYSICALLY POSSIBLE

There exist several items that must be considered to analyze the physical capabilities of the site. Such items of significance would include site size, topography, zoning, shape, frontage and depth. The subject, a 13.434 acre property, is basically level and has average access and road frontage. However, it is limited by its location in the city limits of Charles City, its irregular shape and non-contiguous parcels, and by being bordered on two sides by railroad tracks. It could support an array of industrial development that would have functional utility and be permitted by zoning.

## FINANCIALLY FEASIBLE

Financial feasibility may be defined as the capability of a physically possible and legal use of a property to produce a positive return to the land after considering risk and all costs to create and maintain the use. In order to estimate the financial feasibility, the ideal building(s) for the subject site must be considered. This building(s) should conform and be consistent with the uses in the neighborhood and be in sufficient demand so as to provide an adequate net return for the owner or investor. It has been determined that an industrial use structure(s) would be logical as they are physically possible and legally permissible. Based on the analysis of the immediate marketing area of the subject, there is a mix of uses with the majority being industrial uses.

## MAXIMALLY PRODUCTIVE

The subject's physical characteristics, legally permissible uses, and proven financial feasibility are forces that are maximally productive. The highest and best use of the subject property, as if vacant, would be some type of industrial development when demand warrants.

## HIGHEST AND BEST USE AS VACANT CONCLUSION

The current industrial use of the subject conforms to the zoning regulations of Charles City. No potential zoning changes are foreseen based on conversations with the city engineer. The subject's physical characteristics allow for 13.434 acres that are considered suitable for an industrial development which is considered to be maximally productive use. Taking into consideration the previous four tests, the **highest and best use of the subject, as vacant, is as industrial development when demand warrants.**

## HIGHEST AND BEST USE AS IMPROVED/AS PROPOSED

The highest and best use of a property as improved pertains to the use that should be made of an improved property considering existing improvements. The highest and best use of a property as improved may be the continuation of the existing use,

renovation or rehabilitation, expansion, adaptation or conversion to another use, partial or total demolition, or some combination of these alternatives.

## LEGALLY PERMISSIBLE

The subject is zoned M-1 & M-2, Light & General Manufacturing. The proposed use of the subject property as a poultry processing facility will be a legal and conforming use. The use will be consistent with the physical and economic characteristics of the neighborhood where there are a mix of industrial and commercial uses.

## PHYSICALLY POSSIBLE

The property is a 13.434 acre site. The site adequately supports the existing and proposed improvements. The subject is/will be a poultry processing facility. The existing improvements contribute significant value to the subject and the proposed renovations and additions will further contribute significantly more value to the subject. The facility is of functional design and is currently in fair-to-average condition and will be in average-to-good condition after proposed construction is completed.

## FINANCIALLY FEASIBLE

In determining which possible highest and best use of the subject property is financially feasible, the appraiser must consider which potential use is likely to produce an income equal to, or greater than, the amount needed to satisfy operating expenses, financial obligations, and capital amortization of the investment. The subject facility is/will be a poultry processing facility with controlled atmosphere stunning and air chill. The demand for organic and/or air chilled poultry has been on the rise in the United States. The subject facility is/will be financially feasible. The owners have provided projections for the subject which will be discussed in the income analysis – test of reasonableness.

## MAXIMALLY PRODUCTIVE

As mentioned, the subject's size, shape, access, and visibility are conducive to some type of industrial development. The existing improvements are/will be legally permissible per zoning. They are/will be functional and acceptable in the marketplace. Accordingly, it has been determined that the current and proposed use as a poultry processing facility is the maximally productive use of the subject.

The appraiser assumes there are no environmental hazards, that all laws and regulations governing the facility are in full compliance, and it would be sold as a going concern to achieve full value, along with all of the Extraordinary Assumptions and Hypothetical Conditions outlined in this report.

## HIGHEST AND BEST USE AS IMPROVED CONCLUSION

The current/proposed industrial use of the subject conforms to the zoning regulations of Charles City.  No potential zoning changes are foreseen based on conversations with the city engineer.  The subject's physical characteristics allow for a food processing facility. Taking into consideration the previous four tests, the **highest and best use of the subject, as improved/as proposed, is its current use as a poultry processing facility.**

## HIGHEST AND BEST USE CONCLUSION

Based upon the above analysis and the marketability of the subject property, **the concluded highest and best use is a poultry processing facility.**

## VALUATION METHODOLOGY

Three basic approaches may be used to arrive at an estimate of market value. They are:

1. The Cost Approach
2. The Sales Comparison Approach
3. The Income Approach

## COST APPROACH

The Cost Approach is summarized as follows:

> Cost New
> - Depreciation
> <u>+ Land Value</u>
> = Value

## SALES COMPARISON APPROACH

The Sales Comparison Approach compares sales of similar properties with the subject property. Each comparable sale is adjusted for its inferior or superior characteristics. The values derived from the adjusted comparable sales form a range of value for the subject. By process of correlation and analysis, a final indicated value is derived.

## INCOME APPROACH

The Income Approach converts the anticipated flow of future benefits (income) to a present value estimate through a capitalization and/or a discounting process.

## FINAL RECONCILIATION

The appraisal process concludes with the Final Reconciliation of the values derived from the approaches applied for a single estimate of market value. Different properties require different means of analysis and lend themselves to one approach over the others.

### ANALYSES APPLIED

A cost analysis was considered and was developed for the subject property. There is adequate data to develop a land value, the replacement cost new is verifiable, and the depreciation accrued can be reasonably measured. The Cost Approach is typically the most applicable for special purpose and purpose-built properties.

A sales comparison analysis was considered and was developed because there was adequate market data available for food processing facility transfers. There has also been sales activity in vertically integrated poultry operations.

An income analysis was considered but was not developed. Typical buyers would be either owner-users or investors. In the case of the subject's immediate market, most of the buyers would be vertically integrated poultry companies. The appraiser was not able to analyze the subject's financials as of the effective date of this assignment. If the appraiser were to analyze the owner's financials, this would produce a 'value in use' or a 'going concern value'. Based on the perimeters of this assignment, the value conclusion is to be a fair market value. Furthermore, there were no leases on the subject to analyze, nor were any market leases of poultry processing plants unearthed during our research. The Income Approach would not produce credible results and was deemed not applicable.

# SUBJECT PROPERTY VALUATION – AS PROPOSED

## COST APPROACH – AS PROPOSED/AS COMPLETE

The Cost Approach is based on the principle of substitution - that a prudent and rational person would pay no more for a property than the cost to construct a similar and competitive property, assuming no undue delay in the process. The Cost Approach tends to set the upper limit of value before depreciation is considered. The applied process is as follows:

- Estimate the land value according to its Highest and Best Use. I have used the Sales Comparison Approach; the process is as follows:
  - o Comparable sales, contracts for sale, and current offerings are researched and documented.
  - o Each comparable is analyzed and adjusted to equate with the subject property.
  - o The value indication of each comparable is analyzed and the data reconciled for a land value indication.

- Estimate the replacement cost of the building and site improvements.
- Estimate the physical, functional and/or external depreciation accrued to the improvements.
- Sum the depreciated value of the improvements with the value of the land for an indication of value.

## LAND VALUATION

The subject's market area includes similar sized industrial properties located in Floyd County. No recent transfers of similar vacant land with industrial zoning were unearthed during my research. The appraiser expanded the radius of the search. All sales used were verified, confirmed, and analyzed by this appraiser. These sales occurred between April 2021 and February 2022, range in size from 5.00 acres to 16.81 acres, and are all similarly zoned for industrial uses. It is typical in rural markets like the subject's market to have to increase the search radius and go further back in time to find comparables due to limited activity in industrial property. The local market has been analyzed, and the most commonly quoted unit of comparison for similar industrial properties has been identified as price-per-acre. Price-per-acre has, therefore, been utilized in this analysis.

**Land Comparable 1**



### Transaction

| | | | |
|---|---|---|---|
| ID | 3210 | Date | 2/28/2022 |
| Address | 3500 Technology Drive | Price | $1,500,000 |
| City | Mankato | Price per Acre | $89,233 |
| State | MN | Financing | Cash |
| Tax ID | R01.09.10.200.011 | Property Rights | Fee Simple |
| Grantor | MAVCO Investments, LLC | Days on Market | Unknown |
| Grantee | Eastside Kato Partners, | Verification | Public Records, Costar |
| Legal Description | CRV-1384035 | | |

### Site

| | | | |
|---|---|---|---|
| Acres | 16.81 | Topography | Basically Level |
| Land SF | 732,244 | Zoning | M-1, Light Industrial |
| Road Frontage | Average | Flood Zone | Not in flood zone |
| Shape | Square | Encumbrance or | None known |
| Utilities | Public | Environmental Issues | None known |

### Sale Comments

The property is 16.81 acre lot zoned M-1, Light Industrial. It has public utilities available to the site. The buyer has proposed a seven lot subdivision with five lots ranging from 2.06 to 2.40 acres and two lots ranging from 1.28 acres to 2.84 acres.

## Land Comparable 2



### Transaction

| | | | |
|---|---|---|---|
| **ID** | 3211 | **Date** | 4/8/2021 |
| **Address** | 2827 Hyatt Circle | **Price** | $452,200 |
| **City** | Ames | **Price per Acre** | $85,000 |
| **State** | IA | **Financing** | Cash |
| **Tax ID** | 10-07-325-060 | **Property Rights** | Fee Simple |
| **Grantor** | Dayton Park LLC | **Days on Market** | Unknown |
| **Grantee** | AWS-AMES LLC | **Verification** | Public Records, Costar |
| **Legal Description** | 2021-04497 | | |

### Site

| | | | |
|---|---|---|---|
| **Acres** | 5.32 | **Topography** | Basically Level |
| **Land SF** | 231,739 | **Zoning** | GI, General Industrial |
| **Road Frontage** | Average | **Flood Zone** | Not in flood zone |
| **Shape** | Rectangular | **Encumbrance or** | None known |
| **Utilities** | Public | **Environmental Issues** | None known |

### Sale Comments

The property is a vacant lot is the Ames Community Development Park. It is zoned GI, General Industrial via the city of Ames zoning code.

## Land Comparable 3



### Transaction

| | | | |
|---|---|---|---|
| **ID** | 3212 | **Date** | 9/24/2021 |
| **Address** | 2826 Hyatt Circle | **Price** | $450,000 |
| **City** | Ames | **Price per Acre** | $90,000 |
| **State** | IA | **Financing** | Cash |
| **Tax ID** | 10-07-325-075 | **Property Rights** | Fee Simple |
| **Grantor** | Dayton Park LLC | **Days on Market** | Unknown |
| **Grantee** | KONZA INVESTMENTS, | **Verification** | Public Records, Costar |
| **Legal Description** | 2021-12688 | | |

### Site

| | | | |
|---|---|---|---|
| **Acres** | 5.00 | **Topography** | Basically Level |
| **Land SF** | 217,800 | **Zoning** | GI, General Industrial |
| **Road Frontage** | Average | **Flood Zone** | Not in flood zone |
| **Shape** | Rectangular | **Encumbrance or** | None known |
| **Utilities** | Public | **Environmental Issues** | None known |

### Sale Comments

The property is a vacant lot is the Ames Community Development Park. It is zoned GI, General Industrial via the city of Ames zoning code.

| Land Comparable 4 |
| --- |



| Transaction | | | |
| --- | --- | --- | --- |
| ID | 3213 | Date | 6/11/2021 |
| Address | 10995 High Life Court SW | Price | $1,100,000 |
| City | Cedar Rapids | Price per Acre | $129,412 |
| State | IA | Financing | Cash |
| Tax ID | 19332-51008-00000 | Property Rights | Fee Simple |
| Grantor | Twin Bridges Truck City, | Days on Market | 1610 |
| Grantee | Rexco Equipment Inc | Verification | Public Records, Costar |
| Legal Description | 11055/145 | | |

| Site | | | |
| --- | --- | --- | --- |
| Acres | 8.50 | Topography | Basically Level |
| Land SF | 370,260 | Zoning | LI, Light Industrial |
| Road Frontage | Average | Flood Zone | Not in flood zone |
| Shape | Square | Encumbrance or | None known |
| Utilities | Public | Environmental Issues | None known |

| Sale Comments |
| --- |

The property is a 8.50 acre lot located in West Side Corporate Park. It is within the city limits of Cedar Rapids. It is zoned LI, Light Industrial. Buyer is an equipment dealer and built a large retail/warehouse facility.  It has visibility along I-380.

## LAND COMPARABLES MAP



## LAND SALES ANALYSIS GRID

The above sales have been analyzed and compared with the subject property. I have considered adjustments in the areas of: Property Rights, Financing, Conditions of Sale, Expenditures After the Sale, Market Conditions, Location, and Physical Characteristics. On the following page, is a sales comparison grid displaying the subject property, the comparables, and the adjustments applied.

## COMPARABLE LAND SALES GRID

| Land Analysis Grid | | Comp 1 | | Comp 2 | | Comp 3 | | Comp 4 | |
|---|---|---|---|---|---|---|---|---|---|
| Address | 901 North Main Street | 3500 Technology | | 2827 Hyatt Circle | | 2826 Hyatt Circle | | 10995 High Life Court | |
| City | Charles City | Mankato | | Ames | | Ames | | Cedar Rapids | |
| State | IA | MN | | IA | | IA | | IA | |
| Date | 9/21/2022 | 2/28/2022 | | 4/8/2021 | | 9/24/2021 | | 6/11/2021 | |
| Price | -- | $1,500,000 | | $452,200 | | $450,000 | | $1,100,000 | |
| Acres | 13.434 | 16.810 | | 5.320 | | 5.000 | | 8.500 | |
| Acre Unit Price | -- | $89,233 | | $85,000 | | $90,000 | | $129,412 | |
| **Transaction Adjustments** | | | | | | | | | |
| Property Rights | Fee Simple | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% |
| Financing | Conventional | Cash | 0.0% | Cash | 0.0% | Cash | 0.0% | Cash | 0.0% |
| Conditions of Sale | Cash | Normal | 0.0% | Normal | 0.0% | Normal | 0.0% | Normal | 0.0% |
| **Adjusted Acre Unit Price** | | **$89,233** | | **$85,000** | | **$90,000** | | **$129,412** | |
| Market Trends Through 9/21/2022 | 0.0% | 0.0% | | 0.0% | | 0.0% | | 0.0% | |
| **Adjusted Acre Unit Price** | | **$89,233** | | **$85,000** | | **$90,000** | | **$129,412** | |
| Location | Charles City | Mankato | | Ames | | Ames | | Cedar Rapids | |
| % Adjustment | | -20% | | -20% | | -20% | | -20% | |
| $ Adjustment | | -$17,847 | | -$17,000 | | -$18,000 | | -$25,882 | |
| Acres | 13.43 | 16.81 | | 5.32 | | 5.00 | | 8.50 | |
| % Adjustment | | 0% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0 | | $0 | | $0 | | $0 | |
| Topography | Basically Level | Basically Level | | Basically Level | | Basically Level | | Basically Level | |
| % Adjustment | | 0% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0 | | $0 | | $0 | | $0 | |
| Shape | Irregular | Square | | Rectangular | | Rectangular | | Square | |
| % Adjustment | | -5% | | -5% | | -5% | | -5% | |
| $ Adjustment | | -$4,462 | | -$4,250 | | -$4,500 | | -$6,471 | |
| Utilities | Public | Public | | Public | | Public | | Public | |
| % Adjustment | | 0% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0 | | $0 | | $0 | | $0 | |
| Zoning | M-1 & M-2, Light & | M-1, Light Industrial | | GI, General Industrial | | GI, General Industrial | | LI, Light Industrial | |
| % Adjustment | | 0% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0 | | $0 | | $0 | | $0 | |
| **Adjusted Acre Unit Price** | | **$66,924** | | **$63,750** | | **$67,500** | | **$97,059** | |

## COMPARABLE LAND SALE ANALYSIS

Typically, no two properties are exactly the same. Therefore, a comparative analysis utilizing transactional, quantitative, and/or qualitative adjustments was completed in order to estimate (or quantify) the differences between the subject property and the comparable sales. The differences between the subject property and the comparable sales are generally based upon elements of comparison and property characteristics that help explain the variances in the prices paid for real property. The appraiser determines the elements of comparison for a given appraisal through market research and supports those conclusions with market evidence.

The selected sales utilized in this analysis initially indicate an overall per-acre value range between $85,000 and $129,412. As it relates to the valuation of the subject

property, the transactional, quantitative, and qualitative adjustments have been considered and analyzed as presented below and on the following pages.

## PROPERTY RIGHTS & FINANCING

The property rights and financing terms of all the comparable sales were similar enough to the subject. Thus, no adjustments were warranted.

## CONDITIONS OF SALE

No adjustments were made to the comparable sales due to the similar conditions of sale.

## EXPENDITURES AFTER SALE

None of the comparables had quantifiable expenditures after their sale. Therefore, no adjustments were warranted.

## MARKET CONDITIONS

Comparable sales that occurred under market conditions different from those applicable to the subject (on the effective date of value) require adjustment for any differences that affect their values. An adjustment for market conditions is made if general property values have appreciated or depreciated since the transaction dates due to inflation or deflation, or a change in investors' perceptions of the market over time.

The closed sales occurred between 2021 and 2022. Based upon a review of the sales and industry participants, the market for land sales appears to have been relatively stable during this period, therefore, no adjustment for market conditions was warranted.

## LOCATION

The subject is located in the city limits of Charles City. All comparables are deemed to be located in superior areas in more populated cities with more traffic and visibility and superior road frontage. Therefore, they were adjusted downward.

## SIZE

The subject is 13.434 acres. All comparables are considered to be similar enough to the subject in size. No adjustments were warranted.

## TOPOGRAPHY

The subject is basically level. All comparables have similar topography; therefore, no adjustments were warranted.

## SHAPE

The subject is irregularly shaped and composed of three parcels that are not all contiguous which may limit usage. All comparables are a single large parcel that are either square or rectangular in shape. They would not be as limited in development as the subject; therefore, were considered to be superior and were adjusted downward.

## UTILITIES

The subject has public utilities. All comparables have similar utilities.

## ZONING

The subject is zoned M-1 & M-2, Light & General Manufacturing which is an industrial district. All sales are similarly zoned industrial.

## LAND VALUATION CONCLUSION

The sales presented indicate a range of adjusted values from $63,750 to $97,059 per square foot. Land Comps 1, 2, and 3 are deemed to be most similar to the subject overall. Taking this information into consideration, the overall per-acre value indication for the subject property by way of the Sales Comparison Approach is concluded at **$65,000 per acre overall**. Therefore, the value conclusion of the Sales Comparison Approach is as follows: $65,000 per acre x 13.434 acres = $873,234, rounded to $875,000.

**Land Value Indication (Rounded): $875,000**

## COST ANALYSIS – AS PROPOSED/AS COMPLETE

The next step in the Cost Approach is to estimate the replacement cost of the buildings and site improvements. The replacement costs utilized in this approach are based on a combination of actual cost data provided by the owners and cost information from Marshall Valuation Services, a nationally recognized provider of construction cost data. The appraiser also utilized cost estimates from recent similar assignments for comparison.

Costs included within the Marshall Valuation Services cost estimates include hard and soft costs of construction. These consist of:

- Average architect's and engineer's fees
- Normal interest on building funds during the period of construction plus the processing fee or service charges
- Sales tax on materials

- Normal site preparation
- Contractor's overhead and profit

## SOFT COSTS, ENGINEERING, ARCHITECTURAL, PERMITS & LEGAL

Costs included within the Marshall Valuation Services cost estimates include hard and soft costs of construction and consist of the following: average architect's and engineer's fees; normal interest on building funds during the period of construction plus the processing fee or service charges; sales tax on materials; normal site preparation; and contractor's overhead and profit. For the subject, the costs per square foot were obtained from the MVS Commercial Cost Guide Section 14 (Garages, Industrials, Lofts, and Warehouses).

The appraiser has appraised several new construction projects. Some information is confidential and cannot be disclosed. The table below summarizes five projects and breaks down the cost new into vertical improvements, site improvements and machinery and equipment.

| Comp | Date | Type | Size (GBA) | Vertical Improvements | Site Improvements | M&E | Total Cost New |
|---|---|---|---|---|---|---|---|
| 1 | May-20 | Poultry Processing | 414,783 | $ 148,901,509 | $ 5,630,118 | $ 134,872,056 | $ 289,403,683 |
| 2 | Apr-20 | Orange Juice Processing | 330,602 | $ 51,941,259 | $ 500,000 | $ 36,302,467 | $ 88,743,726 |
| 3 | May-20 | Hog Processing | 660,898 | $ 145,273,392 | $ 26,950,798 | $ 156,462,309 | $ 328,686,499 |
| 4 | Aug-17 | Hatchery | 119,541 | $ 25,021,126 | $ 462,098 | $ 19,616,475 | $ 45,099,699 |
| 5 | Sep-20 | Lamb Processing/Harvest | 63,306 | $ 14,358,195 | $ 3,096,875 | $ 5,708,000 | $ 23,163,070 |

The following table further analyzes the cost comparables into price-per-square-foot. The costs per-square-foot of the vertical improvements for the cost comparables range from $157.11 to $358.99 with an average of $234.41.

| Comp | Vertical Improvements $/SF | Site Improvements $/SF | M&E $/SF | Total Cost New $/SF |
|---|---|---|---|---|
| 1 | $ 358.99 | $ 13.57 | $ 325.16 | $ 697.72 |
| 2 | $ 157.11 | $ 1.51 | $ 109.81 | $ 268.43 |
| 3 | $ 219.81 | $ 40.78 | $ 236.74 | $ 497.33 |
| 4 | $ 209.31 | $ 3.87 | $ 164.10 | $ 377.27 |
| 5 | $ 226.81 | $ 48.92 | $ 90.17 | $ 365.89 |
| Average | $ 234.41 | $ 21.73 | $ 185.20 | $ 441.33 |
| Low | $ 157.11 | $ 1.51 | $ 90.17 | $ 268.43 |
| High | $ 358.99 | $ 48.92 | $ 325.16 | $ 697.72 |

I have compared the MVS cost estimate of the subject's buildings and the cost comparables in the table below.

|  | MVS Cost | Cost Comparables |
|---|---|---|
| $/SF RCN | $242.28 | $157.11 - $358.99: Avg $234.41 |

The MVS RCN estimate is within the range of the cost comparables. Therefore, the appraiser is using the MVS costs in this analysis.

## DEVELOPER'S PROFIT

This factor reflects the profit necessary for the developer to undertake the management, responsibility and risks of construction associated with the subject property. Current valuation theory states that the four components that create value are land, labor, capital, and coordination. Developer's profit, as used in the Cost Approach, reflects the coordination component of value. Typically, developer's profit runs 10% to 20%; however, projects such as the subject are typically built for a specific purpose to be owner operated. Facilities like the subject are not built for speculation or investment purposes; therefore, developer's profit is deemed to be not applicable to the subject.

## DEPRECIATION ANALYSIS

Depreciation may be defined as any loss of value from any cause. There are three general areas of depreciation: physical deterioration, functional obsolescence, and external obsolescence. Depreciation may be curable or incurable, the test being that money spent to cure the depreciation be gained in value. If the depreciation costs more to fix than will be gained in value, then the depreciation is considered incurable.

## PHYSICAL DETERIORATION

This results in deterioration from aging and use. This type of depreciation may be curable or incurable.

## FUNCTIONAL OBSOLESCENCE

This results from a lack of utility or desirability due to design or market perception of the improvements. This type of depreciation may be curable or incurable.

## EXTERNAL OBSOLESCENCE

This is due to circumstances outside the property itself, such as industry, demographic and economic conditions or an undesirable proximate use. This type of depreciation is rarely curable.

## DEPRECIATION ACCRUED TO THE SUBJECT

| Depreciation: Section 1 of 1 | | | | | |
|---|---|---|---|---|---|
| Component | Eff. Age | Life | Percent | | Amount |
| Physical Depreciation: Building | 15 | 55 | 27% | | $7,134,051 |
| Physical Depreciation: Site | 5 | 20 | 25% | | $250,000 |
| Functional Obsolescence Building …………………………… | | | 0% | | $0 |
| External Obsolescence Building …………………………… | | | 20% | | $3,804,827 |
| | | | | Total Depreciation | $11,188,878 |
| | | | | Depreciated Value of Improvements | $15,969,308 |

## DEPRECIATION ANALYSIS

The economic age-life method has been used to determine the total depreciation of the subject facilities. The economic age-life method is defined by the 5th Edition of *The Dictionary of Real Estate Appraisal* as, "a method of estimating depreciation in which the ratio between the effective age of a building and its total economic life is applied to the current cost of the improvements to obtain a lump-sum deduction; also known as the age-life method."

Effective age is defined as the age of property that is based on the amount of observed deterioration and obsolescence it has sustained, which may be different from its chronological age. The effective age of the subject facilities has been determined through visual inspection and by comparing the subject to similar projects appraised by the appraiser. The actual ages of the improvements vary from 0 to 41 years old. The effective age of the subject improvements overall has been determined to be 15 years, a blended effective age, which may be different from their actual age. This takes into account the renovations, facility upgrades, and proposed addition.

Economic life is defined as the period over which improvements to real property contribute to property value. The economic lives of the improvements have been determined by conversations with contractors and other appraisers and through the market extraction method as previously described. The total economic life for the subject's improvements was determined to be 55 years. This is reflective of the mix of construction types included in the subject property.

The formula for this method is:

(Effective Age/Total Life) x Total Replacement Cost New (RCN) = Depreciation

**External Obsolescence**

Economic obsolescence, also referred to as external obsolescence, is the loss in value resulting from influences external to the property itself. External conditions causing EO may be international, national, industry-based, or local in origin. Various external factors affect potential economic returns, thus having a direct impact on the market value of an asset or property.

To quantify EO, an appraiser must first investigate the existence of economic conditions that may reduce the value of a business and, hence, its assets. Then, the EO must be quantified in an objective manner. EO may exist in any industry or property where the following attributes are found:

- Reduced demand for the company's products
- Overcapacity in the industry
- Dislocation of raw material supplies
- Increasing cost of raw materials, labor, utilities, or transportation, while the selling price of the product remains fixed or increases at a much lower rate

- Government regulations that require capital expenditures to be made with little or no return on the new investment
- Environmental considerations that require capital expenditures to be made with little or no return on the new investment
- EO is present when better economic opportunities exist for an investment. The economic principles of supply and demand, and competition drive the loss of value associated with EO.

The appraiser analyzed several transfers of processing facilities to extract market depreciation and obsolescence. It is noted that it is difficult, at best, to allocate functional obsolescence and external obsolescence from the market. The table below summarizes depreciation rates extracted from eight sales of food processing plant sales. The detailed analysis is included in the addenda. The sales were determined to have functional and external obsolescence ranging from -20.6% to 68.7% with an average of 36.7%. Sale 8 presented a negative obsolescence indicating that the buyer paid a premium for the property and/or it included some business value (inventory, A/R, customer lists, brands, etc.). It is noted that all the analyzed facilities are older facilities, like the subject. The sales ranged from 11 – 72 years old with an average of 33 years. They are not of modern design or layout. Most older facilities have short ceiling heights, multiple floors, inefficient product flow, inadequate welfare areas, dated refrigeration and HVAC systems, poor design with regards to animal welfare, etc. In addition, only three of the sales had FF&E that had contributory value. Most facilities either had the FF&E removed prior to sale or it was in poor condition. Typically, if a business fails, the machinery and equipment is removed from the facility and sold separately or scrapped. If a larger corporation sells a facility, they typically remove equipment to use in other facilities they own and/or sell the excess equipment.

| Market Extracted Depreciation | | |
|---|---|---|
| Sale | % Phys/Year | % Func/Ext Obs |
| 1 | 2.0% | 53.4% |
| 2 | 2.0% | 43.4% |
| 3 | 1.5% | 68.7% |
| 4 | 1.5% | 21.8% |
| 5 | 2.0% | 49.9% |
| 6 | 2.0% | 58.3% |
| 7 | 1.5% | 18.6% |
| 8 | 1.9% | -20.6% |
| Avg | 1.8% | 36.7% |
| Low | 1.5% | -20.6% |
| High | 2.0% | 68.7% |

The demand for poultry has continued to rise in the United States. Poultry is seen as good value for money for end users and a lower cost alternative to other proteins. The demand for healthier products (organic, non-GMO, all natural, local, sustainable) has also been on the rise. There are only six poultry plants in the United States that have air chill capabilities, including the subject. Air chilling benefits the producer through an improved product; benefits the environment through reduced

water consumption and benefits the consumer through reduced bacteria and a better flavor.

Furthermore, the owners are established in the specialty poultry processing industry and have experienced significant growth in their business over the past five years. There has also been increased demand for organic and/or air-chilled chicken.

The subject facility is within 250-mile radius of the chickens grow-out farm for processing. It is near other processing facilities; however, it is in a rural area. The facility will be of functional design or layout for a processing plant and cold storage facility. That said, the subject property has transferred multiple times in the past eight years. There is a high level of competition for labor in Iowa due to the large number of processing plants and their demand for workers. In addition, the subject facility was shuttered for approximately three years.

Based on these factors and the above presented market support, the appraiser has determined that there is some functional and/or external obsolescence. It is difficult to determine the allocation between them. The appraiser has selected a rate of 20% functional/external obsolescence.

## COST APPROACH CONCLUSION – AS PROPOSED/AS COMPLETE

The table on the following page presents the cost analysis of the subject. Based on the analysis detailed on the following page, I have reconciled to a prospective "as proposed/as complete" Cost Approach value of **$16,845,000.**

| Marshall Valuation Service |
| --- |
| **Cost Source:** Marshall Valuation Service |

| Building Improvements | | | | | |
| --- | --- | --- | --- | --- | --- |
| **Item** | **Unit Type** | **Cost** | **Quantity** | **Multiplier** | **Total** |
| Processing Building | Sq. Ft. | $244.00 | 105,594 | 1.000 | $25,764,936 |
| Live Hold Shed | Sq. Ft. | $60.50 | 6,500 | 1.000 | $393,250 |
| | | | | **Total Building Improvement Costs** | **$26,158,186** |
| | | | | Price per SF Gross Building Area | $233.36 |

| Site Improvements | | | | |
| --- | --- | --- | --- | --- |
| **Item** | **Unit Type** | **Cost** | **Quantity** | **Total** |
| Site Preparation & Improvements | Lump Sum | $1,000,000 | 1 | $1,000,000 |
| | | | **Total Site Improvement Costs** | **$1,000,000** |
| | | | **Subtotal: Building & Site Costs** | **$27,158,186** |
| | | | Price per SF Gross Building Area | $242.28 |

| Soft Costs | | | |
| --- | --- | --- | --- |
| **Item** | | **Percent Type** | **Total** |
| Engineering ……………… | 0.0% | % Bld. & Site Cost | $0 |
| Architectural ……………… | 0.0% | % of Building Cost | $0 |
| Permits & Legal ……………………………………………………… | | | $0 |
| Leasing ……………………………………………………… | | | $0 |
| | | **Total Soft Costs** | **$0** |
| **Insurable Value (Excludes Site Improvements, related Site Soft Costs and Developer's Profit)** | | | **$26,158,186** |
| **Total Costs** | | | |
| | | Subtotal: Building, Site & Soft Costs | $27,158,186 |
| | | Developer's Profit    0.0% | $0 |
| | | **Total Cost** | **$27,158,186** |
| | | Price per SF Gross Building Area | $242.28 |

| Depreciation: Section 1 of 1 | | | | | |
| --- | --- | --- | --- | --- | --- |
| **Component** | **Eff. Age** | **Life** | **Percent** | | **Amount** |
| Physical Depreciation: Building | 15 | 55 | 27% | | $7,134,051 |
| Physical Depreciation: Site | 5 | 20 | 25% | | $250,000 |
| Functional Obsolescence Building ……………………………… | | | 0% | | $0 |
| External Obsolescence Building ……………………………… | | | 20% | | $3,804,827 |
| | | | **Total Depreciation** | | **$11,188,878** |
| | | | **Depreciated Value of Improvements** | | **$15,969,308** |
| | | | Cost Per Square Foot Gross Building Area | | $142.46 |

| Land Value | |
| --- | --- |
| Land Value ……………………………………………………… | $875,000 |
| Other ……………………………………………………… | $0 |
| **Cost Approach Value Indication** | $16,844,308 |
| **Rounded** | **$16,845,000** |
| Price per SF Gross Building Area | $150.28 |

## SALES COMPARISON APPROACH – AS PROPOSED/AS COMPLETE

The Sales Comparison Approach is based on the premise that a buyer would pay no more for a specific property than the cost of obtaining a property with the same quality, utility, and perceived benefits of ownership. It is based on the principles of supply and demand, balance, substitution, and externalities. The following steps describe the applied process of the Sales Comparison Approach.

- The market in which the subject property competes is investigated; comparable sales, contracts for sale and current offerings are reviewed.
- The most pertinent data is further analyzed, and the quality of the transaction is determined.
- The most meaningful unit of value for the subject property is determined.
- Each comparable sale is analyzed and where appropriate, adjusted to equate with the subject property.
- The value indication of each comparable sale is analyzed, and the data reconciled for a final indication of value via the Sales Comparison Approach.

## COMPARABLES

I have researched and analyzed several transfers for this analysis. All have been researched through various sources, inspected, and verified by a party to the transaction. Some information is confidential in nature and has been retained in the appraiser's work file. The focus was on protein processing facilities in the United States. A larger market area is typical for this type of property due to its special purpose nature. It is also necessary to go further back in time. Several protein processing facilities were unearthed during the research and the appraiser selected eight to analyze in this approach to value.

The best unit of comparison is the price-per-square foot of the GBA. The write-ups on the following pages summarize the comparables identified for this analysis.

### Comparable 1

 

### Transaction

| | | | |
|---|---|---|---|
| **ID** | 537 | **Date** | 1/19/2018 |
| **Address** | 2125 Rochester Rd | **Price** | $14,322,500 |
| **City** | Montgomery | **Price Per SF** | $51.15 |
| **State** | IL | **Transaction Type** | Closed Sale |
| **Tax ID** | 15-30-401-031 | **Financing** | Conventional |
| **Grantor** | Butterball LLC | **Property Rights** | Fee Simple |
| **Grantee** | Carl Buddig & Company | **Days on Market** | 177 |
| **Book/Page or Reference Doc** | 2018K003764 | **Verification** | 3rd party Appraiser, Public records, Articles |

### Site

| | | | |
|---|---|---|---|
| **Acres** | 18.1 | **Topography** | Basically Level |
| **Land SF** | 786,258 | **Zoning** | Industrial |
| **Road Frontage** | Average | **Flood Zone** | Not in flood zone |
| **Shape** | Rectangular | **Encumbrance or** | None Known |
| **Utilities** | Public | **Environmental Issues** | None Known |
| **Access** | Average | **Land To Building Ratio** | 2.8 |

### Improvements

| | | | |
|---|---|---|---|
| **Source For SF Area** | NA | **Deferred Maintenance** | NA |
| **GBA** | 280,000 | **Construction** | Masonry & Steel |
| **Year Built** | 1991 | **Exterior Wall** | Block |
| **Renovations** | NA | **Roof Type** | Flat |
| **Condition** | Average | **Roof Cover** | Tar & Gravel |
| **Quality** | Good | **Ceiling Height** | 18' - 23' |

### Sale Comments

The property is a former Butterball turkey and pork further processing facility that was closed in July 2017. The plant was used to produce the Gusto brand pork and Butterball brand turkey products. The buyer Carl Buddig & Company will be taking over the plant and using it to expand current operations. Carl Buddig is the family owned parent company of Buddig Lunchmeat and Old Wisconsin hardwood smoked sausage and snack products. The facility has 17,747 sf of dry warehouse, 16,213 sf office/welfare areas, and approximately 230,000 sf of refrigerated space (processing, coolers, & freezers). The plant was built in 1991. Ceiling heights range from 18' - 23'. There are 18 dock doors, 1 drive-in door, wastewater pre-treatment, ovens, and meat smokers. The equipment did not contribute value. The facility is good quality and in average condition.

**Comparable 2**



| Transaction | | | |
|---|---|---|---|
| **ID** | 539 | **Date** | 3/13/2020 |
| **Address** | 2588 Two Notch Road | **Price** | $12,250,000 |
| **City** | Lexington | **Price Per SF** | $150.61 |
| **State** | SC | **Transaction Type** | Closed Sale |
| **Tax ID** | 006400-06-019, 006400- | **Financing** | Conventional |
| **Grantor** | Lexington SC Realty | **Property Rights** | Fee Simple |
| **Grantee** | CAE Industrial I LLC | **Days on Market** | n/a |
| **Book/Page or Reference Doc** | 20862-1366 | **Verification** | Public Records, Costar, 3rd party appraiser |

| Site | | | |
|---|---|---|---|
| **Acres** | 26.0 | **Topography** | Basically Level |
| **Land SF** | 1,132,560 | **Zoning** | ID, Industrial |
| **Road Frontage** | Average | **Flood Zone** | Not in flood zone |
| **Shape** | Irregular | **Encumbrance or** | None Known |
| **Utilities** | Public | **Environmental Issues** | None Known |
| **Access** | Average | **Land To Building Ratio** | 13.9 |

| Improvements | | | |
|---|---|---|---|
| **Source For SF Area** | NA | **Deferred Maintenance** | NA |
| **GBA** | 81,334 | **Construction** | Masonry & Steel |
| **Year Built** | 1990 | **Exterior Wall** | Concrete |
| **Renovations** | NA | **Roof Type** | Flat |
| **Condition** | Good | **Roof Cover** | Rubber Membrane |
| **Quality** | Good | **Ceiling Height** | 20' +/- |

| Sale Comments |
|---|

The property is a 74,324 sf food processing facility that is leased by Golden State Foods. It was sold/bought by investors. There are 3 contiguous parcels that were part of the transfer. The property does have rail.  The building is divided into office, processing, and cooler/freezer space.

**Comparable 3**



**Transaction**

| | | | |
|---|---|---|---|
| **ID** | 1834 | **Date** | 4/1/2020 |
| **Address** | 4413 W. Bogart Rd | **Price** | $31,250,000 |
| **City** | Sandusky | **Price Per SF** | $181.83 |
| **State** | OH | **Transaction Type** | Closed Sale |
| **Tax ID** | 33-01290-00, 58-02914- | **Financing** | Conventional |
| **Grantor** | JH Routh Packing Co. | **Property Rights** | Fee Simple |
| **Grantee** | HK Property Holdings LLC | **Days on Market** | Private Sale |
| **Book/Page or Reference** | 202002688 | **Verification** | Owner, Public Records |

**Site**

| | | | |
|---|---|---|---|
| **Acres** | 54.5 | **Topography** | Basically Level |
| **Land SF** | 2,374,456 | **Zoning** | I-2, Heavy Industrial, CS, |
| **Road Frontage** | Average | **Flood Zone** | Not in flood zone |
| **Shape** | Irregular | **Encumbrance or** | None known |
| **Utilities** | Public, Onsite WWT | **Environmental Issues** | None known |
| **Access** | Average | **Land To Building Ratio** | 13.8 |

**Improvements**

| | | | |
|---|---|---|---|
| **Source For SF Area** | NA | **Deferred Maintenance** | NA |
| **GBA** | 171,867 | **Construction** | Masonry & Steel |
| **Year Built** | 1970 | **Exterior Wall** | Multiple |
| **Renovations** | Multiple | **Roof Type** | Flat |
| **Condition** | Average, Fair | **Roof Cover** | Membrance |
| **Quality** | Good, Average | **Ceiling Height** | Various |

**Sale Comments**

Pork processing plant with onsite wastewater pre-treatment. Facility processes 3,200 hogs/day. The total gross plant area is 153,142 square feet: 74,149 square feet on Level 1, 51,879 square feet on Level 2, and 4,067 square feet on Level 3 (office space only – located atop the carcass cooler). The remaining outbuildings include an 1,100 square foot sewage treatment building, a 2,100 square foot equipment storage shed, a 1,122 square foot truck wash. The transaction also includes an offsite cold storage building with 18,725 square feet (905 Pierce Street). The property is good quality and in average condition. The processing plant is older but has been well-maintained. Transaction includes $24,000,000 in M&E. Property was not listed on the open market but is considered an arms-length transaction due to knowledgeable buyer and seller. Appraiser appraised the facility.

**Comparable 4**







| Transaction | | | |
|---|---|---|---|
| **ID** | 1835 | **Date** | 11/28/2018 |
| **Address** | 900 South Platte Ave | **Price** | $30,000,000 |
| **City** | Fremont | **Price Per SF** | $48.92 |
| **State** | NE | **Transaction Type** | Closed Sale |
| **Tax ID** | 270062531, 270062405, | **Financing** | Conventional |
| **Grantor** | Hormel Foods Corporation | **Property Rights** | Fee Simple |
| **Grantee** | WholeStone Farms II, LLC | **Days on Market** | Private Sale |
| **Book/Page or Reference** | 201805671 | **Verification** | Public Records, Costar, 3rd |
| **Doc** | | | Party Appraiser |

| Site | | | |
|---|---|---|---|
| **Acres** | 56.4 | **Topography** | Basically Level |
| **Land SF** | 2,458,526 | **Zoning** | LI, Light Industrial |
| **Road Frontage** | Average | **Flood Zone** | Not in flood zone |
| **Shape** | Irregular | **Encumbrance or** | None known |
| **Utilities** | Public | **Environmental Issues** | None known |
| **Access** | Average | **Land To Building Ratio** | 4.0 |

| Improvements | | | |
|---|---|---|---|
| **Source For SF Area** | Assessment | **Deferred Maintenance** | NA |
| **GBA** | 613,257 | **Construction** | Masonry & Steel |
| **Year Built** | 1948 | **Exterior Wall** | Multiple |
| **Renovations** | Multiple through 2011 | **Roof Type** | Flat |
| **Condition** | Average | **Roof Cover** | Membrane |
| **Quality** | Average | **Ceiling Height** | Various |

**Sale Comments**

10,500 hog/day facility. Hormel Foods sold this facility to WholeStone Farms which is a consortium of 220 hog farmers and producers in MN, SD, and more. They purchased the facility to give producers access to processing capacity. The real estate sale price allocation was $10,000,000. The M&E sold for $20,000,000 in addition to the real estate. The facility can process 10,500 hogs per day. The total sale price of real estate and M&E combined is $30,000,000 which equates to $2,857/hog/day. Hormel agreed to continue to purchase products from the buyers for a period of time. The plant's layout is not optimal due to the age of the facility and additions over the years. It is a average quality and in average/fair condition. The buyers have added new office/wellness space and completed other renovations since purchase.

### Comparable 5





### Transaction

| | | | |
|---|---|---|---|
| ID | 1836 | Date | 2/22/2016 |
| Address | 2850 Highway 60E | Price | $9,600,000 |
| City | Windom | Price Per SF | $71.64 |
| State | MN | Transaction Type | Closed Sale |
| Tax ID | 033-251590011, 033- | Financing | Conventional |
| Grantor | PM Beef Holdings LLC | Property Rights | Fee Simple |
| Grantee | Prime Pork LLC | Days on Market | Private Sale |
| Book/Page or Reference Doc | 277279 | Verification | Public Records, Costar, 3rd Party Appraiser |

### Site

| | | | |
|---|---|---|---|
| Acres | 145.3 | Topography | Basically Level |
| Land SF | 6,330,139 | Zoning | I2, Heavy Industrial, |
| Road Frontage | Average | Flood Zone | Zone X & A |
| Shape | Irregular | Encumbrance or | None known |
| Utilities | Public, Onsite WWT | Environmental Issues | None known |
| Access | Average | Land To Building Ratio | 47.2 |

### Improvements

| | | | |
|---|---|---|---|
| Source For SF Area | Assessment | Deferred Maintenance | None |
| GBA | 134,000 | Construction | Masonry & Steel |
| Year Built | 2004 | Exterior Wall | Metal & Concrete |
| Renovations | After purchase 2016 | Roof Type | Flat |
| Condition | Average | Roof Cover | Membrane |
| Quality | Average | Ceiling Height | Various |

### Sale Comments

Property was a beef processing facility (900 head of cattle/day). Buyers converted to a pork processing facility. $20-25 million capital expense and the anticipated capacity would be 3,500 hogs/day. The plant was built in 2004 and is a masonry building with an effective age of 12 years. It is in average condition. The 134,000 SF building included 7,690 SF office, 11,520 employee welfare rooms, 37,800 SF production area, 14,000 SF cooler space and 25,580 freezer space, with the balance being cattle pens and maintenance/storage areas. It has a wastewater lagoon and some water treatment facilities. It is on the northeast edge of the town of Windom, MN, a largely rural region. The facility is average quality and in average condition. Operated as Hylife Foods.

**Comparable 6**

 

**Transaction**

| | | | |
|---|---|---|---|
| ID | 1837 | Date | 7/16/2020 |
| Address | 5305 Hwy H | Price | $8,855,000 |
| City | Pleasant Hope | Price Per SF | $94.36 |
| State | MO | Transaction Type | Closed Sale |
| Tax ID | 89-16-0.9-29-000-000- | Financing | Conventional |
| Grantor | Moon Ridge Foods LLC, | Property Rights | Fee Simple |
| Grantee | SDNG LLC (Missouri | Days on Market | Private Sale |
| Book/Page or Reference Doc | 2020L/2761 | Verification | Public Records, Costar, Articles |

**Site**

| | | | |
|---|---|---|---|
| Acres | 253.1 | Topography | Basically Level |
| Land SF | 11,023,294 | Zoning | Agriculture & Industrial |
| Road Frontage | Average | Flood Zone | Not in flood zone |
| Shape | Irregular | Encumbrance or | None known |
| Utilities | Public, Onsite WWT | Environmental Issues | None known |
| Access | Average | Land To Building Ratio | 117.5 |

**Improvements**

| | | | |
|---|---|---|---|
| Source For SF Area | Assessment | Deferred Maintenance | None |
| GBA | 93,846 | Construction | Masonry & Steel |
| Year Built | 2006 | Exterior Wall | Metal |
| Renovations | 2015, 2020 | Roof Type | Flat |
| Condition | Average | Roof Cover | Membrane |
| Quality | Average | Ceiling Height | Various |

**Sale Comments**

The property was a 2,000 head/day hog processing facility know as Moon Ridge Foods LLC that was shuttered in 2018. The buyers purchased to convert to a 500 head/day beef processing facility for custom process cattle for a variety of niche programs.

The previous sale occurred in 2015 is of a smaller, 2,000 head per day pork processing facility in SW Missouri. The plant is on 263.82 acres which is partially used for application of wastewater effluent and woods. The plant built it in 2006. There was no allocation to machinery/equipment as it had been removed prior to the sale. After the sale the plant was completely renovated replacing all plumbing, electrical systems, interior finishes, and roof. The older portion of the building, approximately 10,000 square feet was built in the 1950's and the balance was built in 2006. The newer part of the building is of steel frame construction with concrete block and panel walls. The floor plan includes offices, break rooms, cutting and packing areas, cold storage and coolers. The facility is a USDA approved packing plant. The facility is average quality and average condition.

**Comparable 7**




**Transaction**

| | | | |
|---|---|---|---|
| ID | 1838 | Date | 8/3/2020 |
| Address | 920 N. 7th Ave | Price | $14,250,000 |
| City | Greeley | Price Per SF | $146.37 |
| State | CO | Transaction Type | Closed Sale |
| Tax ID | 80332301005 | Financing | Conventional |
| Grantor | Mountain States Rosen | Property Rights | Fee Simple |
| Grantee | Swift Beef Company | Days on Market | Bankruptcy |
| Book/Page or Reference | 4615473 | Verification | Public Records, Costar, 3rd |
| Doc | | | Party Appraiser |

**Site**

| | | | |
|---|---|---|---|
| Acres | 17.4 | Topography | Basically Level |
| Land SF | 756,202 | Zoning | I-H, Heavy Industrial |
| Road Frontage | Average | Flood Zone | Not in flood zone |
| Shape | Irregular | Encumbrance or | None known |
| Utilities | Public | Environmental Issues | None known |
| Access | Average | Land To Building Ratio | 7.8 |

**Improvements**

| | | | |
|---|---|---|---|
| Source For SF Area | Assessment | Deferred Maintenance | Long-term Vacancy |
| GBA | 97,358 | Construction | Masonry |
| Year Built | 1988 | Exterior Wall | Concrete |
| Renovations | Multiple | Roof Type | Flat |
| Condition | Average | Roof Cover | Membrane |
| Quality | Good | Ceiling Height | Various |

**Sale Comments**

JBS has publicly stated that the Mountain States Rosen plant will be converted to a ground beef processing plant once the sale goes through. The company also indicated that it plans to fill the gap in lamb processing with imported lamb from their plants in countries like Australia and New Zealand, Sims said. The MSR plant, which was the second-largest lamb and sheep slaughter facility nationwide, was owned by a cooperative of 149 sheep ranching families in 11 Western states. The cooperative bought the processing plant four and a half years ago from JBS after JBS announced that it intended to stop processing lambs there. Facing financial struggles brought on by the coronavirus pandemic, MSR was forced into bankruptcy. On July 16, Wyoming's bankruptcy court heard arguments and purchasing offers from both JBS and Greeley Fab, a new company partially composed of members of the MSR co-op. JBS was awarded the right to purchase the plant for $14.25 million. Greeley Fab fell short with an offer of $14.05 million.

**Comparable 8**

 



### Transaction

| | | | |
|---|---|---|---|
| ID | 1951 | Date | 11/15/2021 |
| Address | 65 All American Way | Price | $4,000,000 |
| City | North Kingston | Price Per SF | $62.91 |
| State | RI | Transaction Type | Closed Sale |
| Tax ID | NKIN-000180-000007 | Financing | Conventional |
| Grantor | U.S. Foods, Inc. | Property Rights | Fee Simple |
| Grantee | MG88 Providence Cold | Days on Market | 240 |
| Book/Page or Reference Doc | Book 3464 Page 22 | Verification | Public Records, Costar |

### Site

| | | | |
|---|---|---|---|
| Acres | 6.7 | Topography | Basically Level |
| Land SF | 293,594 | Zoning | QGID, Quonset General |
| Road Frontage | Average | Flood Zone | Not in Flood Zone |
| Shape | Basically Rectangular | Encumbrance or | None known |
| Utilities | Public | Environmental Issues | None known |
| Access | Average | Land To Building Ratio | 4.62 |

### Improvements

| | | | |
|---|---|---|---|
| Source For SF Area | Realtor | Deferred Maintenance | None |
| GBA | 63,582 | Construction | Masonry & Steel |
| Year Built | 2000 | Exterior Wall | Block & Metal |
| Renovations | 2002, 2006 | Roof Type | Flat |
| Condition | Average-to-Good | Roof Cover | Membrane |
| Quality | Average | Ceiling Height | Various |

### Sale Comments

This property is located in the Quonset Business Park in North Kingston, and has been utilized as a food distribution facility. It was constructed in 2000 with additions in 2002 and 2006. The total building area is 63,582 SF is broken down as follows: Office Area 4,576 SF, Cooler Space 7,830 SF, and Freezer Space 5,220 SF. It has ceiling height of 23' clear, 14 loading dock height doors, and 1 overhead door. It is steel frame construction with block and metal exterior and a rubber membrane roof.

## COMPARABLES MAP



## ANALYSIS GRID

The above sales have been analyzed and compared with the subject property. I have considered adjustments in the areas of:

- Property Rights Sold
- Financing
- Conditions of Sale
- Market Trends
- Location
- Physical Characteristics

On the following page is a sales comparison grid displaying the subject property, the comparables and the adjustments applied.

| Analysis Grid | | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Comp 5 | Comp 6 | Comp 7 | Comp 8 |
|---|---|---|---|---|---|---|---|---|---|
| Address | 901 North Main Street | 2125 Rochester Rd | 2588 Two Notch Road | 4413 W. Bogart Rd | 900 South Platte Ave | 2850 Highway 60E | 5305 Hwy H | 920 N. 7th Ave | 65 All American Way |
| City | Charles City | Montgomery | Lexington | Sandusky | Fremont | Windom | Pleasant Hope | Greeley | North Kingston |
| State | IA | IL | SC | OH | NE | MN | MO | CO | RI |
| Date | 10/31/2023 | 1/19/2018 | 3/13/2020 | 4/1/2020 | 11/28/2018 | 2/22/2016 | 7/16/2020 | 8/3/2020 | 11/15/2021 |
| Price | -- | $14,322,500 | $12,250,000 | $31,250,000 | $30,000,000 | $9,600,000 | $8,855,000 | $14,250,000 | $4,000,000 |
| Price Adjustment | -- | $0 | $0 | -$24,000,000 | -$20,000,000 | $0 | $0 | $0 | $0 |
| Adjusted Price | -- | $14,322,500 | $12,250,000 | $7,250,000 | $10,000,000 | $9,600,000 | $8,855,000 | $14,250,000 | $4,000,000 |
| GBA | 112,094 | 280,000 | 81,334 | 171,867 | 613,257 | 134,000 | 93,846 | 97,358 | 63,582 |
| Price Per SF | | $51.15 | $150.61 | $42.18 | $16.31 | $71.64 | $94.36 | $146.37 | $62.91 |

**Transaction Adjustments**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Property Rights | Fee Simple | Fee Simple 0.0% | Fee Simple 0.0% | Fee Simple 0.0% | Fee Simple 0.0% | Fee Simple 0.0% | Fee Simple 0.0% | Fee Simple 0.0% | Fee Simple 0.0% |
| Financing | Conventional | Conventional 0.0% | Conventional 0.0% | Conventional 0.0% | Conventional 0.0% | Conventional 0.0% | Conventional 0.0% | Conventional 0.0% | Conventional 0.0% |
| Conditions of Sale | Cash | Motivated Seller 10.0% | Normal 0.0% | Normal 0.0% | Motivated Seller 10.0% | Motivated Seller 10.0% | Court Appointed Sale 10.0% | Bankruptcy 10.0% | Normal 0.0% |

| Adjusted Price/SF | | $56.27 | $150.61 | $42.18 | $17.94 | $78.81 | $103.79 | $161.00 | $62.91 |
|---|---|---|---|---|---|---|---|---|---|
| Market Trends Through 10/31/2023 0.0% | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Adjusted Price/SF** | | **$56.27** | **$150.61** | **$42.18** | **$17.94** | **$78.81** | **$103.79** | **$161.00** | **$62.91** |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Location | Charles City | Montgomery | Lexington | Sandusky | Fremont | Windom | Pleasant Hope | Greeley | North Kingston |
| Comparison | | Superior | Superior | Superior | Similar | Similar | Inferior | Superior | Superior |
| Acres | 13.43 | 18.05 | 26.00 | 54.51 | 56.44 | 145.32 | 253.06 | 17.36 | 6.74 |
| Comparison | | See LTB | See LTB | See LTB | See LTB | See LTB | See LTB | See LTB | See LTB |
| Land to Building Ratio | 5.2 | 2.8 | 13.9 | 13.8 | 4.0 | 47.2 | 117.5 | 7.8 | 4.6 |
| Comparison | | Similar | Similar | Similar | Similar | Similar | Similar | Similar | Similar |
| GBA | 112,094 | 280,000 | 81,334 | 171,867 | 613,257 | 134,000 | 93,846 | 97,358 | 63,582 |
| Comparison | | Larger | Similar | Larger | Larger | Similar | Similar | Similar | Similar |
| Quality | Good | Good | Good | Average | Average | Average | Average | Average | Average |
| Comparison | | Similar | Similar | Inferior | Inferior | Inferior | Inferior | Inferior | Inferior |
| Condition | Average-to-Very Good | Average | Good | Average, Fair | Average | Average | Average | Average | Average-to-Good |
| Comparison | | Inferior | Similar | Inferior | Inferior | Inferior | Inferior | Inferior | Slightly Inferior |
| Utilities | Public | Public | Public | Public, Onsite WWT | Public | Public, Onsite WWT | Public, Onsite WWT | Public | Public |
| Comparison | | Similar | Similar | Similar | Similar | Similar | Similar | Similar | Similar |
| Zoning | M-1 & M-2, Light & General Manufacturing | Industrial | ID, Industrial | I-2, Heavy Industrial, CS, Commercial | LI, Light Industrial | I2, Heavy Industrial, Agriculture | Agriculture & Industrial | I-H, Heavy Industrial | QGID, Quonset General Industrial |
| Comparison | | Similar | Similar | Similar | Similar | Similar | Similar | Similar | Similar |

| **Adjusted Price/SF** | | **$56.27** | **$150.61** | **$42.18** | **$17.94** | **$78.81** | **$103.79** | **$161.00** | **$62.91** |
|---|---|---|---|---|---|---|---|---|---|

## COMPARABLE SALE ADJUSTMENTS

The comparables selected are all recent sales of food processing facilities in the subject's extended market area. Qualitative adjustments were made to the subject: inferior, similar, superior. The unit of comparison used in the analysis grid is the price-per-square-foot of gross building area. Any contributory value of FF&E that transferred with the comparables was subtracted from the gross sale price.

### PROPERTY RIGHTS

All the Comparable Sales were deemed to have similar property rights; therefore, no adjustments were necessary.

### FINANCING

All the Comparable Sales were deemed to have similar enough financing terms; therefore, no adjustments were necessary.

### CONDITIONS OF SALE

Comps 1, 4, 5, 6, and 7 were sold by motivated sellers; therefore, were adjusted upward for this factor.

### MARKET CONDITIONS

No adjustments for market conditions were made; however, the age of these sales was taken into consideration in the reconciliation.

### LOCATION

The subject is located in Charles City, Iowa. Comps 4 and 5 were deemed to be in overall similar rural locations. Comps 1, 2, 3, 7, and 8 are in more urban/populated locations which are deemed superior to the subject. Comp 6 was deemed to be in a more rural area which is considered to be inferior. No quantitative adjustment was made but this factor is taken into account in the reconciliation.

### LAND-TO-BUILDING RATIO

The subject's land-to-building (LTB) ratio is 5.2. Comps 1, 2, 3, 4, 7 and 8 are similar enough to the subject. Typically, an investor will pay more for a property that has a larger LTB because there is more land available for expansion and future development. Comps 5 and 6 have much larger LTBs than the subject which is typically considered to be superior. However, they are located in areas with much lower land values per acre than the subject which is an offsetting factor. Therefore,

they were deemed to be similar enough. No quantitative adjustment was made but this factor is taken into account in the reconciliation.

## GBA

The subject has a GBA of 112,094 square feet. Typically, an investor will pay more per unit for a smaller building. Comps 2, 5, 6, 7, and 8 are deemed to have similar enough GBAs to the subject. Comps 1, 3, and 4 are larger than the subject. No quantitative adjustment was made but this factor is taken into account in the reconciliation.

## QUALITY

The subject is good quality construction. Comps 1 and 2 were deemed to be similar enough to the subject. Comps 3, 4, 5, 6, 7, and 8 were deemed to be inferior in quality of construction. No quantitative adjustment was made but this factor is taken into account in the reconciliation.

## CONDITION

In the 'as proposed/as complete' state, the subject is deemed to be in average-to-very good condition. Comp 2 was deemed to be in similar condition. Comparables 1, 3, 4, 5, 6, 7, and 8 are deemed to be inferior in condition. No quantitative adjustment was made but this factor is taken into account in the reconciliation.

## UTILITIES

The subject uses public utilities. All comparables have public water and sewer and/or onsite wastewater which is considered to be similar enough to the subject. No quantitative adjustment was made but this factor is taken into account in the reconciliation.

## ZONING

The subject is in an industrial zoning district. All comparables are similarly zoned industrial. No quantitative adjustment was made but this factor is taken into account in the reconciliation.

## SALES COMPARISON APPROACH CONCLUSION – AS PROPOSED/AS COMPLETE

The adjusted values of the comparable properties range from $17.94/sf to $161.00/sf with an average rate of $84.19/sf. All eight of the comparable sales have been given consideration as each is relevant in many aspects and together, they are indicative of current trends. Based on an analysis of the comparable sales, with consideration given to all of the factors, it is the appraiser's opinion that the "as proposed/as complete" market value of the subject's real estate is $150.00/sf. The value of the

improvements is calculated as follows $150.00/sf x 112,094 SF which equates to $16,814,100, **or $16,800,000 (rounded)**.

## FINAL RECONCILIATION – AS PROPOSED/AS COMPLETE

The process of reconciliation involves the analysis of each approach to value. The quality of data applied and the significance of each approach, as it relates to market behavior and defensibility of each approach, are considered and weighed.

In this appraisal, three approaches to value were applied. Each approach has been considered separately and comparatively with each other.

| | |
|---|---|
| **Cost Approach:** | $16,845,000 |
| **Sales Approach:** | $16,800,000 |
| **Income Approach:** | Test of Reasonableness |

Because appraising is not a science wherein property differences may be precisely measured, it would be unusual for the value estimated by all approaches to be exactly the same. Each approach implements tools to analyze the market data into an estimate of value and normally indicates a range of values to be reconciled into a final value estimate. The different methods of value estimation reveal both the strengths and weaknesses involved in the analyses and the imperfections in the market and the data used for each. Reconciliation involves a review of the reliability of the data used in each approach to the type of property being appraised and the relative applicability of the approach in the light of the definition of value sought.

The subject of this appraisal is/will be a poultry processing facility. It is located in Charles City, IA. The location is centralized with respect to the area it is to serve. The site and improvements are typical for such an operation.

The investigation of market value for the subject property in this report employed the Cost Approach and the Sales Comparison Approach. The adequacy and reliability of the information and the analysis contained in the approaches has been reviewed and judged for this appraisal. The appraiser found that each approach has merit as it pertains to the subject property and contributes substantially to the final value estimate.

In the Cost Approach, the subject was valued as separate components of land and building. The land sales used offered a fair indication of land value after adjustments. The replacement cost new was based on information supplied by local building contractors and the Marshall Valuation Service, a nationally recognized cost index. The selected square foot costs were therefore considered correctly estimated. The amount of depreciation, however, is a subjective judgment based on the appraiser's observation. Oftentimes the Cost Approach sets the upper limit in the range of values. Most emphasis was placed on the Cost Approach because of the renovations and new construction additions.

The Sales Comparison Approach involves a comparative analysis of the important attributes of the sale properties to those of the subject under the general divisions, location, physical characteristics, and conditions of sale, economic trends, and the change in the market over time. Consideration of the dissimilarities in terms of their probable effect upon the sales price of the subject gives an indication of market value. It does reflect the motivation of buyers and sellers in the marketplace and given some weight.

In addition, the Income Analysis section of this report supports the reconciled value of this property.

Accordingly, it is my opinion that the ***prospective "as proposed/as complete" market value for the unencumbered fee simple interest of the subject property*** as of the effective date October 31, 2023 is:

**Sixteen Million Eight Hundred Thousand Dollars**

**($16,800,000)**

## MACHINERY & EQUIPMENT VALUATION – AS PROPOSED

The purpose of this valuation is to provide the fair market value – installed of the assets. The following definition of value was taken from the Fourth Edition of *"Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets"* by the American Society of Appraisers (ASA).

> ***Fair Market Value – Installed*** is an opinion, expressed in terms of money, at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts, considering market conditions for the asset being valued, independent of earnings generated by the business in which the property is or will be installed, as of a specific date.

The premise reflects the value of an installed asset, based on market conditions for the particular asset being valued, as of a specific date. It assumes that the asset or assets is capable of being used as designed at its current location. Therefore, the market value includes the depreciated value associated with all normal direct and indirect costs, such as installation and other costs, to make the asset or assets fully operational. The installed analysis is based on the premises of the principle of substitution in which a prudent buyer will not pay more for a property than the cost of acquiring a substitute property of equivalent utility. There are many factors that play a role in how much a buyer is willing to pay for assets which may include:

- Existing market share
- Barriers to entry for a market/industry
- Competition
- Profitability
- Supply of raw materials and/or supplier base
- Demand for products produced
- Location of facility
- Brand recognition or trade names
- Existing customer base
- Market and industry trends – including consumer trends

The machinery and equipment valuation includes poultry processing and packaging equipment for the specific purpose of processing live birds to cut up chicken. It also includes all associated support equipment, installations, and other related equipment. It is noted that this valuation does not include refrigeration equipment associated with the coolers/freezers as this is considered to be part of the real estate and was valued as such previously in this appraisal. There was also rolling stock included in this valuation.

## VALUATION METHODOLOGY

There are three approaches used in the determination of value: Cost Approach, Sales Comparison Approach, and Income Approach. These approaches are briefly described below.

**Cost Approach** is a set of procedures where an appraiser estimates a value indication by determining the current replacement or reproduction cost new of the assets being appraised and then deducting all forms of depreciation including physical deterioration, functional obsolescence, and external or economic obsolescence.

**Sales Comparison Approach** is a set of procedures where an appraiser estimates a value indication by comparing assets being appraised with similar assets that have been recently sold and adjusting sales prices based on appropriate elements of comparison.

**Income Approach** is a set of procedures where an appraiser estimates a value indication of assets by converting the anticipated income producing capacity into a present value. There are two methodologies to convert income into value: direct capitalization and discounted cash flow analysis.

## SCOPE OF WORK

AgVisory inspected the existing machinery and equipment on September 21, 2022, with Brian Roelofs. Descriptive information about the assets was provided. AgVisory collected and analyzed the information and developed the approaches to value deemed the most appropriate for the purpose and intended use of this assignment.

Consideration is given to each of the asset's contribution, or the contribution of the assets as a whole, based on the production capacity of the plant. The facility will be able to process 140 birds per minute, or 336,000 birds per week in one shift.

AgVisory conducted market research to identify sales of comparable assets. Based on the installed nature of the machinery and equipment located at the Pure Prairie Farms facility, there is very little market data or published data available. This is because most sales of similar facilities either involve transactions where the entire business or enterprise has sold as a whole or there is a liquidation auction, and the assets are sold and removed from the facility.

Therefore, the Cost Approach was the primary approach to value used valuing the subject's personal property assets. Installed appraisals require a significant amount of judgement by the appraiser which is subjective and based on experience in the industry. The appraiser uses current cost information from manufacturers and similar projects appraised to support replacement cost new and used equipment sales and auction results to support depreciation and obsolescence. AgVisory maintains a database of costs and sales information used to provide additional support.

AgVisory has relied upon the depreciation/asset list and equipment estimates/quotes provided by Pure Prairie Farms. The appraiser makes the extraordinary assumption that the information provided is an accurate representation of the current and proposed assets and their associated costs. It is noted that extraordinary assumptions may affect value. While a significant sample of the assets have been verified, the appraiser is not responsible if there are errors and/or omissions in the list provided by the owners. The full list is maintained in the appraiser's workfile.

In some instances, the assets included in this appraisal were not in operation during the inspection. The appraiser has made the assumption that all equipment is in working order unless otherwise indicated in this report.

AgVisory has considered a number of factors in the valuation of the assets. The appraiser has conducted industry research to support the analysis of the marketability and potential value of the subject assets. Every effort has been made to estimate value conclusions that are supportable and reflective of current market conditions.

The market for food processing and packaging equipment is average to good. In recent years, there has been a lot of merger and acquisition activity in the industry as well as private equity investment. As previously discussed, the market for convenience food products like those produced at the subject is currently strong. Supply chain issues and increasing cost of new equipment has positively impacted the used equipment market. In conclusion, the market for used food processing and packaging equipment has been stable to increasing in salability and value in recent years.

The tables that summarize the valuation of the machinery and equipment are located in the addenda of this report.

## VALUE CONCLUSION MACHINERY & EQUIPMENT – AS PROPOSED

The prospective 'as proposed/as complete' Fair Market Value – Installed of the machinery and equipment located at the Pure Prairie Farms facility in Charles City, Iowa site as of October 31, 2023, is:

**Twenty-Six Million Six Hundred Forty Thousand Dollars**

**($26,640,000)**

| Pure Prairie Farms 'As Proposed/As Complete' M&E Valuation | | |
|---|---|---|
| **Date in Service** **Asset Description** | **Cost** | **FMV - Installed** |
| 11/13/2017    Add'l Servers/Switches | 8,386 | 1,500 |
| 5/31/2018    8TB NVR-32 Camera | 14,391 | 7,000 |
| 11/13/2017    Cafeteria Chairs/Tables | 36,698 | 5,000 |
| 11/13/2017    M&E Original Build | 965,440 | 400,000 |
| 11/13/2017    CO2 Stun, Kill Scald PU | 1,837,415 | 1,200,000 |
| 11/13/2017    Air Chill System | 1,764,656 | 1,200,000 |
| 11/13/2017    Evis & Gib Harvesting System | 1,889,124 | 1,200,000 |
| 11/13/2017    Sensor X Bone System | 477,921 | 350,000 |
| 11/13/2017    Tender Hopper System | 163,898 | 125,000 |
| 11/13/2017    Tack & Shackles | 16,787 | 12,000 |
| 11/13/2017    Air Chill Hanger System | 57,901 | 40,000 |
| 11/13/2017    Berry Paw System | 272,997 | 200,000 |
| 11/13/2017    Box Maker | 12,471 | 9,000 |
| 11/13/2017    Case Sealer | 68,440 | 50,000 |
| 11/13/2017    Conveyors - IDFI | 1,861,564 | 1,000,000 |
| 11/13/2017    Conveyors - ProFab | 390,666 | 150,000 |
| 11/13/2017    CO2 System Connections | 10,953 | 7,500 |
| 11/13/2017    Cutup Saw | 10,686 | 8,000 |
| 11/13/2017    CVP machine | 171,856 | 130,000 |
| 11/13/2017    Electric Inst - Process Equip | 2,241,564 | 1,200,000 |
| 11/13/2017    Elect & PLC Panels | 275,854 | 150,000 |
| 11/13/2017    Engineering - Process Equip | 124,647 | 15,000 |
| 11/13/2017    Equip Commissioning Costs | 2,140,289 | 200,000 |
| 11/13/2017    Fans & Heaters/Live Birds | 39,162 | 25,000 |
| 11/13/2017    Feather Conveyor | 43,969 | 30,000 |
| 11/13/2017    Feather Sys Snd & Catwalk | 37,184 | 25,000 |
| 11/13/2017    Feather Vac System | 51,374 | 35,000 |
| 11/13/2017    Hock Cutter | 23,949 | 15,000 |
| 11/13/2017    Hot Water System | 146,457 | 100,000 |
| 11/13/2017    In Line Chill System | 162,067 | 120,000 |
| 11/13/2017    First Process - installation | 1,229,629 | 120,000 |
| 11/13/2017    Second Process - installation | 699,893 | 70,000 |
| 11/13/2017    Label Printers | 58,068 | 40,000 |
| 11/13/2017    Lift Station - pumps | 42,997 | 30,000 |
| 11/13/2017    Low Press Hot water Pump | 14,949 | 10,000 |
| 11/13/2017    Make-up air system | 471,477 | 350,000 |
| 11/13/2017    metal detector | 14,519 | 10,000 |
| 11/13/2017    Piping Install - Process Equip | 1,615,124 | 150,000 |
| 11/13/2017    Pressure Wash | 3,585 | 1,500 |
| 11/13/2017    Pumps-Wet Well DAF | 17,921 | 12,000 |
| 11/13/2017    Refrigerator System | 1,328,615 | 900,000 |
| 11/13/2017    Tipper Tie System | 49,049 | 35,000 |
| 11/13/2017    Tote/Lind Washer | 65,598 | 50,000 |
| 11/13/2017    Vacuum System | 335,666 | 250,000 |
| 11/13/2017    Vert Ammonia Recirculating System | 48,298 | 30,000 |
| 11/13/2017    Water Softener | 4,484 | 3,000 |
| 11/13/2017    Whole Bird Bagger | 30,955 | 25,000 |
| 11/13/2017    Wash  System | 10,157 | 8,000 |

## Pure Prairie Farms 'As Proposed/As Complete' M&E Valuation

| Date in Service | Asset Description | Cost | FMV - Installed |
|---|---|---:|---:|
| 11/13/2017 | Box Makers | 204,210 | 150,000 |
| 11/13/2017 | Water Meter | 2,378 | 1,500 |
| 11/13/2017 | Compressors (2) | 80,563 | 60,000 |
| 11/13/2017 | Track System for Live Birds | 16,208 | 5,000 |
| 11/13/2017 | Eng - Live Haul related | 51,647 | 35,000 |
| 11/13/2017 | Additional IDFI conveyor | 21,909 | 15,000 |
| 11/13/2017 | Surveillance System | 5,561 | 1,500 |
| 5/22/2018 | POSS PDL 6000 Separator | 416,864 | 350,000 |
| 6/20/2018 | Marel X-Ray machine | 190,033 | 140,000 |
| 6/12/020 | Pack-out project | 53,020 | 40,000 |
| 6/21/2018 | Airshirz Standard | 7,256 | 5,000 |
| 6/26/2018 | Whole Bird & Wing Line | 33,518 | 25,000 |
| 12/27/2017 | Marel X-Ray Machine | 200,000 | 150,000 |
| 5/24/2018 | Plumbing-Machinery | 17,741 | 10,000 |
| 12/1/2017 | Wet Well | 53,200 | 40,000 |
| New | Software | 520,431 | 350,000 |
| New | Plant start up, equipment repairs & update | | |
| | 1st processing - parts to upgrade | 629,343 | 597,876 |
| | 2nd processing - parts to upgrade | 912 | 866 |
| | Air Chill Line - parts to upgrade | 14,406 | 13,686 |
| | Boiler - parts to upgrade | 23,748 | 22,561 |
| | Plumbing & Pumps - parts to upgrade | 61,757 | 58,670 |
| | Refrigeration | 109,026 | 103,575 |
| New | Pallet Racking | 100,000 | 100,000 |
| New | Foodmate Cutup & Deboning Quote 09.02.2022 | | |
| | Distribution Line | 1,594,599 | 1,594,599 |
| | Framelines - Wing & Thigh Drum Cutter, etc. | 1,279,447 | 1,279,447 |
| | Thigh deboner & Whole leg deboner | 5,979,165 | 5,979,165 |
| | Belt Sizer | 380,175 | 380,175 |
| | Installation | 583,175 | 291,588 |
| | Freight | 140,000 | 70,000 |
| New | Retro Fit 2nd Processing & Packaging equipment | 3,628,757 | 2,540,130 |
| New | OSSID - NextGen 2115 WPL - Labeling Machine | 176,118 | 176,118 |
| | Installation & Training | 14,732 | 7,366 |
| | Delivery /Freight | 3,574 | 1,787 |
| New | OSSID - 500E NextGen - Overwrap Machines | | |
| | 5 - Base machines with conveyor | 1,403,115 | 1,403,115 |
| | 5 - 500ESS with Clear Detect Sensors | 281,675 | 281,675 |
| | 5 - 500HWT, Steam | 190,715 | 190,715 |
| | Shipping surcharge | 42,500 | 21,250 |
| | Installation & Training | 67,342 | 33,671 |
| | Delivery /Freight | 10,376 | 5,188 |
| As Proposed/As Complete' FMV - Installed | | $ 39,948,946 | $ 26,635,721 |
| | Rounded | | $ 26,640,000 |

## VALUE CONCLUSION ROLLING STOCK – AS PROPOSED

The proposed equipment estimates included in this valuation was provided by Pure Prairie Farms. The prospective 'as proposed/as complete' Fair Market Value of the rolling stock located at the Pure Prairie Farms facility in Charles City, Iowa site as of October 31, 2023, is:

### Four Million One Hundred Ninety Thousand Dollars
### ($4,190,000)

| Pure Prairie Farms - 'As Proposed' Rolling Stock Valuation | | | | |
|---|---|---|---|---|
| Year | Equipment | Condition | Cost | FMV |
| 2022 | Chicken Cages 9 sets 216 cages | New | 521,517 | 480,000 |
| 2022 | Ford 550 w/ Crysteel Bed | New | 90,386 | 85,000 |
| 2022 | Chev Silverado 1500 Ext Cab | New | 45,900 | 40,000 |
| 2022 | Chev Silverado 1500 Club Cab | New | 51,210 | 45,000 |
| 2022 | Chev Silverado 1500 Club Cab | New | 49,004 | 45,000 |
| 2022 | Chev Silverado 1500 Club Cab | New | 48,647 | 45,000 |
| 2022 | Ford F150 | New | 87,854 | 80,000 |
| 2022 | Chicken Cages 9 sets 216 cages (Feb) | New | 521,517 | 480,000 |
| 2021 | Chev Silverado Duramax 44000 miles | Used | 50,000 | 45,000 |
| 2023 | Pickup - Service | Proposed | 55,000 | 50,000 |
| 2023 | Pickup - Service | Proposed | 55,000 | 50,000 |
| 2023 | Pickup - Service | Proposed | 55,000 | 50,000 |
| 2023 | Vehicle Sr Management | Proposed | 70,000 | 65,000 |
| 2023 | Vehicle Sr Management | Proposed | 70,000 | 65,000 |
| 2023 | Vehicle Sr Management | Proposed | 70,000 | 65,000 |
| 2023 | Vehicle Sr Management | Proposed | 70,000 | 65,000 |
| 2022 | BobCat Telehandler | New | 88,000 | 80,000 |
| 2022 | BobCat Telehandler | New | 88,000 | 80,000 |
| 2022 | BobCat Telehandler | New | 88,000 | 80,000 |
| 11/13/2017 | Pallet Jack | Average | 1,727 | 500 |
| 11/13/2017 | Forklifts | Average | 23,477 | 18,000 |
| 11/13/2017 | Reefer Trailers | Average | 14,968 | 10,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #1 | Average | 66,040 | 50,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #2 | Average | 66,040 | 50,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #3 | Average | 66,040 | 50,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #4 | Average | 66,040 | 50,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #5 | Average | 66,040 | 50,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #6 | Average | 66,040 | 50,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #7 | Average | 66,040 | 50,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #8 | Average | 66,040 | 50,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #9 | Average | 66,040 | 50,000 |
| 12/7/2017 | Track System For Transporting Mods | Average | 10,698 | 2,500 |
| 2022 | 2022 - 4 Curtainsider Trailers (October) | New | 461,833 | 440,000 |
| 2022 | 2000 Ottawa Spotter Truck | Used | 32,941 | 30,000 |
| 2022 | 2011 Autocar Spotter Truck | Used | 21,714 | 20,000 |
| 2022 | 2018 T770 Bobcat Loader | Used | 75,000 | 75,000 |
| 2022 | 2022 5th Wheel Trailer | New | 38,290 | 38,000 |
| 2022 | 5th Wheel Trailer | Used | 25,000 | 25,000 |
| 2023 | 2023 - 4 Curtainsider Trailers (October) | New | 461,833 | 440,000 |
| 2022 | 2023 Chev Silverado Duramax SR Mgmt | New | 72,000 | 70,000 |
| 2022 | 2022 Chev 6500 | New | 79,000 | 75,000 |
| 2023 | 2023 Smithway Chick Trailer | New | 228,725 | 220,000 |
| 2022 | 2022 5th Wheel Trailer | New | 38,290 | 38,000 |
| 2022 | 2000 IH 9100 Semi Truck - Day Cab | Used | 22,507 | 20,000 |
| 2023 | 2023 Chick Trailer #2 | New | 228,725 | 220,000 |
| | | **Totals** | **$ 4,606,123** | **$4,187,000** |
| | | **FMV - Rounded** | | **$4,190,000** |

## INCOME APPROACH – AS PROPOSED/AS COMPLETE

## TEST OF REASONABLENESS

The Income Approach is based primarily on the principle of anticipation; that value is measured as the present worth of all income anticipated to be generated by the property over the ownership period. This approach also takes into consideration that the property will be put to that use, which over a given period of time will produce the greatest net return. Supply and demand are also important forces which must be examined in this approach with regard to gross revenues, expenses, prospective purchasers' demands, and available money supply. The Income Approach also considers the risks, rates of return and financing terms of substitute investments. All of these factors are influential on the Income Approach and must be analyzed from the market.

### EBITDA(X)

The EBITDA stands for earnings before interest, taxes, depreciation, and amortization. EBITDA(x) is a financial ratio relating the value of a business to its earnings before interest, taxes, depreciation, and amortization expenses.

*EBITDA valuation multiple* is a common choice in valuing businesses using the market-based valuation methods. The multiples are ratios that are statistically derived from recent comparable business sales.

Once the price the business sells for is known, the appraiser divides it by the firm's most recent annual EBITDA figure.

EBITDA Multiple = Sale Price or Enterprise Value (EV) / EBITDA

Repeating the calculation for a number of comparable companies provides a statistical population. The valuation multiples thus establish a range, from low to high, as well as the average and median values. The appraiser estimates the value of a company in the same industry sector and with similar financial and operational attributes using the EBITDA valuation multiples. For example, to calculate the expected value of a business, I multiply the company's recent EBITDA earnings by the average valuation multiple.

EBITDA valuation multiple factors out the following elements when estimating the business enterprise value:

- Business Taxes
- Effect of capital structure used to finance business operations
- Cost of recovery of the investment in fixed business assets

EBITDA adjustments in business valuation level the playing field. Many privately-owned businesses are structured as pass-through entities and do not pay taxes, hence the tax addback. Business owners have considerable discretion in how to finance the

operations. This is reflected in the addition of interest expense to
the EBITDA earnings basis. As a result, I can determine the value of the company
regardless of the choice of capital structure.

Management may opt for quick cost recovery on fixed assets and depreciate them
even if the assets retain considerable economic value. Company net income may be
artificially low due to high depreciation and amortization expenses.
Selecting EBITDA as the earnings basis for a business valuation lets me capture the
true economic potential of the firm.

EBITDA valuation multiples are especially well suited for appraisal of asset rich
companies including food and beverage processing businesses, manufacturing
businesses, distribution and wholesale firms, real estate driven companies, and
technology businesses.

## PROJECTED FINANCIAL DATA

The owners provided the appraiser with five years of projected financial statements
from 2022 – 2026. The table below summarizes the combined income and expense
data taken from those statements.

| | Fiscal 2021 | Fiscal 2022 | Fiscal 2023 | Fiscal 2024 | Fiscal 2025 | Fiscal 2026 |
|---|---|---|---|---|---|---|
| Period Ending | 1-Jan-22 | 31-Dec-22 | 30-Dec-23 | 28-Dec-24 | 27-Dec-25 | 2-Jan-27 |
| Period Weeks | 34 | 52 | 52 | 52 | 52 | 53 |
| **Profit & Loss Statement** | | | | | | |
| Birds to Process | - | 3,722,000 | 17,472,000 | 26,712,000 | 34,944,000 | 35,616,000 |
| Meat Pounds Sold | - | 14,025,154 | 78,631,896 | 121,846,120 | 159,396,182 | 162,461,494 |
| **Weight per Bird** | #DIV/0! | 3.77 | 4.50 | 4.56 | 4.56 | 4.56 |
| | | | | | | |
| Net Sales | $    - | $   21,698,133 | $   113,335,899 | $   157,181,664 | $   204,977,552 | $   208,877,259 |
| Customer Freight | - | 963,808 | 6,700,153 | 10,520,745 | 13,762,938 | 14,027,610 |
| | - | - | - | - | - | - |
| **Total Revenue** | - | 22,661,941 | 120,036,052 | 167,702,408 | 218,740,491 | 222,904,869 |
| Value per pound sold | #DIV/0! | 1.62 | 1.53 | 1.38 | 1.37 | 1.37 |
| Cost of Goods Sold | | | | | | |
| | | | | | | |
| Live Cost | - | 12,438,050 | 63,174,395 | 75,263,799 | 97,489,819 | 98,972,533 |
| Plant Cost | - | 4,719,989 | 32,910,012 | 49,185,282 | 63,766,782 | 65,295,176 |
| Freight | - | 963,808 | 6,700,153 | 10,520,745 | 13,762,938 | 14,027,610 |
| **Total Cost** | - | 18,121,848 | 102,784,560 | 134,969,826 | 175,019,539 | 178,295,319 |
| Cost per pound sold | #DIV/0! | 1.29 | 1.31 | 1.11 | 1.10 | 1.10 |
| Other Costs | | | | | | |
| S,G&A Cost | 81,669 | 4,002,583 | 5,702,963 | 7,822,066 | 10,257,284 | 11,110,070 |
| Marketing Cost | - | 90,000 | 260,000 | 260,000 | 260,000 | 265,000 |
| Depreciation | - | 853,085 | 3,764,959 | 5,330,191 | 5,956,584 | 6,746,907 |
| Amortization | - | 28,717 | 87,841 | 87,841 | 87,841 | 89,530 |
| Operating Interest | - | - | - | - | - | - |
| Term Interest | 67,345 | 1,352,773 | 2,565,800 | 2,594,088 | 2,493,456 | 2,209,704 |
| **P&L** | (149,014) | (1,787,064) | 4,869,929 | 16,638,397 | 24,665,787 | 24,188,339 |
| | | | | | | |
| **EBITDA** | $    (81,669) | $    447,511 | $   11,288,528 | $   24,650,517 | $   33,203,667 | $   33,234,480 |
| **EBITDA Percent of Gross Sales** | | 2% | 9% | 15% | 15% | 15% |
| EBITDA per pound sold | | 0.03 | 0.14 | 0.20 | 0.21 | 0.20 |

Pure Prairie Farms projects an EBITDA of $11,288,528 for fiscal year end 2023. This
is the EBITDA used in this analysis. The appraiser is including this approach to
value as a test of reasonableness only and not relying upon the results produced
herein because this analysis produces a going concern value. The going concern
value may include such items as inventory, goodwill, and other intangible items (i.e.,
brands, etc.)

## MARKET EBITDA(X)

The appraiser has researched several known sources for Revenue(x) and EBITDA(x) including PwC, Ernst & Young, Duff & Phelps, Moss Adams, Trinity Capital, SDR Ventures, Capstone Partners, and NYU Stern School of Business.

M&A deal activity in the food and beverage space slightly decreased in Q1 2022, with three less transactions than the previous quarter. There were 363 deals closing over the trailing 12-month (TTM) period, ending March 31, 2022, an increase of 37 transactions year-over-year. Transaction volumes in Q1 2022 were lower than the previous year, with 82 deals announced compared to 93. Q1 2022 marks the seventh consecutive quarter with over 80 deals announced in the North American food and beverage space.

Q1 2022 saw several notable North American deals in the alcoholic beverage space. Monster Beverage Corporation acquired a majority stake in CANarchy Craft Brewery Collective, adding alcoholic beverages to their product portfolio. In addition, Starfield Properties Inc. acquired Shafer, further expanding their wine business. Alcoholic beverages, general, better-for-you and produce were the most active categories in terms of deal volume, representing 56% of total transactions in the quarter. M&A activity in the food and beverage sector in Q1 2022 TTM is still predominately driven by strategic buyers (including companies primarily owned by private equity investors), with strategic transactions representing 78% of total deal value. Of the 363 deals closed over Q1 2022 TTM, 260 (72%) were completed by privately owned buyers.

Following an unprecedented year of deal flow, Q1 2022 transaction volume remained strong with a slight decrease year-over-year due to a variety of economic headwinds. Expected interest rate hikes, global tensions, inflationary pressures and supply chain issues have caused unexpected volatility in the market. Specifically in the food and beverage manufacturing space, capacity pressures have risen from labor shortages, increased wages and inventory scarcities that have shown significant complication to operations.

The remainder of 2022 saw strong sales growth, although at a more moderate pace than 2021. Large cash reserves from public companies and an abundance of dry powder in the market will likely continue driving M&A transactions. Given some of the macro headwinds and fears of a recession currently permeating the market, I believe the food and beverage industry will remain an attractive, defensive sector for investment and acquisitions.





The NYU Stern Business School reported, as of January 2022, an average EBITDA(x) for farming/agriculture companies was 12.87x and the average for food processing companies was 12.62x.

The table on the below was taken from SVR Venture for the first half of 2022. It summarizes public company trading statistics for protein producers. The LTM EBITDA multiples ranged from 7.7x to 56.7x, with an average of 18.7x and median of 13.7x. Tyson Foods, Inc. multiple was 5.6x and Pilgrim's Pride multiple was 12.3x.

## PROTEINS

| | | Market Stats | | | | | Operating Stats | | LTM Multiples | | | NTM Multiples | |
| Company Name | Symbol | Market Cap ($ in Mil) | Price ($) | Quarter Change | YTD Change | % of 52 Week High | Est. Revenue Growth | EBITDA Margin | TEV/ Rev | TEV/ EBITDA | Price/ EPS | TEV/ NTM Revenue | TEV/ NTM EBITDA |
| Tyson Foods | TSN | $ 31.15 | $ 86.06 | (4.0%) | (13%) | 85.4% | 3.9% | 13.4% | 0.7x | 5.6x | 7.7x | 0.7x | 7.3x |
| Hormel Foods | HRL | 25,861 | 47.36 | (6.1%) | (3.0%) | 85.9% | 0.5% | 11.8% | 2.3x | 19.2x | 27.2x | 2.3x | 17.3x |
| Pilgrim's Pride | PPC | 7,505 | 31.23 | 24.4% | 10.7% | 90.1% | 13.6% | 5.4% | 0.7x | 12.3x | 35.9x | 0.6x | 6.4x |
| Post Holdings | POST | 5,002 | 82.35 | 18.9% | 11.6% | 98.0% | (5.6%) | 23.0% | 1.7x | 7.7x | 11.0x | 1.8x | 10.9x |
| Nomad Foods | NOMD | 3,479 | 19.99 | (11.5%) | (21.3%) | 69.1% | (2.3%) | 13.6% | 1.9x | 13.7x | 16.1x | 1.9x | 10.3x |
| Bridgford Foods | BRID | 120 | 13.18 | 20.9% | 8.8% | 92.9% | NM | 1.1% | 0.6x | 56.7x | NM | NM | NM |
| Pingtan Marine Enterprises | PME | 76 | 0.89 | 39.2% | 54.7% | 79.4% | NM | NM | 2.9x | 15.5x | NM | NM | NM |
| Segment Average | | | | 11.4% | 8.6% | 85.8% | 2.0% | 11.4% | 1.5x | 18.7x | 19.6x | 1.5x | 10.5x |
| Segment Median | | | | 18.9% | 8.8% | 85.9% | 0.5% | 12.6% | 1.7x | 13.7x | 16.1x | 1.8x | 10.3x |

The table on the following page summarizes a few transactions of meat processing businesses that have occurred since 2018. Most notable is the Tyson Foods purchase of Tecumseh Poultry which is the value-added chicken company with operations in Nebraska and Arkansas. They also have the brands Smart Chicken and Organic Smart Chicken. Tecumseh uses air-chill and controlled atmosphere stunning. The multiple for the purchase was 9.6x EBITDA.

On July 22, 2022, Cargill and Continental Grain Company announced the completion of the previously announced acquisition of Sanderson Farms, Inc. by a joint venture between Cargill and Continental Grain. The acquisition was announced on August 9, 2021. Sanderson Farms shareholders are receiving $203.00 per each share of common stock they owned as of immediately prior to the completion of the transaction. The total acquisition totaling $4.53 billion. As a result of the completion of the transaction, Sanderson Farms' shares will no longer trade on the NASDAQ beginning July 22, 2022. As a part of the closing of the transaction, Cargill and Continental Grain have combined Sanderson Farms with Wayne Farms, a subsidiary of Continental Grain, forming a new privately held poultry business. The new business, named Wayne-Sanderson Farms, will be headquartered in Oakwood, GA.

| Close Date | Acquirer/ Investor | Target | Description | Transaction Value | EV/ Revenue | EV/ EBITDA |
|---|---|---|---|---|---|---|
| Feb-19 | Symrise AG | International Dehydrated Foods, Inc. | Produces poultry-based, protein-fortifying ingredients | $900.0 | 4.1x | - |
| Apr-18 | Marfrig Global Foods S.A. | National Beef Packing Company, LLC | Processes, Packages and Distributes fresh and frozen beef and beef by-products | $969.0 | 0.3x | - |
| Feb-20 | JBS USA | Empire Packing Co. LP | The transaction includes Empire's case-ready production facilities and Ledbetter branded retail products. Empire is comprised of five processing facilities located in Cincinnati and Mason, Ohio; Denver; Memphis, Tenn.; and Olympia, Wash. | $238.0 | - | - |
| May-19 | Perdue Premium Meat Co. | Panorama Meats | The nation's largest producer of 100% grass-fed and grass-finished certified organic beef. Financial terms of the transaction were not disclosed. | - | - | - |
| Oct-18 | Tyson, Inc. | Tecumseh Poultry, LLC | One of the nation's leading producers of organic branded chicken through its acquisition of Tecumseh Poultry LLC.  The purchase, announced today, includes the air-chilled Smart Chicken® brand. Tecumseh Poultry was founded in 1998 and produces air-chilled, fresh chicken, as well as deli-style chicken and a variety of chicken sausages. MBA Poultry LLC (Tecumseh Poultry LLC) is a chicken company based in Waverly, Nebraska. It was founded in 1998 with the mission to produce a product different from the dominant broiler companies in the country. The company was one of the first to use air chilling. In 2003, the company began to produce US Department of Agriculture certified organic products. In 2005, the company began using controlled atmosphere stunning in its slaughter process. The company's products include whole chicken and chicken parts, deli-style roasted chicken breast and organic uncured chicken sausages. MBA Poultry produced an estimated 2.62 million pounds of ready-to-cook chicken on a weekly basis in 2017, the same amount as 2016. MBA Poultry brands are Smart Chicken and Organic Smart Chicken. | $382.0 total $49.0 PP&E | 2.2x | 9.6x |
| Sep-18 | George's | Ozark Mountain Poultry | OMP is poultry company that produces antibiotic-free and non-GMO chicken products. OMP serves the retail and foodservice channels with its Forester Farmers Market brand. Its Arkansas facilities - a poultry harvest plant in Batesville and a further processing plant in Rogers. Produces 6.3 million pounds of ready-to-cook chicken. | - | - | - |

## GOING CONCERN VALUE CONCLUSION – AS PROPOSED

Taking into consideration the landscape of food and beverage mergers and acquisitions and the operations of Pure Prairie Farms, I have made the following conclusions.

The appraiser utilized the five-year average EBITDA for this analysis, $11,288,528. The EBITDA multiples selected were 5x –7x which are slightly below average for food processing businesses accounting for risk associated with a startup company. The formula for this method is:  EBITDA x EBITDA(x) = Enterprise Value

| EBITDA | EBITDA(x) | Going Concern Value |
|--------|-----------|---------------------|
| $ 11,288,528 | 5 | $ 56,442,640 |
| $ 11,288,528 | 6 | $ 67,731,168 |
| $ 11,288,528 | 7 | $ 79,019,696 |

This analysis has been provided to estimate an 'as proposed/as complete' enterprise / going concern value conclusion for the Pure Prairie Farms as of December 31, 2022. The value range of $56,442,640 to $79,019,696 supports the total reconciled values of the subject property's real estate and personal property.

It is difficult, at best, to predict the future performance of an agribusiness like the subject even three years out due to inherent volatility of agricultural markets and due to unpredictability of weather events, pests, or diseases. This value may include other real estate owned, personal property, rolling stock, inventory, good will, intangible assets, and/or business value.

# SUBJECT PROPERTY VALUATION – AS IS

## COST APPROACH – AS IS

The Cost Approach is based on the principle of substitution - that a prudent and rational person would pay no more for a property than the cost to construct a similar and competitive property, assuming no undue delay in the process. The Cost Approach tends to set the upper limit of value before depreciation is considered. The applied process is as follows:

- Estimate the land value according to its Highest and Best Use. I have used the Sales Comparison Approach; the process is as follows:
  - Comparable sales, contracts for sale, and current offerings are researched and documented.
  - Each comparable is analyzed and adjusted to equate with the subject property.
  - The value indication of each comparable is analyzed and the data reconciled for a land value indication.

- Estimate the replacement cost of the building and site improvements.
- Estimate the physical, functional and/or external depreciation accrued to the improvements.
- Sum the depreciated value of the improvements with the value of the land for an indication of value.

## LAND VALUATION

The land valuation for the 'as is' valuation is the same analysis as the land value conclusion reconciled in the 'as proposed/as complete' valuation. Therefore, it was not repeated here. The value conclusion of the Sales Comparison Approach is as follows: $65,000 per square foot x 13.434 square feet = $873,234, rounded to $875,000.

**Land Value Indication (Rounded): $875,000**

## COST ANALYSIS – AS IS

The next step in the Cost Approach is to estimate the replacement cost of the buildings and site improvements. The replacement costs utilized in this approach are based on a combination of actual cost data provided by the owners and cost information from Marshall Valuation Services, a nationally recognized provider of construction cost data. The appraiser also utilized cost estimates from recent similar assignments for comparison.

Costs included within the Marshall Valuation Services cost estimates include hard and soft costs of construction. These consist of:

- Average architect's and engineer's fees

- Normal interest on building funds during the period of construction plus the processing fee or service charges
- Sales tax on materials
- Normal site preparation
- Contractor's overhead and profit

## SOFT COSTS, ENGINEERING, ARCHITECTURAL, PERMITS & LEGAL

Costs included within the Marshall Valuation Services cost estimates include hard and soft costs of construction and consist of the following: average architect's and engineer's fees; normal interest on building funds during the period of construction plus the processing fee or service charges; sales tax on materials; normal site preparation; and contractor's overhead and profit. For the subject, the costs per square foot were obtained from the MVS Commercial Cost Guide Section 14 (Garages, Industrials, Lofts, and Warehouses).

The appraiser has appraised several new construction projects. Some information is confidential and cannot be disclosed. The table below summarizes five projects and breaks down the cost new into vertical improvements, site improvements and machinery and equipment.

| Comp | Date | Type | Size (GBA) | Vertical Improvements | Site Improvements | M&E | Total Cost New |
|------|------|------|-----------|----------------------|-------------------|-----|----------------|
| 1 | May-20 | Poultry Processing | 414,783 | $ 148,901,509 | $ 5,630,118 | $ 134,872,056 | $ 289,403,683 |
| 2 | Apr-20 | Orange Juice Processing | 330,602 | $ 51,941,259 | $ 500,000 | $ 36,302,467 | $ 88,743,726 |
| 3 | May-20 | Hog Processing | 660,898 | $ 145,273,392 | $ 26,950,798 | $ 156,462,309 | $ 328,686,499 |
| 4 | Aug-17 | Hatchery | 119,541 | $ 25,021,126 | $ 462,098 | $ 19,616,475 | $ 45,099,699 |
| 5 | Sep-20 | Lamb Processing/Harvest | 63,306 | $ 14,358,195 | $ 3,096,875 | $ 5,708,000 | $ 23,163,070 |

The following table further analyzes the cost comparables into price-per-square-foot. The costs per-square-foot of the vertical improvements of the cost comparables range from $157.11 to $358.99 with an average of $234.41.

| Comp | Vertical Improvements $/SF | Site Improvements $/SF | M&E $/SF | Total Cost New $/SF |
|------|--------------------------|------------------------|----------|---------------------|
| 1 | $ 358.99 | $ 13.57 | $ 325.16 | $ 697.72 |
| 2 | $ 157.11 | $ 1.51 | $ 109.81 | $ 268.43 |
| 3 | $ 219.81 | $ 40.78 | $ 236.74 | $ 497.33 |
| 4 | $ 209.31 | $ 3.87 | $ 164.10 | $ 377.27 |
| 5 | $ 226.81 | $ 48.92 | $ 90.17 | $ 365.89 |
| Average | $ 234.41 | $ 21.73 | $ 185.20 | $ 441.33 |
| Low | $ 157.11 | $ 1.51 | $ 90.17 | $ 268.43 |
| High | $ 358.99 | $ 48.92 | $ 325.16 | $ 697.72 |

I have compared the MVS cost estimate of the subject's buildings and the cost comparables in the table on the following page.

| | MVS Cost | Cost Comparables |
|---|---|---|
| $/SF RCN | $194.49 | $157.11 - $358.99; Avg $234.41 |

The MVS RCN estimate is within the range of the cost comparables. Therefore, the appraiser is using the MVS costs in this analysis.

## DEVELOPER'S PROFIT

This factor reflects the profit necessary for the developer to undertake the management, responsibility and risks of construction associated with the subject property. Current valuation theory states that the four components that create value are land, labor, capital, and coordination. Developer's profit, as used in the Cost Approach, reflects the coordination component of value. Typically, developer's profit runs 10% to 20%; however, projects such as the subject are typically built for a specific purpose to be owner operated. Facilities like the subject are not built for speculation or investment purposes; therefore, developer's profit is deemed to be not applicable to the subject.

## DEPRECIATION ANALYSIS

Depreciation may be defined as any loss of value from any cause. There are three general areas of depreciation: physical deterioration, functional obsolescence, and external obsolescence. Depreciation may be curable or incurable, the test being that money spent to cure the depreciation be gained in value. If the depreciation costs more to fix than will be gained in value, then the depreciation is considered incurable.

## PHYSICAL DETERIORATION

This results in deterioration from aging and use. This type of depreciation may be curable or incurable.

## FUNCTIONAL OBSOLESCENCE

This results from a lack of utility or desirability due to design or market perception of the improvements. This type of depreciation may be curable or incurable.

## EXTERNAL OBSOLESCENCE

This is due to circumstances outside the property itself, such as industry, demographic and economic conditions or an undesirable proximate use. This type of depreciation is rarely curable.

## DEPRECIATION ACCRUED TO THE SUBJECT

| Depreciation: Section 1 of 1 | | | | | |
|---|---|---|---|---|---|
| Component | Eff. Age | Life | Percent | | Amount |
| Physical Depreciation: Building | 35 | 55 | 64% | | $10,658,113 |
| Physical Depreciation: Site | 18 | 20 | 90% | | $450,000 |
| Functional Obsolescence Building …………………………… | | | 0% | | $0 |
| External Obsolescence Building …………………………… | | | 20% | | $1,218,070 |
| | | | | Total Depreciation | $12,326,183 |
| | | | | Depreciated Value of Improvements | $4,922,280 |

## DEPRECIATION ANALYSIS

The economic age-life method has been used to determine the total depreciation of the subject facilities. The economic age-life method is defined by the 5th Edition of *The Dictionary of Real Estate Appraisal* as, "a method of estimating depreciation in which the ratio between the effective age of a building and its total economic life is applied to the current cost of the improvements to obtain a lump-sum deduction; also known as the age-life method."

Effective age is defined as the age of property that is based on the amount of observed deterioration and obsolescence it has sustained, which may be different from its chronological age. The effective age of the subject facilities has been determined through visual inspection and by comparing the subject to similar projects appraised by the appraiser. The actual ages of the improvements vary from 5 to 41 years old. The effective age of the subject improvements overall has been determined to be 35 years, a blended effective age, which may be different from their actual age.

Economic life is defined as the period over which improvements to real property contribute to property value. The economic lives of the improvements have been determined by conversations with contractors and other appraisers and through the market extraction method as previously described. The total economic life for the subject's improvements was determined to be 55 years. This is reflective of the mix of construction types included in the subject property.

The formula for this method is:

(Effective Age/Total Life) x Total Replacement Cost New (RCN) = Depreciation

**External Obsolescence**

Economic obsolescence, also referred to as external obsolescence, is the loss in value resulting from influences external to the property itself. External conditions causing EO may be international, national, industry-based, or local in origin. Various external factors affect potential economic returns, thus having a direct impact on the market value of an asset or property.

To quantify EO, an appraiser must first investigate the existence of economic conditions that may reduce the value of a business and, hence, its assets. Then, the EO must be quantified in an objective manner. EO may exist in any industry or property where the following attributes are found:

- Reduced demand for the company's products
- Overcapacity in the industry
- Dislocation of raw material supplies
- Increasing cost of raw materials, labor, utilities, or transportation, while the selling price of the product remains fixed or increases at a much lower rate
- Government regulations that require capital expenditures to be made with little or no return on the new investment
- Environmental considerations that require capital expenditures to be made with little or no return on the new investment
- EO is present when better economic opportunities exist for an investment. The economic principles of supply and demand, and competition drive the loss of value associated with EO.

The appraiser analyzed several transfers of processing facilities to extract market depreciation and obsolescence. It is noted that it is difficult, at best, to allocate functional obsolescence and external obsolescence from the market. The table below summarizes depreciation rates extracted from eight sales of food processing plant sales. The detailed analysis is included in the addenda. The sales were determined to have functional and external obsolescence ranging from -20.6% to 68.7% with an average of 36.7%. Sale 8 presented a negative obsolescence indicating that the buyer paid a premium for the property and/or it included some business value (inventory, A/R, customer lists, brands, etc.). It is noted that all the analyzed facilities are older facilities, like the subject. The sales ranged from 11 – 72 years old with an average of 33 years. They are not of modern design or layout. Most older facilities have short ceiling heights, multiple floors, inefficient product flow, inadequate welfare areas, dated refrigeration and HVAC systems, poor design with regards to animal welfare, etc. In addition, only three of the sales had FF&E that had contributory value. Most facilities either had the FF&E removed prior to sale or it was in poor condition. Typically, if a business fails, the machinery and equipment is removed from the facility and sold separately or scrapped. If a larger corporation sells a facility, they typically remove equipment to use in other facilities they own and/or sell the excess equipment.

| Market Extracted Depreciation | | |
|---|---|---|
| Sale | % Phys/Year | % Func/Ext Obs |
| 1 | 2.0% | 53.4% |
| 2 | 2.0% | 43.4% |
| 3 | 1.5% | 68.7% |
| 4 | 1.5% | 21.8% |
| 5 | 2.0% | 49.9% |
| 6 | 2.0% | 58.3% |
| 7 | 1.5% | 18.6% |
| 8 | 1.9% | -20.6% |
| Avg | 1.8% | 36.7% |
| Low | 1.5% | -20.6% |
| High | 2.0% | 68.7% |

The demand for poultry has continued to rise in the United States. Poultry is seen as good value for money for end users and a lower cost alternative to other proteins. The demand for healthier products (organic, non-GMO, all natural, local, sustainable) has also been on the rise. There are only six poultry plants in the United States that have air chill capabilities, including the subject. Air chilling benefits the producer through an improved product; benefits the environment through reduced water consumption and benefits the consumer through reduced bacteria and a better flavor.

Furthermore, the owners are established in the specialty poultry processing industry and have experienced significant growth in their business over the past five years. There has also been increased demand for organic and/or air-chilled chicken.

The subject facility is within 250-mile radius of the chickens grow-out farm for processing. It is near other processing facilities; however, it is in a rural area. The facility will be of functional design or layout for a processing plant and cold storage facility. That said, the subject property has transferred multiple times in the past eight years. There is a high level of competition for labor in Iowa due to the large number of processing plants and their demand for workers. In addition, the subject facility was shuttered for approximately three years.

Based on these factors and the above presented market support, the appraiser has determined that there is some functional and/or external obsolescence. It is difficult to determine the allocation between them. The appraiser has selected a rate of 20% functional/external obsolescence.

## COST APPROACH CONCLUSION – AS IS

The table on the following page presents the cost analysis of the subject. Based on the analysis detailed on the following page, I have reconciled to a current "as is" Cost Approach value of **$5,800,000.**

| Marshall Valuation Service | | | | | |
|---|---|---|---|---|---|
| **Cost Source:** Marshall Valuation Service | | | | | |

| Building Improvements | | | | | |
|---|---|---|---|---|---|
| **Item** | **Unit Type** | **Cost** | **Quantity** | **Multiplier** | **Total** |
| Processing Building | Sq. Ft. | $199.00 | 82,187 | 1.000 | $16,355,213 |
| Live Hold Shed | Sq. Ft. | $60.50 | 6,500 | 1.000 | $393,250 |
| | | | | **Total Building Improvement Costs** | **$16,748,463** |
| | | | | Price per SF Gross Building Area | $188.85 |

| Site Improvements | | | | |
|---|---|---|---|---|
| **Item** | **Unit Type** | **Cost** | **Quantity** | **Total** |
| Site Preparation & Improvements | Lump Sum | $500,000 | 1 | $500,000 |
| | | | **Total Site Improvement Costs** | **$500,000** |
| | | | **Subtotal: Building & Site Costs** | **$17,248,463** |
| | | | Price per SF Gross Building Area | $194.49 |

| Soft Costs | | | |
|---|---|---|---|
| **Item** | | **Percent Type** | **Total** |
| Engineering ……………… | 0.0% | % Bld. & Site Cost | $0 |
| Architectural ……………… | 0.0% | % of Building Cost | $0 |
| Permits & Legal …………………………………………………… | | | $0 |
| Leasing …………………………………………………… | | | $0 |
| | | **Total Soft Costs** | **$0** |
| **Insurable Value (Excludes Site Improvements, related Site Soft Costs and Developer's Profit)** | | | **$16,748,463** |
| **Total Costs** | | | |
| | Subtotal: Building, Site & Soft Costs | | $17,248,463 |
| | Developer's Profit | 0.0% | $0 |
| | **Total Cost** | | **$17,248,463** |
| | Price per SF Gross Building Area | | $194.49 |

| Depreciation: Section 1 of 1 | | | | |
|---|---|---|---|---|
| **Component** | **Eff. Age** | **Life** | **Percent** | **Amount** |
| Physical Depreciation: Building | 35 | 55 | 64% | $10,658,113 |
| Physical Depreciation: Site | 18 | 20 | 90% | $450,000 |
| Functional Obsolescence Building ………………………… | | | 0% | $0 |
| External Obsolescence Building ………………………… | | | 20% | $1,218,070 |
| | | **Total Depreciation** | | **$12,326,183** |
| | | **Depreciated Value of Improvements** | | **$4,922,280** |
| | | Cost Per Square Foot Gross Building Area | | $55.50 |

| Land Value | |
|---|---|
| Land Value …………………………………………………… | $875,000 |
| Other …………………………………………………… | $0 |
| **Cost Approach Value Indication** | **$5,797,280** |
| **Rounded** | **$5,800,000** |
| Price per SF Gross Building Area | $65.40 |

## SALES COMPARISON APPROACH – AS IS

The Sales Comparison Approach is based on the premise that a buyer would pay no more for a specific property than the cost of obtaining a property with the same quality, utility, and perceived benefits of ownership. It is based on the principles of supply and demand, balance, substitution, and externalities. The following steps describe the applied process of the Sales Comparison Approach.

- The market in which the subject property competes is investigated; comparable sales, contracts for sale and current offerings are reviewed.
- The most pertinent data is further analyzed, and the quality of the transaction is determined.
- The most meaningful unit of value for the subject property is determined.
- Each comparable sale is analyzed and where appropriate, adjusted to equate with the subject property.
- The value indication of each comparable sale is analyzed, and the data reconciled for a final indication of value via the Sales Comparison Approach.

## COMPARABLES

I have researched and analyzed several transfers for this analysis. All have been researched through various sources, inspected, and verified by a party to the transaction. Some information is confidential in nature and has been retained in the appraiser's work file. The focus was on protein processing facilities in the United States. A larger market area is typical for this type of property due to its special purpose nature. It is also necessary to go further back in time. Several protein processing facilities were unearthed during the research and the appraiser selected eight to analyze in this approach to value.

The best unit of comparison is the price-per-square foot of the GBA. The write-ups on the following pages summarize the comparables identified for this analysis.

## Comparable 1

 

### Transaction

| | | | |
|---|---|---|---|
| **ID** | 537 | **Date** | 1/19/2018 |
| **Address** | 2125 Rochester Rd | **Price** | $14,322,500 |
| **City** | Montgomery | **Price Per SF** | $51.15 |
| **State** | IL | **Transaction Type** | Closed Sale |
| **Tax ID** | 15-30-401-031 | **Financing** | Conventional |
| **Grantor** | Butterball LLC | **Property Rights** | Fee Simple |
| **Grantee** | Carl Buddig & Company | **Days on Market** | 177 |
| **Book/Page or Reference Doc** | 2018K003764 | **Verification** | 3rd party Appraiser, Public records, Articles |

### Site

| | | | |
|---|---|---|---|
| **Acres** | 18.1 | **Topography** | Basically Level |
| **Land SF** | 786,258 | **Zoning** | Industrial |
| **Road Frontage** | Average | **Flood Zone** | Not in flood zone |
| **Shape** | Rectangular | **Encumbrance or** | None Known |
| **Utilities** | Public | **Environmental Issues** | None Known |
| **Access** | Average | **Land To Building Ratio** | 2.8 |

### Improvements

| | | | |
|---|---|---|---|
| **Source For SF Area** | NA | **Deferred Maintenance** | NA |
| **GBA** | 280,000 | **Construction** | Masonry & Steel |
| **Year Built** | 1991 | **Exterior Wall** | Block |
| **Renovations** | NA | **Roof Type** | Flat |
| **Condition** | Average | **Roof Cover** | Tar & Gravel |
| **Quality** | Good | **Ceiling Height** | 18' - 23' |

### Sale Comments

The property is a former Butterball turkey and pork further processing facility that was closed in July 2017. The plant was used to produce the Gusto brand pork and Butterball brand turkey products. The buyer Carl Buddig & Company will be taking over the plant and using it to expand current operations. Carl Buddig is the family owned parent company of Buddig Lunchmeat and Old Wisconsin hardwood smoked sausage and snack products. The facility has 17,747 sf of dry warehouse, 16,213 sf office/welfare areas, and approximately 230,000 sf of refrigerated space (processing, coolers, & freezers). The plant was built in 1991. Ceiling heights range from 18' - 23'. There are 18 dock doors, 1 drive-in door, wastewater pre-treatment, ovens, and meat smokers. The equipment did not contribute value. The facility is good quality and in average condition.

**Comparable 2**



| Transaction | | | |
|---|---|---|---|
| **ID** | 539 | **Date** | 3/13/2020 |
| **Address** | 2588 Two Notch Road | **Price** | $12,250,000 |
| **City** | Lexington | **Price Per SF** | $150.61 |
| **State** | SC | **Transaction Type** | Closed Sale |
| **Tax ID** | 006400-06-019, 006400- | **Financing** | Conventional |
| **Grantor** | Lexington SC Realty | **Property Rights** | Fee Simple |
| **Grantee** | CAE Industrial I LLC | **Days on Market** | n/a |
| **Book/Page or Reference Doc** | 20862-1366 | **Verification** | Public Records, Costar, 3rd party appraiser |

| Site | | | |
|---|---|---|---|
| **Acres** | 26.0 | **Topography** | Basically Level |
| **Land SF** | 1,132,560 | **Zoning** | ID, Industrial |
| **Road Frontage** | Average | **Flood Zone** | Not in flood zone |
| **Shape** | Irregular | **Encumbrance or** | None Known |
| **Utilities** | Public | **Environmental Issues** | None Known |
| **Access** | Average | **Land To Building Ratio** | 13.9 |

| Improvements | | | |
|---|---|---|---|
| **Source For SF Area** | NA | **Deferred Maintenance** | NA |
| **GBA** | 81,334 | **Construction** | Masonry & Steel |
| **Year Built** | 1990 | **Exterior Wall** | Concrete |
| **Renovations** | NA | **Roof Type** | Flat |
| **Condition** | Good | **Roof Cover** | Rubber Membrane |
| **Quality** | Good | **Ceiling Height** | 20' +/- |

| Sale Comments |
|---|
| The property is a 74,324 sf food processing facility that is leased by Golden State Foods. It was sold/bought by investors. There are 3 contiguous parcels that were part of the transfer. The property does have rail.  The building is divided into office, processing, and cooler/freezer space. |

**Comparable 3**



**Transaction**

| | | | |
|---|---|---|---|
| **ID** | 1834 | **Date** | 4/1/2020 |
| **Address** | 4413 W. Bogart Rd | **Price** | $31,250,000 |
| **City** | Sandusky | **Price Per SF** | $181.83 |
| **State** | OH | **Transaction Type** | Closed Sale |
| **Tax ID** | 33-01290-00, 58-02914- | **Financing** | Conventional |
| **Grantor** | JH Routh Packing Co. | **Property Rights** | Fee Simple |
| **Grantee** | HK Property Holdings LLC | **Days on Market** | Private Sale |
| **Book/Page or Reference** | 202002688 | **Verification** | Owner, Public Records |

**Site**

| | | | |
|---|---|---|---|
| **Acres** | 54.5 | **Topography** | Basically Level |
| **Land SF** | 2,374,456 | **Zoning** | I-2, Heavy Industrial, CS, |
| **Road Frontage** | Average | **Flood Zone** | Not in flood zone |
| **Shape** | Irregular | **Encumbrance or** | None known |
| **Utilities** | Public, Onsite WWT | **Environmental Issues** | None known |
| **Access** | Average | **Land To Building Ratio** | 13.8 |

**Improvements**

| | | | |
|---|---|---|---|
| **Source For SF Area** | NA | **Deferred Maintenance** | NA |
| **GBA** | 171,867 | **Construction** | Masonry & Steel |
| **Year Built** | 1970 | **Exterior Wall** | Multiple |
| **Renovations** | Multiple | **Roof Type** | Flat |
| **Condition** | Average, Fair | **Roof Cover** | Membrance |
| **Quality** | Good, Average | **Ceiling Height** | Various |

**Sale Comments**

Pork processing plant with onsite wastewater pre-treatment. Facility processes 3,200 hogs/day. The total gross plant area is 153,142 square feet: 74,149 square feet on Level 1, 51,879 square feet on Level 2, and 4,067 square feet on Level 3 (office space only – located atop the carcass cooler). The remaining outbuildings include an 1,100 square foot sewage treatment building, a 2,100 square foot equipment storage shed, a 1,122 square foot truck wash. The transaction also includes an offsite cold storage building with 18,725 square feet (905 Pierce Street). The property is good quality and in average condition. The processing plant is older but has been well-maintained. Transaction includes $24,000,000 in M&E. Property was not listed on the open market but is considered an arms-length transaction due to knowledgeable buyer and seller. Appraiser appraised the facility.

**Comparable 4**





| Transaction | | | |
|---|---|---|---|
| **ID** | 1835 | **Date** | 11/28/2018 |
| **Address** | 900 South Platte Ave | **Price** | $30,000,000 |
| **City** | Fremont | **Price Per SF** | $48.92 |
| **State** | NE | **Transaction Type** | Closed Sale |
| **Tax ID** | 270062531, 270062405, | **Financing** | Conventional |
| **Grantor** | Hormel Foods Corporation | **Property Rights** | Fee Simple |
| **Grantee** | WholeStone Farms II, LLC | **Days on Market** | Private Sale |
| **Book/Page or Reference** | 201805671 | **Verification** | Public Records, Costar, 3rd |
| **Doc** | | | Party Appraiser |

| Site | | | |
|---|---|---|---|
| **Acres** | 56.4 | **Topography** | Basically Level |
| **Land SF** | 2,458,526 | **Zoning** | LI, Light Industrial |
| **Road Frontage** | Average | **Flood Zone** | Not in flood zone |
| **Shape** | Irregular | **Encumbrance or** | None known |
| **Utilities** | Public | **Environmental Issues** | None known |
| **Access** | Average | **Land To Building Ratio** | 4.0 |

| Improvements | | | |
|---|---|---|---|
| **Source For SF Area** | Assessment | **Deferred Maintenance** | NA |
| **GBA** | 613,257 | **Construction** | Masonry & Steel |
| **Year Built** | 1948 | **Exterior Wall** | Multiple |
| **Renovations** | Multiple through 2011 | **Roof Type** | Flat |
| **Condition** | Average | **Roof Cover** | Membrane |
| **Quality** | Average | **Ceiling Height** | Various |

| Sale Comments |
|---|
| 10,500 hog/day facility. Hormel Foods sold this facility to WholeStone Farms which is a consortium of 220 hog farmers and producers in MN, SD, and more. They purchased the facility to give producers access to processing capacity. The real estate sale price allocation was $10,000,000. The M&E sold for $20,000,000 in addition to the real estate. The facility can process 10,500 hogs per day. The total sale price of real estate and M&E combined is $30,000,000 which equates to $2,857/hog/day. Hormel agreed to continue to purchase products from the buyers for a period of time. The plant's layout is not optimal due to the age of the facility and additions over the years. It is a average quality and in average/fair condition. The buyers have added new office/wellness space and completed other renovations since purchase. |

**Comparable 5**





**Transaction**

| | | | |
|---|---|---|---|
| ID | 1836 | Date | 2/22/2016 |
| Address | 2850 Highway 60E | Price | $9,600,000 |
| City | Windom | Price Per SF | $71.64 |
| State | MN | Transaction Type | Closed Sale |
| Tax ID | 033-251590011, 033- | Financing | Conventional |
| Grantor | PM Beef Holdings LLC | Property Rights | Fee Simple |
| Grantee | Prime Pork LLC | Days on Market | Private Sale |
| Book/Page or Reference | 277279 | Verification | Public Records, Costar, 3rd |
| Doc | | | Party Appraiser |

**Site**

| | | | |
|---|---|---|---|
| Acres | 145.3 | Topography | Basically Level |
| Land SF | 6,330,139 | Zoning | I2, Heavy Industrial, |
| Road Frontage | Average | Flood Zone | Zone X & A |
| Shape | Irregular | Encumbrance or | None known |
| Utilities | Public, Onsite WWT | Environmental Issues | None known |
| Access | Average | Land To Building Ratio | 47.2 |

**Improvements**

| | | | |
|---|---|---|---|
| Source For SF Area | Assessment | Deferred Maintenance | None |
| GBA | 134,000 | Construction | Masonry & Steel |
| Year Built | 2004 | Exterior Wall | Metal & Concrete |
| Renovations | After purchase 2016 | Roof Type | Flat |
| Condition | Average | Roof Cover | Membrane |
| Quality | Average | Ceiling Height | Various |

**Sale Comments**

Property was a beef processing facility (900 head of cattle/day). Buyers converted to a pork processing facility. $20-25 million capital expense and the anticipated capacity would be 3,500 hogs/day. The plant was built in 2004 and is a masonry building with an effective age of 12 years. It is in average condition. The 134,000 SF building included 7,690 SF office, 11,520 employee welfare rooms, 37,800 SF production area, 14,000 SF cooler space and 25,580 freezer space, with the balance being cattle pens and maintenance/storage areas. It has a wastewater lagoon and some water treatment facilities. It is on the northeast edge of the town of Windom, MN, a largely rural region. The facility is average quality and in average condition. Operated as Hylife Foods.

| Comparable 6 |
| --- |

 

| Transaction | | | |
| --- | --- | --- | --- |
| **ID** | 1837 | **Date** | 7/16/2020 |
| **Address** | 5305 Hwy H | **Price** | $8,855,000 |
| **City** | Pleasant Hope | **Price Per SF** | $94.36 |
| **State** | MO | **Transaction Type** | Closed Sale |
| **Tax ID** | 89-16-0.9-29-000-000- | **Financing** | Conventional |
| **Grantor** | Moon Ridge Foods LLC, | **Property Rights** | Fee Simple |
| **Grantee** | SDNG LLC (Missouri | **Days on Market** | Private Sale |
| **Book/Page or Reference Doc** | 2020L/2761 | **Verification** | Public Records, Costar, Articles |

| Site | | | |
| --- | --- | --- | --- |
| **Acres** | 253.1 | **Topography** | Basically Level |
| **Land SF** | 11,023,294 | **Zoning** | Agriculture & Industrial |
| **Road Frontage** | Average | **Flood Zone** | Not in flood zone |
| **Shape** | Irregular | **Encumbrance or** | None known |
| **Utilities** | Public, Onsite WWT | **Environmental Issues** | None known |
| **Access** | Average | **Land To Building Ratio** | 117.5 |

| Improvements | | | |
| --- | --- | --- | --- |
| **Source For SF Area** | Assessment | **Deferred Maintenance** | None |
| **GBA** | 93,846 | **Construction** | Masonry & Steel |
| **Year Built** | 2006 | **Exterior Wall** | Metal |
| **Renovations** | 2015, 2020 | **Roof Type** | Flat |
| **Condition** | Average | **Roof Cover** | Membrane |
| **Quality** | Average | **Ceiling Height** | Various |

| Sale Comments |
| --- |

The property was a 2,000 head/day hog processing facility know as Moon Ridge Foods LLC that was shuttered in 2018. The buyers purchased to convert to a 500 head/day beef processing facility for custom process cattle for a variety of niche programs.

The previous sale occurred in 2015 is of a smaller, 2,000 head per day pork processing facility in SW Missouri. The plant is on 263.82 acres which is partially used for application of wastewater effluent and woods. The plant built it in 2006. There was no allocation to machinery/equipment as it had been removed prior to the sale. After the sale the plant was completely renovated replacing all plumbing, electrical systems, interior finishes, and roof. The older portion of the building, approximately 10,000 square feet was built in the 1950's and the balance was built in 2006. The newer part of the building is of steel frame construction with concrete block and panel walls. The floor plan includes offices, break rooms, cutting and packing areas, cold storage and coolers. The facility is a USDA approved packing plant. The facility is average quality and average condition.

**Comparable 7**




**Transaction**

| | | | |
|---|---|---|---|
| ID | 1838 | Date | 8/3/2020 |
| Address | 920 N. 7th Ave | Price | $14,250,000 |
| City | Greeley | Price Per SF | $146.37 |
| State | CO | Transaction Type | Closed Sale |
| Tax ID | 80332301005 | Financing | Conventional |
| Grantor | Mountain States Rosen | Property Rights | Fee Simple |
| Grantee | Swift Beef Company | Days on Market | Bankruptcy |
| Book/Page or Reference | 4615473 | Verification | Public Records, Costar, 3rd |
| Doc | | | Party Appraiser |

**Site**

| | | | |
|---|---|---|---|
| Acres | 17.4 | Topography | Basically Level |
| Land SF | 756,202 | Zoning | I-H, Heavy Industrial |
| Road Frontage | Average | Flood Zone | Not in flood zone |
| Shape | Irregular | Encumbrance or | None known |
| Utilities | Public | Environmental Issues | None known |
| Access | Average | Land To Building Ratio | 7.8 |

**Improvements**

| | | | |
|---|---|---|---|
| Source For SF Area | Assessment | Deferred Maintenance | Long-term Vacancy |
| GBA | 97,358 | Construction | Masonry |
| Year Built | 1988 | Exterior Wall | Concrete |
| Renovations | Multiple | Roof Type | Flat |
| Condition | Average | Roof Cover | Membrane |
| Quality | Good | Ceiling Height | Various |

**Sale Comments**

JBS has publicly stated that the Mountain States Rosen plant will be converted to a ground beef processing plant once the sale goes through. The company also indicated that it plans to fill the gap in lamb processing with imported lamb from their plants in countries like Australia and New Zealand, Sims said. The MSR plant, which was the second-largest lamb and sheep slaughter facility nationwide, was owned by a cooperative of 149 sheep ranching families in 11 Western states. The cooperative bought the processing plant four and a half years ago from JBS after JBS announced that it intended to stop processing lambs there. Facing financial struggles brought on by the coronavirus pandemic, MSR was forced into bankruptcy. On July 16, Wyoming's bankruptcy court heard arguments and purchasing offers from both JBS and Greeley Fab, a new company partially composed of members of the MSR co-op. JBS was awarded the right to purchase the plant for $14.25 million. Greeley Fab fell short with an offer of $14.05 million.

**Comparable 8**

 



| Transaction | | | |
|---|---|---|---|
| ID | 1951 | Date | 11/15/2021 |
| Address | 65 All American Way | Price | $4,000,000 |
| City | North Kingston | Price Per SF | $62.91 |
| State | RI | Transaction Type | Closed Sale |
| Tax ID | NKIN-000180-000007 | Financing | Conventional |
| Grantor | U.S. Foods, Inc. | Property Rights | Fee Simple |
| Grantee | MG88 Providence Cold | Days on Market | 240 |
| Book/Page or Reference Doc | Book 3464 Page 22 | Verification | Public Records, Costar |

| Site | | | |
|---|---|---|---|
| Acres | 6.7 | Topography | Basically Level |
| Land SF | 293,594 | Zoning | QGID, Quonset General |
| Road Frontage | Average | Flood Zone | Not in Flood Zone |
| Shape | Basically Rectangular | Encumbrance or | None known |
| Utilities | Public | Environmental Issues | None known |
| Access | Average | Land To Building Ratio | 4.62 |

| Improvements | | | |
|---|---|---|---|
| Source For SF Area | Realtor | Deferred Maintenance | None |
| GBA | 63,582 | Construction | Masonry & Steel |
| Year Built | 2000 | Exterior Wall | Block & Metal |
| Renovations | 2002, 2006 | Roof Type | Flat |
| Condition | Average-to-Good | Roof Cover | Membrane |
| Quality | Average | Ceiling Height | Various |

| Sale Comments |
|---|

This property is located in the Quonset Business Park in North Kingston, and has been utilized as a food distribution facility. It was constructed in 2000 with additions in 2002 and 2006. The total building area is 63,582 SF is broken down as follows: Office Area 4,576 SF, Cooler Space 7,830 SF, and Freezer Space 5,220 SF. It has ceiling height of 23' clear, 14 loading dock height doors, and 1 overhead door. It is steel frame construction with block and metal exterior and a rubber membrane roof.

## COMPARABLES MAP



## ANALYSIS GRID

The above sales have been analyzed and compared with the subject property. I have considered adjustments in the areas of:

- Property Rights Sold
- Financing
- Conditions of Sale
- Market Trends
- Location
- Physical Characteristics

On the following page is a sales comparison grid displaying the subject property, the comparables and the adjustments applied.

| Analysis Grid | | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Comp 5 | Comp 6 | Comp 7 | Comp 8 |
|---|---|---|---|---|---|---|---|---|---|
| Address | 901 North Main Street | 2125 Rochester Rd | 2588 Two Notch Road | 4413 W. Bogart Rd | 900 South Platte Ave | 2850 Highway 60E | 5305 Hwy H | 920 N. 7th Ave | 65 All American Way |
| City | Charles City | Montgomery | Lexington | Sandusky | Fremont | Windom | Pleasant Hope | Greeley | North Kingston |
| State | IA | IL | SC | OH | NE | MN | MO | CO | RI |
| Date | 9/21/2022 | 1/19/2018 | 3/13/2020 | 4/1/2020 | 11/28/2018 | 2/22/2016 | 7/16/2020 | 8/3/2020 | 11/15/2021 |
| Price | -- | $14,322,500 | $12,250,000 | $31,250,000 | $30,000,000 | $9,600,000 | $8,855,000 | $14,250,000 | $4,000,000 |
| Price Adjustment | -- | $0 | $0 | -$24,000,000 | -$20,000,000 | $0 | $0 | $0 | $0 |
| Adjusted Price | -- | $14,322,500 | $12,250,000 | $7,250,000 | $10,000,000 | $9,600,000 | $8,855,000 | $14,250,000 | $4,000,000 |
| GBA | 88,687 | 280,000 | 81,334 | 171,867 | 613,257 | 134,000 | 93,846 | 97,358 | 63,582 |
| Price Per SF | -- | $51.15 | $150.61 | $42.18 | $16.31 | $71.64 | $94.36 | $146.37 | $62.91 |

| Transaction Adjustments | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Property Rights | Fee Simple | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% |
| Financing | Conventional | Conventional | 0.0% | Conventional | 0.0% | Conventional | 0.0% | Conventional | 0.0% | Conventional | 0.0% | Conventional | 0.0% | Conventional | 0.0% | Conventional | 0.0% |
| Conditions of Sale | Cash | Motivated Seller | 10.0% | Normal | 0.0% | Normal | 0.0% | Motivated Seller | 10.0% | Motivated Seller | 10.0% | Court Appointed Sale | 10.0% | Bankruptcy | 10.0% | Normal | 0.0% |

| Adjusted Price/SF | | $56.27 | $150.61 | $42.18 | $17.94 | $78.81 | $103.79 | $161.00 | $62.91 |
|---|---|---|---|---|---|---|---|---|---|
| Market Trends Through 9/21/2022 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Adjusted Price/SF | | $56.27 | $150.61 | $42.18 | $17.94 | $78.81 | $103.79 | $161.00 | $62.91 |

| | | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Comp 5 | Comp 6 | Comp 7 | Comp 8 |
|---|---|---|---|---|---|---|---|---|---|
| Location | Charles City | Montgomery | Lexington | Sandusky | Fremont | Windom | Pleasant Hope | Greeley | North Kingston |
| Comparison | | Superior | Superior | Superior | Similar | Similar | Inferior | Superior | Superior |
| Acres | 13.43 | 18.05 | 26.00 | 54.51 | 56.44 | 145.32 | 253.06 | 17.36 | 6.74 |
| Comparison | | See LTB | See LTB | See LTB | See LTB | See LTB | See LTB | See LTB | See LTB |
| Land to Building Ratio | 6.6 | 2.8 | 13.9 | 13.8 | 4.0 | 47.2 | 117.5 | 7.8 | 4.6 |
| Comparison | | Similar | Similar | Similar | Similar | Similar | Similar | Similar | Similar |
| GBA | 88,687 | 280,000 | 81,334 | 171,867 | 613,257 | 134,000 | 93,846 | 97,358 | 63,582 |
| Comparison | | Larger | Similar | Larger | Larger | Similar | Similar | Similar | Similar |
| Quality | Good | Good | Good | Average | Average | Average | Average | Average | Average |
| Comparison | | Similar | Similar | Inferior | Inferior | Inferior | Inferior | Inferior | Inferior |
| Condition | Average | Average | Good | Average, Fair | Average | Average | Average | Average | Average-to-Good |
| Comparison | | Similar | Superior | Similar | Similar | Similar | Similar | Similar | Slightly Superior |
| Utilities | Public | Public | Public | Public, Onsite WWT | Public | Public, Onsite WWT | Public, Onsite WWT | Public | Public |
| Comparison | | Similar | Similar | Similar | Similar | Similar | Similar | Similar | Similar |
| Zoning | M-1 & M-2, Light & General Manufacturing | Industrial | ID, Industrial | I-2, Heavy Industrial, CS, Commercial | LI, Light Industrial | I2, Heavy Industrial, Agriculture | Agriculture & Industrial | I-H, Heavy Industrial | QGID, Quonset General Industrial |
| Comparison | | Similar | Similar | Similar | Similar | Similar | Similar | Similar | Similar |

| Adjusted Price/SF | | $56.27 | $150.61 | $42.18 | $17.94 | $78.81 | $103.79 | $161.00 | $62.91 |
|---|---|---|---|---|---|---|---|---|---|

## COMPARABLE SALE ADJUSTMENTS

The comparables selected are all recent sales of food processing facilities in the subject's extended market area. Qualitative adjustments were made to the subject: inferior, similar, superior. The unit of comparison used in the analysis grid is the price-per-square-foot of gross building area. Any contributory value of FF&E that transferred with the comparables was subtracted from the gross sale price.

### PROPERTY RIGHTS

All the Comparable Sales were deemed to have similar property rights; therefore, no adjustments were necessary.

### FINANCING

All the Comparable Sales were deemed to have similar enough financing terms; therefore, no adjustments were necessary.

### CONDITIONS OF SALE

Comps 1, 4, 5, 6, and 7 were sold by motivated sellers; therefore, were adjusted upward for this factor.

### MARKET CONDITIONS

No adjustments for market conditions were made; however, the age of these sales was taken into consideration in the reconciliation.

### LOCATION

The subject is located in Charles City, Iowa. Comps 4 and 5 were deemed to be in overall similar rural locations. Comps 1, 2, 3, 7, and 8 are in more urban/populated locations which are deemed superior to the subject. Comp 6 was deemed to be in a more rural area which is considered to be inferior. No quantitative adjustment was made but this factor is taken into account in the reconciliation.

### LAND-TO-BUILDING RATIO

The subject's land-to-building (LTB) ratio is 6.5. Comps 1, 2, 3, 4, 7 and 8 are similar enough to the subject. Typically, an investor will pay more for a property that has a larger LTB because there is more land available for expansion and future development. Comps 5 and 6 have much larger LTBs than the subject which is typically considered to be superior. However, they are located in areas with much lower land values per acre than the subject which is an offsetting factor. Therefore, they were deemed to be similar enough. No quantitative adjustment was made but this factor is taken into account in the reconciliation.

## GBA

The subject has a GBA of 88,687 square feet. Typically, an investor will pay more per unit for a smaller building. Comps 2, 5, 6, 7, and 8 are deemed to have similar enough GBAs to the subject. Comps 1, 3, and 4 are larger than the subject. No quantitative adjustment was made but this factor is taken into account in the reconciliation.

## QUALITY

The subject is good quality construction. Comps 1 and 2 were deemed to be similar enough to the subject. Comps 3, 4, 5, 6, 7, and 8 were deemed to be inferior in quality of construction. No quantitative adjustment was made but this factor is taken into account in the reconciliation.

## CONDITION

In the 'as is' state, the subject is deemed to be in average condition. Comps 2 and 8 were deemed to be in superior condition. Comparables 1, 3, 4, 5, 6, and 7 are deemed to be superior in condition. No quantitative adjustment was made but this factor is taken into account in the reconciliation.

## UTILITIES

The subject uses public utilities. All comparables have public water and sewer and/or onsite wastewater which is considered to be similar enough to the subject. No quantitative adjustment was made but this factor is taken into account in the reconciliation.

## ZONING

The subject is in an industrial zoning district. All comparables are similarly zoned industrial. No quantitative adjustment was made but this factor is taken into account in the reconciliation.

## SALES COMPARISON APPROACH CONCLUSION – AS IS

The adjusted values of the comparable properties range from $17.94/sf to $161.00/sf with an average rate of $84.19/sf. All eight of the comparable sales have been given consideration as each is relevant in many aspects and together, they are indicative of current trends. Based on an analysis of the comparable sales, with consideration given to all of the factors, it is the appraiser's opinion that the "as is" market value of the subject's real estate is $60.00/sf. The value of the improvements is calculated as follows $60.00/sf x 88,687 SF which equates to $5,321,220**, or $5,320,000 (rounded)**.

## FINAL RECONCILIATION – AS IS

The process of reconciliation involves the analysis of each approach to value. The quality of data applied and the significance of each approach, as it relates to market behavior and defensibility of each approach, are considered and weighed.

In this appraisal, three approaches to value were applied. Each approach has been considered separately and comparatively with each other.

| | |
|---|---|
| **Cost Approach:** | $5,800,000 |
| **Sales Approach:** | $5,320,000 |
| **Income Approach:** | Considered, but not developed |

Because appraising is not a science wherein property differences may be precisely measured, it would be unusual for the value estimated by all approaches to be exactly the same. Each approach implements tools to analyze the market data into an estimate of value and normally indicates a range of values to be reconciled into a final value estimate. The different methods of value estimation reveal both the strengths and weaknesses involved in the analyses and the imperfections in the market and the data used for each. Reconciliation involves a review of the reliability of the data used in each approach to the type of property being appraised and the relative applicability of the approach in the light of the definition of value sought.

The subject of this appraisal is a poultry processing facility. It is located in Charles City, IA. The location is centralized with respect to the area it is to serve. The site and improvements are typical for such an operation.

The investigation of market value for the subject property in this report employed the Cost Approach and the Sales Comparison Approach. The adequacy and reliability of the information and the analysis contained in the approaches has been reviewed and judged for this appraisal. The appraiser found that each approach has merit as it pertains to the subject property and contributes substantially to the final value estimate.

In the Cost Approach, the subject was valued as separate components of land and building. The land sales used offered a fair indication of land value after adjustments. The replacement cost new was based on information supplied by local building contractors and the Marshall Valuation Service, a nationally recognized cost index. The selected square foot costs were therefore considered correctly estimated. The amount of depreciation, however, is a subjective judgment based on the appraiser's observation. Oftentimes the Cost Approach sets the upper limit in the range of values. Some emphasis was placed on the Cost Approach.

The Sales Comparison Approach involves a comparative analysis of the important attributes of the sale properties to those of the subject under the general divisions, location, physical characteristics, and conditions of sale, economic trends, and the change in the market over time. Consideration of the dissimilarities in terms of their probable effect upon the sales price

of the subject gives an indication of market value. It does reflect the motivation of buyers and sellers in the marketplace and given some weight.

Accordingly, it is my opinion that the ***current "as is" market value for the unencumbered fee simple interest of the subject property*** as of the effective date September 21, 2022 is:

### Five Million Five Hundred Thousand Dollars

### ($5,500,000)

## MACHINERY & EQUIPMENT VALUATION – AS IS

The purpose of this valuation is to provide the fair market value – installed of the assets. The following definition of value was taken from the Fourth Edition of *"Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets"* by the American Society of Appraisers (ASA).

> *Fair Market Value – Installed* is an opinion, expressed in terms of money, at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts, considering market conditions for the asset being valued, independent of earnings generated by the business in which the property is or will be installed, as of a specific date.

The premise reflects the value of an installed asset, based on market conditions for the particular asset being valued, as of a specific date. It assumes that the asset or assets is capable of being used as designed at its current location. Therefore, the market value includes the depreciated value associated with all normal direct and indirect costs, such as installation and other costs, to make the asset or assets fully operational. The installed analysis is based on the premises of the principle of substitution in which a prudent buyer will not pay more for a property than the cost of acquiring a substitute property of equivalent utility. There are many factors that play a role in how much a buyer is willing to pay for assets which may include:

- Existing market share
- Barriers to entry for a market/industry
- Competition
- Profitability
- Supply of raw materials and/or supplier base
- Demand for products produced
- Location of facility
- Brand recognition or trade names
- Existing customer base
- Market and industry trends – including consumer trends

The machinery and equipment valuation includes poultry processing and packaging equipment for the specific purpose of processing live birds to cut up chicken. It also includes all associated support equipment, installations, and other related equipment. It is noted that this valuation does not include refrigeration equipment associated with the coolers/freezers as this is considered to be part of the real estate and was valued as such previously in this appraisal. There was also rolling stock included in this valuation.

## VALUATION METHODOLOGY

There are three approaches used in the determination of value: Cost Approach, Sales Comparison Approach, and the Income Approach. These approaches are briefly described below.

> **Cost Approach** is a set of procedures where an appraiser estimates a value indication by determining the current replacement or reproduction cost new of the assets being appraised and then deducting all forms of depreciation including physical deterioration, functional obsolescence, and external or economic obsolescence.

> **Sales Comparison Approach** is a set of procedures where an appraiser estimates a value indication by comparing assets being appraised with similar assets that have been recently sold and adjusting sales prices based on appropriate elements of comparison.

> **Income Approach** is a set of procedures where an appraiser estimates a value indication of assets by converting the anticipated income producing capacity into a present value. There are two methodologies to convert income into value: direct capitalization and discounted cash flow analysis.

## SCOPE OF WORK

AgVisory inspected the existing machinery and equipment on September 21, 2022, with Brian Roelofs. Descriptive information about the assets was provided. AgVisory collected and analyzed the information and developed the approaches to value deemed the most appropriate for the purpose and intended use of this assignment.

Consideration is given to each of the asset's contribution, or the contribution of the assets as a whole, based on the production capacity of the plant.

AgVisory conducted market research to identify sales of comparable assets. Based on the installed nature of the machinery and equipment located at the Pure Prairie Farms facility, there is very little market data or published data available. This is because most sales of similar facilities either involve transactions where the entire business or enterprise has sold as a whole or there is a liquidation auction, and the assets are sold and removed from the facility.

Therefore, the Cost Approach was the primary approach to value used valuing the subject's personal property assets. Installed appraisals require a significant amount of judgement by the appraiser which is subjective and based on experience in the industry. The appraiser uses current cost information from manufacturers and similar projects appraised to support replacement cost new and used equipment sales and auction results to support depreciation and obsolescence. AgVisory maintains a database of costs and sales information used to provide additional support.

AgVisory has relied upon the depreciation/asset list and equipment estimates/quotes provided by Pure Prairie Farms. The appraiser makes the extraordinary assumption that the information provided is an accurate representation of the current and proposed assets and their associated costs. It is noted that extraordinary assumptions may affect value. While a significant sample of the assets have been verified, the appraiser is not responsible if there are errors and/or omissions in the list provided by the owners. The full list is maintained in the appraiser's workfile.

In some instances, the assets included in this appraisal were not in operation during the inspection. The appraiser has made the assumption that all equipment is in working order unless otherwise indicated in this report.

AgVisory has considered a number of factors in the valuation of the assets. The appraiser has conducted industry research to support the analysis of the marketability and potential value of the subject assets. Every effort has been made to estimate value conclusions that are supportable and reflective of current market conditions.

The market for food processing and packaging equipment is average to good. In recent years, there has been a lot of merger and acquisition activity in the industry as well as private equity investment. As previously discussed, the market for convenience food products like those produced at the subject is currently strong. Supply chain issues and increasing cost of new equipment has positively impacted the used equipment market. In conclusion, the market for used food processing and packaging equipment has been stable to increasing in salability and value in recent years.

The tables that summarize the valuation of the machinery and equipment are located in the addenda of this report.

## VALUE CONCLUSION MACHINERY & EQUIPMENT – AS IS

The current 'as is' Fair Market Value – Installed of the machinery and equipment located at the Pure Prairie Farms facility in Charles City, Iowa site as of September 21, 2022, is:

**Eleven Million One Hundred Thirty Thousand Dollars**

**($11,130,000)**

| Pure Prairie Farms 'As Is' M&E Valuation | | | |
|---|---|---|---|
| Date in Service | Asset Description | Cost | FMV - Installed |
| 11/13/2017 | Add'l Servers/Switches | 8,386 | 1,500 |
| 5/31/2018 | 8TB NVR-32 Camera | 14,391 | 7,000 |
| 11/13/2017 | Cafeteria Chairs/Tables | 36,698 | 5,000 |
| 11/13/2017 | M&E Original Build | 965,440 | 400,000 |
| 11/13/2017 | CO2 Stun, Kill Scald PU | 1,837,415 | 1,200,000 |
| 11/13/2017 | Air Chill System | 1,764,656 | 1,200,000 |
| 11/13/2017 | Evis & Gib Harvesting System | 1,889,124 | 1,200,000 |
| 11/13/2017 | Sensor X Bone System | 477,921 | 350,000 |
| 11/13/2017 | Tender Hopper System | 163,898 | 125,000 |
| 11/13/2017 | Tack & Shackles | 16,787 | 12,000 |
| 11/13/2017 | Air Chill Hanger System | 57,901 | 40,000 |
| 11/13/2017 | Berry Paw System | 272,997 | 200,000 |
| 11/13/2017 | Box Maker | 12,471 | 9,000 |
| 11/13/2017 | Case Sealer | 68,440 | 50,000 |
| 11/13/2017 | Conveyors - IDFI | 1,861,564 | 1,000,000 |
| 11/13/2017 | Conveyors - ProFab | 390,666 | 150,000 |
| 11/13/2017 | CO2 System Connections | 10,953 | 7,500 |
| 11/13/2017 | Cutup Saw | 10,686 | 8,000 |
| 11/13/2017 | CVP machine | 171,856 | 130,000 |
| 11/13/2017 | Electric Inst - Process Equip | 2,241,564 | 1,200,000 |
| 11/13/2017 | Elect & PLC Panels | 275,854 | 150,000 |
| 11/13/2017 | Engineering - Process Equip | 124,647 | 15,000 |
| 11/13/2017 | Equip Commissioning Costs | 2,140,289 | 200,000 |
| 11/13/2017 | Fans & Heaters/Live Birds | 39,162 | 25,000 |
| 11/13/2017 | Feather Conveyor | 43,969 | 30,000 |
| 11/13/2017 | Feather Sys Snd & Catwalk | 37,184 | 25,000 |
| 11/13/2017 | Feather Vac System | 51,374 | 35,000 |
| 11/13/2017 | Hock Cutter | 23,949 | 15,000 |
| 11/13/2017 | Hot Water System | 146,457 | 100,000 |
| 11/13/2017 | In Line Chill System | 162,067 | 120,000 |
| 11/13/2017 | First Process - installation | 1,229,629 | 120,000 |
| 11/13/2017 | Second Process - installation | 699,893 | 70,000 |
| 11/13/2017 | Label Printers | 58,068 | 40,000 |
| 11/13/2017 | Lift Station - pumps | 42,997 | 30,000 |
| 11/13/2017 | Low Press Hot water Pump | 14,949 | 10,000 |
| 11/13/2017 | Make-up air system | 471,477 | 350,000 |
| 11/13/2017 | metal detector | 14,519 | 10,000 |
| 11/13/2017 | Piping Install - Process Equip | 1,615,124 | 150,000 |
| 11/13/2017 | Pressure Wash | 3,585 | 1,500 |
| 11/13/2017 | Pumps-Wet Well DAF | 17,921 | 12,000 |
| 11/13/2017 | Refrigerator System | 1,328,615 | 900,000 |
| 11/13/2017 | Tipper Tie System | 49,049 | 35,000 |
| 11/13/2017 | Tote/Lind Washer | 65,598 | 50,000 |
| 11/13/2017 | Vacuum System | 335,666 | 250,000 |
| 11/13/2017 | Vert Ammonia Recirculating System | 48,298 | 30,000 |
| 11/13/2017 | Water Softener | 4,484 | 3,000 |
| 11/13/2017 | Whole Bird Bagger | 30,955 | 25,000 |
| 11/13/2017 | Wash  System | 10,157 | 8,000 |
| 11/13/2017 | Box Makers | 204,210 | 150,000 |
| 11/13/2017 | Water Meter | 2,378 | 1,500 |
| 11/13/2017 | Compressors (2) | 80,563 | 60,000 |
| 11/13/2017 | Track System for Live Birds | 16,208 | 5,000 |
| 11/13/2017 | Eng - Live Haul related | 51,647 | 35,000 |
| 11/13/2017 | Additional IDFI conveyor | 21,909 | 15,000 |
| 11/13/2017 | Survellance System | 5,561 | 1,500 |
| 5/22/2018 | POSS PDL 6000 Seperator | 416,864 | 350,000 |
| 6/20/2018 | Marel X-Ray machine | 190,033 | 140,000 |
| 6/12/2018 | Pack-out project | 53,020 | 40,000 |
| 6/21/2018 | Airshirz Standard | 7,256 | 5,000 |
| 6/26/2018 | Whole Bird & Wing Line | 33,518 | 25,000 |
| 12/27/2017 | Marel X-Ray Machine | 200,000 | 150,000 |
| 5/24/2018 | Plumbing-Machinery | 17,741 | 10,000 |
| 12/1/2017 | Wet Well | 53,200 | 40,000 |
| | | FMV - Installed 'As Is'  $ | 11,132,500 |
| | | Rounded  $ | 11,130,000 |

## VALUE CONCLUSION ROLLING STOCK – AS IS

The 'as is' Fair Market Value of the rolling stock located at the Pure Prairie Farms facility in Charles City, Iowa site as of September 21, 2022, is:

### Two Million Seventy Thousand Dollars

### ($2,070,000)

| Pure Prairie Farms - 'As Is' Rolling Stock Valuation | | | | |
|---|---|---|---|---|
| Year | Equipment | Condition | Cost | FMV |
| 2022 | Chicken Cages 9 sets 216 cages | New | 521,517 | 480,000 |
| 2022 | Ford 550 w/ Crysteel Bed | New | 90,386 | 85,000 |
| 2022 | Chev Silverado 1500 Ext Cab | New | 45,900 | 40,000 |
| 2022 | Chev Silverado 1500 Club Cab | New | 51,210 | 45,000 |
| 2022 | Chev Silverado 1500 Club Cab | New | 49,004 | 45,000 |
| 2022 | Chev Silverado 1500 Club Cab | New | 48,647 | 45,000 |
| 2022 | Ford F150 | New | 87,854 | 80,000 |
| 2022 | Chicken Cages 9 sets 216 cages (Feb) | New | 521,517 | 480,000 |
| 2021 | Chev Silverado Duramax 44000 miles | Used | 50,000 | 45,000 |
| 2022 | BobCat Telehandler | New | 88,000 | 80,000 |
| 2022 | BobCat Telehandler | New | 88,000 | 80,000 |
| 2022 | BobCat Telehandler | New | 88,000 | 80,000 |
| 11/13/2017 | Pallet Jack | Average | 1,727 | 500 |
| 11/13/2017 | Forklifts | Average | 23,477 | 18,000 |
| 11/13/2017 | Reefer Trailers | Average | 14,968 | 10,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #1 | Average | 66,040 | 50,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #2 | Average | 66,040 | 50,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #3 | Average | 66,040 | 50,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #4 | Average | 66,040 | 50,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #5 | Average | 66,040 | 50,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #6 | Average | 66,040 | 50,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #7 | Average | 66,040 | 50,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #8 | Average | 66,040 | 50,000 |
| 12/7/2017 | Curtaininsider-2017 Trailer #9 | Average | 66,040 | 50,000 |
| 12/7/2017 | Track System For Transporting Mods | Average | 10,698 | 2,500 |
| | | Totals | $2,375,265 | $2,066,000 |
| | | FMV - Rounded | | $2,070,000 |

## APPRAISER CERTIFICATION

I certify to the best of my knowledge and belief that:

- The statements of fact contained within this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- The appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.
- Jodi Pries made a personal interior and exterior inspection of the property that is the subject on September 21, 2022.
- The reported analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the Uniform Standards of Professional Appraisal Practice and Code of Professional Ethics of the Appraisal Institute.
- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
- As of the date of this report, Jodi M. Pries has completed the continuing education program for Designated Members of the Appraisal Institute.
- I have sufficient knowledge and appraisal experience to competently complete this appraisal assignment.
- The appraiser has performed the following services regarding the subject within the three-year period immediately preceding acceptance of this assignment:
  - The appraiser appraised the subject facility for another client with an effective date of November 17, 2020, and report date of December 28,2020.
  - The appraiser appraised the subject facility for another client with an effective date of May 1, 2020, and report date of May 4, 2020.

Date Completed:  January 14, 2023

Jodi M. Pries

# ADDENDUM

## STATEMENT OF QUALIFICATIONS

**Jodi M. Pries, MAI**
**President**
Certified General Appraiser

- Office Address: P.O. Box 177, Nassau, DE 19969
- Phone: 302.270.5165
- Web: www.agvisory.com
- E-mail: Jodi.Pries@agvisory.com
- Service Area: Nationwide

## EDUCATION

- B. S. of Agricultural Business & Economics, Auburn University, December 2000
- M.B.A., Wilmington University, May 2008
- M.S. of Real Estate, Johns Hopkins University, May 2012
- Appraisal Education:
  - Licensing Education
  - A-25, Eminent Domain, ASFMRA 5/02
  - Appraisal Review (731); Appraisal Institute 6/05
  - Greenbelts/Transferable Development Rights; Appraisal Institute 11/05
  - Appraising Agricultural Land in Transition; ASFMRA 5/07
  - Valuation of Conservation Easements Certificate Program; ASA/ASFRMA/Appraisal Institute: 2/08
  - General Appraiser Income Approach/Part 1; Appraisal Institute – 4/14
  - General Appraiser Income Approach/Part 2; Appraisal Institute – 7/14
  - ME 201 – Intro to M&E Valuation; American Society of Appraisers – 10/15
  - ME 202 – M&E Valuation Methodology; American Society of Appraisers – 11/15
  - ME 203 – M&E Advanced Topics and Case Studies; American Society of Appraisers – 1/16
  - ME 204 – M&E Valuation Advanced Topics and Report Writing; American Society of Appraisers – 3/16
  - BV 201 – Intro to Business Valuation, Market Approach; American Society of Appraisers – 8/17
  - BV 202 – Intro to Business Valuation, Income Approach; American Society of Appraisers – 10/17
  - Continuing Education from AI and others for licensing requirements.
  - USPAP, 7-hour update
  - DE Laws & Regulations for Appraisers
  - Review Theory – General; Appraisal Institute – 10/20
  - ASFRMA Ethics; ASFMRA – 9/21
  - Inconsistencies in Plain Sight; Appraisal Institute – 9/22
  - Scope of Work; Appraisal Institute – 10/22

## PROFESSIONAL AFFILIATIONS

- State of Delaware, Certified General Real Property Appraiser License #X1-0000395 exp. 10/31/2023
- State of Maryland, Certified General Real Property Appraiser License, #04-27864 exp. 4/17/2023
- State of Virginia, Certified General Real Property Appraiser License, #4001018051exp. 10/31/2022 Do you want to include this one with an expired date?
- State of Pennsylvania, Certified General Appraiser, License # GA004614, exp. 06/30/2023
- Appraisal Institute: Designated Member (MAI)
- ASFMRA: Associate Member
- ASA: Candidate Member – M&E
- State of Oregon, Real Estate Broker License, License # 200270812, exp. 5/31/2024

## EXPERIENCE

- 2012 – Present: President/ & Owner, AgVisory LLC
- 2018 – 2022: Managing Member, AgValuation LLC
- 2010 – 2012:  Commercial Staff Appraiser, The Trice Group
- 2001 – 2009: Principal Appraisal, MidAtlantic Farm Credit, ACA



KIM REYNOLDS
GOVERNOR
ADAM GREGG
LT. GOVERNOR

JEFF PLAGGE
SUPERINTENDENT

July 25, 2022

Ms. Jodi Marie Pries
AgVisory LLC
P.O. Box 177
Nassau, Delaware 19969

**REFERENCE: 22-094**
EMAIL: jodi.pries@agvisory.com

We have approved your request for temporary appraisal practice in Iowa

| Name & Address of Client | Approval Date: 7/25/2022 |
| --- | --- |
| Greater Commercial Lending<br>481 Eagle Station Lane<br>Carson City, Nevada 89701 | |

An out-of-state certified appraiser must comply with Iowa's real estate appraisal statutes and regulations. Each appraiser who receives temporary practice registration is subject to Iowa's full regulatory jurisdiction and is governed by Iowa's statutes and regulations respecting appraiser certification or licensing. Any reports of unethical, incompetent or fraudulent practice will be investigated by the Iowa Real Estate Appraiser Examining Board, and any disciplinary action taken as a result will be forwarded to your home state agency. **You may not start the appraisal prior to the approval date listed above.**

If you have any questions regarding this procedure, do not hesitate to contact this office.

This authorization for temporary practice begins on the approval date and expires six months from that date. If requesting a time extension you must contact Brandy March at brandy.march@iowa.gov *prior to the expiration*.

Sincerely,

B March

Board Administrator, Iowa Real Estate Appraiser Examining Board
Appraisal Management Company Regulator
Division of Banking
200 E Grand, Ste. 350
Des Moines, IA 50309
Phone: (515) 725-9025 | FAX: (515) 725-9032

Enclosure: Properties to be Appraised



KIM REYNOLDS
GOVERNOR
ADAM GREGG
LT. GOVERNOR

JEFF PLAGGE
SUPERINTENDENT

**Name & Address of Client**
Greater Commercial Lending
481 Eagle Station Lane
Carson City, Nevada 89701

REFERENCE: 22-094
**EMAIL**: jodi.pries@agvisory.com

**Property(ies) to be Appraised**

| PROPERTY TYPE | LEGAL DESCRIPTION  / ADDRESS |
|---|---|
| Industrial - Food Processing Facility | 901 N. Main Street, Charles City, Iowa 50616 |
| Vacant Lot | 300 Lawler St, Charles City, Iowa 50616 |



## FLOYD COUNTY ASSESSOR

Assessor Hub provided by
Vanguard Appraisals, Inc

| | |
|---|---|
| **Parcel Number:** | 11-01-428-005-00 |
| **Deed Holder:** | PURE PRAIRIE FARMS, INC. |
| **Property Address:** | 901 N MAIN |
| | CHARLES CITY, IA 50616-0000  MAP THIS ADDRESS |
| **Mailing Address:** | PURE PRAIRIE FARMS, INC. |
| | 68808 FORT ROAD |
| | FAIRFAX, MN 55332-5533 USA |
| **Class:** | INDUSTRIAL |
| **Map Area:** | CHARLES CITY-C |
| **Plat Map:** | 11-01H |
| **Subdivision:** | [NONE] |
| **Sec-Twp-Rng:** | 000-000-000 |
| **Legal Description:** | LANES BLOCK 149 N OFRR & BLOCK 148 BETWEEN RAILROADS & JACKSON ST BETWEEN BLOCKS 148 & 149 & SWLY15' OF FLOYD ST ABUT LOT 10 BLOCK 149 & S1/2 FLOYD ST NWLY OF NW ROW BOUNDARY OF MAIN ST & E OF WLY ROW LINE EXTENDED VAC JACKSONST & S BOUNDARY LINEOF IOWA, CHICAGO & EASTERN RR ROW |
| **Tax Information:** | ONLINE PAYMENT SITE |
| **Property Report:** | PROPERTY REPORT (PDF FILE) |





Pin 11-01-428-005-00 Photo

1 / 13

    

### Prior Year Value Information

| Year | Land Value | Dwelling Value | Improvement Value | Total Value |
|---|---|---|---|---|
| 2022 | $77,400 | $0 | $2,360,830 | $2,438,230 |
| 2021 | $77,400 | $0 | $2,360,830 | $2,438,230 |

More Years...

### Land Information

| Lot Type | Square Feet | Acres |
|---|---|---|
| Acres x Rate | 43,560 | 1.000 |
| Acres x Rate | 43,560 | 1.000 |
| Acres x Rate | 50,530 | 1.160 |
| **Total** | **137,650** | **3.160** |

Assessor's lot sizes are for assessment purposes only and may NOT represent actual dimensions. For more accurate, complete data refer to GIS maps, plat maps, or legal documents.

### Commercial Building Information

| Occupancy | Year Built | Building Area |
|---|---|---|
| Manufacturing (Light) | 1973 | 12,400 |
| Manufacturing (Light) | 1985 | 2,420 |
| Manufacturing (Light) | 1988 | 7,360 |
| Manufacturing (Light) | 1988 | 3,748 |
| Manufacturing (Light) | 1994 | 2,484 |
| Manufacturing (Light) | 1996 | 940 |
| Manufacturing (Light) | 1996 | 4,800 |
| Manufacturing (Light) | 1996 | 400 |

| | | |
|---|---|---|
| Manufacturing (Light) | 1999 | 7,160 |
| Metal Light Mfg - Rigid Steel Frame | 2016 | 1,520 |
| Metal Light Mfg - Rigid Steel Frame | 2016 | 144 |
| Metal Light Mfg - Rigid Steel Frame | 2010 | 242 |
| Metal Light Mfg - Rigid Steel Frame | 2010 | 2,400 |
| Manufacturing (Light) | 2010 | 224 |
| Metal Light Mfg - Rigid Steel Frame | 2010 | 1,540 |
| Metal Light Mfg - Rigid Steel Frame | 2016 | 8,000 |
| Manufacturing (Light) | 2016 | 429 |
| Manufacturing (Light) | 2016 | 264 |
| Manufacturing (Light) | 2016 | 165 |
| Metal Light Mfg - Rigid Steel Frame | 2010 | 9,600 |

### Yard Extra Information

| Description | Item Count | Year Built |
|---|---|---|
| Canopy | 1 | 2010 |
| Fencing - Chain | 1 | 2010 |
| Fencing - Chain | 1 | 2016 |
| Paving - Asphalt | 1 | 1973 |
| Paving - Concrete | 1 | 2010 |
| Paving - Concrete | 1 | 2016 |
| Paving - Concrete | 1 | 1973 |
| Shed | 1 | 2010 |

### Sale Information

| Sale Date | Amount | Non-Useable Transaction Code | Recording |
|---|---|---|---|
| 03/16/2016 | $3,202,609 | 0 - Normal | 2016 0662 |
| 06/28/2011 | $560,000 | 0 - NORMAL ARMS-LENGTH TRANSACTION | 2011 1423 |
| 07/23/2010 | $214,000 | 0 - NORMAL ARMS-LENGTH TRANSACTION | 2010 1616 |
| 08/09/2006 | $645,150 | 043 - SALE OF TWO OR MORE SEPARATELY ASSESSED PARCELS - SINGLE CONSIDERATION | 2006 2507 |

### Building Permit Information

| Date | Number | Reason |
|---|---|---|
| 11/28/2016 | Roof frt awning | Roof |
| 09/15/2016 | fixtures/floor drains | Plumb/Elec |
| 08/18/2016 | 2 story add. | Addition |
| 08/16/2016 | 6' fence n grnd | Fence |
| 10/27/2011 | repair | Roof |
| 09/01/2010 | (2) | A/C |
| 06/07/2010 | steel | Addition |
| 04/21/2010 | & remodel | New Bldg |
| 10/29/2009 | old creamary | Rmv Bldg |
| 05/26/2000 | | New Bldg |

### Tax Information

| Tax Year Payable | Link |
|---|---|
| 2019/2020 | Property Tax Statement |
| 2020/2021 | Property Tax Statement |
| 2021/2022 | Property Tax Statement |

## Sketch



Sketch of Pin 11-01-428-005-00

1 / 1



## GIS Map Information



**Pictometry Online**

**PDF+PIN:  007+11-01-428-005-00**

**901 N MAIN, CHARLES CITY**

| | |
|---|---|
| Deed: | **PURE PRAIRIE FARMS, INC.** |
| Contract: | |
| CID#: | **411110142800500** |
| DBA: | **SIMPLE ESSENTIALS, LLC** |
| MLS: | |

| | |
|---|---|
| Map Area: | **CHARLES CITY-C** |
| Route: | **035-060-050** |
| Tax Dist: | **411 CC-RIVERSIDE TIF** |
| Plat Page: | **11-01H** |
| Subdiv: | **[NONE]** |

| | |
|---|---|
| Checks/Tags: | |
| Lister/Date: | **GK, 05/09/2019** |
| Review/Date: | **CJ, 09/04/2019** |
| Entry Status: | **Refused** |

**Urban / INDUSTRIAL**

Legal: Section: 000; Twp: 000; Rng: 000; Block: ; Lot: ; Deeded Acres: 0.000
LANES BLOCK 149 N OFRR & BLOCK 148    BETWEEN RAILROADS & JACKSON ST BETWEEN  BLOCKS 148 & 149 &  SWLY15' OF FLOYD ST ABUT LOT 10 BLOCK   149 & S1/2 FLOYD ST NWLY OF NW ROW    BOUNDARY OF MAIN ST & E OF WLY ROW LINE EXTENDED VAC JACKSONST & S BOUNDARY LINEOF IOWA, CHICAGO &  EASTERN RR ROW

### Land

| Land Basis | Front | Rear | Side 1 | Side 2 | R. Lot | SF | Acres | Depth/Unit | EFF/Type | Qual./Land | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Acre X Rate | | | | | | 43,560.00 | 1.000 | | | C-4.50 | | | | | | |
| Subtotal | | | | | | 43,560.00 | 1.000 | | | | | | | | | |
| Acre X Rate | | | | | | 43,560.00 | 1.000 | | | C-2.50 | | | | | | |
| Subtotal | | | | | | 43,560.00 | 1.000 | | | | | | | | | |
| Acre X Rate | | | | | | 50,529.60 | 1.160 | | | C-1.75 | | | | | | |
| Subtotal | | | | | | 50,529.60 | 1.160 | | | | | | | | | |
| Grand Total | | | | | | 137,649.60 | 3.160 | | | | | | | | | |

| | Street | | Utilities | | Zoning | | Land Use | |
|---|---|---|---|---|---|---|---|---|
| Acre X Rate | Paved | | City | | LIGHT MANUFACTURING DISTRICT | | URBAN INDUSTRIAL | |
| Acre X Rate | None | | None | | LIGHT MANUFACTURING DISTRICT | | URBAN INDUSTRIAL | |
| Acre X Rate | None | | None | | NOT APPLICABLE | | Not Applicable | |

| Sales | | | | Building Permits | | | | | Values | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | $ Amount | NUTC | Recording | Date | Number | Tag | $ Amount | Reason | Type | | | | Pr Yr: 2022 |
| 03/16/2016 | $3,202,609 | D0 | 2016 0662 | | | | | | Land | | | | |
| 06/28/2011 | $560,000 | D0 | 2011 1423 | | | | | | LandC | | | | $77,400 |
| 07/23/2010 | $214,000 | D0 | 2010 1616 | | | | | | Dwlg | | | | |
| 08/09/2006 | $645,150 | D043 | 2006 2507 | | | | | | Impr | | | | $2,360,830 |
| | | | | | | | | | Total | | | | $2,438,230 |

PDF+PIN: **007+11-01-428-005-00**

Mon, 6/20/2022, 8:45 AM    Page    2

## Component Structure

| Occ. Code | 711 |
| Occ. Descr. | Manufacturing (Light) |
| Year Built | 1973 |
| EFF Age/Yr | 50/ 1973 |
| Condition | |
| Description | B-1 1S C-BLK |
| Perimeter | 472 |
| Stories | 1 |
| Grade | 4 |
| 1st Flr Wall Ht | 20 |
| Base | 12,400 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | | | |
|---|---|---|---|---|
| Ftg & Fdtn | Reinforced Concrete | 12" | | |
| Exterior wall | C'Blk or Tile - 8" | 20 | Brick on Block - 8" | 20 |
| Interior wall | Glassboard Paneling | 20 | | |
| Pilasters | | | | |
| Wall facing | Incl. w / Walls | Average | | |
| Windows | | | | |
| Fronts/Doors | | | | |

## Horizontals

| | | | | |
|---|---|---|---|---|
| Basement | | | | |
| Roof | 4-Ply Compo/Stl Bar Joist | Yes | Rubber Membrane/Stl | No |
| Ceiling | | | | |
| Struct. Floor | 6" R'Concrete | 1 | | |
| Floor Cover | | | | |
| Partitions | | | | |
| Framing | Steel - Average | 1 | | |
| HVAC | Suspended Gas Unit | 1 | | |
| Electrical | Industrial - Average | 1 | | |
| Sprinkler | Exposed Wet | 1 | | |

## Plumbing

| | B | Ext |
|---|---|---|
| Lavatory | | 7 |
| Water Closet | | 7 |
| Ind wash sink - 4' | | 3 |
| Water Closet | | 7 |
| Urinal - Wall | | 2 |
| Lavatory | | 7 |
| Stall Shower or Tub | | 2 |

## Adjustments

| | | |
|---|---|---|
| Floor - dock level adjus | 12,400 | AVG |
| Office-internal with He | 4,408 | AVG |
| Canopy - attached | 264 | AVG |
| Mezzanine - finished(r | 2,160 | AVG |
| Sprinkler - exposed w | 2,160 | AVG |

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

| Bldg / Addn | | Description | Units | | | Year | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 of 20 | Bldg | O 711 — Manufacturing (Light) | | | | | | | | | |
| B-1 | Com | P 711 — Manufacturing (Light) | 12,400 | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | |
| | | Reinforced Concrete - 12" | 408 | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | |
| | | C'Blk or Tile - 8" - 20 | 350 | | | | | | | | |
| | | Brick on Block - 8" - 20 | 58 | | | | | | | | |
| | V | Interior Wall | | | | | | | | | |
| | | Glassboard Paneling - 20 | 368 | | | | | | | | |
| | V | Wall Facing | | | | | | | | | |
| | | Incl. w / Walls - Average | 408 | | | | | | | | |
| | H | Roof | | | | | | | | | |
| | | 4-Ply Compo/Stl Bar Joist - Yes | 6,688 | | | | | | | | |
| | | Rubber Membrane/Stl - No | 5,712 | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | |
| | | 6" R'Concrete - 1 | 12,400 | | | | | | | | |
| | H | Framing | | | | | | | | | |
| | | Steel - Average - 1 | 12,400 | | | | | | | | |
| | H | HVAC | | | | | | | | | |
| | | Suspended Gas Unit - 1 | 12,400 | | | | | | | | |
| | H | Electrical | | | | | | | | | |
| | | Industrial - Average - 1 | 12,400 | | | | | | | | |
| | H | Sprinkler | | | | | | | | | |
| | | Exposed Wet - 1 | 12,400 | | | | | | | | |
| | Plmb | Lavatory - AVG | 7 | | | | | | | | |
| | Plmb | Water Closet - AVG | 7 | | | | | | | | |
| | Plmb | Ind wash sink - 4' - AVG | 3 | | | | | | | | |
| | Plmb | Water Closet - AVG | 7 | | | | | | | | |
| | Plmb | Urinal - Wall - AVG | 2 | | | | | | | | |
| | Plmb | Lavatory - AVG | 7 | | | | | | | | |
| | Plmb | Stall Shower or Tub - AVG | 2 | | | | | | | | |
| | Adj | Floor - dock level adjustment - AVG | 12,400 | | | | | | | | |
| | Adj | Office-internal with Heat & A/C - AVG | 4,408 | | | | | | | | |
| | Adj | Canopy - attached - AVG | 264 | | | | | | | | |
| | Adj | Mezzanine - finished(no a/c) - AVG | 2,160 | | | | | | | | |
| | Adj | Sprinkler - exposed wet - AVG | 2,160 | | | | | | | | |
| | Ex | GLASSBOARD CEILING | 1 | | | 1973 | | | | | | |
| | | Quantity=7,992.00, Units=Square Feet, Height=0 | | | | | | | | | | |

**PDF+PIN:  007+11-01-428-005-00**

## Component Addition

| | |
|---|---|
| Occ. Code | 711 |
| Occ. Descr. | Manufacturing (Light) |
| Year Built | 1985 |
| EFF Age/Yr | 38/    1985 |
| Condition | |
| Description | A-1 1S C-BLK |
| Perimeter | 55 |
| Stories | 1 |
| Grade | 4 |
| 1st Flr Wall Ht | 20 |
| Base | 2,420 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | |
|---|---|---|
| Ftg & Fdtn | Reinforced Concrete | 12" |
| Exterior wall | C'Blk or Tile - 8" | 20 |
| Interior wall | Glassboard Paneling | 20 |
| Pilasters | | |
| Wall facing | | |
| Windows | | |
| Fronts/Doors | | |

## Horizontals

| | | |
|---|---|---|
| Basement | | |
| Roof | 4-Ply Compo/Stl Bar Joist | Yes |
| Ceiling | | |
| Struct. Floor | 6" R'Concrete | 1 |
| Floor Cover | | |
| Partitions | | |
| Framing | Steel - Average | 1 |
| HVAC | Suspended Unit Heater (Gas) | 1 |
| Electrical | Industrial - Average | 1 |
| Sprinkler | Exposed Dry | 1 |

## Plumbing

| | B | Ext |
|---|---|---|
| | | |

## Adjustments

| | | |
|---|---|---|
| Floor - dock level adjus | 2,420 | AVG |

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

| Bldg / Addn | Adtn | Description | Units | | | Year | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 1 | Adtn | O 711 ─Manufacturing (Light) | | | | | | | | | | |
| A-1 | Com | P 711 ─Manufacturing (Light) | 2,420 | | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | | |
| | | Reinforced Concrete - 12" | 55 | | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | | |
| | | C'Blk or Tile - 8" - 20 | 55 | | | | | | | | | |
| | V | Interior Wall | | | | | | | | | | |
| | | Glassboard Paneling - 20 | 55 | | | | | | | | | |
| | H | Roof | | | | | | | | | | |
| | | 4-Ply Compo/Stl Bar Joist - Yes | 2,420 | | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | | |
| | | 6" R'Concrete - 1 | 2,420 | | | | | | | | | |
| | H | Framing | | | | | | | | | | |
| | | Steel - Average - 1 | 2,420 | | | | | | | | | |
| | H | HVAC | | | | | | | | | | |
| | | Suspended Unit Heater (Gas) - 1 | 2,420 | | | | | | | | | |
| | H | Electrical | | | | | | | | | | |
| | | Industrial - Average - 1 | 2,420 | | | | | | | | | |
| | H | Sprinkler | | | | | | | | | | |
| | | Exposed Dry - 1 | 2,420 | | | | | | | | | |
| | Adj | Floor - dock level adjustment - AVG | 2,420 | | | | | | | | | |
| | Ex | GLASSBOARD CEILING | 1 | | | 1985 | | | | | | |
| | | Quantity=2,420.00, Units=Square Feet, Height=0 | | | | | | | | | | |

PDF+PIN: **007+11-01-428-005-00**

## Component Addition

| | |
|---|---|
| Occ. Code | 711 |
| Occ. Descr. | Manufacturing (Light) |
| Year Built | 1988 |
| EFF Age/Yr | 35/    1988 |
| Condition | |
| Description | A-2 1S C-BLK |
| Perimeter | 80 |
| Stories | 1 |
| Grade | 4 |
| 1st Flr Wall Ht | 20 |
| Base | 7,360 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | |
|---|---|---|
| Ftg & Fdtn | Reinforced Concrete | 12" |
| Exterior wall | C'Blk or Tile - 8" | 20 |
| Interior wall | Glassboard Paneling | 20 |
| Pilasters | | |
| Wall facing | | |
| Windows | | |
| Fronts/Doors | | |

## Horizontals

| | | |
|---|---|---|
| Basement | | |
| Roof | Tar and Gravel/ Mtl Dk | Yes |
| Ceiling | | |
| Struct. Floor | 6" R'Concrete | 1 |
| Floor Cover | | |
| Partitions | | |
| Framing | Steel - Average | 1 |
| HVAC | Suspended Unit Heater (Gas) | 1 |
| Electrical | Industrial - Average | 1 |
| Sprinkler | Exposed Dry | 1 |

## Plumbing

| | B | Ext |
|---|---|---|
| | | |

## Adjustments

| | | |
|---|---|---|
| Floor - dock level adjus | 7,360 | AVG |

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

PDF+PIN: **007+11-01-428-005-00**

| Bldg / Addn | | Description | Units | | | Year | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 2 | Adtn | O  711 ━ Manufacturing (Light) | | | | | | | | | |
| A-2 | Com | P  711 ━ Manufacturing (Light) | 7,360 | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | |
| | | Reinforced Concrete - 12" | 80 | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | |
| | | C'Blk or Tile - 8" - 20 | 80 | | | | | | | | |
| | V | Interior Wall | | | | | | | | | |
| | | Glassboard Paneling - 20 | 80 | | | | | | | | |
| | H | Roof | | | | | | | | | |
| | | Tar and Gravel/ Mtl Dk - Yes | 7,360 | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | |
| | | 6" R'Concrete - 1 | 7,360 | | | | | | | | |
| | H | Framing | | | | | | | | | |
| | | Steel - Average - 1 | 7,360 | | | | | | | | |
| | H | HVAC | | | | | | | | | |
| | | Suspended Unit Heater (Gas) - 1 | 7,360 | | | | | | | | |
| | H | Electrical | | | | | | | | | |
| | | Industrial - Average - 1 | 7,360 | | | | | | | | |
| | H | Sprinkler | | | | | | | | | |
| | | Exposed Dry - 1 | 7,360 | | | | | | | | |
| | Adj | Floor - dock level adjustment - AVG | 7,360 | | | | | | | | |
| | Ex | GLASSBOARD CEILING | 1 | | | 1988 | | | | | | |
| | | Quantity=7,360.00, Units=Square Feet, Height=20 | | | | | | | | | |

PDF+PIN: **007+11-01-428-005-00**

Mon, 6/20/2022, 8:45 AM    Page    8

## Component Addition

| | |
|---|---|
| Occ. Code | 711 |
| Occ. Descr. | Manufacturing (Light) |
| Year Built | 1988 |
| EFF Age/Yr | 35/    1988 |
| Condition | |
| Description | A-3 1S C-BLK |
| Perimeter | 192 |
| Stories | 1 |
| Grade | 4 |
| 1st Flr Wall Ht | 20 |
| Base | 3,748 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | |
|---|---|---|
| Ftg & Fdtn | Reinforced Concrete | 12" |
| Exterior wall | C'Blk or Tile - 8" | 20 |
| Interior wall | | |
| Pilasters | | |
| Wall facing | | |
| Windows | | |
| Fronts/Doors | | |

## Horizontals

| | | |
|---|---|---|
| Basement | | |
| Roof | Tar and Gravel/ Mtl Dk | Yes |
| Ceiling | | |
| Struct. Floor | 6" R'Concrete | 1 |
| Floor Cover | | |
| Partitions | | |
| Framing | Steel - Average | 1 |
| HVAC | Suspended Unit Heater (Gas) | 1 |
| Electrical | Industrial - Average | 1 |
| Sprinkler | Exposed Dry | 1 |

## Plumbing

| | B | Ext |
|---|---|---|

## Adjustments

| | | |
|---|---|---|
| Mezzanine - finished(r | 220 | Low |
| Floor - dock level adjus | 3,748 | AVG |

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

PDF+PIN:  **007+11-01-428-005-00**

| Bldg / Addn | Adtn | Description | Units | | | Year | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 3 | Adtn | O 711 ─Manufacturing (Light) | | | | | | | | | | |
| A-3 | Com | P 711 ─Manufacturing (Light) | 3,748 | | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | | |
| | | Reinforced Concrete - 12" | 192 | | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | | |
| | | C'Blk or Tile - 8" - 20 | 192 | | | | | | | | | |
| | H | Roof | | | | | | | | | | |
| | | Tar and Gravel/ Mtl Dk - Yes | 3,748 | | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | | |
| | | 6" R'Concrete - 1 | 3,748 | | | | | | | | | |
| | H | Framing | | | | | | | | | | |
| | | Steel - Average - 1 | 3,748 | | | | | | | | | |
| | H | HVAC | | | | | | | | | | |
| | | Suspended Unit Heater (Gas) - 1 | 3,748 | | | | | | | | | |
| | H | Electrical | | | | | | | | | | |
| | | Industrial - Average - 1 | 3,748 | | | | | | | | | |
| | H | Sprinkler | | | | | | | | | | |
| | | Exposed Dry - 1 | 3,968 | | | | | | | | | |
| | Adj | Mezzanine - finished(no a/c) - Low | 220 | | | | | | | | | |
| | Adj | Floor - dock level adjustment - AVG | 3,748 | | | | | | | | | |

**PDF+PIN: 007+11-01-428-005-00**

Mon, 6/20/2022, 8:45 AM   Page   10

## Component Addition

| | |
|---|---|
| Occ. Code | 711 |
| Occ. Descr. | Manufacturing (Light) |
| Year Built | 1994 |
| EFF Age/Yr | 29/ 1994 |
| Condition | |
| Description | A-4 1S C-BLK |
| Perimeter | 154 |
| Stories | 1 |
| Grade | 4 |
| 1st Flr Wall Ht | 20 |
| Base | 2,484 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | |
|---|---|---|
| Ftg & Fdtn | Reinforced Concrete | 12" |
| Exterior wall | C'Blk or Tile - 8" | 20 |
| Interior wall | | |
| Pilasters | | |
| Wall facing | | |
| Windows | | |
| Fronts/Doors | | |

## Horizontals

| | | |
|---|---|---|
| Basement | | |
| Roof | Tar and Gravel/ Mtl Dk | Yes |
| Ceiling | | |
| Struct. Floor | 6" R'Concrete | 1 |
| Floor Cover | | |
| Partitions | | |
| Framing | Steel - Average | 1 |
| HVAC | Suspended Unit Heater (Gas) | 1 |
| Electrical | Industrial - Average | 1 |
| Sprinkler | Exposed Dry | 1 |

## Plumbing

| | B | Ext |
|---|---|---|
| | | |

## Adjustments

| | | |
|---|---|---|
| Floor - dock level adjus | 2,484 | AVG |

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

PDF+PIN: **007+11-01-428-005-00**

| Bldg / Adtn | | Description | Units | | | Year | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 4 | Adtn | O  711 ━Manufacturing (Light) | | | | | | | | | |
| A-4 | Com | P  711 ━Manufacturing (Light) | 2,484 | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | |
| | | Reinforced Concrete - 12" | 154 | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | |
| | | C'Blk or Tile - 8" - 20 | 154 | | | | | | | | |
| | H | Roof | | | | | | | | | |
| | | Tar and Gravel/ Mtl Dk - Yes | 2,484 | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | |
| | | 6" R'Concrete - 1 | 2,484 | | | | | | | | |
| | H | Framing | | | | | | | | | |
| | | Steel - Average - 1 | 2,484 | | | | | | | | |
| | H | HVAC | | | | | | | | | |
| | | Suspended Unit Heater (Gas) - 1 | 2,484 | | | | | | | | |
| | H | Electrical | | | | | | | | | |
| | | Industrial - Average - 1 | 2,484 | | | | | | | | |
| | H | Sprinkler | | | | | | | | | |
| | | Exposed Dry - 1 | 2,484 | | | | | | | | |
| | Adj | Floor - dock level adjustment - AVG | 2,484 | | | | | | | | |
| 1 of 4 | Ex | Door | 1 | | | 1994 | | | | | |
| | | O.H. - Door - Manual, 6 Ft Wide, 8 Ft High | | | | | | | | | |
| 2 of 4 | Ex | EVAPORATOR ROOM | 1 | | | 1994 | | | | | |
| | | Quantity=1,120.00, Units=Square Feet, Height=20 | | | | | | | | | |
| 3 of 4 | Ex | Canopy | 1 | | | 1994 | | | | | |
| | | 80 SF, Metal, High Pricing | | | | | | | | | |
| 4 of 4 | Ex | Porches,Decks,Patios,etc. | 1 | | | 1994 | | | | | |
| | | 260 SF, Concrete Patio, Average Pricing | | | | | | | | | |

PDF+PIN: **007+11-01-428-005-00**

Mon, 6/20/2022, 8:45 AM    Page    12

## Component Addition

| | |
|---|---|
| Occ. Code | 711 |
| Occ. Descr. | Manufacturing (Light) |
| Year Built | 1996 |
| EFF Age/Yr | 27/    1996 |
| Condition | |
| Description | A-5 1S C-BLK |
| Perimeter | 95 |
| Stories | 1 |
| Grade | 4 |
| 1st Flr Wall Ht | 20 |
| Base | 940 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | |
|---|---|---|
| Ftg & Fdtn | Reinforced Concrete | 12" |
| Exterior wall | C'Blk or Tile - 8" | 20 |
| Interior wall | Glassboard Paneling | 20 |
| Pilasters | | |
| Wall facing | | |
| Windows | | |
| Fronts/Doors | | |

## Horizontals

| | | |
|---|---|---|
| Basement | | |
| Roof | 4-Ply Compo/Stl Bar Joist | Yes |
| Ceiling | | |
| Struct. Floor | 6" R'Concrete | 1 |
| Floor Cover | | |
| Partitions | | |
| Framing | Steel - Average | 1 |
| HVAC | No HVAC | 1 |
| Electrical | Industrial - Average | 1 |
| Sprinkler | Exposed Dry | 1 |

## Plumbing

| | B | Ext |
|---|---|---|
| | | |

## Adjustments

| | | |
|---|---|---|
| Floor - dock level adjus | 940 | AVG |
| Partition C'Blk (8") - P.S | 300 | AVG |

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

PDF+PIN: **007+11-01-428-005-00**

| Bldg / Addn | | Description | Units | | | Year | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 5 | Adtn | O 711 ─Manufacturing (Light) | | | | | | | | | |
| A-5 | Com | P 711 ─Manufacturing (Light) | 940 | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | |
| | | Reinforced Concrete - 12" | 95 | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | |
| | | C'Blk or Tile - 8" - 20 | 95 | | | | | | | | |
| | V | Interior Wall | | | | | | | | | |
| | | Glassboard Paneling - 20 | 150 | | | | | | | | |
| | H | Roof | | | | | | | | | |
| | | 4-Ply Compo/Stl Bar Joist - Yes | 940 | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | |
| | | 6" R'Concrete - 1 | 940 | | | | | | | | |
| | H | Framing | | | | | | | | | |
| | | Steel - Average - 1 | 940 | | | | | | | | |
| | H | HVAC | | | | | | | | | |
| | | No HVAC - 1 | 940 | | | | | | | | |
| | H | Electrical | | | | | | | | | |
| | | Industrial - Average - 1 | 940 | | | | | | | | |
| | H | Sprinkler | | | | | | | | | |
| | | Exposed Dry - 1 | 940 | | | | | | | | |
| | Adj | Floor - dock level adjustment - AVG | 940 | | | | | | | | |
| | Adj | Partition C'Blk (8") - P.S.F.S.A. - AVG | 300 | | | | | | | | |
| 1 of 3 | Ex | GLASSBOARD LINER | 1 | | | 1996 | | | | | |
| | | Quantity=940.00, Units=SFSA, Height=20 | | | | | | | | | |
| 2 of 3 | Ex | Door | 4 | | | 1996 | | | | | |
| | | O.H. - Door w/Seal - Manual, 7 Ft Wide, 8 Ft High | | | | | | | | | |
| 3 of 3 | Ex | Dock Leveler | 3 | | | 1996 | | | | | |
| | | Hydraulic, Low | | | | | | | | | |

PDF+PIN: **007+11-01-428-005-00**

Mon, 6/20/2022, 8:45 AM    Page    14

## Component Addition

| | |
|---|---|
| Occ. Code | 711 |
| Occ. Descr. | Manufacturing (Light) |
| Year Built | 1996 |
| EFF Age/Yr | 27/    1996 |
| Condition | |
| Description | A-6 1S C-BLK |
| Perimeter | 220 |
| Stories | 1 |
| Grade | 4 |
| 1st Flr Wall Ht | 20 |
| Base | 4,800 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | |
|---|---|---|
| Ftg & Fdtn | Reinforced Concrete | 12" |
| Exterior wall | C'Blk or Tile - 8" | 20 |
| Interior wall | Metal Liner | 20 |
| Pilasters | | |
| Wall facing | | |
| Windows | | |
| Fronts/Doors | | |

## Horizontals

| | | |
|---|---|---|
| Basement | | |
| Roof | 4-Ply Compo/Stl Bar Joist | Yes |
| Ceiling | Metal Liner | 1 |
| Struct. Floor | Dock Level R'Conc | 1 |
| Floor Cover | | |
| Partitions | | |
| Framing | Steel - Average | 1 |
| HVAC | No HVAC | 1 |
| Electrical | Industrial - Average | 1 |
| Sprinkler | Exposed Dry | 1 |

## Plumbing

| | B | Ext |
|---|---|---|
| | | |

## Adjustments

| | | |
|---|---|---|
| Floor - dock level adjus | 4,800 | AVG |

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

| Bldg / Addn | Adtn | Description | Units | | | Year | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 6 | Adtn | O  711 ─Manufacturing (Light) | | | | | | | | | |
| A-6 | Com | P  711 ─Manufacturing (Light) | 4,800 | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | |
| | | Reinforced Concrete - 12" | 220 | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | |
| | | C'Blk or Tile - 8" - 20 | 220 | | | | | | | | |
| | V | Interior Wall | | | | | | | | | |
| | | Metal Liner - 20 | 220 | | | | | | | | |
| | H | Roof | | | | | | | | | |
| | | 4-Ply Compo/Stl Bar Joist - Yes | 4,800 | | | | | | | | |
| | H | Ceiling | | | | | | | | | |
| | | Metal Liner - 1 | 4,800 | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | |
| | | Dock Level R'Conc - 1 | 1 | | | | | | | | |
| | H | Framing | | | | | | | | | |
| | | Steel - Average - 1 | 4,800 | | | | | | | | |
| | H | HVAC | | | | | | | | | |
| | | No HVAC - 1 | 4,800 | | | | | | | | |
| | H | Electrical | | | | | | | | | |
| | | Industrial - Average - 1 | 4,800 | | | | | | | | |
| | H | Sprinkler | | | | | | | | | |
| | | Exposed Dry - 1 | 4,800 | | | | | | | | |
| | Adj | Floor - dock level adjustment - AVG | 4,800 | | | | | | | | |
| 1 of 4 | Ex | Cold Storage - Floor | 1 | | | 1996 | | | | | |
| | | 4,800 SF, Sharp Freezer, Average Pricing | | | | | | | | | |
| 2 of 4 | Ex | Cold Storage - Extra Door | 1 | | | 1996 | | | | | |
| | | Sharp Freezer, 56 SFSA, Powered: Yes | | | | | | | | | |
| 3 of 4 | Ex | EXTRA WALL INSUL | 1 | | | 1996 | | | | | |
| | | Quantity=280.00, Units=Lineal Feet, Height=20 | | | | | | | | | |
| 4 of 4 | Ex | CLG INSULATION | 1 | | | 1996 | | | | | |
| | | Quantity=4,800.00, Units=Square Feet, Height=0 | | | | | | | | | |

PDF+PIN: **007+11-01-428-005-00**

Mon, 6/20/2022, 8:45 AM    Page    16

## Component Addition

| | |
|---|---|
| Occ. Code | 711 |
| Occ. Descr. | Manufacturing (Light) |
| Year Built | 1996 |
| EFF Age/Yr | 27/    1996 |
| Condition | |
| Description | A-7 1S C-BLK |
| Perimeter | 80 |
| Stories | 1 |
| Grade | 4 |
| 1st Flr Wall Ht | 24 |
| Base | 400 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | | | |
|---|---|---|---|---|
| Ftg & Fdtn | Reinforced Concrete | 12" | | |
| Exterior wall | C'Blk or Tile - 8" | 24 | C'Blk or Tile - 8" | 4 |
| Interior wall | Glassboard Paneling | 10 | | |
| Pilasters | | | | |
| Wall facing | | | | |
| Windows | | | | |
| Fronts/Doors | | | | |

## Horizontals

| | | | | |
|---|---|---|---|---|
| Basement | | | | |
| Roof | Tar and Gravel/ Mtl Dk | Yes | | |
| Ceiling | | | | |
| Struct. Floor | 6" R'Concrete | 1 | | |
| Floor Cover | | | | |
| Partitions | | | | |
| Framing | Steel - Average | 1 | | |
| HVAC | Suspended Gas Unit | 1 | | |
| Electrical | Industrial - Average | 1 | | |
| Sprinkler | Exposed Dry | 1 | | |

## Plumbing

| | B | Ext |
|---|---|---|
| | | |

## Adjustments

| | | |
|---|---|---|
| Mezzanine - storage | 400 | AVG |

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

PDF+PIN: **007+11-01-428-005-00**

| Bldg / Addn | | Description | Units | | | Year | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 7 | Adtn | O 711 ─ Manufacturing (Light) | | | | | | | | | | |
| A-7 | Com | P 711 ─ Manufacturing (Light) | 400 | | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | | |
| | | Reinforced Concrete - 12" | 60 | | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | | |
| | | C'Blk or Tile - 8" - 24 | 60 | | | | | | | | | |
| | | C'Blk or Tile - 8" - 4 | 20 | | | | | | | | | |
| | V | Interior Wall | | | | | | | | | | |
| | | Glassboard Paneling - 10 | 80 | | | | | | | | | |
| | H | Roof | | | | | | | | | | |
| | | Tar and Gravel/ Mtl Dk - Yes | 400 | | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | | |
| | | 6" R'Concrete - 1 | 400 | | | | | | | | | |
| | H | Framing | | | | | | | | | | |
| | | Steel - Average - 1 | 400 | | | | | | | | | |
| | H | HVAC | | | | | | | | | | |
| | | Suspended Gas Unit - 1 | 400 | | | | | | | | | |
| | H | Electrical | | | | | | | | | | |
| | | Industrial - Average - 1 | 400 | | | | | | | | | |
| | H | Sprinkler | | | | | | | | | | |
| | | Exposed Dry - 1 | 400 | | | | | | | | | |
| | Adj | Mezzanine - storage - AVG | 400 | | | | | | | | | |

PDF+PIN: **007+11-01-428-005-00**

Mon, 6/20/2022, 8:45 AM　Page　18

## Component Addition

| | |
|---|---|
| Occ. Code | 711 |
| Occ. Descr. | Manufacturing (Light) |
| Year Built | 1999 |
| EFF Age/Yr | 24/　1999 |
| Condition | |
| Description | A-8 1S C-BLK |
| Perimeter | 257 |
| Stories | 1 |
| Grade | 4 |
| 1st Flr Wall Ht | 20 |
| Base | 7,160 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | |
|---|---|---|
| Ftg & Fdtn | Reinforced Concrete | 12" |
| Exterior wall | C'Blk or Tile - 8" | 20 |
| Interior wall | Glassboard Paneling | 20 |
| Pilasters | | |
| Wall facing | | |
| Windows | | |
| Fronts/Doors | | |

## Horizontals

| | | |
|---|---|---|
| Basement | | |
| Roof | Tar and Gravel/ Mtl Dk | Yes |
| Ceiling | | |
| Struct. Floor | 6" R'Concrete | 1 |
| Floor Cover | | |
| Partitions | | |
| Framing | Steel - Average | 1 |
| HVAC | Suspended Unit Heater (Gas) | 1 |
| Electrical | Industrial - Average | 1 |
| Sprinkler | Exposed Dry | 1 |

## Plumbing

| | B | Ext |
|---|---|---|
| Water Closet | | 1 |
| Lavatory | | 1 |
| Stall Shower or Tub | | 1 |
| Urinal - Wall | | 1 |

## Adjustments

| | | |
|---|---|---|
| Floor - dock level adjus | 7,160 | AVG |
| Mezzanine - finished(r | 90 | AVG |
| Partition C'Blk (8") - P.S | 1,100 | AVG |

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

Case 24-32426    Doc 13    Filed 09/20/24    Entered 09/20/24 18:21:42    Desc Main
Document    Page 290 of 528
PDF+PIN: 007+11-01-428-005-00

Mon, 6/20/2022, 8:45 AM    Page    19

| Bldg / Addn | | Description | Units | | | Year | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 8 | Adtn | O 711 ━ Manufacturing (Light) | | | | | | | | | |
| A-8 | Com | P 711 ━ Manufacturing (Light) | 7,160 | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | |
| | | Reinforced Concrete - 12" | 257 | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | |
| | | C'Blk or Tile - 8" - 20 | 257 | | | | | | | | |
| | V | Interior Wall | | | | | | | | | |
| | | Glassboard Paneling - 20 | 221 | | | | | | | | |
| | H | Roof | | | | | | | | | |
| | | Tar and Gravel/ Mtl Dk - Yes | 7,160 | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | |
| | | 6" R'Concrete - 1 | 7,160 | | | | | | | | |
| | H | Framing | | | | | | | | | |
| | | Steel - Average - 1 | 7,160 | | | | | | | | |
| | H | HVAC | | | | | | | | | |
| | | Suspended Unit Heater (Gas) - 1 | 7,160 | | | | | | | | |
| | H | Electrical | | | | | | | | | |
| | | Industrial - Average - 1 | 7,160 | | | | | | | | |
| | H | Sprinkler | | | | | | | | | |
| | | Exposed Dry - 1 | 7,160 | | | | | | | | |
| | Plmb | Water Closet - AVG | 1 | | | | | | | | |
| | Plmb | Lavatory - AVG | 1 | | | | | | | | |
| | Plmb | Stall Shower or Tub - AVG | 1 | | | | | | | | |
| | Plmb | Urinal - Wall - AVG | 1 | | | | | | | | |
| | Adj | Floor - dock level adjustment - AVG | 7,160 | | | | | | | | |
| | Adj | Mezzanine - finished(no a/c) - AVG | 90 | | | | | | | | |
| | Adj | Partition C'Blk (8") - P.S.F.S.A. - AVG | 1,100 | | | | | | | | |
| | Ex | GLASSBOARD CEILING | 1 | | | 1999 | | | | | | |
| | | Quantity=5,180.00, Units=Square Feet, Height=0 | | | | | | | | | |

PDF+PIN: **007+11-01-428-005-00**

## Component Addition

| | |
|---|---|
| Occ. Code | 608 |
| Occ. Descr. | Metal Light Mfg - Rigid Steel Frame |
| Year Built | 2016 |
| EFF Age/Yr | 7/    2016 |
| Condition | |
| Description | A-9 1S MTL/STL |
| Perimeter | 172 |
| Grade | 4 |
| Base | 1,520 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | | | |
|---|---|---|---|---|
| Ftg & Fdtn | inforced Concrete w/o Bsmt | 8" | | |
| Exterior wall | R'Concrete kick wall -8" | 4 | Metal/ Stl/ Insul (<50' Wide) | 18 |
| Interior wall | Metal Liner | 18 | | |
| Pilasters | | | | |
| Wall facing | | | | |
| Windows | | | | |
| Fronts/Doors | | | | |

## Horizontals

| | | |
|---|---|---|
| Basement | | |
| Roof | Metal/ Stl/ Insul (< 50' Wide) | No |
| Ceiling | Unfinished | 1 |
| Struct. Floor | 6" R'Concrete | 1 |
| Floor Cover | | |
| Partitions | | |
| Framing | Steel - Average | 1 |
| HVAC | | |
| Electrical | Industrial - Average | 1 |
| Sprinkler | Exposed Dry | 1 |

## Plumbing

| | B | Ext |
|---|---|---|
| | | |

## Adjustments

| | | |
|---|---|---|
| | | |

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

PDF+PIN: **007+11-01-428-005-00**

| Bldg / Addn | Adtn | Description | Units | | | Year | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 9 | Adtn | O  608 ▬ Metal Light Mfg - Rigid Steel Frame | | | | | | | | | |
| A-9 | Com | P  608 ▬ Metal Light Indust. - Rigid Steel Fram | 1,520 | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | |
| | | Reinforced Concrete w/o Bsmt - 8" | 172 | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | |
| | | R'Concrete kick wall -8" - 4 | 172 | | | | | | | | |
| | | Metal/ Stl/ Insul (<50' Wide) - 18 | 172 | | | | | | | | |
| | V | Interior Wall | | | | | | | | | |
| | | Metal Liner - 18 | 172 | | | | | | | | |
| | H | Roof | | | | | | | | | |
| | | Metal/ Stl/ Insul (< 50' Wide) - No | 1,520 | | | | | | | | |
| | H | Ceiling | | | | | | | | | |
| | | Unfinished - 1 | 1,520 | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | |
| | | 6" R'Concrete - 1 | 1,520 | | | | | | | | |
| | H | Framing | | | | | | | | | |
| | | Steel - Average - 1 | 1 | | | | | | | | |
| | H | Electrical | | | | | | | | | |
| | | Industrial - Average - 1 | 1,520 | | | | | | | | |
| | H | Sprinkler | | | | | | | | | |
| | | Exposed Dry - 1 | 1,520 | | | | | | | | |
| | Ex | Door | 1 | | | 2016 | | | | | |
| | | O.H. - Door - Power, 14 Ft Wide, 16 Ft High | | | | | | | | | |

PDF+PIN: **007+11-01-428-005-00**

Mon, 6/20/2022, 8:45 AM     Page   22

## Component Addition

| | |
|---|---|
| Occ. Code | 608 |
| Occ. Descr. | Metal Light Mfg - Rigid Steel Frame |
| Year Built | 2016 |
| EFF Age/Yr | 7/     2016 |
| Condition | |
| Description | A-10 MTL/STL |
| Perimeter | 34 |
| Grade | 4 |
| Base | 144 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | |
|---|---|---|
| Ftg & Fdtn | inforced Concrete w/o Bsmt | 8" |
| Exterior wall | Metal Sandwich Panel - 2" | 9 |
| Interior wall | Unfinished | 0 |
| Pilasters | | |
| Wall facing | | |
| Windows | | |
| Fronts/Doors | | |

## Horizontals

| | | |
|---|---|---|
| Basement | | |
| Roof | Metal/ Stl/ Insul (< 50' Wide) | No |
| Ceiling | Unfinished | 1 |
| Struct. Floor | 6" R'Concrete | 1 |
| Floor Cover | | |
| Partitions | | |
| Framing | Steel - Average | 1 |
| HVAC | | |
| Electrical | Industrial - Light | 1 |
| Sprinkler | | |

## Plumbing

| | B | Ext |
|---|---|---|
| | | |

## Adjustments

| | | |
|---|---|---|
| | | |

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

PDF+PIN: **007+11-01-428-005-00**

| Bldg / Addn | Adtn | Description | Units | | | Year | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 10 | Adtn | O  608 ─ Metal Light Mfg - Rigid Steel Frame | | | | | | | | | | |
| A-10 | Com | P  608 ─ Metal Light Indust. - Rigid Steel Frar | 144 | | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | | |
| | | Reinforced Concrete w/o Bsmt - 8" | 34 | | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | | |
| | | Metal Sandwich Panel - 2" - 9 | 34 | | | | | | | | | |
| | V | Interior Wall | | | | | | | | | | |
| | | Unfinished - 0 | 34 | | | | | | | | | |
| | H | Roof | | | | | | | | | | |
| | | Metal/ Stl/ Insul (< 50' Wide) - No | 144 | | | | | | | | | |
| | H | Ceiling | | | | | | | | | | |
| | | Unfinished - 1 | 144 | | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | | |
| | | 6" R'Concrete - 1 | 144 | | | | | | | | | |
| | H | Framing | | | | | | | | | | |
| | | Steel - Average - 1 | 144 | | | | | | | | | |
| | H | Electrical | | | | | | | | | | |
| | | Industrial - Light - 1 | 144 | | | | | | | | | |

PDF+PIN:  **007+11-01-428-005-00**

Mon, 6/20/2022, 8:45 AM    Page    24

## Component Addition

| | |
|---|---|
| Occ. Code | 608 |
| Occ. Descr. | Metal Light Mfg - Rigid Steel Frame |
| Year Built | 2010 |
| EFF Age/Yr | 13/    2010 |
| Condition | |
| Description | A-11 1S MTL/STL |
| Perimeter | 33 |
| Grade | 4 |
| Base | 242 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | |
|---|---|---|
| Ftg & Fdtn | Reinforced Concrete | 8" |
| Exterior wall | Metal/ Stl/ Insul (<50' Wide) | 10 |
| Interior wall | Glassboard Paneling | 10 |
| Pilasters | | |
| Wall facing | | |
| Windows | | |
| Fronts/Doors | | |

## Horizontals

| | | |
|---|---|---|
| Basement | | |
| Roof | Metal/ Stl/ Insul (< 50' Wide) | Yes |
| Ceiling | | |
| Struct. Floor | Dock Level R'Conc | 1 |
| Floor Cover | | |
| Partitions | | |
| Framing | Steel - Average | 1 |
| HVAC | Electric | 1 |
| Electrical | Industrial - Average | 1 |
| Sprinkler | Exposed Dry | 1 |

## Plumbing

| | B | Ext |
|---|---|---|
| | | |

## Adjustments

| | | |
|---|---|---|
| | | |

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

| Bldg / Addn | | Description | Units | | | Year | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 11 | Adtn | O 608 ─ Metal Light Mfg - Rigid Steel Frame | | | | | | | | | | |
| A-11 | Com | P 608 ─ Metal Light Indust. - Rigid Steel Fram | 242 | | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | | |
| | | Reinforced Concrete - 8" | 33 | | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | | |
| | | Metal/ Stl/ Insul (<50' Wide) - 10 | 33 | | | | | | | | | |
| | V | Interior Wall | | | | | | | | | | |
| | | Glassboard Paneling - 10 | 33 | | | | | | | | | |
| | H | Roof | | | | | | | | | | |
| | | Metal/ Stl/ Insul (< 50' Wide) - Yes | 242 | | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | | |
| | | Dock Level R'Conc - 1 | 242 | | | | | | | | | |
| | H | Framing | | | | | | | | | | |
| | | Steel - Average - 1 | 1 | | | | | | | | | |
| | H | HVAC | | | | | | | | | | |
| | | Electric - 1 | 242 | | | | | | | | | |
| | H | Electrical | | | | | | | | | | |
| | | Industrial - Average - 1 | 242 | | | | | | | | | |
| | H | Sprinkler | | | | | | | | | | |
| | | Exposed Dry - 1 | 242 | | | | | | | | | |

PDF+PIN: **007+11-01-428-005-00**

Mon, 6/20/2022, 8:45 AM    Page    26

## Component Addition

| | |
|---|---|
| Occ. Code | 608 |
| Occ. Descr. | Metal Light Mfg - Rigid Steel Frame |
| Year Built | 2010 |
| EFF Age/Yr | 13/ 2010 |
| Condition | |
| Description | A-12 1S MTL/STL |
| Perimeter | 100 |
| Grade | 4 |
| Base | 2,400 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | |
|---|---|---|
| Ftg & Fdtn | Reinforced Concrete | 8" |
| Exterior wall | Metal/ Stl/ Insul (<50' Wide) | 22 |
| Interior wall | Metal Liner | 22 |
| Pilasters | | |
| Wall facing | | |
| Windows | | |
| Fronts/Doors | | |

## Horizontals

| | | |
|---|---|---|
| Basement | | |
| Roof | Metal/ Stl/ Insul (< 50' Wide) | Yes |
| Ceiling | Unfinished | 1 |
| Struct. Floor | 6" R'Concrete | 1 |
| Floor Cover | | |
| Partitions | | |
| Framing | Steel - Average | 1 |
| HVAC | Suspended Unit Heater (Gas) | 1 |
| Electrical | Industrial - Average | 1 |
| Sprinkler | Exposed Dry | 1 |

## Plumbing

| | B | Ext |
|---|---|---|

## Adjustments

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

PDF+PIN: **007+11-01-428-005-00**

| Bldg / Addn | Adtn | Description | Units | | | Year | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 12 | Adtn | O  608 ━Metal Light Mfg - Rigid Steel Frame | | | | | | | | | |
| A-12 | Com | P  608 ━Metal Light Indust. - Rigid Steel Frar | 2,400 | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | |
| | | Reinforced Concrete - 8" | 100 | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | |
| | | Metal/ Stl/ Insul (<50' Wide) - 22 | 100 | | | | | | | | |
| | V | Interior Wall | | | | | | | | | |
| | | Metal Liner - 22 | 100 | | | | | | | | |
| | H | Roof | | | | | | | | | |
| | | Metal/ Stl/ Insul (< 50' Wide) - Yes | 2,400 | | | | | | | | |
| | H | Ceiling | | | | | | | | | |
| | | Unfinished - 1 | 2,400 | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | |
| | | 6" R'Concrete - 1 | 2,400 | | | | | | | | |
| | H | Framing | | | | | | | | | |
| | | Steel - Average - 1 | 1 | | | | | | | | |
| | H | HVAC | | | | | | | | | |
| | | Suspended Unit Heater (Gas) - 1 | 2,400 | | | | | | | | |
| | H | Electrical | | | | | | | | | |
| | | Industrial - Average - 1 | 2,400 | | | | | | | | |
| | H | Sprinkler | | | | | | | | | |
| | | Exposed Dry - 1 | 2,400 | | | | | | | | |
| | Ex | Door | 1 | | | 2010 | | | | | |
| | | O.H. - Door - Manual, 14 Ft Wide, 14 Ft High | | | | | | | | | |

PDF+PIN: **007+11-01-428-005-00**

Mon, 6/20/2022, 8:45 AM    Page    28

## Component Addition

| | |
|---|---|
| Occ. Code | 711 |
| Occ. Descr. | Manufacturing (Light) |
| Year Built | 2010 |
| EFF Age/Yr | 13/    2010 |
| Condition | |
| Description | A-13 1S MTL/STL |
| Perimeter | 46 |
| Stories | 1 |
| Grade | 4 |
| 1st Flr Wall Ht | 20 |
| Base | 224 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | |
|---|---|---|
| Ftg & Fdtn | Reinforced Concrete w/o Bsmt | 8" |
| Exterior wall | Metal Sandwich Panel - 2" | 20 |
| Interior wall | | |
| Pilasters | | |
| Wall facing | | |
| Windows | | |
| Fronts/Doors | | |

## Horizontals

| | | |
|---|---|---|
| Basement | | |
| Roof | Metal/ Stl/ Insul (< 50' Wide) | No |
| Ceiling | | |
| Struct. Floor | 6" R'Concrete | 1 |
| Floor Cover | | |
| Partitions | | |
| Framing | Steel - Average | 1 |
| HVAC | Suspended Unit Heater (Gas) | 1 |
| Electrical | Industrial - Average | 1 |
| Sprinkler | Exposed Dry | 1 |

## Plumbing

| | B | Ext |
|---|---|---|

## Adjustments

| | | |
|---|---|---|

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

PDF+PIN: **007+11-01-428-005-00**

| Bldg / Addn | Adtn | Description | Units | | | Year | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 13 | Adtn | O  711 ─ Manufacturing (Light) | | | | | | | | | | |
| A-13 | Com | P  711 ─ Manufacturing (Light) | 224 | | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | | |
| | | Reinforced Concrete w/o Bsmt - 8" | 46 | | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | | |
| | | Metal Sandwich Panel - 2" - 20 | 46 | | | | | | | | | |
| | H | Roof | | | | | | | | | | |
| | | Metal/ Stl/ Insul (< 50' Wide) - No | 224 | | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | | |
| | | 6" R'Concrete - 1 | 224 | | | | | | | | | |
| | H | Framing | | | | | | | | | | |
| | | Steel - Average - 1 | 224 | | | | | | | | | |
| | H | HVAC | | | | | | | | | | |
| | | Suspended Unit Heater (Gas) - 1 | 224 | | | | | | | | | |
| | H | Electrical | | | | | | | | | | |
| | | Industrial - Average - 1 | 224 | | | | | | | | | |
| | H | Sprinkler | | | | | | | | | | |
| | | Exposed Dry - 1 | 224 | | | | | | | | | |

PDF+PIN: **007+11-01-428-005-00**

Mon, 6/20/2022, 8:45 AM    Page    30

## Component Addition

| | |
|---|---|
| Occ. Code | 608 |
| Occ. Descr. | Metal Light Mfg - Rigid Steel Frame |
| Year Built | 2010 |
| EFF Age/Yr | 13/    2010 |
| Condition | |
| Description | A-14 1S MTL/STL |
| Perimeter | 83 |
| Grade | 4 |
| Base | 1,540 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | | | |
|---|---|---|---|---|
| Ftg & Fdtn | Reinforced Concrete | 8" | | |
| Exterior wall | Metal/ Stl/ Insul (<50' Wide) | 22 | R'Concrete kick wall -8" | 2 |
| Interior wall | Metal Liner | 0 | | |
| Pilasters | | | | |
| Wall facing | | | | |
| Windows | | | | |
| Fronts/Doors | | | | |

## Horizontals

| | | |
|---|---|---|
| Basement | | |
| Roof | Metal/ Stl/ Insul (< 50' Wide) | Yes |
| Ceiling | Unfinished | 1 |
| Struct. Floor | 6" R'Concrete | 1 |
| Floor Cover | | |
| Partitions | | |
| Framing | Steel - Average | 1 |
| HVAC | Suspended Unit Heater (Gas) | 1 |
| Electrical | Industrial - Average | 1 |
| Sprinkler | Exposed Dry | 1 |

## Plumbing

| | B | Ext |
|---|---|---|
| | | |

## Adjustments

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

PDF+PIN: **007+11-01-428-005-00**

| Bldg / Addn | Adtn | Description | Units | | | Year | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 14 | Adtn | O  608 ─ Metal Light Mfg - Rigid Steel Frame | | | | | | | | | |
| A-14 | Com | P  608 ─ Metal Light Indust. - Rigid Steel Fran | 1,540 | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | |
| | | Reinforced Concrete - 8" | 83 | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | |
| | | Metal/ Stl/ Insul (<50' Wide) - 22 | 83 | | | | | | | | |
| | | R'Concrete kick wall -8" - 2 | 83 | | | | | | | | |
| | V | Interior Wall | | | | | | | | | |
| | | Metal Liner - 0 | 83 | | | | | | | | |
| | H | Roof | | | | | | | | | |
| | | Metal/ Stl/ Insul (< 50' Wide) - Yes | 1,540 | | | | | | | | |
| | H | Ceiling | | | | | | | | | |
| | | Unfinished - 1 | 1,540 | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | |
| | | 6" R'Concrete - 1 | 1,540 | | | | | | | | |
| | H | Framing | | | | | | | | | |
| | | Steel - Average - 1 | 1,540 | | | | | | | | |
| | H | HVAC | | | | | | | | | |
| | | Suspended Unit Heater (Gas) - 1 | 1,540 | | | | | | | | |
| | H | Electrical | | | | | | | | | |
| | | Industrial - Average - 1 | 1,540 | | | | | | | | |
| | H | Sprinkler | | | | | | | | | |
| | | Exposed Dry - 1 | 1,540 | | | | | | | | |
| | Ex | Door | 1 | | | 2010 | | | | | |
| | | O.H. - Door - Power, 16 Ft Wide, 16 Ft High | | | | | | | | | |

PDF+PIN: **007+11-01-428-005-00**

Mon, 6/20/2022, 8:45 AM    Page    32

## Component Addition

| | |
|---|---|
| Occ. Code | 608 |
| Occ. Descr. | Metal Light Mfg - Rigid Steel Frame |
| | |
| Year Built | 2016 |
| EFF Age/Yr | 7/    2016 |
| Condition | |
| Description | A-15 2S MTL/STL |
| Perimeter | 420 |
| Grade | 4 |
| Base | 8,000 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | | | | | |
|---|---|---|---|---|---|---|
| Ftg & Fdtn | Reinforced Concrete | 12" | | | | |
| Exterior wall | Metal Sandwich Panel - 2" | 38 | R'Concrete kick wall -8" | 2 | Metal Sandwich Panel - 2" | 18 |
| Interior wall | Unfinished | 0 | | | | |
| Pilasters | | | | | | |
| Wall facing | | | | | | |
| Windows | | | | | | |
| Fronts/Doors | | | | | | |

## Horizontals

| | | | | |
|---|---|---|---|---|
| Basement | | | | |
| Roof | Rubber Membrane/Stl | Yes | | |
| Ceiling | Unfinished | 1 | | |
| Struct. Floor | 6" R'Concrete | 1 | R'Concrete - Self Supporting | 1 |
| Floor Cover | | | | |
| Partitions | | | | |
| Framing | Steel - Average | 2 | | |
| HVAC | | | | |
| Electrical | Industrial - Average | 2 | | |
| Sprinkler | Exposed Dry | 2 | | |

## Plumbing

| | B | Ext |
|---|---|---|
| | | |

## Adjustments

| | | | |
|---|---|---|---|
| | | | |

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

PDF+PIN:  **007+11-01-428-005-00**

| Bldg / Addn | Adtn | Description | Units | | | Year | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 15 | Adtn | O  608 ─ Metal Light Mfg - Rigid Steel Frame | | | | | | | | | |
| A-15 | Com | P  608 ─ Metal Light Indust. - Rigid Steel Fram | 8,000 | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | |
| | | Reinforced Concrete - 12" | 260 | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | |
| | | Metal Sandwich Panel - 2" - 38 | 260 | | | | | | | | |
| | | R'Concrete kick wall -8" - 2 | 260 | | | | | | | | |
| | | Metal Sandwich Panel - 2" - 18 | 160 | | | | | | | | |
| | V | Interior Wall | | | | | | | | | |
| | | Unfinished - 0 | 260 | | | | | | | | |
| | H | Roof | | | | | | | | | |
| | | Rubber Membrane/Stl - Yes | 8,000 | | | | | | | | |
| | H | Ceiling | | | | | | | | | |
| | | Unfinished - 1 | 8,000 | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | |
| | | 6" R'Concrete - 1 | 8,000 | | | | | | | | |
| | | 8" R'Concrete - Self Supporting - 1 | 8,000 | | | | | | | | |
| | H | Framing | | | | | | | | | |
| | | Steel - Average - 2 | 8,000 | | | | | | | | |
| | H | Electrical | | | | | | | | | |
| | | Industrial - Average - 2 | 8,000 | | | | | | | | |
| | H | Sprinkler | | | | | | | | | |
| | | Exposed Dry - 2 | 8,000 | | | | | | | | |
| 1 of 2 | Ex | ADDITIONAL FOR 4" INSUL WALLS | 1 | | | 2016 | | | | | |
| | | Quantity=260.00, Units=Lineal Feet, Height=38 | | | | | | | | | |
| 2 of 2 | Ex | ADDITIONAL FOR 4' INSULATED WA | 1 | | | 2016 | | | | | |
| | | Quantity=260.00, Units=Lineal Feet, Height=12 | | | | | | | | | |

PDF+PIN: **007+11-01-428-005-00**

Mon, 6/20/2022, 8:45 AM    Page    34

## Component Addition

| | |
|---|---|
| Occ. Code | 711 |
| Occ. Descr. | Manufacturing (Light) |
| Year Built | 2016 |
| EFF Age/Yr | 7/    2016 |
| Condition | |
| Description | A-16 2S MTL/STL |
| Perimeter | 51 |
| Stories | 2 |
| Grade | 4 |
| 1st Flr Wall Ht | 28 |
| Avg Upper Wall Hght | 12 |
| Base | 429 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | | | |
|---|---|---|---|---|
| Ftg & Fdtn | inforced Concrete w/o Bsmt | 12" | | |
| Exterior wall | Metal Sandwich Panel - 2" | 26 | R'Concrete kick wall -8" | 2 |
| Interior wall | | | | |
| Pilasters | | | | |
| Wall facing | | | | |
| Windows | | | | |
| Fronts/Doors | | | | |

## Horizontals

| | | | | |
|---|---|---|---|---|
| Basement | | | | |
| Roof | Rubber Membrane/Stl | No | | |
| Ceiling | | | | |
| Struct. Floor | 6" R'Concrete | 1 | ar Jst/Mtl Dk/Conc. Topping | 1 |
| Floor Cover | | | | |
| Partitions | | | | |
| Framing | Steel - (C.F.) | 1 | | |
| HVAC | | | | |
| Electrical | Industrial - Average | 2 | | |
| Sprinkler | Exposed Dry | 2 | | |

## Plumbing

| | B | Ext |
|---|---|---|
| | | |

## Adjustments

| | | |
|---|---|---|
| | | |

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

PDF+PIN: **007+11-01-428-005-00**

| Bldg / Addn | | Description | Units | | | Year | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 16 | Adtn | O 711 — Manufacturing (Light) | | | | | | | | | | |
| A-16 | Com | P 711 — Manufacturing (Light) | 429 | | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | | |
| | | Reinforced Concrete w/o Bsmt - 12" | 51 | | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | | |
| | | Metal Sandwich Panel - 2" - 26 | 51 | | | | | | | | | |
| | | R'Concrete kick wall -8" - 2 | 51 | | | | | | | | | |
| | H | Roof | | | | | | | | | | |
| | | Rubber Membrane/Stl - No | 429 | | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | | |
| | | 6" R'Concrete - 1 | 429 | | | | | | | | | |
| | | Bar Jst/Mtl Dk/Conc. Topping - 1 | 429 | | | | | | | | | |
| | H | Framing | | | | | | | | | | |
| | | Steel - (C.F.) - 1 | 12,012 | | | | | | | | | |
| | H | Electrical | | | | | | | | | | |
| | | Industrial - Average - 2 | 429 | | | | | | | | | |
| | H | Sprinkler | | | | | | | | | | |
| | | Exposed Dry - 2 | 429 | | | | | | | | | |

PDF+PIN: **007+11-01-428-005-00**

Mon, 6/20/2022, 8:45 AM    Page   36

## Component Addition

| | |
|---|---|
| Occ. Code | 711 |
| Occ. Descr. | Manufacturing (Light) |
| Year Built | 2016 |
| EFF Age/Yr | 7/    2016 |
| Condition | |
| Description | A-17 2S MTL/STL |
| Perimeter | 46 |
| Stories | 2 |
| Grade | 4 |
| 1st Flr Wall Ht | 28 |
| Avg Upper Wall Hght | 12 |
| Base | 264 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | | | | |
|---|---|---|---|---|---|
| Ftg & Fdtn | inforced Concrete w/o Bsmt | 12" | | | |
| Exterior wall | Metal Sandwich Panel - 2" | 26 | R'Concrete kick wall -8" | 2 | |
| Interior wall | | | | | |
| Pilasters | | | | | |
| Wall facing | | | | | |
| Windows | | | | | |
| Fronts/Doors | | | | | |

## Horizontals

| | | | | | |
|---|---|---|---|---|---|
| Basement | | | | | |
| Roof | Rubber Membrane/Stl | No | | | |
| Ceiling | | | | | |
| Struct. Floor | 6" R'Concrete | 1 | ar Jst/Mtl Dk/Conc. Topping | 1 | |
| Floor Cover | | | | | |
| Partitions | | | | | |
| Framing | Steel - (C.F.) | 1 | | | |
| HVAC | | | | | |
| Electrical | Industrial - Average | 2 | | | |
| Sprinkler | Exposed Dry | 2 | | | |

## Plumbing

| | B | Ext |
|---|---|---|
| | | |

## Adjustments

| | | |
|---|---|---|
| | | |

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

PDF+PIN: **007+11-01-428-005-00**

| Bldg / Addn | | Description | Units | | | Year | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 17 | Adtn | O 711 ─ Manufacturing (Light) | | | | | | | | | | |
| A-17 | Com | P 711 ─ Manufacturing (Light) | 264 | | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | | |
| | | Reinforced Concrete w/o Bsmt - 12" | 46 | | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | | |
| | | Metal Sandwich Panel - 2" - 26 | 46 | | | | | | | | | |
| | | R'Concrete kick wall -8" - 2 | 46 | | | | | | | | | |
| | H | Roof | | | | | | | | | | |
| | | Rubber Membrane/Stl - No | 264 | | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | | |
| | | 6" R'Concrete - 1 | 264 | | | | | | | | | |
| | | Bar Jst/Mtl Dk/Conc. Topping - 1 | 264 | | | | | | | | | |
| | H | Framing | | | | | | | | | | |
| | | Steel - (C.F.) - 1 | 7,392 | | | | | | | | | |
| | H | Electrical | | | | | | | | | | |
| | | Industrial - Average - 2 | 264 | | | | | | | | | |
| | H | Sprinkler | | | | | | | | | | |
| | | Exposed Dry - 2 | 264 | | | | | | | | | |

PDF+PIN: **007+11-01-428-005-00**

Mon, 6/20/2022, 8:45 AM    Page    38

## Component Addition

| | |
|---|---|
| Occ. Code | 711 |
| Occ. Descr. | Manufacturing (Light) |
| Year Built | 2016 |
| EFF Age/Yr | 7/    2016 |
| Condition | |
| Description | A-18 1S MTL/FR |
| Perimeter | 15 |
| Stories | 1 |
| Grade | 4 |
| 1st Flr Wall Ht | 10 |
| Base | 165 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | | | | | |
|---|---|---|---|---|---|---|
| Ftg & Fdtn | inforced Concrete w/o Bsmt | 8" | | | | |
| Exterior wall | Metal/ Frm/ Insul (<50' Wide) | 10 | | | | |
| Interior wall | | | | | | |
| Pilasters | | | | | | |
| Wall facing | | | | | | |
| Windows | | | | | | |
| Fronts/Doors | | | | | | |

## Horizontals

| | | | | | | |
|---|---|---|---|---|---|---|
| Basement | | | | | | |
| Roof | Metal/ Frm/ Insul (< 50' Wide) | No | | | | |
| Ceiling | | | | | | |
| Struct. Floor | 4" R'Concrete | 1 | | | | |
| Floor Cover | | | | | | |
| Partitions | | | | | | |
| Framing | Wood - Average | 1 | | | | |
| HVAC | No HVAC | 1 | | | | |
| Electrical | Warehouse | 1 | | | | |
| Sprinkler | | | | | | |

## Plumbing

| | B | Ext |
|---|---|---|
| | | |

## Adjustments

| | | |
|---|---|---|
| | | |

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

PDF+PIN: **007+11-01-428-005-00**

| Bldg / Addn | Adtn | Description | Units | | | Year | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 18 | Adtn | O  711 ─ Manufacturing (Light) | | | | | | | | | | |
| A-18 | Com | P  711 ─ Manufacturing (Light) | 165 | | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | | |
| | | Reinforced Concrete w/o Bsmt - 8" | 15 | | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | | |
| | | Metal/ Frm/ Insul (<50' Wide) - 10 | 15 | | | | | | | | | |
| | H | Roof | | | | | | | | | | |
| | | Metal/ Frm/ Insul (< 50' Wide) - No | 165 | | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | | |
| | | 4" R'Concrete - 1 | 165 | | | | | | | | | |
| | H | Framing | | | | | | | | | | |
| | | Wood - Average - 1 | 1 | | | | | | | | | |
| | H | HVAC | | | | | | | | | | |
| | | No HVAC - 1 | 165 | | | | | | | | | |
| | H | Electrical | | | | | | | | | | |
| | | Warehouse - 1 | 165 | | | | | | | | | |

PDF+PIN: **007+11-01-428-005-00**

Mon, 6/20/2022, 8:45 AM    Page    40

## Component Addition

| | |
|---|---|
| Occ. Code | 608 |
| Occ. Descr. | Metal Light Mfg - Rigid Steel Frame |
| Year Built | 2010 |
| EFF Age/Yr | 13/    2010 |
| Condition | |
| Description | A-19 1S MTL/STL |
| Perimeter | 320 |
| Grade | 4 |
| Base | 9,600 |
| Basement | 0 |
| GBA | 66,933 |

## Verticals

| | | |
|---|---|---|
| Ftg & Fdtn | Reinforced Concrete | 8" |
| Exterior wall | Mtl/ Stl/ Insul (=>100' Wide) | 16 |
| Interior wall | Unfinished | 0 |
| Pilasters | | |
| Wall facing | | |
| Windows | | |
| Fronts/Doors | | |

## Horizontals

| | | |
|---|---|---|
| Basement | | |
| Roof | etal/ Stl/ Insul (=>100' Wide) | Yes |
| Ceiling | Unfinished | 1 |
| Struct. Floor | 6" R'Concrete | 1 |
| Floor Cover | | |
| Partitions | | |
| Framing | Steel - Average | 1 |
| HVAC | Suspended Unit Heater (Gas) | 1 |
| Electrical | Industrial - Light | 1 |
| Sprinkler | Exposed Dry | 1 |

## Plumbing

| | B | Ext |
|---|---|---|
| | | |

## Adjustments

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

PDF+PIN: **007+11-01-428-005-00**

| Bldg / Addn | Adtn | Description | Units | | | Year | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 19 | Adtn | O  608 ━ Metal Light Mfg - Rigid Steel Frame | | | | | | | | | |
| A-19 | Com | P  608 ━ Metal Light Indust. - Rigid Steel Frar | 9,600 | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | |
| | | Reinforced Concrete - 8" | 320 | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | |
| | | Mtl/ Stl/ Insul (=>100' Wide) - 16 | 320 | | | | | | | | |
| | V | Interior Wall | | | | | | | | | |
| | | Unfinished - 0 | 320 | | | | | | | | |
| | H | Roof | | | | | | | | | |
| | | Metal/ Stl/ Insul (=>100' Wide) - Yes | 9,600 | | | | | | | | |
| | H | Ceiling | | | | | | | | | |
| | | Unfinished - 1 | 9,600 | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | |
| | | 6" R'Concrete - 1 | 9,600 | | | | | | | | |
| | H | Framing | | | | | | | | | |
| | | Steel - Average - 1 | 1 | | | | | | | | |
| | H | HVAC | | | | | | | | | |
| | | Suspended Unit Heater (Gas) - 1 | 9,600 | | | | | | | | |
| | H | Electrical | | | | | | | | | |
| | | Industrial - Light - 1 | 9,600 | | | | | | | | |
| | H | Sprinkler | | | | | | | | | |
| | | Exposed Dry - 1 | 9,600 | | | | | | | | |
| 1 of 2 | Ex | Door | 2 | | | 2010 | | | | | |
| | | O.H. - Door - Power, 14 Ft Wide, 14 Ft High | | | | | | | | | |
| 2 of 2 | Ex | Door | 1 | | | 2010 | | | | | |
| | | O.H. - Door - Power, 14 Ft Wide, 12 Ft High | | | | | | | | | |

PDF+PIN: **007+11-01-428-005-00**

| | | Description | Units | | Cond | Year | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| P:Y-1 | Yrd I | 1 — Paving - Asphalt<br>14,000 SF, Asphalt Parking Lots, Low Pricing | | | | 1973 | | | | | | | |
| P:Y-2 | Yrd I | 1 — Paving - Concrete<br>4,000 SF, Conc Parking Lots, Avg Pricing | | | | 1973 | | | | | | | |
| P:Y-3 | Yrd I | 1 — Paving - Concrete<br>2,400 SF, Conc Parking Lots, Avg Pricing | | | | 2010 | | | | | | | |
| P:Y-3 | Yrd I | 1 — Fencing - Chain<br>No Barbs, 6 Ft-hgh, 100 LF, 0 LF-Gates, No Sec. Gate | | | | 2010 | | | | | | | |
| P:Y-4 | Yrd I | 1 — Shed<br>W11.00 x L14.00 154 SF, Metal Shed, Avg Pricing | | | | 2010 | | | | | | | |
| P:Y-5 | Yrd I | 1 — Canopy<br>252 SF, Metal, High Pricing | | | | 2010 | | | | | | | |
| P:Y-6 | Yrd I | 1 — Paving - Concrete<br>680 SF, Conc Parking Lots, Avg Pricing | | | | 2016 | | | | | | | |
| P:Y-6 | Yrd I | 1 — Fencing - Chain<br>No Barbs, 8 Ft-hgh, 74 LF, 0 LF-Gates, No Sec. Gate | | | | 2016 | | | | | | | |

PDF+PIN: 007+11-01-428-005-00

Mon, 6/20/2022, 8:45 AM   Page   43

| Prior Year | Comment | Value Type | Location | Class | Land Value | Dwelling Value | Improvement Value | M & E Value | Total Value |
|------|---------|------------|----------|-------|-----------|----------------|-------------------|-------------|-------------|
| 2022 | 2020 Manual Migration 05-11-2022 | Appr | Urban | Ind | $77,400 | $0 | $2,360,830 | $0 | $2,438,230 |
| 2021 | | Appr | Urban | Ind | $77,400 | $0 | $2,360,830 | $0 | $2,438,230 |
| 2020 | | Appr | Urban | Ind | $77,400 | $0 | $2,360,830 | $0 | $2,438,230 |
| 2019 | | Appr | Urban | Ind | $74,500 | $0 | $1,781,630 | $0 | $1,856,130 |
| | w/Exemptions applied: | | | | $74,500 | $0 | $1,229,630 | $0 | $1,304,130 |
| 2018 | VAI Import from file | Import | Urban | Ind | $74,500 | $0 | $1,714,380 | $0 | $1,788,880 |
| 2017 | w/Ex: $1,237,860 Total; $74,500 Land; $0 D | Appr | Urban | Ind | $74,500 | $0 | $1,714,380 | $0 | $1,788,880 |
| 2016 | | Appr | Urban | Ind | $74,500 | $0 | $1,051,070 | $0 | $1,125,570 |
| 2015 | | Appr | Urban | Ind | $74,500 | $0 | $1,051,070 | $0 | $1,125,570 |
| 2014 | | Appr | Urban | Ind | $74,500 | $0 | $1,051,070 | $0 | $1,125,570 |
| 2013 | | Appr | Urban | Ind | $74,500 | $0 | $1,051,070 | $0 | $1,125,570 |
| 2012 | | Appr | Urban | Ind | $74,500 | $0 | $1,051,070 | $0 | $1,125,570 |
| 2011 | w/Ex: $486,920 Total; $74,500 Land; $0 Dwl | Appr | Urban | Ind | $74,500 | $0 | $1,051,070 | $0 | $1,125,570 |
| 2010 | COMBINED | Appr | | | $0 | $0 | $0 | $0 | $0 |













PDF+PIN: **007+11-01-428-005-00**











Photo 13 of 13  05/18/2011

PDF+PIN: 007+11-01-428-005-00

Mon, 6/20/2022, 8:45 AM    Page    47

A-18 1S MTL/FR
[165]

A-10 MTL/STL
[144]

COMPACTOR COVER
[80]

Y-2

CONC PAD
[260]

A-17 2S MTL/STL
[264]

2010

9   16

72

10

8

26

11
14

14
18

Y-5
[252]

A-14 1S MTL/STL
[1540]

1994

28  28

A-4 1S C-BLK
[2484]

18

Y-4

11
24

15

2016    50

1999

55

1988

26

A-15 2S MTL/STL
[8000]

36

A-3 1S C-BLK
[3748]

11

2010

A-11 1S MTL/STL
[242]

76

22

10

20

A-9 1S MTL/STL
[1520]

120

100

PRTN

1985

A-8 1S C-BLK
[7160]

A-1 1S C-BLK
[2420]

44

OFFICE
[4408]

76

6

172

55

44

CANOPY
[264]

Y-1

1988

80

2010

120

136

58

20

160

A-19 1S MTL/STL
[9600]

92

A-2 1S C-BLK
[7360]

B-1 1S C-BLK
[12400]

15

32

A-5 1S C-BLK
[940]

60

80

5

23

11

39

30

80

1996

40
17    Y5
[680]

A-16 2S MTL/STL
[429]

1996

20

20

2010

A-12 1S MTL/STL
[2400]

1996

A-7 1S C-BLK
[400]

40

60

A-6 1S C-BLK
[4800]

80

Y-3 CONC PAD
[2400]

40

32

A-13 1S MTL/STL
[224]

7

60

Sketch 1 of 1

**Frank H. Rottinghaus**
Floyd County Treasurer
101 S. Main Street Ste 303
Charles City, IA 50616-2792 Phone: 641-257-6118

Receipt #
**09509**

**Frank H. Rottinghaus**
Floyd County Treasurer
101 S. Main Street Ste 303
Charles City, IA 50616-2792 Phone: 641-257-6118

Receipt #
**09509**

Parcel #
**000110142800500**

| TAX DUE: | Sept 1, 2021 or Full Year |
|---|---|
| TAX DELQ: | Oct 1, 2021 |

| FULL YEAR | Sept 1, 2021 | |
|---|---|---|
| **$82,234.00** | **$41,117.00** | DEED |

DED 9938954

SIMPLY ESSENTIALS, LLC
1075 NORTH AVENUE
SANGER CA 93657

411 000 Charles City Ci ty/CC Sch/River side URTIF Base

Parcel #
**000110142800500**

| TAX DUE: | March 1, 2022 |
|---|---|
| TAX DELQ: | April 1, 2022 |

| March 1, 2022 | |
|---|---|
| **$41,117.00** | DEED |

DED 9938954

SIMPLY ESSENTIALS, LLC
1075 NORTH AVENUE
SANGER CA 93657

411 000 Charles City Ci ty/CC Sch/River side URTIF Base

---

**FLOYD COUNTY TAX BILL for SEPTEMBER 2021 AND MARCH 2022. Please keep in a safe place.** Send the correct stubs along with your check for payment. If your taxes are paid by your Bank in Escrow, this is for your information only. SEE REVERSE SIDE. **Based on January 1, 2020 Valuations. Taxes for July 1, 2020 through June 30, 2021. Payable September 2021 and March 2022.**

---

**Parcel # 000110142800500**    Location: 901 N MAIN CHARLES CITY

411 000 Charles City Ci ty/CC Sch/River side URTIF Base

| | | | Gross Acres | 0.00 |
|---|---|---|---|---|
| | Sect 000 Twn 000 Rng 000 | | Exempt Acres | 0.00 |
| | | | Net Acres | 0.00 |

LEGAL Description: LANES BLOCK 149 N OF RR & BLOCK 148 BETWEEN RAILROADS & JACKSON ST BETWEEN BLOCKS 148 & 149 & SWLY15' OF FLOYD ST

| VALUATIONS AND TAXES | THIS YEAR | | LAST YEAR | | TAX DUE | Delinquent Tax, Specials, Drainage |
|---|---|---|---|---|---|---|
| | Assessed | Taxable | Assessed | Taxable | $44,652.00 2021 | |
| Ind Land | 77,400 | 69,660 | 74,500 | 67,050 | | |
| Buildings | 2,360,830 | 2,124,747 | 1,229,630 | 1,106,667 | | |
| Dwellings | 0 | 0 | 0 | 0 | | |
| **TOTAL VALUE:** | **$2,438,230** | **$2,194,407** | **$1,304,130** | **$1,173,717** | | |
| Less Military Exemption: | | $0 | | $0 | | |
| **NET TAXABLE VALUE:** | | **$2,194,407** | | **$1,173,717** | | |

| | THIS YEAR | LAST YEAR | |
|---|---|---|---|
| Value Times Levy per 1000 of: | 37.4741200 | 38.0425900 | **9938954** |
| EQUALS GROSS TAX OF: | 82,233.47 | 44,651.23 | Simply Essentials, LLC |
| Less Credits of: | | | |
| Homestead Credit: | 0.00 | 0.00 | |
| Ag Land Credit: | 0.00 | 0.00 | |
| Family Farm Credit: | 0.00 | 0.00 | |
| Bus Prop Tax Credit Fund: | 0.00 | 0.00 | |
| Low Income/Elderly Credit: | 0.00 | 0.00 | |
| Prepaid Tax: | 0.00 | 0.00 | |
| **NET ANNUAL TAXES:** | **$82,234.00** | **$44,652.00** | |

| Ag Dwelling Tax: | $0.00 | $0.00 | County EMS: $50,000.00 | City EMS: $1,860.00 |
|---|---|---|---|---|

| | Distribution of your current & prior year taxes | | | Total property taxes levied by taxing authority | | |
|---|---|---|---|---|---|---|
| Taxing Authority: | %Total | Current | Prior | Current | Prior | Percent +/- |
| CHARLES CITY | 45.859 | 37,711.74 | 20,219.79 | 4,271,686.00 | 4,100,223.00 | 4.181 |
| CCC SCHOOLS | 32.106 | 26,401.86 | 14,146.13 | 7,753,732.00 | 7,287,241.00 | 6.401 |
| COUNTY LEVIES | 13.070 | 10,748.15 | 6,279.93 | 5,519,533.00 | 5,647,250.00 | 2.261 - |
| NORTH IOWA II | 2.675 | 2,199.88 | 1,109.88 | 8,425,607.00 | 7,607,116.00 | 10.759 |
| DEBT SERVICE | 2.604 | 2,141.73 | 1,224.27 | 1,019,262.00 | 1,018,910.00 | 0.034 |
| CO HOSP | 1.260 | 1,036.06 | 589.20 | 485,999.00 | 484,903.00 | 0.226 |
| ASSESSOR | 1.025 | 842.70 | 479.25 | 395,296.00 | 394,415.00 | 0.223 |
| ST CHAS/CC CEM | 0.703 | 577.91 | 284.35 | 74,802.00 | 66,084.00 | 13.192 |
| AG EXTENSION | 0.698 | 573.97 | 319.20 | 269,240.00 | 262,694.00 | 2.491 |

---

*YOU MAY PAY ONLINE AT: www.IowaTaxAndTags.org*

**Frank H. Rottinghaus**
Floyd County Treasurer
101 S. Main Street Ste 303
Charles City, IA 50616-2792 Phone: 641-257-6118

Receipt #
**09509**

| DUE Sept 1, 2021 | **$41,117.00** | DUE March 1, 2022 | **$41,117.00** |
|---|---|---|---|
| Date Paid: _____ | | Date Paid: _____ | |
| Check # _____ | | Check # _____ | |

006066                                    PAM



# FLOYD COUNTY ASSESSOR

| | |
|---|---|
| **Parcel Number:** | 12-06-301-007-00 |
| **Deed Holder:** | PURE PRAIRIE FARMS, INC. |
| **Property Address:** | 300 LAWLER |
| | CHARLES CITY, IA 50616-0000  MAP THIS ADDRESS |
| **Mailing Address:** | PURE PRAIRIE FARMS, INC. |
| | 68808 FORT ROAD |
| | FAIRFAX, MN 55332-5533 USA |
| **Class:** | INDUSTRIAL |
| **Map Area:** | CHARLES CITY-C |
| **Plat Map:** | 12-06E |
| **Subdivision:** | [NONE] |
| **Sec-Twp-Rng:** | 006-095-015 |
| **Legal Description:** | PAR 'A' LANES ADD'N BLK 139 & PAR 'B' LANE'S ADD'N PT OF |
| | BLOCKS 138 & 139 |
| **Tax Information:** | ONLINE PAYMENT SITE |
| **Property Report:** | PROPERTY REPORT (PDF FILE) |



Pin 12-06-301-007-00 Photo

1 / 1



## Prior Year Value Information

| Year | Land Value | Dwelling Value | Improvement Value | Total Value |
|---|---|---|---|---|
| 2022 | $46,780 | $0 | $331,520 | $378,300 |
| 2021 | $46,780 | $0 | $331,520 | $378,300 |

More Years...

## Land Information

| Lot Type | Square Feet | | Acres |
|---|---|---|---|
| Acres x Rate | 43,560 | | 1.000 |
| Acres x Rate | 379,408 | | 8.710 |
| **Total** | **422,968** | | **9.710** |

Assessor's lot sizes are for assessment purposes only and may NOT represent actual dimensions. For more accurate, complete data refer to GIS maps, plat maps, or legal documents.

## Commercial Building Information

| Occupancy | Year Built | Building Area |
|---|---|---|
| Metal Shop - Steel Frame | 2016 | 6,500 |
| Metal Shop - Steel Frame | 2016 | 220 |

## Yard Extra Information

| Description | Item Count | Year Built |
|---|---|---|
| Fencing - Chain | 1 | 2010 |
| Paving - Concrete | 1 | 1940 |
| Paving - Concrete | 1 | 2016 |

| Sale Information | | | |
|---|---|---|---|
| **Sale Date** | **Amount** | **Non-Useable Transaction Code** | **Recording** |
| 03/16/2016 | $47,391 | 26 - Split of division | 2016 0663 |
| 12/30/2015 | $47,391 | 34 - Vacant lot | 2016 0443 |
| 06/09/2005 | $1 | 034 - VACANT LOTS | 2005 1573 |

| Building Permit Information | | |
|---|---|---|
| **Date** | **Number** | **Reason** |
| 10/25/2016 | 65x100 steel | New Bldg |

| Tax Information | |
|---|---|
| **Tax Year Payable** | **Link** |
| 2019/2020 | Property Tax Statement |
| 2020/2021 | Property Tax Statement |
| 2021/2022 | Property Tax Statement |

## Sketch



Sketch of Pin 12-06-301-007-00

1 / 1

## GIS Map Information



Floyd County Assessor's Office                      Mon, 6/20/2022, 8:51 AM   Page   1

**300 LAWLER, CHARLES CITY**

| | |
|---|---|
| Deed: | **PURE PRAIRIE FARMS, INC.** |
| Contract: | |
| CID#: | **410120630100500** |
| DBA: | **MTL BUILDING** |
| MLS: | |

| | |
|---|---|
| Map Area: | **CHARLES CITY-C** |
| Route: | **034-060-03F** |
| Tax Dist: | **410 CHARLES CITY** |
| Plat Page: | **12-06E** |
| Subdiv: | **[NONE]** |

| | |
|---|---|
| Checks/Tags: | |
| Lister/Date: | **GK, 05/09/2019** |
| Review/Date: | **CJ, 09/04/2019** |
| Entry Status: | **Inspected** |

**Urban / INDUSTRIAL**

Legal: Section: 006; Twp: 095; Rng: 015; Block: ; Lot: ; Deeded Acres: 9.710
PAR 'A' LANES ADD'N BLK 139 & PAR 'B'  LANE'S ADD'N PT OF  BLOCKS 138 & 139

### Land

| Land Basis | Front | Rear | Side 1 | Side 2 | R. Lot | SF | Acres | Depth/Unit | EFF/Type | Qual./Land | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Acre X Rate** | | | | | | 43,560.00 | 1.000 | | | C-3.00 | | | | | | |
| Subtotal | | | | | | 43,560.00 | 1.000 | | | | | | | | | |
| **Acre X Rate** | | | | | | 379,407.60 | 8.710 | | | C-1.25 | | | | | | |
| Subtotal | | | | | | 379,407.60 | 8.710 | | | | | | | | | |
| **Grand Total** | | | | | | 422,967.60 | 9.710 | | | | | | | | | |

| | Street | | Utilities | | Zoning | | Land Use | |
|---|---|---|---|---|---|---|---|---|
| **Acre X Rate** | Paved | | City | | NOT APPLICABLE | | Not Applicable | |
| **Acre X Rate** | Paved | | City | | NOT APPLICABLE | | Not Applicable | |

| Sales | | | | Building Permits | | | | | Values | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | $ Amount | NUTC | Recording | Date | Number | Tag | $ Amount | Reason | Type | | Pr Yr: 2022 |
| 03/16/2016 | $47,391 | D26 | 2016 0663 | | | | | | Land | | |
| 12/30/2015 | $47,391 | D34 | 2016 0443 | | | | | | LandC | | $46,780 |
| 06/09/2005 | $1 | D034 | 2005 1573 | | | | | | Dwlg | | |
| | | | | | | | | | Impr | | $331,520 |
| | | | | | | | | | Total | | $378,300 |

PDF+PIN: **007+12-06-301-007-00**

Mon, 6/20/2022, 8:51 AM    Page    2

## Component Structure

| | |
|---|---|
| Occ. Code | 605 |
| Occ. Descr. | Metal Shop - Steel Frame |
| Year Built | 2016 |
| EFF Age/Yr | 7/    2016 |
| Condition | |
| Description | B-1 1S MTL/STL |
| Perimeter | 330 |
| Grade | 4 |
| Base | 6,500 |
| Basement | 0 |
| GBA | 6,720 |

## Verticals

| | | | | |
|---|---|---|---|---|
| Ftg & Fdtn | inforced Concrete w/o Bsmt | 8" | | |
| Exterior wall | Mtl/ Stl/ Insul (51'-79' Wide) | 16 | R'Concrete kick wall -8" | 3 |
| Interior wall | Metal Liner | 16 | | |
| Pilasters | | | | |
| Wall facing | | | | |
| Windows | | | | |
| Fronts/Doors | | | | |

## Horizontals

| | | |
|---|---|---|
| Basement | | |
| Roof | etal/ Stl/ Insul (51'-79' Wide) | No |
| Ceiling | Metal Liner | 1 |
| Struct. Floor | 6" R'Concrete | 1 |
| Floor Cover | | |
| Partitions | | |
| Framing | Steel - Average | 1 |
| HVAC | uspended Unit Heater (Gas) | 1 |
| Electrical | Industrial - Light | 1 |
| Sprinkler | | |

## Plumbing

| | B | Ext |
|---|---|---|
| Rough Plumbing | | 1 |

## Adjustments

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

PDF+PIN: **007+12-06-301-007-00**

| Bldg / Addn | | Description | Units | | | Year | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 of 2 | Bldg | O 605 ━Metal Shop - Steel Frame | | | | | | | | | |
| B-1 | Com | P 608 ━Metal Light Indust. - Rigid Steel Fram | 6,500 | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | |
| | | Reinforced Concrete w/o Bsmt - 8" | 330 | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | |
| | | Mtl/ Stl/ Insul (51'-79' Wide) - 16 | 330 | | | | | | | | |
| | | R'Concrete kick wall -8" - 3 | 330 | | | | | | | | |
| | V | Interior Wall | | | | | | | | | |
| | | Metal Liner - 16 | 330 | | | | | | | | |
| | H | Roof | | | | | | | | | |
| | | Metal/ Stl/ Insul (51'-79' Wide) - No | 6,500 | | | | | | | | |
| | H | Ceiling | | | | | | | | | |
| | | Metal Liner - 1 | 6,500 | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | |
| | | 6" R'Concrete - 1 | 6,500 | | | | | | | | |
| | H | Framing | | | | | | | | | |
| | | Steel - Average - 1 | 1 | | | | | | | | |
| | H | HVAC | | | | | | | | | |
| | | Suspended Unit Heater (Gas) - 1 | 6,500 | | | | | | | | |
| | H | Electrical | | | | | | | | | |
| | | Industrial - Light - 1 | 6,500 | | | | | | | | |
| | Plmb | Rough Plumbing - AVG | 1 | | | | | | | | |
| 1 of 2 | Ex | Door | 5 | | | 2016 | | | | | |
| | | O.H. - Door - Power, 14 Ft Wide, 16 Ft High | | | | | | | | | |
| 2 of 2 | Ex | Fans and Dryers | 12 | | | 2016 | | | | | |
| | | 3 HP RPM Motor, Fan Only | | | | | | | | | |

PDF+PIN: **007+12-06-301-007-00**

Mon, 6/20/2022, 8:51 AM    Page    4

## Component Addition

| | |
|---|---|
| Occ. Code | 605 |
| Occ. Descr. | Metal Shop - Steel Frame |
| Year Built | 2016 |
| EFF Age/Yr | 7/    2016 |
| Condition | |
| Description | A-1 1S MTL/STL |
| Perimeter | 42 |
| Grade | 4 |
| Base | 220 |
| Basement | 0 |
| GBA | 6,720 |

## Verticals

| | | |
|---|---|---|
| Ftg & Fdtn | inforced Concrete w/o Bsmt | 8" |
| Exterior wall | Metal/ Stl/ Insul (<50' Wide) | 12 |
| Interior wall | Metal Liner | 12 |
| Pilasters | | |
| Wall facing | | |
| Windows | | |
| Fronts/Doors | | |

## Horizontals

| | | |
|---|---|---|
| Basement | | |
| Roof | Metal/ Stl/ Insul (< 50' Wide) | No |
| Ceiling | | |
| Struct. Floor | 6" R'Concrete | 1 |
| Floor Cover | | |
| Partitions | | |
| Framing | Steel - Average | 1 |
| HVAC | Electric | 1 |
| Electrical | Industrial - Light | 1 |
| Sprinkler | | |

## Plumbing

| | B | Ext |
|---|---|---|
| | | |

## Adjustments

© 1995-2015 Vanguard Appraisals, Inc.
(rev. 20.0.32.3275)

PDF+PIN: **007+12-06-301-007-00**

| Bldg / Addn | | Description | Units | | | Year | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Addtn 1 | Adtn | O  605 ─ Metal Shop - Steel Frame | | | | | | | | | | |
| A-1 | Com | P  608 ─ Metal Light Indust. - Rigid Steel Frar | 220 | | | | | | | | | |
| | V | Ftg & Fdtn | | | | | | | | | | |
| | | Reinforced Concrete w/o Bsmt - 8" | 42 | | | | | | | | | |
| | V | Exterior Wall | | | | | | | | | | |
| | | Metal/ Stl/ Insul (<50' Wide) - 12 | 30 | | | | | | | | | |
| | V | Interior Wall | | | | | | | | | | |
| | | Metal Liner - 12 | 42 | | | | | | | | | |
| | H | Roof | | | | | | | | | | |
| | | Metal/ Stl/ Insul (< 50' Wide) - No | 220 | | | | | | | | | |
| | H | Struct. Floor | | | | | | | | | | |
| | | 6" R'Concrete - 1 | 220 | | | | | | | | | |
| | H | Framing | | | | | | | | | | |
| | | Steel - Average - 1 | 1 | | | | | | | | | |
| | H | HVAC | | | | | | | | | | |
| | | Electric - 1 | 220 | | | | | | | | | |
| | H | Electrical | | | | | | | | | | |
| | | Industrial - Light - 1 | 220 | | | | | | | | | |

PDF+PIN: **007+12-06-301-007-00**

| | | Description | Units | | Cond | Year | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Yrd | 1 — Paving - Concrete | | | | 1940 | | | | | | |
| P:0 | I | 375,705 SF, Conc Parking Lots, Low Pricing | | | | | | | | | | |
| | Yrd | 1 — Fencing - Chain | | | | 2010 | | | | | | |
| P:0 | I | 3 Strand Barb, 6 Ft-hgh, 1,268 LF, 0 LF-Gates, No Sec. Gate | | | | | | | | | | |
| | Yrd | 1 — Paving - Concrete | | | | 2016 | | | | | | |
| | I | 8,000 SF, Conc Parking Lots, Avg Pricing | | | | | | | | | | |

PDF+PIN: **007+12-06-301-007-00**

| Prior Year | Comment | Value Type | Location | Class | Land Value | Dwelling Value | Improvement Value | M & E Value | Total Value |
|---|---|---|---|---|---|---|---|---|---|
| 2022 | 2020 Manual Migration 05-11-2022 | Appr | Urban | Ind | $46,780 | $0 | $331,520 | $0 | $378,300 |
| 2021 | | Appr | Urban | Ind | $46,780 | $0 | $331,520 | $0 | $378,300 |
| 2020 | | Appr | Urban | Ind | $46,780 | $0 | $331,520 | $0 | $378,300 |
| 2019 | | Appr | Urban | Ind | $60,690 | $0 | $250,890 | $0 | $311,580 |
| 2018 | VAI Import from file | Import | Urban | Ind | $60,690 | $0 | $241,500 | $0 | $302,190 |
| 2017 | | Appr | Urban | Ind | $60,690 | $0 | $241,500 | $0 | $302,190 |
| 2016 | | Appr | Urban | Ind | $4,370 | $0 | $0 | $0 | $4,370 |
| 2015 | | Appr | Urban | Ind | $33,040 | $0 | $0 | $0 | $33,040 |
| 2014 | | Appr | Urban | Ind | $33,040 | $0 | $0 | $0 | $33,040 |
| 2013 | | Appr | Urban | Ind | $33,040 | $0 | $2,950 | $0 | $35,990 |
| 2012 | | Appr | Urban | Ind | $33,040 | $0 | $2,950 | $0 | $35,990 |
| 2011 | | Appr | Urban | Ind | $33,040 | $0 | $2,950 | $0 | $35,990 |
| 2010 | VAI --- pre convert to new manual values | Appr | | | $33,040 | $0 | $2,810 | $0 | $35,850 |
| 2009 | | Appr | | | $33,040 | $0 | $2,810 | $0 | $35,850 |
| 2008 | | Appr | | | $33,040 | $0 | $2,810 | $0 | $35,850 |
| 2007 | | Appr | | | $33,040 | $0 | $2,810 | $0 | $35,850 |
| 2006 | | Appr | | | $33,040 | $0 | $2,810 | $0 | $35,850 |
| 2005 | | Appr | | | $33,040 | $0 | $2,810 | $0 | $35,850 |
| 2004 | | Appr | | | $146,840 | $0 | $2,810 | $0 | $149,650 |

PDF+PIN: **007+12-06-301-007-00**

Mon, 6/20/2022, 8:51 AM   Page   8

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2003 | | Appr | | | $146,840 | $0 | $2,810 | $0 | $149,650 |
| 2002 | | Appr | | | $146,840 | $0 | $2,810 | $0 | $149,650 |
| 2001 | | Appr | | | $146,840 | $0 | $2,810 | $0 | $149,650 |

```
                    20
              11          A-1 1S MTL/STL
                              [220]
        100

65                     B-1 1S MTL/STL
                              [6500]
```

Sketch 1 of 1



**Frank H. Rottinghaus**
Floyd County Treasurer
101 S. Main Street Ste 303
Charles City, IA 50616-2792 Phone: 641-257-6118

Receipt #
08682

Parcel #
000120630100700

TAX DUE:    Sept 1, 2021 or Full Year
TAX DELQ:    Oct 1, 2021

| FULL YEAR | Sept 1, 2021 | |
|---|---|---|
| $12,758.00 | $6,379.00 | DEED |

DED 9938954

SIMPLY ESSENTIALS, LLC
1075 NORTH AVENUE
SANGER CA 93657

410 000 Charles City Ci ty/Charles City Sch

**Frank H. Rottinghaus**
Floyd County Treasurer
101 S. Main Street Ste 303
Charles City, IA 50616-2792 Phone: 641-257-6118

Receipt #
08682

Parcel #
000120630100700

TAX DUE:    March 1, 2022
TAX DELQ:    April 1, 2022

| March 1, 2022 | |
|---|---|
| $6,379.00 | DEED |

DED 9938954

SIMPLY ESSENTIALS, LLC
1075 NORTH AVENUE
SANGER CA 93657

410 000 Charles City Ci ty/Charles City Sch

**FLOYD COUNTY TAX BILL for SEPTEMBER 2021 AND MARCH 2022. Please keep in a safe place.** Send the correct stubs along with your check for payment. If your taxes are paid by your Bank in Escrow, this is for your information only. SEE REVERSE SIDE. **Based on January 1, 2020 Valuations. Taxes for July 1, 2020 through June 30, 2021. Payable September 2021 and March 2022.**

Parcel # 000120630100700        Location: 300 LAWLER CHARLES CITY

| | | | Gross Acres | 0.00 |
|---|---|---|---|---|
| 410 000 Charles City Ci ty/Charles City Sch | | | Exempt Acres | 0.00 |
| | Sect 006 Twn 095 Rng 015 | | Net Acres | 0.00 |

LEGAL Description: PAR 'A' LANES ADD'N BLK 139 & PAR 'B' LANE'S ADD'N PT OF BLOCKS 138 & 139

### VALUATIONS AND TAXES

| | THIS YEAR | | LAST YEAR | | TAX DUE | Delinquent Tax, Specials, Drainage |
|---|---|---|---|---|---|---|
| | Assessed | Taxable | Assessed | Taxable | $10,668.00 2021 | |
| Ind | | | | | | |
| Land | 46,780 | 42,102 | 60,690 | 54,621 | | |
| Buildings | 331,520 | 298,368 | 250,890 | 225,801 | | |
| Dwellings | 0 | 0 | 0 | 0 | | |
| **TOTAL VALUE:** | $378,300 | $340,470 | $311,580 | $280,422 | | |
| Less Military Exemption: | | $0 | | $0 | | |
| **NET TAXABLE VALUE:** | | $340,470 | | $280,422 | | |

| | THIS YEAR | LAST YEAR | |
|---|---|---|---|
| Value Times Levy per 1000 of: | 37.4741200 | 38.0425900 | **9938954** |
| EQUALS GROSS TAX OF: | 12,758.81 | 10,667.98 | Simply Essentials, LLC |
| Less Credits of: | | | |
| Homestead Credit: | 0.00 | 0.00 | |
| Ag Land Credit: | 0.00 | 0.00 | |
| Family Farm Credit: | 0.00 | 0.00 | |
| Bus Prop Tax Credit Fund: | 0.00 | 0.00 | |
| Low Income/Elderly Credit: | 0.00 | 0.00 | |
| Prepaid Tax: | 0.00 | 0.00 | |
| **NET ANNUAL TAXES:** | **$12,758.00** | **$10,668.00** | |

| Ag Dwelling Tax: | $0.00 | $0.00 | County EMS: $50,000.00 | | City EMS: $1,860.00 | |
|---|---|---|---|---|---|---|

| | | Distribution of your current & prior year taxes | | Total property taxes levied by taxing authority | | |
|---|---|---|---|---|---|---|
| Taxing Authority: | %Total | Current | Prior | Current | Prior | Percent +/- |
| CHARLES CITY | 42.650 | 5,441.33 | 4,492.69 | 4,271,686.00 | 4,100,223.00 | 4.181 |
| CCC SCHOOLS | 34.019 | 4,340.12 | 3,576.41 | 7,753,732.00 | 7,287,241.00 | 6.401 |
| COUNTY LEVIES | 13.967 | 1,781.86 | 1,601.01 | 5,519,533.00 | 5,647,250.00 | 2.261 - |
| NORTH IOWA II | 2.822 | 359.98 | 279.14 | 8,425,607.00 | 7,607,116.00 | 10.759 |
| DEBT SERVICE | 2.604 | 332.27 | 292.49 | 1,019,262.00 | 1,018,910.00 | 0.034 |
| CO HOSP | 1.346 | 171.76 | 150.21 | 485,999.00 | 484,903.00 | 0.226 |
| ASSESSOR | 1.095 | 139.71 | 122.18 | 395,296.00 | 394,415.00 | 0.223 |
| ST CHAS/CC CEM | 0.751 | 95.81 | 72.49 | 74,802.00 | 66,084.00 | 13.192 |
| AG EXTENSION | 0.746 | 95.16 | 81.38 | 269,240.00 | 262,694.00 | 2.491 |

***YOU MAY PAY ONLINE AT: www.IowaTaxAndTags.org***

**Frank H. Rottinghaus**
Floyd County Treasurer
101 S. Main Street Ste 303
Charles City, IA 50616-2792 Phone: 641-257-6118

Receipt #
08682

DUE Sept 1, 2021        $6,379.00
Date Paid: _____
Check # _____

DUE March 1, 2022        $6,379.00
Date Paid: _____
Check # _____

006066                    PAM

**Instr. Number: 2021 3155**
**BK: 2021 PG: 3155**
**Recorded: 12/23/2021 at 9:58:28.0 AM**
**Pages 8**
**County Recording Fee: $77.00**
**Iowa E-Filing Fee: $3.00**
**Combined Fee: $80.00**
**Revenue Tax: $0.00**
**Amy M. Assink RECORDER**
**Floyd County, Iowa**

## COURT OFFICER DEED
### Recorder's Cover Sheet

**Preparer Information:** Larry S. Eide, 103 E. State Street, Suite 800, PO Box 1588, Mason City, IA 50402-1588, Phone: 641.423.4264

**Taxpayer Information:** Pure Prairie Farms, Inc., a Minnesota corporation, 68808 Fort Road, Fairfax, MN 55332-5533

**Return Document To:** Simply Essentials, LLC, c/o Larry S. Eide, Chapter 7 Bankruptcy Trustee, PO Box 1588, Mason City, IA 50402-1588

**Grantors:** Simply Essentials, LLC, c/o Larry S. Eide, Chapter 7 Bankruptcy Trustee, PO Box 1588, Mason City, IA 50402-1588

**Grantees:** Pure Prairie Farms, Inc., a Minnesota corporation, 68808 Fort Road, Fairfax, MN 55332-5533

**Legal Description:** See attached Exhibits A and B (pages 3 through 8 of this document)

**Document or instrument number of previously recorded documents:**

**Special Warranty Deed dated March 16, 2016, executed by Peter Ng and by C-GO International, Inc., as grantor, in favor of Simple Essentials, LLC, as grantee, recorded April 7, 2016 as Document Number 2016-0662, Floyd County, Iowa.**

**Special Warranty Deed dated March 16, 2016, executed by Cedar River Poultry, L.L.C., as grantor, in favor of Simple Essentials, LLC, as grantee, recorded April 7, 2016 as Document Number 2016-0663, Floyd County, Iowa.**

**Corrective Deed dated April 8, 2016, executed by Cedar River Poultry, L.L.C., as grantor, in favor of Simple Essentials, LLC, as grantee, recorded April 13, 2016 as Document Number 2016-0726, Floyd County, Iowa.**

**Affidavit of Correction dated March 1, 2017, executed by Dennis M. Krause, recorded March 2, 2017, as Document Number 2017-0360, Floyd County, Iowa.**

NCS- 1015327 -MPLS ( CA IEC )



## COURT OFFICER DEED

IN THE MATTER OF THE CHAPTER 7
BANKRUPTCY OF SIMPLY ESSENTIALS, LLC

now pending in the United States Bankruptcy Court for the Northern District of Iowa.
Case No. 20-00305.

     Pursuant to the authority and power vested in the undersigned, and in consideration of
One Dollar(s) and other valuable consideration, the undersigned, in the representative capacity
designated below, hereby Convey(s) to **Pure Prairie Farms, Inc.**, a Minnesota corporation, the
following described real estate in Floyd County, Iowa:

     Real estate legally described in the attached Exhibit A and Exhibit B.

     Parcel Nos. 11-01-428-005-00 and 12-06-301-007-00

     This deed is exempt from real estate transfer tax under Iowa Code Sections
428A.2(19) and 428A.3.

     Words and phrases herein, including acknowledgement hereof, shall be construed as in
the singular or plural number, and as masculine, feminine or neutral gender, according to the
context.

Dated: December ___14___, 2021.

                                                                  Larry S. Eide

As Bankruptcy Trustee in the above-entitled estate or cause.

STATE OF IOWA, COUNTY OF CERRO GORDO, ss:

     This record was acknowledged before me on December ___14th___, 2021, by Larry S. Eide
as Bankruptcy Trustee of Chapter 7 Bankruptcy Estate of Simply Essentials, LLC.

                      Signature of Notary Public

> PAMELA J OLSON
> Commission Number 793959
> My Commission Expires
> 7/12/2025

EXHIBIT A

Parcel 1:

Lots one, two, eight, nine and ten (1, 2, 8, 9 & 10), Block one hundred forty-nine (149) and Lots three, four and five (3, 4 & 5) of Detwiler's Subdivision of Lots three (3), four (4) and Five (5), Block one hundred forty-nine (149), all in Lane's Addition to St. Charles, now incorporated in and as a part of Charles City, Iowa - this includes the Northerly 198 feet of Vacated Alley, Block 149, Lane's Addition to St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa.

AND

That part of Lots six (6) and seven (7), Block one hundred forty-nine (149), Lane's Addition and that part of Lots eleven (11), twelve (12), thirteen (13), and fourteen (14), Detwiler's Subdivision of Lots Three (3), Four (4), and Five (5) of Block One Hundred Forty-nine (149), Lane's Addition and the vacated alley in Block 149, Lane's Addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa, described as follows:

Beginning at the Northerly corner of said Lot Seven (7), thence South fifty-six (56) degrees, thirty (30) minutes East, two hundred sixty-four (264.00) feet; thence south thirty-three (33) degrees, thirty (30) minutes West 79.30 feet; thence Northwesterly along a 794.02 foot radius curve concave Northeasterly 265.60 feet, said curve having a long chord of North 54 degrees, 16 minutes 12 seconds West 264.20 feet; thence North 33 degrees, 30 minutes East 69.02 feet to the place of beginning,

AND

The Southeasterly 10 feet of Jackson Street abutting Lots 7, 8, 9, 10 and abutting the Northerly 3.02 feet of Lot 6; all in Block 149, of Lane's Addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

AND

The Southwesterly 15 feet of Floyd Street abutting Lot 10 in Block 149 of Lane's Addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

AND

All that part of Block One Hundred Forty-eight (148) in Lane's Addition to St. Charles, Charles City, Floyd County, Iowa, lying North of a line drawn Seventeen and five-tenths (17.5) feet Northeasterly of and parallel with the Southwesterly lines of Lots Nos. Two (2) and Nine (9), in said Block, and lying South of line drawn Fifty-three (53) feet South of and parallel with the centerline of the Chicago, Milwaukee, St. Paul and Pacific Railroad right of way.

Also described as: All that part of Lots 1, 2, and 9, in Block 148, Lane's Addition to St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, lying North of a line drawn Seventeen and five-tenths feet Northeasterly from and parallel to the Southwesterly line of said Lots 2 and 9, and lying South of a line drawn Fifty-three feet South of and parallel to the center line of the Chicago, Milwaukee and St. Paul Railroad right of way.

AND

The Southwesterly Seventeen and one-half feet (SWly 17 1/2) of Lots Two and Nine (2 & 9), of Block One Hundred Forty-eight (148), Lane's Addition to St. Charles, now a part of Charles City, Floyd County, Iowa, which is South of the right of way of the Chicago, Milwaukee, St. Paul and Pacific Railway.

AND

That part of Lots Seven and Eight (7 & 8), lying between the right of ways of Illinois Central Railroad Company and the Chicago, Milwaukee and St. Paul Railroad Co., except the Charles City Western Railway Company right of way, all located in Block One Hundred Forty-eight (148). in Lane's Addition to St. Charles, now incorporated in and a part of Charles City. Floyd County, Iowa.

AND

Lot Three (3), and all that part of Lot Four (4), lying between Lot Three (3) and the right of way of the Dubuque and Sioux City Railroad Company, (The Dubuque and Sioux City Railroad Company right of way now being the right of way of the Illinois Central Railroad Company), all in Block One Hundred Forty-eight (148), in Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa.

AND

All of vacated Jackson Street lying Southwesterly of the Southwest boundary of Floyd Street and Northeasterly of the Northeast boundary of Lane Street in Lane's Addition to

St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, except the Southeasterly 10 feet of Jackson Street abutting Lots 7, 8, 9, 10 and abutting the Northerly 3.02 feet of Lot 6; in Block 149, of Lane's Addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

AND

The South One-half of all that portion of Floyd Street lying Northwesterly of the Northwest right of way boundary of Main Street and East of the Westerly right of way line extended of vacated Jackson Street and the south boundary line of the Iowa, Chicago and Eastern Railroad right of way, EXCEPT that portion thereof previously vacated by the City of Charles City and conveyed to the adjoining owner on the South by Quit Claim Deed recorded in Book 95 at page 305 in the office of the Floyd County Recorder, subject to a permanent easement reserved by the City of Charles City, Iowa, for the location of its utilities (water and sewer) within the boundaries of this property and for the right to enter upon this property for the future maintenance and replacement of these utilities.

EXHIBIT B

Lots 1 and 2, Subdivision of Lot 11, Block 139, Lane's Addition to St Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

The East one-half of original Lot 12 (sometimes described as Lot 3, Subdivision of Lot 12), Block 139, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

The South 100 feet of Lots 8, 9, 10, 11, 12, 13, 14 and the South 100 feet of the East 95 feet of Lot 7, all in the Subdivision of Lot 11, in Block 139, of Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

Also all that part of said Lot 11, of said Block 139, which lies between Lots 13 and 14 aforesaid, bounded on the South by the North side of Lawler Street, and on the North by a line parallel to and distant 100 feet North of said North line of Lawler Street;

Lot 41, Block 138, all in Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

Lots 39 and 40, Block 138, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

Lot 4, Block 138, all being in Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

Lots 7 and 8, Block 138, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

Lots 5 and 6, Block 138, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

Lots 35 and 36, Block 138, Lane's Addition to St. Charles, now incorporated in and apart of Charles City, Floyd County, Iowa;

Beginning at a point which is the SE Corner of Lot 1, Block 165, of Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa, and running thence SE to SW corner of Lot 42, Block 138, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Iowa; thence running South along the Westerly side of said Block 138, of Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Iowa, to the NW corner of Lot 34, Block 138, of said Lane's Addition to St. Charles, now incorporated in and forming a part of Charles City, Iowa; thence running NWly to the NW corner of Lot 1, Chaney's Subdivision of Lot 13, Block 139, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa; thence North to place of beginning;

Lots 37 and 38, Block 138, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

Also that portion of the S 1/2 of the NE 1/4 of Sec. 6, Twp 95 N, Rge 15, West of the 5th P.M., lying East of the McGregor and Sioux City Railway and the Cedar Falls and Minnesota Railway and West and South of the Transfer or Joint right-of-way of Hart-Parr Company, Chicago, Milwaukee & St. Paul; Illinois Central and Charles City Western Railways;

A parcel of land being the North three (3) feet of Lots Eleven (11) and Thirty-four (34), Block One Hundred Thirty-eight (138), Lane's Addition to Charles City, Floyd County, Iowa, in the Southwest one-fourth (SW1/4) of Section Six (6), in Township Ninety-five North (95N), Range fifteen (15) West of the 5th P.M., except all minerals and mineral rights and easements in favor of the mineral and mineral rights estate;

Parcels of land lying along the Illinois Central Railroad Company's Northerly property line located in Section 6, Township 95 North, Range 15 West of the 5th Principal Meridian, at Charles City, Floyd County, Iowa, more particularly described as follows:

C.   Also, that part of Lot Eleven (11) and Lot Thirty-four (34) in Block One Hundred Thirty-eight (138) in Lane's Addition to St. Charles, now Charles City, Floyd County, Iowa lying North of a line thirty-six feet distant (as measured at right angles) and parallel to the centerline of the main track of the Illinois Central Railroad as now located across said Addition, except the North three (3) feet of said lots;

D.   Also, a triangular parcel of land in Lots One (1), Two (2), Three (3), Four (4), Five (5), Six (6), and Seven (7) in Cheney's Subdivision of Lot Thirteen (13) in Block One Hundred and Thirty-nine (139) in Lane's Addition to St. Charles, now Charles City, Floyd County, Iowa, and more particularly described as follows: Beginning at a point in the East line of said Lot One (1) that is one hundred five (105) feet South of the Northwest corner of said Lot; thence North to said Lot corner, thence West along the North line of said Sub-Division of Lot Thirteen (13) a distance of four hundred forty-five (445) feet, thence Southeasterly to the point of beginning;

A belt, strip or parcel of land 20 feet wide by 600 feet long in the Subdivision of Lot 11 of Block 139, of Lane's Addition to St. Charles (now Charles City) according to the recorded plat thereof, North and adjoining the parcel of land heretofore conveyed to Hart-Parr Company by the Chicago, Milwaukee and St. Paul Railway Company, predecessor of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company, by a quit claim deed dated November 5, 1906, and which parcel of land extends West from the West side line of Lane Street (now Scott Street) for a distance of 600 feet.

All of the above has been more particularly described as:

Parcel "A": Lots 1 and 2, Subdivision of Lot 11, Block 139, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa.

Parcel "B": A part of Blocks 138 and 139, Lane's Addition to St. Charles, now

incorporated in and a part of Charles City, Floyd County, Iowa, being more particularly described as follows:

Beginning at the Northeast corner of Lot 4, of said Block 138, thence S00° 29' 23" E along the Westerly right of way of "E" Street to a point 36 foot distant from the centerline of the Illinois Central railroad track, 451.10 feet; thence S89° 26' 59" W along a line 36 foot distant and parallel to the said centerline of railroad track 330.49 feet to the Easterly right of -way of "D" Street; thence N88° 48' 52" W, 66.03 feet to the Westerly right of way of said "D" Street and 38 foot distant from said centerline of railroad track; thence N77° 15' 01" W, 456.98 feet to a point on the North line of Lot 13, of said Block 139 (also being the North line of Lot 7, Cheney's Sub-division); thence S89° 27' 58" W along said North line of Lot 13 (also being along the North line of Lots 7, 8 and 9 of said Cheney's sub-division), 141.19 feet to the East line of the West half of original Lot 12 of said Block 139; thence N00° 35' 54" W along said East line of the West half Lot 12 and along West line of vacated Lawler Street, 212.80 feet to the North right of way line of said Lawler Street; thence S89° 38' 46" W along said North right of way 14.17 feet; thence N00° 35' 54" W, 120.00 feet to the South right of way of the Chicago, Milwaukee & St. Paul railroad; thence N89° 38' 46" E along said railroad, 600.00 feet to the West right of way of vacated "D" Street; thence, continuing along said railroad, N78° 19' 09" E, 67.25 feet to the Northwest corner of Lot 41, of said Block 138; thence N89° 25' 24" E, continuing along said railroad also being along the North line of said Lots 41 and 4, 331.34 feet to the point of beginning.

 **F**LOYD **C**OUNTY **A**SSESSOR

Assessor Hub provided by
Vanguard Appraisals, Inc

| | |
|---|---|
| **Parcel Number:** | 11-01-429-002-00 |
| **Deed Holder:** | ILLINOIS CENTRAL GULF RR CO. |
| **Property Address:** | |
| | CHARLES CITY, IA 50616-0000 |
| **Mailing Address:** | ILLINOIS CENTRAL GULF RR; ATTN: PROPERTY TAX |
| | 17641 S ASHLAND AVENUE |
| | HOMEWOOD, IL 60430 USA |
| **Class:** | COMMERCIAL |
| **Map Area:** | CHARLES CITY-C |
| **Plat Map:** | 11-01H |
| **Subdivision:** | [NONE] |
| **Sec-Twp-Rng:** | 000-000-000 |
| **Legal Description:** | LANES PART OF BLOCK 150 E OF MAIN & W OF |
| | GRAND |
| **Tax Information:** | ONLINE PAYMENT SITE |
| **Property Report:** | PROPERTY REPORT (PDF FILE) |





Pin 11-01-429-002-00 Photo

1 / 2

◄   ►

### Prior Year Value Information

| Year | Land Value | Dwelling Value | Improvement Value | Total Value |
|---|---|---|---|---|
| 2022 | $17,270 | $0 | $7,150 | $24,420 |
| 2021 | $17,270 | $0 | $7,150 | $24,420 |
| ▼ More Years... | | | | |

### Land Information

| Lot Type | Square Feet | Acres |
|---|---|---|
| Sq. Ft x Rate | 26,572 | 0.610 |

Assessor's lot sizes are for assessment purposes only and may NOT represent actual dimensions. For more accurate, complete data refer to GIS maps, plat maps, or legal documents.

### Yard Extra Information

| Description | Item Count | Year Built |
|---|---|---|
| ▼ Porches,Decks,Patios,etc. | 2 | 2005 |

### Tax Information

| Tax Year Payable | Link |
|---|---|
| 2019/2020 | Property Tax Statement |
| 2020/2021 | Property Tax Statement |
| 2021/2022 | Property Tax Statement |



Sketch of Pin 11-01-429-002-00

1 / 1

GIS Map Information

PDF+PIN:  006+11-01-429-002-00

| | |
|---|---|
| , CHARLES CITY | |

| | |
|---|---|
| Deed: | **ILLINOIS CENTRAL GULF RR CO.** |
| Contract: | |
| CID#: | **411110142900200** |
| DBA: | **2-GAZEBO'S** |
| MLS: | |

| | |
|---|---|
| Map Area: | **CHARLES CITY-C** |
| Route: | **035-050-230** |
| Tax Dist: | **411 CC-RIVERSIDE TIF** |
| Plat Page: | **11-01H** |
| Subdiv: | **[NONE]** |

| | |
|---|---|
| Checks/Tags: | |
| Lister/Date: | **MAR, 11/20/2018** |
| Review/Date: | **CJ, 06/20/2019** |
| Entry Status: | **Inspected** |

**Urban / COMMERCIAL**

Legal: Section: 000; Twp: 000; Rng: 000; Block: ; Lot: ; Deeded Acres: 0.000

LANES PART OF    BLOCK 150 E OF MAIN & W OF GRAND

### Land

| Land Basis | Front | Rear | Side 1 | Side 2 | R. Lot | SF | Acres | Depth/Unit | EFF/Type | Qual./Land | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SqFt X Rate** | | | | | | 26,572.00 | 0.610 | | | C-1.00 | | | | | |
| Subtotal | | | | | | 26,572.00 | 0.610 | | | | | | | | |
| **Grand Total** | | | | | | 26,572.00 | 0.610 | | | | | | | | |

| Street | Utilities | Zoning | Land Use |
|---|---|---|---|
| SqFt X Rate | None | None | NOT APPLICABLE | Not Applicable |

| Sales | | | | Building Permits | | | | | Values | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | $ Amount | NUTC | Recording | Date | Number | Tag | $ Amount | Reason | Type | | | | Pr Yr: 2022 |
| | | | | | | | | | Land | | | | |
| | | | | | | | | | LandC | | | | $17,270 |
| | | | | | | | | | Dwlg | | | | |
| | | | | | | | | | Impr | | | | $7,150 |
| | | | | | | | | | Total | | | | $24,420 |

PDF+PIN: **006+11-01-429-002-00**

| | | Description | Units | | | Cond | Year | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Yrd | 2 ─ Porches,Decks,Patios,etc. | | | | | 2005 | | | | | | | |
| | I | 309 SF, Gazebo, Avg Pricing | | | | | | | | | | | | |

PDF+PIN: 006+11-01-429-002-00

Mon, 6/20/2022, 8:47 AM   Page  3

| Prior Year | Comment | Value Type | Location | Class | Land Value | Dwelling Value | Improvement Value | M & E Value | Total Value |
|---|---|---|---|---|---|---|---|---|---|
| 2022 | 2020 Manual Migration 05-11-2022 | Appr | Urban | Comm | $17,270 | $0 | $7,150 | $0 | $24,420 |
| 2021 | | Appr | Urban | Comm | $17,270 | $0 | $7,150 | $0 | $24,420 |
| 2020 | | Appr | Urban | Comm | $17,270 | $0 | $7,150 | $0 | $24,420 |
| 2019 | | Appr | Urban | Comm | $19,930 | $0 | $0 | $0 | $19,930 |
| 2018 | VAI Import from file | Import | Urban | Comm | $22,920 | $0 | $0 | $0 | $22,920 |
| 2017 | | Eq | Urban | Comm | $22,920 | $0 | $0 | $0 | $22,920 |
| 2016 | | Eq | Urban | Comm | $22,920 | $0 | $0 | $0 | $22,920 |
| 2015 | | Eq | Urban | Comm | $22,920 | $0 | $0 | $0 | $22,920 |
| 2014 | | Eq | Urban | Comm | $22,920 | $0 | $0 | $0 | $22,920 |
| 2013 | | Eq | Urban | Comm | $22,920 | $0 | $0 | $0 | $22,920 |
| 2012 | | Appr | Urban | Comm | $19,930 | $0 | $0 | $0 | $19,930 |
| 2011 | | Appr | Urban | Comm | $19,930 | $0 | $0 | $0 | $19,930 |
| 2010 | VAI --- pre convert to new manual values | Appr | | | $19,190 | $0 | $0 | $0 | $19,190 |
| 2009 | | Appr | | | $19,190 | $0 | $0 | $0 | $19,190 |
| 2008 | | Appr | | | $19,190 | $0 | $0 | $0 | $19,190 |
| 2007 | | Appr | | | $19,190 | $0 | $0 | $0 | $19,190 |
| 2006 | | Appr | | | $19,190 | $0 | $0 | $0 | $19,190 |
| 2005 | | Appr | | | $19,190 | $0 | $0 | $0 | $19,190 |
| 2004 | | Appr | | | $19,190 | $0 | $0 | $0 | $19,190 |

PDF+PIN: **006+11-01-429-002-00**

Mon, 6/20/2022, 8:47 AM   Page   4

| 2003 | | Appr | | | $19,190 | $0 | $0 | $0 | $19,190 |
| 2002 | | Appr | | | $19,190 | $0 | $0 | $0 | $19,190 |
| 2001 | | Appr | | | $19,190 | $0 | $0 | $0 | $19,190 |





Sketch 1 of 1





**Frank H. Rottinghaus**
Floyd County Treasurer
101 S. Main Street Ste 303
Charles City, IA 50616-2792 Phone: 641-257-6118

Receipt #
09392

Parcel #
000110142900200

TAX DUE:   Sept 1, 2021 or Full Year
TAX DELQ: Oct 1, 2021

| FULL YEAR | Sept 1, 2021 | |
|---|---|---|
| $516.00 | $258.00 | MAIL |

DED 3056000
Deed ILLINOIS CENTRAL GULF RR CO.

ILLINOIS CENTRAL GULF RR; ATTN: PROPERTY TAX
17641 S ASHLAND AVENUE
HOMEWOOD IL 60430

411 000 Charles City Ci ty/CC Sch/River side URTIF Base

**Frank H. Rottinghaus**
Floyd County Treasurer
101 S. Main Street Ste 303
Charles City, IA 50616-2792 Phone: 641-257-6118

Receipt #
09392

Parcel #
000110142900200

TAX DUE:   March 1, 2022
TAX DELQ: April 1, 2022

| March 1, 2022 | |
|---|---|
| $258.00 | MAIL |

DED 3056000
Deed ILLINOIS CENTRAL GULF RR CO.

ILLINOIS CENTRAL GULF RR; ATTN: PROPERTY TAX
17641 S ASHLAND AVENUE
HOMEWOOD IL 60430

411 000 Charles City Ci ty/CC Sch/River side URTIF Base

**FLOYD COUNTY TAX BILL for SEPTEMBER 2021 AND MARCH 2022. Please keep in a safe place.** Send the correct stubs along with your check for payment. If your taxes are paid by your Bank in Escrow, this is for your information only. SEE REVERSE SIDE. **Based on January 1, 2020 Valuations. Taxes for July 1, 2020 through June 30, 2021. Payable September 2021 and March 2022.**

**Parcel # 000110142900200**        Location: CHARLES CITY

411 000 Charles City Ci ty/CC Sch/River side URTIF Base

Sect 000 Twn 000 Rng 000

| Gross Acres | 0.00 |
|---|---|
| Exempt Acres | 0.00 |
| Net Acres | 0.00 |

LEGAL Description: LANES PART OF BLOCK 150 E OF MAIN & W OF GRAND

### VALUATIONS AND TAXES

| | THIS YEAR | | LAST YEAR | | TAX DUE | Delinquent Tax, Specials, Drainage |
|---|---|---|---|---|---|---|
| Com | Assessed | Taxable | Assessed | Taxable | | |
| Land | 17,270 | 15,543 | 19,930 | 17,937 | | |
| Buildings | 7,150 | 6,435 | 0 | 0 | | |
| Dwellings | 0 | 0 | 0 | 0 | | |
| **TOTAL VALUE:** | $24,420 | $21,978 | $19,930 | $17,937 | | |
| Less Military Exemption: | | $0 | | $0 | | |
| **NET TAXABLE VALUE:** | | $21,978 | | $17,937 | | |

| | | | |
|---|---|---|---|
| Value Times Levy per 1000 of: | 37.4741200 | 38.0425900 | 3056000 |
| EQUALS GROSS TAX OF: | 823.61 | 682.37 | Illinois Central Gulf RR Co. |
| Less Credits of: | | | |
| Homestead Credit: | 0.00 | 0.00 | |
| Ag Land Credit: | 0.00 | 0.00 | |
| Family Farm Credit: | 0.00 | 0.00 | |
| Bus Prop Tax Credit Fund: | -307.39 | -264.80 | |
| Low Income/Elderly Credit: | 0.00 | 0.00 | |
| Prepaid Tax: | 0.00 | 0.00 | |
| **NET ANNUAL TAXES:** | **$516.00** | **$418.00** | |

| | | | | |
|---|---|---|---|---|
| Ag Dwelling Tax: | $0.00 | $0.00 | County EMS: $50,000.00 | City EMS: $1,860.00 |

| | Distribution of your current & prior year taxes | | Total property taxes levied by taxing authority | | |
|---|---|---|---|---|---|
| Taxing Authority: | %Total | Current | Prior | Current | Prior | Percent +/- |
| CHARLES CITY | 45.858 | 236.63 | 189.29 | 4,271,686.00 | 4,100,223.00 | 4.181 |
| CCC SCHOOLS | 32.107 | 165.67 | 132.42 | 7,753,732.00 | 7,287,241.00 | 6.401 |
| COUNTY LEVIES | 13.070 | 67.44 | 58.78 | 5,519,533.00 | 5,647,250.00 | 2.261- |
| NORTH IOWA II | 2.674 | 13.80 | 10.39 | 8,425,607.00 | 7,607,116.00 | 10.759 |
| DEBT SERVICE | 2.605 | 13.44 | 11.46 | 1,019,262.00 | 1,018,910.00 | 0.034 |
| CO HOSP | 1.260 | 6.50 | 5.52 | 485,999.00 | 484,903.00 | 0.226 |
| ASSESSOR | 1.025 | 5.29 | 4.49 | 395,296.00 | 394,415.00 | 0.223 |
| ST CHAS/CC CEM | 0.703 | 3.63 | 2.66 | 74,802.00 | 66,084.00 | 13.192 |
| AG EXTENSION | 0.698 | 3.60 | 2.99 | 269,240.00 | 262,694.00 | 2.491 |

*YOU MAY PAY ONLINE AT: www.IowaTaxAndTags.org*

**Frank H. Rottinghaus**
Floyd County Treasurer
101 S. Main Street Ste 303
Charles City, IA 50616-2792 Phone: 641-257-6118

Receipt #
09392

| DUE Sept 1, 2021 | **$258.00** | DUE March 1, 2022 | **$258.00** |
|---|---|---|---|
| Date Paid: _____ | | Date Paid: _____ | |
| Check # _____ | | Check # _____ | |

003447                    PAM

| INST. NO. ‐ 660 | FILED FOR RECORD THE _16_ DAY OF | STATE OF IOWA, FLOYD COUNTY: | |
| RECORDING FEE $26.50 | _August_ 19 _72_ AT _12.04_ | _Alaine Kellogg_ | Recorder |
| TRANSFER FEE $ _5.00_ | O'CLOCK P. M. BOOK _98_ PAGE _349-61_ | By _____ | Deputy |

# D E E D

KNOW ALL MEN BY THESE PRESENTS, That for and in consideration

of the sum of TEN DOLLARS ($10.00) and other valuable consider-

ations, the receipt of which are acknowledged, ILLINOIS CENTRAL

RAILROAD COMPANY, a corporation of the State of Illinois, herein-

after called Grantor, by this deed and other instruments con-

currently executed and delivered, hereby grants, bargains, sells,

transfers, assigns, conveys, releases, remises and forever quit-

claims to ILLINOIS CENTRAL GULF RAILROAD COMPANY, a corporation of

the State of Delaware, hereinafter called Grantee, whose address

is 135 East Eleventh Place, Chicago, Illinois 60605, its successors

and assigns forever, all of the lines of railroad and all of the

property, real, personal and mixed of the Grantor in the State of

Iowa, wherever located therein, including, but not limited to the

real and personal property and interests in property described in

in Exhibit A, attached hereto, and specifically incorporated herein.

Including, without limitation, any and all main, branch, side,

switch, yard, storage, cut-off, spur, industrial, wye, connecting,

terminal, passing or other tracks; any and all rights of way, lands,

lots, reservoirs, easements or roadbeds, privileges, servitudes,

reversions and riparian, accretion and batture rights, any and all

terminal properties, warehouses, elevators, stockyards, car, engine

or freight houses, shops, docks, fences, turntables, rails, station

grounds, depots, buildings, elevated structures, superstructures,

structures, water, icing and fueling stations; any and all signals,

interlocking plants, telegraph, telephone and communication poles,

lines, wires and facilities; any and all switches, bridges, turnouts, trestles, tunnels, culverts or viaducts; any and all supplies, fuel, locomotives, engines, cars and other rolling stock, equipment machinery, tools, implements, furniture, chattels, fixtures, improvements and appurtenances; and any and all other things of whatever kind and wherever situated connected with the use, maintenance and operation of the lines of railroad or any of them or any of the real property described in this conveyance.

Also, any and all rights to relocate and change channels of water courses, to dig ditches, to deposit earth and to back water on privately owned lands, rights derived from releases of damages account construction, maintenance and operation of the railroad and account overflow and drainage and those account closing of roads, rights derived from releases of obligations to construct fences and to provide farm and other crossings; also any and all street and road crossing rights, leases and leasehold rights.

Also, all the coal, oil, gas, sulphur and other materials (whether similar or dissimilar to the minerals specifically mentioned and whether now known to exist or hereafter discovered) and any interest, right or title of any kind or character whatsoever in, under, upon or produced from any of the property hereby conveyed, whether specifically or correctly described herein or not, with all rights appurtenant thereto and all rights heretofore reserved by Grantor.

All of the real property herein conveyed is situated within the State of Iowa and by this deed and other instruments

-2-

concurrently executed and delivered, it is the intent of the Grantor to convey and transfer to Grantee all of the lines of railroad and all the assets and property of Grantor, real, personal and mixed, whether specifically described herein or not and whether correctly described herein or not, and wherever situated.

TO HAVE AND TO HOLD the said property, with all rights, privileges, improvements and appurtenances thereunto belonging to the Grantee, its successors and assigns, forever.

Subject in the case of real property to restrictions, exceptions and reservations of record, if any, made by Grantor prior to the date of this conveyance.

In order to facilitate the recording of this deed several identical counterparts thereof have been executed, acknowledged and delivered, each of which shall be deemed to be an original and all of which counterparts shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Grantor, pursuant to resolutions adopted by its Board of Directors and resolutions adopted by its stockholders by requisite vote has caused these presents to be subscribed by its Vice President and its corporate seal to be hereunto affixed by its Asst Secretary, this _10_ day of _August_, 1971.

ILLINOIS CENTRAL RAILROAD COMPANY.

By _____

H. Miller   Vice President

ATTEST:

ASSISTANT Secretary
R. C. Wiese

Description Approved _____

Form 4 ............rd _____

-3-

STATE OF ILLINOIS )
) SS
COUNTY OF C O O K )

I, *Charles G. Kingery*, Notary Public, in and for the said County and State, hereby certify that _H. W. Mec_, Vice President of the aforesaid Illinois Central Railroad Company, who is personally known to me, and known to be such Vice President of said corporation, and the same person whose name is subscribed to the above instrument as such Vice President, appeared before me this day in person in said State and County, and being by me duly sworn, did say that he was on the date of the execution of the said instrument Vice President of the said corporation, and that the seal affixed to said instrument is the corporate seal of said corporation, and that the said instrument was signed and sealed in behalf of said corporation by authority of its Board of Directors, and he acknowledged that he, being informed of the contents of the conveyance as such Vice President signed, sealed and delivered the said instrument by signing the name of the corporation by himself as Vice President as his own free and voluntary act as said Vice President and as the free and voluntary act and deed of the said corporation, for the uses and purposes therein set forth. I further certify that the seal of said corporation as affixed to said instrument was attested and proven before me by _R. C. Wise_ as Ass't. Secretary of said corporation.

Given under my hand and seal of office in Chicago, Cook County, Illinois, this _10_ day of _August_, 1972.

_____
Notary Public
Charles G. Kingery

My Commission expires _November 23, 1973_.


**Address of Grantee:**

135 East Eleventh Place
Chicago, Illinois 60605


-4-

## STATE OF IOWA

All rights, title and interest to the lines of railroads of varying widths and outlying properties in the State of Iowa, owned or operated by the Illinois Central Railroad Company as follows:

A. The former "Dunleith and Dubuque Bridge Company." State line to Jones Street (all in the City of Dubuque), including:

Beginning at the Illinois-Iowa state line (Mississippi River) at the City of Dubuque and extending southwesterly a distance of 1.22 miles to the south line of Jones Street in said city, Dubuque County.

Including, but not limited to the real estate described in the following instrument and passing over the county of:

### DUBUQUE COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| Dunleith and Dubuque Bridge Co. | 7-1-1946 | 121 | 136 |

B. The former "Dubuque & Sioux City Railroad Company." (D&SCRCo.)

1. Dubuque - Sioux City

Beginning at the south line of Jones Street in the City of Dubuque, Dubuque County and extending in a general westerly direction a distance of 326.17 miles to a connection with the Chicago and North Western Railway Co. at Sioux City, Woodbury County.

Including, but not limited to the real estate described in the following instruments and passing over and through the counties of:

### DUBUQUE COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 121 | 81 |
| Standard Oil Co. | 4-25-1949 | 39 | 118 |
| G. H. Seippel | 5-3-1949 | 39 | 143 |
| M. Cate & Wife | 5-3-1949 | 39 | 145 |
| J. W. Burds, et al. | 4-14-1949 | 38 | 614-648 |
| CMStP&P R. Co. | 6-21-1948 | 128 | 362 |

EXHIBIT A

## DELAWARE COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 71 | 557 |
| O. H. Brockman & Wife | 6-21-1955 | 78 | 137 |
| E. F. Dygert & Wife | 9-19-1955 | 78 | 165 |
| J. Biehl & Wife | 5-17-1963 | J | 487 |

## BUCHANAN COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCO. | 7-1-1946 | 271 | 288 |
| L. K. Fuller | 4-6-1965 | 331 | 80 |
| F. P. Gallery | 3-1-1965 | 331 | 71 |
| M. A. & N. L. Hogan | 3-12-1965 | 331 | 88 |
| H. & A. Heiniger | 1-19-1965 | 331 | 54 |
| R. & D. Connally | 3-27-1965 | 331 | 71 |
| M. P. Carson, et al. | 2-6-1965 | 331 | 60 |
| K. W. Nozman & Wife | 4-30-1951 | 285 | 492 |
| H. V. Lynn & Wife | 5-3-1951 | 285 | 508 |
| S. P. Powell | 4-28-1951 | 285 | 491 |
| J. O'Brien & Wife | 5-1-1951 | 285 | 493 |
| H. A. Houck | 10-7-1957 | 309 | 91 |
| Waterloo, Cedar Falls & Northern R. | 6-28-1956 | 293 | 544 |

## BLACK HAWK COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 244 | 403 |
| K. C. Childs | 6-15-1925 | 120 | 524 |
| R. L. Leach | 5-27-1925 | C | 109 |
| Wm. T. Evans & Wife | 10-27-1925 | 80 | 340 |
| S. R. Thummel, et al. | 10-26-1925 | 80 | 359 |
| F. E. Cole & Wife | 3-13-1925 | 120 | 431 |
| Highland Improvement Co. | 9-3-1925 | 120 | 561 |
| P. Davis | 9-2-1925 | 120 | 563 |
| R. N. Cowin & Wife | 3-16-1925 | 120 | 448 |
| First National Bank | 3-5-1925 | 120 | 432 |
| C. W. Cotton & Wife | 9-3-1925 | 120 | 562 |
| R. Cotton, et al. | 9-9-1925 | 120 | 571 |
| J. Schuler & Wife | 2-26-1925 | 120 | 434 |
| W. H. Brunn | 12-9-1925 | 80 | 360 |
| City of Waterloo | 9-12-1902 | 49 | 560 |
| J. S. Tuthill & Wife | 12-11-1929 | 137 | 134, 126, 133, 132 |

-2-

| | | | |
|---|---|---|---|
| P. H. Henry & Wife | 12-11-1929 | 137 | 134 |
| The Iowa Public Service Co. | 3-29-1932 | 141 | 551 |
| Waterloo Concrete Corp. | 7-11-1932 | 141 | 593 |
| The Rath Packing Co. | 1-14-1933 | 146 | 46 |
| Board of Park Comm. of Waterloo | 10-22-1931 | 134 | 579 |
| M. H. Cowin & Wife | 9-26-1949 | 283 | 543 |
| Iowa Public Service Co. | 3-21-1951 | 301 | 201 |
| The Rath Packing Co. | 3-27-1951 | 301 | 217 |
| The Rath Packing Co. | 3-27-1951 | 301 | 203 |
| Litchfield Mfg. Co. | 2-28-1906 | 66 | 144 |
| H. M. Reed | 8-30-1906 | 66 | 237 |
| Iowa Public Service Co. | 3-21-1951 | 301 | 199 |
| Wm. H. Hesse & Wife | 7-5-1949 | 106 | 415 |
| City of Cedar Falls | 6-27-1933 | 145 | 182 |
| Waterloo, Cedar Falls & Northern R. | 6-28-1956 | 117 | 455-526 |

## BUTLER COUNTY

| | | Recorded | |
|---|---|---|---|
| Acquired From | Date | Book | Page |
| D&SCRCo. | 7-1-1946 | 79 | 319 |
| IM&NWR. Co. | 4-9-1900 | 53 | 147 |

## FRANKLIN COUNTY

| | | Recorded | |
|---|---|---|---|
| Acquired From | Date | Book | Page |
| D&SCR. Co. | 7-1-1946 | 71 | 45 |

## HARDIN COUNTY

| | | Recorded | |
|---|---|---|---|
| Acquired From | Date | Book | Page |
| D&SCRCo. | 7-1-1946 | 375 | 86 |
| F. W. Wisner & Hrs. | 5-31-1894 | 166 | 249 |

## HAMILTON COUNTY

| | | Recorded | |
|---|---|---|---|
| Acquired From | Date | Book | Page |
| D&SCRCo. | 7-1-1946 | 70 | 215 |

-3-

BOOK 98 PAGE 355

## WEBSTER COUNTY

|  |  | Recorded | |
| Acquired From | Date | Book | Page |
| D&SCRCo. | 7-1-1946 | 50 | 216 |
| The American Cement Plaster Co. | 9-16-1915 | 26 | 401 |
| N. H. Bracken & Wife | 9-23-1947 | 47 | 489 |
| State of Iowa | 3-19-1947 | 47 | 504 |
| City of Fort Dodge | 9-10-1947 | 47 | 488 |
| The Minneapolis & St. Louis Railway Co. | 12-8-1953 | 59 | 343 |
| City of Fort Dodge | 9-10-1947 | 47 | 488 |
| C. E. Busse & Wife | 7-26-1962 | 108 | 8 |
| City of Fort Dodge | 8-15-1934 | 33 | 289 |
| Heirs of J. L. Beven | 7-9-1945 | 45 | 367 |

## CALHOUN COUNTY

|  |  | Recorded | |
| Acquired From | Date | Book | Page |
| D&SCRCo. | 7-1-1946 | 78 | 590 |

## POCAHONTAS COUNTY

|  |  | Recorded | |
| Acquired From | Date | Book | Page |
| D&SCRCo. | 7-1-1946 | 51 | 27 |

## BUENA VISTA COUNTY

|  |  | Recorded | |
| Acquired From | Date | Book | Page |
| D&SCRCo. | 7-1-1946 | 30 | 585 |
| City of Storm Lake | 5-27-1957 | 23 | 120 |

## CHEROKEE COUNTY

|  |  | Recorded | |
| Acquired From | Date | Book | Page |
| D&SCRCo. | 7-1-1946 | 47 | 621 |

## PLYMOUTH COUNTY

|  |  | Recorded | |
| Acquired From | Date | Book | Page |
| D&SCRCo. | 7-1-1946 | 39 | 91-92 |

-4-

## WOODBURY COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 547 | 36 |
| American Pop Corn Co. | 3-4-1942 | 157 | 200 |
| Chauncey L. Jay | 3-20-1924 | 80 | 591 |
| C. A. Whitney | 4-11-1924 | 174 | 79 |
| City of Sioux City | 3-16-1915 | E | 476 |
| City of Sioux City | 2-14-1955 | 784 | 639 |
| Town of Anthon | 3-3-1954 | 777 | 578 |
| City of Sioux City | 5-27-1949 | 601 | 293 |
| Cargill, Inc. | 4-20-1960 | 951 | 109 |

Excluding from the above any and all portion thereof previously disposed of or conveyed by grantor.

2.  Manchester - Cedar Rapids.

Beginning from a connection with the line between Dubuque-Sioux City at Manchester, Delaware County and extending in a general southerly direction a distance of 41.84 miles to a connection with the Chicago, Rock Island and Pacific Railroad Company at Cedar Rapids, Linn County.

Including, but not limited to the real estate described in the following instruments and located in the counties of:

## DELAWARE COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 71 | 557 |

## LINN COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 749 | 587 |
| Mary Dietz & Husb. | 11-13-1916 | 398 | 127 |
| Eva C. Nye & Husb. | 10-31-1916 | 398 | 128 |

Excluding from the above any and all portion thereof previously disposed of or conveyed by grantor.

3.  Mona Junction - Lyle (Minnesota).

-5-

Beginning from the connection with the line between Dubuque-Sioux City at a point known as Mona Junction, Black Hawk County and extending in a general northerly direction a distance of 76.01 miles to the Iowa-Minnesota state line at Lyle, Minnesota.

### ALSO

### Stacyville Junction - Stacyville.

Beginning from the connection with the line between Mona Junction and the Iowa-Minnesota state line at Stacyville Junction, Mitchell County and extending in a general easterly direction a distance of 7.85 miles to the Town of Stacyville, of same county.

Including, but not limited to the real estate described in the following instruments and located in the counties of:

### BLACK HAWK COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 244 | 403 |

### BREMER COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCO. | 7-1-1946 | 96 | 592 |

### CHICKASAW COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 72 | 591 |

### FLOYD COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 82 | 340 |

### MITCHELL COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 60 | 100 |

-6-

Excluding from the above any and all portions thereof previously disposed of or conveyed by grantor.

4. Tara - Council Bluffs.

a. Beginning from a connection with the line between Dubuque-Sioux City at Tara, Webster County and extending in a general southwesterly direction a distance of 130.97 miles to the east end of the Missouri River bridge at Council Bluffs, Pottawattamie County.

ALSO

(The former "Omaha Bridge and Terminal Railway Co.")

b. Beginning at the east end of the Missouri River bridge at Council Bluffs and extending westerly a distance of 0.11 miles to the Nebraska-Iowa state line in the center of Missouri River.

ALSO

(The former O.B. & T. Ry. Co.)

c. Beginning at the Nebraska-Iowa state line near the intersection of 13th Street and "G" Avenue and extending westerly a distance of 0.60 miles to the Iowa-Nebraska state line.

Including, but not limited to the real estate described in the following instruments and located in the counties of:

### WEBSTER COUNTY

| Acquired From | Date | Recorded | |
| --- | --- | --- | --- |
| | | Book | Page |
| D&SCRCo. | 7-1-1946 | 50 | 216 |
| C. E. Busse & Wife | 7-26-1962 | 108 | 8 |

### CALHOUN COUNTY

| Acquired From | Date | Recorded | |
| --- | --- | --- | --- |
| | | Book | Page |
| D&SCRCo. | 7-1-1946 | 78 | 590 |

### SAC COUNTY

| Acquired From | Date | Recorded | |
| --- | --- | --- | --- |
| | | Book | Page |
| D&SCRCo. | 7-1-1946 | 23 | 387 |

-7-

## CRAWFORD COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 54 | 228 |
| J. T. Harahan | 12-15-1910 | 27 | 292 |
| C. Christie | 5-21-1902 | 22 | 451 |
| City of Denison | 1-24-1920 | 6 | 222 |
| C. W. Tucker | 1-10-1944 | 52 | 425 |

## HARRISON COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 459 | 43 |

## POTTAWATTAMIE COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 51 | 27 |
| J. T. Harahan | 12-15-1910 | 504 | 116 |

Excluding from the above any and all portions thereof previously disposed of or conveyed by grantor.

5. Onawa Junction - Anthon.

Beginning from the connection with the line between Dubuque-Sioux City in Cherokee at a point known as Onawa Junction, Cherokee County and extending in a general Southwesterly direction a distance of 30.08 miles to the town of Anthon, Woodbury County.

### ALSO

Anthon - Onawa (Abandoned Line).

Beginning in the town of Anthon and extending in a southwesterly direction to the town of Onawa, Monona County.

Including, but not limited to the real estate described in the following instruments and located in the counties of:

## CHEROKEE COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 47 | 621 |

## WOODBURY COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 527 | 36 |

-8-

## MONONA COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 70 | 93 |

Excluding from the above any and all portions thereof previously disposed of or conveyed by grantor.

### 6. Cherokee - Rock Rapids (State Line).

Beginning from the connection with the line between Dubuque-Sioux City at Cherokee, Cherokee County and extending in a north-westerly direction a distance of 70.09 miles to the Iowa-Minnesota state line north of Rock Rapids, Lyon County.

Including, but not limited to the real estate described in the following instruments and located in the counties of:

### CHEROKEE COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 47 | 621 |

### O'BRIEN COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 62 | 319 |

### SIOUX COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 65 | 269 |
| Dena K. Groub | 6-5-1969 | 73 | 516 |

### LYON COUNTY

| Acquired From | Date | Recorded Book | Page |
|---|---|---|---|
| D&SCRCo. | 7-1-1946 | 192 | 601 |

Excluding from the above any and all portions thereof previously disposed of or conveyed by grantor.

-9-

## Pure Prairie Tax Map



Map Center: 43° 4' 25.2, -92° 40' 15.01

**6-95N-15W**
**Floyd County**
**Iowa**

0ft          377ft          753ft

©2022 AgriData, Inc.

Maps Provided By:
**surety**
CUSTOMIZED ONLINE MAPPING
© AgriData, Inc. 2021    www.AgriDataInc.com

Field borders provided by Farm Service Agency as of 5/21/2008.

7/26/2022



110128100400

120615302700

Fourteenth Ave.

120617901800

D St.

E St.

120615307200

120617901200

Brackett St.

N. Grand Ave.

Thirteenth Ave.

110128200900

120615303600

120615305500

Thirteenth Ave.

120618200100

Lane St.

110143200400Lane St.

110142800500

N. Grand Ave.

120630100200

120630100700

E St.

110143300100

Lane St.

120630200900

Johnson St.

Jackson St.

Lane St.

110143400200Lane St.

110143700200

110143500300

120650501300

120632700100

120632800

Main St.

110143800500

Wisconsin St.

110143600200

N. Grand Ave.

120630300800

120630301600

D St.

120632902

0100

Spriggs St.

Main St.

Tenth Ave.

120632701900

E St.

120632900500

110143900100

Spriggs St.

120630403900

120630403100

120632700700

120632901500

Ninth Ave.

Ninth Ave.

lin St.

Main St.

N. Grand Ave.

120635100200

120635300300

B St.

C St.

D St.

120637601000

E St.

120

10147800300

Eighth Ave.

Eighth Ave.

PIN: 11-01-429-002-00
Tax ID: 411110142900200
Appraised Value: 24,890
Owner: ILLINOIS CENTRAL GULF RR CO.
Class: COMMERCIAL

## Pure Prairie Aerial Map



Map Center: 43° 4' 24.69, -92° 40' 15.01

0ft          376ft          753ft

**6-95N-15W**
**Floyd County**
**Iowa**

7/26/2022

Maps Provided By:
**surety**
CUSTOMIZED ONLINE MAPPING
© AgriData, Inc. 2021    www.AgriDataInc.com
Field borders provided by Farm Service Agency as of 5/21/2008.

PIN: 11-01-429-002-00
Tax ID: 411110142900200
Appraised Value: 24,890
Owner: ILLINOIS CENTRAL GULF RR CO.
Class: COMMERCIAL

## Pure Prairie FEMA Report



Map Center: 43° 4' 24.69, -92° 40' 15.01

| | | | |
|---|---|---|---|
| State: | IA | Acres: | 14 |
| County: | Floyd | Date: | 7/26/2022 |
| Location: | 6-95N-15W | | |
| Township: | Charles City | | |

Maps Provided By:
**surety** CUSTOMIZED ONLINE MAPPING
© AgriData, Inc. 2021    www.AgriDataInc.com

| Name | Number | County | NFIP Participation | Acres | Percent |
|---|---|---|---|---|---|
| City of Charles City | 190128 | Floyd | Regular | 14.00 | 100% |
| | | | **Total** | 14.00 | 100% |

| Map Change | Date | Case No. | Acres | Percent |
|---|---|---|---|---|
| No | | | 0 | 0% |

| Zone | SubType | Description | Acres | Percent |
|---|---|---|---|---|
| X | AREA OF MINIMAL FLOOD HAZARD | Outside 500-year Floodplain | 9.07 | 64.8% |
| X | 0.2 PCT ANNUAL CHANCE FLOOD HAZARD | 500-year floodplain | 4.83 | 34.5% |
| AE | | 100-year Floodplain | 0.1 | 0.7% |
| | | **Total** | 14.00 | 100% |

| Panel | Effective Date | Acres | Percent |
|---|---|---|---|
| 19067C0210E | 6/19/2020 | 14.00 | 100% |
| | **Total** | 14.00 | 100% |

Flood related information provided by FEMA

## Pure Prairie Topography Map



map center: 43° 4' 24.69, -92° 40' 15.01

**6-95N-15W**
**Floyd County**
**Iowa**

0ft          376ft          753ft

Maps Provided By:

Field borders provided by Farm Service Agency as of 5/21/2008.

7/26/2022



PIN: 11-01-429-002-00
Tax ID: 411110142900200
Appraised Value: 24,890
Owner: ILLINOIS CENTRAL GULF RR CO.
Class: COMMERCIAL



## ZONING DISTRICTS

| | | |
|---|---|---|
| UA | URBAN–AGRICULTURAL DISTRICT | REDEVELOPMENT AREA |
| COS | CONSERVATION AND OPEN SPACE DISTRICT | |
| R–1 | SINGLE FAMILY RESIDENCE DISTRICT | |
| R–2 | GENERAL RESIDENCE DISTRICT | |
| R–3 | MULTI–FAMILY RESIDENCE DISTRICT | |
| R–4 | MOBILE HOME RESIDENCE DISTRICT | |
| PUD | PLANNED UNIT DEVELOPMENT (PUD) DISTRICT | |
| B–1 | LOCAL BUSINESS DISTRICT | |
| B–2 | GENERAL BUSINESS DISTRICT | |
| B–3 | SERVICE BUSINESS DISTRICT | |
| B–4 | HIGHWAY SERVICE BUSINESS DISTRICT | |
| M–1 | LIGHT MANUFACTURING DISTRICT | |
| M–2 | GENERAL MANUFACTURING DISTRICT | |
| FM | FLOODPLAIN MANAGEMENT (OVERLAY) DISTRICT | |

THIS MAP IS FOR REFERENCE PURPOSES ONLY.
FOR PRECISE INFORMATION CONSULT THE
OFFICIAL ZONING MAP REFERRED TO IN SECTION
VI, PARAGRAPH B OF THE ZONING ORDINANCE IN THE
OFFICE OF THE CITY CLERK OF CHARLES CITY.

PASSED AND APPROVED: 1/03/05
EFFECTIVE DATE: 1/18/05
ORDINANCE NO. 1013

SCALE IN FEET

0    500   1000

**V & K**

VEENSTRA & KIMM, INC.

PROJECT NO. 3596
OCTOBER 8, 2004

*ZONING MAP*
*CHARLES CITY, IOWA*



## SECTION XVIII

## M-1 LIGHT MANUFACTURING DISTRICT

### A.    STATEMENT OF INTENT

The M-1 Light Manufacturing District is intended and designed to provide flexibility in the location of certain manufacturing, industrial, and warehousing uses while maintaining protection for nearby non-industrial districts.  The M-1 District is characterized by lots with landscaped grounds, provisions for off-street parking and loading spaces, structures generally one or two stories in height, and exterior storage enclosed by fence or landscape buffer.

### B.    PRINCIPAL PERMITTED USES

Only the uses of structure or land listed in this section shall be permitted in the M-1 District.

1.    Manufacturing and processing uses that are wholly contained within a building and create no offensive noise, dust, odor, vibration, or electrical interference.

2.    Automobile, truck and trailer body repair.

3.    Banks.

4.    Beverage (non-alcoholic) processing and bottling.

5.    Boat building and repair.

6.    Building and material sales including lumber yards.

7.    Cameras and other photographic equipment, except film.

8.    Cartage and express establishments.

9.    Ceramic products - such as pottery and small glazed tile.

10.   Clubs and lodges.

11.   Contractors' offices.

12.   Cosmetics and toiletries.

13.   Dyeing and cleaning works.

14. Electrical appliances, equipment and supplies - small.

15. Frozen food lockers.

16. Fuel and ice sales.

17. Garages, public and automobile parking lots.

18. Greenhouses.

19. Leather products, fabricating only.

20. Medical laboratory supplies, equipment, furnishings and specialties.

21. Metal finishing.

22. Monument and ornamental stone works.

23. Motor vehicle and equipment sales and service.

24. Musical instruments manufacture.

25. Paper products, small - such as envelopes and stationery.

26. Pharmaceutical products - compounding only.

27. Plastic products, small.

28. Public utility and public service uses.

29. Publishing and printing.

30. Radio and television broadcasting stations.

31. Research laboratories.

32. Restaurants.

33. Seed processing.

34. Stone quarries.

35. Storage and warehouse establishments, except gasoline and other such flammable materials.

36. Manufacture of textiles.

37. Manufacture of toys.

38. Vehicles and equipment such as farm implements, equipment and machinery, bicycles, etc, but not including motor vehicles - assembly.

39. Wholesale, general except gasoline and other such flammable materials.

40. Wood products.

41. Manufacture and/or sales of agricultural products.

The following uses shall not be located within 200 feet of the R-1 District.

1. Automobile service stations.

2. Feed and grain processing.

3. Food products - processing and combining, except fish.

4. Fertilizer manufacture not to include organic materials, but chemicals processing permitted.

5. Ice - dry and natural - manufacturing and  processing.

6. Laundries.

7. Milk bottling and distributing stations.

8. Motor freight terminals.

9. Theatres, automobile drive-in only.

10. Prefabrication, assembly and storage of prefabricated houses.

## C.   SPECIAL USES

Special uses as authorized by the Board of Adjustment after a public hearing.

1. Adult entertainment business.

2. Airports.

3. Amusement and recreation enterprise including bowling alleys, skating rinks, tennis and racquet ball facilities and other similar types or uses.

4.    Other similar manufacturing, fabricating, repairing or storing establishments unless prohibited by this Ordinance.

5.    Parks and playgrounds.

6.    Wind generators.

The following uses shall not be located within 200 feet of the R-1 District.

1.    Abattoirs.

2.    Fuel oil, coal, gasoline and gas - sales and bulk storage.

3.    Stadiums, auditoriums and armories.

4.    Stockyards or slaughter of animals and fowls and processing.

**D.    PERMITTED ACCESSORY USES**

1.    Accessory uses of land or structures customarily incidental and subordinate to any of the above principal uses.

2.    Dwelling for watchman or caretaker.

3.    Employee cafeteria or other food concession in conjunction with permitted use.

**E.    BULK REGULATIONS**

The following minimum requirements shall be observed subject to the modifications contained in this Ordinance.

| | | |
|---|---|---|
| 1. | Lot Area: | No minimum requirement. |
| 2. | Lot Width: | No minimum requirement. |
| 3 | Front Yard: | 30 feet. |
| 4. | Rear Yard: | 30 feet. |
| 5. | Side Yard: | 25 feet. |
| 6. | Maximum Height: | 40 feet. |
| 7. | Number of Stories: | 2 stories. |
| 8. | Total Floor Area Ratio: | 0.7. |
| 9. | Off-Street Parking and Loading: | Spaces for off-street parking and loading shall be provided in accordance with the provisions of Section XXII. |

18-4

| 10. | Signs: | Signs shall be provided in accordance with provisions of Section XXIII. |
|-----|--------|--------|
| 11. | Screening: | Where a Manufacturing District adjoins a Residential District screening shall be provided along the lot lines of the business property. Evergreen planting is preferable, but decorative concrete block or brick screen walls or solid fences (but not chain link fences) no more than 8 feet in height are also acceptable. |

## F.    SPECIAL REQUIREMENTS

1.    Required front and side yards shall be maintained as open landscaped areas and shall not be used for parking, loading, storage or other uses.

2.    Exterior storage other than the display of products for retail sale shall be enclosed by a fence or suitable landscape planing, the design or type of which shall be approved by the planning commission, and which will screen the stored materials from view from public streets or residential areas.

3.    No raw material, finished product, or waste product which may cause dust or odor which would adversely affect adjoining properties shall be stored outside a building nor shall any junk, debris, or waste material be permitted to accumulate on the site.

4.    Adult Entertainment Businesses. It is the purpose of this Ordinance to regulate adult entertainment businesses to limit their inherent adverse impact in the community while at the same time permitting lawful businesses to conduct operations in the community. The City Council finds as evidenced in other cities that the number of adult entertainment businesses is increasing and that, because of their very nature, are recognized as having serious, objectionable operational characteristics, which are magnified when located in close proximity to dwellings, churches, schools, and parks. Special regulation of adult entertainment businesses is necessary to ensure that these adverse affects will not contribute to the blighting or downgrading of the surrounding neighborhood. The City Council further finds that these regulations are necessary to protect the youth of this community from the objectionable operational characteristics of such businesses by restricting their location. The City Council further finds that these regulations are necessary to protect the health, safety and general welfare of all residents of the community.

(a)    Limitations on Adult Entertainment Businesses: Adult entertainment businesses shall be subject to the following restrictions and no person shall cause or permit the establishment of any adult entertainment business contrary to said restrictions:

18-5

1) No adult entertainment business shall be open for business between the hours of twelve (12) midnight and six (6) a.m.

2) An adult entertainment business shall not be allowed within five hundred (500) feet of another existing adult entertainment business.

3) An adult entertainment business shall not be located within five hundred (500) feet of any residentially zoned district.

4) An adult entertainment business shall not be located within one thousand (1,000) feet of a pre-existing school, public park, or church.

5) Measurements shall be made in a straight line, without regard to intervening structures or objects, from the main entrance of such adult entertainment business to the point on the property line of such other business, school, church, public park or areas zoned for residential use which is closest to the said main entrance of such adult entertainment business.

(b) Prohibited Activities of Adult Entertainment Businesses:

1) No adult entertainment business shall employ any person under eighteen (18) years of age.

2) No adult entertainment business shall furnish any merchandise or services to any person who is under eighteen (18) years of age.

3) No adult entertainment business shall be conducted in any manner that permits the observation of any model or any material depicting, describing or relating to specified sexual activities or specified anatomical areas by display, decoration, sign, show window or other opening from any public way or from any property not licensed as an adult use.  No operator of an adult entertainment business or any officer, associate, member, representative, agent, owner, or employee of such business shall engage in any activity or conduct or permit any other person to engage in any activity of conduct in or about the premises which is prohibited by this Ordinance or any laws of the State.

4) No part of the interior of the adult entertainment business shall be visible from any pedestrian sidewalk, walkway, street, or other public or semi-public area.

5)     An adult entertainment business shall post a sign at the entrance of the premises which shall state the nature of the business and shall state that no one under the age of eighteen (18) years is allowed on the premises.  This Section shall not be construed to prohibit the owner from establishing an older age limitation for coming on the premises.

6)     Except as hereinafter provided no person shall intentionally expose those parts of his or her body hereinafter listed to another in any public place, or in any place where such exposure is seen by another person or persons located in any public area.

    a)     A woman's nipple, the areola thereof, or any portion of the female breast at or below the nipple thereof, except as necessary in the breast feeding of a baby.

    b)     The pubic hair, pubes, perineum, or anus of a male or female, the penis of scrotum of a male, or the vagina of a female, excepting such body parts of prepubescent infants of either sex.

    (c)     Establishment of adult entertainment businesses shall include the opening of such business as a new business, the relocation of such business, or the conversion of an existing business location to any of the uses described in Section 3 - Rules and Definitions.

    (d)     Special Use Permit: The adult entertainment businesses may be permitted subject to approval by the Board of Adjustment after public hearing.  In its determination upon the particular use at the location requested, the Board shall consider all of the following provisions:

1)     That the proposed location, design, construction and operation of the particular use adequately safeguards the health, safety and general welfare of persons residing or working in adjoining or surrounding property;

2)     That such use shall not impair an adequate supply of light and air to surrounding property;

3)     That such use shall not unduly increase congestion in the streets or public danger of fire and safety;

4)     That such use shall not diminish or impair established property values in adjoining or surrounding property; and

5) That such use shall be in accord with the intent, purpose and spirit of this Ordinance and the Comprehensive Plan of the City of Charles City.

6) Applications for an adult entertainment business under the terms of this Section shall be accompanied by evidence concerning the feasibility of the proposed request and its effect on surrounding property and shall include a site plan defining the areas to be developed for buildings and structure, the areas to be developed, for parking, the locations and driveways and the points of ingress and egress, the location and height of walls, the location and type of landscaping, the location, size and number of signs and the manner of providing water supply and sewage treatment facilities.

## SECTION XIX

## M-2 GENERAL MANUFACTURING DISTRICT

### A.    STATEMENT OF INTENT

The M-2 General Manufacturing District is intended and designed to provide areas suitable for activities and uses of a medium and heavy industrial nature.  It is intended that no residential development be permitted in the M-2 District.

### B.    PRINCIPAL PERMITTED USES

Only the uses and structures or land listed in this section shall be permitted in the M-2 District.

1.    Uses permitted in the M-1 Districts.

2.    Automobile, tractor, truck, trailer, motorcycle and other motor vehicles manufacture and assembly, including parts.

3.    Building materials, such as prefabricated houses, composition wallboards, partitions, panels, stone-and gravel processing plants and cement, concrete and asphaltic concrete mixing plants.

4.    Chemicals - processing.

5.    Equipment, miscellaneous, such as farm implements and machines, construction machines and equipment, such as power shovels, graders, excavators, manufacture and assembly, including parts.

6.    Food products - manufacturing of basic products from raw state and refining, roasting, pasteurizing and extracting.

7.    Fuel oil, coal, gasoline, and gas - sales and bulk storage.

8.    Glass - manufacture and fabricating.

9.    Machines, business - such as typewriters, accounting machines, calculators and card counting equipment.

10.   Machines, miscellaneous - such as washing machines and dryers, firearms, refrigerators, air-conditioning and commercial motion-picture equipment.

11.   Machine tools - such as metal lathes, metal presses, metal stamping and woodworking.

12. Meat and fish products - packing and processing of, but not including glue and size manufacturing.

13. Metal alloys and foil, miscellaneous - such as solder, brass, bronze, tin, lead and gold.

14. Metal finishing, plating, grinding, sharpening, polishing, cleaning, rust-proofing and heat treatment.

15. Metal and metal products, treatment and processing - such as enameling, japanning, lacquering and galvanizing.

16. Metal products - such as fabrication and assembly of metal doors, cabinets and similar products.

17. Metal, structural - such as fabrication of bars, girders, wire and similar products.

18. Paint.

19. Paper products - such as shipping containers and pulp goods, pressed or molded (including paper mache), carbon paper and coated paper stencils.

20. Plastic products, large.

21. Tools and other hardware - such as bolts, nuts, screws, doorknobs, drills, hand tools and cutlery, hinges, house hardware, locks, nonferrous metal castings and plumbing appliances.

22. Signs - as regulated in this subsection

23. Wholesale and storage establishments for gasoline and other such flammable materials

24. Wood and lumber and other wood products - including sawmills and planing mills, excelsior, plywood and veneers and wood-preserving treatment.

## C.   SPECIAL USES

Special uses as authorized by the Board of Adjustment after a public hearing.

1.   Special uses of M-1 District, except Adult Entertainment Business.

2.   Other manufacturing, fabricating, repairing or storing establishments unless prohibited in this Ordinance.

3.     Automobile wrecking yards.

4.     Junk yards.

5.     Public sanitary land fill.

6.     Forge plants, crushers, blast furnaces.

## D.     PERMITTED ACCESSORY USES

1.     Accessory uses customarily incidental to a permitted principal use.

2.     Accessory uses permitted in the M-1 District.

## E.     BULK REGULATIONS

The following minimum requirements shall be observed subject to the modifications contained in this Ordinance.

| | | |
|---|---|---|
| 1. | Lot Area: | No minimum requirement. |
| 2. | Lot Width: | No minimum requirement. |
| 3. | Front Yard: | 40 feet. |
| 4. | Rear Yard: | 30 feet. |
| 5. | Side Yard: | 25 feet. |
| 6. | Maximum Height: | 40 feet. |
| 7. | Number of Stories: | 2 stories. |
| 8. | Total Floor Area Ratio: | 0.6. |
| 9. | Off-Street Parking and Loading: | Spaces for off-street parking and loading shall be provided in accordance with the provisions of Section XXII. |
| 10. | Signs: | Signs shall be provided in accordance with provisions of Section XXIII. |
| 11. | Screening: | Where a local Manufacturing District adjoins a Residential District screening shall be provided along the lot lines of the business property.  Evergreen planting is preferable, but decorative concrete block or brick screen walls or solid fences (but not chain link fences) no more than 8 feet in height are also acceptable. |

## F.    SPECIAL REQUIREMENTS

1.  No certificate of compliance shall be issued for any use in conflict with any ordinance of the City of Charles City or law of the State of Iowa regulating nuisances.

2.  No certificate of compliance shall be issued for any dwelling, school, hospital, clinic, or other institution for human care, except where accessory to a permitted principal use.

3.  The special uses hereinbefore listed may be permitted, subject to approval by the Board of Adjustment after public hearing.  In its determination upon the particular uses at the location requested, the Board shall consider all of the following provisions:

    (a)  That the proposed location, design, construction, and operation of the particular use adequately safeguards the health, safety, and general welfare of persons residing or working in adjoining or surrounding property.  To this end the Board may require that appropriate landscaping, walls, fences, or other artificial screens be provided as buffers to minimize the effects of these uses on adjoining or surrounding property.

    (b)  That such use shall not impair an adequate supply of light and air to surrounding property.

    (c)  That such use shall not unduly increase congestion in the streets, danger of fire, or other threats to public safety.

    (d)  That such use shall not diminish or impair established property values in adjoining or surrounding property.

**First American**

# Commitment

ISSUED BY

First American Title Insurance Company

File No: NCS-1015327-MPLS

COMMITMENT FOR TITLE INSURANCE

Issued By

## *FIRST AMERICAN TITLE INSURANCE COMPANY*

NOTICE

IMPORTANT-READ CAREFULLY: THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and the Commitment Conditions, *First American Title Insurance Company*, a Nebraska Corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Policy Amount and the name of the Proposed Insured.

If all of the Schedule B, Part I-Requirements have not been met within six months after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

**First American Title Insurance Company**

Dennis J. Gilmore, President

Greg L. Smith, Secretary

If this jacket was created electronically, it constitutes an original document.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030019 (5-11-17) | Page 1 of 10 | | ALTA Commitment for Title Insurance (8-1-16) |
| --- | --- | --- | --- |
| | | | Iowa |

1. DEFINITIONS

   (a) **"Knowledge" or "Known": Actual or imputed** knowledge, but not constructive notice imparted by the Public Records.

   (b) **"Land": The land described in Schedule A and affixed improvements that by law constitute real property. The term "Land"** does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.

   (c) **"Mortgage": A mortgage, deed of trust, or other security instrument, including one evidenced by electronic means authorized** by law.

   (d) **"Policy": Each contract of title insurance, in a form adopted by the American Land Title Association,** issued or to be issued by the Company pursuant to this Commitment.

   (e) **"Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this** Commitment.

   (f) **"Proposed Policy Amount": Each dollar amou**nt specified in Schedule A as the Proposed Policy Amount of each Policy to be issued pursuant to this Commitment.

   (g) **"Public Records": Records established under state statutes at the Commitment Date for the purpose of imparting constructive** notice of matters relating to real property to purchasers for value and without Knowledge.

   (h) **"Title": The estate or interest described in Schedule A.**

2. If all of the Schedule B, Part I—Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

3. **The Company's liability and obligation is limited by and this Commitment is not valid without:**

   (a) the Notice;

   (b) the Commitment to Issue Policy;

   (c) the Commitment Conditions;

   (d) Schedule A;

   (e) Schedule B, Part I—Requirements;

   (f) Schedule B, Part II—Exceptions; and

   (g) a counter-signature by the company or its issuing agent that may be in electronic form.

4. **COMPANY'S RIGHT TO AMEND**

   The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company shall not be liable for any other amendment to this Commitment.

5. LIMITATIONS OF LIABILITY

   (a) **The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended** Commitment, resulting **from the Proposed Insured's good faith reliance to:**

      (i) comply with the Schedule B, Part I—Requirements;

      (ii) **eliminate, with the Company's written consent, any Schedule B, Part II**—Exceptions; or

      (iii) acquire the Title or create the Mortgage covered by this Commitment.

   (b) The Company shall not be liable under Commitment Condition 5(a) if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.

   (c) The Company will only have liability under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.

   (d) **The Company's liability shall not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and** described in Commitment Conditions 5(a)(i) through 5(a)(iii) or the Proposed Policy Amount.

   (e) The Company shall not be liable for the content of the Transaction Identification Data, if any.

   (f) In no event shall the Company be obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I—Requirements have been met to the satisfaction of the Company.

   (g) **In any event, the Company's liability is limited** by the terms and provisions of the Policy.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

6.  LIABILITY OF COMPANY AND CHOICE OF LAW AND FORUM: (Continued)

(a)  Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.

(b)  Any claim must be based in contract and must be restricted solely to the terms and provisions of this Commitment.

(c)  Until the Policy is issued, this Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.

(d)  The deletion or modification of any Schedule B, Part II—Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.

(e)  Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.

(f)  When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

7.  IF THIS COMMITMENT HAS BEEN ISSUED BY AN ISSUING AGENT

The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for the purpose of providing closing or settlement services.

8.  PRO-FORMA POLICY

The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

9.  ARBITRATION

The Policy contains an arbitration clause. All arbitrable matters when the Proposed Policy Amount is $2,000,000 or less shall be arbitrated at the option of either the Company or the Proposed Insured as the exclusive remedy of the parties. A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

---

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030019 (5-11-17) | Page 3 of 10 | ALTA Commitment for Title Insurance (8-1-16) Iowa |
|---|---|---|

| First American | ALTA Commitment for Title Insurance |
|---|---|
| Schedule A | ISSUED BY<br><br>First American Title Insurance Company<br><br>File No: NCS-1015327-MPLS |

*Transaction Identification Data for reference only:*

Issuing Agent: First American Title Insurance Company National Commercial Services

Commitment No.: NCS-1015327-MPLS

Property Address: 901 North Main Charles City, Charles City, IA

Revision No.: 1. 12/7/21; Updated Effective Date; Added Item 16 to Schedule B, Part I; Updated Item 7 of Schedule B, Part II.

Issuing Office: 121 South 8th Street, Suite 1250, Minneapolis, MN 55402

Issuing Office File No.: NCS-1015327-MPLS

## SCHEDULE A

1.  Commitment Date: November 29, 2021 at 8:00 AM

2.  Policy to be issued:

    (a)  ALTA®  Owner's Policy

         Proposed Insured: Pure Prairie Farms
         Proposed Policy Amount: $1,000,000.00

    (b)  2006 ALTA®  Lender Policy

         Proposed Insured: To Be Furnished
         Proposed Policy Amount: $1,000,000.00

3.  The estate or interest in the Land described or referred to in this Commitment is

    Fee Simple

4.  The Title is, at the Commitment Date, vested in:

    Simply Essentials, LLC, a Delaware limited liability company

5.  The Land referred to in this Commitment is described as follows:

    Real property in the City of Charles City, County of Floyd, State of Iowa, described as follows:

    Parcel 1:

    Lots One, Two, Eight, Nine and Ten (1, 2, 8, 9 & 10), Block One Hundred Forty-Nine (149) and Lots Three, Four and Five (3, 4 & 5) of Detwiler's Subdivision of Lots Three (3), Four (4) and Five (5), Block One Hundred Forty-Nine (149), all in Lane's addition to St. Charles, now incorporated in and as a part of Charles City, Iowa - this includes the Northerly 198 feet of Vacated alley, Block 149, Lane's addition to St. Charles, now incorporated in and as a Part of Charles City, Floyd County, Iowa.

    and

    That Part of Lots Six (6) and Seven (7), Block One Hundred Forty-Nine (149), Lane's addition and that Part of Lots Eleven (11), Twelve (12), Thirteen (13), and Fourteen (14), Detwiler's Subdivision of

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

Case 24-32426   Doc 13   Filed 09/20/24 ... One Hundred Forty-nine (149), Lane's addition and the Vacated alley in Block 149, Lane's addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa, described as follows:

Beginning at the Northerly corner of Said Lot Seven (7), thence South Fifty-Six (56) degrees, Thirty (30) minutes East, Two Hundred Sixty-Four (264.00) feet; thence South Thirty-Three (33) degrees, Thirty (30) minutes West 79.30 feet: thence Northwesterly along a 794.02 foot radius curve concave Northeasterly 265.60 feet, said curve having a long chord of North 54 degrees, 16 minutes 12 seconds West 264.20 feet: thence North 33 Degrees, 30 minutes East 69.02 feet to the place of beginning,

and

The Southeasterly 10 feet of Jackson Street abutting Lots 7, 8, 9, 10 and abutting the Northerly 3.02 feet of Lot 6; all in Block 149, of Lane's addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

and

The Southwesterly 15 feet of Floyd Street abutting Lot 10 in Block 149 of Lane's addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

and

All that Part of Block One Hundred Forty-Eight (148) in Lane's addition to St. Charles, Charles City, Floyd County, Iowa, lying North of a line drawn Seventeen and Five-Tenths (17.5) feet Northeasterly of and parallel with the Southwesterly lines of Lots Nos. Two (2) and Nine (9), in said Block, and Lying South of line drawn Fifty-Three (53) feet South of and parallel with the centerline of the Chicago, Milwaukee, St. Paul and Pacific Railroad right of way.

Also described as: All that part of Lots 1, 2, and 9, in Block 148, Lane's addition to St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, lying North of a line drawn Seventeen and Five-Tenths feet Northeasterly from and Parallel to the Southwesterly line of said Lots 2 and 9, and Lying South of a line drawn Fifty-Three feet South of and parallel to the center line of the Chicago, Milwaukee and St. Paul Railroad right of way.

and

The Southwesterly Seventeen and one-half feet (SWly 17 1/2) of Lots Two and Nine (2 & 9), of Block One Hundred Forty-Eight (148), Lane's addition to St. Charles, now a part of Charles City, Floyd County, Iowa, which is South of the right of way of the Chicago, Milwaukee, St. Paul and Pacific Railway.

and

That Part of Lots Seven and Eight (7 & 8), lying between the right of ways of Illinois Central Railroad Company and the Chicago, Milwaukee and St. Paul Railroad Co., Except the Charles City Western Railway Company Right of Way, all Located in Block One Hundred Forty-Eight (148), in Lane's addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa.

and

Lot Three (3), and all that part of Lot Four (4), lying between Lot Three (3) and the right of way of the Dubuque and Sioux City Railroad Company, (The Dubuque and Sioux City Railroad Company right of way now being the right of way of the Illinois Central Railroad Company), all in Block One Hundred

This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

St. Charles), in Lane's addition to St. Charles, now incorporated in and as a part of Charles City,
Floyd County, Iowa.

and

All of Vacated Jackson Street lying Southwesterly of the Southwest boundary of Floyd Street and
Northeasterly of the Northeast boundary of Lane Street in Lane's addition to St. Charles, now
incorporated in and as a part of Charles City, Floyd County, Iowa, except the Southeasterly 10 feet of
Jackson Street abutting Lots 7, 8, 9, 10 and abutting the Northerly 3.02 feet of Lot 6: in Block 149, of
Lane's addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

and

The South One-Half of all that portion of Floyd Street lying Northwesterly of the Northwest right of
way boundary of Main Street and East of the Westerly right of way line extended of vacated Jackson
Street and the south boundary line of the Iowa, Chicago and Eastern Railroad right of way, Except
that portion thereof previously vacated by the City of Charles City and conveyed to the adjoining
owner on the South by Quit Claim Deed recorded in Book 95, page 305 in the office of the Floyd
County Recorder.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not
valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part
II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses
are prohibited. Reprinted under license from the American Land Title Association.

| | ALTA Commitment for Title Insurance |
|---|---|
| **First American** | ISSUED BY |
| **Schedule BI & BII** | **First American Title Insurance Company** |
| | File No: NCS-1015327-MPLS |

Commitment No.: NCS-1015327-MPLS

SCHEDULE B, PART I

Requirements

All of the following Requirements must be met:

1.  The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

2.  Pay the agreed amount for the estate or interest to be insured.

3.  Pay the premiums, fees, and charges for the Policy to the Company.

4.  Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

5.  The standard form of Seller's and/or Purchaser's Affidavit, satisfactory to the Company, is required.

6.  In regard to Simply Essentials, LLC, we require the following:

    A)  Furnish a copy of the Articles of Organization and the Operating Agreement.
    B)  Furnish a Certificate of Good Standing from the Delaware Secretary of State's office.
    C)  Furnish a resolution of the members authorizing the proposed transaction.
    D)  The proposed transaction should be executed by all the members of the LLC unless provided otherwise in the operating agreement. If the members of the above referenced limited liability company are entities other than individuals, additional requirements will be made.

    Upon review of these items we reserve the right to make further requirements.

7.  We find nothing of record to establish the status of Pure Prairie Farms as an entity. We must be furnished proof of its legal status and copies of all the instruments under which it operates.

    We reserve the right to make additional requirements upon review of these items.

8.  Deed from Simply Essentials, LLC, a Delaware limited liability company, to Pure Prairie Farms.

9.  Provide the Company with a completed Iowa Declaration of Value Statement to be submitted with the deed. The current form of the Declaration can be downloaded online at: https://tax.iowa.gov

10. Provide the Company with a completed Iowa Groundwater Hazard Statement to be submitted with the deed. The current form of this Statement can be downloaded online at the DNR website: http://www.iowadnr.gov

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice: the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030019 (5-11-17) | Page 7 of 10 | | ALTA Commitment for Title Insurance (8-1-16) Iowa |

11.    If the property has a private septic system, provide the buyer with a copy of the complete Iowa Time of Transfer Inspection completion or a certificate of inspection based on the DNR website: http://www.iowadnr.gov

12.    Mortgage from Pure Prairie Farms, to [a legal entity to be determined] in the amount of $ 1,000,000.00.

13.    Release of Exception No(s) 13 under Schedule B, Section Two, to be recorded in the public records.

14.    Prior to closing, the Company must confirm whether the county recording office in which the Land is located has changed its access policies due to the COVID-19 outbreak.  If recording has been restricted, specific underwriting approval is required; and, additional requirements or exceptions may be made.

15.    Additional requirements to be determined.

16.    A search of the records disclosed a Bankruptcy filed August 10, 2020 in the Eastern District of California as Case No. 2020-12633, recorded August 18, 2020, as Document No. 2020-1942. Filed by Simply Essentials, LLC, a Delaware limited liability company. Submit the Bankruptcy documents to the Company for examination and possible further requirements.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

First American

**Schedule BI & BII (Cont.)**

ALTA Commitment for Title Insurance

ISSUED BY

First American Title Insurance Company

File No: NCS-1015327-MPLS

Commitment No.: NCS-1015327-MPLS

SCHEDULE B, PART II

Exceptions

1. Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the Public Records, or attaching subsequent to the Commitment Date but prior to the date the Proposed Insured acquires for value the Title or Mortgage covered by this Commitment.

2. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the Public Records.

3. Any facts, rights, interests, or claims which are not shown by the Public Records but which could be ascertained by an inspection of the Land or by making inquiry of persons in possession thereof.

4. Easements, or claims of easement, not shown by the Public Records.

5. Any lien, or right to lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the Public Records.

6. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records.

7. Real estate taxes for fiscal year 2020-2021, payable in the year 2021-2022, in the total amount of $82,234.00.
   The first half installment is unpaid, with penalty.
   The second half installment is unpaid.
   Current tax parcel number: 110142800500.

   Note: Taxes for 2019-2020, payable 2020-2021, in the amount of $44,652.00 are past due with penalty.

8. Special assessments, if any, not yet certified to the County Treasurer

9. Rights reserved by the Illinois Central Railroad Company, an Illinois corporation, in Quit Claim Deed dated May 23, 1972, recorded August 17, 1972, in Book 71, Page 142-4.

10. Terms and conditions of Resolution No. 16-09 (BOA) Granting Special Use for Property located at 901 N. Main St., recorded November 23, 2009 as Instrument No. 2009-3211.

11. Easement for utility purposes, together with the rights incidental thereto, in as reserved by the City of Charles City in Ordinance No. 1055, an Ordinance vacating a portion of Floyd Street, recorded June 7, 2011, as Instrument No. 2011-1274.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

12. ~~as of Survey filed October 10, 1900, in Amendment 2000 0629.~~

13. Mortgage, Security Agreement, Assignment of Leases and Rents, and Fixture Filing executed by Simply Essentials, LLC, a Delaware limited liability company to Bank of the West, dated June 27, 2017, recorded June 28, 2017, as Document No. 2017 1216, securing the original amount of $15,000,000.00, and any other amounts which may become due and payable under the terms thereof.

Assignment of above Mortgage, Security Agreement, Assignment of Leases and Rents, and Fixture Filing to U. S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation Programs, dated June 27, 2017, recorded June 30, 2017, as Document No. 2017 1227.

14. Rights of the Public, State of Iowa, County of Floyd, in and to that portion of the land taken or used for road purposes, whether by easement or fee title.

15. Any claim that the Title is subject to a trust or lien created under The Perishable Agricultural Commodities Act, 1930 (7 U.S.C. §§499a, et seq.) or the Packers and Stockyards Act (7 U.S.C. §§181 et seq.) or under similar state laws.

16. Rights of way for railroads, switch tracks or spur tracks, if any, and right of the railroad company to the use, operation, maintenance and repair of same.

17. Rights of tenants under unrecorded leases.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| | |
|---|---|
| **First American** | ISSUED BY |
| **Commitment** | First American Title Insurance Company |
| | File No: NCS-1015327-1-MPLS |

## COMMITMENT FOR TITLE INSURANCE

### Issued By

### *FIRST AMERICAN TITLE INSURANCE COMPANY*

### NOTICE

IMPORTANT-READ CAREFULLY: THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

### COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and the Commitment Conditions, *First American Title Insurance Company*, a Nebraska Corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Policy Amount and the name of the Proposed Insured.

If all of the Schedule B, Part I-Requirements have not been met within six months after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

**First American Title Insurance Company**

Dennis J. Gilmore, President

Greg L. Smith, Secretary

If this jacket was created electronically, it constitutes an original document.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This page is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030019 (5-11-17) | Page 1 of 8 | | ALTA Commitment for Title Insurance (8-1-16)<br>Iowa |
|---|---|---|---|

1. DEFINITIONS
   (a) **"Knowledge" or "Known": Actual or imputed** knowledge, but not constructive notice imparted by the Public Records.
   (b) **"Land":** The land described in Schedule A and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.
   (c) **"Mortgage":** A mortgage, deed of trust, or other security instrument, including one evidenced by electronic means authorized by law.
   (d) **"Policy":** Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.
   (e) **"Proposed Insured":** Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.
   (f) **"Proposed Policy Amount":** Each dollar amount specified in Schedule A as the Proposed Policy Amount of each Policy to be issued pursuant to this Commitment.
   (g) **"Public Records":** Records established under state statutes at the Commitment Date for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge.
   (h) **"Title":** The estate or interest described in Schedule A.

2. If all of the Schedule B, Part I—Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

3. The Company's liability and obligation is limited by and this Commitment is not valid without:
   (a) the Notice;
   (b) the Commitment to Issue Policy;
   (c) the Commitment Conditions;
   (d) Schedule A;
   (e) Schedule B, Part I—Requirements;
   (f) Schedule B, Part II—Exceptions; and
   (g) a counter-signature by the company or its issuing agent that may be in electronic form.

4. **COMPANY'S RIGHT TO AMEND**
   The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company shall not be liable for any other amendment to this Commitment.

5. LIMITATIONS OF LIABILITY
   (a) **The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended** Commitment, resulting **from the Proposed Insured's good faith reliance to:**
       (i) comply with the Schedule B, Part I—Requirements;
       (ii) **eliminate, with the Company's written consent, any Schedule B, Part II—Exceptions; or**
       (iii) acquire the Title or create the Mortgage covered by this Commitment.
   (b) The Company shall not be liable under Commitment Condition 5(a) if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.
   (c) The Company will only have liability under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.
   (d) **The Company's liability shall not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and** described in Commitment Conditions 5(a)(i) through 5(a)(iii) or the Proposed Policy Amount.
   (e) The Company shall not be liable for the content of the Transaction Identification Data, if any.
   (f) In no event shall the Company be obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I—Requirements have been met to the satisfaction of the Company.
   (g) **In any event, the Company's liability is limited** by the terms and provisions of the Policy.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

6.  LIABILITY OF COMPANY MUST BE BASED ON THIS COMMITMENT

(a)  Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.

(b)  Any claim must be based in contract and must be restricted solely to the terms and provisions of this Commitment.

(c)  Until the Policy is issued, this Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.

(d)  The deletion or modification of any Schedule B, Part II—Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.

(e)  Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.

(f)  When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

7.  IF THIS COMMITMENT HAS BEEN ISSUED BY AN ISSUING AGENT

The issuing agent is the **Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for the purpose of providing closing or settlement services.**

8.  PRO-FORMA POLICY

The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

9.  ARBITRATION

The Policy contains an arbitration clause. All arbitrable matters when the Proposed Policy Amount is $2,000,000 or less shall be arbitrated at the option of either the Company or the Proposed Insured as the exclusive remedy of the parties. A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030019 (5-11-17) | Page 3 of 8 | ALTA Commitment for Title Insurance (8-1-16) Iowa |
|---|---|---|

| First American | ALTA Commitment for Title Insurance |
|---|---|
| **Schedule A** | ISSUED BY<br><br>First American Title Insurance Company<br><br>File No: NCS-1015327-1-MPLS |

*Transaction Identification Data for reference only:*

Issuing Agent: First American Title Insurance Company
National Commercial Services
Commitment No.: NCS-1015327-1-MPLS

Issuing Office: 121 South 8th Street, Suite 1250,
Minneapolis, MN 55402
Issuing Office File No.: NCS-1015327-1-MPLS

Property Address: 300 Lawler Street, Charles City, IA 50616

Revision No.:

### SCHEDULE A

1.  Commitment Date: November 29, 2021 at 7:30 AM

2.  Policy to be issued:

    (a)  ALTA®  Owner's Policy

        Proposed Insured: To Be Determined
        Proposed Policy Amount: $1,000.00

    (b)  2006 ALTA®  Lender's Policy

        Proposed Insured: To Be Determined
        Proposed Policy Amount: $1,000.00

3.  The estate or interest in the Land described or referred to in this Commitment is

    Fee Simple

4.  The Title is, <u>at the Commitment Date, vested in</u>:

    Simply Essentials, LLC, a Delaware limited liability company

5.  The Land referred to in this Commitment is described as follows:

    Real property in the City of Charles City, County of Floyd, State of Iowa, described as follows:

    Parcels A and B as depicted on Boundary Survey filed October 22, 2007, as Instrument No. 2007
    2619, being part of Blocks 138 and 139 and vacated Lane and Lawler streets all in the Lane's
    Addition to St. Charles, Floyd County, Iowa.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030019 (5-11-17) | Page 4 of 8 | ALTA Commitment for Title Insurance (8-1-16)<br>Iowa |
|---|---|---|

ALTA Commitment for Title Insurance

**First American**

ISSUED BY

First American Title Insurance Company

File No: NCS-1015327-1-MPLS

# Schedule BI & BII

Commitment No.: NCS-1015327-1-MPLS

SCHEDULE B, PART I

Requirements

All of the following Requirements must be met:

1.   The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

2.   Pay the agreed amount for the estate or interest to be insured.

3.   Pay the premiums, fees, and charges for the Policy to the Company.

4.   Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

5.   The standard form of Seller's and/or Purchaser's Affidavit, satisfactory to the Company, is required.

6.   Deed from Simply Essentials, LLC, a Delaware limited liability company, to To Be Determined.

7.   In regard to Simply Essentials, LLC, a Delaware limited liability company, we require the following:

A)  Furnish a copy of the Articles of Organization and the Operating Agreement.
B)  Furnish a Certificate of Good Standing from the Delaware Secretary of State's office.
C)  Furnish a resolution of the members authorizing the proposed transaction.
D)  The proposed transaction should be executed by all the members of the LLC unless provided otherwise in the operating agreement. If the members of the above referenced limited liability company are entities other than individuals, additional requirements will be made.

8.   Provide the Company with a completed Iowa Declaration of Value Statement to be submitted with the deed. The current form of the Declaration can be downloaded online at: https://tax.iowa.gov

9.   Provide the Company with a completed Iowa Groundwater Hazard Statement to be submitted with the deed. The current form of this Statement can be downloaded online at the DNR website: http://www.iowadnr.gov

10.  If the property has a private septic system, provide the Company with a copy of the completed Iowa Time of Transfer Inspection completed by a certified inspector listed on the DNR website: http://www.iowadnr.gov

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030019 (5-11-17) | Page 5 of 8 | | ALTA Commitment for Title Insurance (8-1-16) Iowa |

11.    Restored mortgage Row 13-Be reinstated a mortgage to the proposed insured on Schedule A, No. 2(b) as mortgagee.

12.    A search of the records disclosed a Bankruptcy filed August 10, 2020 in the Eastern District of California as Case No. 2020-12633, recorded August 18, 2020, as Document No. 2020-1942. Filed by Simply Essentials, LLC, a Delaware limited liability company. Submit the Bankruptcy documents to the Company for examination and possible further requirements.

13.    Satisfaction or release of Mortgage at item 22 of Schedule B, Part II.

14.    Prior to closing, the Company must confirm whether the county recording office in which the Land is located has changed its access policies due to the COVID-19 outbreak. If recording has been restricted, specific underwriting approval is required: and, additional requirements or exceptions may be made.

15.    Additional requirements to be determined.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030019 (5-11-17) | Page 6 of 8 | ALTA Commitment for Title Insurance (8-1-16) Iowa |

| | ALTA Commitment for Title Insurance |
|---|---|
| First American | ISSUED BY |
| Schedule BI & BII (Cont.) | First American Title Insurance Company |
| | File No: NCS-1015327-1-MPLS |

Commitment No.: NCS-1015327-1-MPLS

SCHEDULE B, PART II

Exceptions

THIS COMMITMENT DOES NOT REPUBLISH ANY COVENANT, CONDITION, RESTRICTION, OR LIMITATION CONTAINED IN ANY DOCUMENT REFERRED TO IN THIS COMMITMENT TO THE EXTENT THAT THE SPECIFIC COVENANT, CONDITION, RESTRICTION, OR LIMITATION VIOLATES STATE OR FEDERAL LAW BASED ON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN.

The Policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1. Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I-Requirements are met.

2. Rights or claims of parties in possession not shown by the Public Records.

3. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the Public Records.

4. Any facts, rights, interests or claims which are not shown by the Public Records, but which could be ascertained by an inspection of the Land or by making inquiry of persons in possession thereof.

5. Easements, claims of easement or encumbrances which are not shown by the Public Records.

6. Any lien or right to a lien for services, labor, material or equipment, unless such lien is shown by the Public Records at Date of Policy and not otherwise excepted from coverage herein.

7. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records.

8. Real estate taxes for fiscal year 2020-2021, payable in the year 2021-2022, in the total amount of $12,758.00.
   The first half installment unpaid, plus penalty.
   The second half installment unpaid.
   Current tax parcel number: 120630100700.

   Note: 2019-2020 taxes, payable 2020-2021 are unpaid in the amount of $10,668.00, plus penalty.

9. Special assessments, if any, not yet certified to the County Treasurer

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

10. Reserved in Mines Rights and Easements as contained in Deed dated August 14, 1972, recorded
    September 27, 1972, in Book 90, at Page 393.

11. Terms and conditions of and easements as contained in Memorandum of Easement dated March 20,
    2007, recorded April 18, 2007, as Document No. 2007-0879.

12. Certificate of No Further Action regarding underground storage tank dated May 2, 2011, recorded
    May 13, 2011, as Document No. 2011-1075.

13. Certificate of No Further Action regarding underground storage tank dated May 2, 2011, recorded
    May 2, 2011, as Document No. 2011-1076.

14. Certificate of No Further Action regarding underground storage tank dated May 2, 2011, recorded
    May 13, 2011, as Document No. 2011-1077.

15. Lease between Charles City Area Development Corporation, Lessor, and J & P Express, Lessee, as
    evidenced by Property Lease Agreement Addendum dated June 22, 2011, recorded July 8, 2011, as
    Document No. 2011-1488.

16. Certificate of No Further Action regarding underground storage tank dated September 19, 2011,
    recorded September 22, 2011, as Document No. 2011-2066.

17. Certificate of No Further Action regarding underground storage tank dated September 13, 2011,
    recorded September 22, 2011, as Document No. 2011-2032.

18. Certificate of No Further Action regarding underground storage tank dated September 13, 2011,
    recorded September 22, 2011, as Document No. 2011-2033.

19. Certificate of No Further Action regarding underground storage tank dated September 13, 2011,
    recorded September 22, 2011, as Document No. 2011-2034.

20. Certificate of No Further Action regarding underground storage tank dated February 9, 2015,
    recorded February 18, 2015, as Document No. 2015-0370.

21. Terms and conditions of Resolution No. 05-16 Granting Special Use dated January 18, 2018, recorded
    January 22, 2018, as Document No. 2018-0153.

22. Mortgage dated July 16, 2019, recorded July 17, 2019, as Document No. 2019-1433, executed by
    Simply Essentials, LLC, a Delaware limited liability company, Borrower, in favor of Pitman Farms, a
    California corporation, Lender, in the amount of $5,000,000.00.

23. Rights of tenants under unrecorded leases.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2006-2016 American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

Form No. 1402.06
ALTA Owner's Policy (6-17-06)
1100302P050600



Policy Page 1
Policy Number: 1015327

# OWNER'S POLICY OF TITLE INSURANCE

ISSUED BY

## First American Title Insurance Company

**Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at the address shown in Section 18 of the Conditions.**

### COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS, FIRST AMERICAN TITLE INSURANCE COMPANY, a Nebraska corporation (the "Company") insures, as of Date of Policy and, to the extent stated in Covered Risks 9 and 10, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.
2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from
   (a) A defect in the Title caused by
      (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
      (ii) failure of any person or Entity to have authorized a transfer or conveyance;
      (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
      (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;
      (v) a document executed under a falsified, expired, or otherwise invalid power of attorney;
      (vi) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
      (vii) a defective judicial or administrative proceeding.
   (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.
   (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.
3. Unmarketable Title.
4. No right of access to and from the Land.
5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (a) the occupancy, use, or enjoyment of the Land;
   (b) the character, dimensions, or location of any improvement erected on the Land;
   (c) the subdivision of land; or
   (d) environmental protection
   if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.
6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.
7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.
8. Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.
9. Title being vested other than as stated in Schedule A or being defective
   (a) as a result of the avoidance in whole or in part, or from a court order providing an alternative remedy, of a transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction vesting Title as shown in Schedule A because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or
   (b) because the instrument of transfer vesting Title as shown in Schedule A constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of the failure of its recording in the Public Records
      (i) to be timely, or
      (ii) to impart notice of its existence to a purchaser for value or to a judgment or lien creditor.
10. Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 9 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this policy, but only to the extent provided in the Conditions.

### First American Title Insurance Company

Dennis J Gilmore, President

Greg L Smith, Secretary

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 2
Policy Number: 1015327

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risks 9 and 10); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
   (a) a fraudulent conveyance or fraudulent transfer; or
   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

**CONDITIONS**

**1. DEFINITION OF TERMS**

The following terms when used in this policy mean:
(a) "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b), or decreased by Sections 10 and 11 of these Conditions.
(b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.
(c) "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.
(d) "Insured": The Insured named in Schedule A.
   (i) The term "Insured" also includes
      (A) successors to the Title of the Insured by operation of law as distinguished from purchase, including heirs, devisees, survivors, personal representatives, or next of kin;
      (B) successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;
      (C) successors to an Insured by its conversion to another kind of Entity;
      (D) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title
         (1) if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,
         (2) if the grantee wholly owns the named Insured,
         (3) if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity, or
         (4) if the grantee is a trustee or beneficiary of a trust created by a written instrument established by the Insured named in Schedule A for estate planning purposes.

(ii) With regard to (A), (B), (C), and (D) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured.
(e) "Insured Claimant": An Insured claiming loss or damage.
(f) "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.
(g) "Land": The land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.
(h) "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.
(i) "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.
(j) "Title": The estate or interest described in Schedule A.
(k) "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

**2. CONTINUATION OF INSURANCE**

The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

**3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT**

The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured hereunder of any claim of title or interest that is adverse to the Title, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title, as insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

**4. PROOF OF LOSS**

In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

**5. DEFENSE AND PROSECUTION OF ACTIONS**

(a) Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.
(b) The Company shall have the right, in addition to the options contained in

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 3
Policy Number: 1015327

Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

(c) Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

## 6. DUTY OF INSURED CLAIMANT TO COOPERATE

(a) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b) The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

## 7. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY

In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance.
To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay.
Upon the exercise by the Company of this option, all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in this subsection, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b) To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.

(i) To pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

(ii) To pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs,

attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

## 8. DETERMINATION AND EXTENT OF LIABILITY

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the lesser of
(i) the Amount of Insurance; or
(ii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy.

(b) If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title, as insured,
(i) the Amount of Insurance shall be increased by 10%, and
(ii) the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c) In addition to the extent of liability under (a) and (b), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

## 9. LIMITATION OF LIABILITY

(a) If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title, as insured.

(c) The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

## 10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY

All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment.

## 11. LIABILITY NONCUMULATIVE

The Amount of Insurance shall be reduced by any amount the Company pays under any policy insuring a Mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject, or which is executed by an Insured after Date of Policy and which is a charge or lien on the Title, and the amount so paid shall be deemed a payment to the Insured under this policy.

## 12. PAYMENT OF LOSS

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

## 13. RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT

(a) Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.
If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 4
Policy Number: 1015327

(b) The Company's right of subrogation includes the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

## 14. ARBITRATION

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

## 15. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT

(a) This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage that arises out of the status of the Title or by any action asserting such claim shall be restricted to this policy.

(c) Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d) Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

## 16. SEVERABILITY

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

## 17. CHOICE OF LAW; FORUM

(a) Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefore in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.
Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b) Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

## 18. NOTICES, WHERE SENT

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at 1 First American Way, Santa Ana, CA 92707, Attn: Claims Department.

# POLICY OF TITLE INSURANCE



Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 5
Policy Number: 1015327

# SCHEDULE A

## *First American Title Insurance Company*

Name and Address of the issuing Title Insurance Company:
First American Title Insurance Company
121 South 8th Street, Suite 1250
Minneapolis, MN 55402

File No.: **NCS-1015327-MPLS**                    Policy No.: **1015327**

Address Reference: 901 North Main St. and 300 Lawler St. , Charles City, IA

Amount of Insurance:  $2,500,000.00
Date of Policy:  December 23, 2021 at 9:58 a.m.

1.    Name of Insured:

    Pure Prairie Farms, Inc., a Minnesota corporation

2.    The estate or interest in the Land that is insured by this policy is:

    Fee Simple

3.    Title is vested in:

    Pure Prairie Farms, Inc., a Minnesota corporation

4.    The Land referred to in this policy is described as follows:

    Real property in the City of Charles City, County of Floyd, State of Iowa, described as follows:

    Parcel 1:

    Lots One, Two, Eight, Nine and Ten (1, 2, 8, 9 & 10), Block One Hundred Forty-Nine (149) and Lots
    Three, Four and Five (3, 4 & 5) of Detwiler's Subdivision of Lots Three (3), Four (4) and Five (5),
    Block One Hundred Forty-Nine (149), all in Lane's addition to St. Charles, now incorporated in and as
    a part of Charles City, Iowa - this includes the Northerly 198 feet of Vacated alley, Block 149, Lane's
    addition to St. Charles, now incorporated in and as a Part of Charles City, Floyd County, Iowa.

    and

    That Part of Lots Six (6) and Seven (7), Block One Hundred Forty-Nine (149), Lane's addition and
    that Part of Lots Eleven (11), Twelve (12), Thirteen (13), and Fourteen (14), Detwiler's Subdivision of
    Lots Three (3), Four (4), and Five (5) of Block One Hundred Forty-Nine (149), Lane's addition and
    the Vacated alley in Block 149, Lane's addition to St. Charles, now incorporated as the City of Charles
    City, Floyd County, Iowa, described as follows:

    Beginning at the Northerly corner of Said Lot Seven (7), thence South Fifty-Six (56) degrees, Thirty
    (30) minutes East, Two Hundred Sixty-Four (264.00) feet; thence South Thirty-Three (33) degrees,
    Thirty (30) minutes West 79.30 feet; thence Northwesterly along a 794.02 foot radius curve concave
    Northeasterly 265.60 feet, said curve having a long chord of North 54 degrees, 16 minutes 12
    seconds West 264.20 feet; thence North 33 Degrees, 30 minutes East 69.02 feet to the place of
    beginning,

    and

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 6
Policy Number: 1015327

The Southeasterly 10 feet of Jackson Street abutting Lots 7, 8, 9, 10 and abutting the Northerly 3.02 feet of Lot 6; all in Block 149, of Lane's addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

and

The Southwesterly 15 feet of Floyd Street abutting Lot 10 in Block 149 of Lane's addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

and

All that Part of Block One Hundred Forty-Eight (148) in Lane's addition to St. Charles, Charles City, Floyd County, Iowa, lying North of a line drawn Seventeen and Five-Tenths (17.5) feet Northeasterly of and parallel with the Southwesterly lines of Lots Nos. Two (2) and Nine (9), in said Block, and Lying South of line drawn Fifty-Three (53) feet South of and parallel with the centerline of the Chicago, Milwaukee, St. Paul and Pacific Railroad right of way.

Also described as: All that part of Lots 1, 2, and 9, in Block 148, Lane's addition to St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, lying North of a line drawn Seventeen and Five-Tenths feet Northeasterly from and Parallel to the Southwesterly line of said Lots 2 and 9, and Lying South of a line drawn Fifty-Three feet South of and parallel to the center line of the Chicago, Milwaukee and St. Paul Railroad right of way.

and

The Southwesterly Seventeen and one-half feet (SWly 17 1/2) of Lots Two and Nine (2 & 9), of Block One Hundred Forty-Eight (148), Lane's addition to St. Charles, now a part of Charles City, Floyd County, Iowa, which is South of the right of way of the Chicago, Milwaukee, St. Paul and Pacific Railway.

and

That Part of Lots Seven and Eight (7 & 8), lying between the right of ways of Illinois Central Railroad Company and the Chicago, Milwaukee and St. Paul Railroad Co., Except the Charles City Western Railway Company Right of Way, all Located in Block One Hundred Forty-Eight (148), in Lane's addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa.

and

Lot Three (3), and all that part of Lot Four (4), lying between Lot Three (3) and the right of way of the Dubuque and Sioux City Railroad Company, (The Dubuque and Sioux City Railroad Company right of way now being the right of way of the Illinois Central Railroad Company), all in Block One Hundred Forty-Eight (148), in Lane's addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa.

and

All of Vacated Jackson Street lying Southwesterly of the Southwest boundary of Floyd Street and Northeasterly of the Northeast boundary of Lane Street in Lane's addition to St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, except the Southeasterly 10 feet of Jackson Street abutting Lots 7, 8, 9, 10 and abutting the Northerly 3.02 feet of Lot 6; in Block 149, of Lane's addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

and

The South One-Half of all that portion of Floyd Street lying Northwesterly of the Northwest right of way boundary of Main Street and East of the Westerly right of way line extended of vacated Jackson Street and the south boundary line of the Iowa, Chicago and Eastern Railroad right of way, Except

Case 24-32426    Doc 13    Filed 09/20/24    Entered 09/20/24 18:21:42    Desc Main
Document        Page 408 of 528

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 7
Policy Number: 1015327

that portion thereof previously vacated by the City of Charles City and conveyed to the adjoining owner on the South by Quit Claim Deed recorded in Book 95, page 305 in the office of the Floyd County Recorder.

Parcel 2:

Parcel "A": Lots 1 and 2, Subdivision of Lot 11, Block 139, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa.

Parcel "B": A part of Blocks 138 and 139, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa, being more particularly described as follows: Beginning at the Northeast corner of Lot 4, of said Block 138, thence SOO° 29' 23" E along the Westerly right of way of "E" Street to a point 36 foot distant from the centerline of the Illinois Central railroad track, 451.10 feet; thence S89° 26' 59" W along a line 36 foot distant and parallel to the said centerline of railroad track 330.49 feet to the Easterly right of way of "D" Street; thence N88° 48' 52" W, 66.03 feet to the Westerly right of way of said "ID" Street and 38 foot distant from said centerline of railroad track; thence N77° 15' 01" W, 456.98 feet to a point on the North line of Lot 13, of said Block 139 (also being the North line of Lot 7, Cheney's Sub division); thence S89° 27' 58" W along said North line of Lot 13 (also being along the North line of Lots 7, 8 and 9 of said Cheney's sub-division), 141.19 feet to the East line of the West half of original Lot 12 of said Block 139; thence NOW 35' 54" W along said East line of the West half Lot 12 and along West line of vacated Lawler Street, 212.80 feet to the North right of way line of said Lawler Street; thence S89° 38' 46" W along said North right of way 14.17 feet; thence NOO° 35' 54" W, 120.00 feet to the South right of way of the Chicago, Milwaukee & St. Paul railroad; thence N89° 38' 46" E along said railroad, 600.00 feet to the West right of way of vacated "D" Street; thence, continuing along said railroad, N78° 19' 09" E, 67.25 feet to the Northwest corner of Lot 41, of said Block 138; thence N89° 25' 24" E, continuing along said railroad also being along the North line of said Lots 41 and 4, 331.34 feet to the point of beginning.

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 8
Policy Number: 1015327

# SCHEDULE B

File No.: **NCS-1015327-MPLS**

Policy No.: **1015327**

## EXCEPTIONS FROM COVERAGE

This Policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

1. Real Estate Taxes and Assessments for the second half of the fiscal year 2020-2021 payable in 2022 and thereafter.

2. Rights reserved by the Illinois Central Railroad Company, an Illinois corporation, in Quit Claim Deed dated May 23, 1972, recorded August 17, 1972, in Book 71, Page 142-4. (Parcel 1)

3. Terms and conditions of Resolution No. 16-09 (BOA) Granting Special Use for Property located at 901 N. Main St., recorded November 23, 2009 as Instrument No. 2009-3211. (Parcel 1)

4. Easement for utility purposes, together with the rights incidental thereto, in as reserved by the City of Charles City in Ordinance No. 1055, an Ordinance vacating a portion of Floyd Street, recorded June 7, 2011, as Instrument No. 2011-1274. (Parcel 1)

5. Plat of Survey, filed October 10, 2006, as Instrument No. 2006-2579. (Parcel 1)

6. Rights of the Public, State of Iowa, and County of Floyd, in and to that portion of the land taken or used for road purposes, whether by easement or fee title. (Parcel 1)

7. Rights of way for railroads, switch tracks or spur tracks, if any, and right of the railroad company to the use, operation, maintenance and repair of same.

8. Reservation of mineral rights and easements as contained in Deed dated August 10, 1972, recorded September 27, 1972, in Book 98 LD, Page 393. (Parcel 2)

9. Terms and conditions of the Memorandum of Easement dated March 20, 2007, recorded April 18, 2007, as Document No. 2007-0879. (Parcel 2)

10. Certificate of No Further Action regarding underground storage tank dated May 2, 2011, recorded May 13, 2011, as Document No. 2011-1075. (Parcel 2)

11. Certificate of No Further Action regarding underground storage tank dated May 2, 2011, recorded May 2, 2011, as Document No. 2011-1076. (Parcel 2)

12. Certificate of No Further Action regarding underground storage tank dated May 2, 2011, recorded May 13, 2011, as Document No. 2011-1077. (Parcel 2)

13. Certificate of No Further Action regarding underground storage tank dated September 19, 2011, recorded September 22, 2011, as Document No. 2011-2066. (Parcel 2)

14. Certificate of No Further Action regarding underground storage tank dated September 13, 2011, recorded September 22, 2011, as Document No. 2011-2032. (Parcel 2)

Case 24-32426    Doc 13    Filed 09/20/24    Entered 09/20/24 18:21:42    Desc Main
Document      Page 410 of 528
Form No. 1402.06
ALTA Owner's Policy (6-17-06)
Policy Page 9
Policy Number: 1015327

15. Certificate of No Further Action regarding underground storage tank dated September 13, 2011, recorded September 22, 2011, as Document No. 2011-2033. (Parcel 2)

16. Certificate of No Further Action regarding underground storage tank dated September 13, 2011, recorded September 22, 2011, as Document No. 2011-2034. (Parcel 2)

17. Certificate of No Further Action regarding underground storage tank dated February 9, 2015, recorded February 18, 2015, as Document No. 2015-0370. (Parcel 2)

18. Terms and conditions of Resolution No. 05-16 Granting Special Use dated January 18, 2018, recorded January 22, 2018, as Document No. 2018-0153. (Parcel 2)

19. This item has been intentionally deleted.

20. Any claim that the Title is subject to a trust or lien created under The Perishable Agricultural Commodities Act, 1930 (7 U.S.C. §§499a, et seq.) or the Packers and Stockyards Act (7 U.S.C. §§181 et seq.) or under similar state laws.

21. Mortgage, Assignment of Leass and Rents and Security Agreement dated December 17, 2021 between Pure Prairie Farms Inc. as Mortgagor, and Michael Helgeson as Mortgagee, in the original principal amount of $7,000,000.00, and recorded December 23, 2021, as Instrument No. 2021 3156.

22. Survey as to Parcel 1 prepared by Sayre Associates , dated December 17, 2021, last revise February 9, 2022, under Job No. /project #22932, shows the following:

    a. Encroachment of building into parcel of real estate northerly adjacent to Parcel 1;

    b. There appear to be overlaps, ambiguities and discrepancies in the legal description of Parcel 1 which should be corrected by recording an Affidavit of Possession and a Plat of Survey;

    c. Encroachment over the northerly adjacent parcel for access purposes to North Main Street without benefit of an easement;

    d. Building encroaches into the easement referenced in Exception 4 herein (2011-1274); and

    e. Encroachment of concrete pad into parcel of real estate northerly adjacent to Parcel 1.

23. Survey as to Parcel 2 prepared by Sayre Associates , dated January 3, 2022, last revised February 9, 2022, under Job No. /project #22932, shows the following:

    a. Pavement encroaches into the parcel of real estate northerly adjacent to Parcel B of Parcel 2; and

    b. Railroad tracks encroach into the southerly portion of Parcel B of Parcel 2.

End of Schedule B

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 10
Policy Number: 1015327

 **First American**

## COVENANTS, CONDITIONS AND RESTRICTIONS - IMPROVED LAND - OWNER'S POLICY ENDORSEMENT

### Issued by

## *First American Title Insurance Company*

Attached to Policy No.: 1015327

File No.: NCS-1015327-MPLS

1. The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For the purposes of this endorsement only:

   a. "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b. "Improvement" means a building, structure located on the surface of the Land, road, walkway, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;

   b. Enforced removal of an Improvement as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

   c. A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a. any Covenant contained in an instrument creating a lease;

   b. any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

   c. except as provided in Section 3.c., any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 11
Policy Number: 1015327

controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date: December 23, 2021

**First American Title Insurance Company**

Dennis J. Gilmore, President

Greg L. Smith, Secretary

| Form 50-10801 (7-1-14) | Page 11 of 23 | ALTA 9.2-06 Covenants, Conditions and Restrictions Improved Land - Owner's Policy (Rev. 4-2-12) |

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 12
Policy Number: 1015327

 **First American**

### ACCESS AND ENTRY
### ENDORSEMENT

#### Issued by

## *First American Title Insurance Company*

Attached to Policy No.: 1015327
As to Parcel 1 only.
File No.: NCS-1015327-MPLS

The Company insures against loss or damage sustained by the Insured if, at Date of Policy (i) Parcel 1 of the Land does not abut and have both actual vehicular and pedestrian access to and from North Main Street and Lane Street (the "Street"), (ii) the Street is not physically open and publicly maintained, or (iii) the Insured has no right to use existing curb cuts or entries along that portion of the Street abutting Parcel 1 of the Land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date: December 23, 2021

**First American Title Insurance Company**

Dennis J. Gilmore, President

Greg L. Smith, Secretary

Form 50-10045 (7-1-14) | Page 12 of 23 | Modified ALTA 17-06 Access and Entry (6-17-06)

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 13
Policy Number: 1015327

 **First American**

## ACCESS AND ENTRY
## ENDORSEMENT

### Issued by

## First American Title Insurance Company

Attached to Policy No.: 1015327
As to Parcel B of Parcel 2 only.
File No.: NCS-1015327-MPLS

The Company insures against loss or damage sustained by the Insured if, at Date of Policy (i) Parcel B of Parcel 2 of  the Land does not abut and have both actual vehicular and pedestrian access to and from E Street (the "Street"), (ii) the Street is not physically open and publicly maintained, or (iii) intentionally deleted.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date: December 23, 2021

**First American Title Insurance Company**

Dennis J. Gilmore, President

Greg L. Smith, Secretary

Form 50-10045 (7-1-14) | Page 13 of 23 | | modified ALTA 17-06 Access and Entry (6-17-06)

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 14
Policy Number: 1015327

 **First American**

## ACCESS AND ENTRY
## ENDORSEMENT

### Issued by

## First American Title Insurance Company

Attached to Policy No.: 1015327
As to Parcel A of Parcel 2 only
File No.: NCS-1015327-MPLS

The Company insures against loss or damage sustained by the Insured if, at Date of Policy (i) Parcel A of Parcel 2 of the Land does not abut and have both actual vehicular and pedestrian access to and from N. Grand Ave. (the "Street"), (ii) the Street is not physically open and publicly maintained, or (iii) intentionally deleted.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date: December 23, 2021

**First American Title Insurance Company**

Dennis J. Gilmore, President

Greg L. Smith, Secretary

| Form 50-10045 (7-1-14) | Page 14 of 23 | | modified ALTA 17-06 Access and Entry (6-17-06) |

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 15
Policy Number: 1015327

 **First American**

### LOCATION ENDORSEMENT

### Issued by

## *First American Title Insurance Company*

Attached to Policy No.: 1015327
As to Parcel 1 only
File No.: NCS-1015327-MPLS

The Company insures against loss or damage sustained by the Insured by reason of the failure of a

1-story Concrete/Metal Building

known as 901 North Main Street, Charles City, IA 50616,

to be located on Parcel 1 of the Land at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date: December 23, 2021

**First American Title Insurance Company**

Dennis J. Gilmore, President

Greg L. Smith, Secretary

| Form 50-10054 (7-1-14) | Page 15 of 23 | | modified ALTA 22-06 Location (6-17-06) |

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 16
Policy Number: 1015327

 **First American**

### LOCATION ENDORSEMENT

### Issued by

## First American Title Insurance Company

Attached to Policy No.: 1015327
As to Parcel B of Parcel 2 only
File No.: NCS-1015327-MPLS

The Company insures against loss or damage sustained by the Insured by reason of the failure of a

1 story metal building

known as 300 Lawler Street, Charles City, IA 50616,

to be located on Parcel B of Parcel 2 of the Land at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date: December 23, 2021

**First American Title Insurance Company**

Dennis J. Gilmore, President

Greg L. Smith, Secretary

| Form 50-10054 (7-1-14) | Page 16 of 23 | | modified ALTA 22-06 Location (6-17-06) |
|---|---|---|---|

First American Title Insurance Company

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 17
Policy Number: 1015327

 *First American*

### SAME AS SURVEY ENDORSEMENT

### Issued by

## *First American Title Insurance Company*

Attached to Policy No.: 1015327
As to Parcel 1 only.
File No.: NCS-1015327-MPLS

The Company insures against loss or damage sustained by the Insured by reason of the failure of Parcel 1 of the Land as described in Schedule A to be the same as that identified on the survey made by Sayre Associates dated December 17, 2021, last revised February 9, 2022, and designated Job No. /project #22932.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date: December 23, 2021

*First American Title Insurance Company*

Dennis J Gilmore, President

Greg L Smith, Secretary

| Form 50-10059 (7-1-14) | Page 17 of 23 | modified ALTA 25-06 Same as Survey (10-16-08) CLTA 116.1-06 (10-16-08) |
|---|---|---|

 **First American**

### SAME AS SURVEY ENDORSEMENT

### Issued by

## *First American Title Insurance Company*

Attached to Policy No.: 1015327
As to Parcel 2 only
File No.: NCS-1015327-MPLS

The Company insures against loss or damage sustained by the Insured by reason of the failure of Parcel 2 of the Land as described in Schedule A to be the same as that identified on the survey made by Sayre Associates dated January 3, 2022, last revised February 9, 2022, and designated Job No. /project #22932.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date: December 23, 2021

*First American Title Insurance Company*

Dennis J. Gilmore, President

Greg L. Smith, Secretary

| Form 50-10059 (7-1-14) | Page 18 of 23 | modified ALTA 25-06 Same as Survey (10-16-08) CLTA 116.1-06 (10-16-08) |
| --- | --- | --- |

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 19
Policy Number: 1015327

 **First American**

### UTILITY ACCESS ENDORSEMENT

### Issued by

## First American Title Insurance Company

Attached to Policy No.: 1015327
As to Parcel 1 only.
File No.: NCS-1015327-MPLS

The Company insures against loss or damage sustained by the Insured by reason of the lack of a right of access to the following utilities or services: **[CHECK ALL THAT APPLY]**

| ☒ Water service | ☐ Natural gas service | ☒ Telephone service |
| ☒ Electrical power service | ☒ Sanitary sewer | ☐ Storm water drainage |
| ☐ | ☐ | ☐ |

either over, under or upon rights-of-way or easements for the benefit of Parcel 1 of the Land because of:

(1) a gap or gore between the boundaries of the Land and the rights-of-way or easements;

(2) a gap between the boundaries of the rights-of-way or easements; or

(3) termination by a grantor, or its successor, of the rights-of-way or easements.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date: December 23, 2021

**First American Title Insurance Company**

Dennis J. Gilmore President

Greg L. Smith, Secretary

Form 50-10047 (7-1-14)    Page 19 of 23                      modified ALTA 17.2-06 Utility Access (10-16-08)

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 20
Policy Number: 1015327

 **First American**

### UTILITY ACCESS ENDORSEMENT

### Issued by

## First American Title Insurance Company

Attached to Policy No.: 1015327
As to Parcel 2 only.
File No.: NCS-1015327-MPLS

The Company insures against loss or damage sustained by the Insured by reason of the lack of a right of access to the following utilities or services: **[CHECK ALL THAT APPLY]**

| | | |
|---|---|---|
| ☒ Water service | ☐ Natural gas service | ☒ Telephone service |
| ☒ Electrical power service | ☒ Sanitary sewer | ☒ Storm water drainage |
| ☐ | ☐ | ☐ |

either over, under or upon rights-of-way or easements for the benefit of the Land because of:

(1) a gap or gore between the boundaries of the Land and the rights-of-way or easements;

(2) a gap between the boundaries of the rights-of-way or easements; or

(3) termination by a grantor, or its successor, of the rights-of-way or easements.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date: December 23, 2021

**First American Title Insurance Company**

Dennis J. Gilmore, President          Greg L. Smith, Secretary

Form 50-10047 (7-1-14)   Page 20 of 23                     modified ALTA 17.2-06 Utility Access (10-16-08)

First American Title Insurance Company

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

Policy Page 21
Policy Number: 1015327



 **First American**

### MULTIPLE TAX PARCELS
### ENDORSEMENT

### Issued by

## *First American Title Insurance Company*

Attached to Policy No.: 1015327

File No.: NCS-1015327-MPLS

The Company insures against loss or damage sustained by the Insured by reason of those portions of the Land identified below not being assessed for real estate taxes under the listed Tax Identification Numbers or those Tax Identification Numbers including any additional land:

| Parcel: | Tax Identification Numbers: |
|---|---|
| Parcel 1 | 110142800500 |
| Parcel 2 | 120630100700 |

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

*First American Title Insurance Company*

Dennis J. Gilmore, President

Greg L. Smith, Secretary

**Copyright 2006–2016 American Land Title Association. All rights reserved.**
The use of this form (or any derivative thereof) is restricted to ALTA licenses and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 50-11226 (8-22-16) | Page 21 of 23 | | ALTA 18.2-06 Multiple Tax Parcels (8-1-16) |
|---|---|---|---|

 *First American*

## POLICY AUTHENTICATION ENDORSEMENT

### Issued by

### *First American Title Insurance Company*

Attached to Policy No.: 1015327

File No.: NCS-1015327-MPLS

When the policy is issued by the Company with a policy number and Date of Policy, the Company will not deny liability under the policy or any endorsements issued with the policy solely on the grounds that the policy or endorsements were issued electronically or lack signatures in accordance with the Conditions.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

*IN WITNESS WHEREOF,* the Company has caused this endorsement to be issued and become valid when signed by an authorized officer or licensed agent of the Company.

Date: December 23, 2021

*First American Title Insurance Company*

Dennis J. Gilmore  President

Greg L. Smith  Secretary

| Form 50-10899 (7-1-14) | Page 22 of 23 | | ALTA 39-06 Policy Authentication (4-2-13)<br>CLTA 142-06 |
| --- | --- | --- | --- |

Form No. 1402.06
ALTA Owner's Policy (6-17-06)

 **First American**

### DELETION OF ARBITRATION CONDITION –
### OWNER'S POLICY ENDORSEMENT

### Issued by

### *First American Title Insurance Company*

Attached to Policy No.: 1015327                              File No.: NCS-1015327-MPLS

The Policy is hereby amended by deleting Paragraph 14 from the Conditions.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date: December 23, 2021

*First American Title Insurance Company*

Dennis J. Gilmore, President                    Greg L. Smith, Secretary

| Form 50-11000 (7-1-14) | Page 23 of 23 | | Deletion of Arbitration Condition - Owner's Policy
For use with ALTA 2006 Owner's Policy |

First American Title Insurance Company

LOCATION: CHARLES CITY, FLOYD COUNTY, IOWA

PREPARED BY AND RETURN TO:
JAMES H. CORDELL
SAYRE ASSOCIATES
216 S. DULUTH AVE
SIOUX FALLS, SD 57104
PHONE: 605-332-7211

SURVEY REQUESTED BY: PURE PRAIRIE FARMS, INC.
CURRENT PROPRIETOR: PURE PRAIRIE FARMS, INC.

Document 2022 0633

Book 2022 Page 0633 Type SURV Pages 3
Date 3/25/2022 Time 11:14 AM
Rec Amt $17.00

INDX
NOTE
SCAN
CHCK
PRNT

AMY M ASSINK, COUNTY RECORDER
FLOYD COUNTY IOWA

## PLAT OF SURVEY

Parcel J in Blocks 148 and 149 of Lane's Addition, Charles City, Iowa and in
Blocks 3 and 4 of Detwiler's Subdivision of Lots 3, 4 and 5 of Block 149, Lane's
Addition, Charles City, Iowa in the NE1/4 of the SE1/4 of Section 1, Township 95
North, Range 16 West of the 5th P.M., City of Charles City, Floyd County, Iowa



### VICINITY MAP

CHARLES CITY, IOWA
NOT-TO-SCALE

### Legend

O  - Denotes rebar set and marked by License No. 17741

●  - Denotes found T-bar w/cap monument

(R) - Record Distance

(M) - Measured Distance

Notes:
The bearing system for this plat is based
on the UTM Zone 15 North.

I hereby certify that this land surveying document was
prepared and the related survey work was performed by me or
under my direct personal supervision and that I am a duly
licensed Land Surveyor under the laws of the State of Iowa.

James H. Cordell                3/22/22

JAMES H. CORDELL   License number 17741   (date)

My license renewal date is December 31, 2023

Pages or sheets covered by this seal: 3



JAMES H.
CORDELL
17741
3/22/2...
IOWA

SHEET 1 OF 3



216 S. Duluth Avenue • Sioux Falls, SD 57104
Phone: (605) 332-7211 • Fax: (605) 332-7222
Engineers • Surveyors

BY; JHC, 23000 Plat of Survey.dwg, PLAT OF SURVEY (1), REV DATE: Mon DD, YYYY, PRINT DATE: Mar 22, 2022

# PLAT OF SURVEY

Parcel J in Blocks 148 and 149 of Lane's Addition, Charles City, Iowa and in Blocks 3 and 4 of Detwiler's Subdivision of Lots 3, 4 and 5 of Block 149, Lane's Addition, Charles City, Iowa in the NE1/4 of the SE1/4 of Section 1, Township 95 North, Range 16 West of the 5th P.M., City of Charles City, Floyd County, Iowa

### LEGAL DESCRIPTION:

**Parcel J** in the NE1/4 of the SE1/4 of Section 1, Township 95 North, Range 16 West of the 5th P.M., City of Charles City, Floyd County, Iowa, more particularly described as follows:

Beginning at the Northeasterly corner of the S1/2 of vacated Floyd Street and the Westerly right-of-way of Main Street;

Thence along the Westerly right-of-way of Main Street S33°19'12" 310.49' to the Northerly right-of-way of the Illinois Central Railroad; thence Northwesterly along a 794.02' radius curve concave Northeasterly 265.10', said curve having a long chord of North 54°24'32"W 263.87'; thence S33°02'52"W 62.86' to the Northerly right-of-way of Lane Street; thence along the Northerly right-of-way of Lane Street N56°41'33" 65.99'; thence N33°15'11"E 76.62' to the Northerly right-of-way of the Illinois Central Railroad; thence Northwesterly along a 794.02' radius curve concave Northeasterly 25.90', said curve having a long chord of North 39°01'52"W 25.090'; thence continuing along said Northerly railroad right-of-way N38°13'50"W 246.82' to the South right-of-way of the Iowa Chicago and Eastern Railroad; thence continuing along the South right-of-way of the Iowa Chicago and Eastern Railroad N89°45'41"E 357.45' to the centerline of vacated Floyd Street; thence along the centerline of vacated Floyd Street S56°37'29"E 290.39' to the Point of Beginning containing 139,242 SF ± and 3.197 Acres ±, subject to any easements of record.



### LINE TABLE

| Line # | Bearing | Distance |
|--------|---------|----------|
| L1 | S33°02'52"W | 62.86' |
| L2 | N56°41'33"E | 65.99' |
| L3 | N33°15'11"E | 79.62' |

### CURVE TABLE

| Curve # | Delta | Radius | Tangent | Length (L) | Length (C) | Chord Direction |
|---------|-------|--------|---------|------------|------------|-----------------|
| C1 | 19°07'46" | 794.02' | 133.79' | 265.10' | 263.87' | N54°24'32"W |
| C2 | 1°52'08" | 794.02' | 12.95' | 25.90' | 25.90' | N39°01'52"W |

## GRAPHIC SCALE

```
0        50      100                200
```
1" = 100'

**SHEET 2 OF 3**

### Notes:
The bearing system for this plat is based on the UTM Zone 15 North.

## Legend

○  - Denotes rebar set and marked by License No. 17741

●  - Denotes found T-bar w/cap monument

(R)  - Record Distance

(M)  - Measured Distance



**Sayre Associates**
Engineers • Surveyors
216 S. Duluth Avenue • Sioux Falls, SD 57104
Phone: (605) 332-7211 • Fax: (605) 332-7222

BY:  JHC, 23000 Plat of Survey.dwg, PLAT OF SURVEY (2), REV DATE: Mon DD, YYYY, PRINT DATE:  Mar 22, 2022

# PLAT OF SURVEY

Parcel J in Blocks 148 and 149 of Lane's Addition, Charles City, Iowa and in
Blocks 3 and 4 of Detwiler's Subdivision of Lots 3, 4 and 5 of Block 149, Lane's
Addition, Charles City, Iowa in the NE1/4 of the SE1/4 of Section 1, Township 95
North, Range 16 West of the 5th P.M., City of Charles City, Floyd County, Iowa

## PREVIOUSLY KNOWN AND DESCRIBED AS:

Lots One, Two, Eight, Nine and Ten (1, 2, 8, 9 & 10), Block One Hundred Forty-Nine (149) and Lots Three, Four and Five (3, 4 & 5) of Detwiler's Subdivision of Lots Three (3), Four (4) and Five (5), Block One Hundred Forty-Nine (149), all in Lane's addition to St. Charles, now incorporated in and as a part of Charles City, Iowa - this includes the Northerly 198 feet of Vacated alley, Block 149, Lane's addition to St. Charles, now incorporated in and as a Part of Charles City, Floyd County, Iowa.

and

That Part of Lots Six (6) and Seven (7), Block One Hundred Forty-Nine (149), Lane's addition and that Part of Lots Eleven (11), Twelve (12), Thirteen (13), and Fourteen (14), Detwiler's Subdivision of Lots Three (3), Four (4), and Five (5) of Block One Hundred Forty-Nine (149), Lane's addition and the Vacated alley in Block 149, Lane's addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa, described as follows:

Beginning at the Northerly corner of Said Lot Seven (7), thence South Fifty-Six (56) degrees, Thirty (30) minutes East, Two Hundred Sixty-Four (264.00) feet; thence South Thirty-Three (33) degrees, Thirty (30) minutes West 79.30 feet; thence Northwesterly along a 794.02 foot radius curve concave Northeasterly 265.60 feet, said curve having a long chord of North 54 degrees, 16 minutes 12 seconds West 264.20 feet; thence North 33 Degrees, 30 minutes East 69.02 feet to the place of beginning,

and

The Southeasterly 10 feet of Jackson Street abutting Lots 7, 8, 9, 10 and abutting the Northerly 3.02 feet of Lot 6; all in Block 149, of Lane's addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

and

The Southwesterly 15 feet of Floyd Street abutting Lot 10 in Block 149 of Lane's addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

And

All that Part of Block One Hundred Forty-Eight (148) in Lane's addition to St. Charles, Charles City, Floyd County, Iowa, lying North of a line drawn Seventeen and Five-Tenths (17.5) feet Northeasterly of and parallel with the Southwesterly lines of Lots Nos. Two (2) and Nine (9), in said Block, and Lying South of line drawn Fifty-Three (53) feet South of and parallel with the centerline of the Chicago, Milwaukee, St. Paul and Pacific Railroad right of way.

Also described as: All that part of Lots 1, 2, and 9, in Block 148, Lane's addition to St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, lying North of a line drawn Seventeen and Five-Tenths feet Northeasterly from and Parallel to the Southwesterly line of said Lots 2 and 9, and Lying South of a line drawn Fifty-Three feet South of and parallel to the center line of the Chicago, Milwaukee and St. Paul Railroad right of way.

and

The Southwesterly Seventeen and one-half feet (SWly 17 1/2) of Lots Two and Nine (2 & 9), of Block One Hundred Forty-Eight (148), Lane's addition to St. Charles, now a part of Charles City, Floyd County, Iowa, which is South of the right of way of the Chicago, Milwaukee, St. Paul and Pacific Railway.

and

That Part of Lots Seven and Eight (7 & 8), lying between the right of ways of Illinois Central Railroad Company and the Chicago, Milwaukee and St. Paul Railroad Co., Except the Charles City Western Railway Company Right of Way, all Located in Block One Hundred Forty-Eight (148), in Lane's addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa.

and

Lot Three (3), and all that part of Lot Four (4), lying between Lot Three (3) and the right of way of the Dubuque and Sioux City Railroad Company, (The Dubuque and Sioux City Railroad Company right of way now being the right of way of the Illinois Central Railroad Company), all in Block One Hundred Forty-Eight (148), in Lane's addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa.

and

All of Vacated Jackson Street lying Southwesterly of the Southwest boundary of Floyd Street and Northeasterly of the Northeast boundary of Lane Street in Lane's addition to St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, except the Southeasterly 10 feet of Jackson Street abutting Lots 7, 8, 9, 10 and abutting the Northerly 3.02 feet of Lot 6; in Block 149, of Lane's addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

and

The South One-Half of all that portion of Floyd Street lying Northwesterly of the Northwest right of way boundary of Main Street and East of the Westerly right of way line extended of vacated Jackson Street and the south boundary line of the Iowa, Chicago and Eastern Railroad right of way, Except that portion thereof previously vacated by the City of Charles City and conveyed to the adjoining owner on the South by Quit Claim Deed recorded in Book 95, page 305 in the office of the Floyd County Recorder.

**SHEET 3 OF 3**

*Sayre*
**Associates**

216 S. Duluth Avenue • Sioux Falls, SD 57104
Phone: (605) 332-7211 • Fax: (605) 332-7222
**Engineers • Surveyors**

# ALTA/NSPS LAND TITLE SURVEY



**VICINITY MAP**

SEC. 1-95-16

**GRAPHIC SCALE**

( IN FEET )

## LEGEND

- PIN FOUND
- FIRE HYDRANT
- STREET LIGHT
- LIGHT POLE
- FLOOD LIGHT
- HISTORICAL LIGHT POLE
- POWER POLE
- TRAFFIC SIGNAL
- POWER BOX
- ROOF DRAIN
- TELEPHONE BOX
- EXISTING MANHOLE
- EXISTING STORM M.H.
- SIGN
- STREET SIGN
- GAS METER
- UTILITY CITY CLOSURE
- GUY WIRE
- FLAG POLE
- GAS VALVE
- WATER SHUTOFF
- WATER VALVE
- OHW — OVERHEAD WIRE
- UP — UNDERGROUND POWER
- UPC — UNDERGROUND POWER (CITY)
- UT — UNDERGROUND TELEPHONE
- FO — FIBER OPTIC
- UTV — UNDERGROUND TELEVISION
- W — WATER LINE
- GAS — GAS LINE
- SS — SANITARY SEWER
- STORM SEWER
- CHAIN LINK FENCE
- BARBED WIRE FENCE
- WOOD FENCE
- EXISTING CURB & GUTTER
- — 100 — EXISTING CONTOUR
- DECIDUOUS TREE
- CONIFEROUS TREE
- CONCRETE SURFACE
- EXISTING BUILDING LINE
- ACCESS AS INDICATED
- RAILROAD SIGNAL

## CURVE TABLE

| Curve # | Delta | Radius | Tangent | Length (L) | Length (C) | Chord Direction |
|---|---|---|---|---|---|---|
| C1 | 1°53'08" | 794.02' | 12.95' | 25.90' | 25.90' | N39°01'52"W |
| C2 | 19°07'40" | 794.02' | 133.79' | 265.10' | 263.87' | N54°24'32"W |

ALTA/NSPS LAND TITLE SURVEY

CHARLES CITY, IA, ALTA UPDATE
901 N. MAIN STREET
CHARLES CITY, FLOYD COUNTY, IOWA

I hereby certify that this land surveying document was prepared and the related survey work was performed by me or under my direct personal supervision and that I am a duly licensed Land Surveyor under the laws of the State of Iowa.

_____
(signature)

JAMES H. CORDELL

License number 17741

My license renewal date is December 31, 2023.

Pages or sheets covered by this seal: 2

2/9/22
(date)

JAMES H. CORDELL
17741

| PROJECT NO.: | 22932 |
|---|---|
| SURVEYED BY: | DLS/EJC |
| CREATED BY: | GRA |
| APPROVED BY: | JHC |
| REVISION DATE: | |

ALTA / NSPS
LAND TITLE SURVEY

# 1 of 2

Sayre Associates

Engineering Solutions

BY: GRA, 22932 BC ALTA West Property.dwg, ALTA, PRINT DATE:  Feb 09, 2022

# ALTA/NSPS LAND TITLE SURVEY

## Legal Description

Real property in the City of Charles City, County of Floyd, State of Iowa, described as follows:

Parcel 1:

Lots One, Two, Eight, Nine and Ten (1, 2, 8, 9 & 10), Block One Hundred Forty-Nine (149) and Lots Three, Four and Five (3, 4 & 5) of Detwiler's Subdivision of Lots Three (3), Four (4) and Five (5), Block One Hundred Forty-Nine (149), all in Lane's addition to St. Charles, now incorporated in and as a part of Charles City, Iowa - this includes the Northerly 198 feet of Vacated alley, Block 149, Lane's addition to St. Charles, now incorporated in and as a Part of Charles City, Floyd County, Iowa.

and

That Part of Lots Six (6) and Seven (7), Block One Hundred Forty-Nine (149), Lane's addition and Part of Lots Eleven (11), Twelve (12), Thirteen (13), and Fourteen (14), Detwiler's Subdivision of Lots Three (3), Four (4), and Five (5) of Block One Hundred Forty-Nine (149), Lane's addition and the Vacated alley in Block 149, Lane's addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa, described as follows:

Beginning at the Northerly corner of Said Lot Seven (7), thence South Fifty-Six (56) degrees, Thirty (30) minutes East, Two Hundred Sixty-Four (264.00) feet; thence South Thirty-Three (33) degrees, Thirty (30) minutes West 79.30 feet; thence Northwesterly along a 794.02 foot radius curve concave Northeasterly 265.60 feet, said curve having a long chord of North 54 degrees, 16 minutes 12 seconds West 264.20 feet; thence North 33 Degrees, 30 minutes East 69.02 feet to the place of beginning.

and

The Southeasterly 10 feet of Jackson Street abutting Lots 7, 8, 9, 10 and abutting the Northerly 3.02 feet of Lot 6; all in Block 149, of Lane's addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

and

The Southwesterly 15 feet of Floyd Street abutting Lot 10 in Block 149 of Lane's addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

And

All that Part of Block One Hundred Forty-Eight (148) in Lane's addition to St. Charles, Charles City, Floyd County, Iowa, lying North of a line drawn Seventeen and Five-Tenths (17.5) feet Northeasterly of and parallel with the Southwesterly lines of Lots Nos. Two (2) and Nine (9), in said Block, and Lying South of line drawn Fifty-Three (53) feet South of and parallel with the centerline of the Chicago, Milwaukee, St. Paul and Pacific Railroad right of way.

Also described as: All that part of Lots 1, 2 and 9, in Block 148, Lane's addition to St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, lying North of a line drawn Seventeen and Five-Tenths feet Northeasterly from and Parallel to the Southwesterly line of said Lots 2 and 9, and Lying South of a line drawn Fifty-Three feet South of and parallel to the center line of the Chicago, Milwaukee and St. Paul Railroad right of way.

and

The Southwesterly Seventeen and one-half feet (SWly 17 1/2) of Lots Two and Nine (2 & 9), of Block One Hundred Forty-Eight (148), Lane's addition to St. Charles, now a part of Charles City, Floyd County, Iowa, which is South of the right of way of the Chicago, Milwaukee, St. Paul and Pacific Railway.

and

That Part of Lots Seven and Eight (7 & 8), lying between the right of ways of Illinois Central Railroad Company and the Chicago, Milwaukee and St. Paul Railroad Co., Except the Charles City Western Railway Company Right of Way, all Located in Block One Hundred Forty-Eight (148), in Lane's addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa.

and

Lot Three (3), and all that part of Lot Four (4), lying between Lot Three (3) and the right of way of the Dubuque and Sioux City Railroad Company, (The Dubuque and Sioux City Railroad Company right of way now being the right of way of the Illinois Central Railroad Company), all in Block One Hundred Forty-Eight (148), in Lane's addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa.

and

All of Vacated Jackson Street lying Southwesterly of the Southwest boundary of Floyd Street and Northeasterly of the Northeast boundary of Lane Street in Lane's addition to St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, except the Southeasterly 10 feet of Jackson Street abutting Lots 7, 8, 9, 10 and abutting the Northerly 3.02 feet of Lot 6; in Block 149, of Lane's addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

and

The South One-Half of all that portion of Floyd Street lying Northwesterly of the Northwest right of way boundary of Main Street and East of the Westerly right of way line extended of vacated Jackson Street and the south boundary line of the Iowa, Chicago and Eastern Railroad right of way, Except that portion thereof previously vacated by the City of Charles City and conveyed to the adjoining owner on the South by Quit Claim Deed recorded in Book 95, page 305 in the office of the Floyd County Recorder.

The property described herein is the same property described in First American Title Insurance Company commitment number NCS-1015327-MPLS bearing an effective date of November 29, 2021 and all easements, covenants and restrictions referenced in said title commitment or apparent from a physical inspection of the site or otherwise known to me have been plotted hereon or otherwise noted as to their effect on the subject property.

## Schedule B - Section 2 Exceptions

Items listed as numbers 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 13, 14, 15 AND 16 in Schedule B - Section 2 exceptions of the title commitment for the subject property prepared by First American Title Insurance Company commitment number NCS-1015327-MPLS bearing an effective date of November 29, 2021 are not survey related items and are not plottable.

11. Easement for utility purposes, together with the rights incidental thereto, in as reserved by the City of Charles City in Ordinance No. 1055, an Ordinance vacating a portion of Floyd Street, recorded June 7, 2011, as Instrument No. 2011-1274. This item is on the subject property and is plotted hereon.

12. Plat of Survey, filed October 10, 2006, as Instrument No. 2006-2579. This item is shown as a part of the property boundary.

## Utility Notes

The utilities shown have been located using field survey information and records made available to us by the respective utility companies at the time this site plan was being prepared. The surveyor makes no guarantee that the utilities shown comprise all such utilities in the area, either in-service or abandoned. The surveyor further does not warrant that the underground utilities shown are in the exact location indicated although the surveyor does certify that they are located as accurately as possible from information available. The exact location of underground utilities must be verified by utility companies prior to any construction by calling the IA one call notification center.

## Flood Zone Information

Said described property is located within an area having a Zone Designation C by the Federal Emergency Management Agency, on Flood Insurance Rate Map No. 4602010005B, with an effective date of October 15, 1985.

## Miscellaneous Notes

1. The accompanying survey was made on the ground and correctly shows the location of all buildings, structures and other improvements situated on the premises; that there are no visible encroachments on the subject property or upon the land abutting said property except as shown.

2. This map or plat and the survey on which it is based were made in accordance with laws regulating surveying in the State of Iowa.

3. Access to the site is provided off N. Main Street and Lane Street all publicly dedicated streets.

4. At the time of the survey the address of the subject property was 901 N. Main Street, Charles City, IA.

5. There are no striped parking spaces on the subject property.

6. There is no record or observed evidence of the site being used as a cemetery.

7. At the time of the survey there was no observable evidence of current earth moving work, building construction or building additions.

8. At the time of the survey there were no proposed changes in street right of way lines or evidence of recent street or sidewalk construction or repairs observed.

## Surveyor's Certification

To: Simply Essentials, LLC, a Delaware Limited Liability Company; Pure Prairie Farms, Inc.; First American Title Insurance Company Title

   This is to certify that this map or plan and the survey on which it is based were made in accordance with the 2021 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys, jointly established and adopted by ALTA and NSPS, and includes Table A Items 1, 2, 3, 4, 7(a), 7(b)(1), 8, 9, 11, 13, 16 and 17 of the Table A thereof. The field work was completed on December 21, 2021.

Date of Plat or Map: December 17, 2021

Signed: _James H. Cordell_

   James H. Cordell
   Land Surveyor Number 17741

Date of field survey:      December 21, 2021
Date of last revision:     None

Survey performed by:
Sayre Associates, Inc.
216 S. Duluth Avenue
Sioux Falls, SD 57104
Phone: 605-332-7211
Fax: 605-332-7222

Sayre Associates

Engineering Solutions

216 S. Duluth Avenue, Sioux Falls, SD 57104
Phone: (605) 332-7211 • Fax: (605) 332-7222

ALTA/NSPS LAND TITLE SURVEY

CHARLES CITY, IA ALTA UPDATE
901 N. MAIN STREET
CHARLES CITY, FLOYD COUNTY, IOWA

| | |
|---|---|
| PROJECT NO.: | 22932 |
| SURVEYED BY: | DLS/EJC |
| CREATED BY: | GRA |
| APPROVED BY: | JHC |
| REVISION DATE: | |
| ALTA / NSPS LAND TITLE SURVEY | |

## 2 of 2

# ALTA/NSPS LAND TITLE SURVEY

**VICINITY MAP**
SEC. 6-95-15

6
SITE

**GRAPHIC SCALE**
100   50   0   50   100   200
( IN FEET )

## LEGEND

- PIN FOUND
- FIRE HYDRANT
- STREET LIGHT
- LIGHT POLE
- FLOOD LIGHT
- HISTORICAL LIGHT POLE
- POWER POLE
- TRAFFIC SIGNAL
- POWER BOX
- ROOF DRAIN
- TELEPHONE BOX
- EXISTING MANHOLE
- EXISTING STORM M.H.
- SIGN
- STREET SIGN
- GAS METER
- UTILITY CLOSURE
- GUY WIRE
- FLAG POLE
- GAS VALVE
- WATER SHUTOFF
- WATER VALVE
- OHW — OVERHEAD WIRE
- UP — UNDERGROUND POWER
- UPC — UNDERGROUND POWER (CITY)
- UT — UNDERGROUND TELEPHONE
- F — FIBER OPTIC
- UTV — UNDERGROUND TELEVISION
- W — WATER LINE
- G — GAS LINE
- S — SANITARY SEWER
- SS — STORM SEWER
- CHAIN LINK FENCE
- BARBED WIRE FENCE
- WOOD FENCE
- EXISTING CURB & GUTTER
- EXISTING CONTOUR
- DECIDUOUS TREE
- CONIFEROUS TREE
- CONCRETE SURFACE
- EXISTING BUILDING LINE
- ACCESS AS INDICATED

**Engineering Solutions**

Sayre Associates
216 S. Duluth Avenue
Sioux Falls, SD 57104
Phone (605) 332-7211 Fax (605) 332-7222

ALTA/NSPS LAND TITLE SURVEY
CHARLES CITY, IA. ALTA UPDATE
300 LAWLER STREET
CHARLES CITY, FLOYD COUNTY, IOWA

## Legal Description

Real property in the City of Charles City, County of Floyd, State of Iowa, described as follows:

Parcel "A": Lots 1 and 2, Subdivision of Lot 11, Block 139, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa.

Parcel "B": A part of Blocks 138 and 139, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa, being more particularly described as follows:

Beginning at the Northeast corner of Lot 4, of said Block 138, thence S00° 29' 23" E along the Westerly right of way of "E" Street to a point 36 foot distant from the centerline of the Illinois Central railroad track, 451.10 feet; thence S89° 26' 59" W along a line 36 foot distant and parallel to the said centerline of railroad track 330.49 feet to the Easterly right of -way of "D" Street; thence N88° 48' 52" W, 66.03 feet to the Westerly right of way of said "D" Street and 36 foot distant from said centerline of railroad track; thence N77° 15' 01" W, 456.98 feet to a point on the North line of Lot 13, of said Block 139 (also being the North line of Lot 7, Cheney's Sub-division); thence S89° 27' 58" W

along said North line of Lot 13 (also being along the North line of Lots 7, 8 and 9 of said Cheney's sub-division), 141.19 feet to the East line of the West half of original Lot 12 of said Block 139; thence N00 35' 54" W along said East line of the West half Lot 12 and along West line of vacated Lawler Street, 212.80 feet to the North right of way line of said Lawler Street; thence S89° 38' 46" W along said North right of way 14.17 feet; thence N00° 35' 54" W, 120.00 feet to the South right of way of the Chicago, Milwaukee & St. Paul railroad; thence N89° 38' 46" E along said railroad, 600.00 feet to the West right of way of vacated "D" Street; thence, continuing along said railroad, N78° 19' 09" E, 67.25 feet to the Northwest corner of Lot 41, of said Block 138; thence N89° 25' 24" E, continuing along said railroad also being along the North line of said Lots 41 and 4, 331.34 feet to the point of beginning.

The property described herein is the same property described in First American Title Insurance Company commitment number NCS-1015327-1-MPLS bearing an effective date of November 29, 2021 and all easements, covenants and restrictions referenced in said title commitment or apparent from a physical inspection of the site or otherwise known to me have been plotted hereon or otherwise noted as to their effect on the subject property.

## Schedule B - Section 2 Exceptions

Items listed as numbers 1, 2, 3, 4, 5, 6, 7, 8, 9, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22 and 23 in Schedule B - Section 2 exceptions of the title commitment for the subject property prepared by First American Title Insurance Company commitment number NCS-1015327-1-MPLS bearing an effective date of November 29, 2021 are not survey related items and are not plottable.

10. Reservation of mineral rights and easements as contained in Deed dated August 10, 1972, recorded September 27, 1972, in Book 98 LD, Page 393. This item is on the subject property and is a blanket easement across the subject property therefore it is not plotted hereon.

11. Terms and conditions of and easements as contained in Memorandum of Easement dated March 20, 2007, recorded April 18, 2007, as Document No. 2007-0879. This item is not on the subject property and is not plotted hereon.

## Utility Notes

The utilities shown have been located using field survey information and records made available to us by the respective utility companies at the time this site plan was being prepared. The surveyor makes no guarantee that the utilities shown comprise all such utilities in the area, either in-service or abandoned. The surveyor further does not warrant that the underground utilities shown are in the exact location indicated although the surveyor does certify that they are located as accurately as possible from information available. The exact location of underground utilities must be verified by utility companies prior to any construction by calling the IA one call notification center.

## Flood Zone Notes

Said described property is located within an area having a Zone Designation X by the Federal Emergency Management Agency, Community Number 190128 on Flood Insurance Rate Map No. 19067C0210E, with an effective date of June 19, 2020.

## Miscellaneous Notes

1.  The accompanying survey was made on the ground and correctly shows the location of all buildings, structures and other improvements situated on the premises, that there are no visible encroachments on the subject property or upon the land abutting said property except as shown.

2.  This map or plat and the survey on which it is based were made in accordance with laws regulating surveying in the Iowa.

3.  Access to the site is provided off N. Grand Street and E Street Street all publicly dedicated streets.

4.  At the time of the survey the address of the subject property was 300 Lawler Street, Charles City, IA 50616.

5.  There are no parking spaces on the subject property.

6.  There is no record or observed evidence of the site being used as a cemetery.

7.  At the time of the survey there was no observable evidence of current earth moving work, building construction or building additions.

8.  At the time of the survey there were no proposed changes in street right of way lines or evidence of recent street or sidewalk construction or repairs observed.

## Surveyor's Certification

To: Simply Essentials, LLC, a Delaware Limited Liability Company; Pure Prairie Farms, Inc.; First American Title Insurance Company Title

This is to certify that this map or plan and the survey on which it is based were made in accordance with the 2021 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys, jointly established and adopted by ALTA and NSPS, and includes Table A items 1, 2, 3, 4, 7(a), 7(b)(1), 8, 9, 11, 13, 16 and 17 of the Table A thereof. The field work was completed on December 17, 2021.

Date of Plat or Map: December 17, 2021

Signed: _James H. Cordell_
James H. Cordell
Land Surveyor Number 17741

Date of field survey:    December 17, 2021
Date of last revision:    None

Survey performed by:
Sayre Associates, Inc.
216 S. Duluth Avenue
Sioux Falls, SD 57104
Phone: 605-332-7211
Fax: 605-332-7222



I hereby certify that this land surveying document was prepared and the related survey work was performed by me or under my direct personal supervision and that I am a duly licensed Land Surveyor under the laws of the State of Iowa.

_James H. Cordell_    2/9/22
(signature)    (date)

License number 17741

My license renewal date is December 31, 2023

Pages or sheets covered by this seal: 1

PROJECT NO.: 22932
SURVEYED BY: DLS/EJC
CREATED BY: GRA
APPROVED BY: JHC
REVISION DATE:

ALTA / NSPS
LAND TITLE SURVEY

**1**

BY: GRA, 22932 ALTA East Property.dwg, ALTA, PRINT DATE: Feb 09, 2022

---

(survey drawing annotations)

IOWA CHICAGO AND EASTERN RAILROAD

PARCEL A
CONTAINS:
24,799 SQ. FT. ±
0.569 ACRES ±
(NO BUILDINGS)

N89°58'58"E

POINT OF BEGINNING PARCEL B

LAWLER STREET (PUBLICLY DEDICATED)

VACATED LAWLER STREET

PARCEL B
CONTAINS:
397,988 SQ. FT. ±
9.136 ACRES ±

ILLINOIS CENTRAL RAILROAD

OWNER CROELL READI-MIX INC.
OWNER AMELIA MANAGEMENT, LLC
OWNER FARMERS FEED & GRAIN COMPANY INC
ADJOINERS WOOD RETAINING WALL
OWNER FARMERS FEED & GRAIN COMPANY INC

BUILDING (1 STORY-METAL) BLDG. HEIGHT ± 22'

SCALE: 1" = 50'

N 89°58'58"E
N79°19'09"E
N89°45'36"E  331.34'
N89°29'24"E
N78°18'46"E

EDGE OF CONCRETE
BROKEN CONCRETE
VACATED STREET
EDGE OF CONCRETE
BROKEN CONCRETE

S89°26'59"W
S89°47'11"W

LOCATION: Lane's Addition, Charles City, Iowa

PREPARED BY AND RETURN TO:
JAMES H. CORDELL
SAYRE ASSOCIATES
216 S. DULUTH AVE
SIOUX FALLS, SD 57104
PHONE: 605-332-7211

SURVEY REQUESTED BY: Pure Prairie Farms
CURRENT PROPRIETOR: Illinois Central Railroad Company

## LEGAL DESCRIPTION:

# PLAT OF SURVEY

### PARCEL I

That part of Lots 1, 7 and 8, lying north of the Illinois Central Railroad, in Block 150 of Lane's Addition to the City of St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, together with all of Lots 10, 11 and 12 in Block 150 of Lane's Addition to the City of St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, more particularly described as follows:
Beginning at the Northwesterly corner of said Lot 12;
Thence along the Northerly line of said Lot 12 S56°37'29"E 123.23' to the Westerly right-of-way of N. Grand Street, also being the Northeasterly corner of said Lot 12; thence along the Westerly right-of-way of N. Grand Street S00°14'20"E 67.88' to the Northerly right-of-way of the Illinois Central Railroad; thence Northwesterly along a 842.41' radius curve concave Northeasterly 169.23', said curve having a long chord of N74°35'34"W 168.94' to the Easterly right-of-way of N. Main Street; thence along the Easterly right-of-way of N. Main Street N33°19'12"E 108.64' to the Point of Beginning containing 12,694 SF ± and 0.291 Acres ±, subject to any easements of record.
AND

### PARCEL II

That part of Lots 2 and 3, lying south of the Illinois Central Railroad, in Block 150 of Lane's Addition to the City of St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, more particularly described as follows:
Beginning at the Southeasterly corner of said Lot 2;
Thence along the Northwesterly right-of-way of Lane Street N56°37'29"W 198.20' to the Southerly right-of-way of the Illinois Central Railroad; thence Southeasterly along a 942.41' radius curve concave Northeasterly 170.35', said curve having a long chord of S76°13'40"E 170.12' to the Westerly right-of-way of N. Grand Street; thence along the Westerly right-of-way of N. Grand Street S00°14'20"E 68.53' to the Point of Beginning containing 5,220 SF ± and 0.120 Acres ±, subject to any easements of record.



| LINE TABLE | | |
|---|---|---|
| Line # | Bearing | Distance |
| L1 | S56°37'29"E | 123.23' |
| L2 | S00°14'20"E | 67.88' |
| L3 | S00°14'20"E | 68.53' |
| L4 | N56°37'29"W | 198.20' |
| L5 | N33°19'12"E | 108.64' |

Notes:
The bearing system for this plat is based on the UTM Zone 15 North.

Legend
○ - Denotes rebar set and marked by License No. 17741
● - Denotes found survey monument
(R) - Record Distance
(M) - Measured Distance

GRAPHIC SCALE
0    50    100         200

1" = 100'

| CURVE TABLE | | | | | |
|---|---|---|---|---|---|
| Curve # | Delta | Radius | Tangent | Length (L) | Length (C) | Chord Direction |
| C2 | 11°30'35" | 842.41' | 84.90' | 169.23' | 168.94' | N74°35'34"W |
| C5 | 10°21'24" | 942.41' | 85.41' | 170.35' | 170.12' | S76°13'40"E |

I hereby certify that this land surveying document was prepared and the related survey work was performed by me or under my direct personal supervision and that I am a duly licensed Land Surveyor under the laws of the State of Iowa.

James H. Cordell          11/28/22
JAMES H. CORDELL   License number 17741     (date)

My license renewal date is December 31, 2023
Pages or sheets covered by this seal: 1

LICENSED LAND SURVEYOR
JAMES H. CORDELL
17741
IOWA

SHEET 1 OF 1

SAYRE Associates
Engineers • Surveyors

BY:  JHC, 23000 Plat of Survey Block 150.dwg, PLAT OF SURVEY RR PROP, REV DATE: Mon DD, YYYY, PRINT DATE: Nov 28, 2022

LOCATION: ORIGINAL PLAT OF BELOIT, IOWA

PREPARED BY AND RETURN TO:
JAMES H. CORDELL
SAYRE ASSOCIATES
216 S. DULUTH AVE
SIOUX FALLS, SD 57104
PHONE: 605-332-7211

SURVEY REQUESTED BY: Pure Prairie Farms
CURRENT PROPRIETOR: City Improvement Assoc. of Charles City

## PLAT OF SURVEY

### LEGAL DESCRIPTION:

All of Lot 9 in Block 150, Lane's Addition to St.Charles, now a part of incorporated City of Charles City, Floyd County, Iowa, more particularly described as follows:
Beginning at the Northeasterly corner of said Lot 9;
Thence along the Westerly right-of-way of N. Grand Street S00°14'20"E 158.30' to the Southeasterly corner of said Lot 9; thence along the Southerly line of said Lot 9 N56°37'29"W 123.23' to the Easterly right-of-way of N. Main Street and the Southwesterly corner of said Lot 9; thence along the Easterly right-of-way of N. Main Street N33°19'12" 131.85' to the Northwesterly corner of said Lot 9; thence along the Northerly line of said Lot 9 S56°36'10"E 35.72'  to the Point of Beginning containing 10,478 SF ± and 0.240 Acres ±, subject to any easements of record.



| LINE TABLE | | |
|---|---|---|
| Line # | Bearing | Distance |
| L6 | S56°36'10"E | 35.72' |
| L7 | S00°14'20"E | 158.30' |
| L8 | N56°37'29"W | 123.23' |
| L9 | N33°19'12"E | 131.85' |

POINT OF BEGINNING

LOT 9

CENTERLINE OF ILLINOIS CENTRAL RAILROAD

### GRAPHIC  SCALE

0    50    100    200

1" = 100'

I hereby certify that this land surveying document was prepared and the related survey work was performed by me or under my direct personal supervision and that I am a duly licensed Land Surveyor under the laws of the State of Iowa.

JAMES H. CORDELL    License number 17741        (date)

My license renewal date is December 31, 2023
Pages or sheets covered by this seal: 1

JAMES H. CORDELL 17741
LICENSED LAND SURVEYOR
IOWA

### Legend

○  - Denotes rebar set and marked by License No. 17741

●  - Denotes found survey monument

(R) - Record Distance

(M) - Measured Distance

### Notes:
The bearing system for this plat is based on the UTM Zone 15 North.

**Sayre Associates**
Engineers • Surveyors
216 S. Duluth Avenue •Sioux Falls, SD 57104
Phone: (605) 332-7211 •Fax: (605) 332-7222

SHEET 1 OF 1

## REAL ESTATE SALE CONTRACT

The undersigned, hereinafter called "Buyer", hereby offers to buy from **Illinois Central Railroad Company**, an Illinois corporation, hereinafter called "Seller", the interest of Seller in the real estate hereinafter described and called the "Premises", on the following terms and conditions:

1.  **Price.**  Buyer agrees to pay Seller a total purchase price of Fifty Thousand and NO/100 Dollars (<u>$50,000.00</u>) payable at Closing.

2.  **Deposit**.    A deposit of <u>$5,000.00</u> (the "Deposit") is delivered to Seller contemporaneously with the delivery of this offer.  The Deposit shall be applied against the purchase price at Closing or applied as provided in Paragraph 10.  Any interest on the Deposit shall be the property of Seller.

3.  **Interest in Property**. The property (the "Premises") for which Seller is conveying its real estate interest, if any, consists of approximately  <u>0.40</u>  acres of vacant land as shown on the plat labeled <u>Exhibit A</u>, dated <u>02/28/2022</u>, attached hereto and made a part hereof, and are located in the City of Charles City, County of Floyd, State of Iowa.

4.  **Conveyance**.  Seller shall convey or cause the Premises to be conveyed to Buyer by Quitclaim Deed, hereinafter called the "Deed", subject to the exceptions and reservations contained in this Contract. The Buyer in the Deed shall be the undersigned Buyer unless Buyer designates a nominee by written notice to Seller within fifteen days after the acceptance of this offer.  Such nominee may be any entity owned or controlled by Buyer or under common ownership or control with Buyer; any other nominee is subject to the written approval of Seller.  This Contract may not be assigned by Buyer except to such permitted nominee as set forth above. Buyer guarantees performance by such nominee of all terms and conditions hereof.

    SELLER, BY NATURE OF THE QUITCLAIM DEED, MAKES NO REPRESENTATION OR WARRANTY CONCERNING THE CONDITION OF THE PREMISES OR ITS TITLE.

5.  **Evidence of Title**.  BUYER SHALL, AT ITS EXPENSE DO ONE OF THE FOLLOWING: (1) Obtain and furnish to Seller, within forty-five (45) days after Seller's acceptance of this offer, a preliminary title report or commitment from a title insurance company, or (2) Provide a letter to Seller that says that Buyer is aware of possible clouds on Seller's title, but that Buyer is assuming this risk and will not obtain a title report or commitment.  If Buyer chooses Option 1, Buyer shall deliver to Seller, within ten (10) days after receipt of such title evidence, a written statement specifying the defects, if any, other than the permitted exceptions and reservations set forth herein, which render Seller's title unmarketable.  In the event Buyer claims title defects, the time of Closing shall be extended for a period of up to thirty (30) days after receipt of such statement until the claimed title defects are cured.  If Seller is unable or unwilling to cure such defects within such 30-day period, and Buyer is unwilling to accept the Deed subject to such defects, then either party may terminate this Contract by delivering written notice to the other party of its intention to do so within ten (10) days thereafter.  Upon termination, Seller shall return the Deposit to Buyer.  If Buyer shall fail to deliver to Seller a statement of title defects within ten (10) days after Buyer's receipt of such title

evidence, Buyer shall be deemed to accept title as shown on the title evidence and to waive any objections to title.

6.    **Exceptions**.  This Contract and the Deed shall be subject to and in accordance with the following exceptions, reservations and conditions:

(A)    standard exceptions of the Title Company in its title policies issued in the state in which the Premises are located.

(B)    special taxes or assessments for improvements not yet completed, if any.

(C)    installments not due at the date hereof of any special tax or assessment for improvements completed, if any.

(D)    general taxes, if any, for the tax year prior to the year in which the Deed is delivered and subsequent years.  If the Premises are locally assessed for the year in which the Deed is delivered, the taxes for such year shall be prorated as of the date on which the Deed is delivered on the basis of the most recent tax bill, unless the payment of taxes has been assumed by a tenant.  If the Premises is assessed as railroad operating property by the State in which the Premises is located, then the Seller agrees to pay, when due, taxes for the year in which the deed is delivered and prior years, assessed in Seller's name.

(E)    building, building lines and use or occupancy restrictions, zoning and building laws or ordinances, and other laws, ordinances, requirements, limitations, restrictions, regulations and codes which are or may be imposed upon the Premises by any governmental authority having jurisdiction thereof.

(F)    public roads and highways, if any.

(G)    judgment liens; however, any judgment against Seller which may appear of record as a lien against the Premises shall be settled and satisfied by Seller if and when it is judicially determined to be finally valid, and Seller shall indemnify the Buyer for all loss arising out of Seller's failure to have such judgment lien so settled and satisfied.  This provision shall survive the Closing of this transaction and the delivery of the Deed.

(H)    covenants, conditions, restrictions, licenses and easements of record.

(I)    Intentionally omitted.

(J)    The sale of the Premises is subject to all of the rights of the owner of the mineral estate in said Premises, if any.  If, however, it is found that Seller has mineral right in the Premises, such rights will not be retained by Seller but will pass to Buyer by the Quitclaim Deed from Seller as set forth in Section 4 herein.

(K)    rights of any government agencies, public or quasi-public utilities for the use, maintenance, repair, replacement and reconstruction of existing driveways, roads and highways, conduits, sewers, drains, water mains, fiber optics cables and/or

2

communications systems, gas lines, electric power lines, wires, and other utilities and easements.

(L)    acts by, through or under Buyer.

7.    **Reservations**.

(A)    Seller shall reserve for itself, its successors and assigns, the right for the continued use, maintenance, repair, replacement and reconstruction of all existing conduits, sewers, drains, water mains, fiber optic cables and/or communications systems, gas lines, electric power lines, wires and other utilities and easements on the Premises, whether or not of record, including access thereto. Buyer will not interfere with the rights herein reserved by Seller or interfere with any facilities used pursuant thereto.

(B)    Buyer, its successors and assigns, agrees that it will not do nor cause to be done, any act that will impede the natural flow or drainage of water over the Premises herein conveyed so as to cause such drainage of water to accumulate on Seller's property abutting the track side sale boundaries of the Premises to the detriment of Seller's, its successors and assigns, use and enjoyment of its property. This covenant shall in no way be construed to prohibit Buyer, its successors and assigns, from erecting buildings or other improvements on the Premises so long as drainage, equivalent to that presently existed, is maintained whether naturally or by other means. This covenant shall run with the land conveyed and be binding upon Buyer, its successors and assigns, forever.

8.    **Due Diligence**.   During the forty-five (45) day period following acceptance of this Contract (the "Due Diligence Period"), Buyer shall have the right, at Buyer's expense, to enter onto the Premises at reasonable times for the purpose of inspecting, surveying and making environmental and engineering studies and soil tests.   Buyer agrees to indemnify and hold Seller harmless from all costs, expenses, liability and damages, including attorneys' fees, incurred or arising in connection with anything done or work performed by, through or under Buyer pursuant to the provisions of this paragraph, regardless of Seller's negligence.   In conducting any inspections, investigations or tests of the Premises, Buyer and its agents and representatives shall: (i) maintain comprehensive general liability (occurrence) insurance in form and amounts reasonably satisfactory to Seller, covering any accident arising in connection with the presence of Buyer, its agents and representatives on the Premises and shall deliver a certificate of insurance verifying such coverage to Seller prior to entry upon the Premises; (ii) not permit any liens to attach to the Premises by reason of the exercise of its rights hereunder; (iii) fully restore the Premises to the condition in which the same was found before any such inspections or tests were undertaken; and (iv) not reveal or disclose any information obtained during such inspections, investigations or tests concerning the Premises to any third party.   Buyer shall provide Seller with copies of all inspection reports, surveys, and environmental assessments obtained by Buyer with respect to the Premises.   In the event that Buyer determines that the condition of the Premises is unsatisfactory and gives written notice of termination to Seller prior to the expiration of

the Due Diligence Period, this Contract shall be terminated and the Deposit returned to Buyer. If Buyer fails to so terminate, Buyer shall purchase the Premises and any improvements thereon in an "as is, where at" condition and subject to all faults of every kind and nature whatsoever, whether latent or patent and whether now or hereafter existing. Buyer represents and warrants to Seller that Buyer has not relied, and shall not rely, upon any representations or statements or the failure to make any representation or statement, by Seller or Seller's agents or employees or by any person acting, or purporting to act, on behalf of Seller. Buyer specifically agrees that Seller shall not be obligated to do any restoration, repairs, remediation or other work in connection with the Premises, that Seller shall not be liable for any restoration, repairs, remediation or other work necessary to cause the Premises to meet any applicable laws, ordinances, requirements, limitations, restrictions, regulations or codes, or be suitable for any particular use, and that Buyer shall indemnify and hold Seller harmless from all costs, expenses, liability and damages, including attorneys' fees, incurred or arising in connection with any such restoration, repairs, remediation or other work. Buyer waives, releases, acquits and forever discharges Seller, its employees and agents and any other person acting on behalf of Seller, of and from any and all claims, actions, causes of action, liabilities, demands, rights, damages, cost, expenses, or compensation whatsoever, direct or indirect, known or unknown, foreseen or unforeseen, which Buyer now has or may have or which may arise in the future on account of or in any way growing out of or in connection with any Hazardous Materials or Other Conditions on, under, from or affecting the Premises or any law or regulation applicable thereto. This provision shall survive the closing of this transaction and the delivery of the Deed.

9.   **Legal Description and Survey**. The legal description to be used in the Deed shall be prepared by Buyer. Buyer shall, at Buyer's expense, obtain and deliver to Seller a legal description and plat of survey within forty-five (45) days of Seller's acceptance of this Contract.

10.   **Closing**. The Closing shall occur, via mail, within ten (10) days after expiration of the Due Diligence Period as set forth in Section 8 of this Contract, or at the time, date and location mutually agreeable to Buyer and Seller. Seller shall prepare the deed and pertinent closing documents and deliver the same for review and approval by Buyer prior to closing. Buyer agrees to purchase, affix and cancel all documentary stamps in the amount prescribed by statute, and pay all required transfer taxes and fees incidental to the recordation of said Deed. Buyer shall apply for any lot splits or tax divisions with the appropriate local authorities at Buyer's cost and expense.

11.   **Real estate commission**. Buyer agrees to indemnify, defend, and hold harmless Seller against any and all claims by any broker, attorney, or agent engaged by Buyer for a fee or commission arising out of this Contract. Seller agrees to indemnify, defend, and hold harmless Buyer against any and all claims by any broker, attorney, or agent engaged by Seller for a fee or commission arising out of this Contract. The provisions in this paragraph shall survive the Closing.

12.   **Regulatory approval**. If Seller is required to obtain regulatory approval of this transaction by any agency, the Closing date shall be extended for the time required to obtain such approval. If such approval cannot be obtained within sixty (60) days, either

4

party may terminate this Contract by written notice to the other and, upon termination, Seller shall return the Deposit to Buyer.

13.   **Liquidated damages**.  Time is of the essence of this Contract.  If Buyer shall default or fail to perform the requirements of this Contract within the time limits herein specified, the Seller may retain the Deposit as liquidated damages and just compensation, and not as a penalty or forfeiture, and declare this Contract terminated. In the event of default by Seller, Buyer's sole remedy shall be a return of the Deposit.

14.   **Notices**.  All notices and demands herein required shall be in writing sent by telecopier, overnight courier or certified or registered mail to the other party at the address shown herein.   Notices sent by (i) telecopier shall be deemed made upon confirmed transmission; (ii) overnight courier shall be deemed made one business day after being sent; and (iii) certified or registered mail shall be deemed made three days after mailing.

15.   **Condemnation or Casualty**.  If, prior to the Closing of this sale, all or any portion of the Premises are condemned, damaged or destroyed, Buyer shall have the option of either accepting an assignment of any condemnation or insurance proceeds or to terminate this Contract.  Buyer shall deliver written notice of its election to Seller within ten (10) days of the date Seller notifies Buyer of such condemnation, damage or destruction.  If Buyer fails to notify Seller, Buyer shall be deemed to elect to close and accept an assignment of the proceeds.   If Buyer terminates, the Deposit shall be returned to Buyer.

16.   **Miscellaneous**.

(A)   Time is of the essence in the performance of each and every one of the terms of this Contract.  Whenever any determination is to be made or action to be taken on a date specified in this Contract, if such date shall fall upon a Saturday, Sunday or legal holiday, the date for such determination or action shall be extended to the first business day immediately thereafter.

(B)   This Contract embodies the entire agreement of the parties hereto and supersedes any prior understandings or written or oral agreements between the parties concerning the Premises.  No oral statements shall be of any force or effect.   No variation modification or alteration of the terms hereof shall be binding upon either party unless set forth in an express and formal written amendment.

(C)   This Contract shall be construed in accordance with the laws of the State of Iowa.

(D)   For the purposes of this Agreement, (i) "Hazardous Materials" include, without limit, any flammable explosives, radioactive materials, hazardous materials, hazardous wastes, hazardous or toxic substances, or related materials defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. §§ 9601, *et seq.*), the Hazardous Materials Transportation Act, as amended (49 U.S.C. §§ 1801, *et seq.*), the Resource Conservation and Recovery Avenue, as amended (42 U.S.C. §§ 6901, *et seq.*),

the Toxic Substances Control Act, as amended (15 U.S.C. §§ 2601, *et seq.*), and in the regulations adopted and publications promulgated pursuant thereto, as such laws or regulations now exist or may exist in the future, and (ii) "Other Conditions" include, without limit, methane and other gases, petroleum and any fraction thereof, nonhazardous wastes or materials, and any physical conditions of other subsurface conditions which arise out of or are in any way related to current or previous uses or activities on the Premises.

17. **Other Conditions**.  If all or any portion of the Premises are located within five hundred (500) feet of a railroad right-of-way, Buyer agrees that the Premises shall be conveyed subject to the reduction in use and enjoyment and inconveniences, including noise, vibrations and odors, which may result from rail operations on adjacent or near-by properties.  This provision shall survive the closing of this transaction and the delivery of the Deed.

18. **Acceptance**.  This Contract, and any attached Addendum, when accepted and signed by the Seller, shall constitute the entire agreement between the parties and shall thereafter be binding upon and inure to the benefit of the Seller and the Buyer, their heirs, administrators, successors and assigns.  The execution and delivery of this Contract by Buyer constitutes an offer to purchase the Premises on the terms described herein, which offer shall remain irrevocable and available for acceptance by Seller for a period of thirty (30) days after the date of Buyer's signature below.  **This offer shall not become binding upon Seller until executed by Seller and a duplicate original of this Contract is delivered to Buyer.**

IN WITNESS WHEREOF, the parties have executed this Contract as of the dates set forth below.

Buyer (print or type name): _Pure Prairie Farms Inc_

By: _____
        (Buyer signature and title)
    _George D Peichel_

Date of Buyer's Offer _4-27_ , 2022

Buyers Address for notices:
_68808 Fort Rd_
_Fairfax MN 55332_
Telephone: _612-209-6740_
Fax: _____
    _gdpeichel@pureprairiefarms.com_

Seller: **Illinois Central Railroad Company**, an Illinois corporation.

By: _____
Name: _James V. Fountain_
Title: _Senior Manager Real Estate_

Seller's address for notices:
Real Estate Department
CN
17641 S. Ashland Avenue
Homewood, IL 60430
Attn: Senior Manager
Fax: 708-332-4348

Contract accepted by Seller this _3rd_ day of _May_ , 2022

7

**<u>EXHIBIT A</u>**

<u>The Premises</u>

**DESCRIPTION:** 2070/WPR/10001 4 (0.40 Acs. ±)

Charles City
State of Iowa
United States of America

THIS IS NOT A PLAN OF SURVEY / CECI N'EST PAS UN PLAN D'ARPENTAGE

⊠ Subject Lands/Terrain Sujet

PROPERTY SKETCH

**SUBDIVISION:** Osage (393)
**SPUR / ANTENNE:** N/A
**MILEAGE / MILLIAIRE:** 42.02 - 42.10
**DATE:** February 8, 2022
**SCALE / ÉCHELLE:** 1:1500

CN

EXHIBIT A

LOCATION: Lane's Addition, Charles City, Iowa

PREPARED BY AND RETURN TO:
JAMES H. CORDELL
SAYRE ASSOCIATES
216 S. DULUTH AVE
SIOUX FALLS, SD 57104
PHONE: 605-332-7211

SURVEY REQUESTED BY: Pure Prairie Farms
CURRENT PROPRIETOR: Illinois Central Railroad Company

## PLAT OF SURVEY

### LEGAL DESCRIPTION:

**PARCEL I**
That part of Lots 1, 7 and 8, lying north of the Illinois Central Railroad, in Block 150 of Lane's Addition to the City of St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, together with all of Lots 10, 11 and 12 in Block 150 of Lane's Addition to the City of St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, more particularly described as follows:
Beginning at the Northwesterly corner of said Lot 12;
Thence along the Northerly line of said Lot 12 S56°37'29"E 123.23' to the Westerly right-of-way of N. Grand Street, also being the Northeasterly corner of said Lot 12; thence along the Westerly right-of-way of N. Grand Street S00°14'20"E 67.88' to the Northerly right-of-way of the Illinois Central Railroad; thence Northwesterly along a 842.41' radius curve concave Northeasterly 169.23', said curve having a long chord of N74°35'34"W 168.94' to the Easterly right-of-way of N. Main Street; thence along the Easterly right-of-way of N. Main Street N33°19'12"E 108.64' to the Point of Beginning containing 12,694 SF ± and 0.291 Acres ±, subject to any easements of record.
AND
**PARCEL II**
That part of Lots 2 and 3, lying south of the Illinois Central Railroad, in Block 150 of Lane's Addition to the City of St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, more particularly described as follows:
Beginning at the Southeasterly corner of said Lot 2;
Thence along the Northwesterly right-of-way of Lane Street N56°37'29"W 198.20' to the Southerly right-of-way of the Illinois Central Railroad; thence Southeasterly along a 942.41' radius curve concave Northeasterly 170.35', said curve having a long chord of S76°13'40"E 170.12' to the Westerly right-of-way of N. Grand Street; thence along the Westerly right-of-way of N. Grand Street S00°14'20"E 68.53' to the Point of Beginning containing 5,220 SF ± and 0.120 Acres ±, subject to any easements of record.



### LINE TABLE

| Line # | Bearing | Distance |
|---|---|---|
| L1 | S56°37'29"E | 123.23' |
| L2 | S00°14'20"E | 67.88' |
| L3 | S00°14'20"E | 68.53' |
| L4 | N56°37'29"W | 198.20' |
| L5 | N33°19'12"E | 108.64' |

Notes:
The bearing system for this plat is based on the UTM Zone 15 North.

### Legend

○ - Denotes rebar set and marked by License No. 17741
● - Denotes found survey monument
(R) - Record Distance
(M) - Measured Distance

### GRAPHIC SCALE

0    50    100    200

1" = 100'

### CURVE TABLE

| Curve # | Delta | Radius | Tangent | Length (L) | Length (C) | Chord Direction |
|---|---|---|---|---|---|---|
| C2 | 11°30'35" | 842.41' | 84.90' | 169.23' | 168.94' | N74°35'34"W |
| C5 | 10°21'24" | 942.41' | 85.41' | 170.35' | 170.12' | S76°13'40"E |

I hereby certify that this land surveying document was prepared and the related survey work was performed by me or under my direct personal supervision and that I am a duly licensed Land Surveyor under the laws of the State of Iowa.

_____
JAMES H. CORDELL   License number 17741        (date)

My license renewal date is December 31, 2023
Pages or sheets covered by this seal: 1

LICENSED LAND SURVEYOR
JAMES H. CORDELL
17741
IOWA

SHEET 1 OF 1

SAYRE Associates
Engineers • Surveyors

BY:  JHC, 23000 Plat of Survey Block 150.dwg, PLAT OF SURVEY RR PROP, REV DATE: Mon DD, YYYY, PRINT DATE: Jun 22, 2022

### FIRST AMENDMENT TO REAL ESTATE CONTRACT
#### (Approximately 0.40 Acres of Vacant Land in City of Charles City, Floyd County, Iowa)

This First Amendment to Real Estate Contract (this "**Amendment**") is made and entered to effective as of June 14, 2022, between ILLINOIS CENTRAL RAILROAD COMPANY, an Illinois corporation ("**Seller**") and PURE PRAIRIE FARMS, INC., a Minnesota corporation ("**Buyer**").

### RECITALS

A.      Seller and Buyer entered into that certain Real Estate Contract with an acceptance date of May 3, 2022 (the "**Agreement**").

B.      Pursuant to Section 8 of the Purchase Agreement, the Due Diligence Period is currently set to expire on June 17, 2022.

C.      The parties desire to amend the Agreement to extend the Due Diligence Period.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows.

1.      <u>Defined Terms</u>.  Any capitalized terms not specifically defined in this Amendment shall have the same meanings ascribed to them in the Agreement.

2.      <u>Due Diligence Period</u>.  The first sentence of Section 8 of the Agreement is hereby amended to replace the phrase:

"During the forty-five (45) day period following acceptance of this Contract (the "Due Diligence Period")"

with

"During the ninety (90) day period following acceptance of this Contract (the "Due Diligence Period")"

3.      <u>Due Diligence Period Expiration Date</u>.  The parties acknowledge and agree that pursuant to Section 2 above, the Due Diligence Period will expire on August 1, 2022.  All references to "Due Diligence Period" in the Agreement shall mean this extended date.

4.      <u>Counterparts</u>.  This Amendment may be executed in counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.  This Amendment may be transmitted by electronic mail in portable document format ("pdf") and signatures appearing on electronically transmitted instruments shall be treated as original signatures.

6.      <u>Continuing Effect</u>.  Except as expressly stated in this Amendment, all terms, covenants and conditions set forth in the Agreement shall remain in full force and effect.  The Agreement, as amended by this Amendment, shall be considered one agreement.

73922693v1

IN WITNESS WHEREOF, the parties have executed this First Amendment to Real Estate Contract.

**Seller:**

ILLINOIS CENTRAL RAILROAD COMPANY,
an Illinois corporation

By _____
   James V. Fountain
   Senior Manager Real Estate

**Buyer:**

PURE PRAIRIE FARMS, INC.,
a Minnesota corporation

By_____
   George D. Peichel
   Title: _____

73922693v1

## SECOND AMENDMENT TO REAL ESTATE CONTRACT
### (Approximately 0.40 Acres of Vacant Land in City of Charles City, Floyd County, Iowa)

This Second Amendment to Real Estate Contract (this "**Amendment**") is made and entered to effective as of July 26, 2022, between ILLINOIS CENTRAL RAILROAD COMPANY, an Illinois corporation ("**Seller**") and PURE PRAIRIE FARMS, INC., a Minnesota corporation ("**Buyer**").

### RECITALS

A.      Seller and Buyer entered into that certain Real Estate Contract with an acceptance date of May 3, 2022, as amended by that certain First Amendment dated Jun 14, 2022 (collectively, the "**Agreement**").

B.      Pursuant to Section 8 of the Agreement, the Due Diligence Period is currently set to expire on August 1, 2022.

C.      The parties desire to amend the Agreement to extend the Due Diligence Period.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows.

1.      Defined Terms.  Any capitalized terms not specifically defined in this Amendment shall have the same meanings ascribed to them in the Agreement.

2.      Due Diligence Period.  The first sentence of Section 8 of the Agreement is hereby amended to replace the phrase:

"During the forty-five (45) day period following acceptance of this Contract (the "Due Diligence Period")"

with

"During the one hundred thirty-five (135) day period following acceptance of this Contract (the "Due Diligence Period")"

3.      Due Diligence Period Expiration Date.  The parties acknowledge and agree that pursuant to Section 2 above, the Due Diligence Period will expire on September 15, 2022.  All references to "Due Diligence Period" in the Agreement shall mean this extended date.

4.      Counterparts.  This Amendment may be executed in counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.  This Amendment may be transmitted by electronic mail in portable document format ("pdf") and signatures appearing on electronically transmitted instruments shall be treated as original signatures.

74370453v2

6.    <u>Continuing Effect</u>.  Except as expressly stated in this Amendment, all terms, covenants and conditions set forth in the Agreement shall remain in full force and effect.  The Agreement, as amended by this Amendment, shall be considered one agreement.

IN WITNESS WHEREOF, the parties have executed this Second Amendment to Real Estate Contract.

**Seller:**                                                   **Buyer:**

ILLINOIS CENTRAL RAILROAD COMPANY,                PURE PRAIRIE FARMS, INC.,
an Illinois corporation                              a Minnesota corporation

By _____          By_____
   James V. Fountain                                 George D. Peichel
   Senior Manager Real Estate                        Title: _____

74370453v2

This document was prepared by:
Michael Barron
Attorney, Illinois Central Railroad Company
17641 South Ashland Avenue
Homewood, Illinois 60430
Telephone: 708-332-4381

<u>AFTER RECORDING, PLEASE FURNISH TAX BILLS</u>
<u>TO THE FOLLOWING ADDRESS:</u>

Pure Prairie Farms Inc.
68808 Fort Rd.
Fairfax, Minnesota 55332

## <u>QUITCLAIM DEED</u>

THIS INDENTURE Witnesseth that the Grantor, **ILLINOIS CENTRAL RAILROAD COMPANY,** an Illinois corporation, for and in consideration of the sum of TEN AND 00/100 DOLLARS ($10.00) in hand paid and other valuable consideration, hereby Conveys and Quitclaims to the Grantee, **Pure Prairie Farms Inc.,** of 68808 Fort Rd., Fairfax, Minnesota 55332 all right, title, interest and claim in and to the following described lands and property situated in the County of Floyd and State of Iowa to wit (the "Premises"):

That part of Lots 1, 7 and 8, lying north of the Illinois Central Railroad, in Block 150 of Lane's Addition to the City of St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, together with all of Lots 10, 11 and 12 in Block 150 of Lane's Addition to the City of St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, more particularly described as follows:

1

Beginning at the Northwesterly corner of said Lot 12;

Thence along the Northerly line of said Lot 12 S56°37'29"E 123.23' to the Westerly right-of-way of N. Grand Street, also being the Northeasterly corner of said Lot 12; thence along the Westerly right-of-way of N. Grand Street S00°14'20"E 67.88' to the Northerly right-of-way of the Illinois Central Railroad; thence Northwesterly along a 842.41' radius curve concave Northeasterly 169.23', said curve having a long chord of N74°35'34"W 168.94' to the Easterly right-of-way of N. Main Street; thence along the Easterly right-of-way of N. Main Street N33°19'12"E 108.64' to the Point of Beginning containing 12,694 SF ± and 0.291 Acres ±, subject to any easements of record.

AND

That part of Lots 2 and 3, lying south of the Illinois Central Railroad, in Block 150 of Lane's Addition to the City of St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, more particularly described as follows:

Beginning at the Southeasterly corner of said Lot 2;

Thence along the Northwesterly right-of-way of Lane Street N56°37'29"W 198.20' to the Southerly right-of-way of the Illinois Central Railroad; thence Southeasterly along a 942.41' radius curve concave Northeasterly 170.35', said curve having a long chord of S76°13'40"E 170.12' to the Westerly right-of-way of N. Grand Street; thence along the Westerly right-of-way of N. Grand Street S00°14'20"E 68.53' to the Point of Beginning containing 5,220 SF ± and 0.120 Acres ±, subject to any easements of record.

Grantor shall reserve for itself, its successors and assigns, the right for the continued use, maintenance, repair, replacement and reconstruction of all existing conduits, sewers, drains, water mains, fiber optic cables and/or communications systems, gas lines, electric power lines, wires and other utilities and easements on the Premises, whether or not of record, including access thereto. Grantee will not interfere with the rights herein reserved by Grantor or interfere with any facilities used pursuant thereto.

Grantee, its successors and assigns, agrees that it will not do nor cause to be done, any act that will impede the natural flow or drainage of water over the Premises herein conveyed so as to cause such drainage of water to accumulate on Grantor's property abutting the track side sale boundaries of the Premises to the detriment of Grantor's, its successors and

2

assigns, use and enjoyment of its property. This covenant shall in no way be construed to prohibit Grantee, its successors and assigns, from erecting buildings or other improvements on the Premises so long as drainage, equivalent to that presently existed, is maintained whether naturally or by other means. This covenant shall run with the land conveyed and be binding upon Grantee, its successors and assigns, forever.

Grantee agrees that the Premises shall be conveyed subject to the reduction in use and enjoyment and inconveniences, including noise, vibrations and odors, which may result from rail operations on adjacent or near-by properties.

3

**IN WITNESS WHEREOF, ILLINOIS CENTRAL RAILROAD COMPANY**, the Grantor, has caused these presents to be signed by its Senior Manager Real Estate, he being thereunto duly authorized this _22nd_ day of _NOVEMBER_, 2022.

ILLINOIS CENTRAL RAILROAD COMPANY

By: _____

James V. Fountain
Senior Manager Real Estate

STATE OF ILLINOIS )
                  ) SS
COUNTY OF COOK )

I, the undersigned, a Notary Public, in and for said County and State aforesaid, Do Hereby Certify that James V. Fountain, personally known to me to be the Senior Manager Real Estate of the ILLINOIS CENTRAL RAILROAD COMPANY, a Delaware corporation and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged under oath that as such Senior Manager Real Estate of said corporation, he signed and delivered the said instrument as Senior Manager Real Estate, pursuant to authority given by the Board of Directors of said corporation as his free and voluntary act and as the free and voluntary act and deed of said corporation, for the uses and purposes therein set forth.

Given under my hand and seal this _22nd_ day of November, 2022.

_____
NOTARY PUBLIC

My Commission Expires:

_March 23, 2025_

> SYDNEY M CERVANTES
> OFFICIAL SEAL
> Notary Public, State of Illinois
> My Commission Expires
> March 23, 2025

Property Address: Part of Lane's Addition, East of N. Main Street and West of N. Grand Street, Charles City, Iowa 50616

Permanent Real Estate Tax Number: 11-01-429-002-00

4

Instr Number: 2021 3155
BK:  2021 PG:  3155
Recorded: 12/23/2021 at 9:58:28.0 AM
Pages 8
County Recording Fee: $77.00
Iowa E-Filing Fee: $3.00
Combined Fee: $80.00
Revenue Tax: $0.00
Amy M. Assink RECORDER
Floyd County, Iowa

# COURT OFFICER DEED
### Recorder's Cover Sheet

**Preparer Information:** Larry S. Eide, 103 E. State Street, Suite 800, PO Box 1588, Mason City, IA 50402-1588, Phone: 641.423.4264

**Taxpayer Information:** Pure Prairie Farms, Inc., a Minnesota corporation, 68808 Fort Road, Fairfax, MN 55332-5533

**Return Document To:** Simply Essentials, LLC, c/o Larry S. Eide, Chapter 7 Bankruptcy Trustee, PO Box 1588, Mason City, IA 50402-1588

**Grantors:** Simply Essentials, LLC, c/o Larry S. Eide, Chapter 7 Bankruptcy Trustee, PO Box 1588, Mason City, IA 50402-1588

**Grantees:** Pure Prairie Farms, Inc., a Minnesota corporation, 68808 Fort Road, Fairfax, MN 55332-5533

**Legal Description:** See attached Exhibits A and B (pages 3 through 8 of this document)

**Document or instrument number of previously recorded documents:**

**Special Warranty Deed dated March 16, 2016, executed by Peter Ng and by C-GO International, Inc., as grantor, in favor of Simple Essentials, LLC, as grantee, recorded April 7, 2016 as Document Number 2016-0662, Floyd County, Iowa.**

**Special Warranty Deed dated March 16, 2016, executed by Cedar River Poultry, L.L.C., as grantor, in favor of Simple Essentials, LLC, as grantee, recorded April 7, 2016 as Document Number 2016-0663, Floyd County, Iowa.**

**Corrective Deed dated April 8, 2016, executed by Cedar River Poultry, L.L.C., as grantor, in favor of Simple Essentials, LLC, as grantee, recorded April 13, 2016 as Document Number 2016-0726, Floyd County, Iowa.**

**Affidavit of Correction dated March 1, 2017, executed by Dennis M. Krause, recorded March 2, 2017, as Document Number 2017-0360, Floyd County, Iowa.**

NCS-1015327 -MPLS (CA IKC)



**COURT OFFICER DEED**

IN THE MATTER OF THE CHAPTER 7
BANKRUPTCY OF SIMPLY ESSENTIALS, LLC

now pending in the United States Bankruptcy Court for the Northern District of Iowa.
Case No. 20-00305.

    Pursuant to the authority and power vested in the undersigned, and in consideration of
One Dollar(s) and other valuable consideration, the undersigned, in the representative capacity
designated below, hereby Convey(s) to **Pure Prairie Farms, Inc.**, a Minnesota corporation, the
following described real estate in Floyd County, Iowa:

    Real estate legally described in the attached Exhibit A and Exhibit B.

    Parcel Nos. 11-01-428-005-00 and 12-06-301-007-00

    This deed is exempt from real estate transfer tax under Iowa Code Sections
428A.2(19) and 428A.3.

    Words and phrases herein, including acknowledgement hereof, shall be construed as in
the singular or plural number, and as masculine, feminine or neutral gender, according to the
context.

Dated:  December _14_, 2021.

_____
Larry S. Eide

As Bankruptcy Trustee in the above-entitled estate or cause.

STATE OF IOWA, COUNTY OF CERRO GORDO, ss:

    This record was acknowledged before me on December _14th_, 2021, by Larry S. Eide
as Bankruptcy Trustee of Chapter 7 Bankruptcy Estate of Simply Essentials, LLC.

_____
Signature of Notary Public

NOTARIAL SEAL
PAMELA J OLSON
Commission Number 793959
My Commission Expires
_7/12/2025_
IOWA

EXHIBIT A

Parcel 1:

Lots one, two, eight, nine and ten (1, 2, 8, 9 & 10), Block one hundred forty-nine (149) and Lots three, four and five (3, 4 & 5) of Detwiler's Subdivision of Lots three (3), four (4) and Five (5), Block one hundred forty-nine (149), all in Lane's Addition to St. Charles, now incorporated in and as a part of Charles City, Iowa - this includes the Northerly 198 feet of Vacated Alley, Block 149, Lane's Addition to St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa.

AND

That part of Lots six (6) and seven (7), Block one hundred forty-nine (149), Lane's Addition and that part of Lots eleven (11), twelve (12), thirteen (13), and fourteen (14), Detwiler's Subdivision of Lots Three (3), Four (4), and Five (5) of Block One Hundred Forty-nine (149), Lane's Addition and the vacated alley in Block 149, Lane's Addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa, described as follows:

Beginning at the Northerly corner of said Lot Seven (7), thence South fifty-six (56) degrees, thirty (30) minutes East, two hundred sixty-four (264.00) feet; thence south thirty-three (33) degrees, thirty (30) minutes West 79.30 feet; thence Northwesterly along a 794.02 foot radius curve concave Northeasterly 265.60 feet, said curve having a long chord of North 54 degrees, 16 minutes 12 seconds West 264.20 feet; thence North 33 degrees, 30 minutes East 69.02 feet to the place of beginning,

AND

The Southeasterly 10 feet of Jackson Street abutting Lots 7, 8, 9, 10 and abutting the Northerly 3.02 feet of Lot 6; all in Block 149, of Lane's Addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

AND

The Southwesterly 15 feet of Floyd Street abutting Lot 10 in Block 149 of Lane's Addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

AND

All that part of Block One Hundred Forty-eight (148) in Lane's Addition to St. Charles, Charles City, Floyd County, Iowa, lying North of a line drawn Seventeen and five-tenths (17.5) feet Northeasterly of and parallel with the Southwesterly lines of Lots Nos. Two (2) and Nine (9), in said Block, and lying South of line drawn Fifty-three (53) feet South of and parallel with the centerline of the Chicago, Milwaukee, St. Paul and Pacific Railroad right of way.

Also described as: All that part of Lots 1, 2, and 9, in Block 148, Lane's Addition to St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, lying North of a line drawn Seventeen and five-tenths feet Northeasterly from and parallel to the Southwesterly line of said Lots 2 and 9, and lying South of a line drawn Fifty-three feet South of and parallel to the center line of the Chicago, Milwaukee and St. Paul Railroad right of way.

AND

The Southwesterly Seventeen and one-half feet (SWly 17 1/2) of Lots Two and Nine (2 & 9), of Block One Hundred Forty-eight (148), Lane's Addition to St. Charles, now a part of Charles City, Floyd County, Iowa, which is South of the right of way of the Chicago, Milwaukee, St. Paul and Pacific Railway.

AND

That part of Lots Seven and Eight (7 & 8), lying between the right of ways of Illinois Central Railroad Company and the Chicago, Milwaukee and St. Paul Railroad Co., except the Charles City Western Railway Company right of way, all located in Block One Hundred Forty-eight (148). in Lane's Addition to St. Charles, now incorporated in and a part of Charles City. Floyd County, Iowa.

AND

Lot Three (3), and all that part of Lot Four (4), lying between Lot Three (3) and the right of way of the Dubuque and Sioux City Railroad Company, (The Dubuque and Sioux City Railroad Company right of way now being the right of way of the Illinois Central Railroad Company), all in Block One Hundred Forty-eight (148), in Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa.

AND

All of vacated Jackson Street lying Southwesterly of the Southwest boundary of Floyd Street and Northeasterly of the Northeast boundary of Lane Street in Lane's Addition to

St. Charles, now incorporated in and as a part of Charles City, Floyd County, Iowa, except the Southeasterly 10 feet of Jackson Street abutting Lots 7, 8, 9, 10 and abutting the Northerly 3.02 feet of Lot 6; in Block 149, of Lane's Addition to St. Charles, now incorporated as the City of Charles City, Floyd County, Iowa.

AND

The South One-half of all that portion of Floyd Street lying Northwesterly of the Northwest right of way boundary of Main Street and East of the Westerly right of way line extended of vacated Jackson Street and the south boundary line of the Iowa, Chicago and Eastern Railroad right of way, EXCEPT that portion thereof previously vacated by the City of Charles City and conveyed to the adjoining owner on the South by Quit Claim Deed recorded in Book 95 at page 305 in the office of the Floyd County Recorder, subject to a permanent easement reserved by the City of Charles City, Iowa, for the location of its utilities (water and sewer) within the boundaries of this property and for the right to enter upon this property for the future maintenance and replacement of these utilities.

EXHIBIT B

Lots 1 and 2, Subdivision of Lot 11, Block 139, Lane's Addition to St Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

The East one-half of original Lot 12 (sometimes described as Lot 3, Subdivision of Lot 12), Block 139, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

The South 100 feet of Lots 8, 9, 10, 11, 12, 13, 14 and the South 100 feet of the East 95 feet of Lot 7, all in the Subdivision of Lot 11, in Block 139, of Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

Also all that part of said Lot 11, of said Block 139, which lies between Lots 13 and 14 aforesaid, bounded on the South by the North side of Lawler Street, and on the North by a line parallel to and distant 100 feet North of said North line of Lawler Street;

Lot 41, Block 138, all in Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

Lots 39 and 40, Block 138, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

Lot 4, Block 138, all being in Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

Lots 7 and 8, Block 138, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

Lots 5 and 6, Block 138, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

Lots 35 and 36, Block 138, Lane's Addition to St. Charles, now incorporated in and apart of Charles City, Floyd County, Iowa;

Beginning at a point which is the SE Corner of Lot 1, Block 165, of Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa, and running thence SE to SW corner of Lot 42, Block 138, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Iowa; thence running South along the Westerly side of said Block 138, of Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Iowa, to the NW corner of Lot 34, Block 138, of said Lane's Addition to St. Charles, now incorporated in and forming a part of Charles City, Iowa; thence running NWly to the NW corner of Lot 1, Chaney's Subdivision of Lot 13, Block 139, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa; thence North to place of beginning;

Lots 37 and 38, Block 138, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa;

Also that portion of the S 1/2 of the NE 1/4 of Sec. 6, Twp 95 N, Rge 15, West of the 5th P.M., lying East of the McGregor and Sioux City Railway and the Cedar Falls and Minnesota Railway and West and South of the Transfer or Joint right-of-way of Hart-Parr Company, Chicago, Milwaukee & St. Paul; Illinois Central and Charles City Western Railways;

, A parcel of land being the North three (3) feet of Lots Eleven (11) and Thirty-four (34), Block One Hundred Thirty-eight (138), Lane's Addition to Charles City, Floyd County, Iowa, in the Southwest one-fourth (SW1/4) of Section Six (6), Township Ninety-five North (95N), Range fifteen (15) West of the 5th P.M., except all minerals and mineral rights and easements in favor of the mineral and mineral rights estate;

Parcels of land lying along the Illinois Central Railroad Company's Northerly property line located in Section 6, Township 95 North, Range 15 West of the 5th Principal Meridian, at Charles City, Floyd County, Iowa, more particularly described as follows:

C. Also, that part of Lot Eleven (11) and Lot Thirty-four (34) in Block One Hundred Thirty-eight (138) in Lane's Addition to St. Charles, now Charles City, Floyd County, Iowa lying North of a line thirty-six feet distant (as measured at right angles) and parallel to the centerline of the main track of the Illinois Central Railroad as now located across said Addition, except the North three (3) feet of said lots;

D. Also, a triangular parcel of land in Lots One (1), Two (2), Three (3), Four (4), Five (5), Six (6), and Seven (7) in Cheney's Subdivision of Lot Thirteen (13) in Block One Hundred and Thirty-nine (139) in Lane's Addition to St. Charles, now Charles City, Floyd County, Iowa, and more particularly described as follows: Beginning at a point in the East line of said Lot One (1) that is one hundred five (105) feet South of the Northwest corner of said Lot; thence North to said Lot corner, thence West along the North line of said Sub-Division of Lot Thirteen (13) a distance of four hundred forty-five (445) feet, thence Southeasterly to the point of beginning;

A belt, strip or parcel of land 20 feet wide by 600 feet long in the Subdivision of Lot 11 of Block 139, of Lane's Addition to St. Charles (now Charles City) according to the recorded plat thereof, North and adjoining the parcel of land heretofore conveyed to Hart-Parr Company by the Chicago, Milwaukee and St. Paul Railway Company, predecessor of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company, by a quit claim deed dated November 5, 1906, and which parcel of land extends West from the West side line of Lane Street (now Scott Street) for a distance of 600 feet.

All of the above has been more particularly described as:

Parcel "A": Lots 1 and 2, Subdivision of Lot 11, Block 139, Lane's Addition to St. Charles, now incorporated in and a part of Charles City, Floyd County, Iowa.

Parcel "B": A part of Blocks 138 and 139, Lane's Addition to St. Charles, now

incorporated in and a part of Charles City, Floyd County, Iowa, being more particularly described as follows:

Beginning at the Northeast corner of Lot 4, of said Block 138, thence S00° 29' 23" E along the Westerly right of way of "E" Street to a point 36 foot distant from the centerline of the Illinois Central railroad track, 451.10 feet; thence S89° 26' 59" W along a line 36 foot distant and parallel to the said centerline of railroad track 330.49 feet to the Easterly right of -way of "D" Street; thence N88° 48' 52" W, 66.03 feet to the Westerly right of way of said "D" Street and 38 foot distant from said centerline of railroad track; thence N77° 15' 01" W, 456.98 feet to a point on the North line of Lot 13, of said Block 139 (also being the North line of Lot 7, Cheney's Sub-division); thence S89° 27' 58" W along said North line of Lot 13 (also being along the North line of Lots 7, 8 and 9 of said Cheney's sub-division), 141.19 feet to the East line of the West half of original Lot 12 of said Block 139; thence N00° 35' 54" W along said East line of the West half Lot 12 and along West line of vacated Lawler Street, 212.80 feet to the North right of way line of said Lawler Street; thence S89° 38' 46" W along said North right of way 14.17 feet; thence N00° 35' 54" W, 120.00 feet to the South right of way of the Chicago, Milwaukee & St. Paul railroad; thence N89° 38' 46" E along said railroad, 600.00 feet to the West right of way of vacated "D" Street; thence, continuing along said railroad, N78° 19' 09" E, 67.25 feet to the Northwest corner of Lot 41, of said Block 138; thence N89° 25' 24" E, continuing along said railroad also being along the North line of said Lots 41 and 4, 331.34 feet to the point of beginning.

## REAL ESTATE SALE CONTRACT

The undersigned, hereinafter called "Buyer", hereby offers to buy from **City Improvement Association of Charles City**, an Iowa non-profit corporation, hereinafter called "Seller", the interest of Seller in the real estate hereinafter described and called the "Premises", on the following terms and conditions:

1.  **Price.**  Buyer agrees to pay Seller a total purchase price of THIRTY SEVEN THOUSAND AND NO/100 Dollars ($37,000.00) payable at Closing.

2.  **Deposit**.  Buyer shall deliver a deposit of THREE THOUSAND AND NO/100 Dollars ($3,000.00) (the "Deposit") to Title Company (defined below) within five (5) days after Seller's acceptance of this offer.  The Deposit shall be applied against the purchase price at Closing or returned to Buyer as provided in Paragraphs 5, 8, 12, 15, or 17, as applicable.  Any interest on the Deposit shall be the property of Seller.

3.  **Interest in Property**.  The property (the "Premises") for which Seller is conveying its real estate interest consists of approximately 0.283 acres of vacant land described as Floyd County Parcel Number 110142900100, as depicted on **Exhibit A** attached hereto and made a part hereof, located in the City of Charles City, County of Floyd, State of Iowa.

4.  **Conveyance**.  Seller shall convey or cause the Premises to be conveyed to Buyer by Warranty Deed, hereinafter called the "Deed", subject to the exceptions and reservations contained in this Contract. The Buyer in the Deed shall be the undersigned Buyer unless Buyer designates a nominee by written notice to Seller within fifteen (15) days after the acceptance of this offer.  Such nominee may be any entity owned or controlled by Buyer or under common ownership or control with Buyer; any other nominee is subject to the written approval of Seller.  This Contract may not be assigned by Buyer except to such permitted nominee as set forth above. Buyer guarantees performance by such nominee of all terms and conditions hereof.

5.  **Evidence of Title**.  BUYER SHALL, AT ITS EXPENSE:

    (a)    within ten (10) days after Seller's acceptance of this offer, order a preliminary title report or commitment (the "Title Commitment") from First American Title Insurance Company (the "Title Company"); and

    (b)    within (10) days after Buyer's receipt of the Title Commitment, order an ALTA/NSPS land title survey (the "Survey").

    The Title Commitment and the Survey are hereinafter referred to as the "Title Evidence." Buyer shall deliver to Seller, within ten (10) days after receipt of the Title Evidence, a written statement specifying the matters that, in Buyer's absolute discretion, constitute title defects ("Title Objection Notice").  In the event Buyer delivers a Title Objection Notice, the time of Closing shall be extended for a period of up to thirty (30) days after receipt of such statement until the claimed title defects are cured.  If Seller is unable or unwilling to cure such defects within such 30-day period, and Buyer is unwilling to

accept the Deed subject to such defects, then Buyer may terminate this Contract by delivering written notice to Seller of its intention to do so within ten (10) days thereafter. Upon termination, Seller shall return the Deposit to Buyer. If Buyer shall fail to deliver to Seller a Title Objection Notice within ten (10) days after Buyer's receipt of the Title Evidence, then Buyer shall be deemed to accept title as shown on the title evidence and all exceptions title shown in the Title Evidence shall be deemed "Permitted Exceptions", except any liens and standard exceptions that can be insured over by a standard seller's affidavit from Seller in favor of the Title Company.

6.     **Exceptions**.  This Contract and the Deed shall be subject to the Permitted Exceptions.

7.     **Intentionally omitted.**

8.     **Due Diligence**.   During the forty-five (45) day period following acceptance of this Contract (the "Due Diligence Period"), Buyer shall have the right, at Buyer's expense, to enter onto the Premises at reasonable times for the purpose of inspecting, surveying and making environmental and engineering studies and soil tests.  Buyer agrees to indemnify and hold Seller harmless from all costs, expenses, liability and damages, including attorneys' fees, incurred or arising in connection with anything done or work performed by, through or under Buyer pursuant to the provisions of this paragraph, regardless of Seller's negligence.  In conducting any inspections, investigations or tests of the Premises, Buyer and its agents and representatives shall: (i) maintain comprehensive general liability (occurrence) insurance in form and amounts reasonably satisfactory to Seller, covering any accident arising in connection with the presence of Buyer, its agents and representatives on the Premises and shall deliver a certificate of insurance verifying such coverage to Seller prior to entry upon the Premises; (ii) not permit any liens to attach to the Premises by reason of the exercise of its rights hereunder; (iii) fully restore the Premises to the condition in which the same was found before any such inspections or tests were undertaken; and (iv) not reveal or disclose any information obtained during such inspections, investigations or tests concerning the Premises to any third party.  Buyer shall provide Seller with copies of all inspection reports, surveys, and environmental assessments obtained by Buyer with respect to the Premises.  In the event that Buyer determines that the condition of the Premises is unsatisfactory and gives written notice of termination to Seller prior to the expiration of the Due Diligence Period, this Contract shall be terminated and the Deposit returned to Buyer.  If Buyer fails to so terminate, Buyer shall purchase the Premises and any improvements thereon in an "as is, where at" condition and subject to all faults of every kind and nature whatsoever, whether latent or patent and whether now or hereafter existing.  Buyer represents and warrants to Seller that Buyer has not relied, and shall not rely, upon any representations or statements or the failure to make any representation or statement, by Seller or Seller's agents or employees or by any person acting, or purporting to act, on behalf of Seller.  Buyer specifically agrees that Seller shall not be obligated to do any restoration, repairs, remediation or other work in connection with the Premises, that Seller shall not be liable for any restoration, repairs, remediation or other work necessary to cause the Premises to meet any applicable laws, ordinances, requirements, limitations, restrictions, regulations or codes, or be suitable for any particular use, and that Buyer shall indemnify and hold Seller harmless from all costs, expenses, liability and damages, including attorneys' fees, incurred or arising in connection with any such restoration, repairs, remediation or other work.  Buyer waives,

2

releases, acquits and forever discharges Seller, its employees and agents and any other person acting on behalf of Seller, of and from any and all claims, actions, causes of action, liabilities, demands, rights, damages, cost, expenses, or compensation whatsoever, direct or indirect, known or unknown, foreseen or unforeseen, which Buyer now has or may have or which may arise in the future on account of or in any way growing out of or in connection with any Hazardous Materials or Other Conditions on, under, from or affecting the Premises or any law or regulation applicable thereto.  This provision shall survive the closing of this transaction and the delivery of the Deed.

9.      **Legal Description and Survey.**  The legal description to be used in the Deed shall be the legal description contained in the Survey, or if no Survey is obtained, then the legal description in the Title Commitment.

10.     **Closing.**  The Closing shall occur, through escrow with the Title Company, on the date that is the later of (i) ten (10) days after expiration of the Due Diligence Period; or (ii) five (5) days after the conditions in Section 17 are satisfied or waived by Buyer.  If Buyer gives Seller notice that Buyer desires to close earlier than the foregoing dates, the Closing shall occur within ten (10) days of Buyer's notice to Seller.  Seller shall prepare the deed and pertinent closing documents and deliver the same for review and approval by Buyer prior to closing.  Buyer agrees to purchase, affix and cancel all documentary stamps in the amount prescribed by statute, and pay all required transfer taxes and fees incidental to the recordation of said Deed.  Buyer shall apply for any lot splits or tax divisions with the appropriate local authorities at Buyer's cost and expense.  Buyer and Seller shall prorate real estate taxes as is customary in a sale of commercial property in Iowa.

11.     **Real estate commission.**  Buyer agrees to indemnify, defend, and hold harmless Seller against any and all claims by any broker, attorney, or agent engaged by Buyer for a fee or commission arising out of this Contract.  Seller agrees to indemnify, defend, and hold harmless Buyer against any and all claims by any broker, attorney, or agent engaged by Seller for a fee or commission arising out of this Contract.  The provisions in this paragraph shall survive the Closing.

12.     **Regulatory approval.**  If Seller is required to obtain regulatory approval of this transaction by any agency, the Closing date shall be extended for the time required to obtain such approval.  If such approval cannot be obtained within sixty (60) days, either party may terminate this Contract by written notice to the other and, upon termination, Seller shall return the Deposit to Buyer.

13.     **Liquidated damages.**  Time is of the essence of this Contract.  If Buyer shall default or fail to perform the requirements of this Contract within the time limits herein specified, the Seller may retain the Deposit as liquidated damages and just compensation, and not as a penalty or forfeiture, and declare this Contract terminated.  In the event of default by Seller, Buyer's sole remedies shall be a return of the Deposit and termination of this Agreement or specific performance.

14.     **Notices.**  All notices and demands herein required shall be in writing sent by email, overnight courier or certified or registered mail to the other party at the address shown herein.  Notices sent by (i) email shall be deemed made upon confirmed transmission;

3

(ii) overnight courier shall be deemed made one business day after being sent; and (iii) certified or registered mail shall be deemed made three days after mailing.

15.   **Condemnation or Casualty**.  If, prior to the Closing of this sale, all or any portion of the Premises are condemned, damaged or destroyed, Buyer shall have the option of either accepting an assignment of any condemnation or insurance proceeds or to terminate this Contract.  Buyer shall deliver written notice of its election to Seller within ten (10) days of the date Seller notifies Buyer of such condemnation, damage or destruction.  If Buyer fails to notify Seller, Buyer shall be deemed to elect to close and accept an assignment of the proceeds.   If Buyer terminates, the Deposit shall be returned to Buyer.

16.   **Miscellaneous**.

(A)   Time is of the essence in the performance of each and every one of the terms of this Contract.  Whenever any determination is to be made or action to be taken on a date specified in this Contract, if such date shall fall upon a Saturday, Sunday or legal holiday, the date for such determination or action shall be extended to the first business day immediately thereafter.

(B)   This Contract embodies the entire agreement of the parties hereto and supersedes any prior understandings or written or oral agreements between the parties concerning the Premises.  No oral statements shall be of any force or effect.   No variation modification or alteration of the terms hereof shall be binding upon either party unless set forth in an express and formal written amendment.

(C)   This Contract shall be construed in accordance with the laws of the State of Iowa.

(D)   For the purposes of this Agreement, (i) "Hazardous Materials" include, without limit, any flammable explosives, radioactive materials, hazardous materials, hazardous wastes, hazardous or toxic substances, or related materials defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. §§ 9601, *et seq.*), the Hazardous Materials Transportation Act, as amended (49 U.S.C. §§ 1801, *et seq.*), the Resource Conservation and Recovery Avenue, as amended (42 U.S.C. §§ 6901, *et seq.*), the Toxic Substances Control Act, as amended (15 U.S.C. §§ 2601, *et seq.*), and in the regulations adopted and publications promulgated pursuant thereto, as such laws or regulations now exist or may exist in the future, and (ii) "Other Conditions" include, without limit, methane and other gases, petroleum and any fraction thereof, nonhazardous wastes or materials, and any physical conditions of other subsurface conditions which arise out of or are in any way related to current or previous uses or activities on the Premises.

17.   **Other Conditions**.   Buyer's obligation to purchase the Premises and close the transaction contemplated by this Contract is contingent upon each of the following:

(A)     the closing under the Real Estate Sale Contract between Buyer and Illinois Central Road Company regarding Buyer's purchase of the real property indicated by cross-hatching on attached <u>Exhibit B</u> (the "Railroad Property"), and

(B)     the City of Charles vacating the portion of Main Street adjacent to the west of the Premises and the Railroad Property, and the City granting the Buyer an easement to use such area that is satisfactory to Buyer.

If the foregoing contingencies are not satisfied to Buyer's satisfaction or waived by Buyer on or before September 30, 2022, either party may terminate this Contract any time after such date up until the Closing occurs and upon such termination the Title Company shall return the Deposit to Buyer. The contingencies in this Section are for Buyer's benefit and may be waived by Buyer in Buyer's sole discretion.

18.     **Acceptance**. This Contract, when accepted and signed by the Seller, shall constitute the entire agreement between the parties and shall thereafter be binding upon and inure to the benefit of the Seller and the Buyer, their heirs, administrators, successors and assigns. The execution and delivery of this Contract by Buyer constitutes an offer to purchase the Premises on the terms described herein, which offer shall remain irrevocable and available for acceptance by Seller for a period of thirty (30) days after the date of Buyer's signature below. **This offer shall not become binding upon Seller until executed by Seller and a duplicate original of this Contract is delivered to Buyer.**

IN WITNESS WHEREOF, the parties have executed this Contract as of the dates set forth below.

Buyer (print or type name): PURE PRAIRIE FARMS, INC., a Minnesota corporation

By: _____ CFO
        (Buyer signature and title)

Date of Buyer's Offer  5/2  , 2022

Buyers Address for notices:
901 N. Main Street
Charles City, IA 50626
Attention:  Brian Roelofs
Email: broelofs@pureprairiefarms.com

Seller:  City Improvement Association of Charles City, an Iowa non-profit corporation

By: _____
Name: _____
Title: _____

Seller's address for notices:
1200 Cedar St
Charles City IA 50616

Attention: _____
Email: grpiep @ gmail.com

Contract accepted by Seller this 18 day of May , 2022

5

## EXHIBIT A

Depiction of the Premises



## **EXHIBIT B**

Depiction of the Railroad Property



Exhibit B-1

## LEASE AGREEMENT WITH OPTION TO PURCHASE REAL ESTATE

This Lease Agreement With Option to Purchase Real Estate (the "Agreement") is entered into effective as of the date stated herein between the City of Charles City, Iowa ("City") and Pure Prairie Farms, Inc. ("Pure Prairie").

### Recitals

A. Pure Prairie acquired a processing facility at 901 N. Main Street in Charles City, Iowa, which facility abuts North Main Street to the northwest. Pure Prairie is in the process of acquiring certain parcels of real estate owned by third parties, which abut North Main Street to the southeast. Pure Prairie intends to expand the existing facility located at 901 N. Main Street and has expressed interest in utilizing North Main Street for future plant operation.

B. The City previously vacated by Ordinance the portion of public right of way abutting the Pure Prairie facility at 901 N. Main Street after determining that said right of way was not needed for use of the public, that its maintenance as a street at public expense was no longer justified; and that the vacation of the right-of-way would not deny abutting property owners with street access to their properties.

C. Following vacation of the public right of way, the City has agreed to lease a certain portion of vacated right of way of North Main Street to Pure Prairie on the terms and conditions set forth herein and has agreed to grant to Pure Prairie an option to purchase said property at the conclusion of the lease period upon the terms and conditions stated herein.

NOW, THEREFORE, in consideration of the foregoing and the promises, undertakings and mutual agreements contained herein, Pure Prairie and the City covenant and agree as follows:

1. LEASE OF PROPERTY. The City does hereby lease to Pure Prairie the real property described as:

   *That portion of Main Street lying between Block 149 and Block 150 Lane's Addition lying north of the northerly right-of-way of the Canadian National Railway*

   and as further depicted and identified on Exhibit A ("the Property"), which is approximately 17,424 square feet.

2. LEASE TERM. The term of this lease shall commence on November 7, 2022, and shall terminate three years later on November 7, 2025, unless sooner terminated or extended as provided in this lease.

3. USE OF THE PROPERTY. During the term of the lease, Pure Prairie's use of the Property shall be limited to the uses described and depicted on the site plan as set forth in Exhibit B ("Site Plan"). Pure Prairie shall not use the Property in any other manner not specifically depicted in the Site Plan nor make structural

alterations or permanent improvements on the Property, except as set forth on the Site Plan, without the express written consent of the City Engineer of the plans and specifications therefore, which approval shall be at the sole discretion of the City Engineer. The City Engineer's consent shall be deemed given upon issuance of the necessary City permits to construct the improvements. Pure Prairie will conform to and obey all laws, ordinances, rules, regulations and requirements and orders of all federal, state, and local governmental authorities, respecting use of the Property.

4.  RENT. Pure Prairie, or its assign, agrees to pay to the City or assigns for the use of the Property during the duration of the lease annual rent as follows: $22,000.00 payable on November 7, 2022, and $22,000.00 on each November 7 thereafter during the term of this lease. All rent payments shall be credited towards the purchase price of the Property at Closing under the Option to Purchase set forth in Paragraph 14 herein.

5.  CARE AND MAINTENANCE OF PROPERTY. Pure Prairie takes the Property AS IS, WITH ALL FAULTS. Pure Prairie shall, at its own expense, keep all and every part of the Property in good repair and a reasonable safe and clean condition, which shall include but not be limited to snow removal. Upon termination of this lease, Pure Prairie shall be responsible for removing any improvements or alterations on the Property and returning the property to the City in its original condition at its cost, ordinary wear and tear excepted, unless the Option to Purchase in Section 14 is exercised.

6.  LIABILITY, INDEMNIFICATION AND HOLD HARMLESS. This lease is made upon the express condition that the City shall be free from all liabilities and claims for damage and/or suits for or by reason of any injury or injuries to any person or persons or property of any kind whatsoever, whether the person or property of Pure Prairie, its assigns, tenants, agents or employees, or third persons, from any cause or causes whatsoever while in or upon the Property or any part thereof during the term of this lease or occasioned by any occupancy or use of said Property or any activity on the Property, except to the extent those arise due to the City's, its employees', officers', and agents' negligence or intentional misconduct and as provided in Section 11(c). Pure Prairie hereby covenants and agrees to indemnify, defend and hold harmless the City, its employees, officers, and agents from and against all damages, claims, loss or liability (including reasonable attorney fees and incidental and consequential damages) on account of damage to property, bodily injury or death, or personal injury of any person or persons to the extent arising out of or connected with Pure Prairie's presence or use of the Property pursuant to this lease, except to the extent those arise due to the City's, its employees', officers', and agents' negligence or intentional misconduct and as provided in Section 11(c).

Further, Pure Prairie agrees to assume all risk of loss, injury, or damage of any kind or nature whatsoever to any motor vehicle or other personal property belonging to Pure Prairie, its tenants, agents, employees or third persons which

74812246v2

may be now or hereafter placed upon said Property and all risk of loss, injury or damage of any kind or nature whatsoever to the contents of any such vehicle or any other property now or that may hereafter be placed upon said Property, whether belonging to the Pure Prairie or others, and to save and keep harmless the City from all claims and suits growing out of any such loss, injury or damage, except to the extent those arise due to the City's, its employees', officers', and agents' negligence or intentional misconduct and as provided in Section 11(c).

7. INSURANCE.   Pure Prairie shall carry general liability insurance naming the City as an additional insured in an amount not less than $5,000,000.00 to cover risks associated with its use of the Property during the lease term and shall provide proof thereof prior to the beginning of the lease term. The City shall be provided with a Certificate of Insurance establishing compliance with this Paragraph 7 prior to the beginning of the lease term.

8. ASSIGNMENT. Pure Prairie may not assign or transfer its rights and obligations under this Agreement without the prior written consent of the City, which will not be unreasonably withheld. Notwithstanding the foregoing, the City agrees that Pure Prairie may enter into a leasehold mortgage encumbering its rights under this lease (including the Option to Purchase) and, upon request from Pure Prairie, the City shall issue a landlord estoppel certificate and consent to leasehold mortgage to Pure Prairie's lender on a form reasonable acceptable to Pure Prairie's lender. Among other matters, the consent shall include (a) the City's consent to the leasehold mortgage; and (b) the City's acknowledge that if lender forecloses on Pure Prairie's leasehold interest and option to purchase or obtains such rights through other proceedings brought in lieu of foreclosure, the City will (i) recognize lender as the tenant; and (ii) allow lender to further assign the lease or sublease. The provisions of this Agreement shall be binding on Pure Prairie' successors and/or assigns.

9. PURE PRAIRIE OBLIGATIONS.   Pure Prairie shall furnish all items necessary for its use of the Property at its sole cost and expenses, including but not limited to utilities, landscaping and lawn mowing, and snow removal. Pure Prairie is responsible for complying with all applicable laws and regulations, including but not limited to the Americans with Disabilities Act, regulations of the Board of Health, applicable City Ordinances and of the State of Iowa and Federal Government. Pure Prairie shall pay all taxes, assessments, or other charges that shall or may during the lease term be imposed on, or arise in connection with, the Property.

10. SIGNS.   No sign, marking, or other inscription of any kind, unless approved by City in writing, will be put on or attached to any part of the Property. The City shall not be responsible for any costs associated with signs or markings.

11. CITY'S RIGHT OF ACCESS.   The City may enter the Property after providing at least 24 hours' written notice to Pure Prairie (except in the event of an emergency which shall only require as much notice as possible under the

circumstances) for the purpose of inspecting the Property or for servicing of any utilities located under the Property. In the event the City services utilities on or under the Property, the City shall: (a) work diligently to minimize the impact on Pure Prairie's use of the Property; (b) coordinate with Pure Prairie to ensure that Pure Prairie has adequate ingress and egress to Pure Prairie's building, including loading docks that are adjacent to the Property; and (c) repair the Property and improvements thereon to substantially the same condition that existed prior to servicing the utilities.

12. HAZARDOUS WASTE.
   A. Pure Prairie's Duties. Pure Prairie agrees that no activity will be conducted on the Property that will produce or make use of any Hazardous Substances, except as needed in the ordinary course of Pure Prairie's business provided such Hazardous Substances are properly stored in a manner and location meeting all environmental laws. Hazardous Substances shall mean pollutants, contaminants, toxic or hazardous waste, or any other substances, the use and/or the removal of which is required or the use of which is restricted, prohibited or penalized by any environmental law.
   B. Limitation of Storage. The Property shall not be used in any manner for the storage of any Hazardous Substances except for the temporary storage of such materials that are used in the ordinary course of Pure Prairie's business provided such materials are properly stored in a manner and location meeting all environmental laws. Pure Prairie shall be responsible for obtaining any required permits and paying any fees and providing any testing required by any governmental agency related to its use or storage of Hazardous Substances.
   C. Clean-up Costs. If at any time during or after the term of the lease, the Property are found to be contaminated or subject to said conditions, due to contamination caused by Pure Prairie, Pure Prairie shall diligently institute proper and thorough cleanup procedures at Pure Prairie's sole cost and expense.

13. TERMINATION OF LEASE. If Pure Prairie does not exercise the Option to Purchase set forth in Section 14, this lease shall terminate upon expiration of the original term unless extended through a written mutual agreement of the parties. If Pure Prairie exercises the Option to Purchase, this lease shall terminate upon the earlier of conveyance of the Property from the City to Pure Prairie and the termination of the Option to Purchase. Additionally, in the event Pure Prairie fails to observe and perform any covenant, condition or obligation created by this lease, the City shall provide written notice to Pure Prairie requesting that the breach/noncompliance be immediately remedied. In the event the breach or noncompliance continues to be evidenced thirty (30) days beyond the date of the written notice, the City may declare this lease to be terminated and provide Pure Prairie with a written notice of such termination. In the event of termination of the lease prior to expiration of the original term, then the Option to Purchase set forth in Paragraph 14 herein shall be null and void and of no force and effect.

4

14. OPTION TO PURCHASE. Pure Prairie, as part of the consideration herein, is granted the exclusive right, option, and privilege of purchasing the Property upon conclusion of the original term of the lease. This option shall terminate if the City terminates the lease for breach or noncompliance under Paragraph 13 prior to expiration of the original term of the lease. If Pure Prairie does not notify the City in writing at least thirty (30) days prior to the expiration of the original term that Pure Prairie will not exercise the option to purchase, Pure Prairie shall be deemed to have automatically exercised the option.

If Pure Prairie exercises its option under this Paragraph, the purchase price to be paid by Pure Prairie to the City shall be $100,000.00. Pursuant to Paragraph 4 herein, if all rent payments are timely made, the amount due and owing at Closing shall be $34,000.00. Closing shall occur upon termination of the original lease term or as soon as practical thereafter. The purchase price shall be paid in cash at the time of closing, subject to adjustments for selling/closing expenses.

Upon payment of the purchase price, the City shall convey title by a municipal "Quit Claim Deed" subject to reservation of easements for utilities located on the Property with such easements confined to the actual location of easements that exist as of the Effective Date of the lease.

Pure Prairie may, at Pure Prairie's expense and prior to closing, have the Property surveyed and certified by a Registered Land Surveyor. Pure Prairie shall be responsible for all professional fees and expenses for any engineers, professionals, or consultants employed by Pure Prairie.

Pure Prairie shall be responsible for any abstracting/reports, title examination, title guaranty/insurance premiums, and closing fees and expenses. Pure Prairie acknowledges that Pure Prairie will acquire title to the Property in its present condition "with all faults," and "as is" without representations or warranties, express or implied, as to the condition of the property or the improvements thereon or as to value, fitness for use, state of title, or environmental matters.

15. NOTICES. Notices under this lease shall be in writing and delivered to the representative of the party to receive notice at the address of the party to receive notice as it appears below or as otherwise provided for by proper notice hereunder. The effective date for any notice under this Lease shall be the date of delivery of such notice with postage prepaid thereon or by recognized overnight delivery service:

If to City:                          If to Pure Prairie:
City Administrator                   George Peichel
105 Milwaukee Mall                   901 N Main
Charles City, IA 50616               Charles City Iowa 50616

16. MEMORANDUM. A memorandum of this Agreement shall be recorded at Pure Prairie's expense in the office of the Recorder of Floyd County, Iowa.

74812246v2

17. CONTINGENCIES. This lease is subject to and conditioned upon the following:
   A. Approval of the City Council of the City of Charles City, Iowa.
   B. Pure Prairie entering into a written purchase agreement with the City of Charles City, Charles City, Iowa, for the sale of that portion of Lots 2, 3, and 3, Block 132, Lane's Addition, lying south of the southerly right-of-way of the Canadian National Railway for the purchase price of $8,700.00 upon such other terms and conditions as agreed to by the parties.

18. MISCELLANEOUS.
   A. The parties agree that this Agreement comprises the entire agreement of the parties. This Agreement shall inure to the benefit of and be binding upon the parties and their successors or assigns. The Agreement may be amended in writing from time to time by mutual consent of the parties. All amendments to the lease must be fully executed by both parties.
   B. There are no third party beneficiaries to this Agreement. The Agreement is intended only to benefit Pure Prairie and the City.
   C. The terms and provisions of this Agreement shall be constructed in accordance with the laws of the state of Iowa. Any and all litigation or actions commenced in connection with this lease shall be brought in Floyd County, Iowa, in the Floyd County District Court or in the United States District Court for the Northern District of Iowa, provided that jurisdiction is proper in that forum.
   D. Nothing in this Agreement shall be construed as creating or constituting the relationship of a partnership, joint venture, or other association of any kind of agent/principal relationship between the parties.
   E. This Agreement shall remain in full force and effect to the end of the specified term or until terminated or canceled pursuant to this Agreement. All obligations of the parties incurred or existing under this Agreement as of the date of expiration, termination, or cancellation will survive the termination or conclusion of the lease.
   F. Failure by either party at any time to require performance by the other party or to claim a breach of any provision of this lease shall not be construed as affecting any subsequent breach or the right to require performance with respect thereto or to claim a breach with respect thereto.
   G. If any provision of this Agreement is held to be invalid or unenforceable the remainder shall be valid and enforceable.
   H. This Agreement may be executed in counterparts, which taken together form a complete lease.

[Remainder of Page Intentionally Blank; Signature Page Follows]

74812246v2

Dated this _10_ day of _Nov_____, 2022

CITY OF CHARLES CITY                          PURE PRAIRIE FARMS, INC.

DeLaine Freeseman, Mayor Pro Tem              By: _____ George Peichel

                                              Title: _____ CFO _____

Attest:

Trudy O'Donnell, City Clerk

**Foodmate US, Inc.**
221 Turner Blvd.
Ball Ground GA  30107
678 819 5270  Phone
678 819 5273  Fax
www.foodmateusa.com

# Cutup and Deboning

# PROPOSAL

Prepared For

by

Foodmate US, Inc.
Quote # 28405
Revision R02
September 02, 2022

Created by Sales Engineer:
Hasta Monger
hmonger@foodmateusa.com
678-995-2410

**Foodmate US, Inc.**

221 Turner Blvd.
Ball Ground, GA 30107

www.foodmateus.com

David Coburn
dcoburn@foodmateusa.com
770-633-7793

**Pure Prairie Farms**

901 N. Main St.
Charles City IA  50616

Pureprairiefarms.com

Brian Roelofs
broelofs@pureprairiefarms.com
(320)260-0635

**foodmate**
Poultry Processing Systems

Foodmate US, Inc.
221 Turner Blvd.
Ball Ground GA  30107
678 819 5270  Phone
678 819 5273  Fax
www.foodmateusa.com

Quote # 28405

Currency: **$**

Document Date: September 02,

| | Quantity | UoM | Price | Tax % | Tax Value | Total |
|---|---|---|---|---|---|---|

**Scope of Project:**

* Supply a distribution line at 8" centers with weighing and vision grading
* Supply (2) framelines at 12" centers with buffer transfers
* Supply (1) double stacked belt sizer with 8 stations in total
* Bypasses and pneumatic unloaders to be controlled by Chicksort
* Supply (2) Max2.0, (1) 5" Optix (manual loading) and (1) left leg Ultimate deboners
* Control panels with Arc Flash and Allen-Bradley controls
* Supply Chicksort 3

**Disclaimers:**

* Only (1) double stacked belt sizer is included in this quote. Changes in the type and number of belt sizer will result in price adjustment.

* Only thigh and drum discharge conveyors for Optix thigh deboner are included with the machine.

* Only boneless legs discharge conveyor is included with the Ultimate leg deboner.

* Only loading conveyor and the conveyor underneath that runs lengthwise are included with Max2.0 cap deboners.

* Customer is responsible for supplying other supporting conveyors.

* Fat Puller cannot be added to these compact framelines.

* This quote includes Chicksort 3 which can be upgraded to Chicksort 4 for additional cost if available.

* Everyone is aware of the global disruptions in the delivery of industrial parts and components.  Foodmate is doing its best to keep stock on hand for the needs of our customers, but our suppliers are also subject to delays that are out of our control.  We recommend placing your orders in a timely manner but please note that there still may be delays.

* Our goal continues to be providing you with superior equipment, parts and service.
_____

**Design Specs:**

**Product: Broilers with an average live weight of 2.27 kg (5.00 lbs)**

**Distribution Line Pitch: 8"**
**Frameline Chain Pitch: 12"**
**Shackle Width: 5"**
**Frameline Shackle Type: Nonweighing**
**Shackle Manufacturer: Foodmate**
**Chiller Capacity: 175 BPM**
**Working Hours: 2 shifts**
**Chilling Process: Air**
**Final Product: Frozen or Fresh**
**Packing: Retail or Bulk**
**Electricity: 480V, 3ph, 60Hz, 24V Control Voltage**

**Max2.0 Product infeed:**
**Breast caps or front halves, anatomically cut, with or without skin.**
**The product should not be broken, bruised or damaged.**

**Max2.0 Product outfeed:**
**Half or whole fillet without tenders**
**Half of Whole fillet with tenders**
**Tenders (clipped)**

**foodmate**
Poultry Processing Systems

Foodmate US, Inc.
221 Turner Blvd.
Ball Ground GA  30107
678 819 5270  Phone
678 819 5273  Fax
www.foodmateusa.com

Quote # 28405

Currency: **$**

Document Date: September 02,

| | Quantity | UoM | Price | Tax % | Tax Value | Total |
|---|---|---|---|---|---|---|
| **Skin** | | | | | | |
| **Wishbone** | | | | | | |
| **Rest meat** | | | | | | |
| | | | | | | |
| **Max2.0 Product weight (Football or Caps):** | | | | | | |
| **Min. 500 gr. - max. 1500 gram** | | | | | | |
| | | | | | | |
| **Max2.0 Product variation:** | | | | | | |
| **The machine can handle a weight variation plus or minus 150 gram per recipe** | | | | | | |
| | | | | | | |
| **Max2.0 Product temperature:** | | | | | | |
| **Between 4 and 5°C to obtain maximum yield** | | | | | | |
| | | | | | | |
| **Max2.0 Product Maturation:** | | | | | | |
| **For optimal yield, within 2,5 hrs or after 24 hrs after killing** | | | | | | |

**\* Foodmate Equipment will be tested with USDA Grade "A" Product**
**\* Uniform birds which are anatomically intact**
**\* Without broken bones or major deformations such as missing parts**
**\* Bird temperature: 36 – 40 degr F, wings not frozen**
**\* Max Distribution Line Speed: 220 birds per minute**
**\* Max Cutup Speed (Frameline): 80 birds per minute (due to wing segmenting)**
**\* Max Deboner Speed: 90 caps per minute optimal**
**\* EQUIPMENT is operated according to FOODMATE specifications**
**\* EQUIPMENT is maintained according to FOODMATE specifications**
**\* Blades are sharpened according to FOODMATE specifications**

_____

**Per drawing 4842 L03 Pure Farms 083122**

| | Quantity | UoM | Price | Tax % | Tax Value | Total |
|---|---|---|---|---|---|---|
| **FM Overhead Conveyor 8" PT, Meter** Item Code: ➡ FP.00.000.060 | 110 | Meter | 66.25 | 0.00 | 0.00 | 7,287.50 |
| **\*\*\*Overhead Conveyor Chain Joint Link--see FMU OC.00.104** Item Code: ➡ FP.00.000.036 | 10 | Each | 20.46 | 0.00 | 0.00 | 204.60 |
| **Transfer Shackle, Plastic BB** Item Code: ➡ SP.00.300.012 | 520 | Each | 14.09 | 0.00 | 0.00 | 7,326.80 |
| **Single Unloader Section Distribution Line** Item Code: ➡ SA00113823 | 5 | Each | 9,271.29 | 0.00 | 0.00 | 46,356.45 |
| **Hex Bolt M8x30** Item Code: ➡ IB.00.005.004 | 520 | Each | 0.32 | 0.00 | 0.00 | 166.40 |
| **Lock Nut M8, Zinc Plated** Item Code: ➡ IB.01.002.013 | 520 | Each | 0.17 | 0.00 | 0.00 | 88.40 |



**Foodmate US, Inc.**
221 Turner Blvd.
Ball Ground GA  30107
678 819 5270  Phone
678 819 5273  Fax
www.foodmateusa.com

Quote # 28405
Document Date: September 02,

Currency: **$**
Carry Over: **61,341.75**

| | Quantity | UoM | Price | Tax % | Tax Value | Total |
|---|---|---|---|---|---|---|
| **Drive Frame 180 Pneumatic**<br>Item Code:  SA00062810 | **1** | **Each** | **15,582.00** | **0.00** | **0.00** | **15,582.00** |
| **\*\*Gear Flexline I-Track R240/90gr\*\***<br>Item Code:  SA00102980 | **2** | **Each** | **3,201.00** | **0.00** | **0.00** | **6,402.00** |
| **Motor Reducer**<br>Item Code:  IE.00.000.149 | **3** | **Each** | **6,678.00** | **0.00** | **0.00** | **20,034.00** |
| **Elevation - Vision System 8"**<br>Item Code:  LA00113484 | **2** | **Each** | **2,941.00** | **0.00** | **0.00** | **5,882.00** |
| **FM I-Section Cut-Up Line L = 2993mm**<br>Item Code:  LA00015689 | **40** | **Each** | **486.00** | **0.00** | **0.00** | **19,440.00** |
| **FM Up-Down I-Track 30 Degrees**<br>Item Code:  LA00034101 | **14** | **Each** | **250.00** | **0.00** | **0.00** | **3,500.00** |
| **Bend R240/90 - I - Track**<br>Item Code:  LA00102450 | **12** | **Each** | **1,967.00** | **0.00** | **0.00** | **23,604.00** |
| **Bend R240/135 - I - Track**<br>Item Code:  LA00102451 | **2** | **Each** | **1,214.00** | **0.00** | **0.00** | **2,428.00** |
| **Corner Wheel 15x4 D478 + Hub**<br>Item Code:  SA00103332 | **15** | **Each** | **1,655.00** | **0.00** | **0.00** | **24,825.00** |
| **Bearing Cover**<br>Item Code:  DF00106606 | **15** | **Each** | **24.00** | **0.00** | **0.00** | **360.00** |



**Foodmate US, Inc.**
221 Turner Blvd.
Ball Ground GA  30107
678 819 5270  Phone
678 819 5273  Fax
www.foodmateusa.com

Quote # 28405
Document Date: September 02,

Currency: **$**
Carry Over: **183,127.15**

| | Quantity | UoM | Price | Tax % | Tax Value | Total |
|---|---|---|---|---|---|---|
| **FM Protection Strip R240** | **8** | **Each** | **1,088.00** | **0.00** | **0.00** | **8,704.00** |
| Item Code: SA00065780 | | | | | | |
| **Encoder Wheel Turck Inline 100** | **1** | **Each** | **6,338.00** | **0.00** | **0.00** | **6,338.00** |
| Item Code: SA00169878 | | | | | | |
| **Encoder Wheel ES7S Inline** | **1** | **Each** | **6,338.00** | **0.00** | **0.00** | **6,338.00** |
| Item Code: SA00062623 | | | | | | |
| **Buffer Rehanger Inline CCW** | **2** | **Each** | **296,800.00** | **0.00** | **0.00** | **593,600.00** |
| Item Code: FM.00.808.000 | | | | | | |
| **FM Control Box** | **1** | **Each** | **115,752.00** | **0.00** | **0.00** | **115,752.00** |
| Item Code: IH.11.004.000  **Allen-Bradley Controls** | | | | | | |
| **Bracket SR-PB5/1-S (100)** | **2** | **Each** | **5,098.00** | **0.00** | **0.00** | **10,196.00** |
| Item Code: SA00131265  **5 Button Start/Stop/Reset** | | | | | | |
| **Emergency Junction Box w/ Bracket** | **3** | **Each** | **2,093.00** | **0.00** | **0.00** | **6,279.00** |
| Item Code: SA00165781 | | | | | | |
| **Signal Kit Flex** | **3** | **Each** | **1,739.00** | **0.00** | **0.00** | **5,217.00** |
| Item Code: SA00185273 | | | | | | |
| **FM InVision Frame with LED Lighting and Cameras** | **2** | **Each** | **40,810.00** | **0.00** | **0.00** | **81,620.00** |
| Item Code: FM.00.597.000 | | | | | | |
| **FM Weighing Rehanger CCW 6"/8"** | **1** | **Each** | **344,971.60** | **0.00** | **0.00** | **344,971.60** |
| Item Code: FM.00.806.000 | | | | | | |
| **User Interface PC - 1 x per system** | **1** | **Each** | **4,664.00** | **0.00** | **0.00** | **4,664.00** |
| Item Code: FMCSUIPC | | | | | | |



**Foodmate US, Inc.**
221 Turner Blvd.
Ball Ground GA  30107
678 819 5270  Phone
678 819 5273  Fax
www.foodmateusa.com

Quote # 28405

Currency: **$**

Document Date: September 02,

Carry Over: **1,367,166.75**

| | Quantity | UoM | Price | Tax % | Tax Value | Total |
|---|---|---|---|---|---|---|
| **Chicksort 3 Ctrls-1 per Multiline System** | **1** | **Each** | **70,670.00** | **0.00** | **0.00** | **70,670.00** |
| Item Code:  FMCSCOR3 | | | | | | |
| **Chicksort Ctrls-On Line Hot Swap** | **1** | **Each** | **28,270.00** | **0.00** | **0.00** | **28,270.00** |
| Item Code:  FMCSCOR2 | | | | | | |
| **FM ChickSort InVision Control Box** | **1** | **Each** | **9,892.00** | **0.00** | **0.00** | **9,892.00** |
| Item Code:  FMCSVGCTL | | | | | | |
| **FM ChickSort InVision Grading Software** | **1** | **Each** | **35,332.00** | **0.00** | **0.00** | **35,332.00** |
| Item Code:  FMCSVGSW | | | | | | |
| **FM ChickSort In-line Weigh Station Controls** | **1** | **Each** | **23,055.00** | **0.00** | **0.00** | **23,055.00** |
| Item Code:  FMCSWSCTL | | | | | | |
| **Ruggedized Windows Tablet with ChickSort Mobile App** | **3** | **Each** | **3,111.00** | **0.00** | **0.00** | **9,333.00** |
| Item Code:  FMCSTAB2 | | | | | | |
| **FM ChickSort I/O Module - 8 Inputs 8 Outputs** | **8** | **Each** | **4,240.00** | **0.00** | **0.00** | **33,920.00** |
| Item Code:  FMCS8I8O | | | | | | |
| **FM ChickSort I/O Module - X Inputs X Outputs** | **2** | **Each** | **8,480.00** | **0.00** | **0.00** | **16,960.00** |
| Item Code:  FMCSBUFF | | | | | | |
| **Distribution Line Subtotal** | | | | | | **1,594,598.75** |
| **FM CUTUP OVERHEAD SYSTEM - FLEX/FRAME** | **1** | **Each** | **211,204.00** | **0.00** | **0.00** | **211,204.00** |
| Item Code:  FM.00.500.000  Frameline 1 | | | | | | |
| **FM CUTUP OVERHEAD SYSTEM - FLEX/FRAME** | **1** | **Each** | **211,204.00** | **0.00** | **0.00** | **211,204.00** |
| Item Code:  FM.00.500.000  Frameline 2 | | | | | | |



**Foodmate US, Inc.**
221 Turner Blvd.
Ball Ground GA  30107
678 819 5270  Phone
678 819 5273  Fax
www.foodmateusa.com

Quote # 28405
Document Date: September 02,

Currency: **$**
Carry Over: **1,805,802.75**

| | Quantity | UoM | Price | Tax % | Tax Value | Total |
|---|---|---|---|---|---|---|
| **FM Control Box** | 2 | Each | 115,752.00 | 0.00 | 0.00 | 231,504.00 |
| Item Code: IH.11.004.000  Control Panel with Allen-Bradley, Arc Flash, No VFD on Blade Motors | | | | | | |
| **Control Panel** | 2 | Each | 2,411.50 | 0.00 | 0.00 | 4,823.00 |
| Item Code: IH.01.003.964  4 Button Start/Stop/Reset | | | | | | |
| **Bracket-SR-PB4/1-S** | 2 | Each | 556.00 | 0.00 | 0.00 | 1,112.00 |
| Item Code: SA00064213 | | | | | | |
| **Pneumatic Unloader Pneumatic Unloader** | 2 | Each | 7,250.00 | 0.00 | 0.00 | 14,500.00 |
| Item Code: FM.00.501.000 | | | | | | |
| **FM Wing Stretcher** | 2 | Each | 6,890.00 | 0.00 | 0.00 | 13,780.00 |
| Item Code: FM.00.505.000 | | | | | | |
| **FM Mid Wing Cutter With Bypass** | 2 | Each | 28,090.00 | 0.00 | 0.00 | 56,180.00 |
| Item Code: FM.00.515.000 | | | | | | |
| **FM Wing Tip Cutter With Bypass** | 2 | Each | 35,086.00 | 0.00 | 0.00 | 70,172.00 |
| Item Code: FM.00.520.000 | | | | | | |
| **FM Wing Cutter Super Cut Without Bypass** | 2 | Each | 37,524.00 | 0.00 | 0.00 | 75,048.00 |
| Item Code: FM.00.525.000 | | | | | | |
| **FM Halving Machine Single Blade** | 2 | Each | 11,130.00 | 0.00 | 0.00 | 22,260.00 |
| Item Code: FM.00.530.000  Spine Cutter/Nonpass | | | | | | |
| **FM CAP Cutter** | 2 | Each | 38,546.00 | 0.00 | 0.00 | 77,092.00 |
| Item Code: FM.00.535.000  Nonbypass | | | | | | |
| **FM Leg Processor Without Bypass** | 2 | Each | 78,440.00 | 0.00 | 0.00 | 156,880.00 |
| Item Code: FM.00.549.000 | | | | | | |



**Foodmate US, Inc.**
221 Turner Blvd.
Ball Ground GA  30107
678 819 5270  Phone
678 819 5273  Fax
www.foodmateusa.com

Quote # 28405
Document Date: September 02,

Currency: **$**
Carry Over: **2,740,357.75**

| | Quantity | UoM | Price | Tax % | Tax Value | Total |
|---|---|---|---|---|---|---|
| **Food Service Unloader Food Service Unloader** | **2** | **Each** | **2,660.00** | **0.00** | **0.00** | **5,320.00** |
| Item Code:  FM.00.550.000 | | | | | | |
| **Food Service Unloader** | **2** | **Each** | **7,250.00** | **0.00** | **0.00** | **14,500.00** |
| Item Code:  FM.00.550.000  Singe Leg/Pneumatic | | | | | | |
| **Food Service Unloader** | **2** | **Each** | **7,250.00** | **0.00** | **0.00** | **14,500.00** |
| Item Code:  FM.00.550.000  Pneumatic Leg Unloader | | | | | | |
| **FM Thigh/Drum Cutter Thigh Drum Cutter - 12"/5" (Blue Wheel)** | **2** | **Each** | **29,680.00** | **0.00** | **0.00** | **59,360.00** |
| Item Code:  FM.00.555.000 | | | | | | |
| **FM Leg Turning System  for BB Opti XL** | **2** | **Each** | **2,597.00** | **0.00** | **0.00** | **5,194.00** |
| Item Code:  FM.00.558.000 | | | | | | |
| **Buffertank Valve Assembly** | **6** | **Each** | **3,084.00** | **0.00** | **0.00** | **18,504.00** |
| Item Code:  SA00123453 | | | | | | |
| **Valve Assembly- One Leg Unloader** | **2** | **Each** | **3,084.00** | **0.00** | **0.00** | **6,168.00** |
| Item Code:  SA00143155 | | | | | | |
| **FM Trolley/One Leg Detection** | **2** | **Each** | **2,782.00** | **0.00** | **0.00** | **5,564.00** |
| Item Code:  SA00056247 | | | | | | |
| **Single Trolley Detection** | **6** | **Each** | **763.00** | **0.00** | **0.00** | **4,578.00** |
| Item Code:  SA00114107 | | | | | | |
| **Framelines Subtotal** | | | | | | **1,279,447.00** |
| | **4** | **Each** | **85,000.00** | **0.00** | **0.00** | **340,000.00** |
| Item Code:  FMU001  Deboner Surcharge | | | | | | |

**foodmate**

Poultry Processing Systems

**Foodmate US, Inc.**
221 Turner Blvd.
Ball Ground GA  30107
678 819 5270  Phone
678 819 5273  Fax
www.foodmateusa.com

Quote # 28405

Document Date: September 02,

Currency: **$**

Carry Over: **2,874,045.75**

| | Quantity | UoM | Price | Tax % | Tax Value | Total |
|---|---|---|---|---|---|---|
| **Intelligent Thigh Deboner 5"** | **1** | **Each** | **1,855,000.00** | **0.00** | **0.00** | **1,855,000.00** |
| Item Code: ➡️ FM.00.625.000 | | | | | | |
| | **1** | **Each** | **34,450.00** | **0.00** | **0.00** | **34,450.00** |
| Item Code: ➡️ FMU001  **Optix Thigh Belt/PK Belting/Standard** | | | | | | |
| | **1** | **Each** | **25,970.00** | **0.00** | **0.00** | **25,970.00** |
| Item Code: ➡️ FMU001  **Optix Drum Belt/PK Belting/Standard** | | | | | | |
| **Ultimate Whole Leg Deboner** | **1** | **Each** | **1,695,000.00** | **0.00** | **0.00** | **1,695,000.00** |
| Item Code: ➡️ FM.00.640.000  **Left Leg Deboner** | | | | | | |
| | **1** | **Each** | **38,745.00** | **0.00** | **0.00** | **38,745.00** |
| Item Code: ➡️ FMU001  **Boneless Legs Discharge Conveyor/PK Belting** | | | | | | |
| **MAX 2.0** | **2** | **Each** | **995,000.00** | **0.00** | **0.00** | **1,990,000.00** |
| Item Code: ➡️ FM.00.711.000 | | | | | | |
| **Deboners Subtotal** | | | | | | **5,979,165.00** |
| | **1** | **Each** | **345,600.00** | **0.00** | **0.00** | **345,600.00** |
| Item Code: ➡️ FMU001  **Double Stacked Belt Sizer with 8 Stations Total** | | | | | | |
| | **1** | **Each** | **17,035.00** | **0.00** | **0.00** | **17,035.00** |
| Item Code: ➡️ FMU001  **1 Set of Basic Spare Parts** | | | | | | |

**Includes:**

- **Loadcell**
- **Product detection**
- **Motor of weighing unit**
- **Motor of sorting conveyor**
- **Basic spare parts**

| | Quantity | UoM | Price | Tax % | Tax Value | Total |
|---|---|---|---|---|---|---|
| | **1** | **Each** | **5,125.00** | **0.00** | **0.00** | **5,125.00** |
| Item Code: ➡️ FMU001  **Optional: Transformer for Belt Sizer** | | | | | | |



**Foodmate US, Inc.**
221 Turner Blvd.
Ball Ground GA  30107
678 819 5270  Phone
678 819 5273  Fax
www.foodmateusa.com

Quote # 28405
Document Date: September 02,

Currency: **$**
Carry Over: **9,215,845.75**

| | Quantity | UoM | Price | Tax % | Tax Value | Total |
|---|---|---|---|---|---|---|
| | **1** | **Each** | **12,415.00** | **0.00** | **0.00** | **12,415.00** |

Item Code:    FMU001    **Optional: Marix G Grader Software**

Database software, MATRIX S-server to be installed on 1 computer

• **MATRIX G client for generating production reports**
• **The user software MATRIX G client can be installed on various computers**
• **Gathers and stores all processed information of the grader**
• **For the software: each device will require an static IP address or must be connected by DHCP**
• **For the remote service: Ports 80 & 81 of the firewall should be open in order to remotely service the MARELEC devices directly**

• **Not included:**
o **Modifications of software and hardware not described in this document**
o **Interface with 3rd party software and hardware**
o **Adjustment of 3rd party software and hardware**

_____

**Belt Sizer**
**Subtotal**                                                                                     **380,175.00**

**Foodmate US, Inc.**
221 Turner Blvd.
Ball Ground GA  30107
678 819 5270  Phone
678 819 5273  Fax
www.foodmateusa.com

Quote # 28405
Document Date: September 02,

Currency: **$**
Carry Over: **9,233,385.75**

| | Quantity | UoM | Price | Tax % | Tax Value | Total |
|---|---|---|---|---|---|---|

\* **Supervision of Installation, Startup, Commissioning and Training**

\* **The installation days provided on this quote are for one planned specific time agreed upon between Foodmate and Customer**

\* **If the scope changes after order and a phased install is needed, then Foodmate will need to revise man days from original scope.**

\* **By delivering a service over a longer period, the size of the project team will need to be reevaluated and agreed upon between both parties.**

| | Quantity | UoM | Price | Tax % | Tax Value | Total |
|---|---|---|---|---|---|---|
| **Installation** | 314 | Each | 1,600.00 | 0.00 | 0.00 | 502,400.00 |
| Item Code:  ➡ Installation    **Equipment** | | | | | | |
| **Installation** | 42 | Each | 1,600.00 | 0.00 | 0.00 | 67,200.00 |
| Item Code:  ➡ Installation    **Customer Service** | | | | | | |
| **Chicksort Support 24x7** | 1 | Each | 13,575.00 | 0.00 | 0.00 | 13,575.00 |
| Item Code:  ➡ FMCSSUPPORT 24 | | | | | | |

**Freight will be billed at actual at time of delivery.**

| Payment Term | Customer Net 30 |
|---|---|

| | |
|---|---|
| Quotation Subtotal: | **$9,816,560.75** |
| Freight: | **$140,000.00** |
| Total Before Tax: | **$9,956,560.75** |
| Total Tax Amount: | **$0.00** |
| **Total Amount:** | **$9,956,560.75** |

Quotation Valid Until:  10/02/22



**Foodmate US, Inc.**
221 Turner Blvd.
Ball Ground GA  30107
678 819 5270  Phone
678 819 5273  Fax
www.foodmateusa.com

Cutup and Deboning

Quote # 28405

Revision R02

September 02, 2022

PROPOSAL ACCEPTANCE

Your signature below indicates acceptance of this proposal and the terms and conditions herein.

**Payment Terms are as follows:**

Fifty percent (50%) upon BUYER's issuance of an order, forty percent (40%) upon SELLER's notice to BUYER that any such equipment and/or components are ready for shipment to BUYER, and ten percent (10%) upon commissioning and sign out due no later than thirty (30) days from the date of the applicable invoice.

In order to guarantee pricing and dates, payments must be received in accordance with payment terms, and all technical specifications will need to be resolved no later than one week after receiving a PO. If the customer and Foodmate signed a "Pre-Order Leadtime Form" and the layout # has not been revised from the layout # stated on the quote, then Foodmate will guarantee those dates. Once the factory assigns the Factory Ready Date (FRD), your Project Manager and or Sales Representative will contact you to complete the Statement of Work (SOW). The SOW will communicate important information like FRD, Delivery Date, Installation Date, and Expected Startup. If any dates are unknown at that time, we will need to amend and update the SOW once dates are secured. You, the customer, will be able to decide on transport options, like Air Freight, Sea Freight, Drop Ship door to door, Port Locations, etc., once the SOW is presented to you. Certain freight options may incur higher prices than stated on this quote.

If the layout or scope of work changes, Foodmate may need to revise the SOW, after the Change Order and Layout Modification has been approved. New dates will be communicated upon execution of Change Order and Layout Modification Approval. The Project Purchase Price will be adjusted according to requested modifications. You, the customer, will also incur engineering fees at the rate of $150 per hour for any engineering services associated with Layout Modifications.

For Foodmate US, Inc.:                                    For Pure Prairie Farms:

Signature: _____            Signature: _____

Name: _____            Name: _____

Title: _____            Title: _____

Date: _____            Date: _____



**Foodmate US, Inc.**
221 Turner Blvd.
Ball Ground GA  30107
678 819 5270  Phone
678 819 5273  Fax
www.foodmateusa.com

## FOODMATE US, INC. TERMS AND CONDITIONS OF SALE (this "Agreement")

**1.    CONTRACT TERMS.**  Stated below are the terms and conditions upon which Foodmate US, Inc. ("SELLER"), will accept orders for equipment, installation, maintenance and/or parts ("PRODUCTS") from BUYER. Such PRODUCTS shall be identified on an invoice or other communication to BUYER. By entering an order directly with SELLER or by the transmission of BUYER's order from an authorized representative of BUYER to SELLER for acceptance, BUYER agrees that the terms and conditions set forth herein shall be incorporated in BUYER's order. Unless otherwise specified by SELLER in writing, quotations shall be valid for a period of thirty (30) days from the date thereof. SELLER shall not be bound until BUYER's order has been accepted in writing by an authorized representative of SELLER. Except as to quantity and prices listed in any such accepted order, these terms and conditions shall control over any terms that are in addition to , or inconsistent or in conflict with, such terms and conditions unless SELLER's acceptance specifically references a numbered provision herein (or part thereof), states that it is expressly overridden, and is separately initialed by SELLER's authorized representative ("Override"). Further, unless expressly stated otherwise in such Override, any quantities, prices and other different terms shall apply one time only for the subject order. If SELLER's acknowledgment contains terms additional to or different from the BUYER's order, it shall be effective as an acceptance of such order only if such additional or different items are included in the order, and they shall be so included if not objected to in writing within ten (10) days from the date of SELLER's acknowledgement. SELLER will not be bound by any additional, different or inconsistent terms in BUYER's purchase order or other documents from BUYER, and shipment or delivery of PRODUCTS pursuant to a purchase order that contains additional, different or inconsistent terms does not constitute acceptance of such terms by SELLER. SELLER may withdraw any offer to sell BUYER PRODUCTS within seven (7) days of BUYER's acceptance of any such offer.

**2.    PAYMENT; TAXES.**  Unless stated otherwise, prices are stated in U.S. dollars, are subject to change without notice and do not include taxes, duties or any import/export charges, fees, shipment costs or expenses. Banking charges, if any, are to be paid by BUYER. BUYER's order to SELLER constitutes a continuing offer to purchase the PRODUCTS, identified in such order at the price in effect at the time the order is received; provided, however, that the price may be adjusted by SELLER, at any time, to reflect increases in costs/expenses due to tariffs affecting the U.S. and/or its foreign counterparts. In addition to the agreed price, BUYER shall pay SELLER any applicable taxes or governmental charges which may be required in connection with PRODUCTS sold under this Agreement. Unless otherwise stated on signed quote, payment for all PRODUCTS comprising equipment or components is due as follows: fifty percent (50%) upon BUYER's issuance of an order, forty percent (40%) upon SELLER's notice to BUYER that any such equipment and/or components are ready for shipment to BUYER, and ten percent (10%) upon commissioning and sign out due no later than thirty (30) days of the date of the applicable invoice. All past due payments shall incur interest of one and one-half percent (1 ½%) per month. Delay in the BUYER's ability to take delivery of PRODUCTS for any reason shall not result in an extension of any noted payment terms. Failure to pay the forty percent (40%) installment payment may result in the reassignment of the specifically identified equipment to a different buyer and require a new production order and delivery date. There will be a twenty percent (20%) restocking fee and a $100.00 administrative fee for any cancelled or partially cancelled order for equipment. SELLER shall not be obligated to ship PRODUCTS unless BUYER has paid for such PRODUCTS . Title to PRODUCTS will transfer from SELLER to BUYER upon BUYER's acceptance of delivery. BUYER grants SELLER a purchase money security interest in all PRODUCTS delivered hereunder until the total selling price, including taxes, delivery, installation and other charges, have been paid in full. SELLER has the right to file a UCC-1 financing statement in the public records of the appropriate state of domicile. BUYER may also be required to sign and deliver to SELLER additional security agreement.

**3.    DELIVERY.**  Unless designated otherwise, all PRODUCTS are sold F.O.B. destination point or transfer to BUYER designated carrier. SELLER will determine the point of origin of shipment. Shipment will be by any carrier that SELLER deems reasonable, freight collect or prepaid by BUYER. Upon transfer of PRODUCTS to the BUYER designated carrier, all risk of loss or damage to the PRODUCTS is transferred to BUYER. Unless specifically agreed in writing, shipment dates quoted are estimates, and SELLER does not guarantee a particular date for shipment or delivery of the PRODUCTS. SELLER shall not be liable for any losses, damages, or penalties occasioned by late performance, nor for any deviation in performance due to supplier delays, shortages or interruption in labor, raw materials, equipment, fuel or power, transportation delays or unavailability, machinery or equipment breakdown, fire, hail, flood, rain or windstorm, explosions, strikes, labor disputes, embargos, wars, riots, civil disturbances, governmental restrictions, actions or omissions, acts of terrorism, other acts of nature, acts of BUYER, other delays in transportation or any other condition beyond the reasonable control of SELLER . In any such events, the date of delivery will be extended by a period equal to the delay plus a reasonable time to resume production and SELLER shall use commercially reasonable efforts to equitably allocate available PRODUCTS covered hereby , in excess of its own needs, proportionately among its customers, including BUYER, in such a manner as shall be determined by SELLER in its discretion to be practicable. Nothing herein shall excuse BUYER of its liability to pay for PRODUCTS shipped by or on behalf of SELLER to BUYER. In the event of loss or damage to PRODUCTS in shipping, BUYER shall obtain a written statement from the carrier's representative as to the circumstances of the loss or damage and deliver a copy to SELLER. All freight claims for breakage, loss or damage, whether obvious or concealed, shall be made by the SELLER only against the carrier within the time period specified by ICC regulations. PRODUCTS are deemed accepted by BUYER unless notice is given in writing within two (2) days of delivery. BUYER may not reject any shipment due to immaterial defects. SELLER's liability in the event any item is properly rejected by BUYER shall be limited, at SELLER's option, to repair or replacement. If the sale of PRODUCTS provides for installation, SELLER's obligation to deliver the PRODUCTS and provide for their installation shall in no event commence until BUYER's premises are ready to receive the PRODUCTS, and such obligation shall be subject to all the other terms of this Agreement. Costs and expenses to SELLER or its contractor for delays in installation due to interference or delays by other contractors and /or by BUYER on BUYER's project will be charged to BUYER, including storage and handling fees of $500 per month for delays in excess of thirty (30) days. BUYER shall be responsible for all coverage to SELLER caused by any change to SELLER's installation practices, if any, of PRODUCTS purchased hereunder, whether such change is made at BUYER's request or required due to facility layout, utility availability, or otherwise. BUYER IS RESPONSIBLE FOR ALL FACILITY SPECIFICATIONS PROVIDED TO SELLER.

**4.    WARRANTY; DISCLAIMERS.**  The PRODUCTS are warranted to be free from material defects in materials and workmanship for the lesser of four thousand (4,000) run-time hours or twelve (12) months, except where parts are considered to be a motor or electrical in nature in which case the warranty is reduced to the lesser of two thousand (2,000) run-time hours or six (6) months. No warranty will be granted to parts deemed by SELLER as consumables like blades or bearings. No warranty is hereby given for any services performed by SELLER. The determination as to whether PRODUCTS are defective shall rest solely and exclusively with SELLER. If PRODUCTS are deemed by SELLER to not be covered by the above warranty, SELLER will provide repair services at its then-current daily rate, with a one (1) day minimum, plus SELLER's expenses. All warranties will be null and void if PRODUCTS (a) have been improperly repaired or altered; (b) have been subjected to misuse, negligence or accident; (c) have been used in a manner contrary to SELLER's instructions or the written documentation accompanying the products; (d) have been combined with other materials; (e) are defective as a result of transportation or shipment; (f) are improperly installed by BUYER or its agent; or (g) are used with any parts that were not original equipment manufactured (OEM). To make a claim under this warranty, BUYER must notify SELLER within ten (10) days of discovery of a defect. SELLER waives any and all rights it may have to warranty coverage if it fails to notify SELLER of a defect within the time provided. THIS LIMITED WARRANTY CANNOT BE TRANSFERRED OR ASSIGNED AND IS FOR THE SOLE AND EXCLUSIVE BENEFIT OF BUYER. If SELLER determines that the PRODUCTS are defective, SELLER, at its sole election, will either replace the PRODUCTS, repair the PRODUCTS, or accept a return of the PRODUCTS for full credit of the purchase price paid therefor. THE WARRANTY CONTAINED IN THIS PARAGRAPH IS PROVIDED IN PLACE OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, ORAL OR WRITTEN, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. THE REMEDIES PROVIDED HEREIN ARE THE SOLE AND EXCLUSIVE REMEDIES OF BUYER AND ARE IN LIEU OF ALL OTHER REMEDIES. BUYER agrees that it will not rely upon, and SELLER does not authorize, any representation, warranty or agreement made by any of SELLER's representative, except as set forth herein.

**5.    LIMITATION OF LIABILITY.**  BUYER agrees that any liability of SELLER or its affiliates hereunder or with respect to the sale of PRODUCTS shall be limited to the amount of the purchase price actually received by SELLER from BUYER, and shall not include any special, incidental, indirect, cover, consequential, exemplary, punitive or similar damages, any damages based on injury to person or property, or any lost sales, profits or data, even if BUYER and /or SELLER is advised of the possibility of such damages.

**6.    INSURANCE.**  BUYER shall maintain throughout completed installation and title transfer, as applicable, workers' compensation insurance with statutory limits and commercial general liability insurance with a combined single limit for bodily injury and property damage of not less than $1,000,000 per occurrence and $1,000,000 in the aggregate, or such other amounts of coverage as BUYER may carry, whichever is greater. All such policies shall provide for contractual liability and shall include a standard cross-liability clause or endorsement. All such policies shall name SELLER as an additional insured (except for the workers' compensation insurance). The protection of SELLER as additional insured under BUYER's commercial general liability policy as required herein shall apply on a primary basis and no other insurance maintained by SELLER shall be called upon to contribute to any loss for which SELLER is covered as an additional insured under BUYER's commercial general liability policy. The protection of SELLER as additional insured under Customer's commercial general liability policy as required herein shall be afforded by Insurance Services Office ("ISO") form # CG 20 26, ("Additional Insured - Designated Person or Organization"), or a substantially similar form which affords additional insured protection to SELLER applicable under this contract between SELLER and BUYER. Each policy of insurance required of BUYER herein shall be endorsed to provide that the insurer thereof shall mail notice to SELLER at least ten (10) days prior to any cancellation of such policy. BUYER hereby waives all rights of recovery against SELLER with respect to any and all losses covered by any of the insurance policies required of BUYER herein. Each policy of insurance required of BUYER herein shall be endorsed to provide that the insurer thereof waives all rights of subrogation against SELLER. Prior to or immediately upon execution of this agreement, and within ten (10) days of the expiration date of any policy of insurance required of BUYER herein, BUYER shall provide to SELLER certificates of insurance evidencing BUYER's compliance with all of the above insurance requirements. Such certificates shall include/attach copies of the actual policy insurance endorsements addressing the aforementioned additional insured, primary/non-contributory, waiver of subrogation and notice of cancellation requirements.

**7.    REMOTE SUPPORT AND INTERNET ACCESS.**  For remote support software and operational support, BUYER guarantees to provide an internet connection to the installed PRODUCTS. Remote support cannot be established by using a VPN service provided for by BUYER. To establish a connection to the installed PRODUCTS, SELLER will provide a VPN Router in the installed PRODUCTS ("VPN Router"). This VPN Router equips the installed PRODUCTS with a local network and accesses the internet via a secure VPN connection between the PRODUCTS and SELLER's Talk2M cloud. SELLER uses the Talk2M cloud to access the installed PRODUCTS. In any circumstance that BUYER is not able to provide an internet connection, even temporarily, SELLER cannot offer such remote support to BUYER. The manufacturer of the VPN Router is ISO 27001-certified company EWON. This network environment shall solely be used by SELLER for



**Foodmate US, Inc.**
221 Turner Blvd.
Ball Ground GA  30107
678 819 5270  Phone
678 819 5273  Fax
www.foodmateusa.com

the purpose of: (a) providing remote Equipment repair and/ or improvement services; (b) allowing Buyer to receive emails when there is an Equipment malfunction; (c) collecting data on wear and tear of the Equipment for service visits; and, (d) creating a 2nd user interface/ monitor for Buyer (optional).  This router shall under no circumstance be used by SELLER for any other purpose than the abovementioned.  If use of the network environment is required for any reason outside of the scope of this purpose, but nevertheless in light of providing services to the PRODUCTS, this use shall be subject to BUYER's advance approval.  The following options are available to BUYER in order to increase its PRODUCTS' network security: ( a) creating a virtual local area network ('VLAN') to separate the PRODUCTS' network from the BUYER's network; and/or (b) providing the Ewon service through a 2nd internet provider, which differs from BUYER's standard network provider.   Please note that adding a second user interface / monitor for BUYER as mentioned above and /or using a GSM network to facilitate connection on the PRODUCTS is not possible in some cases. This is only possible if the GSM signal on the PRODUCTS' production location is of sufficient quality. These options are not delivered as a standard and shall need to be agreed upon separately in writing between BUYER and SELLER.

     **8.**    **APPLICABLE  LAW.**  This Agreement shall be interpreted and construed in accordance with the laws of the State of Georgia, without regard to conflicts -of-law rules of such state.  The parties expressly exclude the applicability of the United Nations Convention on Contracts for the International Sales of Goods.   Any action or proceeding arising out of or related to this Agreement shall be brought only in a federal or state court located in Georgia, and the parties hereby consent to such venue and the jurisdiction of such courts over the subject matter of such proceedings and themselves.  If any provision hereof, partly or completely, shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision or portion hereof and this Agreement shall be construed as if such invalid or unenforceable provision or portion thereof had never existed.

     **9.**    **MISCELLANEOUS.**  Neither party is or shall be deemed to be the agent, partner or joint venture of the other.  Neither party shall be authorized to bind the other, except as expressly provided herein, nor shall either,  party be responsible for the acts or omissions of the other.  The headings herein are for convenience of reference only and do not constitute part of this Agreement or affect the meaning, construction or effect hereof.  This Agreement contains the complete and exclusive statement of the agreement between the parties with respect to the subject matter hereof and supersedes all previous or contemporaneous statements, oral or written, including, without limitation, descriptions of PRODUCTS in catalogues, advertisements or other sales literature.  BUYER shall not assign this Agreement without, SELLER's prior written consent.   No modification to this Agreement, including, without limitation, any change orders, shall be binding unless signed by both parties hereto.

# SMITHWAY, INC.
# QUOTATION

QUOTED TO:                                          QUOTED BY:
PURE PRAIRIE FARMS                                   ROCKY L. SMITH
ATTN: GEORGE                                        PO BOX 188
REF: 48' SMITHWAY A/C STRAIGHT FRAME TRL            FAIRVIEW, NC  28730
EMAIL : gpeichel@pureprairiefarms.com              PHONE# 828-628-1756
DATE:  JANUARY 31, 2022                             FAX# 828-628-7662

*WE ARE PLEASED TO QUOTE ON YOUR INQUIRY AS FOLLOWS:*

- ONE 48' SMITHWAY AIR-CONDITIONED TRAILER WITH 15 TON DUAL 7-1/2 TON R410 COMPRESSORS
- GREAT DANE STRAIGHT FRAME TRAILER13'-6" HIGH X 102" WIDE
- SLIDING AIR RIDE SUSPENSION WITH MANUAL DUMP VALVES
- ANTILOCK BRAKES
- EXTERIOR – PRE-PAINTED WHITE .050 ALUMINUM
- INTERIOR WALLS AND CEILING – SMITHWAY MAX INSULATION WITH POLYUREA LINER
- ALUMINUM CHICK BOX DIVISION BARS
- INSULATED SWING REAR DOORS WITH EMERGENCY DROP DOWN VENTS
- ONE ROADSIDE DOOR 48"X88"
- SUB FLOOR – ALUMINUM
- RAISED FLOOR – HINGED ½" PLASTIC WITH ALUMINUM RAILS AND HOLD BACKS FOR WASHOUT
- LOAD LOCK AND TRACK
- ALUMINUM OVERHEAD FAN BRACKETS WITH ADJUSTABLE PLASTIC FAN BLADES & ALUMINUM FAN CAGES
- EMERGENCY DROP DOWN INTAKE OPENINGS IN MIXING CHAMBER
- CORNER MOUNTED TEMPERATURE & MODE READ-OUT SYSTEM
- ONE DOUBLE THROW – THREE POLE TRANSFER SWITCH
- TWO 45 KW 3 PHASE DIESEL EPS GENERATORS WITH 50 GAL ALUMINUM FUEL TANK MOUNTED UNDERNEATH TRAILER
- 16 – SIDE WALL EMERGENCY VENTS AND HOLD BACKS
- ALLEN BRADLEY 1400 PROGRAMMABLE LOGIC CONTROL
- 2 - 15KW 3 PHASE ELECTRIC DUCT HEATERS

TRAILER COST:  $228,725.00

**This price quote is good for 60 days. Please contact us for a price update after 60 days.**

**NOTE: PER GREAT DANE / JOHNSON CONTRACT – 14 WEEKS PRIOR TO MANUFACTURE OF THE TRAILER, THE PRICE COULD INCREASE**

PAYMENT TERMS: 25% AS DOWN PAYMENT AT TIME OF ORDER
BALANCE DUE UPON COMPLETION
F.O.B. FAIRVIEW, NC

WE NEITHER ACCEPT NOR COLLECT TAXES FOR ANY AGENCY OR AGENCIES



Performance, Packaged

# PROPOSAL

| Quote Number : MQ1829-002 | Quote Date : 11/02/22 | VALID THROUGH:  01/06/23 |
|---|---|---|

**Prepared for :**

Bob Wolfe

Pure Prairie Farms

68888 Fort Road

Fairfax MN 55332

United States

## Project Description

Includes Removal of 2 Obsolete Tray Sealers

5% Discount for Multiple Machine Purchase

3% Discount for Trade In

## System Summary  (Installation, Delivery & Training not included)

Lead Time : 16 Weeks

*All displayed totals are US Dollars

 **Component # 1**                                     **Subtotal**

Ossid 500E Next Gen                                      **$1,918,005.00**

---

**Ossid 500E Next Gen**

Prepared for:
**Pure Prairie Farms**



## COMPONENT DESCRIPTION:

Ossid Next Gen 500E Overwrap Machine Features and Benefits Include:

•Reduced cost of ownership

•Modular assembly design

•Qualified with multiple materials

•Consistent tightly wrapped packaging

•Leak resistant end seals

•Welded, trimmed center seal allows for easy printing on both the top and bottom of packages

•Print Registration

•Runs tray sizes from #2 to 10" x 15" including #9 and heights up to 5 1/4"

•Runs at speeds up to 60 packages per minute

•Modified atmosphere packaging (MAP) -  Optional Upgrade

---

**Your Ossid Contact:**
Cory Johnson
cory.johnson@promachbuilt.com

# System Total :
# $1,995,723.00



# PROPOSAL

## REQUIRED ITEMS:

| | Quantity | List Price | Discount | Ext. Price |
|---|---|---|---|---|
| **Base Machine** | 5 | $305,025.00 | $122,010.00 | **$1,403,115.00** |
| **Ossid Auto-Indexing Conveyor** | 5 | Included | | **Included** |
| **Left to Right Orientation** | 2 | Included | | **Included** |
| **Right to Left Orientation** | 3 | Included | | **Included** |
| **500ESS With Clear Detect Sensors** | 5 | $61,234.00 | $24,495.00 | **$281,675.00** |
| **ESS 230v** | 5 | Included | | **Included** |
| **500HWT, Steam** | 5 | $41,460.00 | $16,585.00 | **$190,715.00** |
| **Ossid Water Recirculation Unit 168-0000** | 5 | Included | | **Included** |
| **Shipping Surcharge** | 5 | $12,500.00 | $20,000.00 | **$42,500.00** |
| | | | **Subtotal:** | **$1,918,005.00** |
| **Installation and Training** | 1 | $67,342.00 | | **$67,342.00** |
| **Delivery-Estimated(Actual will be billed)Dedicated** | 2 | $5,188.00 | | **$10,376.00** |
| **Component #1** | | | **Total:** | **$1,995,723.00** |

**Your Ossid Contact:**
Cory Johnson
cory.johnson@promachbuilt.com

# System Total :
# $1,995,723.00





|  | **Service Quotation** |
|---|---|
| Quote Number | MQ1829-2 |
| Quote Date | 11/2/2022 |
| Payment Terms | Net 30 Days |

**Quotation Prepared For:**  Ossid Rep.   Cory Johnson

**Company**   Pure Prairie

| Hourly Rates Per Visit | | | | | |
|---|---|---|---|---|---|
| **Rate/hr** | | | **#Hrs** | **# Techs** | **Totals** |
| $175.00 | Technician standard | | 96 | 2 | $33,600 |
| $263.00 | Technician overtime | | 32 | 2 | $16,832 |
| $350.00 | Technician Premium Time-Ossid Holidays | | | | $0 |
| $190.00 | Software/Engineer support standard | | | | $0 |
| $285.00 | Software/Engineer support overtime | | | | $0 |
| $380.00 | Software/Engineer Premium Time-Ossid Holidays | | | | $0 |
| | **Labor Costs** | | | | **$50,432** |

| Travel and Living Expenses Per Visit | | | | | |
|---|---|---|---|---|---|
| **Rate/Est** | | **Miles** | **# Days** | **# Techs** | **Totals** |
| $200.00 | Number of nights in hotel | | 14 | 2 | $5,600 |
| $125.00 | Number of days for rental car | | 16 | 2 | $4,000 |
| $1,000.00 | Flight cost estimate | | 2 | 2 | $2,000 |
| $95.00 | Number of days on site (meals & incidentals) | | 16 | 2 | $3,040 |
| $0.62 | Mileage Estimate | 120 | | 1 | $74 |
| | 15% Administrative fee | | | | $2,196 |
| | **Travel and Living Costs** | | | | **$16,910** |

| **Total Service>>>** | **$67,342** |
|---|---|

| **Purpose of Trip** |
|---|

Technician to travel Friday.  Confirm installation and test machines on Saturday and Sunday.  Support production and provide training on Monday through Thursday.  Travel Friday.  2 Weeks to install 5 Overwrap systems and remove 2 Tray Sealers.

**This is an estimated quotation based upon information provided at the time of the call.**
**Actual hours and cost may vary dependent upon schedule and conditions once onsite.**

Thank you for the opportunity to quote Ossid service. We will follow up as quickly as possible to confirm the dates and secure a purchase order.



# PROPOSAL

**ABOUT OSSID:**
Ossid is a leading innovator and manufacturer of high-speed overwrap tray packaging, tray sealing, weigh/price/labeling, case scale, and form/fill/seal packaging equipment. Ossid provides solutions worldwide across numerous markets...including fresh and processed beef, pork, and poultry, cheese/dairy, fresh produce, convenience foods, consumer goods, and medical devices.

Ossid is committed to providing its customers with the means to produce the most attractive, reliable package in their market. Ossid's sales team ensures every project is carefully evaluated by our engineering team and project managers to ensure that our customers' aesthetic and performance objectives are achieved.  Once installed an Ossid machine will be supported for the rest of its life by our ProCustomer® aftermarket team and PMMI Certified service technicians.

## YOUR CONTACT:

Cory Johnson
cory.johnson@promachbuilt.com

## ABOUT PRO MACH:

ProMach is a family of best-in-class packaging solution brands serving manufacturers of all sizes and geographies in the food, beverage, pharmaceutical, personal care, and household and industrial goods industries. ProMach brands operate across the entire packaging spectrum: filling and capping, flexibles, pharma, product handling, labeling and coding, and end of line. ProMach also provides Performance Services including integrated solutions, design/build, engineering services, and productivity software to optimize packaging line design and deliver maximum uptime.



ProMach designs, manufactures, integrates, and supports the most sophisticated and advanced packaging solutions in the global marketplace. Its diverse customer base, from Fortune 500 companies to smaller, privately-held businesses worldwide, depends on reliable, flexible, technologically advanced equipment and integrated solutions. ProMach is headquartered near Cincinnati, Ohio, with manufacturing facilities and offices throughout the United States, Canada, Mexico, Brazil, Europe, United Arab Emirates and China. For more information about ProMach, visit http://www.ProMachBuilt.com.

**System Total :
$1,995,723.00**



# PROPOSAL

## ABOUT AFTERMARKET SERVICES:

Ossid is committed to providing our customers with superior packaging solutions and fully meeting your needs.  To meet these objectives, we provide one of the most complete customer service programs available in the industry including the service personnel, parts and training necessary to keep your equipment running at peak efficiency.

Ossid maintains a dedicated staff of in-house employees to provide service for both mechanical and electrical related service issues.  Additionally, our full time, factory trained field service technicians are routinely dispatched from the Rocky Mount plant to provide installation/start-up assistance for new machine and conversions to existing equipment as well as emergency service when needed.  On-site training of mechanics and operators by the field service technicians (both in the classroom and on the machine) is available through our Service Department.  When necessary the Ossid Engineering Department provides training programs on a regular basis at our facility in Rocky Mount, North Carolina and our technical staff is always available to answer your questions.

The Aftermarket Services Department is responsible for providing "As Built" machine manuals, which are available in both hard copy and CD.

As a further service to our customers Ossid offers a Preferred Service Program which provides quarterly or semi-annual preventative maintenance by our factory-trained service technicians for machines at discounted rates.  Alternate Service Programs, tailored to unique needs, are available.

Responsibility for keeping our customers up and running with the necessary spare and emergency parts falls to the Ossid Parts Department.  Our experienced, dedicated employees will assist you with ordering, technical support, service or training needs to help ensure that your packaging solutions operate as effectively and efficiently as possible. The Parts Department maintains a complete reference library of manuals for every machine sold by Ossid  as well as an extensive inventory of parts to ensure that what you need is what we deliver when you need it most. We are dedicated to keeping you up and running.

Ossid also offers an afterhours emergency hotline for ordering parts. Here at Ossid, we understand that the need for parts do not always coincide with regular business hours.  The emergency hotline allows our customers to receive the same great service at any hour for a small fee so emergency parts no longer have to tie up production. Ossid's regular business hours are Monday through Friday, 8 am to 5 pm EST. To reach Ossid after hours, call 252-904-4737.

For more information on upgrades and retrofits, email us at Ossid.Parts@ProMachBuilt.com

**System Total :
$1,995,723.00**



# PROPOSAL

## OSSID SERVICE RATE EXPLANATION:

**Labor Rates**

Labor is charged for all travel time, in-plant time, and any additional time required to document service. ProMach is not responsible for delays due to weather, traffic or mechanical failures. There is a minimum charge of eight hours per day. A maximum of twelve hours per day, per person, are allowed for on-site except in extreme emergencies and only when authorized by the Ossid Service Manager.

| Billable Hours | Service Technician | OSSID Engineer |
|---|---|---|
| **Regular Time and Travel Time:** Is billed for the first eight hours Monday through Friday. | $175.00/HR | $190.00/HR |
| **Overtime:–** Is billed after the first eight hours Monday - Friday, Saturday or Sunday. | $263.00/HR | $285.00/HR |
| **Premium Time:** – Applies to all laborperformed on ProMach Holidays, and weekends adjoining ProMach Holidays. | $350.00/HR | $380.00/HR |

**Delays/Layovers**

Layover days for the convenience of the customer, resulting in an overnight stay will be billed at a flat rate of eight hours per day at the Regular Time hourly rates except for Holidays or weekends adjoining a Holiday which will be billed at Premium Time. Travel time is billed at the applicable daily rate.

**Expenses**

The customer is obligated to pay all travel and living expenses incurred by the Technical Representative on the customer's behalf. These expenses include public transportation to and from the airports, trains or bus depots; air, train, rental car or bus fare and/or automobile mileage if the Technical Representative drives their own or company vehicle. A meal Per Diem will be charged at a rate of $95 per day. Whenever possible, service calls shall be grouped and travel expenses pro-rated. An administrative surcharge of 15% will be affixed to all invoiced normal travel expenses. A cancelation fee for already confirmed and scheduled service trips will be billed a maximum fee of $250/day. In addition, the customer is also responsible travel cancellation fees that may be applicable. These rates do not apply to international travel (outside of US), please refer to your quotation for applicable charges.

**Holidays**

Work will not be scheduled on the following ProMach Holidays or adjoining weekends except in extreme emergencies and only when authorized by the Service Manager. Holidays include New Year's Day, Memorial Day, Good Friday, Easter, Independence Day, Labor Day, Thanksgiving Day and the day after Thanksgiving, Christmas Eve (observed) and Christmas Day.

**System Total :
$1,995,723.00**



**PROPOSAL**

## TERMS AND CONDITIONS

**Pricing Confidentiality:** Quotes and pricing terms are negotiated between Customer and Ossid LLC and may be unique to the Customer. Therefore, and except as otherwise provided by law, Customer hereby agrees to keep the pricing arrangement confidential for a period of no less than three (3) years from the date of the signed quote. Customer will not use this Confidential Information in furtherance of its business, or the business of anyone else, whether or not in competition with Ossid LLC.

**Warranty:** Seller's warranty is valid for a period of 180 days from the date of delivery to the original Buyer.

**Pay Terms:** 40% Dep. 50% 14 days prior to ship,Net30

**Shipment:** All prices are ex-works Ossid's Battleboro, NC facility, and unless otherwise stated in writing, do not include crating, insurance in transit or taxes and duties.  Damage in transport is not covered under the Ossid warranty.

**Quote Validity:** The quotation is an invitation for an order and is binding upon Ossid's acceptance of a formal purchase order. All quoted prices are subject to increase resulting from any tariffs or duties on imports relating to goods and products in this quotation.  As tariffs or duties are determined, the effect on quoted prices will be communicated to you and shall be reflected in any invoice or purchase order relating to this order.
This quotation shall be valid for 30 days from the date of receipt, after which it will be extended or expire at our discretion.

**Full terms and conditions:**
Available at: https://files.promachbuilt.com/Pro-Mach-Terms-Conditions-Sale.pdf
Service Rates are subject to change without notice – Revised Jan.2022 – Always refer to your quote for payment terms and expected charges.
**Ask us how you could potentially save money on parts and labor through preventative maintenance or inspection agreements. A custom contract can be created to meet your specific needs.**

Signed by:_____

Signed by:_____
Cory Johnson

Name:_____

Title:_____

Date:_____

Date:_____

**Your Ossid Contact:**
Cory Johnson
cory.johnson@promachbuilt.com

**System Total :
$1,995,723.00**

 Performance, Packaged

**OSSID**®

# PROPOSAL

| Quote Number : MQ1893-002 | Quote Date : 11/04/22 | VALID THROUGH:  01/06/23 |
|---|---|---|

**Prepared for :**
Pure Prairie Farms
68888 Fort Road
Fairfax MN 55332
United States

## System Summary (Installation, Delivery & Training not included)

Lead Time : 22 Weeks

*All displayed totals are US Dollars

 **Component # 1**          **Subtotal**

NextGen 2115 WPL          **$176,118.08**

**NextGen 2115 WPL**

Prepared for:
Pure Prairie Farms



## COMPONENT DESCRIPTION:

FEATURES & BENEFITS

• Speed – Throughput up to 150 packages per minute
• Versatility – One machine for all your labeling needs
• Top & Bottom labeling, Label sizes from 1.5" x 1.5" to 4" x 5", True Type Fonts, Graphics
• Robust - Stainless steel construction to handle the harsh production environments of the protein industry.
• Modularity – Allows upgrades & expansions to existing equipment without losing initial investments.
• Maintainability – Quick change wear items; Belts, Print Heads, Actuators. Quick release conveyors and open frame design for easy cleaning.
• Connectivity – The heart of a fully implemented WPL installation opens the world of; Remote Trouble Shooting & Maintenance, Central Product Maintenance.
• Constant Torque Conveyor Drive System – packages maintain constant speed throughout whole machine.
• Barcodes – 21 different symbologies at your fingertips, including 2D & QR.
• Smart Print Technology – 20-40% more throughput by eliminating need to retract label stock.
• Hybrid Control System – combines machine controls and system software into one processing unit, allowing for faster weighing, processing, and labeling times, which means more packages per minute

**Your Ossid Contact:**
Cory Johnson
cory.johnson@promachbuilt.com

# System Total : $194,424.08

11/4/2022 / MQ1893-002



# PROPOSAL

## REQUIRED ITEMS:

| | Quantity | List Price | Ext. Price |
|---|---|---|---|
| **Base Machine WPL (1T)** | 2 | $88,059.04 | **$176,118.08** |
| | | **Subtotal:** | **$176,118.08** |
| **Installation and Training** | 1 | $14,732.00 | **$14,732.00** |
| **Delivery-Estimated(Actual will be billed)Dedicated** | 1 | $3,574.00 | **$3,574.00** |
| **Component #1** | | **Total:** | **$194,424.08** |

**Your Ossid Contact:**
Cory Johnson
cory.johnson@promachbuilt.com

# System Total : $194,424.08

**11/4/2022 / MQ1893-002**





Performance, Packaged

|  | Service Quotation |
|---|---|
| Quote Number | MQ1893-2 |
| Quote Date | 8/31/2022 |
| Payment Terms | 11/2/2022 |
| Ossid Rep. | Cory Johnson |

**Quotation Prepared For:**

**Company**    Pure Prairie Farms

| Hourly Rates Per Visit | | | | | |
|---|---|---|---|---|---|
| **Rate/hr** | | | **#Hrs** | **# Techs** | **Totals** |
| $175.00 | Technician standard | | 40 | 1 | $7,000 |
| $263.00 | Technician overtime | | 16 | 1 | $4,208 |
| $350.00 | Technician Premium Time-Ossid Holidays | | | | $0 |
| $190.00 | Software/Engineer support standard | | | | $0 |
| $285.00 | Software/Engineer support overtime | | | | $0 |
| $380.00 | Software/Engineer Premium Time-Ossid Holidays | | | | $0 |
| | **Labor Costs** | | | | **$11,208** |

| Travel and Living Expenses Per Visit | | | | | |
|---|---|---|---|---|---|
| **Rate/Est** | | **Miles** | **# Days** | **# Techs** | **Totals** |
| $155.00 | Number of nights in hotel | | 6 | 1 | $930 |
| $105.00 | Number of days for rental car | | 6 | 1 | $630 |
| $750.00 | Flight cost estimate | | 1 | 1 | $750 |
| $95.00 | Number of days on site (meals & incidentals) | | 6 | 1 | $570 |
| $0.58 | Mileage Estimate | 200 | | 1 | $116 |
| | 15% Administrative fee | | | | $528 |
| | **Travel and Living Costs** | | | | **$3,524** |

**Total Service>>>**        **$14,732**

| Purpose of Trip |
|---|

Technician to travel Friday.  Confirm installation and test machines on Saturday and Sunday.  Support production and provide training on Monday through Wednesday.  Travel Thursday.

**This is an estimated quotation based upon information provided at the time of the call.**
**Actual hours and cost may vary dependent upon schedule and conditions once onsite.**

Thank you for the opportunity to quote Ossid service. We will follow up as quickly as possible to confirm the dates and secure a purchase order.



# PROPOSAL

**ABOUT OSSID:**

Ossid is a leading innovator and manufacturer of high-speed overwrap tray packaging, tray sealing, weigh/price/labeling, case scale, and form/fill/seal packaging equipment. Ossid provides solutions worldwide across numerous markets...including fresh and processed beef, pork, and poultry, cheese/dairy, fresh produce, convenience foods, consumer goods, and medical devices.

Ossid is committed to providing its customers with the means to produce the most attractive, reliable package in their market. Ossid's sales team ensures every project is carefully evaluated by our engineering team and project managers to ensure that our customers' aesthetic and performance objectives are achieved.  Once installed an Ossid machine will be supported for the rest of its life by our ProCustomer® aftermarket team and PMMI Certified service technicians.

## YOUR CONTACT:

Cory Johnson

cory.johnson@promachbuilt.com

## ABOUT PRO MACH:

ProMach is a family of best-in-class packaging solution brands serving manufacturers of all sizes and geographies in the food, beverage, pharmaceutical, personal care, and household and industrial goods industries. ProMach brands operate across the entire packaging spectrum: filling and capping, flexibles, pharma, product handling, labeling and coding, and end of line. ProMach also provides Performance Services including integrated solutions, design/build, engineering services, and productivity software to optimize packaging line design and deliver maximum uptime.



ProMach designs, manufactures, integrates, and supports the most sophisticated and advanced packaging solutions in the global marketplace. Its diverse customer base, from Fortune 500 companies to smaller, privately-held businesses worldwide, depends on reliable, flexible, technologically advanced equipment and integrated solutions. ProMach is headquartered near Cincinnati, Ohio, with manufacturing facilities and offices throughout the United States, Canada, Mexico, Brazil, Europe, United Arab Emirates and China. For more information about ProMach, visit http://www.ProMachBuilt.com.

**System Total : $194,424.08**

**11/4/2022 / MQ1893-002**



**PROPOSAL**

## ABOUT AFTERMARKET SERVICES:

Ossid is committed to providing our customers with superior packaging solutions and fully meeting your needs.  To meet these objectives, we provide one of the most complete customer service programs available in the industry including the service personnel, parts and training necessary to keep your equipment running at peak efficiency.

Ossid maintains a dedicated staff of in-house employees to provide service for both mechanical and electrical related service issues.  Additionally, our full time, factory trained field service technicians are routinely dispatched from the Rocky Mount plant to provide installation/start-up assistance for new machine and conversions to existing equipment as well as emergency service when needed.  On-site training of mechanics and operators by the field service technicians (both in the classroom and on the machine) is available through our Service Department.  When necessary the Ossid Engineering Department provides training programs on a regular basis at our facility in Rocky Mount, North Carolina and our technical staff is always available to answer your questions.

The Aftermarket Services Department is responsible for providing "As Built" machine manuals, which are available in both hard copy and CD.

As a further service to our customers Ossid offers a Preferred Service Program which provides quarterly or semi-annual preventative maintenance by our factory-trained service technicians for machines at discounted rates.  Alternate Service Programs, tailored to unique needs, are available.

Responsibility for keeping our customers up and running with the necessary spare and emergency parts falls to the Ossid Parts Department.  Our experienced, dedicated employees will assist you with ordering, technical support, service or training needs to help ensure that your packaging solutions operate as effectively and efficiently as possible. The Parts Department maintains a complete reference library of manuals for every machine sold by Ossid  as well as an extensive inventory of parts to ensure that what you need is what we deliver when you need it most. We are dedicated to keeping you up and running.

Ossid also offers an afterhours emergency hotline for ordering parts. Here at Ossid, we understand that the need for parts do not always coincide with regular business hours.  The emergency hotline allows our customers to receive the same great service at any hour for a small fee so emergency parts no longer have to tie up production. Ossid's regular business hours are Monday through Friday, 8 am to 5 pm EST. To reach Ossid after hours, call 252-904-4737.

For more information on upgrades and retrofits, email us at Ossid.Parts@ProMachBuilt.com



**PROPOSAL**

## OSSID SERVICE RATE EXPLANATION:

**Labor Rates**
Labor is charged for all travel time, in-plant time, and any additional time required to document service. ProMach is not responsible for delays due to weather, traffic or mechanical failures. There is a minimum charge of eight hours per day. A maximum of twelve hours per day, per person, are allowed for on-site except in extreme emergencies and only when authorized by the Ossid Service Manager.

| Billable Hours | Service Technician | OSSID Engineer |
|---|---|---|
| **Regular Time and Travel Time:** Is billed for the first eight hours Monday through Friday. | $175.00/HR | $190.00/HR |
| **Overtime:–** Is billed after the first eight hours Monday - Friday, Saturday or Sunday. | $263.00/HR | $285.00/HR |
| **Premium Time:** – Applies to all laborperformed on ProMach Holidays, and weekends adjoining ProMach Holidays. | $350.00/HR | $380.00/HR |

**Delays/Layovers**
Layover days for the convenience of the customer, resulting in an overnight stay will be billed at a flat rate of eight hours per day at the Regular Time hourly rates except for Holidays or weekends adjoining a Holiday which will be billed at Premium Time. Travel time is billed at the applicable daily rate.

**Expenses**
The customer is obligated to pay all travel and living expenses incurred by the Technical Representative on the customer's behalf. These expenses include public transportation to and from the airports, trains or bus depots; air, train, rental car or bus fare and/or automobile mileage if the Technical Representative drives their own or company vehicle. A meal Per Diem will be charged at a rate of $95 per day. Whenever possible, service calls shall be grouped and travel expenses pro-rated. An administrative surcharge of 15% will be affixed to all invoiced normal travel expenses. A cancelation fee for already confirmed and scheduled service trips will be billed a maximum fee of $250/day. In addition, the customer is also responsible travel cancellation fees that may be applicable. These rates do not apply to international travel (outside of US), please refer to your quotation for applicable charges.

**Holidays**
Work will not be scheduled on the following ProMach Holidays or adjoining weekends except in extreme emergencies and only when authorized by the Service Manager. Holidays include New Year's Day, Memorial Day, Good Friday, Easter, Independence Day, Labor Day, Thanksgiving Day and the day after Thanksgiving, Christmas Eve (observed) and Christmas Day.



# PROPOSAL

# TERMS AND CONDITIONS

**Pricing Confidentiality:** Quotes and pricing terms are negotiated between Customer and Ossid LLC and may be unique to the Customer. Therefore, and except as otherwise provided by law, Customer hereby agrees to keep the pricing arrangement confidential for a period of no less than three (3) years from the date of the signed quote. Customer will not use this Confidential Information in furtherance of its business, or the business of anyone else, whether or not in competition with Ossid LLC.

**Warranty:** Seller's warranty is valid for a period of 180 days from the date of delivery to the original Buyer.

**Pay Terms:** 40% Dep. 50% 14 days prior to ship,Net30

**Shipment:** All prices are ex-works Ossid's Battleboro, NC facility, and unless otherwise stated in writing, do not include crating, insurance in transit or taxes and duties.  Damage in transport is not covered under the Ossid warranty.

**Quote Validity:** The quotation is an invitation for an order and is binding upon Ossid's acceptance of a formal purchase order. All quoted prices are subject to increase resulting from any tariffs or duties on imports relating to goods and products in this quotation.  As tariffs or duties are determined, the effect on quoted prices will be communicated to you and shall be reflected in any invoice or purchase order relating to this order.
This quotation shall be valid for 30 days from the date of receipt, after which it will be extended or expire at our discretion.

**Full terms and conditions:**
Available at: https://files.promachbuilt.com/Pro-Mach-Terms-Conditions-Sale.pdf
Service Rates are subject to change without notice – Revised Jan.2022 – Always refer to your quote for payment
terms and expected charges.
**Ask us how you could potentially save money on parts and labor through preventative
maintenance or inspection agreements. A custom contract can be created to meet your specific
needs.**

Signed by:_____

Name:_____

Title:_____

Date:_____

Signed by:_____

Cory Johnson

Date:_____

**Your Ossid Contact:**
Cory Johnson
cory.johnson@promachbuilt.com

# System Total : $194,424.08

**11/4/2022 / MQ1893-002**

6

| Current Owner | Year Acquired | Model Year | Equipment | Condition |
|---|---|---|---|---|
| PPF | 2022 | 2022 | 4 Curtiansider Trailers (October) | New |
| PPF | 2022 | 2000 | Ottawa Spotter Truck | Used |
| PPF | 2022 | 2011 | Autocar Spotter Truck | Used |
| PPF | 2022 | 2018 | T770 Bobcat Loader | Used |
| PPF | 2022 | 2022 | 5th Wheel Trailer | New |
| PPF | 2022 | | 5th Wheel Trailer | Used |
| PPF - Future | 2023 | 2023 | 4 Curtiansider Trailers (Feb) | New |
| PPF - Future | 2022 | 2023 | Chev Silverado Duramax SR Mngmt | New |
| PPF - Future | 2022 | 2022 | Chev 6500 | New |
| PPF - Future | 2023 | 2023 | Chick Trailer | New |
| PPF - Future | 2022 | 2022 | 5th Wheel Trailer | New |
| Ridgely Farms | 2022 | 2000 | IH 9100  Semi Truck - Day Cab | Used |
| PPF - Future | 2023 | 2023 | Chick Trailer # 2 | New |
| PPF - Future | 2022 | 2022 | 5 Ossid 500E Machines see Quote | New |
| PPF - Future | 2022 | 2022 | Ossid NextGen 2115 WPL | New |
| PPF - Future | 2022 | 2022 | Refrigeration Upgraded Equipment | New |
| | | | **Total** | |

| Total Cost | |
|---:|---|
| 461,833 | |
| 32,941 | |
| 21,714 | |
| 75,000 | |
| 38,290 | |
| 25,000 | |
| 461,833 | |
| 72,000 | |
| 79,000 | |
| 228,725 | See Quote |
| 38,290 | |
| 22,507 | |
| 228,725 | See Quote |
| 1,995,723 | See Quote |
| 972,120 | See Quote |
| 2,600,000 | See Quote |
| **7,353,701** | |



July 21, 2022

Greater Commercial Lending
481 Eagle Station Lane
Carson City, NV 89701
Attn: Lori Adkins

Dear Ms. Adkins,
,
Thank you for choosing AgVisory for your valuation and consulting service needs. I am confident that you will be very satisfied with the services that we offer.

Enclosed please find our Agreement for Services. If this Agreement is acceptable to you, please sign and return to our office via email.  Once we receive the signed Agreement from you, we will expedite your request.

If you have questions, please don't hesitate to contact me. I can be reached at 302.270.5165.

Again, thank you for choosing AgVisory.

Sincerely,

Jodi M. Pries
President

Enclosure



# AGREEMENT OF SERVICES

**DATE OF AGREEMENT:** July 21, 2022

**PARTIES TO AGREEMENT:**
**Client:**
Greater Commercial Lending
481 Eagle Station Lane
Carson City, NV 89701
Attn: Lori Adkins

**Appraiser(s):**
Jodi Pries
jodi.pries@agvisory.com
302.270.5165

AgVisory LLC
P.O. Box 177
Nassau, DE 19969

Client hereby engages Appraiser to complete an appraisal assignment as follows:

**PROPERTY IDENTIFICATION / DESCRIPTION**
901 N. Main Street, Charles City, Iowa 50616
300 Lawler Street, Charles City, Iowa 50616
Parcel #s 110142800500, 120630100700, 110142900200
Poultry processing facility with proposed expansion

**INTEREST VALUED**
Fee Simple of Real Estate and Machinery & Equipment

**INTENDED USERS**
Greater Nevada Credit Union

Note: No other users are intended by Appraiser. Appraiser shall consider the intended users when determining the level of detail to be provided in the Appraisal Report.

**INTENDED USE**
To aid in lending decision



Note: No other use is intended by Appraiser.  The intended use as stated shall be used by Appraiser in determining the appropriate Scope of Work for the assignment.

**TYPE OF VALUE**
Market Value of Real Estate
Fair Market Value – Installed of M&E

**DATE OF VALUE**
Current 'As Is'
Prospective 'As Proposed/As Complete'

**PROPERTY TO BE VALUED**
Real Estate & Processing Equipment – 'As Is'
Real Estate & Processing Equipment – 'As Proposed'
Allocation of Value to Lot being purchased

**HYPOTHETICAL CONDITIONS, EXTRAORDINARY ASSUMPTIONS**
None anticipated

**APPLICABLE REQUIREMENTS OTHER THAN THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE (USPAP)**
- The Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute
- American Society of Farm Managers & Rural Appraisers (ASFMRA) Ethics & Guidelines
- American Society of Appraisers (ASA) Code of Ethics

**ANTICIPATED SCOPE OF WORK**
**Site visit:**
On site visits to be scheduled with Pure Prairie Farms

**Valuation approaches:**
Sales comparison approach / Cost approach / Income approach
*Note: Appraiser shall use all approaches necessary to develop a credible opinion of value.*

**APPRAISAL REPORT**
Summary narrative

**CONTACT FOR PROPERTY ACCESS, IF APPLICABLE**
To be provided by client



**PROPOSED IMPROVEMENTS**
If the property appraised consists of proposed improvements, Client shall provide to
Appraiser plans, specifications or other documentation sufficient to identify the extent and
character of the proposed improvements.

**PROPERTIES UNDER CONTRACT FOR SALE**
If the property appraised is currently under contract for sale, Client shall provide to
Appraiser a copy of said contract including all addenda.

**ADDITIONAL DOCUMENTATION**
Client agrees to provide Appraiser with the documentation as indicated in Appendix A to
this Agreement.

**FEE & DELIVERY DATE**
The fee for delivery by October 28, 2022 is $25,000 inclusive of travel expenses

**PAYMENT TERMS**
100% to be paid upon receipt of report.

**PAYMENT DUE DATE**
Appraiser shall invoice Client for services rendered pursuant to this Agreement based upon
the fees specified in this Agreement.  Appraiser's invoices are considered due upon receipt
by Client and shall be deemed delinquent if not paid within 30 days of the date of
Appraiser's invoice.

**DELIVERY METHOD**
E-mail

**WHEN APPRAISER'S OBLIGATIONS ARE COMPLETE**
Appraiser's obligations pursuant to this Agreement are complete when the Appraisal
Report in the form specified in this Agreement is delivered to Client pursuant to this
Agreement.  Appraiser agrees to be responsive to Client's legitimate inquiries regarding the
contents of the report after delivery.

**CONFIDENTIALITY**
Appraiser shall not provide a copy of the written Appraisal Report to or disclose the results
of the appraisal prepared in accordance with this Agreement to, any party other than
Client, unless Client authorizes, except as stipulated in the Confidentiality Section of the
Ethics Rule of the Uniform Standards of Professional Appraisal Practice (USPAP).



**USE OF EMPLOYEES OR INDEPENDENT CONTRACTORS**

Appraiser may use employees or independent contractors at Appraiser's discretion to complete the assignment, unless otherwise agreed by the parties. Notwithstanding, Appraiser shall sign the written Appraisal Report and take full responsibility for the services provided as a result of this Agreement.

**SERVICES NOT PROVIDED**

The fees set forth in this Agreement apply to the appraisal services rendered by Appraiser as set forth in this Agreement.  Unless otherwise specified herein, Appraiser's services for which the fees in this Agreement apply shall not include meetings with persons other than Client or Client's agents or professional advisors; Appraiser's deposition(s) or testimony before judicial, arbitration or administrative tribunals; or any preparation associated with such depositions or testimony.  Any additional services performed by Appraiser not set forth in this Agreement will be performed on terms and conditions set forth in an amendment to this Agreement, or in a separate agreement.

**TESTIMONY AT COURT OR OTHER PROCEEDINGS**

Unless otherwise stated in this Agreement, Client agrees that Appraiser's assignment pursuant to this Agreement shall not include Appraiser's participation in or preparation for, whether voluntarily or pursuant to subpoena, any oral or written discovery; sworn testimony in a judicial, arbitration or administrative proceeding; or attendance at any judicial, arbitration or administrative proceeding relating to this assignment.

**CHANGES TO AGREEMENT**

Any changes to the assignment as outlined in this Agreement shall necessitate a new Agreement.  The identity of the Client, intended users, or intended use; the date of value; type of value; or property appraised cannot be changed without a new Agreement.

**CANCELLATION**

Client may cancel this Agreement at any time prior to Appraiser's delivery of the Appraisal Report upon written notification to Appraiser. Client shall pay Appraiser for work completed on assignment prior to Appraiser's receipt of written cancellation notice, unless otherwise agreed upon by Appraiser and Client in writing.

**APPRAISER INDEPENDENCE**

Appraiser cannot agree to provide a value opinion that is contingent on a predetermined amount. Appraiser cannot guarantee the outcome of the assignment in advance.  Appraiser cannot ensure that the opinion of value developed as a result of this Assignment will serve



to facilitate any specific objective of Client or others or advance any particular cause. Appraiser's opinion of value will be developed competently and with independence, impartiality and objectivity.

**SPECIAL OR CONSEQUENTIAL DAMAGES**
Neither party shall under any circumstances be liable to the other party for special, exemplary, punitive or consequential damages, including, without limitation, loss of profits or damages proximately caused by loss of use of any property, whether arising from either party's negligence, breach of the Agreement or otherwise, whether or not a party was advised, or knew, of the possibility of such damages, or such possibility was foreseeable by that party. In no event shall Appraiser be liable to Client for any amounts that exceed the fees and costs paid by Client to Appraiser pursuant to this Agreement.

**ASSIGNMENT**
Neither party may assign this Agreement to a third party without the express written consent of the other party, which the non-assigning party may withhold in its sole discretion.  In the event this Agreement is assigned by mutual consent of the parties, it shall become binding on the assigning party's permitted assigns.

**EXTENT OF AGREEMENT**
This Agreement represents the entire and integrated agreement between Client and Appraiser and supersedes all prior negotiations, representations or agreements, either written or oral.  This Agreement may be amended only by a written instrument signed by both Client and Appraiser.  This Agreement includes the following Appendices, which are incorporated into, and made a part of, this Agreement:

By Appraiser:                                    By Client:

_Jodi M Pries_                                   _Lori Adkins_
_____              _____
Jodi M Pries                                     Authorized Signature of Client
Date:__7/21/2022_____              Date:__7/22/22_____



# Addenda

**List of requested items for appraisals**

1. Site plans, blueprints, and/or building sketches with square footages, building heights
2. Depreciation schedules or asset list
3. Process flow diagrams
4. Maps/Surveys of Land
5. Deeds or legal descriptions/Title Report
6. Income & Expense Statements and/or Financial Statements (3-5 year history and/or projections if a proposed project)
7. Recent renovations and cost data
8. Proposed projects
   a. Cost Budget with breakdown of costs,
   b. Plans & specifications
9. Leases, if applicable
10. Contact names and numbers for all facilities to be inspected
11. Real Estate Taxes (and personal property taxes, if applicable)

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

In re:

Pure Prairie Poultry, Inc.,                                          Case No. 24-32426 KAC

            Debtor.                                   Chapter 11 Case

## DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR INTERIM AND FINAL ORDERS (I) GRANTING EXPEDITED HEARING, (II) APPROVING POSTPETITION FINANCING, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) AUTHORIZING USE OF CASH COLLATERAL, (V) GRANTING ADEQUATE PROTECTION, (VI) MODIFYING AUTOMATIC STAY, AND (VII) GRANTING RELATED RELIEF

Debtor, by and through its undersigned counsel, submits this memorandum of law in support of its motion in the above-entitled matter and in accordance with Local Rule 9013-2(a). The relief requested in the Motion should be granted to allow Debtors to continue operating their business.

## FACTUAL BACKGROUND

The supporting facts are set forth in the verified Motion.  All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the motion.

## ARGUMENT

**I.    DEBTOR'S REQUEST FOR EXPEDITED RELIEF SHOULD BE GRANTED.**

Debtor requests expedited relief. Bankruptcy Rule 9006(c) provides that the Court may reduce the notice period "for cause shown." Cause exists here to grant the Motion on an expedited basis. As described in the Motion, the liquidity to be provided under the DIP Financing is essential to the Debtor's continued operations and the success of the Debtor's efforts to maximize the value of the estate, and is needed on the most urgent basis possible. Without the proceeds of the DIP

2

Financing, Debtor will be unable to fund operating expenses, satisfy trust obligations, or pursue a sale of business assets for the benefit of its creditors, their employees, and other stakeholders. Many growers depend on their business relationship with Pure Prairie to sustain their own operations.  The livelihood of more than 130 employees, many of whom are living paycheck to paycheck, literally hangs in the balance.  Indeed, unless the requested relief is granted on an expedited basis, the Debtor will almost certain be forced to convert the case and to liquidate under Chapter 7.  Expedited relief is therefore necessary and appropriate to avoid immediate and irreparable harm.

## II.    DEBTOR SHOULD BE AUTHORIZED TO OBTAIN THE DIP FINANCING UNDER SECTION 364 OF THE BANKRUPTCY CODE

Section 364 of the Bankruptcy Code authorizes a debtor in possession to obtain postpetition financing and to grant superpriority administrative status and liens on its property. Specifically, Section 364(c) provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>    (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; [or]
>    (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>    (3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c). Further, § 364(d) provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate only if:
>    (A)    the trustee is unable to obtain such credit otherwise; and
>    (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

3

Provided that an agreement to obtain secured credit is consistent with the Bankruptcy Code and its underlying policies, courts afford debtors considerable deference in exercising sound business judgment to obtain such credit. *See, e.g., In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of post petition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment").

Further, in determining whether the Debtor exercised sound business judgment in deciding to enter into the DIP Loan Documents, this Court may appropriately take into consideration non-economic benefits to Debtor accompanying the proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That

> which helps foster consensus may be preferable to a notionally better transaction
> that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

Here, given all the facts and circumstances present in these cases, Debtor has satisfied the necessary conditions under §§ 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP financing. Debtor exercised proper business judgment in securing the DIP Financing on terms that are fair and reasonable and the best available to it in the current market. Debtor could not obtain credit on an unsecured or administrative expense basis, and Debtor has provided the Prepetition Secured Parties with adequate protection against any potential diminution in value of their interests. For all the reasons discussed below, therefore, the Court should grant Debtor's request to enter into the DIP Financing pursuant to §§ 364(c) and (d) of the Bankruptcy Code.

### A.   Debtor Exercised Sound and Reasonable Business Judgment in Deciding to Enter into the DIP Financing

Based on the facts of these Cases, the DIP Financing represents a proper exercise of the Debtor's business judgment. Bankruptcy courts routinely defer to debtors' business judgment on most business decisions, including decisions about whether and how to borrow money. *Grp. Of Institutional Investors v. Chi., Milwaukee, St. Paull & Pac. R.R.*, 318 U.S. 523, 550 (1943); *In re Farmland Indus., Inc*. at 882) ("Business judgments should be left to the board room and not to this Court.") (quoting *In re Simasko Prod. Co*., 47 B.R. 444, 449 (Bankr. D. Colo. 1985)); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983). "More exacting scrutiny would slow the administration of the debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

5

In general, a bankruptcy court defers to a debtor's business judgment regarding the need for, and the proposed use of, funds, unless the debtor's decision improperly leverages the bankruptcy process or its purpose is not so much to benefit the estate as it is to benefit a party in interest. *See Ames Dep't Stores*, 115 B.R. at 40; *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *Id.* at 513-14 (footnote omitted).

To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs., Inc.,* 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

Here, Debtor exercised sound business judgment in determining that the DIP financing is appropriate. Debtor is not able to operate with cash collateral as the sole source of funding. Debtor and its advisors analyzed whether projected cash collateral would suffice to fund operations during the case, and concluded that DIP Financing is necessary. Debtor considered such factors as the uncertainty inherent in estimating the timing of receipts and disbursements and the need for continued periodic incremental liquidity. In consideration of these factors, Debtor concluded that the benefits and certainty provided by using DIP Financing outweighed the risks associated with attempting to finance the operations solely with cash collateral.

With the assistance of its advisors, Debtor concluded that the DIP Financing represents the best terms available in the current market. Debtor was unable to find alternative DIP Financing on

better terms. *See* Peichel Decl. ¶¶91-92. Given the need for financing, Debtor's decision is therefore sound and reasonable under the circumstances.

The DIP Financing will send a strong signal to the Debtor's employees, vendors, and other parties in interest regarding the viability of the Debtor's operations and its efforts to effect a sale process that will maximize value. I If approved, the DIP Financing will preserve and enhance the value of the Debtor's estate. Entry into the DIP Financing is a sound exercise of the Debtor's business judgment.

### B.   Debtor Meets the Conditions Necessary Under Section 364(c) to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis

Section 364(c) of the Bankruptcy Code authorizes a debtor to obtain postpetition financing on a secured or superpriority basis, or both, where the Court finds, after notice and a hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [Bankruptcy Code]. . . ." 11 U.S.C. § 364(c).

Courts have articulated a three-part test to determine whether a debtor is entitled to obtain financing under § 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> (a)      the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative expense claim;
> (b)      the credit transaction is necessary to preserve the assets of the estate; and
> (c)      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Ames Dep't Stores, Inc*., 115 B.R. at 37-39; *accord In re St. Mary Hosp*., 86 B.R. 893, 401 (Bankr. E.D. Pa. 1988); *In re Crouse Grp., Inc.,* 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

In order to satisfy this test, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *accord In re Ames Dep't Stores, Inc*., 115 B.R. at 37 (debtor must show that it has made reasonable

efforts to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code);
*In re Crouse Grp., Inc.,* 71 B.R. at 549 (secured credit under section 364(c)(2) of the Bankruptcy
Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be
obtained). "The statute imposes no duty to seek credit from every possible lender before
concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. V. Caldor
Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized
where debtor could not obtain credit as an administrative expense). This is especially true when
time is of the essence. *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). When
few lenders are likely to be able and willing to extend the necessary credit, "it would be unrealistic
and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re
Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank
FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also Ames Dep't Stores, 115
B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to
satisfy the standards of § 364(c) by approaching four lending institutions and selecting the most
favorable of the two offers it received).

 As laid out in the Peichel Declaration, Debtor made reasonable efforts to secure the best
possible postpetition financing under the circumstances. Because of Debtor's urgent need for
liquidity, Debtor was unable to solicit any viable proposals that authorized financing on an
unsecured or administrative expense basis. To the contrary, Debtor's negotiations made clear that
Debtor's only viable option was to obtain financing from the DIP Lender on the terms provided in
the DIP Loan Documents. *See* Peichel Decl. ¶¶ 91-92.

The Court should therefore authorize Debtor to provide the DIP Lender superpriority administrative expense status for any obligations arising under the DIP Credit Agreement as provided for in § 364(c)(1) of the Bankruptcy Code.

**C.    Debtor Should Be Authorized to Obtain Postpetition Financing Secured by Liens That are Senior to the Liens Securing the Prepetition Secured Debt**

In addition to authorizing financing under Section 364(c) of the Bankruptcy Code, a court may also authorize a debtor to obtain postpetition credit secured by a lien that is senior in priority to existing liens on encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected or consent is obtained. *See* 11 U.S.C. § 364(d)(1).

When determining whether to authorize a debtor to obtain credit secured by a lien that is senior or equal to a prepetition lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets. Courts consider a number of factors, including, without limitation:

- Whether alternative financing is available on any other basis (i.e., whether any other proposals are before the court);
- Whether the proposed financing is necessary to preserve estate assets and is necessary, essential, and appropriate for continued operation of the debtor's business;
- Whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and
- Whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37-39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862-79; *Barbara K. Enters.*, 2008 WL 2439649, at *10.

The DIP Financing satisfies each of these factors. First, as described above, despite significant efforts, Debtor was unable to obtain alternative DIP financing. The agreement before

the court reflects the most favorable terms on which Debtor was able to obtain financing. Debtor

is not able to obtain financing on equal or better terms than the terms provided by the DIP Lender,

or any other source, without granting liens senior in priority to those securing the prepetition

obligations.

Second, Debtor urgently needs the funds to be provided under the DIP Financing to

preserve the value of its estate for the benefit of all creditors and other parties in interest. Without

the DIP Financing, Debtor will be unable to operate and conduct a responsible sale process.

Providing Debtor with the liquidity necessary to preserve its going concern value through the

pendency of this case is in the best interests of all stakeholders.

Third, the terms of the DIP Financing are reasonable and adequate to support the Debtor's

necessary activities through the pendency of this case. The interest rates and fees under the DIP

Financing are market rates in comparison to the interest rates and fees in other recent cases.

Fourth, as described in greater detail above and in the Peichel Declaration, Debtor and the

DIP Lender negotiated the DIP Loan Documents in good faith and at arms' length, and Debtor's

entry into the DIP Loan Documents is an exercise of its sound business judgment. The DIP

Financing is on the most favorable terms available to Debtor under current market conditions and

the Debtor's financial condition. In light of all these factors, Debtor should be authorized to secure

the DIP Financing with first priority senior priming liens.

**D.      The Interests of the Prepetition Secured Parties are Adequately Protected**

The DIP Financing adequately protects the interests of the Prepetition Secured Parties and

Disputed Prepetition Secured Claims. Furthermore, Henkel has agreed to subordinate its liens and

interests to the DIP Financing. The interests of the Prepetition Secured Parties are protected by (i)

adequate protection liens in the amount equal to the aggregate diminution in value of the interests

in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, a valid
replacement security interest in and lien on all prepetition and post-petition property and assets of
Debtor and its estate, including the DIP Collateral and all proceeds thereof, subordinate only to
the DIP Liens (as defined in the Interim DIP Order), (ii) payments as set forth in the Proposed
Budget (to the extent applicable), and (iii) access to all information provided to DIP Lender. The
interests of Disputed Prepetition Secured Claims are protected by (i) adequate protection liens in
Debtors' postpetition assets of the same character, value, validity and dignity as existed prior to
the Petition Date.

A debtor may obtain post-petition credit "secured by a senior or equal lien on property of
the estate that is subject to a lien only if" the debtor, among other things, provides "adequate
protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B). What constitutes
adequate protection is decided on a case-by-case basis, and adequate protection may be provided
in various forms, including payment of adequate protection fees, payment of interest or granting
of replacement liens or administrative claims. *See, e.g., In re Martin*, 761 F.2d 472, 474 (8th Cir.
1985) ("[S]uch matters 'are [to be] left to case-by-case interpretation and development.'") quoting
H.R. Rep. No. 595, 95th Cong., 2d Sess. 339, reprinted in 1978 U.S. Code Cong. & Ad. News
5963, 6295); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of
adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty
Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736
(Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case,
but its focus is protection of the secured creditor from diminution in the value of its collateral
during the reorganization process") (citation omitted).

The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession. *See Martin*, 761 F.2d at 474; *In re Johnson*, 90 B.R. 973, 978 (Bankr. D. Minn. 1988) (holding that secured creditor is not impaired and is not entitled to receive adequate protection payments where value of collateral does not decline); *495 Cent. Park*, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization."); *In re Beker Indus. Corp.*, 58 B.R. at 736; *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

Further, courts in this district and others have approved similar forms of adequate protection for prepetition secured creditors. *See, e.g., In re Duke and King Acquisition Corp.*, No. 10-38652 (GFK) (Bankr. D. Minn. Jan. 24, 2011) [ECF No. 138] (authorizing replacement liens to prepetition secured creditors for the use of cash collateral); *In re Otter Tail AG Enters., LLC*, 2009 Bankr. LEXIS 5352, at *10-11 (Bankr. D. Minn. Nov. 20, 2009) (granting, *inter alia*, adequate protection liens for the use of cash collateral); *In re Schwing America, Inc.*, No. 09-36760 (NCD) (Bankr. D. Minn. Oct. 2, 2009) [ECF No. 15] (granting replacement liens in connection with authorizing postpetition financing on an interim basis); *In re Polaroid Corp.*, No. 08-46617 (GFK) (Bankr. D. Minn. Jan. 27, 2009) [ECF No. 70] (authorizing replacement liens to prepetition secured creditors for the use of cash collateral); *In re Premium Protein Prods., LLC*, 2009 Bankr. LEXIS 5285, at *26-27 (Bankr. D. Neb. Nov. 18, 2009) (granting adequate protection liens and superpriority claims pursuant to 507(b) to prepetition lenders); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (KRH) Bankr. E.D. Va. Dec. 12, 2012) (granting, inter alia, first and second lien adequate protection liens); *In re Patriot Coal Corp.*, No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012) [ECF No. 275] (granting, inter alia, DIP liens, adequate protection liens and

superpriority claims to secure DIP obligations); *In re NewPage Corp.*, No. 11-12804 (KG) (Bankr.

D. Del. Oct. 5, 2011).

Accordingly, the Court should find that the adequate protection provided to the Prepetition

Secured Parties and Disputed Prepetition Secured Claims is fair and reasonable, and satisfies the

requirements of section 364(d)(1)(B) of the Bankruptcy Code.

## III.    DEBTOR SHOULD BE AUTHORIZED TO USE THE CASH COLLATERAL

Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash

collateral. Specifically, that provision provides, in pertinent part, that: "The trustee may not use,

sell, or lease cash collateral . . . unless—

> (A)    each entity that has an interest in such cash collateral
> consents; or
> (B)    the court, after notice and a hearing, authorizes such use,
> sale, or lease in accordance with the provisions of [section 363].

11 U.S.C. § 363(c)(2). Further, section 363(e) provides that "on request of an entity that has an

interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without

a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate

protection of such interest." 11 U.S.C. § 363(e).

Debtor satisfied the requirements of sections 363(c)(2) and (e), and should be authorized

to use the Cash Collateral. First, as explained above, the DIP Lender has consented to the use of

Cash Collateral on the terms set forth in the DIP Orders. Second, as described above, Debtor is

providing the Prepetition Secured Parties with (i) adequate protection liens in the amount equal to

the aggregate diminution in value of the interests in the Prepetition Collateral (including Cash

Collateral) from and after the Petition Date, a valid replacement security interest in and lien on all

prepetition and postpetition property and assets of Debtor and its estate, including the DIP

Collateral and all proceed thereof, subordinate only to the DIP Liens (as defined in the Interim DIP

Order), (ii) payments as set forth in the Proposed Budget (to the extent applicable), and (iii) access to all information provided to DIP Lender. Finally, Debtor is providing the Disputed Prepetition Secured Claims with (i) adequate protection liens in Debtors' postpetition assets of the same character, value, validity and dignity as existed prior to the Petition Date.

## IV.    DEBTOR SHOULD BE AUTHORIZED TO PAY THE FEES IN CONNECTION WITH THE DIP FINANCING

Debtor has agreed, subject to Court approval, to pay certain fees to the DIP Lender in connection with the DIP financing. Specifically, Debtor will pay a $375,000 Issuance Fee, 1% on the undrawn portion of the Line of Credit Commitment, 2.5% of the facility amount as a Funding Fee, 1.0% as a Commitment Fee, and the greater of (a) 2% of the total amount funded by the DIP Lender or (b)(i) 1.4x the amount of DIP Lender's invested capital or (ii) 1.6x of the amount of DIP Lender's invested capital in the event that the Bankruptcy Court has not approved the Bidding Procedures Order including a Stalking Horse Bid within thirty (30) days of the funding of the Initial Draw.  In addition, the Debtor will pay all reasonable and documented costs and expenses of DIP Lender in connection with the preparation, negotiation, execution, and/or administration of the Loan Documents. The Fees are in line with market rates and other DIP facilities approved in recent retail cases.  The fees Debtor has agreed to pay to the DIP Lender and other obligations under the DIP Credit Agreement represent the most favorable terms on which the DIP Lender would agree to make the DIP Financing available. The fees are also lower than what had been offered by other potential lenders in connection with the Debtor's efforts to locate such financing prepetition. Debtor considered the fees when determining in its sound business judgment that the DIP Loan Documents constituted the best terms on which Debtor could obtain the postpetition financing necessary to continue its operations and prosecute this case, and paying these fees in

order to obtain the DIP Financing is in the best interests of the Debtor's estate, creditors and other

parties in interest.

## VI.    THE DIP LENDER AND PREPETITION SECURED PARTIES SHOULD BE DEEMED TO HAVE ACTED IN GOOD FAITH UNDER SECTION 364(e)

Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on

loans extended to a debtor, and its right in any lien securing those loans, even if the authority of

the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section

364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

As explained in detail herein and in the Peichel Declaration, the DIP Loan Documents and

proposed DIP Orders are the result of Debtor's reasonable and informed determination that the

DIP Lender offered the most favorable terms on which to obtain needed postpetition financing,

and of arm's-length, good faith negotiations between Debtor, the DIP Lender, and the Prepetition

Secured Parties. The terms and conditions of the DIP Loan Documents are fair and reasonable, the

adequate protection provided to the Prepetition Secured Parties is fair and reasonable, and the

proceeds of the DIP Financing will be used only for purposes that are permissible under the

Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Loan

Documents other than as described herein. Accordingly, the Court should find that the DIP Lender

and Prepetition Secured Parties are "good faith" lenders within the meaning of section 364(e) of

the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## VII.    MODIFICATION OF THE AUTOMATIC STAY IS WARRANTED

The DIP Loan Documents contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Credit Agreement, and to take various other actions without further order of or application to the Court, subject to a required notice period. Specifically, the proposed interim order provides that the DIP Lender must provide five days' notice to Debtor's counsel, counsel to the Committee, and the U.S. Trustee before the DIP Lender may exercise any default-related rights and remedies against the DIP Collateral and that during the five day notice period any party in interest may file a pleading in opposition to the DIP Lender's exercise of rights and remedies and seek an extension of the automatic stay.

Stay modification provisions of this sort are ordinary features of DIP financing and, in the Debtors' business judgment, are reasonable under the circumstances. *See, e.g., In re Premium Protein Prods., LLC*, 2009 Bankr. LEXIS 5285, at *31-32 (Bankr. D. Neb. Nov. 18, 2009); *In re Trilogy Dev. Co*., 2009 Bankr. LEXIS 5178, at *19 (Bankr. W.D. Mo. July 14, 2009); *In re AMF Bowling Worldwide, Inc*., No. 12-36495 (KRH) (Banbkr. E.D. Va. Dec. 18, 2012); *In re Patriot Coal Corp*., No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012); *In re Eastman Kodak Co*., No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 16, 2012); *In re Roomstore, Inc*., No. 11-37790 (KLP) (Bankr. E.D. Va. Jan. 5, 2012); *In re The Great Atl. & Pac Tea Co*., No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011); *In re Canal Corp. f/k/a Chesapeake Corp*., No. 08-36642 (DOT) (Bankr. E.D. Va. Feb. 3, 2009); *In re Circuit City Stores, Inc*., No. 08-35653 (KRH) (Bankr. E.D. Va. Dec. 23, 2008).

## VIII. DEBTOR REQUIRES IMMEDIATE ACCESS TO THE DIP FINANCING

The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

Debtor and its estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing Debtor to borrow up to $7.5 million under the DIP Financing, is not granted promptly after the Petition Date. Further, Debtor anticipates that the commencement of this case will significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of administering this case and addressing key constituents' concerns regarding Debtor's financial health and ability to continue operations in light of this cases. Accordingly, Debtor has an immediate need for access to liquidity to, among other things, continue the operation of its businesses, satisfy its PASA trust fund obligations, maintain its relationships with customers, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers and otherwise satisfy working capital and operational needs, all of which is required to preserve and maintain Debtor's enterprise value for the benefit of all parties in interest.

The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district and others in similar circumstances. *See, e.g, In re Genmar Holdings, Inc.,* No. 09-43537 (Bankr. D. Minn. June 4, 2009) [ECF No. 23] (approving DIP loan with granting of senior lien); *In re US Fidelis, Inc.*, 2010 Bankr. LEXIS 5837, at *10 (Bankr. E.D. Mo. May 28, 2010) (authorizing secured

postpeititon financing on a superpriority basis); *In re Premium Protein Prods., LLC*, 2009 Bankr. LEXIS 5285, at *6-9 (Bankr. D. Neb. Nov. 18, 2009) (authorizing debtor to incur postpetition secured indebtedness on an interim basis); *In re Trilogy Dev. Co.*, 2009 Bankr. LEXIS 5178, at *7 (Bankr. W.d. Mo. July 14, 2009) (authorizing postpetition secured financing with superpriority DIP liens priming prepetition secured construction loan); *In re Va. United Methodist Homes of Williamsburg, Inc.*, No. 13-31098 (KRH) (Bankr. E.D. Va. Mar. 6, 2013) (approving postpetition financing on an interim basis); *In re AMF Bowling Worldwide, Inc*, No. 12-36495 (KRH) (Bankr.E.D. Va. Nov.. 14, 2012); *In re Patriot Coal Corp.,* No. 12-12900 (ALG) (Bankr. S.D.N.Y. July 12, 2012); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 20, 2012); *In re Roomstore, Inc.*, No. 11-37790 (KLP) (Bankr. E.D. Va. Dec. 14, 2011); *In re Bear Island Paper Co., L.L.C.*, No. 10-31202 (DOT) (Bankr. E.D. Va. Feb. 26, 2010); *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009). Likewise, for the reasons set forth above, prompt entry of the Interim Order authorizing the DIP Financing and the Order authorizing use of cash collateral is necessary to avert immediate and irreparable harm to Debtor's estate and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

## CONCLUSION

For the foregoing reasons, Debtor respectfully requests that the Court grant the relief requested in this Motion.

Dated: September 20, 2024        **TAFT STETTINIUS & HOLLISTER LLP**

By: _/s/ James M. Jorissen_
     James M. Jorissen, #262833
     Adam G. Chandler, #397408
     Schaan P. Barth, #397898
     2200 IDS Center
     80 South Eighth Street
     Minneapolis, MN 55402
     Telephone: 612-977-8400
     Facsimile: 612-977-8650
     jorissen@taftlaw.com
     achandler@taftlaw.com
     sbarth@taftlaw.com

**PROPOSED COUNSEL FOR THE DEBTOR**

134977411v8